UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| ——————————————— x | | |
| ROBERT LUCAS, Individually and on Behalf of All Others Similarly Situated, | : : | Civil Action No. 1:20-cv-04740 |
| | : | |
| Plaintiff, | : : | CLASS ACTION |
| | : | |
| vs. | : : | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| | : | |
| UNITED STATES OIL FUND, LP, UNITED STATES COMMODITY FUNDS LLC, JOHN P. LOVE and STUART P. CRUMBAUGH, | : : : : | |
| | : | |
| Defendants. | : : | |
| ——————————————— x | | DEMAND FOR JURY TRIAL |

Plaintiff Robert Lucas ("plaintiff"), individually and on behalf of all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings of the United States Oil Fund, LP ("USO" or the "Fund") and analyst reports, media reports, releases and other publicly disclosed reports and information about USO.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a securities class action on behalf of all persons who purchased USO securities during the period from March 19, 2020 to April 28, 2020, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "1934 Act").

2.     USO is an exchange traded fund ("ETF") purportedly designed to track the daily changes in percentage terms of the spot price of West Texas Intermediate ("WTI") light, sweet crude oil delivered to Cushing, Oklahoma.  Because retail investors are generally not equipped to buy and sell barrels of oil or authorized to trade oil futures, ETFs such as USO provide one of the primary means that such investors can gain exposure to fluctuations in oil prices.

3.     USO stated that it would achieve its investment objective by investing substantially all of its portfolio assets in the near month WTI futures contract.  However, unbeknownst to investors, extraordinary market conditions in early 2020 made USO's purported investment objective and strategy unfeasible.  Oil demand fell precipitously as governments imposed lockdowns and businesses halted operations in response to the coronavirus pandemic.

- 1 -

In addition, in early March 2020, Saudi Arabia and Russia launched an oil price war, increasing production and slashing export prices in a bid to increase the global market share of their domestic petrochemical enterprises.  As excess oil supply increased and oil prices waned, the facilities available for storage in Cushing, Oklahoma approached capacity, ultimately causing a rare market dynamic known as "super contango" in which the futures prices for oil substantially exceeded the spot price.  At the same time, retail investors began pouring hundreds of millions of dollars into USO in an attempt to "buy the dip," believing (correctly) that the price of oil would rebound as economies exited lockdown periods and the Russia/Saudi oil price war ended. Because of the nature of USO's investment strategy, these converging factors caused the Fund to suffer exceptional losses and undermined the Fund's ability to meet its ostensible investment objective.

4.      Defendants, as the creators, issuers and operators of the largest oil-related ETF in existence and active market-making players in the complex commodities and futures markets that determined the Fund's performance, possessed inside knowledge about the negative consequences to the Fund as a result of these converging adverse events.  However, rather than disclose the known impacts and risks to the Fund as a result of these exceptional threats, defendants instead conducted a massive offering of USO shares, ultimately selling billions of dollars' worth of USO shares to the market.  Although the offering increased the fees payable to defendants, it also exacerbated the undisclosed risks to the Fund by magnifying trading inefficiencies and causing USO to approach position and accountability limits as a result of the Fund's massive positions in the WTI futures market.

5.      In the days that followed, USO quickly deteriorated.   Ultimately, the Fund suffered billions of dollars in losses and was forced to abandon its investment strategy.  Through

a series of rapid-fire investment overhauls, USO was forced to transform from the passive ETF designed to track spot oil prices that defendants had pitched to investors to an almost unrecognizable actively managed fund struggling to avoid a total implosion.  In April and May 2020, defendants belatedly acknowledged the extreme threats and adverse impacts that the Fund had been experiencing at the time of the March offering, but which they had failed to disclose to investors.

6.     As a result of defendants' material misrepresentations and omissions during the Class Period, plaintiff and members of the Class (defined below) suffered billions of dollars in losses.  This lawsuit seeks recompense for those losses.

## JURISDICTION AND VENUE

7.     The claims alleged herein arise under §§10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC.

8.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the 1934 Act.

9.     Venue is proper in this District pursuant §27 of the 1934 Act and 28 U.S.C. §1391(b).  USO shares trade and were distributed in this District and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

10.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE Arca, Inc. ("NYSE"), a national securities exchange.

## PARTIES

11.     Plaintiff Robert Lucas purchased USO securities during the Class Period as set forth in the accompanying certification incorporated herein by reference and has been damaged thereby.

12.     Defendant United States Oil Fund, LP is a commodity pool operator that provides investment exposure to oil markets.  The Fund's shares trade on the NYSE under the symbol "USO."

13.     Defendant United States Commodity Funds LLC (the "Sponsor" or "USCF") is the sponsor and general and managing partner for the Fund.

14.     Defendant John P. Love is the President, Chief Executive Officer and a Principal of the Sponsor.

15.     Defendant Stuart P. Crumbaugh is the Chief Financial Officer and a Principal of the Sponsor.

16.     The defendants identified in ¶¶14-15 are referred to herein as the "Individual Defendants."  The Individual Defendants made, or caused to be made, false statements that artificially inflated the prices of USO securities during the Class Period.  The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of USO's quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  They were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being

- 4 -

concealed from the public and that the positive representations being made were then materially false and misleading.  The Individual Defendants are liable for the false and misleading statements pleaded herein.

17.     Defendants are liable for: (i) making false and misleading statements; and (ii) failing to disclose adverse facts known to them about USO.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of USO securities was a success, as it: (i) deceived the investing public regarding USO's business, prospects and risks; (ii) artificially inflated the prices of USO securities; and (iii) caused plaintiff and other members of the Class to purchase USO securities at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### Background to the Fund

18.     USO is a commodity pool and ETF designed to allow investors to gain exposure to fluctuations in the price of oil.  Because most retail investors are not equipped to buy and sell barrels of oil or authorized to trade oil futures contracts, they utilize ETFs such as USO to make investments based on the price of oil and to gain investment exposure to fluctuations in spot oil prices.

19.     The Fund's investment objective is for the daily changes in percentage terms of its per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of WTI light, sweet crude oil delivered to Cushing, Oklahoma.  The Fund measures changes in the spot price of oil by reference to the daily changes in the price of specified short-term oil futures contracts – called the "Benchmark Oil Futures Contract" – plus interest earned on USO's collateral holdings, less USO's expenses.

20.     The Fund's Benchmark Oil Futures Contract refers to the futures contract on light, sweet crude oil as traded on the New York Mercantile Exchange (the "NYMEX") that is

the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it refers to the futures contract that is the next month contract to expire. The Fund's investment objective is to achieve a daily percentage change in its NAV over any 30-day period within plus or minus 10% of the daily percentage change in the price of the Benchmark Oil Futures Contract over the same period.  In order to achieve its investment objective, USO has historically invested substantially all of its assets in current or front-month WTI futures contracts in order to closely track the Benchmark Oil Futures Contract.

21.     A futures contract is a legal agreement to buy or sell a particular commodity at a predetermined price at a specified time in the future.  The buyer of a futures contract takes on the obligation to buy and receive the underlying asset when the futures contract expires, while the seller of a futures contract takes on the obligation to deliver the underlying asset at expiration. Futures contracts can be used to hedge other investments, to protect against fluctuations in the price of a commodity, or as a speculative investment.

22.     Many investors, including USO, trade futures contracts without any expectation of ever taking or delivering the underlying asset.  Instead, these investors close out their positions prior to contract expiry.  In the case of USO, the Fund rolled over its futures contract positions every month by selling its current WTI futures contracts holdings and then using the proceeds to buy the next month's WTI futures contracts.  When the near month WTI futures contract was within two weeks of expiry, USO transitioned its positions to the next month futures contracts over a four-day period, a sequence it repeated every month.

23.     The Fund's efforts to roll its portfolio over every month to the next month futures contract subjected the Fund to market forces known as "backwardation" and "contango."  In the event of a crude oil futures market where near month contracts trade at a higher price than next

month to expire contracts, a situation described as "backwardation," then the value of the contract would tend to rise as it approaches expiration. Conversely, in the event of a crude oil futures market where near month contracts trade at a lower price than next month contracts, a situation described as "contango," then the value of the benchmark contract would tend to decline as it approaches expiration.

24.     The Fund publishes its NAV per share daily on its website, http://www.uscfinvestments.com/uso.  As an ETF, the market price for USO shares can reflect either a premium or a discount to the Fund's NAV.  However, because market makers, known as "authorized participants," can buy new shares or redeem outstanding shares from the Fund, arbitrage opportunities generally cause daily changes in USO's share price on the NYSE to closely track daily changes in USO's NAV.

### DEFENDANTS' FRAUDULENT SCHEME AND COURSE OF BUSINESS

25.     Demand for oil suffered a precipitous decline in early 2020 due to the global coronavirus pandemic.  National, state and local governments imposed mandatory lockdowns to mitigate the spread of the disease.  Businesses closed and consumer spending plummeted.

26.     Adding to pricing pressures, on March 8, 2020, the Kingdom of Saudi Arabia unexpectedly announced price discounts for its oil exports of $6 to $8 per barrel to its customers in Europe, Asia and the United States.  The next day, the price of WTI fell 25%, its biggest single-day decline in decades.  In the days that followed, Saudi Arabia and Russia announced significant increases in oil production, further depressing crude oil prices.  By March 18, 2020, WTI fell below $21 per barrel, an 18-year low and less than half the price of just two weeks previously.

27.     Around this same time, retail investors began pouring hundreds of millions of dollars into USO in order to "buy the dip" in oil prices, expecting (correctly) that the price of oil would rise as the market effects of the coronavirus pandemic and the Russia/Saudi oil price war waned. However, unbeknownst to investors – but well known to defendants – the recent market volatility and massive influx of investor capital had created adverse trends and extreme risks set to implode USO's value and which threatened the Fund's very existence.  As the Fund ballooned in size, issuing over ***$2.4 billion*** worth of new shares in the month of March alone, USO also encountered position limits that impaired its ability to achieve its investment objective and liquidity constraints that amplified Fund losses.

28.     In addition, the WTI near future contracts that formed almost the entirety of USO's portfolio entered a period of "super contango," a rare event that occurs when the spot price trades substantially below the futures price.  This dynamic was exacerbated because the inventory space available to store WTI barrels in Cushing, Oklahoma was quickly filling up due to excess supply, significantly increasing the costs to store delivered oil barrels.  By March 23, 2020, the contango between near month and next month WTI futures contracts reached $2.12, an increase of ***more than 1,500%*** as compared to the contango that existed at the beginning of March.  As the near month WTI futures contracts held by USO approached expiry and converged on the spot price, the Fund suffered devastating losses and was set to suffer even greater losses when it rolled forward into significantly more expensive next month contracts in mid-April 2020.

29.     Defendants, as the creators, issuers and operators of the largest oil-related ETF in existence and active market-making players in the complex commodities and futures markets that determined the Fund's performance, possessed unique insider knowledge about the negative consequences to the Fund as a result of these converging adverse events.  However, rather than

disclose the known impacts and risks to the Fund as a result of these exceptional threats, defendants decided to conduct a massive offering of USO shares to public investors (the "Offering"). Despite the fact that the risk profile for the Fund had profoundly changed, solicitation materials for the Offering substantially mirrored the Fund's prior disclosures. Indeed, unbeknownst to investors, the Offering itself materially increased the risks to the Fund because it heightened liquidity constraints in the WTI futures market and pushed the Fund towards position limits as the Sponsor piled hundreds of millions of dollars from Offering proceeds into the Fund's purported investment strategy.

30.    On March 19, 2020, USO filed with the SEC a registration statement on Form S-3 to register USO shares for the Offering, which, after amendment, was declared effective March 23, 2020 (the "Registration Statement"). The Individual Defendants signed the Registration Statement on behalf of themselves, USO and the Sponsor. Defendants would ultimately sell all of the shares registered under the Registration Statement.

31.    The Offering allowed defendants to raise hundreds of millions of dollars from outside investors. In March 2020, the Fund sold over $2.4 billion worth of USO shares to investors. Similarly, in April 2020, the Fund sold about $3.9 billion worth of USO shares. This compares to only $3.2 billion worth of USO shares sold during the *entirety* of 2019.

32.    The sharp increase in share issuances as a result of the Offering also increased the management fees paid to the Sponsor and, ultimately, the Individual Defendants as principals of the Sponsor. USO was contractually obligated to pay the Sponsor a management fee based on the Fund's average daily net assets, paid monthly at 0.45% per annum. Proceeds raised from share issuances increase the Fund's NAV and, just as importantly, offset Fund losses from operating and investment activities that would otherwise decrease the Fund's NAV and,

consequently, the management fees paid by the Fund.  Despite the fact that the Fund suffered over $3.8 billion in total net losses in March and April 2020 combined (compared to $485 million in net income for USO's fiscal 2019), average monthly management fees paid by USO increased 74% over the average monthly amount paid by the Fund in 2019.

33.     Soon after the Offering launched, the Fund began to suffer extraordinary losses and operational malfunctions. By March 31, 2020, the contango between near and next month WTI futures contracts increased to over $4, nearly doubling in just one week.  Two weeks later, the contango between near and next month WTI futures contracts increased to over $7.

34.     On April 16, 2020, USO announced a significant change to its investment strategy.  Citing "market conditions and regulatory requirements," USO stated that it would now only invest 80% of its portfolio in current month WTI futures contracts (as opposed to the previous 100% allocation) and the remaining 20% in second month WTI futures contracts.  As a result, USO stated that it "may not be able to meet its investment objective."

35.     On April 20, 2020 – the day before the May 2020 WTI contracts expired – the May 2020 WTI contracts closed at a negative price as investors became concerned that the cost to store the barrels of oil being delivered to Cushing, Oklahoma would be more than the oil was worth.

36.     That same day, USO announced that it was running out of registered shares that it could sell to the market.  As a result, the Fund stated that it may be forced to suspend its creation of new shares, which could increase the spread between bid and ask prices offered by brokers and cause the market price of USO shares to significantly diverge from its NAV per share.

37.     Also on April 20, 2020, USO filed with the SEC a registration statement on Form S-3 for the sale of additional USO shares to the market (the "April Registration Statement").

The SEC, however, refused to declare the registration effective out of concern for the impact to investors, preventing defendants from flooding the market with even more USO shares.

38.     The April Registration Statement made numerous revelations about how recent market dynamics had adversely impacted the Fund.   For example, the April Registration Statement contained an entirely new section regarding "COVID-19 Risk" and the severe impacts of the pandemic on the Fund's performance, which had been conspicuously absent from the Registration Statement.   It stated in pertinent part:

*COVID-19 Risk.*

An outbreak of infectious respiratory illness caused by a novel coronavirus known as COVID-19 was first detected in China in December 2019 and has now been detected globally. In March 2020, the World Health Organization declared the COVID-19 outbreak a pandemic. COVID-19 has resulted in numerous deaths, travel restrictions, closed international borders, enhanced health screenings at ports of entry and elsewhere, disruption of and delays in healthcare service preparation and delivery, prolonged quarantines and the imposition of both local and more widespread "work from home" measures, cancellations, supply chain disruptions, and lower consumer demand, as well as general concern and uncertainty. ***The ongoing spread of COVID-19 has had, and is expected to continue to have, a material adverse impact on local economies in the affected jurisdictions and also on the global economy, as cross border commercial activity and market sentiment are increasingly impacted by the outbreak and government and other measures seeking to contain its spread. The impact of COVID-19, and other infectious illness outbreaks that may arise in the future, could adversely affect individual issuers and capital markets in ways that cannot necessarily be foreseen. In addition, actions taken by government and quasi-governmental authorities and regulators throughout the world in response to the COVID-19 outbreak, including significant fiscal and monetary policy changes, may affect the value, volatility, pricing and liquidity of some investments or other assets, including those held by or invested in by USO. Public health crises caused by the COVID-19 outbreak may exacerbate other pre-existing political, social and economic risks in certain countries or globally. The duration of the COVID-19 outbreak and its ultimate impact on USO and, [sic] on the global economy, cannot be determined with certainty. The COVID-19 pandemic and its effects may last for an extended period of time, and could result in significant and continued market volatility, exchange trading suspensions and closures, declines in global financial markets, higher default rates, and a substantial economic downturn or recession. The foregoing could impair the USO's ability to maintain operational standards (such as with respect to satisfying redemption requests), disrupt the operations of USO's***

*service providers, adversely affect the value and liquidity of USO's investments, and negatively impact the USO's performance and your investment in USO. The extent to which COVID-19 will affect USO and USO's service providers and portfolio investments will depend on future developments, which are highly uncertain and cannot be predicted, including new information that may emerge concerning the severity of COVID-19 and the actions taken to contain COVID-19. Given the significant economic and financial market disruptions associated with the COVID-19 pandemic, the valuation and performance of the USO's investments could be impacted adversely*.[1]

39.    The April Registration Statement also revealed that the Fund had suffered the "[w]orst [m]onthly [d]rawdown" in its history in March 2020, losing 55% in a single month.  It acknowledged that the Fund would be unable to achieve ***any*** significant interest income for all of 2020 due to losses suffered since the start of the year.  It stated that, "[g]iven market volatility in 2020 arising from the COVID-19 pandemic and other geopolitical issues, USO believes it is reasonable to assume that ***it will not earn any significant interest income in 2020***."

40.    On April 21, 2020, USO announced that it had been unable to invest according to the new investment strategy announced on April 16, 2020.  Instead, the Fund had invested 40% of its portfolio in the first month WTI futures contract, 55% in the second month WTI futures contract, and 5% in the third month WTI futures contract.

41.    Also on April 21, 2020, USO announced that the April Registration Statement had not been declared effective by the SEC and that, as a result, the Fund had issued all of its remaining registered shares.

42.    On April 22, 2020, USO announced that the Fund would undergo a 1-for-8 reverse split of shares after market close on April 28, 2020.

43.    That same day, USO announced that it had once again changed its investment strategy as a result of "extraordinary market conditions in the crude oil markets, including 'super

---

[1]    Emphasis has been added unless otherwise noted.

contango.'"   As a result, it stated that it would be investing only approximately 20% of its portfolio in the first month WTI futures contract, while investing 50% in the second month WTI futures contract, 20% in third month WTI futures contract, and 10% in the fourth month WTI futures contract.

44.     Two days later, on April 24, 2020, USO stated that it was yet again altering its investment strategy.  While it would still be investing approximately 20% of its portfolio in the first month WTI futures contract, USO claimed it would now invest 40% in the second month WTI futures contract, 20% in third month WTI futures contract, and 20% in the fourth month WTI futures contract.

45.     Three days after that, on April 27, 2020, USO stated that it was once again revising its investment strategy.  As a result, it would invest approximately 30% in the second month WTI futures contract, 15% in the third month WTI futures contract, 15% in the fourth month WTI futures contract, 15% in the fifth month WTI futures contract, 15% in the sixth month WTI futures contract, and 10% in the June 2021 WTI futures contract.

46.     As a result of these sudden and dramatic changes, the Fund's investment strategy was fundamentally different from the strategy represented to investors in the Registration Statement.  Indeed, as had become apparent, the passive strategy of investing Fund assets in current month WTI futures contracts was not feasible during the Class Period because of the undisclosed adverse trends that the Fund was then experiencing, as detailed herein.

47.     On April 27, 2020, USO filed with the SEC an amendment to the April Registration Statement on Form S-3/A, which included additional disclosures regarding the convergence of adverse factors impacting the Fund and its performance (the "April Amendment").  For example, the April Amendment stated that the Fund was suffering from the

impacts of "super contango."  It also revealed that the Fund's performance and ability to execute

its strategy had been impacted not only by COVID-19, but also the Russia/Saudi oil price war,

the sale of an enormous amount of USO shares in a short period of time (an effect compounded

by the Offering), and regulatory and marketplace limits placed on the Fund.  It stated in pertinent

part:

> In 2020, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, significant market volatility occurred and is continuing in the crude oil markets as well as the oil futures markets. *As a result of market and regulatory conditions, including significant market volatility, large numbers of USO shares purchased during a short period of time, regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO announced its intent to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract and that it could, if it determined it appropriate in light of market conditions and regulatory requirements, invest in Other Oil-Related Interests. Investments intended to meet USO's investment objective, other than investments in the Benchmark Futures Contract, may impact the performance of USO and can make it difficult for USO to track the Benchmark Futures Contract or meet its investment objective*.
>
> *Certain circumstances, including the need to comply with regulatory requirements (including, but not limited to, exchange accountability and position limits) and market conditions (including but not limited to those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing) as well as risk mitigation measures imposed . . . by USO's futures commission merchant that further limit USO and other market participants from investing in crude oil futures contracts in certain months, could and have caused USO to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract. Currently, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, significant market volatility occurred in the oil futures markets. In addition, the exchange where the Benchmark Oil Futures Contract is traded became concerned about positions that USO had acquired in that contract and imposed limits on USO's holding of that contract, as well as subsequent months of that contract*.

48.     The April Amendment also acknowledged that the Fund risked substantially

diverging from its benchmark and failing to meeting its investment objective because of market

- 14 -

conditions and its inability to sufficiently invest in the Benchmark Futures Contracts.   It

continued in pertinent part:

> In 2020, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, significant market volatility occurred and is continuing in the crude oil markets as well as the oil futures markets. ***As a result of market and regulatory conditions, including significant market volatility, large numbers of USO shares purchased during a short period of time, and applicable regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO invested in Oil Futures Contracts in months other than the Benchmark Oil Futures Contracts. The foregoing impacted the performance of USO and made it difficult for USO to track the Benchmark Futures Contract or meet its investment objective, which is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses***.

> ***USO intends to attempt to continue tracking the Benchmark Futures Contract as closely as possible, however, in the current market and regulatory environment, significant tracking deviations can be anticipated to occur above and beyond the differences that historically occurred when the primary investment was the Benchmark Futures Contract and light sweet crude oil futures contracts of the same month traded on ICE Futures***. ***In addition, the types of permitted investments that USO invests in as a result of regulatory requirements and limits imposed by its futures commission merchants in trying to approximate its investment objective such as later months in the Oil Futures Contracts than the tenor of the Benchmark Futures Contract are likely, and will likely continue, to experience greater effects from contango. While it is USO's expectation that at some point in the future it will return to investing in the Benchmark Futures Contract and related ICE Futures contracts or other similar futures contracts of the same tenor based on light, sweet crude oil, there can be no guarantee of when, if ever, that will occur. As a result, investors in USO should expect that there will be continued deviations between the performance of USO's investments and the Benchmark Futures Contract and that USO may not be able to track the Benchmark Futures Contract or meet its investment objective***.

49.    On April 28, 2020, USO filed with the SEC the Fund's monthly account

statement for March 2020 on Form 8-K.  The statement revealed that USO had suffered nearly

***$1.2 billion*** in total losses for the month.  However, because the Fund also issued over $2.4

billion worth of new USO shares, the Fund's total NAV actually increased during the month.

April 28, 2020 was also the last day before the Fund's reverse split.  That day, the price of USO

closed at $2.13 per share, down ***over 60%*** since the start of the Class Period, despite the injection

of billions of dollars in outside investor capital into the Fund as a result of new share issuances.

50.     On April 30, 2020, USO filed a notice with the SEC on Form 8-K disclosing that

the Fund was once again changing its investment strategy and would likely continue to make

such changes going forward.  Because of the frequent and dramatic changes to its investment

strategy, the Fund stated that it would provide future updates on its investments on the Fund's

website pursuant to a complex waterfall formula, effectively giving the Sponsor carte blanche to

invest in any oil-related investments that it saw fit and destroying any pretense that the Fund was

following the investment objective represented to investors in the Registration Statement.  In a

span of only a few weeks, the USO had radically changed from a passive investment vehicle

used to track the spot price of oil through current WTI futures contracts to what was effectively

an actively managed fund frantically struggling to avoid a total implosion through a hodgepodge

of oil-related investments.  In addition, the notice stated that USO had suffered "significant

deviations" from its claimed investment objective as a result of its inability to invest in the near

month WTI futures market.

51.     On May 6, 2020, USO filed with the SEC another amendment on Form S-3/A to

the April Registration Statement (the "May Amendment").  The May Amendment made clear

that the extraordinary market conditions that had destroyed the ability of the Fund to follow its

investment objective and caused investors to suffer billions of dollars in losses had materially

impacted the Fund by March 2020 – *i.e.*, ***before*** the Offering – despite the fact that these specific

impacts and threats to the Fund's performance were omitted from the Registration Statement.

The robust and specific risk disclosures provided in the May Amendment stood in stark contrast

to the lack of such disclosures in the Registration Statement, notwithstanding the fact that these disclosures were required to be made in the Registration Statement in order to make the statements provided therein not misleading and to comply with SEC regulations.  For example, the May Amendment stated in pertinent part:

> As a result of previously discussed market conditions and the regulatory response that occurred *in March* and April of 2020, large numbers of USO shares that were purchased during a short period of time, and regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO invested in Oil Futures Contracts in months other than the Benchmark Oil Futures Contracts. The foregoing impacted the performance of USO and made it difficult for USO to meet its investment objective, which is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses.
>
> *        *        *
>
> **In March 2020**, contango dramatically increased and reached historic levels during the economic crisis arising from the COVID-19 pandemic and disputes among oil producing nations regarding limits on oil production levels. This contango was due to significant market volatility that has occurred and is continuing in the crude oil markets as well as the oil futures markets. Crude oil prices have collapsed in the wake of the COVID-19 demand shock, which reduced global petroleum consumption, and the price war launched by Saudi Arabia **at the beginning of March 2020** in response to Russia's unwillingness to participate in extending previously agreed upon supply cuts. An estimated twenty million barrels a day of crude demand evaporated as a result of quarantines and massive drops in industrial and manufacturing activity. In addition, the United States, OPEC, Russia, and other oil producers around the world agreed to a historic 9.7 million barrel per day cut to crude supply. In the short term, this cut does not close the gap relative to the massive drop in demand.  However, the duration of the agreement, lasting until 2022, should allow oil prices to slowly recover as demand re-materializes. The supply cut should also reduce at least some of the unprecedented volatility oil markets experienced **in March**. As the crisis continues into the second quarter of 2020, and potentially beyond, demand weakness and limited storage capacity will continue to put pressure on crude oil in the near term.

52.     On May 27, 2020, USO filed the Fund's monthly account statement for April 2020 on Form 8-K with the SEC.  The statement revealed that USO had suffered over **$2.6**

*billion* in total losses for the month, which included more than ***$3.6 billion in realized trading losses*** on futures contracts (partially offset by unrealized trading gains).  However, because the Fund also issued over $3.8 billion worth of new USO shares, the Fund's total NAV actually increased during the month.

53.     On May 29, 2020, it was reported that the SEC and the Commodity Futures Trading Commission had both launched investigations into USO regarding the propriety of the Fund's disclosures to investors and the Fund's rapid-fire changes to its investment strategy.

54.     As a result of defendants' wrongful acts and omissions, plaintiff and the Class purchased USO securities at artificially inflated prices, suffering significant losses and were damaged thereby.

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE CLASS PERIOD

55.     The Class Period begins on March 19, 2020.  On that day, defendants filed with the SEC the Registration Statement on Form S-3.  Numerous representations to investors in the Registration Statement were materially false and misleading when made.  For example, despite the severity of the adverse market trends impacting the Fund, which caused it to suffer hundreds of millions of dollars in losses and threatened the Fund's very existence, the Registration Statement contained substantially the same generic boilerplate risk disclosures that the Fund had provided in past registration statements.  This conveyed to the market that USO was not facing the extraordinary convergence of existential threats that the Fund was in fact facing at the time. The Registration Statement did not even mention the Russia/Saudi price war, the effects of "super contango," the specific impacts of ongoing market volatility on Fund performance, or the fact that the Fund was approaching position limits and liquidity constraints because of the

massive influx of investor capital into the Fund (an adverse trend accelerated by the Offering itself).

56.     The Registration Statement also failed to provide any specifics regarding the effects of the COVID-19 pandemic, instead merely listing "pandemics such as COVID-19" among a laundry list of general market "events or conditions" that "*may* adversely impact the demand for crude oil." The Registration Statement stated in pertinent part:

> ***Economic conditions impacting crude oil***. The demand for crude oil correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices. ***Other factors that affect general economic conditions in the world or in a major region, such as*** changes in population growth rates, periods of civil unrest, ***pandemics (e.g. COVID-19)***[,] government austerity programs, or currency exchange rate fluctuations, ***can also impact the demand for crude oil***. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and ***other events or conditions (e.g. pandemics such as COVID-19),*** that impair the functioning of financial markets and institutions ***also may adversely impact the demand for crude oil***.

57.     The statements in ¶56 were materially false and misleading when made. At the time of the Offering, the Fund had ***already*** been severely impacted by increased volatility in oil and oil-related markets and reduced oil demand as a result of the COVID-19 pandemic, which had compromised the Fund's ability to achieve its investment strategy and objective and caused the Fund to suffer hundreds of millions of dollars in losses. The bald mention of COVID-19 in the Registration Statement among a laundry list of general market conditions that "may" possibly cause future adverse impacts to the Fund omitted the adverse impacts, concrete harms and existential threats posed by the pandemic that already existed at the time. Rather than timely provide this information in the Registration Statement as was required, these adverse facts were only belatedly revealed ***after*** the Offering had been completed, including in the COVID-19-

related disclosures contained in the April Amendment and the May Amendment and similar belated disclosures by USO, as detailed in ¶¶34-52 above.

58.    The Registration Statement likewise discussed general factors that "may affect" oil supply and demand, but omitted the acute impacts that the Fund was ***already*** suffering as a result of the Russia/Saudi oil price war and the precipitous slowdown in demand as a result of the coronavirus pandemic.   These discussions were essentially verbatim to representations contained in the Fund's prior registration statements, despite the materially different risks that the Fund was then experiencing at the time of the Offering.  The Registration Statement stated in pertinent part:

> ***Other crude oil demand-related factors****. Other factors that may affect the demand for crude oil and therefore its price, include technological improvements in energy efficiency; seasonal weather patterns, which affect the demand for crude oil associated with heating and cooling; increased competitiveness of alternative energy sources that have so far generally not been competitive with oil without the benefit of government subsidies or mandates; and changes in technology or consumer preferences that alter fuel choices, such as toward alternative fueled vehicles.

> ***Other crude oil supply-related factors****. Crude oil prices also vary depending on a number of factors affecting supply. For example, increased supply from the development of new oil supply sources and technologies to enhance recovery from existing sources tends to reduce crude oil prices to the extent such supply increases are not offset by commensurate growth in demand. Similarly, increases in industry refining or petrochemical manufacturing capacity may impact the supply of crude oil. World oil supply levels can also be affected by factors that reduce available supplies, such as adherence by member countries to the Organization of the Petroleum Exporting Countries ("OPEC") production quotas and the occurrence of wars, hostile actions, natural disasters, disruptions in competitors' operations, or unexpected unavailability of distribution channels that may disrupt supplies. Technological change can also alter the relative costs for companies in the petroleum industry to find, produce, and refine oil and to manufacture petrochemicals, which in turn may affect the supply of and demand for oil.

59.    Similarly, the Registration Statement contained boilerplate discussions of the potential impacts of contango, regulatory position limits and accountability levels, market

volatility, illiquidity and correlation risks that were substantially identical to the representations defendants had made in connection with past offerings, despite the fact that the Fund was *already* suffering acute impacts from each of these so-called potential risks that "may" or "could" impact the Fund in the future.   Indeed, rather than disclose the true facts, the Registration Statement claimed that the Fund's investments remained highly liquid, stating:

> USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking and liquidation of positions in these financial interests and in Other Oil-Related Investments that, in the opinion of USCF, may be readily liquidated with the original counterparty or through a third party assuming the position of USO.

60.     The statements in ¶¶58-59 were materially false and misleading when made. Specifically, while the Registration Statement acknowledged the materiality to the Fund of certain categories of potentially adverse events, it failed to disclose that severe examples of these general prospective categories were *already* then occurring, threatening the Fund's very existence and undermining the Fund's ability to achieve its investment objective.   Instead of disclosing known adverse impacts and the specific risks that the Fund was then facing, the Registration Statement offered only generic, boilerplate discussions of future potential adverse impacts to the Fund that "may" or "could" occur if general categories of contingent circumstances later developed.   Further, by failing to provide any meaningful discussion of concrete harms and imminent threats then facing the Fund and instead simply copying generic, boilerplate risk disclosures from past offerings, the Registration Statement represented to investors that the risk profile of the Fund had not materially changed since the time of these prior offerings.   In fact, the Fund was facing multiple crises that had radically altered its risk profile and undermined its ability to achieve its investment objective (as defendants would later be forced to concede), including: (1) extraordinary market volatility caused by decreased demand

for oil from the coronavirus pandemic and increased oil supply and diminished oil prices caused by the Russia/Saudi oil price war; (2) a massive influx of investor capital into the Fund, totaling hundreds of millions of dollars, in a matter of days, which increased Fund inefficiencies, heightened illiquidity in the WTI futures contract markets in which the Fund invested, and caused the Fund to approach positional and regulatory limits (adverse trends exacerbated by the Offering itself); and (3) a sharp divergence between spot and future prices in the WTI oil markets, leading to a super contango market dynamic as oil storage space in Cushing, Oklahoma dwindled and was insufficient to account for the excess supply expected to be delivered pursuant to the WTI May 2020 futures contract.  These events synergistically converged during the Class Period to adversely impact USO, threatening the Fund in ways uniquely known and understood by defendants because of their insider and market maker status.

61.    The Registration Statement also misrepresented "USO's Investment Objective and Strategy."  The Registration Statement stated that the Fund's investment objective was "for the daily changes in percentage terms of its shares' per share [NAV] to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of [the Benchmark Oil Futures Contract], plus interest earned on USO's collateral holdings, less USO's expenses."  It defined "[t]he Benchmark Oil Futures Contract" as "the futures contract on light, sweet crude oil as traded on the [NYMEX] that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire."

62.    Similarly, the Registration Statement represented that the Fund would achieve its investment objective by investing in the near month WTI futures contract, stating that the

"design of USO's Benchmark Oil Futures Contract is such that every month it begins by using the near month contract to expire until the near month contract is within two weeks of expiration, when, over a four day period, it transitions to the next month contract to expire as its benchmark contract and keeps that contract as its benchmark until it becomes the near month contract and close to expiration."   Likewise the Registration Statement claimed that the "Benchmark Oil Futures Contract is changed from the near month contract to the next month contract over a four-day period."   It continued in pertinent part:

> In addition, USCF believes that market arbitrage opportunities will cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis. USCF further believes that daily changes in prices of the Benchmark Oil Futures Contract have historically closely tracked the daily changes in spot prices of light, sweet crude oil. USCF believes that *the net effect of these relationships will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track, the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses*.

63.    Moreover, the Registration Statement stated, "USCF [*i.e.*, the Sponsor] believes that market arbitrage opportunities will cause the daily changes in USO's share price on the NYSE Arca to closely track the daily changes in USO's per share NAV" and "that the daily changes in USO's NAV in percentage terms will closely track the daily changes in percentage terms in the Benchmark Oil Futures Contract, less USO's expenses."   It continued in pertinent part:

> *USCF employs a "neutral" investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down*. USO's "neutral" investment strategy is designed to permit investors generally to purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-effective manner, and/or to permit participants in the oil or other industries to hedge the risk of losses in their crude oil-related transactions. Accordingly, depending on the investment objective of an individual investor, the risks generally associated with investing in crude oil and/or the risks involved in hedging may exist.

64.     The Registration Statement also claimed that USO was "not actively managed" and instead simply "tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising." It continued in pertinent part:

> USO is not actively managed by conventional methods. Accordingly, *if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract*. USCF will seek to cause the NAV of USO's shares to track the Benchmark Oil Futures Contract during periods in which its price is flat or declining as well as when the price is rising.

65.     The statements in ¶¶61-64 were materially false and misleading when made. Specifically, USO could not pursue the claimed passive investment strategy or objective portrayed in the Registration Statement because the Fund was facing a host of interrelated crises that had undermined its ability to invest substantially all Fund assets in the near month WTI futures contract and thus track its benchmark, including: (1) extraordinary market volatility caused by decreased demand for oil from the coronavirus pandemic and increased oil supply and diminished oil prices caused by the Russia/Saudi oil price war; (2) a massive influx of investor capital into the Fund, totaling hundreds of millions of dollars, in a matter of days, which increased Fund inefficiencies, heightened illiquidity in the WTI futures contract markets in which the Fund invested, and caused the Fund to approach positional and regulatory limits (adverse trends exacerbated by the Offering itself); and (3) a sharp divergence between spot and future prices in the WTI oil markets, leading to a super contango market dynamic as oil storage space in Cushing, Oklahoma dwindled and was insufficient to account for the excess supply expected to be delivered pursuant to the WTI May 2020 futures contract.  As a result, the Fund could not continue to pursue the passive investment strategy represented in the Registration

Statement, causing its results to significantly deviate from its purported benchmark, and the Fund

was not an effective means for investors to track the daily percentage changes in the spot price of

light, sweet crude oil delivered to Cushing, Oklahoma.

66.    Moreover, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303(a)(3)(ii) ("Item

303"), required defendants to "[d]escribe any known trends or uncertainties that have had or that

the registrant reasonably expects will have a material favorable or unfavorable impact on net

sales or revenues or income from continuing operations."   Similarly, Item 105 of SEC

Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the

Registration Statement, "a discussion of the most significant factors that make an investment in

the registrant or offering speculative or risky" and that each risk factor "adequately describe[] the

risk."  The failure of the Registration Statement to disclose the concrete harms and acute risks to

the Fund posed by the coronavirus pandemic, the Russia/Saudi oil price war, the massive influx

of investor capital into the Fund, the fact that the Fund was approaching position and

accountability limits, the effects of super contango, and insufficient WTI storage capacity

violated Item 303 because these undisclosed risks were known to defendants and would (and did)

have an unfavorable impact on USO's revenues and income from continuing operations.  This

failure also violated Item 105 because these specific risks were not adequately disclosed, or

disclosed at all, even though they were some of the most significant factors that made an

investment in USO securities speculative or risky.

## CLASS ACTION ALLEGATIONS

67.    Plaintiff brings this action as a class action on behalf of all persons who purchased

USO securities during the Class Period (the "Class").  Excluded from the Class are defendants

and their families, the officers, directors and affiliates of the defendants, at all relevant times, and

members of their immediate families, and their legal representatives, heirs, successors or assigns

and any entity in which defendants have or had a controlling interest.

68.     The members of the Class are so numerous that joinder of all members is

impracticable.  Fund shares are actively traded on the NYSE under the ticker symbol "USO" and

millions of shares were sold throughout the Class Period.  While the exact number of Class

members is unknown to plaintiff at this time and can only be ascertained through appropriate

discovery, plaintiff believes that there are hundreds of members in the proposed Class.  Record

owners and other members of the Class may be identified from records maintained by USO or its

transfer agent and may be notified of the pendency of this action by mail, using the form of

notice similar to that customarily used in securities class actions, including being given an

opportunity to exclude themselves from the Class.

69.     Plaintiff's claims are typical of the claims of the members of the Class, as all

members of the Class are similarly affected by defendants' wrongful conduct in violation of

federal law that is complained of herein.

70.     Plaintiff will fairly and adequately protect the interests of the members of the

Class and has retained counsel competent and experienced in class and securities litigation.

71.     Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

        (a)     whether defendants violated the 1934 Act;

        (b)     whether statements made by defendants to the investing public during the

Class Period about the business, operations and risks of investing in the Fund were false and

misleading; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

72.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**LOSS CAUSATION AND ECONOMIC LOSS**

73.     As detailed herein, defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of USO securities and operated as a fraud or deceit on purchasers of USO securities.  As detailed above, when the truth about defendants' misconduct was revealed, the value of USO securities declined precipitously as the prior artificial inflation no longer propped up the prices of such securities.  The declines in the prices of USO securities were the direct result of the nature and extent of defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the share price declines negate any inference that the losses suffered by plaintiff and members of the Class were caused by changed market conditions, macroeconomic or industry factors or Fund-specific facts unrelated to the defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by plaintiff and members of the Class was a direct result of defendants' fraudulent scheme to artificially inflate the prices of USO securities and the subsequent significant decline in the value of the Fund's securities when defendants' prior misrepresentations and other fraudulent conduct were revealed.

74.     At all relevant times, defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by plaintiff and the members of the Class.  Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Fund's business and operations, as alleged herein.  Before and during the time of plaintiff's and Class members' purchases of USO securities, defendants issued materially false and misleading statements and omitted material facts necessary to make defendants' statements not false or misleading, causing the prices of USO securities to be artificially inflated.  Plaintiff and members of the Class purchased USO securities at those artificially inflated prices, causing them to suffer damages as complained of herein.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE

75.     At all relevant times, USO securities traded in an efficient market for the following reasons, among others:

(a)     USO shares met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, USO filed periodic public reports with the SEC;

(c)     defendants regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(d)     unexpected material news about the Fund was rapidly reflected in and incorporated into the price of the Fund's securities.

76.     As a result of the foregoing, the market for USO securities promptly digested current information regarding the Fund from publicly available sources and reflected such information in the prices of USO securities.   Under these circumstances, a presumption of reliance applies to plaintiff's and Class members' purchases of Fund securities.

77.     A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because plaintiff's claims are based, in significant part, on defendants' material omissions.   Because this action involves defendants' failure to disclose material adverse information regarding the Fund's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.   All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.   Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

78.     Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by defendants, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor."

79.     Defendants' verbal "Safe Harbor" warnings accompanying any of their oral FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Fund, and thus were ineffective to shield those statements from liability.

80.     Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of USO or the Sponsor who knew that the

FLS was false. Further, none of the historic or present tense statements made by defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## COUNT I

### For Violation of §10(b) of the 1934 Act and Rule 10b-5
### Against All Defendants

81. Plaintiff incorporates the foregoing paragraphs by reference.

82. Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

83. These defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

(a) Employed devices, schemes and artifices to defraud;

(b) Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c) Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and Class members in connection with their purchases of USO securities.

84. Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for USO securities. Plaintiff and the other members of the Class would not have purchased USO securities at the prices paid, or at all, had they been aware that the market prices were artificially and falsely inflated by defendants' misleading statements.

85.     As a direct and proximate result of defendants' wrongful conduct, plaintiff and the Class suffered damages in connection with their purchases of USO securities.

## COUNT II

### For Violation of §20(a) of the 1934 Act
### Against the Sponsor and the Individual Defendants

86.     Plaintiff incorporates the foregoing paragraphs by reference.

87.     The Sponsor and the Individual Defendants were control persons of USO within the meaning of §20(a) of the 1934 Act.

88.     By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of USO's operations and/or intimate knowledge of the false and misleading statements filed by USO with the SEC and disseminated to the investing public, the Sponsor and the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of USO, including the content and dissemination of the various statements plaintiff contends are false and misleading. The Sponsor and the Individual Defendants were provided with, or had unlimited access to, copies of USO's reports, press releases, public filings and other statements alleged by plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.  The Sponsor also controlled the Individual Defendants as it did all of its employees.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.     Awarding plaintiff's reasonable costs and expenses, including attorneys' fees; and

D.     Awarding such other relief as the Court may deem just and proper.

### JURY DEMAND

Plaintiff hereby demands a trial by jury.

DATED:  June 19, 2020                    ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                         SAMUEL H. RUDMAN


                                                         _____
                                                              *s/ Samuel H. Rudman*
                                                         SAMUEL H. RUDMAN

                                                         58 South Service Road, Suite 200
                                                         Melville, NY  11747
                                                         Telephone:  631/367-7100
                                                         631/367-1173 (fax)
                                                         srudman@rgrdlaw.com

                                                         ROBBINS GELLER RUDMAN
                                                            & DOWD LLP
                                                         BRIAN E. COCHRAN
                                                         200 South Wacker Drive, 31st Floor
                                                         Chicago, IL  60606
                                                         Telephone:  312/674-4674
                                                         312/674-4676 (fax)
                                                         bcochran@rgrdlaw.com

                                                         LAW OFFICES OF CURTIS V. TRINKO, LLP
                                                         CURTIS V. TRINKO
                                                         39 Sintsink Drive West, 1st Floor
                                                         Port Washington, NY  11050
                                                         Telephone:  516/883-1437
                                                         ctrinko@trinko.com

                                                         Attorneys for Plaintiff