**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: UNITED STATES OIL FUND, LP SECURITIES LITIGATION | Case No. 1:20-cv-04740 (PGG) (GWG) |
| | Oral Argument Requested |
| This Document Relates To:  ALL ACTIONS | |

## USO DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ................................................................................1

BACKGROUND ..................................................................................................5

    A.    Defendants................................................................................................5

    B.    The Structure and Operation of USO ................................................7

    C.    Disclosures in the Challenged USO Registration Statements ................8

            1.    The Registration Statements Disclosed that USO Has a Daily Investment Objective to Provide Exposure to the Daily Performance of the Benchmark Oil Futures Contract....................................................8

            2.    The Registration Statements Disclosed that USO Seeks Its Investment Objective but Is Not Otherwise Actively Managed, Regardless of Market Developments and Trends ......................................9

            3.    The Registration Statements Disclosed that Large Losses Can Be Caused by Volatility and Illiquidity, the Risk of which May Be Increased by USO's Large Positions in Futures Contracts......................11

            4.    The Registration Statements Disclosed that USO's Benchmark and Investment Portfolio Are Subject to the Natural Market Force of Contango ........................................................................................12

            5.    The Registration Statements Disclosed that Accountability Levels and Position Limits Are More Likely to Be Imposed as USO's Assets Grow and May Affect Returns......................................................12

            6.    The Registration Statements Disclosed the Possibility of Non-Correlation or Tracking Errors Among USO's NAV, USO's Share Price, the Spot Price of Crude Oil, and the Price of the Benchmark Oil Futures Contract..............................................................14

            7.    Market Developments that Impact Supply and Demand for Crude Oil May Impact the Prices of Crude Oil and Oil Futures Contracts .........15

    D.    Class Period Events.............................................................................16

            1.    Major, Well-Known World Events Affected Oil Prices...........................16

            2.    Investors Hoping to Buy into the Dip Purchased USO Shares ................17

3.     As Regulatory Limits Began To Be Imposed on USO's Investments, USO Fully Disclosed Portfolio Reallocations ..........................................18

E.     Alleged Misrepresentations and Omissions ......................................................19

ARGUMENT .......................................................................................................................20

I.     ALL CLAIMS MUST BE DISMISSED BECAUSE THE CAC FAILS TO ALLEGE MATERIAL MISSTATEMENTS OR OMISSIONS .....................................21

A.     The Challenged Registration Statements Fully and Accurately Disclosed the Fund Features and Risks that Allegedly Caused Its Value to Decline ............23

1.     The Registration Statements Disclosed that USO's Large Positions in WTI Futures Contracts May Contribute to Illiquidity and Are Subject to Large Sudden Losses ...............................................................24

2.     The Registration Statements Disclosed the Effects of Contango and the Potential Negative Effects of USO's Large Trades During Contango ......................................................................................................26

3.     The Registration Statements Disclosed that Regulatory Limits Are More Likely to Be Imposed as USO's Assets Grow, and USCF May Diversify USO's Investment Portfolio by Purchasing Later Month WTI Futures Contracts ...........................................................................29

4.     The Registration Statements Disclosed the Possibility of Tracking Errors or Non-Correlation Among USO's NAV, USO's Share Price, the Spot Price of Crude Oil, and the Value of the Benchmark ................31

5.     The Registration Statements Disclosed Market Developments that Impact Supply and Demand for Crude Oil and May Affect Prices of Crude Oil and Oil Futures Contracts .....................................................33

B.     The Registration Statements Were Not Required to Be Updated to Disclose Publicly Available or Ongoing Market Developments in Real Time .......................................................................................................................35

C.     Plaintiff's Contentions that the Registration Statements Failed to Adequately Detail How Disclosed Risks Would Materialize Are Impermissible Pleading by Hindsight and Internally Inconsistent .....................39

D.     Plaintiff's Allegations Regarding Other Challenged Disclosures Fail as a Matter of Law ...................................................................................................41

E.     Plaintiff's Allegations Regarding Regulation S-K Fail as a Matter of Law for All of the Same Reasons ................................................................................44

II.      THE CAC FAILS TO STATE A CLAIM UNDER SECTION 10(b) OF THE
         EXCHANGE ACT AND RULE 10b-5 BECAUSE IT MAKES NO PLAUSIBLE
         ALLEGATIONS OF SCIENTER ................................................................................... 46

III.     THE CAC FAILS TO STATE A CLAIM UNDER SECTION 11 OF THE
         SECURITIES ACT BECAUSE PLAINTIFF FAILED TO PLEAD STANDING
         TO CHALLENGE THE REGISTRATION STATEMENTS ......................................... 51

CONCLUSION ...................................................................................................................... 53

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Alki Partners, L.P. v. Windhorst*,
    472 F. App'x 7 (2d Cir. 2012) (summary order) ...................................................47

*In re Ariad Pharm., Inc. Sec. Litig.*,
    842 F.3d 744 (1st Cir. 2016) ................................................................................52

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ........................................................................... 20, 30, 42

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) .............................................................. 6, 20, 47, 49

*Barilli v. Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019) ...................................................................38

*Basic Inc. v. Levinson*,
    485 U.S. 224 (1988) .............................................................................................22

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................................... 20, 30, 42, 52

*Bettis v. Aixtron SE*,
    No. 16-cv-25, 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016)................... 37, 38, 44

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
    665 F. Supp. 2d 404 (S.D.N.Y. 2009) ...................................................................40

*C.D.T.S. v. UBS AG*,
    No. 12-cv-4924, 2013 WL 6576031 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom.*
    *Westchester Teamsters Pension Fund v. UBS AG*, 604 F. App'x 5 (2d Cir.
    2015)......................................................................................................................50

*In re Century Aluminum Co. Sec. Litig.*,
    729 F.3d 1104 (9th Cir. 2013) .............................................................................52

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
    No. 08-cv-7062, 2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010)....................... 34, 40

*DeMaria v. Andersen*,
    318 F.3d 170 (2d Cir. 2003) ............................................................... 22, 42, 51

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
    553 F.3d 187 (2d Cir. 2009) ............................................................... 20, 22, 46

*In re Express Scripts Holdings Co. Sec. Litig.*,
  773 F. App'x 9 (2d Cir. 2019) (summary order) ................................................40

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
  873 F.3d 85 (2d Cir. 2017) ................................................................................22

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003) ................................................................51

*Grant v. Cty. of Erie*,
  542 F. App'x 21 (2d Cir. 2013) (summary order).............................................41

*Hart v. Internet Wire, Inc.*,
  145 F. Supp. 2d 360 (S.D.N.Y. 2001)...........................................................48, 50

*Hinds Cty., Miss. v. Wachovia Bank N.A.*,
  620 F. Supp. 2d 499 (S.D.N.Y. 2009) ................................................................42

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995) ..............................................................................41

*Ho v. Duoyuan Glob. Water, Inc.*,
  887 F. Supp. 2d 547 (S.D.N.Y. 2012) ................................................................52

*Holbrook v. Trivago N.V.*,
  No. 17-cv-8348, 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom.*
  *Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) ....................................45

*Hutchison v. Deutsche Bank Sec. Inc.*,
  647 F.3d 479 (2d Cir. 2011) ..............................................................................44

*I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*,
  936 F.2d 759 (2d Cir. 1991) ..............................................................................21

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
  163 F.3d 102 (2d Cir. 1998) ..............................................................................38

*In re IPO Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006) ...........................................................................52, 53

*Kalnit v. Eichler*,
  264 F.3d 131 (2d Cir. 2001) ..........................................................................47, 48

*Kapps v. Torch Offshore, Inc.*,
  379 F.3d 207 (5th Cir. 2004) .............................................................................45

*Krim v. pcOrder.com, Inc.*,
  402 F.3d 489 (5th Cir. 2005) .............................................................................51

*Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*,
   902 F. Supp. 2d 329 (S.D.N.Y. 2012), *aff'd sub nom. IBEW Local Union No.*
   *58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*,
   783 F.3d 383 (2d Cir. 2015) .............................................. 20, 21

*Lindstrom v. TD Ameritrade, Inc.*,
   No. 20-cv-4028, 2020 WL 7398792 (N.D. Ill. Dec. 17, 2020)............................37

*In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*,
   272 F. Supp. 2d 243 (S.D.N.Y. 2003) ................................................36

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010) .....................................................21, 39

*Nguyen v. MaxPoint Interactive, Inc.*,
   234 F. Supp. 3d 540 (S.D.N.Y. 2017) ..............................................45

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000) ...................................... 40, 47, 48, 51

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
   538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009)...............24, 40

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
   No. 15-cv-5999 (PGG), 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017), *aff'd*
   *sub nom. Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773
   F. App'x 630 (2d Cir. 2019) .....................................................38, 39

*In re Proshares Tr. II Sec. Litig.*,
   No. 19-cv-886, 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020)..............................25, 26

*In re ProShares Tr. Sec. Litig.*,
   728 F.3d 96 (2d Cir. 2013) ..................................... 22, 23, 39, 40

*In re ProShares Tr. Sec. Litig.*,
   889 F. Supp. 2d 644 (S.D.N.Y. 2012), *aff'd*, 728 F.3d 96 (2d Cir. 2013)............................23

*Raghavendra v. Trustees of Columbia Univ.*,
   No. 06-cv-6841, 2008 WL 2696226 (S.D.N.Y. July 7, 2008)..............................30

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004) ..................................... 20, 45, 46

*Rubinstein v. Credit Suisse Grp. AG*,
   457 F. Supp. 3d 289 (S.D.N.Y. 2020) ..............................................24, 40

*Salahuddin v. Jones*,
   992 F.2d 447 (2d Cir. 1993) (per curiam) ............................................41

*Scott v. Gen. Motors Co.*,
  46 F. Supp. 3d 387 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015)........................37

*SEC v. Yorkville Advisors, LLC*,
  305 F. Supp. 3d 486 (S.D.N.Y. 2018) ................................................................................47

*Set Capital LLC v. Credit Suisse Grp. AG*,
  No. 18-cv-2268, 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019) ...........................................35

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010) ................................................................................................46

*SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*,
  No. 09-cv-5064, 2010 WL 2473595 (S.D.N.Y. June 17, 2010), *aff'd* 448 F.
  App'x 116 (2d Cir. 2011) ....................................................................................................35

*Stadnick v. Vivint Solar, Inc.*,
  861 F.3d 31 (2d Cir. 2017) ............................................................................ 21, 42, 44, 45

*Steinberg v. PRT Grp., Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000)...............................................................................22, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) ................................................................................... 46, 49, 50

*In re TVIX Sec. Litig.*,
  25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v.
  Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014) .............................................................40

*In re UBS AG Sec. Litig.*,
  No. 07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub
  nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d
  173 (2d Cir. 2014) ....................................................................................... 37, 38, 49

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011) ..............................................................................................23

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 ................................*passim*

Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o .....................*passim*

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934,
  15 U.S.C. §§ 78j and 78t ...............................................................................................*passim*

**Rules**

Fed. R. Civ. P. 8 ............................................................................................... 21

Fed. R. Civ. P. 9(b) .................................................................................. *passim*

Fed. R. Civ. P. 12(b)(6) ........................................................................ 6, 20, 22

**Regulations**

17 C.F.R. § 229.105 ................................................................................... 44, 45

17 C.F.R. § 229.303 ................................................................................... 44, 45

17 C.F.R. § 229.503 ........................................................................................ 44

**Other Authorities**

CME CLEARING, *Testing Opportunities in CME's 'New Release' Environment for Negative Prices and Strikes for Certain NYMEX Energy Contracts*, Apr. 15, 2020, https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/04/ Chadv20-160.pdf. ......................................................................................... 37

CME Group, *Crude Oil – Volume*, https://www.cmegroup.com/trading/energy/crude-oil/light-sweet-crude_quotes_volume_voi.html#tradeDate=20201230 (last accessed Jan. 26, 2021) ............................................................................................................ 36

CME Group, *Crude Oil Futures – Quotes*, https://www.cmegroup.com/trading/energy/crude-oil/light-sweet-crude_quotes_globex.html (last accessed Jan. 26, 2021) ................................. 35, 36

CME Group, *Light Sweet Crude Oil (WTI) Futures and Options*, https://www.cmegroup.com/trading/energy/light-sweet-crude-oil.html (last accessed Jan. 26, 2021) ................................................................................. 36

CNBC, *United States Oil Fund, LP*, https://www.cnbc.com/quotes/?symbol=USO (last accessed Jan. 26, 2021) ................................................................................. 36

Jacqueline Davalos, et al., *Oil Market Shows Fear that U.S. Is Running Out of Storage Space*, BLOOMBERG, last updated Mar. 25, 2020, https://www.bloomberg.com/news/articles/2020-03-24/oil-extends-recovery-as-optimism-over-u-s-stimulus-increases ................................................................ 36

Jonathan Garber, *Oil Prices Could Fall Below Zero: Analyst*, YAHOO!FINANCE, Mar. 18, 2020, https://finance.yahoo.com/news/oil-prices-could-fall-below-152446634.html ............................................................................................36

ICE Futures Europe, *WTI Crude Futures*, https://www.theice.com/products/213/WTI-Crude-Futures/data?marketId=5164580&span=2 (last accessed Jan. 26, 2021)..............................36

Devika Krishna Kumar, *Oil Prices Dive to Lowest in Over a Year on Coronavirus Fears*, REUTERS, Feb. 26, 2020, reuters.com/article/us-global-oil/oil-prices-dive-to-lowest-in-over-a-year-on-coronavirus-fears-idUSKCN20L08P ............................36

Devika Krishna Kumar, *Oil Ends March with Biggest Monthly and Quarterly Losses Ever*, REUTERS, Mar. 30, 2020, https://www.reuters.com/article/us-global-oil/oil-ends-march-with-biggest-monthly-and-quarterly-losses-ever-idUSKBN21I03I ...............................................................................................36

Sam Meredith, *Oil Prices Just Had Their Worst Ever Quarter as Coronavirus Slashes Demand*, CNBC, Mar. 31, 2020, https://www.cnbc.com/2020/03/31/coronavirus-brent-and-wti-oil-prices-set-for-their-worst-ever-quarter.html ..........................................................................37

Sarah Ponczek & Heejin Kim, *Huge Swings Send U.S. Futures to Volatility Limit for Second Day*, BLOOMBERG, last updated Mar. 10, 2020, https://www.bloomberg.com/news/articles/2020-03-09/u-s-stock-futures-fall.....................36

Stanley Reed, *The World is Running Out of Places to Store Its Oil*, N.Y. TIMES, last updated Mar. 27, 2020, https://www.nytimes.com/2020/03/26/business/energy-environment/oil-storage.html................................................................................................36

Guarav Sharma, *Oil Storage May Run out in 6 Weeks as Crude Futures Endure Worst Ever Quarter*, FORBES, Mar. 31, 2020, https://www.forbes.com/sites/gauravsharma/2020/03/31/oil-storage-may-run-out-in-6-weeks-as-crude-futures-endure-worst-ever-quarter/?sh=24a42b406ed8 ...................................................................37

John Stepek, *Oil Prices Have Collapsed – And Some Argue That They Could Even Turn Negative*, MONEYWEEK, Mar. 30, 2020, https://moneyweek.com/investments/commodities/energy/oil/601069/oil-prices-have-collapsed-and-some-argue-that-they-could ................................................. 36, 37

Weizan Tan, *Oil Prices Fall to 17-Year Low as Saudi Arabia-Russia Standoff Continues, Coronavirus Hits Demand*, CNBC, Mar. 30, 2020, https://www.cnbc.com/2020/03/30/oil-falls-amid-saudi-arabia-russia-price-war-coronavirus-hits-demand.html ......................................................................37

Natasha Turak, *Oil Prices Could Hit Teens in Coming Weeks as Markets Crater Over Coronavirus and Price War*, CNBC, Mar. 17, 2020, https://www.cnbc.com/2020/03/17/oil-prices-could-hit-the-teens-in-coming-weeks-as-markets-crater-over-coronavirus-and-price-war.html..............................................36

U.S. Energy Information Administration, *Cushing, OK WTI Spot Price FOB*, https://www.eia.gov/dnav/pet/hist/RWTCD.htm (last accessed Jan. 26, 2021)....................35

U.S. Energy Information Administration, *Petroleum & Other Liquids*, https://www.eia.gov/dnav/pet/PET_STOC_WSTK_DCU_NUS_W.htm (last accessed Jan. 26, 2021) ........................................................................................................36

## PRELIMINARY STATEMENT

This putative class action fails to state a claim under the securities laws because the risks of the unprecedented world and economic events that negatively affected oil prices and the share price of United States Oil Fund, LP (the "Fund" or "USO") during the alleged class period were fully and accurately disclosed.

Lead Plaintiff Nutit, A.S. purports to be an investor in USO, an exchange-traded fund ("ETF") with a daily investment objective tied to the performance of short-term futures contracts on crude oil. Plaintiff brings this putative class action to recoup its alleged losses on investments made between February 25 and April 28, 2020. The Consolidated Amended Complaint ("CAC") alleges that Plaintiff and other investors opportunistically sought to "buy the dip" in the price of USO shares as oil prices were declining during the class period – hoping to profit by "tak[ing] advantage of rapidly evolving events in oil markets." CAC ¶¶ 6, 62. USO shares instead continued to decline due to extraordinary developments that dramatically impacted supply and demand for oil, including the highly publicized COVID-19 pandemic and a Saudi-Russian oil price war. Yet, even under these extraordinary circumstances, USO achieved its stated investment objective throughout the class period. In short, the Fund successfully provided the exposure to oil prices that investors sought in purchasing USO shares; Plaintiff's losses were caused by the fact that oil prices continued to decline during the class period rather than rebound as investors hoped – not by some undisclosed feature of the Fund or hidden risk of investing. Fundamentally, Plaintiff faults USO's disclosures regarding (i) how the Fund operates, which was fully and accurately disclosed, and (ii) how oil prices (and thus USO's share price) were affected by a once-in a-century public health crisis and a price war between major oil producing countries. But the securities laws do not permit recovery for the materialization of well-disclosed risks, especially those pertaining to public events beyond any defendant's ability to predict.

Investors buy shares of USO to obtain exposure to the price of light, sweet crude oil delivered to Cushing, Oklahoma (known as West Texas Intermediate or "WTI" crude oil) without having to purchase, store, and sell physical barrels of oil.  USO is designed to provide exposure to the daily performance of the spot price (*i.e.*, current market price) of WTI crude oil *as measured by* daily changes in the price of specified WTI futures contracts, which are contracts to buy or sell WTI crude oil at a set expiration date.  There is a WTI futures contract that expires each month on a schedule set by the relevant futures exchange – here, the New York Mercantile Exchange ("NYMEX") – usually on the twentieth or twenty-first of the preceding month (*e.g.*, May 2020 WTI futures contracts expired on April 21, 2020).

Specifically, USO seeks to track the "Benchmark Oil Futures Contract" or "Benchmark" – defined as the WTI futures contract that is the "near" month contract (*i.e.*, the contract set to expire soonest in time) up until it is within two weeks of expiration.  Then, the Benchmark rolls over to the WTI futures contract that will expire in the next month.  When the value of the Benchmark decreases, USO's net asset value ("NAV") is designed to decrease by approximately the same percentage (before interest and expenses).  In particular, USO's stated investment objective is for the average daily percentage change in its NAV to be within plus or minus 10% of the average daily percentage change in the price of the Benchmark over any 30 successive valuation days.  To achieve this investment objective, USO primarily invests in oil futures contracts, including WTI futures and other oil-related futures, but it may invest in other oil-related investments as well.

Plaintiff challenges registration statements that USO filed with the U.S. Securities and Exchange Commission ("SEC") in connection with offerings of USO shares on February 25 and March 23, 2020.  Seeking to "buy the dip," investors purchased USO shares in these offerings, even while prices of WTI futures and USO shares were declining, causing the Fund's total assets

under management ("AUM") to grow.  Plaintiff purports to bring claims under (a) Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") against all defendants on behalf of investors who purchased USO shares pursuant and/or traceable to the Fund's prospectuses and registration statements issued in connection with the February 25 and March 23 offerings, and (b) Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 against the USO Defendants[1] on behalf of a putative class of investors who purchased USO shares during the February 25 to April 28, 2020 putative class period.  CAC ¶ 1.

Each of Plaintiff's claims fails as a matter of law.  *First*, its claims all fail because Plaintiff does not plausibly allege any material misstatement or omission of fact as required to state a claim under both the Securities Act and the Exchange Act.  The disclosures informed investors of all relevant Fund features, market conditions, and attendant investment risks.  In particular, the registration statements explained that USO's investment objective is for the average daily percentage change of its NAV for any period of 30 successive valuation days to be within plus or minus 10% of the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period.  The registration statements specifically explained that USO is not actively managed and would continue to pursue its investment objective regardless of market developments and trends, including declining oil prices.

The registration statements warned that various market developments may impact prices of crude oil and oil futures contracts more generally – which may lead to large and sudden losses. Those risks materialized during the class period when demand for crude oil plummeted as COVID-19 spread across the globe and economies shut down.  At around the same time, Saudi

---

[1] The CAC uses "USO Defendants" to collectively refer to USO, United States Commodity Funds LLC ("USCF"), John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Andrew F Ngim, Robert L. Nguyen, Peter M. Robinson, Gordon L. Ellis, and Malcolm R. Fobes III.

Arabia launched a price war against Russia by announcing oil price discounts that overwhelmed global oil markets with supply.  With diminished demand and a spike in supply, prices of crude oil, oil futures contracts, and the Benchmark Oil Futures Contract dropped.  As a result of the foregoing, the value of USO's investment portfolio and NAV declined on a similar percentage basis, by its disclosed design and per its investment objective.  As disclosed, USO continued to seek its investment objective by investing its assets primarily in oil futures contracts.

The registration statements further warned that USO's share price could be negatively affected by market conditions such as illiquidity and "contango" (which occurred both historically and in early 2020) and that USO's large positions in oil futures contracts may increase the risks of loss from such conditions.  The registration statements cautioned that regulatory limits on the number of oil futures contracts USO can hold are more likely to be imposed as USO's assets reach higher levels, and as a result, USO's portfolio of investments may be diversified to invest in a different mix of futures contracts.  Towards the end of the class period, as the Fund's AUM grew and market events unfolded, new regulatory limits were imposed on USO's futures holdings.  In response and as forewarned, the USO Defendants exercised their fully disclosed discretion to further diversify by also investing in *later* month futures contracts.  USO also updated investors in real time as the limits were imposed and as USO's investments were diversified in response.  The registration statements also warned of possible non-correlation or "tracking errors" between USO's NAV, USO's share price, the spot price of crude oil, and the value of the Benchmark.

In short, investors were fully informed about USO's features and risks, including the risk of sudden total loss due to USO's growth and "price-insensitive participation" in the oil futures contracts market during periods of illiquidity and volatility.  CAC ¶¶ 3, 12.  Defendants were not

required to predict precisely how the disclosed risks could materialize or update the disclosed risks in real time as they came to fruition in full public view in early 2020.

*Second*, the Exchange Act claims fail as a matter of law because the CAC does not plausibly allege that the USO Defendants acted with scienter as required under the heightened pleading standard of Fed. R. Civ. P. 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.  The PSLRA requires Plaintiff to allege a cogent and compelling theory supported by facts that give rise to a strong inference of scienter.  Yet, Plaintiff asks the Court to infer scienter based on speculative, vague, and unsubstantiated allegations of "unique insider knowledge" of the relevant risks by virtue of the USO Defendants' roles in managing the Fund.  These allegations fail as a matter of law.  Moreover, courts consistently reject Plaintiff's theory that the USO Defendants had the requisite motive and opportunity to mislead investors simply because they sought to earn additional management fees.

*Third*, Plaintiff fails to state a claim under Section 11 of the Securities Act because Plaintiff has not plausibly alleged that it owned shares directly traceable to the challenged registration statements – as required to plead standing.  Instead, Plaintiff alleges traceability without any factual allegation even remotely suggesting its shares were originally issued pursuant to either, let alone both, of the challenged registration statements.  This is insufficient as a matter of law.

For all these reasons, the CAC should be dismissed with prejudice.

## BACKGROUND

### A.    Defendants

Defendant USO is a commodity pool and ETF organized as a limited partnership.  It issues shares that trade on the NYSE Arca stock exchange.  *See* RS at 1, 2.[2]  Defendant USCF is the

---

[2] The CAC challenges disclosures in two registration statements – which the CAC refers to as the "February Registration Statement" and "March Registration Statement."  The CAC seems to use

general partner, sponsor, and commodity pool operator of USO. *Id.* at 1, 2, 34. USCF also is the general partner for several other funds that operate as ETFs. *Id.* at 2, 34.

The CAC also names as defendants John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Andrew F Ngim, Robert L. Nguyen, Peter M. Robinson, Gordon L. Ellis, and Malcolm R. Fobes III (collectively, "Individual Defendants") – all of whom are Principals of USCF. *Id.* at 35–38. Mr. Love is President, Chief Executive Officer, and Chairman of the Board of Directors of USCF. Mr. Crumbaugh is Chief Financial Officer, Secretary, and Treasurer of USCF. The CAC refers to Messrs. Love and Crumbaugh collectively as "USO Officer Defendants." Mr. Gerber is Vice President of USCF. Mr. Ngim is Chief Operating Officer and a Management Director of USCF. Mr. Nguyen is a Management Director of USCF. Messrs. Robinson, Ellis, and Fobes are Independent Directors of USCF.

The CAC further names as defendants several Authorized Participants[3] and the Fund's marketing agent, ALPS Distributors, Inc. ("ALPS"). The CAC alleges that the Authorized

"February Registration Statement" to refer collectively to the registration statement that USCF filed with the SEC on January 13, 2020, the amendment filed on February 21, and the prospectus filed on February 25. *See* Ex. 1 to Declaration of Amy D. Roy, Esq. ("Roy Decl.") (Prospectus (Feb. 25, 2020)). The CAC seems to use "March Registration Statement" to refer collectively to the registration statement that USCF filed with the SEC on March 19, the amendment filed on March 23, and the prospectus filed on March 23. *See* Roy Decl. Ex. 2 (Prospectus (Mar. 23, 2020)). Herein, the February and March Registration Statements are referred to collectively as the "Registration Statements." For ease of reference, the "RS" pincites herein are to the page numbers indicated in the lower right-hand corner of both the attached February 25 and March 23 prospectuses. Unless otherwise noted, the material appears in both prospectuses at the same pincites. In evaluating a Rule 12(b)(6) motion to dismiss, the Court can consider the attached Registration Statements because they are "legally required public disclosure documents filed with the SEC" and extensively referenced and relied upon throughout the CAC. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).

[3] The remaining Authorized Participant defendants are ABN AMRO Clearing Chicago LLC ("ABN Amro" in the CAC), Goldman, Sachs & Company (n/k/a Goldman Sachs & Co. LLC), J.P. Morgan Securities, Inc. (n/k/a J.P. Morgan Securities LLC), Merrill Lynch Professional Clearing Corp., and Virtu Financial BD LLC (n/k/a Virtu Americas LLC) (collectively, the "Authorized Participants"). Plaintiff filed a Notice of Voluntary Dismissal, ECF No. 138, of its claims against

Participants sold USO shares on the secondary market pursuant to Authorized Participant agreements with USO and USCF. ALPS allegedly distributed and sold USO shares to the Authorized Participants on behalf of USO. The CAC collectively labels the Authorized Participants and ALPS as "Underwriter Defendants." The USO Defendants, the Authorized Participants, and ALPS are referred to collectively herein as "Defendants."

**B.    The Structure and Operation of USO**

USO is an ETF, which is a type of pooled investment product with publicly listed shares that trade on a national securities exchange. ETFs are similar to mutual funds. For example, both ETFs and mutual funds calculate a daily NAV per share based on the current market value of the fund's underlying assets (*i.e.*, the value of its portfolio) minus its liabilities (including management fees), which is then divided by the number of shares. *Id.* at 66. There are some key operational differences between ETFs and mutual funds. While investors in a traditional mutual fund may purchase and redeem (*i.e.*, sell back) shares directly from the mutual fund, only a limited number of Authorized Participants may purchase and redeem shares directly from an ETF. *Id.* at 18, 67, 71. Authorized Participants purchase and redeem shares from ETFs at the daily NAV and only in large blocks of shares (typically 100,000 shares called "Creation Baskets"). *Id.* at 1, 64. Investors then buy and sell ETF shares on the secondary market through Authorized Participants or other intermediaries throughout the trading day at market prices that vary based on the forces of supply, demand, and other economic or regulatory factors. *Id.* at 12, 18. Thus, ETF share prices in the secondary market are set by market forces, not by the ETF. *Id.* at 12, 18. ETF share prices in the

---

BNP Paribas Securities Corp., Citadel Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities (USA) LLC, Deutsche Bank Securities Inc., Morgan Stanley & Company, Inc. (n/k/a Morgan Stanley & Company, LLC), Nomura Securities International, Inc., RBC Capital Markets, LLC, SG Americas Securities LLC, and UBS Securities LLC.

secondary market often correspond with the NAV, but they can (and often do) trade at a premium or discount to the NAV.  *Id.* at 1, 12, 18, 24, 30.

### C.  Disclosures in the Challenged USO Registration Statements

As explained below, the Registration Statements disclosed all of the Fund's relevant structural features, external market conditions, and attendant investment risks that could affect an investment in USO.

### 1.  The Registration Statements Disclosed that USO Has a Daily Investment Objective to Provide Exposure to the Daily Performance of the Benchmark Oil Futures Contract

USO's investment objective is for the daily percentage change of its NAV per share to "reflect" the daily percentage change in the spot price of WTI crude oil – "*as measured by the daily changes in the price of a specified short-term futures contract on light, sweet crude oil (the 'Benchmark Oil Futures Contract')* plus interest earned on USO's collateral holdings, less USO's expenses." *Id.* at 5, 9, 30 (emphasis added).  USO's investment objective is based on the Benchmark Oil Futures Contract, not the price of crude oil. *Id.* at 5 ("Investors should be aware that USO's investment objective is *not* for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, *nor* is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period *greater than one day.*"); *see also id.* at 9, 30.[4]

The Benchmark Oil Futures Contract is defined as the WTI futures contract "that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract

---

[4] All emphasis is as in the original unless otherwise noted.

to expire." *Id.* at 5, 30.  The "Benchmark Oil Futures Contract is changed from the near month contract to the next month contract over a four-day period . . . . two weeks prior to expiration of the near month contract for that month." *Id.* at 30.  By the fourth day of the "roll," the Benchmark has transitioned fully to the next month contract, and the cycle begins again. *Id.*

> ### 2.  The Registration Statements Disclosed that USO Seeks Its Investment Objective but Is Not Otherwise Actively Managed, Regardless of Market Developments and Trends

In seeking its investment objective, USO "invest[s] so that the average daily percentage change in USO's NAV *for any period of 30 successive valuation days will be within plus/minus ten percent (10%)* of the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period." *Id.* at 5, 9 (emphasis added); *see also id.* at 24.  USO primarily invests in oil futures contracts, which include "futures contracts for light, sweet crude oil, other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels." *Id.* at 5.  USO also may invest in other oil-related investments "to a lesser extent, in order to comply with regulatory requirements or in view of market conditions." *Id.*  As disclosed, "***USO is not actively managed and tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising***." *Id.* at 17.  Thus, "if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with" the monthly change in the Benchmark Oil Futures Contract and redeeming Creation Baskets.[5] *Id.*  This "'neutral' investment strategy"

---

[5] As defined in the Registration Statements, "Oil Interests" include "Oil Futures Contracts" and "Other Oil-Related Investments." RS at 5.  "Oil Futures Contracts" include "futures contracts for light, sweet crude oil, other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels that are traded on the NYMEX, ICE Futures Europe and ICE Futures U.S. (together, 'ICE Futures') or other U.S. and foreign exchanges." *Id.*  "Other Oil-Related Investments" include "cash-settled options on Oil Futures Contracts, forward contracts for oil, cleared swap contracts and non-exchange traded ('over-the-counter' or 'OTC') transactions that

means that USO will "track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down." *Id.* at 25.

Although USO is not actively managed, USCF maintains discretion over USO's investments in determining how best to meet the investment objective. *Id.* at 12. USCF can diversify USO's investments "for various reasons, including the ability to enter into the precise amount of exposure to the crude oil market, position limits or other regulatory requirements limiting USO's holdings, and market conditions." *Id.* at 29. Importantly, "[t]he specific Oil Futures Contracts purchased depend on various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts *with respect to the month of expiration*, and the prevailing price volatility of particular contracts." *Id.* (emphasis added). When investing in oil futures contracts, "USCF does not anticipate letting USO's Oil Futures Contracts expire and taking delivery of the underlying commodity." *Id.* Instead, "USCF anticipates it will 'roll' USO's positions," *id.* at 30, which it may do "when it changes the Benchmark Oil Futures Contracts or Other Oil-Related Investments *or it otherwise determines it would be appropriate to do so.*" *Id.* at 29 (emphasis added). "The *anticipated* dates that the monthly four-day roll period will commence are posted on USO's website at *www.uscfinvestments.com*, and *are subject to change without notice.*" *Id.* at 30 (emphasis added). In addition, "[t]he daily holdings of USO are available on USO's website at *www.uscfinvestments.com.*" *Id.* at 24.

---

are based on the price of oil, other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing." *Id.*

### 3. The Registration Statements Disclosed that Large Losses Can Be Caused by Volatility and Illiquidity, the Risk of which May Be Increased by USO's Large Positions in Futures Contracts

The Registration Statements emphasized that "[f]utures contracts have a high degree of price variability and are subject to occasional rapid and substantial changes," and "*Price Volatility May Possibly Cause the Total Loss of Your Investment*." *Id.* at 10.  They warned:

> **YOU SHOULD CAREFULLY CONSIDER WHETHER YOUR FINANCIAL CONDITION PERMITS YOU TO PARTICIPATE IN A COMMODITY POOL.  IN SO DOING, YOU SHOULD BE AWARE THAT COMMODITY INTEREST TRADING CAN QUICKLY LEAD TO LARGE LOSSES AS WELL AS GAINS.  SUCH TRADING LOSSES CAN SHARPLY REDUCE THE NET ASSET VALUE OF THE POOL AND CONSEQUENTLY THE VALUE OF YOUR INTEREST IN THE POOL.**

*Id.* at 3.  Put simply, "*all or substantially all of an investment in USO could be lost.*" *Id.* at 9, 10 (emphasis added).

Further, in a section called "*[c]ertain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time,*" the Registration Statements warned that "[t]he large size of the positions that USO may acquire increases the risk of illiquidity both by making its positions more difficult to liquidate and by potentially increasing losses while trying to do so." *Id.* at 17.  The Registration Statements explained that USO's "[f]utures positions cannot always be liquidated at the desired price," and "losses may be incurred during the period in which positions are being liquidated." *Id.*  In particular, it can be "difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market" or in the event of "[a] market disruption, such as a foreign government taking political actions that disrupt the market for . . . its crude oil production or exports." *Id.*

4. **The Registration Statements Disclosed that USO's Benchmark and Investment Portfolio Are Subject to the Natural Market Force of Contango**

Contango is a market condition in which investors are willing to pay more for a commodity in the future than they are today, causing the commodity's future price to trade at a premium above its current spot price. As relevant to USO, which holds primarily oil futures contracts rather than oil itself, contango results in "a crude oil futures market where near month contracts trade at a lower price than next month contracts."[6] *Id.* at 13. Because USO's "strategy . . . entails holding the near month contract," which it then rolls forward prior to expiration to the next month contract, "the price relationship between that [near month] futures contract and the next month futures contract will impact returns." *Id.* at 26. Specifically, "[i]f the futures market is in contango," USO (like any other investor) "would be buying a next month futures contract for a higher price than the current near month futures contract." *Id.* In particular, investors were warned that during periods of contango, "investors could lose part or all of their investment" and "a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return." *Id.* at 13 ("***Natural forces in the oil futures market known as . . . 'contango' may increase USO's tracking error and/or negatively impact total return***."); *see also id.* at 6, 25.

5. **The Registration Statements Disclosed that Accountability Levels and Position Limits Are More Likely to Be Imposed as USO's Assets Grow and May Affect Returns**

Like other investors in the futures markets, USO is subject to regulatory limits "on the maximum net long or net short futures contracts in commodity interests that" it "may hold, own or control." *Id.* at 13. Accountability level regulatory limits "are not a fixed ceiling, but rather a

---

[6] The Registration Statements also described an opposite market force, "backwardation," whereby "near month contracts trade at a higher price than next month to expire contract." RS at 13.

threshold above which the exchange may exercise greater scrutiny and control over an investor's positions."[7]  *Id.*  As explained to investors, if USO exceeds these regulatory limits, it may be subject to further monitoring by the futures exchanges, "including [of its] total size of all positions, investment and trading strategy, and the extent of liquidity resources of USO and the Related Public Funds." *Id.*  "If deemed necessary" by the exchanges, "USO could be ordered to reduce its futures contracts traded on such exchanges to below the 10,000 single month and/or 20,000 all month accountability level." *Id.*  "The effect of any future regulatory change on USO is impossible to predict, but it could be substantial and adverse."  *Id.* at 20 (warning "futures exchanges are authorized to take extraordinary actions in the event of a market emergency").

Investors specifically were warned that "[a]s USO's assets reach higher levels, it is more likely to exceed position limits, accountability levels or other regulatory limits and, as a result, it is more likely that it will invest in accordance with such priority in Other Oil-Related Investments at such higher levels." *Id.* at 29.  If "USO exceeds accountability levels on either the NYMEX or ICE Futures and is required by such exchanges to reduce its holdings, such reduction could potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract."  *Id.* at 14; *see also id.* at 13 ("***Accountability levels, position limits, and daily price fluctuation limits set by the exchanges have the potential to cause tracking error, which could cause the price of shares to substantially vary from the price of the Benchmark Oil Futures Contract***.").

---

[7] For example, as USO disclosed before the start of the class period in its Form 10-K, "USO exceeded accountability levels of the NYMEX during the year ended December 31, 2019 when it held a maximum of 33,818 Crude Oil Futures CL contracts, on the NYMEX, exceeding the 'any' month limit.  No action was taken by the NYMEX and USO did not reduce the number of Futures Contracts held as a result."  Roy Decl. Ex. 3 (Form 10-K at 9 (Feb. 21, 2020)).

**6. The Registration Statements Disclosed the Possibility of Non-Correlation or Tracking Errors Among USO's NAV, USO's Share Price, the Spot Price of Crude Oil, and the Price of the Benchmark Oil Futures Contract**

In addition to the disclosures described above warning of possible tracking errors (*i.e.*, non-correlation) caused by contango and regulatory limits, *id.* at 13, the Registration Statements warned at length that, "[t]o the extent that investors use USO as a means of indirectly investing in crude oil, there is the risk that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis, will not closely track the daily changes in the spot price of light, sweet crude oil on a percentage basis." *Id.* at 6; *see also id.* at 5, 25. USO's share price and the spot price of crude oil may not correlate if [1] USO's share price "does not correlate closely with the value of USO's NAV; [2] the changes in USO's NAV do not correlate closely with the changes in the price of the Benchmark Oil Futures Contract; or [3] the changes in the price of the Benchmark Oil Futures Contract do not closely correlate with the changes in the cash or spot price of crude oil." *Id.* at 6; *see also id.* at 12. There is a "risk that the daily changes in the price of USO's shares, in percentage terms, will not accurately track the daily changes in the Benchmark Oil Futures Contract, in percentage terms, and that daily changes in the Benchmark Oil Futures Contract in percentage terms, will not closely correlate with daily changes in the spot prices of light, sweet crude oil, in percentage terms." *Id.* at 25.[8] Non-correlation can be caused by many factors, including market disruptions, variation in the oil markets, supply and demand for oil futures contracts and other oil-related investments, regulatory limits, expenses (including the Fund's

---

[8] As noted below, despite these warnings of tracking error risk, the Fund in fact achieved its stated investment objective throughout the class period. *See* Roy Decl. Ex. 4 (Excerpted Prospectus at 4 (June 12, 2020) ("[T]he average percentage difference for the 30-day period ending March 31, 2020 was -0.004%, for the 30-day period ending April 30, 2020, it was -1.364% and for the 30-day period ending May 31, 2020, it was -2.247%.")).

management fee), transaction costs, interest income, and other extraordinary circumstances.  *Id.* at 12, 21, 25.  As a result, "investors may not be able to use USO as a cost-effective way to indirectly invest in crude oil."  *Id.* at 6.

Notably, the Registration Statements explained in detail that "***[t]he market price at which investors buy or sell [USO] shares may be significantly less or more than NAV***" because USO's share price is set by "supply and demand forces at work in the secondary trading market" (*i.e.*, the NYSE Arca), while USO's NAV varies "throughout the day as fluctuations occur in the market value of USO's portfolio investments."  *Id.* at 12.  As a result, there may be a "discount or premium in the trading price relative to the NAV per share," which "may be influenced by various factors, including the number of investors who seek to purchase or sell shares in the secondary market [*i.e.*, the volume of trading on the secondary market] and the liquidity of the Oil Futures Contracts market [*i.e.*, liquidity in the WTI futures market]."  *Id.* at 71.[9]

### 7. Market Developments that Impact Supply and Demand for Crude Oil May Impact the Prices of Crude Oil and Oil Futures Contracts

The Registration Statements discussed at length the "***[e]conomic conditions impacting crude oil***."  *Id.* at 9–10.  "Crude oil prices depend on local, regional and global events or conditions that affect supply and demand for oil."  *Id.* at 9.  The "***crude oil demand-related factors*** . . . that may affect the demand for crude oil and therefore its price, include . . . changes in technology or

---

[9] Likewise, non-correlation between USO's share price and NAV "may also be influenced by non-concurrent trading hours" between the end of regular trading of WTI futures contracts on the NYMEX (2:30 p.m.) and the end of trading of USO shares on the NYSE Arca (4:00 p.m.).  RS at 12, 32, 66.  In that time window, "liquidity in the global light sweet crude market will be reduced" and "trading spreads and the resulting premium or discount on the shares may widen and, therefore, increase the difference between the price of the shares and the NAV of the shares."  *Id.* at 12; *see also id.* at 71.  "USCF expects that exploitation of certain arbitrage opportunities by Authorized Participants and their clients and customers will tend to cause the public trading price to track NAV per share closely over time, but *there can be no assurance of that*."  *Id.* at 12 (emphasis added).

consumer preferences that alter fuel choices," *id.*, as well as "[v]ariables such as drought, floods, weather, embargoes, tariffs and other political events." *Id.* at 11. In addition, "[o]ther factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil." *Id.* at 9. In particular, "demand for crude oil correlates closely with general economic growth rates," and "[t]he occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices." *Id.* The March Registration Statement added "pandemics (e.g. COVID-19)" to this illustrative list of economic conditions that may impact demand for crude oil. *Id.* Likewise, "[c]rude oil prices also vary depending on a number of factors affecting supply," including "adherence by member countries to the Organization of the Petroleum Exporting Countries ('OPEC') production quotas and the occurrence of wars" and "hostile actions." *Id.* These factors "may have a larger impact on crude oil prices and . . . Oil Futures Contracts . . . than on traditional securities" and "create additional investment risks that subject USO's investments to greater volatility than investments in traditional securities." *Id.* at 11. As discussed below, all of the events to which Plaintiff points – and which contributed to these economic conditions about which the offering materials warned investors – unfolded publicly before investors.

### D. Class Period Events

#### 1. Major, Well-Known World Events Affected Oil Prices

As alleged in the CAC, during the class period, COVID-19, an oil price war, and other extraordinary world and economic events increased supply and lowered demand for crude oil – causing a drop in prices of crude oil and oil futures contracts. CAC ¶¶ 60–61. In January 2020, a new strain of coronavirus was discovered in China, *id.* ¶ 60, and, in February, cases began to spread globally. *Id.* ¶ 61. On March 8, supply of crude oil increased when Saudi Arabia "shocked global

oil markets by announcing price discounts for its oil exports . . . . threaten[ing] to overwhelm global oil markets with supply." *Id.* ¶ 64. "Russia responded in kind, and soon the two countries were flooding global markets with cheap oil." *Id.* ¶ 65. On March 11, COVID-19 was declared a pandemic, and by March 20, California and New York had announced stay-at-home orders. *Id.* ¶ 67. Throughout the class period, additional states and nations followed suit. All of "[t]hese dramatic events created significant turmoil in oil markets." *Id.* ¶ 65. As a result, demand for crude oil declined and storage capacity for crude oil became limited while supply increased, *id.* ¶¶ 5, 66 – causing prices of near month WTI futures contracts to decline. *Id.* ¶ 67.

## 2. Investors Hoping to Buy into the Dip Purchased USO Shares

As oil prices declined, the value of USO's portfolio holdings and NAV decreased per its disclosed design and structure. Investors observed the drop in value of USO shares and hoped to "take advantage" of market conditions (*i.e.*, an anticipated rebound in oil prices) to turn a profit – leading to increased trading volume in USO shares. *Id.* ¶ 62. To keep up with investor demand, in February and March 2020, the Fund registered new shares and conducted offerings after the SEC declared the Registration Statements effective. As disclosed at the top of the first page, the February Registration Statement registered 425,300,000 new shares, and the March Registration Statement registered 1,136,200,000 new shares. RS at 1. As investors chose to purchase these new USO shares, the size of the Fund's assets under management naturally grew. CAC ¶¶ 6, 62. In turn and as disclosed, the Fund invested in additional near month WTI futures contracts and other permitted investments. RS at 5, 24, 29. The Fund also published its daily holdings on its website. *Id.* at 24. The website further disclosed that the Fund rolled from April to May WTI futures contracts between March 6 and March 11. CAC ¶ 82. By March 11, the Fund no longer held April WTI futures contracts. *Id.* Then, between April 7 and April 13, the Fund rolled from May to June WTI futures contracts. *Id.* By April 13, the Fund no longer held May WTI futures

contracts. *Id.* A week later, on April 20, May WTI futures contracts (which the Fund no longer held) closed at a negative price the day before their April 21 expiration. *Id.* ¶ 13.

### 3. As Regulatory Limits Began To Be Imposed on USO's Investments, USO Fully Disclosed Portfolio Reallocations

In mid-April, accountability levels and position limits began to be imposed on the Fund's investments in WTI futures contracts. *Id.* ¶ 116. Each time the limits were imposed, USO promptly filed a Form 8-K press release with the SEC disclosing how it would reallocate its holdings across later month WTI futures contracts to comply with the limits. *Id.* ¶¶ 116–23; *see, e.g.*, Roy Decl. Ex. 5 (Form 8-K at 2 (Apr. 16, 2020)). In each disclosure, USO warned that it may not meet its investment objective as a result of its changed portfolio.

On April 20, USO filed a Form S-3 registration statement with the SEC to register further new shares, on top of those issued in the February and March offerings. CAC ¶ 99. That same day, USO filed a Form 8-K warning investors that it may suspend its sale of Creation Baskets to Authorized Participants if it ran out of registered shares before the SEC declared its latest registration statement effective. *See* Roy Decl. Ex. 6 (Form 8-K at 2 (Apr. 20, 2020)). On April 21, USO disclosed that the SEC had not yet declared its latest registration statement effective, and USO was suspending the sale of Creation Baskets. CAC ¶¶ 117, 187; *see also* Roy Decl. Ex. 7 (Form 8-K at 2 (Apr. 21, 2020)). Thereafter, USO issued additional Form 8-K disclosures that it was reallocating its holdings across later month WTI futures contracts. *See, e.g.*, CAC ¶¶ 120, 186; Roy Decl. Ex. 8 (Form 8-K at 2 (Apr. 22, 2020)). The SEC later declared an amended version of the April registration statement effective in June 2020.

Despite the extraordinary class period developments, the Fund consistently met its investment objective by investing so that its average daily percentage change in its NAV over any period of 30 successive valuation days remained within plus or minus 10% of the average daily

percentage change in the price of the Benchmark over the same period. *See* Roy Decl. Ex. 4 (Excerpted Prospectus at 4 (June 12, 2020) ("[T]he average percentage difference for the 30-day period ending March 31, 2020 was -0.004%, for the 30-day period ending April 30, 2020, it was -1.364% and for the 30-day period ending May 31, 2020, it was -2.247%" – all of which were well within the plus or minus 10% range.)).

###        E.        Alleged Misrepresentations and Omissions

Plaintiff alleges that there are materially misleading misrepresentations and omissions in the Registration Statements regarding the risks related to the Fund's structure, its investment portfolio, and the scope and impact of external market conditions. *First*, the Registration Statements allegedly failed to disclose that USO's class period offerings and large positions in WTI futures contracts could materially increase the risks to the Fund by heightening liquidity constraints in the WTI futures market, CAC ¶ 169, exacerbating the risks of contango, *id.* ¶¶ 3, 17, 82–89, and "forcing the Fund to run up against regulatory limits." *Id.* ¶¶ 142, 145–46, 169. *Second*, the Registration Statements allegedly misled investors into believing "percentage daily changes in the price of USO shares, USO's NAV per share, WTI near months futures contracts and spot prices should move almost perfectly in tandem." *Id.* ¶ 102. *Third*, the Registration Statements allegedly failed to disclose the "specific impacts" of the COVID-19 pandemic and the Russian-Saudi price war on the Fund's performance. *Id.* ¶ 141.

Plaintiff also challenges other class period disclosures, alleging: (a) information on the USCF website, including "a Fund 'factsheet' compiled by the USO Defendants, contained misstatements or omissions, *id.* ¶¶ 178–82; (b) the March 20 and 24 Form 8-Ks misstated the financial condition of the Fund, *id.* ¶¶ 184–85; (c) the April 16 Form 8-K and an April 22 Form 8-K failed to provide the reasons for the Fund's reallocation of its investments, *id.* ¶ 186; and (d) an

April 21 Form 8-K failed to explain why the SEC had not yet declared the April 20 registration statement effective. *Id.* ¶ 187.

## ARGUMENT

When faced with a Fed. R. Civ. P. 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 557). The factual allegations in the complaint must be sufficient "to raise a right to relief above the speculative level" and must "plausibly suggest[]" liability. *Twombly*, 550 U.S. at 555, 557 (citations omitted). While the court must take all well-pled *facts* as true in deciding a motion under Rule 12(b)(6), "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

In addition, under Fed. R. Civ. P. 9(b), a heightened pleading standard applies to claims alleging fraud. *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009). Rule 9(b) requires plaintiffs to plead alleged misstatements or omissions with particularity by specifying which statements were fraudulent, who made the statements, when and where the statements were made, and why the statements were fraudulent. *See ATSI*, 493 F.3d at 99. Rule 9(b) applies to Section 10(b) and Rule 10b-5 claims as well as Section 11 claims that are "grounded in fraud." *See Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004). Section 11 claims not "styled or denominated" as fraud are also held to the heightened Rule 9(b) pleading requirements if based on allegations of fraud. *Id.* at 171. Here, Plaintiff's Section 11 claims are grounded in fraud as Plaintiff relies on the same factual allegations in support of all of its claims. *See Lighthouse Fin. Grp. v. Royal Bank of Scotland Grp., PLC*, 902 F. Supp. 2d 329, 338–39

(S.D.N.Y. 2012) (plaintiffs cannot avoid Rule 9(b) by "separat[ing] their claims into separate sections" if "the false and misleading statements and omissions alleged for both sets of claims pertain to the exact same underlying events"), *aff'd sub nom. IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp., PLC*, 783 F.3d 383 (2d Cir. 2015).

Even setting aside the heightened pleading standards of Rule 9(b), the CAC fails to satisfy the basic standard pleading requirements set forth in Rule 8 because the Registration Statements' disclosures on their face fully and accurately describe the nature and risks of investing in the Fund and do not contain material misstatements or misleading omissions.

## I.    ALL CLAIMS MUST BE DISMISSED BECAUSE THE CAC FAILS TO ALLEGE MATERIAL MISSTATEMENTS OR OMISSIONS

Plaintiff's Securities Act claims (Counts I and II) are based on alleged misrepresentations and omissions in the Registration Statements.  The Exchange Act claims (Counts III and IV) are based on these same allegations regarding the Registration Statements, as well as alleged misrepresentations and omissions in subsequent Fund filings.  To bring a viable misrepresentation or omission claim under Section 11 of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5, Plaintiff must allege that each challenged Registration Statement contained a false statement of material fact or omitted a material fact "necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); *see also Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir. 1991). To bring an omission claim, Plaintiff further must allege that Defendants had a duty to disclose the allegedly omitted information.  *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360–61 (2d Cir. 2010).  All of Plaintiff's claims fail as a matter of law because the CAC points to no fact in the Registration Statements or elsewhere that is even arguably false or misleading and asserts no omission of material fact that renders the disclosures misleading.

As the Second Circuit has explained, the key inquiry is whether the challenged disclosure documents "read as a whole," "cover-to-cover," and "taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003)); *see also DeMaria*, 318 F.3d at 180 (explaining offering documents must be read as a whole as the "inquiry does not focus on whether particular statements, taken separately, were literally true" (citation and internal quotation marks omitted)). A misstatement or omission must be "material" to be actionable. A misstatement is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *ECA*, 553 F.3d at 197 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)). For an alleged omission, there must be "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *Basic*, 485 U.S. at 231–32). The "total mix" includes "all facts related to the statement or omission, its surrounding text, the offering documents, the securities, the structure of the transaction, and the market in which the transaction occurs." *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 151 (2d Cir. 2017). In applying the "reasonable investor" materiality standard, courts "presume that a reasonable investor can comprehend the basic meaning of plain-English disclosures." *ProShares*, 728 F.3d at 103.

Courts routinely dismiss securities claims where the disclosure documents sufficiently warned of the risks or other features about which the plaintiff claims to have been misled:

> If a plaintiff's claims of misstatement or omission conflict with the plain language of the prospectus, the prospectus controls and the court need not accept as true the allegations of the complaint. In such a situation, dismissal of the complaint is proper, for no additional facts can prove the claims. The Second Circuit has consistently affirmed Rule 12(b)(6) dismissals of securities claims where the risks of which plaintiffs complained were disclosed in the prospectus.

*Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) (citations omitted); *ProShares*, 728 F.3d at 102 ("[W]hen a registration statement warns of the exact risk that later materialized, a [S]ection 11 claim will not lie as a matter of law." (citation omitted)). A disclosure need only warn of the nature of the risks and "need not disclose every possible permutation of the risk, nor predict the precise manner in which the risks will manifest themselves." *In re ProShares Tr. Sec. Litig.*, 889 F. Supp. 2d 644, 655 (S.D.N.Y. 2012) (citation and internal quotation marks omitted), *aff'd*, 728 F.3d 96 (2d Cir. 2013).

### A. The Challenged Registration Statements Fully and Accurately Disclosed the Fund Features and Risks that Allegedly Caused Its Value to Decline

Plaintiff's core theory – that the Registration Statements failed to disclose the risks that USO's own large positions in WTI futures could contribute to market illiquidity, contango, imposition of regulatory limits, and ultimately large investor losses – fails because the Registration Statements fully and accurately disclosed all relevant Fund features and risks as to which Plaintiff claims to have been misled.[10] Even assuming the truth of Plaintiff's far-fetched allegations that investor losses during the class period were due to anything other than the massive and still developing economic shocks, the Registration Statements disclosed: (1) USO's large positions in WTI futures contracts may contribute to illiquidity and are subject to large sudden losses; (2) the effects of contango and the potential negative effects of USO's large trades during contango; (3) regulatory limits are more likely to be imposed as USO's assets grow, and USCF may diversify

---

[10] To the extent Plaintiff seeks to call into question Defendants' decision to issue shares of USO during the class period as USO disclosed it would, this decision simply is not actionable under the securities laws. *See, e.g.*, *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) ("In order for market activity to be manipulative, that conduct must involve misrepresentation or nondisclosure."). As a part of its normal operations, USO continuously registers new shares when its remaining shares are low so that it may meet investor demand and ensure that shares are available for Authorized Participants to purchase for Creation Baskets. RS at 2, 5, 64. USO's decision to issue shares in the ordinary course cannot be tied to any misrepresentation or omission.

USO's investment portfolio by purchasing later month WTI futures contracts; (4) the possibility of tracking errors or non-correlation among USO's NAV, USO's share price, the spot price of crude oil, and the value of the Benchmark; and (5) market developments that impact supply and demand for crude oil may affect prices of crude oil and oil futures contracts.  As explained below, the disclosures are easily of "sufficient precision and clarity to alert prudent investors to the nature of the offerings and the risks entailed."  *Rubinstein v. Credit Suisse Grp. AG*, 457 F. Supp. 3d 289, 295 (S.D.N.Y. 2020) (quoting *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 664 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009)).

      1.       **The Registration Statements Disclosed that USO's Large Positions in WTI Futures Contracts May Contribute to Illiquidity and Are Subject to Large Sudden Losses**

Contrary to Plaintiff's core theory, the Registration Statements warned of the risks posed by illiquidity in the WTI futures market and that USO's large positions in WTI futures could increase that risk.  Specifically, investors were warned that during periods of illiquidity it can be "difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market."  RS at 17.  Further, the Registration Statements fully disclosed that, in passively seeking its investment objective, USO sells its large positions in near month futures contracts prior to their expiration even if "losses may be incurred during the period in which positions are being liquidated."  *Id.*  USO does this to avoid "letting USO's Oil Futures Contracts expire and taking delivery of the underlying commodity," *id.* at 29, and to continue passively "track[ing] the Benchmark Oil Futures Contract" including "***when the price is rising***."  *Id.* at 17. Because "[f]utures positions cannot always be liquidated at the desired price," USO may need to sell its futures positions at unfavorable prices.  *Id*. at 17.  The disclosures thus warned:  "***Certain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time***."  *Id.*

The Registration Statements further warned that the Fund's own large holdings could magnify the illiquidity risk. "*The large size of the positions that USO may acquire increases the risk of illiquidity* both by making its positions more difficult to liquidate and by potentially increasing losses while trying to do so." *Id.* (emphasis added). Investors were also informed of just how large the Fund's holdings were, and that they could be expected to grow. The Fund provided the exact size and nature of its daily investment holdings on its website. *Id.* at 24. The Registration Statements also disclosed the size of USO's class period offerings, *id.* at 1, as well as the total number of outstanding USO shares trading in the secondary market. *Id.* at 32. The Registration Statements further warned that, as investors purchased USO shares, USO would invest the proceeds in additional WTI futures contracts. *Id.* at 14 ("USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments."); *id.* at 77 ("USO expects to invest primarily in futures contracts, and particularly in futures contracts traded on the NYMEX."); *see also id.* at 20, 24, 29. Investors were thus fully informed of the potential illiquidity risk posed by USO's own large holdings in WTI futures contracts.

Recently, Judge Denise L. Cote held that similar disclosures were sufficient to "lead a reasonable investor to know that the Fund's own conduct in purchasing and selling VIX futures contracts could affect market liquidity and drive down the value of [Fund] shares." *See In re Proshares Tr. II Sec. Litig.*, No. 19-cv-886, 2020 WL 71007, at *7 (S.D.N.Y. Jan. 3, 2020). There, the disclosures stated in nearly identical language that "[t]he large size of the positions which the [Fund] may acquire increases the risk of illiquidity by both making their positions more difficult to liquidate and increasing the losses incurred while trying to do so." *Id.* As in *ProShares*, a

reasonable investor would understand that USO's large positions in WTI futures contracts could affect market liquidity, the Fund's ability to trade at favorable prices, and investor losses.

Despite these clear warnings, Plaintiff claims that the March Registration Statement misled investors by stating "that the Fund's investments remained highly liquid," CAC ¶¶ 166–69, pointing to the following passage of the Registration Statements entitled "***Liquidity***":

> USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking and liquidation of positions in these financial interests and in Other Oil-Related Investments that, in the opinion of USCF, may be readily liquidated with the original counterparty or through a third party assuming the position of USO.

RS at 30.  But this passage did not promise that the prices of USO's investments would be unaffected by market illiquidity.  Rather, it simply stated that USO invests in instruments that "in the opinion of USCF" have sufficient volume to allow for ready liquidation – that is, enough volume to allow USO to sell its positions.  *Id.*  By no means was this a representation that USO's investments were "highly" liquid such that the price of these sales would be unaffected by periods of relative illiquidity.  Indeed, reading this "Liquidity" statement alongside disclosures that "[f]utures positions cannot always be liquidated at the desired price" and "***[c]ertain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time***," *id.* at 17, a reasonable investor would understand that the price of USO's investments could be negatively affected by liquidity constraints.

### 2.     The Registration Statements Disclosed the Effects of Contango and the Potential Negative Effects of USO's Large Trades During Contango

The CAC concedes that the Registration Statements disclosed "the potential effects of 'contango'" and illustrative historical data regarding contango.  CAC ¶ 161.  Yet, Plaintiff avers that the Registration Statements failed to disclose "[USO] ***Defendants' own role*** in exacerbating that contango dynamic" by allegedly "flooding the market" with near month WTI futures contracts

during the roll period.  *Id.* ¶ 89.  To the contrary, the Registration Statements fully disclosed the risks posed by USO's large trades in a contango environment, as explained below, and Plaintiff's conclusory theory of USO's market impact is unsupported by any plausible factual allegation.[11]

*First*, the Registration Statements explained that USO is subject to the natural market dynamic of contango – whereby prices for near month futures contracts are lower than prices for next month futures contracts.  RS at 26 ("If the futures market is in contango, an investor would be buying a next month futures contract for a higher price than the current near month futures contract.").  In this contango environment, "the value of an investment in the second month would tend to underperform the spot price of crude oil."  *Id.*  Nevertheless, USO will continue to roll its futures positions forward each month, typically over a four-day period, *id.* at 30, consistent with its investment objective and to avoid taking delivery of the underlying commodity.  *Id.* at 29.  Thus, the Registration Statements were clear that USO rolls its positions from near month futures to next month futures even if contango is present, in effect causing the Fund to sell low and buy high.  *Id.* As noted above, the Registration Statements also made clear to investors the large size of USO's holdings in WTI futures contracts as well as the potential effect of that size on pricing.  *Id.* at 1, 24, 32.  The disclosures plainly warned of the resulting potential of investor losses from pursuing the Fund's strategy during contango.  *Id.* at 6, 13 ("'*[C]ontango' may increase USO's tracking error and/or negatively impact total return*," including "[w]hen compared to total return of other

---

[11] Moreover, despite Plaintiff's allegations to the contrary, CAC ¶¶ 122, 158, the Registration Statements did not misrepresent the roll period for USO's Benchmark or investment portfolio.  Throughout the class period, the Benchmark rolled over four-day periods as disclosed.  RS at 13, 30.  By contrast, with respect to USO portfolio's own roll period, the Registration Statements had warned that "[t]he anticipated dates that the monthly four-day roll period will commence are posted on USO's website at *www.uscfinvestments.com*, and are subject to change without notice."  *Id.* at 30.  A reasonable investor would have thus understood that USO's roll period for its futures positions might "change without notice."  *Id.*

price indices, such as the spot price of crude oil, the impact of . . . contango may cause the total

return of USO's per share NAV to vary significantly.").   The Registration Statements expressly

warned, "[i]n the future, it is likely that the relationship between the market price of USO's shares

and changes in the spot prices of light, sweet crude oil will continue to be impacted by contango."

*Id.* at 5, 25.   No reasonable investor could have misunderstood that the Fund's returns could be

negatively affected by a contango environment and that the Fund's large monthly rolling trades in

that environment could exacerbate those effects.

Plaintiff contends that the March Registration Statement[12] misleadingly claimed that

"'[p]eriods of contango . . . do ***not*** materially impact USO's investment objective.'"   CAC ¶¶ 89,

143, 161.   In so alleging, Plaintiff appears to confuse an impact on USO's investment objective

with an impact on USO's returns.   The passage referenced in the CAC reads:

> Periods of contango or backwardation *[i.e., the reverse of contango]* do not
> materially impact USO's investment objective of having the daily percentage
> changes in its per share NAV track the daily percentage changes in the price of the
> Benchmark Oil Futures Contract *since the impact of backwardation and contango*
> *tend to equally impact the daily percentage changes in price of both USO's shares*
> *and the Benchmark Oil Futures Contract.*

RS at 29 (emphasis added).   This is simply an explanation that contango does not materially impact

the Fund's ability to achieve its investment objective of tracking the Benchmark because contango

tends to equally affect USO's share price and the Benchmark.   *Id.*   This is not a statement that

contango will not affect USO's returns.   Investors clearly were warned that contango may cause

investor losses, even if it leaves the Fund still able to meet its investment objective.

---

[12] The CAC does not appear to allege a misstatement or omission concerning contango in the
February Registration Statement – conceding that "[b]y the start of the February Offering,
contango effects were relatively modest."   CAC ¶ 90.   Even if it did challenge the disclosures in
the February Registration Statement, those allegations would fail for the same reasons.

*Second*, Plaintiff's allegations regarding the alleged impact of USO's rolling positions on the market price of WTI futures are entirely conclusory.  For example, the CAC posits that USO "created intense selling pressure" as it transitioned from May to June WTI futures contracts between April 7 and April 13 – allegedly causing the price of May WTI futures to go negative a week later on April 20.  CAC ¶¶ 83, 115.  But the CAC offers no plausible factual allegations or explanation for how the Fund could impact the value of May WTI futures contracts that *it no longer owned* or why the April 20 negative price of May WTI futures is relevant in any way whatsoever to the Fund or investor losses.  As Plaintiff concedes, by the time that May WTI futures went negative on April 20, USO's Benchmark and investment portfolio had transitioned to holding June WTI futures.  *Id.* ¶ 83.  Thus, the price of May WTI futures could not have affected the value of USO's Benchmark, NAV, or share price.  Instead of alleging facts to support this theory, the CAC cites an unidentified "market observer[]" who contends, "on April 20 . . . [e]xchange-traded products like USO, along with other investors, were caught holding positions that would have required them to take delivery of crude barrels with few places to put it, leading to a panicked selloff."  *Id.*  This article is demonstrably wrong.  As the CAC admits, USO completed its roll out of May WTI futures on April 13, thus USO did not hold *any* positions in May WTI futures as of April 20.  *Id.*  USO therefore could not have been required to take delivery of crude barrels, and its holdings could not have affected the market price of WTI futures on April 20.

### 3. The Registration Statements Disclosed that Regulatory Limits Are More Likely to Be Imposed as USO's Assets Grow, and USCF May Diversify USO's Investment Portfolio by Purchasing Later Month WTI Futures Contracts

Plaintiff next asserts that the March Registration Statement failed to disclose "that the March Offering *itself* would cause USO to run up against regulatory limits that sharply constrained the Sponsor's investment discretion, compounding already severe market disruptions and

accelerating investor losses."  CAC ¶ 150.  This allegation runs headlong into both Registration Statements' clear disclosures of the potential imposition of regulatory limits as USO's assets grew and USCF's discretion to diversify the Fund's portfolio holdings in response.[13]

Specifically, the Registration Statements warned that USO's positions in futures contracts are subject to position limits and accountability levels, and "[a]s USO's assets reach higher levels, it is more likely to exceed position limits, accountability levels or other regulatory limits."  RS at 29.  Nevertheless, "USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments."  *Id.* at 14.  Thus, even though Defendants had no way of predicting investor demand for shares, the Registration Statements plainly warned that USO would continue to issue shares and, in turn, would continue to invest in futures contracts even as USO's assets grew.  *Id.*  The Registration Statements also explained that USCF has discretion to diversify USO's investment portfolio by investing in WTI futures contracts with later expiration dates:  "The specific Oil Futures Contracts purchased depend on various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts *with respect to the month of expiration*, and the prevailing price volatility of particular contracts."  *Id.* at 29 (emphasis added).  When the exchanges and regulators began to impose regulatory limits towards the end of the class

---

[13] In apparent support of its allegations, the CAC cites speculative commentary from unidentified sources.  *See, e.g.*, CAC ¶¶ 13, 116 (claiming an unidentified analyst opined that USO's transition to later month WTI futures contracts was akin to "***dropp[ing] a bomb on the energy markets***"); *id.* ¶ 77 (contending "one market observer" remarked that USO's position in WTI near month futures contracts was "a ridiculous amount of holding for one fund").  Speculative, unattributed commentary does not meet the pleading requirements of *Twombly* and *Iqbal*.  *See, e.g., Raghavendra v. Trustees of Columbia Univ.*, No. 06-cv-6841, 2008 WL 2696226, at *11 (S.D.N.Y. July 7, 2008) (finding allegations based on "press reports" were "speculative, conclusory" and "clearly implausible under the *Twombly* standard").  In any event, the Fund always disclosed that it could invest in later month WTI futures contracts.  RS at 29.

period due to unprecedented market events, USCF exercised its discretion, as disclosed, to invest

in later month WTI futures.  *Id.*  Thus, as disclosed, USO invested in WTI futures throughout the

class period, even as its assets grew.  Accordingly, contrary to Plaintiff's assertions, USCF did not

switch from passive to active management when it diversified USO's holdings as disclosed.

Rather, USCF invested in later month futures contracts *for the purpose of continuing to meet*

*USO's passive investment objective*.  *Id.* at 12.

> **4.      The Registration Statements Disclosed the Possibility of Tracking Errors or Non-Correlation Among USO's NAV, USO's Share Price, the Spot Price of Crude Oil, and the Value of the Benchmark**

Plaintiff next implausibly claims that "according to Defendants, the market price for USO

'closely track[ed]' th[e] NAV, meaning that percentage daily changes in the price of USO shares,

USO's NAV per share, WTI near months futures contracts and spot prices should move almost

perfectly in tandem."  CAC ¶ 102.  But the Registration Statements repeatedly warned of the exact

opposite possibility (*i.e.*, "non-correlation" between USO's NAV, USO's share price, the spot

price of crude oil, and the value of the Benchmark) – which ultimately could result in Fund losses.

Specifically, a section of the Registration Statements called "**Correlation Risk**" dedicated to this

very issue explained that daily changes in USO's share price and the spot price of crude oil *may*

*not correlate* if [1] USO's share price "does not correlate closely with the value of USO's NAV;

[2] the changes in USO's NAV do not correlate closely with the changes in the price of the

Benchmark Oil Futures Contract; or [3] the changes in the price of the Benchmark Oil Futures

Contract do not closely correlate with the changes in the cash or spot price of crude oil."  RS at 6;

*see also id.* at 6, 12.  Thus, investors were expressly warned that they "may not be able to use USO

as a cost-effective way to indirectly invest in crude oil or as a hedge against the risk of loss in

crude oil-related transactions."  *Id.* at 6.  The Registration Statements further explained *how* such

non-correlation or tracking errors could occur, including that USO's NAV and share price may

vary "*significantly*" due to liquidity constraints in the markets for oil futures contracts, "non-concurrent trading hours" of USO shares on the secondary market and oil futures trading hours, and variation in the USO share price throughout the trading day due to investor volume and other "supply and demand forces at work in the secondary trading market."[14]  *Id.* at 12, 71.

*Second*, USO's stated investment strategy – to invest so that the daily percentage changes in USO's NAV and Benchmark over a 30-day period were within plus or minus 10% (a 20-point margin of error) – contemplated there could be certain levels of non-correlation.  *Id.* at 5, 9, 24, 32.  Further, the Registration Statements explained that non-correlation between the daily percentage changes in USO's NAV and Benchmark can be caused by "disruptions in the market for light, sweet crude oil, the imposition of position or accountability limits by regulators or exchanges, or other extraordinary circumstances," including USO's own changes to its investment portfolio "[a]s USO approaches or reaches position limits with respect to the Benchmark Oil Futures Contract and other Oil Futures Contracts or in view of market conditions," *id.* at 12, as well as USO's expenses, transaction costs, and interest income.  *Id.* at 25.

*Third*, non-correlation between the daily percentage changes in the price of the Benchmark and spot price of crude oil may be due to "variations in the speculative oil market, supply of and demand for Oil Futures Contracts (including the Benchmark Oil Futures Contract) and Other Oil-Related Investments, and technical influences in oil futures trading."  *Id.* at 12.  Despite Plaintiff's claims that the USO Defendants "would later admit that an 'investment in USO is *not*

---

[14] Notably, the Registration Statements explained:  "USCF expects that exploitation of certain arbitrage opportunities by Authorized Participants and their clients and customers will tend to cause the public trading price to track NAV per share closely over time, *but there can be no assurance of that*."  *Id.* at 12 (emphasis added).  In challenging this disclosure, the CAC quotes only the first clause of the disclosure and wholly ignores the warning of "no assurance" at the end of the sentence.  Thus, even assuming the truth of Plaintiff's baseless allegation that USO's NAV and share price failed to closely track during the class period, the CAC allegations fail.

a proxy for investing in the oil markets,'" CAC ¶ 143, the Registration Statements cautioned from the outset:

> Investors should be aware that USO's investment objective is *not* for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, *nor* is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period *greater than one day.*

RS at 5.

*Fourth*, as explained above, Defendants disclosed that contango, backwardation, accountability levels, position limits, and daily price fluctuation limits all may contribute to tracking errors. *See, e.g.*, *id.* at 13 ("***Natural forces in the oil futures market known as 'backwardation' and 'contango' may increase USO's tracking error and/or negatively impact total return.***"); *id.* ("***Accountability levels, position limits, and daily price fluctuation limits set by the exchanges have the potential to cause tracking error, which could cause the price of shares to substantially vary from the price of the Benchmark Oil Futures Contract.***").

In short, no reasonable investor would expect USO's NAV, USO's price per share, and the spot prices of oil and WTI futures to "move almost perfectly in tandem." CAC ¶ 102.

### 5.    The Registration Statements Disclosed Market Developments that Impact Supply and Demand for Crude Oil and May Affect Prices of Crude Oil and Oil Futures Contracts

The Registration Statements specifically disclosed that market developments affecting oil supply and demand – including the types of market shocks that occurred during the class period – can affect the prices of crude oil and oil futures contracts as well as the Fund's NAV. They cautioned that "changes in . . . consumer preferences that alter fuel choices" are factors that "may affect the demand for crude oil and therefore its price." RS at 9. In addition, "general economic conditions in the world or in a major region" and "other events or conditions that impair the

functioning of financial markets and institutions also may adversely impact the demand for crude oil." *Id.* The Registration Statements offered non-exhaustive examples of "***[e]conomic conditions impacting crude oil*** *. . . such as* changes in population growth rates, periods of civil unrest, government austerity programs, or currency exchange rate fluctuations." *Id.* (emphasis added). *See, e.g.*, *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-cv-7062, 2010 WL 4642554, at *18 (S.D.N.Y. Nov. 17, 2010) ("[W]hen read as a whole, the Registration Statement does not suggest that every conceivable possibility of a negative event would be discussed.  Nor were Defendants required to disclose every conceivable possibility of a negative event."  (citation and internal quotation marks omitted)).  When further information became known about the global pandemic, the March Registration Statement expressly referenced the risk of pandemics such as COVID-19.  Regardless, any reasonable investor reading the disclosures in either the February or March Registration Statements would have understood that a global pandemic was the type of "general economic condition[] in the world or in a major region" that could "impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil."  RS at 9.

The Registration Statements further disclosed the risks posed by conflict between oil-producing nations:  "Crude oil prices also vary depending on a number of factors affecting supply," including "political events," "hostile actions," and "adherence by member countries to the Organization of the Petroleum Exporting Countries ('OPEC') production quotas." *Id.* The Registration Statements explained that hostile actions by an OPEC member, such as Saudi Arabia, "may have a larger impact on crude oil prices and crude oil-linked instruments, including Oil Futures Contracts . . . than on traditional securities." *Id.* at 11.  In particular, "[a] market disruption," such as "a foreign government taking political actions that disrupt . . . its crude oil

production or exports . . . can [] make it difficult [for USO] to liquidate a position" in futures contracts. *Id.* at 17. Thus, a reasonable investor would understand that market developments that impact supply and demand for crude oil, such as a major oil producer launching a supply-based price war as occurred in March 2020, also impact the prices of crude oil and oil futures contracts.

### B. The Registration Statements Were Not Required to Be Updated to Disclose Publicly Available or Ongoing Market Developments in Real Time

Investors – along with the rest of the world – had ready access in real time to the day-to-day market data and the developments that transpired in early 2020. The securities laws do not require defendants to update their disclosures to provide this publicly available information or ongoing market developments in real time or with the changing tides of the market.

*First*, defendants are not required to disclose data that is otherwise readily publicly available to investors. *See, e.g.*, *Set Capital LLC v. Credit Suisse Grp. AG*, No. 18-cv-2268, 2019 WL 4673433, at * 4 (S.D.N.Y. Sept. 25, 2019) ("[T]he previous spikes in volatility and their effect on the VIX Futures Index were public information readily available to investors."); *SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*, No. 09-cv-5064, 2010 WL 2473595, at *9 (S.D.N.Y. June 17, 2010) ("[A]ll the information Plaintiff claims was concealed by Defendants was publicly available . . . and on these facts the law renders Defendants' purported misstatements immaterial." (citation and internal alterations omitted)), *aff'd* 448 F. App'x 116 (2d Cir. 2011). The CAC itself cites a range of public data, including data allegedly describing prices of crude oil, WTI futures, and USO shares; the trading volume in WTI futures; the size and nature of USO's investment portfolio; and USO's NAV and monthly return. CAC ¶¶ 74–78, 81, 85–86, 91–94, 151. This data was publicly available to investors[15] – just as it was available to Plaintiff to be included in the

---

[15] *See, e.g.*, (i) U.S. Energy Information Administration, *Cushing, OK WTI Spot Price FOB*, https://www.eia.gov/dnav/pet/hist/RWTCD.htm (last accessed Jan. 26, 2021) (daily spot price of crude oil); (ii) CME Group, *Crude Oil Futures – Quotes*,

CAC.  *See In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.*, 272 F. Supp. 2d 243, 250 (S.D.N.Y. 2003) ("Plaintiff's own Complaint demonstrates that" the information at issue "was publicly available.").  The CAC further admits that data about the size and nature of USO's investment portfolio, USO's NAV and monthly return, the trading volume in USO shares, and anticipated roll dates was available on USO's own website.  CAC ¶ 178.

*Second*, as the CAC also acknowledges, the developing market conditions in early 2020 were widely publicized by major national news organizations in real time.[16]  *See, e.g.*, *id.* ¶ 61

---

https://www.cmegroup.com/trading/energy/crude-oil/light-sweet-crude_quotes_globex.html (last accessed Jan. 26, 2021) (daily and intra-day prices of WTI futures contracts); (iii) CNBC, *United States Oil Fund, LP*, https://www.cnbc.com/quotes/?symbol=USO (last accessed Jan. 26, 2021) (daily price of USO shares); (iv) CME Group, *Light Sweet Crude Oil (WTI) Futures and Options*, https://www.cmegroup.com/trading/energy/light-sweet-crude-oil.html (last accessed Jan. 26, 2021) (average daily volume and open interest for WTI crude oil futures); (v) ICE Futures Europe, *WTI      Crude      Futures*,      https://www.theice.com/products/213/WTI-Crude-Futures/data?marketId=5164580&span=2 (last accessed Jan. 26, 2021) (same); (vi) CME Group, *Crude   Oil   –   Volume*,   https://www.cmegroup.com/trading/energy/crude-oil/light-sweet-crude_quotes_volume_voi.html#tradeDate=20201230 (last accessed Jan. 26, 2021) (same); and (vii) U.S. Energy Information Administration, *Petroleum   &   Other   Liquids*, https://www.eia.gov/dnav/pet/PET_STOC_WSTK_DCU_NUS_W.htm (last accessed Jan. 26, 2021) (weekly inventories of crude oil and other petroleum products).

[16] *See, e.g.*, Devika Krishna Kumar, *Oil Prices Dive to Lowest in Over a Year on Coronavirus Fears*, REUTERS, Feb. 26, 2020, reuters.com/article/us-global-oil/oil-prices-dive-to-lowest-in-over-a-year-on-coronavirus-fears-idUSKCN20L08P; Sarah Ponczek & Heejin Kim, *Huge Swings Send U.S. Futures to Volatility Limit for Second Day*, BLOOMBERG, last updated Mar. 10, 2020, https://www.bloomberg.com/news/articles/2020-03-09/u-s-stock-futures-fall; Natasha Turak, *Oil Prices Could Hit Teens in Coming Weeks as Markets Crater Over Coronavirus and Price War*, CNBC, Mar. 17, 2020, https://www.cnbc.com/2020/03/17/oil-prices-could-hit-the-teens-in-coming-weeks-as-markets-crater-over-coronavirus-and-price-war.html; Jonathan Garber, *Oil Prices Could Fall Below Zero: Analyst*, YAHOO!FINANCE, Mar. 18, 2020, https://finance.yahoo.com/news/oil-prices-could-fall-below-152446634.html;      Jacqueline Davalos, et al., *Oil Market Shows Fear that U.S. Is Running Out of Storage Space*, BLOOMBERG, last updated Mar. 25, 2020, https://www.bloomberg.com/news/articles/2020-03-24/oil-extends-recovery-as-optimism-over-u-s-stimulus-increases; Stanley Reed, *The World is Running Out of Places   to   Store   Its   Oil*, N.Y. TIMES, last updated Mar. 27, 2020, https://www.nytimes.com/2020/03/26/business/energy-environment/oil-storage.html;      Devika Krishna Kumar, *Oil Ends March with Biggest Monthly and Quarterly Losses Ever*, REUTERS, Mar. 30, 2020, https://www.reuters.com/article/us-global-oil/oil-ends-march-with-biggest-monthly-and-quarterly-losses-ever-idUSKBN21I03I; John Stepek, *Oil Prices Have Collapsed – And Some*

(citing *Reuters* on impact of COVID-19 on oil prices); *id.* ¶ 148 (conceding it "was already apparent to any investor alive at the time: that COVID-19 was in fact a thing that existed that could 'affect general economic conditions in the world'").  Plaintiff "fails to identify any duty that [defendants] owed to [plaintiff] to inform him of market trends" where "contemporaneous newspaper articles referenced in [defendants'] Motion make clear that the" possible impact of developing market conditions "was widely reported in the media."  *Lindstrom v. TD Ameritrade, Inc.*, No. 20-cv-4028, 2020 WL 7398792, at *3 (N.D. Ill. Dec. 17, 2020); *see also Bettis v. Aixtron SE*, No. 16-cv-25, 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016) ("Courts have repeatedly concluded that information is in the public domain when it has been reported by news and media outlets."); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014) ("The fundamental flaw of Lead Plaintiff's thesis is that [its] own Amended Complaint reflects public knowledge of" alleged misstatements and omissions "through press coverage and [defendant's] disclosures" and "acknowledges that [defendant's] disclosure in the Registration Statement identified" the related risk factors.), *aff'd*, 605 F. App'x 52 (2d Cir. 2015); *In re UBS AG Sec. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at *33 (S.D.N.Y. Sept. 28, 2012) (acknowledging total mix includes "articles

---

*Argue That They Could Even Turn Negative*, MONEYWEEK, Mar. 30, 2020, https://moneyweek.com/investments/commodities/energy/oil/601069/oil-prices-have-collapsed-and-some-argue-that-they-could; Weizan Tan, *Oil Prices Fall to 17-Year Low as Saudi Arabia-Russia Standoff Continues, Coronavirus Hits Demand*, CNBC, Mar. 30, 2020, https://www.cnbc.com/2020/03/30/oil-falls-amid-saudi-arabia-russia-price-war-coronavirus-hits-demand.html; Guarav Sharma, *Oil Storage May Run out in 6 Weeks as Crude Futures Endure Worst Ever Quarter*, FORBES, Mar. 31, 2020, https://www.forbes.com/sites/gauravsharma/2020/03/31/oil-storage-may-run-out-in-6-weeks-as-crude-futures-endure-worst-ever-quarter/?sh=24a42b406ed8; Sam Meredith, *Oil Prices Just Had Their Worst Ever Quarter as Coronavirus Slashes Demand*, CNBC, Mar. 31, 2020, https://www.cnbc.com/2020/03/31/coronavirus-brent-and-wti-oil-prices-set-for-their-worst-ever-quarter.html; *see also* CME CLEARING, *Testing Opportunities in CME's 'New Release' Environment for Negative Prices and Strikes for Certain NYMEX Energy Contracts*, Apr. 15, 2020, https://www.cmegroup.com/content/dam/cmegroup/notices/clearing/2020/04/Chadv20-160.pdf.

and reports that the [defendants] cite [that] appeared in widely circulated publications"), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). In fact, by alleging investors sought to "buy the dip" in USO share prices caused by class period market developments, Plaintiff concedes that investors were aware that these market developments had already caused USO shares to lose value and were betting on a rebound. CAC ¶ 6.

Put simply, the CAC has not plausibly alleged that any of these market developments was uniquely known to Defendants, and Defendants have "no duty to disclose information that is within the public domain through publication in the news media." *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254–55 (S.D.N.Y. 2019). Plaintiff instead asks the Court to assume Defendants somehow had special foreknowledge of "the negative consequences to the Fund" from the market events, based on their alleged roles as the purported "creators, issuers, underwriters and operators" of USO and their alleged "proprietary and privileged access to" unspecified "complex and detailed market information." CAC ¶¶ 11, 68, 106, 209–11. These vague, conclusory allegations are insufficient. *See, e.g., Bettis*, 2016 WL 7468194, at *13 (rejecting claim that defendants had foreknowledge where plaintiff "*alleges no facts* to demonstrate that Defendants knew" of public information in advance and plaintiff instead only "point[s] to the very articles that reported the news" themselves (emphasis added)).

*Third*, issuers have a duty to update statements that were reasonable at the time they were made only if they later "become[] misleading." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998). "A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement." *Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15-cv-5999 (PGG), 2017 WL 4403314, at *13 (S.D.N.Y. Sept. 30, 2017) (citation omitted) ("In other words, [courts] look to the total mix of

available information." (citation and internal quotation marks omitted)), *aff'd sub nom. Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630 (2d Cir. 2019). The Second Circuit has explained that "the proper inquiry requires an examination of defendants' representations, taken together and in context." *Morgan Stanley*, 592 F.3d at 366 (citation and internal quotation marks omitted).

Plaintiff cannot point to any disclosure in the Registration Statements that had become misleading in light of the total mix of information available to investors. The Registration Statements fully disclosed the very risks at issue in the CAC – USO's large positions in WTI futures could contribute to illiquidity, contango, imposition of position limits, diversification of USO's investment holdings, tracking errors, and large losses. The Registration Statements also warned that market developments that impact supply and demand for crude oil affect prices of crude oil and oil futures contracts – and the market developments at issue in the CAC were widely, publicly available. The securities laws do not impose a duty to disclose changes to the *degree* of disclosed risk where the *nature* of the risks already was fully disclosed. *See, e.g.*, *ProShares*, 728 F.3d at 104–05 (rejecting "allegation that [issuer] failed to disclose that the more an ETF's underlying index changed value day-to-day for a particular investor, the more likely it became that the investor would experience long-term losses").

### C. Plaintiff's Contentions that the Registration Statements Failed to Adequately Detail How Disclosed Risks Would Materialize Are Impermissible Pleading by Hindsight and Internally Inconsistent

In attempting to plead around the extensive disclosures in the Registration Statements and widely publicized market developments, Plaintiff alleges that Defendants should have predicted in advance and further detailed the "specific impacts" that market developments would have on USO "during the class period." *See, e.g.*, CAC ¶¶ 112, 116, 134, 141, 143, 147–48. But the securities laws do not require Defendants "to predict and disclose all possible negative results

across any market scenario." *ProShares*, 728 F.3d at 105; *see also In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014) ("It is not a material omission to fail to predict future market performance." (citation omitted)), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014).  In other words, "Defendants need not be clairvoyant," and they are not expected to "anticipate[] future events." *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019) (summary order) (internal quotation marks omitted) (citing *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000)); *In re Britannia Bulk Holdings Inc. Sec. Litig.*, 665 F. Supp. 2d 404, 416 (S.D.N.Y. 2009) ("[T]he fact that the Offering Documents did not explicitly articulate every contingency . . . did not 'affect the total mix of information' available to reasonable investors in [the defendant's] securities, and therefore, was not materially misleading on its face." (citation omitted)).  "The Securities Law requires accuracy as to current facts, not omniscience as to future events" and "[a] Registration Statement is not required to predict the 'precise manner' in which [defendant's] financing risk might manifest itself, so long as the risk itself is clearly disclosed." *Charter Twp.*, 2010 WL 4642554, at *14–15, 18.  Plaintiff cannot rely on "20/20 hindsight" to challenge disclosures in the Registration Statements.  *See Rubinstein*, 457 F. Supp. 3d at 295 (citation omitted); *Ikanos Commc'ns*, 538 F. Supp. 2d at 673.

Moreover, the CAC takes numerous contradictory positions that undermine its plausibility in attempting to craft some viable theory of liability.  For example, the CAC laments both that USO *offered shares* in February and March and that it *ran out of shares* in April.  *Compare* CAC ¶ 12  *with* CAC ¶ 99.  The CAC also faults Defendants for diversifying USO's holdings in response to the imposition of regulatory limits, *id.* ¶¶ 13, 125, while contradictorily faulting Defendants for failing to "limit the market turmoil" until required.  *Id.* ¶ 116.  Likewise, the CAC alleges that USO's passive investment objective caused investor losses, *id.* ¶ 112, yet complains that USO

switched its strategy to active management. *Id.* ¶ 125. In addition, the CAC alleges that USO's reallocation of its investment portfolio "indicated 'structural problems' with the Fund," *id.* ¶ 106, yet later admits that "[t]he timing of these regulatory orders made clear that [the regulatory orders] were the true impetus for USO's rapid-fire investment changes." *Id.* ¶ 129. Not only do these inconsistent allegations fail for all of the reasons described above, but they also demonstrate that the allegations in the CAC are facially implausible. *See, e.g.*, *Grant v. Cty. of Erie*, 542 F. App'x 21, 23 (2d Cir. 2013) (summary order) ("This Circuit has recognized an exception to the rule that a court must accept all factual assertions as true when attenuated allegations supporting the claim are contradicted by more specific allegations in the Complaint or when a claim is based on wholly conclusory and inconsistent allegations." (citing *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1095 (2d Cir. 1995); *Salahuddin v. Jones*, 992 F.2d 447, 449 (2d Cir. 1993) (per curiam)).

### D.   Plaintiff's Allegations Regarding Other Challenged Disclosures Fail as a Matter of Law

In support of its Exchange Act claims in Counts III and IV, Plaintiff challenges certain class period disclosures outside the Registration Statements, alleging: (a) the USCF website, including "a Fund 'factsheet'" compiled by the USO Defendants, contained misstatements or omissions, CAC ¶¶ 178–82; (b) the March 20 and 24 Form 8-Ks contained misrepresentations and omissions regarding USO's financial condition, *id.* ¶¶ 184–85; (c) the April 16 Form 8-K and an April 22 Form 8-K disclosing USO's reallocation of its investment portfolio failed to detail the reasons for the reallocation, *id.* ¶ 186; and (d) an April 21 Form 8-K failed to specify why the SEC had not yet declared the April 20 registration statement effective.[17] *Id.* ¶ 187.

---

[17] The CAC also mentions SEC and Commodity Futures Trading Commission ("CFTC") investigations, CAC ¶¶ 14, 137–38, but makes no allegation about which disclosures were at issue in the investigations, how they relate to the disclosures challenged here (if at all), or how the mere existence of those investigations supports Plaintiff's Securities Act or Exchange Act claims. Nor does the CAC allege that any defendant faced any civil enforcement proceeding or charges. In

*First*, in challenging alleged misstatements or omissions on the website and in the factsheet, the CAC offers no new allegations.  Instead, the CAC merely refers back to the same arguments made with respect to the Registration Statements' disclosures, contending that the website and factsheet "were materially false and misleading when made *because they failed to disclose the facts listed in ¶¶65-138*."  *Id.* ¶ 181 (emphasis added).  Because these arguments rely on the same allegations already addressed above, they fail for all of the same reasons.

*Second*, the CAC claims that the March 20 and 24 Form 8-Ks disclosing USO's financial condition through December 31, 2019 misleadingly failed to report on the Fund's interim financial condition in early 2020.  *Id.* ¶¶ 184–85.  These allegations are meritless.  There is no obligation to disclose interim financial information absent a "substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."  *Stadnick*, 861 F.3d at 37 (quoting *DeMaria*, 318 F.3d at 180 (alternation in original)).  As explained above, the total mix included: (1) disclosures about risks of sudden total loss posed by USO's large positions, market conditions, regulatory limits, and contango; (2) financial information about USO's assets and investment portfolio holdings published daily on its website and in the January 2020 account statement; and (3) widely circulated public data and press coverage regarding ongoing market developments.  No reasonable investor would have been misled about the nature and risks of the Fund.

---

short, Plaintiff hopes the Court will infer some sort of wrongdoing, but such allegations do not lend any legal support to its claims.  *See, e.g.*, *Hinds Cty., Miss. v. Wachovia Bank N.A.*, 620 F. Supp. 2d 499, 514 (S.D.N.Y. 2009) ("[T]he various investigations, inquiries, and subpoenas do not make the CAC's allegations plausible, for the purposes of deciding a motion to dismiss under the standards as laid out in *Twombly* and *Iqbal*" absent "information in the CAC about the progress of . . . these investigations" or any "indication from any of these proceedings that wrongdoing of the kind alleged has occurred.").

*Third*, the CAC complains that the April 16 Form 8-K and an April 22 Form 8-K failed to detail the "specific reasons" for the Fund's changes to its investment portfolio.  CAC ¶ 186. According to the CAC, Defendants waited until April 24 to "admit" that the futures exchanges and regulators had imposed certain regulatory limits.  *Id.* ¶¶ 116, 121.  Plaintiff is wrong.  As explained in detail above, the Registration Statements disclosed from the outset the risks related to regulatory limits, RS at 13, including that USO might invest in later month futures contracts as a result of such limits.  RS at 29.  USO's reallocation of its investments was fully within the scope of the Registration Statements' disclosures and consistent with its investment objective.  Having told investors exactly what the Fund might do under such circumstances, USO was under no legal obligation to further update investors when it responded in the matter previously disclosed.  Yet, even if Defendants had an obligation to explain investment decisions that were consistent with the disclosures, Defendants disclosed on April 16 that USO would diversify its portfolio "[c]ommencing on April 17, 2020, and *until* further notice and market conditions and *regulatory conditions permit otherwise*."  Roy Decl. Ex. 5 (Form 8-K at 2 (Apr. 16, 2020) (emphasis added)). The phrase "until . . . market conditions and regulatory conditions permit otherwise" made clear that the Fund altered its investment portfolio in light of market conditions and regulatory requirements.  *Id.*  The disclosures also reminded investors that, as previously disclosed, "USO's portfolio holdings as of the end of the prior business day are posted each day on the [USO] website," and USO can "invest in . . . futures contracts on the NYMEX and ICE Futures in any month available or in varying percentages or invest in any other permitted investments described . . . in its prospectus, without further disclosure."  Roy Decl. Ex. 8 (Form 8-K at 2 (Apr. 22, 2020)).

*Fourth*, the CAC alleges that an April 21 Form 8-K, *see* Roy Decl. Ex. 7 (Form 8-K at 2 (Apr. 21, 2020)), was misleading for failing to disclose the "specific reasons" why the SEC had

not yet declared effective the registration statement filed the day before on April 20.  CAC ¶¶ 117, 187.  Yet, Plaintiff does not allege that Defendants even knew or could have known the reason for the SEC's inaction – let alone that this information would materially impact the total mix of information available to investors.  In fact, Defendants kept investors apprised of all material facts in real time,  disclosing:  (1) on April 20, it was running out of registered shares and may not be able to sell Creation Baskets, which could cause USO shares to trade at a premium in the secondary market, *see* Roy Decl. Ex. 6 (Form 8-K at 2 (Apr. 20, 2020)); (2) on April 21, it ran out of shares, and the SEC had not yet declared the April 20 registration statement effective, *see* Roy Decl. Ex. 7 (Form 8-K at 2 (Apr. 21, 2020)); and (3) numerous pre-effective amendments and letters exchanges with the SEC until the SEC declared an amended registration statement effective in June 2020.  As such, the allegations in the CAC do not support a claim for material misstatement or omission.  *See Bettis*, 2016 WL 7468194, at *12–13.

### E.  Plaintiff's Allegations Regarding Regulation S-K Fail as a Matter of Law for All of the Same Reasons

In support of all Counts, the CAC alleges that Defendants failed to comply with Item 303, 17 C.F.R. § 229.303(a)(3)(ii), and Item 105, 17 C.F.R. § 229.105, of Regulation S-K.  Item 303 requires issuers to disclose any trend "(1) known to management and (2) reasonably likely to have material effects on the registrant's financial condition or results of operations."  *Stadnick*, 861 F.3d at 39 (internal quotation marks omitted).  Item 105 requires issuers to provide, in the Registration Statements, "under the caption 'Risk Factors' a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky."  17 C.F.R. § 229.105 (2019) (formerly 17 C.F.R. § 229.503).  If allegations are not "'reasonably likely' to be material under Item 303," they are not among the "most significant factors" rendering an offering speculative or risky under Item 105.  *Hutchison v. Deutsche Bank Sec. Inc.*, 647 F.3d 479, 484 n.4 (2d Cir. 2011).

Not only has Plaintiff entirely failed to allege knowledge on the part of management as explained below in Part II, Plaintiff's Regulation S-K allegations fail for all of the reasons already outlined above, as Plaintiff merely points back to the same allegations "detailed in ¶¶65-138" in alleging these purported violations. CAC ¶¶ 174–75. Those arguments are "unavailing" because the disclosures "included ample warning" of the impact of all of the risks outlined in the CAC. *See Stadnick*, 861 F.3d at 39. In addition, Plaintiff failed to plead that any of the alleged developing risks could have established a "trend" that required disclosure. *See Holbrook v. Trivago N.V.*, No. 17-cv-8348, 2019 WL 948809, at *19 (S.D.N.Y. Feb. 26, 2019) (explaining there is no general "obligation to disclose the results of a quarter in progress" (citation omitted)), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019); *Nguyen v. MaxPoint Interactive, Inc.*, 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017) ("[E]vents occurring within a two month period of time do not establish a 'trend' for purposes of the disclos[ures] required by Item 303."); *Kapps v. Torch Offshore, Inc.*, 379 F.3d 207, 218 (5th Cir. 2004) (holding a five-month "decline in natural gas prices [did not yet constitute] a trend" requiring disclosure).

For all of the reasons described above, Plaintiff has failed to identify a material misstatement or omission as required to state a claim under Section 11 of the Securities Act, Section 10(b) of the Exchange Act, or Rule 10b-5. No reasonable investor could have been misled about the risks of investing in the Fund, given the total mix of information provided in the Registration Statements and otherwise publicly available. For this reason alone, all of the CAC's claims (Counts I – IV) fail as a matter of law.[18]

---

[18] Having failed to adequately plead the primary violations of Section 11 of the Securities Act or Section 10(b) of the Exchange Act, Plaintiff also failed to state a "control person" claim under Section 15 of the Securities Act or Section 20(a) of the Exchange Act, respectively. *See, e.g.*, *Rombach*, 355 F.3d at 177–78.

## II.   THE CAC FAILS TO STATE A CLAIM UNDER SECTION 10(B) OF THE EXCHANGE ACT AND RULE 10B-5 BECAUSE IT MAKES NO PLAUSIBLE ALLEGATIONS OF SCIENTER

The Exchange Act and Rule 10b-5 claims in Counts III and IV also fail as a matter of law because the CAC fails to allege *any* facts demonstrating that the USO Defendants acted with scienter – much less facts satisfying the heightened pleading standards of Fed. R. Civ. P. 9(b) and the PSLRA.[19]   Under Rule 9(b), the complaint must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *Rombach*, 355 F.3d at 170 (citation omitted).  The PSLRA requires that the complaint "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."   15 U.S.C. § 78u-4(b)(2)(A).   Under the PSLRA, "the inference of scienter must be more than merely 'reasonable' or 'permissible' – it must be cogent and compelling."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  That is, "the inference of scienter [must be] cogent and at least as compelling as any opposing inference one could draw from the facts alleged."  *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010) (quoting *Tellabs*, 551 U.S. at 324).  In assessing scienter allegations, courts consider "whether all of the facts alleged, taken collectively, give rise to a *strong inference* of scienter," and "the court *must* take into account plausible opposing inferences," including "nonculpable explanations for the defendant's conduct."  *Tellabs*, 551 U.S. at 323–24 (emphasis added).

In pleading a Section 10(b) or Rule 10b-5 claim, "[t]he requisite state of mind . . . is an intent to deceive, manipulate, or defraud."  *ECA*, 553 F.3d at 198 (*Tellabs*, 551 U.S. at 313).  "The

---

[19] The CAC includes a conclusory allegation that other defendants had "insider knowledge," CAC ¶ 11, but it only asserts Exchange Act claims against the USO Defendants.

plaintiff may satisfy [this pleading] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.  Here, Plaintiff asserts no facts whatsoever that could suggest the requisite state of mind, let alone a strong inference of scienter, to satisfy the heightened pleading standard of the PSLRA and Fed. R. Civ. P. 9(b).

*First*, the CAC does not plausibly allege any facts "showing that the defendants had both motive and opportunity to commit the fraud."  *See id.*  Instead, the CAC's sole theory is that the USO Defendants had motive and opportunity simply because they collected management fees. *See* CAC ¶¶ 213–15.  Courts have consistently rejected this motive theory.  *See Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7, 10 (2d Cir. 2012) (summary order) ("[N]either a desire to earn transactional fees nor a desire to cultivate business relations is sufficient to establish scienter."); *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001) (requiring plaintiffs "assert a concrete and personal benefit"); *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 512 (S.D.N.Y. 2018) ("The mere 'desire to earn management fees . . . does not suffice to allege a 'concrete and personal benefit' resulting from the fraud,'" and "'would read the scienter requirement out of the statute.'" (citation omitted)).

*Second*, the CAC fails to allege any facts demonstrating "strong circumstantial evidence of conscious misbehavior or recklessness" as to any defendant.  *ATSI*, 493 F.3d at 99.  To plead a reckless misstatement, Plaintiff had to allege that the misleading nature of the statement was "either known to the defendant or so obvious that the defendant must have been aware of it" – that is, essentially equivalent to an intent to defraud or mislead.  *Kalnit*, 264 F.3d at 142 (citation omitted).  In this context, recklessness means "conscious recklessness – *i.e.*, a state of mind approximating actual intent."  *Novak*, 216 F.3d at 312 (citation and internal quotation marks

omitted).  Allegations "that a defendant merely ought to have known [are] not sufficient to allege recklessness.  Rather, to withstand a motion to dismiss, Plaintiff must detail specific contemporaneous data or information known to the defendants that was inconsistent with the representation in question." *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (citation and internal quotation marks omitted); *Novak*, 216 F.3d at 312.  Where, as here, motive has not been sufficiently alleged, "the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (citation omitted).  Yet, rather than allege facts demonstrating conscious misbehavior or recklessness, Plaintiff simply describes the USO Defendants' role in managing the Fund.  CAC ¶¶ 208–12.  Plaintiff baldly alleges that the USO Defendants had scienter "by virtue of their receipt of information reflecting the true facts regarding USO, their control over, and/or receipt and/or modification of the Fund's allegedly materially misleading misstatements and/or their associations with the Fund and/or the Sponsor which made them privy to confidential proprietary information concerning USO." *Id.* ¶ 208.  Plaintiff does not describe the so-called "information reflecting the true facts" other than to allege that the USO Defendants, by virtue of their ordinary duties in managing the Fund, "merely 'ought to have known'" of the allegedly undisclosed risks.  *Hart*, 145 F. Supp. 2d at 368 (citation omitted).

In other words, Plaintiff asks the Court to assume scienter simply because the USO Defendants created USO, received information about USO, assessed its risks and performance, and participated in the WTI futures contracts market.  CAC ¶ 210.  Plaintiff cannot expect the Court to infer that the USO Defendants acted recklessly simply by pointing to their role in managing the Fund or alleged knowledge of supposed "red flag" market conditions and undisclosed risks with the benefit of hindsight.  *See Hart*, 145 F. Supp. 2d at 368.  Plaintiff bears the burden of pointing to facts that make their theory of scienter "more than merely 'reasonable'

or 'permissible' – it must be cogent and compelling." *Tellabs*, 551 U.S. at 324.  The unremarkable

assertion that the USO Defendants are knowledgeable about historical or day-to-day market

conditions concerning crude oil or oil futures contracts, CAC ¶ 211, does not support an inference

that the subsequent market developments were so obvious that it was reckless for the USO

Defendants not to have made additional disclosures.  *See, e.g.*, *In re UBS AG Sec. Litig.*, 2012 WL

4471265, at *16 ("[R]eports about a downturn . . . do not, by themselves, permit the inference that

[defendants] knew or should have known that any of the statements [or omissions] cited in the

compliant were misleading' because 'general facts about the financial world are insufficiently

particularized to establish that defendants acted with scienter." (citation omitted)).  If this were

enough, scienter could be assumed every time a defendant creates an investment fund, monitors it,

and participates in a related market – in other words, tantamount to imposing strict liability.

The CAC also does not assert any particularized allegations as to the conduct of any

*individual* USO Defendant, let alone offer "facts giving rise to a strong inference that the defendant

acted with the required state of mind." *ATSI*, 493 F.3d at 99 (citation omitted).  Plaintiff merely

assumes that they *must have* knowingly or recklessly made false or misleading statements simply

"[b]y virtue of their high-level positions, and their ownership and contractual rights, participation

in and/or awareness of USO's operations," alleged access to unspecified public statements, SEC

filings, other "material non-public information" about the Fund, "unique insider knowledge" about

the alleged adverse events, "sophisticated investment tools,"[20] "proprietary and non-public data,"

---

[20] Plaintiff is a sophisticated investor with access to "sophisticated investment tools."  CAC ¶ 211.
Plaintiff's website describes its proprietary algorithm trading capabilities, including "big data,
market simulation algorithms, and different exchanges testing environment."  *See* nutit.cz (last
accessed Jan. 28, 2021).  Yet, Plaintiff fails to offer any plausible, particularized allegations as to
how the USO Defendants used "sophisticated investment tools" or what particular "proprietary
and non-public data" was available to them.

and communications with third party "market players."  CAC ¶¶ 4, 208–12, 231.  Yet, Plaintiff

fails to offer any plausible, particularized allegations as to the nature of the supposed inside

knowledge or how such knowledge or information put the USO Defendants on notice of anything

contrary to their disclosures.  Plaintiff's allegations thus fail to pass muster under the PSLRA,

which requires Plaintiff to plead "specific contemporaneous data or information known to the

defendants that was inconsistent with the representation in question."  *Hart*, 145 F. Supp. 2d at

368 (citation omitted).  In addition, "[s]cienter must be separately pled and individually

supportable as to each defendant."  *C.D.T.S. v. UBS AG*, No. 12-cv-4924, 2013 WL 6576031, at

*6 (S.D.N.Y. Dec. 13, 2013), *aff'd sub nom. Westchester Teamsters Pension Fund v. UBS AG*,

604 F. App'x 5 (2d Cir. 2015).  Yet, the CAC addresses Defendants as a group, only mentioning

the Individual Defendants singularly when defining the "Parties."  CAC ¶¶ 25–34.  Plaintiff's

conclusory assertions regarding the individual USO Defendants' issuance and signing of the

Registration Statements, *id.* ¶ 209, also fall well below the PSLRA's pleading standards.  *See*

*Tellabs*, 551 U.S. at 324.  The fact that a defendant issued or signed a registration statement does

not "give rise to a *strong inference* of scienter."  *Tellabs*, 551 U.S. at 323–24 (emphasis added).  If

it did, any action asserting claims based on a registration statement could allege scienter simply by

pointing to the signed or issued registration statement.

Even if Plaintiff could point to facts demonstrating a "'strong inference' of scienter" that

is cogent and compelling rather "than merely 'reasonable' or 'permissible,'" the Court must

consider "plausible opposing inferences," including "nonculpable explanations for the defendant's

conduct."  *Id.*  The more plausible inference here is that the USO Defendants sought for USO to

perform as described in the Registration Statements and as required by securities laws despite

extraordinary market developments.  Unlike cases where courts have found scienter based on

recklessness, the USO Defendants' alleged knowledge of certain facts or acute risks does not contradict or refute any of the Fund's disclosures.  *See Novak*, 216 F.3d at 308 (noting plaintiffs typically plead with specificity that defendants had "knowledge of facts or access to information contradicting their public statements").  In light of the extensive disclosures in the Registration Statements, no reasonable investor would have expected the USO Defendants to give advance warning of specific market developments, and there is no basis to infer an intent to deceive from the fact that they did not do so.  Without more, Plaintiff cannot establish scienter to satisfy the PSLRA or Rule 9(b), and the Court should grant the motion to dismiss the Section 10(b) and Rule 10b-5 claims.

## III.    THE CAC FAILS TO STATE A CLAIM UNDER SECTION 11 OF THE SECURITIES ACT BECAUSE PLAINTIFF FAILED TO PLEAD STANDING TO CHALLENGE THE REGISTRATION STATEMENTS

In addition to the reasons described in Section I, the Court should dismiss Counts I and II as a matter of law because Plaintiff does not plausibly allege that it purchased shares pursuant to either challenged Registration Statement.  Only investors who purchased shares issued pursuant to the challenged registration statement have standing under Section 11 to challenge its disclosures.  *See DeMaria*, 318 F.3d at 175 (stating Section 11 "provides a cause of action for 'any person acquiring' a security issued pursuant to a materially false registration statement"); *see also Krim v. pcOrder.com, Inc.*, 402 F.3d 489, 497, 502 (5th Cir. 2005) (explaining Section 11 "specifically confer[s] standing on a *subset* of security owners" and "aftermarket purchasers seeking Section 11 standing must demonstrate that their shares are traceable to the challenged registration statement").  To survive a motion to dismiss, "a named plaintiff must have purchased shares traceable to the challenged offering."  *In re Glob. Crossing, Ltd. Sec. Litig.*, 313 F. Supp. 2d 189, 207–08 (S.D.N.Y. 2003) ("[P]laintiffs who purchased securities not issued pursuant to the misleading registration statement lack standing as surely as the purchasers of other securities entirely.").

A plaintiff can establish traceability to the challenged registration statement "[1] either through proof of a direct chain of title from the original offering to the [plaintiff] . . . or [2] through proof that the [plaintiff] bought her shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re IPO Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006) (citation omitted).  Bare allegations of traceability are insufficient if a plaintiff purchased its shares in a market that includes shares issued pursuant to other unchallenged registration statements.  *See In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016) (dismissing Section 11 claims because "a general allegation that a plaintiff's shares are traceable to the offering in question is nothing more than a 'formulaic recitation' of that element" that fails to satisfy *Twombly*); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) (dismissing claims that did "not offer any facts to support their conclusory statements that their shares can be traced to" a particular offering).  Generally, "experience and common sense tell us that when a company has offered shares under more than one registration statement, aftermarket purchasers usually will *not* be able to trace their shares back to a particular offering," and so "plaintiffs ha[ve] to allege facts from which we can reasonably infer that their situation is different."  *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1107–08 (9th Cir. 2013) ("Standing alone, the conclusory allegation that plaintiffs 'purchased [the Company's] common stock directly traceable to the Company's Secondary Offering' does not allow us to draw a reasonable inference about anything because it is devoid of factual content.").

Plaintiff failed to plead standing to challenge the Registration Statements because Plaintiff did not allege any facts suggesting its shares were originally issued pursuant to either challenged Registration Statement.  As Plaintiff concedes, USO has issued shares pursuant to numerous registration statements since 2006.  CAC ¶ 53.  Thus, Plaintiff did not buy "shares in a market

containing only shares issued pursuant to the allegedly defective registration statement," and Plaintiff was required to allege "proof of a direct chain of title from the original offering to the [plaintiff]." *See IPO*, 471 F.3d at 31 n.1 (citation and internal quotation marks omitted). Yet, Plaintiff does not allege any facts that could establish that it purchased USO shares pursuant to either challenged Registration Statement rather than one of the prior registration statements. Instead, the CAC baldly asserts traceability without alleging any supporting facts. CAC ¶¶ 1, 22, 42, 199. The CAC does not even attempt to distinguish between the two challenged Registration Statements in alleging standing. Moreover, as the Registration Statements disclosed and as is true for all ETFs, investors can only buy and sell USO shares on the secondary market through Authorized Participants or other intermediaries. RS at 1, 18. Yet, Plaintiff has not alleged that it even has any way of knowing if the USO shares that it purchased on the secondary market were issued pursuant to either challenged Registration Statement. In sum, the CAC fails to allege that Plaintiff purchased USO shares traceable to either challenged Registration Statement.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the CAC with prejudice.

Dated:  January 29, 2021                    ROPES & GRAY LLP

_____

Robert A. Skinner (*admitted pro hac vice*)
Amy D. Roy *(admitted pro hac vice)*
Jessica M. Bergin (*admitted pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel.:  (617) 951-7000
Fax:  (617) 951-7050
*robert.skinner@ropesgray.com*
*amy.roy@ropesgray.com*
*jessica.bergin@ropesgray.com*


*Attorneys for Defendants United States Oil Fund, LP, United States Commodity Funds LLC, John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Andrew F Ngim, Robert L. Nguyen, Peter M. Robinson, Gordon L. Ellis, and Malcolm R. Fobes III*