# EXHIBIT 2

Case 1:20-cv-04740-PGG Document 144-2 Filed 04/09/21 Page 2 of 79

424B3 1 i20178_uso-424b3.htm

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-237290

**PROSPECTUS**

# United States Oil Fund, LP®*

**1,136,200,000 Shares**

**\*Principal U.S. Listing Exchange: NYSE Arca, Inc.**

The United States Oil Fund, LP ("USO") is an exchange traded fund organized as a limited partnership that issues shares that trade on the NYSE Arca stock exchange ("NYSE Arca"). USO's investment objective is to track a benchmark of short-term oil futures contracts. USO pays its general partner, United States Commodity Funds LLC ("USCF"), a limited liability company, a management fee and incurs operating costs. Both USO and USCF are located at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596. The telephone number for both USO and USCF is 510.522.9600. In order for a hypothetical investment in shares to break even over the next 12 months, assuming a selling price of $12.78 per share (the net asset value as of December 31, 2019), the investment would have to generate a 0% or $0 return. A negative return would be required, because USO's assumed interest income, would cause USO's income to exceed its assumed expenses during this period.

USO is an exchange traded fund. This means that most investors who decide to buy or sell shares of USO shares place their trade orders through their brokers and may incur customary brokerage commissions and charges. Shares trade on the NYSE Arca under the ticker symbol "USO" and are bought and sold throughout the trading day at bid and ask prices like other publicly traded securities.

Shares trade on the NYSE Arca after they are initially purchased by "Authorized Participants," institutional firms that purchase shares in blocks of 100,000 shares called "baskets" through USO's marketing agent, ALPS Distributors, Inc. (the "Marketing Agent"). The price of a basket is equal to the net asset value ("NAV") of 100,000 shares on the day that the order to purchase the basket is accepted by the Marketing Agent. The NAV per share is calculated by taking the current market value of USO's total assets (after close of NYSE Arca) subtracting any liabilities and dividing that total by the total number of outstanding shares. The offering of USO's shares is a "best efforts" offering, which means that neither the Marketing Agent nor any Authorized Participant is required to purchase a specific number or dollar amount of shares. USCF pays the Marketing Agent a marketing fee consisting of a fixed annual amount plus an incentive fee based on the amount of shares sold. Authorized Participants will not receive from USO, USCF or any of their affiliates any fee or other compensation in connection with the sale of shares. Aggregate compensation paid to the Marketing Agent and any affiliate of USCF for distribution-related services in connection with this offering of shares will not exceed ten percent (10%) of the gross proceeds of the offering.

Investors who buy or sell shares during the day from their broker may do so at a premium or discount relative to the market value of the underlying oil futures contracts in which USO invests due to supply and demand forces at work in the secondary trading market for shares that are closely related to, but not identical to, the same forces influencing the prices of crude oil and the oil futures contracts that serve as USO's investment benchmark. Investing in USO involves risks similar to those involved with an investment directly in the oil market, the correlation risk described above, and other significant risks. See "**Risk Factors Involved with an Investment in USO**" beginning on page 5.

Case 1:20-cv-04740-PGG Document 144-2 Filed 04/20/21 Page 3 of 79

The offering of USO's shares is registered with the Securities and Exchange Commission ("SEC") in accordance with the Securities Act of 1933 (the "1933 Act"). The offering is intended to be a continuous offering and is not expected to terminate until all of the registered shares have been sold or three years from the date of the original offering, whichever is earlier, unless extended as permitted under the rules under the 1933 Act, although the offering may be temporarily suspended if and when no suitable investments for USO are available or practicable. USO is not a mutual fund registered under the Investment Company Act of 1940 ("1940 Act") and is not subject to regulation under the 1940 Act.

**NEITHER THE SEC NOR ANY STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES OFFERED IN THIS PROSPECTUS, OR DETERMINED IF THIS PROSPECTUS IS TRUTHFUL OR COMPLETE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

USO is a commodity pool and USCF is a commodity pool operator subject to regulation by the Commodity Futures Trading Commission and the National Futures Association under the Commodity Exchange Act ("CEA").

**THE COMMODITY FUTURES TRADING COMMISSION HAS NOT PASSED UPON THE MERITS OF PARTICIPATING IN THIS POOL NOR HAS THE COMMISSION PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE DOCUMENT.**

**The date of this prospectus is March 23, 2020**

**COMMODITY FUTURES TRADING COMMISSION**

**RISK DISCLOSURE STATEMENT**

YOU SHOULD CAREFULLY CONSIDER WHETHER YOUR FINANCIAL CONDITION PERMITS YOU TO PARTICIPATE IN A COMMODITY POOL. IN SO DOING, YOU SHOULD BE AWARE THAT COMMODITY INTEREST TRADING CAN QUICKLY LEAD TO LARGE LOSSES AS WELL AS GAINS. SUCH TRADING LOSSES CAN SHARPLY REDUCE THE NET ASSET VALUE OF THE POOL AND CONSEQUENTLY THE VALUE OF YOUR INTEREST IN THE POOL. IN ADDITION, RESTRICTIONS ON REDEMPTIONS MAY AFFECT YOUR ABILITY TO WITHDRAW YOUR PARTICIPATION IN THE POOL.

FURTHER, COMMODITY POOLS MAY BE SUBJECT TO SUBSTANTIAL CHARGES FOR MANAGEMENT, AND ADVISORY AND BROKERAGE FEES. IT MAY BE NECESSARY FOR THOSE POOLS THAT ARE SUBJECT TO THESE CHARGES TO MAKE SUBSTANTIAL TRADING PROFITS TO AVOID DEPLETION OR EXHAUSTION OF THEIR ASSETS. THIS DISCLOSURE DOCUMENT CONTAINS A COMPLETE DESCRIPTION OF EACH EXPENSE TO BE CHARGED THIS POOL AT PAGE 38 AND A STATEMENT OF THE PERCENTAGE RETURN NECESSARY TO BREAK EVEN, THAT IS, TO RECOVER THE AMOUNT OF YOUR INITIAL INVESTMENT, AT PAGE 38.

THIS BRIEF STATEMENT CANNOT DISCLOSE ALL THE RISKS AND OTHER FACTORS NECESSARY TO EVALUATE YOUR PARTICIPATION IN THIS COMMODITY POOL. THEREFORE, BEFORE YOU DECIDE TO PARTICIPATE IN THIS COMMODITY POOL, YOU SHOULD CAREFULLY STUDY THIS DISCLOSURE DOCUMENT, INCLUDING THE DESCRIPTION OF THE PRINCIPAL RISK FACTORS OF THIS INVESTMENT, AT PAGE 5.

YOU SHOULD ALSO BE AWARE THAT THIS COMMODITY POOL MAY TRADE FOREIGN FUTURES OR OPTIONS CONTRACTS. TRANSACTIONS ON MARKETS LOCATED OUTSIDE THE UNITED STATES, INCLUDING MARKETS FORMALLY LINKED TO A UNITED STATES MARKET, MAY BE SUBJECT TO REGULATIONS WHICH OFFER DIFFERENT OR DIMINISHED PROTECTION TO THE POOL AND ITS PARTICIPANTS. FURTHER, UNITED STATES REGULATORY AUTHORITIES MAY BE UNABLE TO COMPEL THE ENFORCEMENT OF THE RULES OF REGULATORY AUTHORITIES OR MARKETS IN NON-UNITED STATES JURISDICTIONS WHERE TRANSACTIONS FOR THE POOL MAY BE EFFECTED.

SWAPS TRANSACTIONS, LIKE OTHER FINANCIAL TRANSACTIONS, INVOLVE A VARIETY OF SIGNIFICANT RISKS. THE SPECIFIC RISKS PRESENTED BY A PARTICULAR SWAP TRANSACTION NECESSARILY DEPEND UPON THE TERMS OF THE TRANSACTION AND YOUR CIRCUMSTANCES. IN GENERAL, HOWEVER, ALL SWAPS TRANSACTIONS INVOLVE SOME COMBINATION OF MARKET RISK, CREDIT RISK, COUNTERPARTY CREDIT RISK, FUNDING RISK, LIQUIDITY RISK, AND OPERATIONAL RISK.

HIGHLY CUSTOMIZED SWAPS TRANSACTIONS IN PARTICULAR MAY INCREASE LIQUIDITY RISK, WHICH MAY RESULT IN A SUSPENSION OF REDEMPTIONS. HIGHLY LEVERAGED TRANSACTIONS MAY EXPERIENCE SUBSTANTIAL GAINS OR LOSSES IN VALUE AS A RESULT OF RELATIVELY SMALL CHANGES IN THE VALUE OR LEVEL OF AN UNDERLYING OR RELATED MARKET FACTOR.

IN EVALUATING THE RISKS AND CONTRACTUAL OBLIGATIONS ASSOCIATED WITH A PARTICULAR SWAP TRANSACTION, IT IS IMPORTANT TO CONSIDER THAT A SWAP TRANSACTION MAY BE MODIFIED OR TERMINATED ONLY BY MUTUAL CONSENT OF THE ORIGINAL PARTIES AND SUBJECT TO AGREEMENT ON INDIVIDUALLY NEGOTIATED TERMS. THEREFORE, IT MAY NOT BE POSSIBLE FOR THE COMMODITY POOL OPERATOR TO MODIFY, TERMINATE, OR OFFSET THE POOL'S OBLIGATIONS OR THE POOL'S EXPOSURE TO THE RISKS ASSOCIATED WITH A TRANSACTION PRIOR TO ITS SCHEDULED TERMINATION DATE.

# TABLE OF CONTENTS

| | Page |
|---|---|
| **Disclosure Document:** | |
| Prospectus Summary | 1 |
|     USO's Investment Objective and Strategy | 1 |
|     Principal Investment Risks of an Investment in USO | 2 |
|     USO's Fees and Expenses | 4 |
| Risk Factors Involved with an Investment in USO | 5 |
|     Investment Risk | 5 |
|     Correlation Risk | 8 |
|     Tax Risk | 10 |
|     OTC Contract Risk | 12 |
|     Other Risks | 13 |
| Additional Information about USO, its Investment Objective and Investments | 19 |
|     Impact of Contango and Backwardation on Total Returns | 21 |
|     What are the Trading Policies of USO? | 26 |
|     Prior performance of USO | 28 |
|     Composite Performance Data for USO | 28 |
|     USO's Operations | 29 |
|     USCF and its Management and Traders | 29 |
|     USO's Service Providers | 34 |
|     USO's Fees and Expenses | 38 |
|     Breakeven Analysis | 38 |
|     Conflicts of Interest | 40 |
|     Ownership or Beneficial Interest in USO | 41 |
|     USCF's Responsibilities and Remedies | 41 |
|     Liability and Indemnification | 41 |
|     Meetings | 42 |
|     Termination Events | 42 |
|     Provisions of Law | 43 |
|     Books and Records | 43 |
|     Statements, Filings, and Reports | 43 |
|     Fiscal Year | 45 |
|     Governing Law; Consent to Delaware Jurisdiction | 45 |
|     Legal Matters | 45 |
|     U.S. Federal Income Tax Considerations | 45 |
|     Backup Withholding | 55 |
|     Other Tax Considerations | 56 |
|     Certain ERISA and Related Considerations | 56 |
|     Form of Shares | 58 |
|     Transfer of Shares | 59 |
|     What is the Plan of Distribution | 60 |
|     Calculating Per Share NAV | 62 |
|     Creation and Redemption of Shares | 63 |
|     Use of Proceeds | 67 |
| Information You Should Know | 68 |
| Summary of Promotional and Sales Material | 69 |
| Intellectual Property | 69 |
| Where you can Find More Information | 69 |
| Statement Regarding Forward-Looking Statements | 70 |
| Incorporation by Reference of Certain Information | 70 |
|     Privacy Policy | 70 |
| Appendix A | A-1 |
|     Glossary of Defined Terms | A-1 |

**PROSPECTUS SUMMARY**

*This is only a summary of the prospectus and, while it contains material information about USO and its shares, it does not contain or summarize all of the information about USO and the shares contained in this prospectus that is material and/or which may be important to you. You should read this entire prospectus, including "Risk Factors Involved with an Investment in USO" beginning on page 5, before making an investment decision about the shares. For a glossary of defined terms, see Appendix A.*

United States Oil Fund, LP ("USO"), a Delaware limited partnership, is a commodity pool that continuously issues common shares of beneficial interest that may be purchased and sold on the NYSE Arca stock exchange ("NYSE Arca"). USO is managed and controlled by United States Commodity Funds LLC ("USCF"), a Delaware limited liability company. USCF is registered as a commodity pool operator ("CPO") with the Commodity Futures Trading Commission ("CFTC") and is a member of the National Futures Association ("NFA").

**USO's Investment Objective and Strategy**

The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of a specified short-term futures contract on light, sweet crude oil called the "Benchmark Oil Futures Contract," plus interest earned on USO's collateral holdings, less USO's expenses.

**What Is the "Benchmark Oil Futures Contract"?**

The Benchmark Oil Futures Contract is the futures contract on light, sweet crude oil as traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire.

USO seeks to achieve its investment objective by investing primarily in futures contracts for light, sweet crude oil, other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels that are traded on the NYMEX, ICE Futures Europe and ICE Futures U.S. (together, "ICE Futures") or other U.S. and foreign exchanges (collectively, "Oil Futures Contracts") and to a lesser extent, in order to comply with regulatory requirements or in view of market conditions, other oil-related investments such as cash-settled options on Oil Futures Contracts, forward contracts for oil, cleared swap contracts and non-exchange traded ("over-the-counter" or "OTC") transactions that are based on the price of oil, other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing (collectively, "Other Oil-Related Investments"). Market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing. (For convenience and unless otherwise specified, Oil Futures Contracts and Other Oil-Related Investments collectively are referred to as "Oil Interests" in this prospectus.)

In addition, USCF believes that market arbitrage opportunities will cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis. USCF further believes that daily changes in prices of the Benchmark Oil Futures Contract have historically closely tracked the daily changes in spot prices of light, sweet crude oil. USCF believes that the net effect of these relationships will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track, the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses.

Specifically, USO seeks to achieve its investment objective by investing so that the average daily percentage change in USO's NAV for any period of 30 successive valuation days will be within plus/minus ten percent (10%) of the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period.

Investors should be aware that USO's investment objective is *not* for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, *nor* is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period *greater than one day*. This is because natural market forces called contango and backwardation have impacted the total return on an investment in USO's shares during the past year relative to a hypothetical direct investment in crude oil and, in the future, it is likely that the relationship between the market price of USO's shares and changes in the spot prices of light, sweet crude oil will continue to be so impacted by contango and backwardation. (It is important to note that the disclosure above ignores the potential costs associated with physically owning and storing crude oil, which could be substantial.)

1

Case 1:20-cv-04740-PGG   Document 144-2   Filed 04/20/21   Page 7 of 79

**Principal Investment Risks of an Investment in USO**

An investment in USO involves a degree of risk. Some of the risks you may face are summarized below. A more extensive discussion of these risks appears beginning on page 5.

**Investment Risk**

Investors may choose to use USO as a means of investing indirectly in crude oil. There are significant risks and hazards inherent in the crude oil industry that may cause the price of crude oil to widely fluctuate.

**Correlation Risk**

To the extent that investors use USO as a means of indirectly investing in crude oil, there is the risk that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis, will not closely track the daily changes in the spot price of light, sweet crude oil on a percentage basis. This could happen if the price of shares traded on the NYSE Arca does not correlate closely with the value of USO's NAV; the changes in USO's NAV do not correlate closely with the changes in the price of the Benchmark Oil Futures Contract; or the changes in the price of the Benchmark Oil Futures Contract do not closely correlate with the changes in the cash or spot price of crude oil. This is a risk because if these correlations do not exist, then investors may not be able to use USO as a cost-effective way to indirectly invest in crude oil or as a hedge against the risk of loss in crude oil-related transactions.

The price relationship between the near month contract to expire and the next month contract to expire that compose the Benchmark Oil Futures Contract will vary and may impact both the total return over time of USO's NAV, as well as the degree to which its total return tracks other crude oil price indices' total returns. In cases in which the near month contract's price is lower than the next month contract's price (a situation known as "contango" in the futures markets), then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to decline as it approaches expiration. In cases in which the near month contract's price is higher than the next month contract's price (a situation known as "backwardation" in the futures markets), then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to rise as it approaches expiration.

**Tax Risk**

USO is organized and operated as a limited partnership in accordance with the provisions of its limited partnership agreement and applicable state law, and therefore, has a more complex tax treatment than conventional mutual funds.

**Over-the-Counter ('OTC) Contract Risk**

USO may also invest in Other Oil-Related Investments, many of which are negotiated or OTC contracts that are not as liquid as Oil Futures Contracts and expose USO to credit risk that its counterparty may not be able to satisfy its obligations to USO.

2

---

**Other Risks**

USO pays fees and expenses that are incurred regardless of whether it is profitable.

Unlike mutual funds, commodity pools or other investment pools that manage their investments in an attempt to realize income and gains and distribute such income and gains to their investors, USO generally does not distribute cash to limited partners or other shareholders. You should not invest in USO if you will need cash distributions from USO to pay taxes on your share of income and gains of USO, if any, or for any other reason.

You will have no rights to participate in the management of USO and will have to rely on the duties and judgment of USCF to manage USO.

USO is subject to actual and potential inherent conflicts involving USCF, various commodity futures brokers and "Authorized Participants," the institutional firms that directly purchase and redeem shares in baskets. USCF's officers, directors and employees do not devote their time exclusively to USO. USCF's persons are directors, officers or employees of other entities that may compete with USO for their services, including other commodity pools (funds) that USCF manages. USCF could have a conflict between its responsibilities to USO and to those other entities. As a result of these and other relationships, parties involved with USO have a financial incentive to act in a manner other than in the best interests of USO and the shareholders.

---

3

**USO's Fees and Expenses**

This table describes the fees and expenses that you may pay if you buy and hold shares of USO. You should note that you may pay brokerage commissions on purchases and sales of USO's shares, which are not reflected in the table. Authorized Participants will pay applicable creation and redemption fees. *See* "Creation and Redemption of Shares— *Creation and Redemption Transaction Fee*," page 66.

**Annual Fund Operating Expenses** (expenses that you pay each year as a percentage of the value of your investment)[1]

| | |
|---|---|
| Management Fees | 0.45% |
| Distribution Fees | None |
| Other Fund Expenses | 0.34% |
| Total Annual Fund Expenses | 0.79% |

(1) Based on amounts for the year ended December 31, 2019. The individual expense amounts in dollar terms are shown in the table below. As used in this table, (i) Professional Expenses include expenses for legal, audit, tax accounting and printing; and (ii) Independent Director and Officer Expenses include amounts paid to independent directors and for officers' liability insurance.

| | | |
|---|---|---|
| Management fees | $ | 6,461,273 |
| Professional Expenses | $ | 1,440,997 |
| Brokerage commissions | $ | 2,423,017 |
| Licensing fees | $ | 215,376 |
| Registration fees | $ | 504,876 |
| Independent Directors and Officer Expenses | $ | 333,741 |

4

Case 1:20-cv-04740-PGG   Document 144-2   Filed 04/29/21   Page 10 of 79

## RISK FACTORS INVOLVED WITH AN INVESTMENT IN USO

*You should consider carefully the risks described below before making an investment decision. You should also refer to the other information included in this prospectus as well as information found in our periodic reports, which include USO's financial statements and the related notes, that are incorporated by reference. See "Incorporation By Reference of Certain Information", page 70.*

USO's investment objective is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses. USO seeks to achieve its investment objective by investing so that the average daily percentage change in USO's NAV for any period of 30 successive valuation days will be within plus/minus ten percent (10%) of the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period. USO's investment strategy is designed to provide investors with a cost-effective way to invest indirectly in crude oil and to hedge against movements in the spot price of light, sweet crude oil. An investment in USO involves investment risk similar to a direct investment in Oil Futures Contracts and Other Oil-Related Investments, and correlation risk, or the risk that investors purchasing shares to hedge against movements in the price of crude oil will have an efficient hedge only if the price they pay for their shares closely correlates with the price of crude oil. In addition to investment risk and correlation risk, an investment in USO involves tax risks, OTC risks, and other risks.

### Investment Risk

*The NAV of USO's shares relates directly to the value of the Benchmark Oil Futures Contracts and other assets held by USO and fluctuations in the prices of these assets could materially adversely affect an investment in USO's shares. Past performance is not necessarily indicative of future results; all or substantially all of an investment in USO could be lost.*

The net assets of USO consist primarily of investments in Oil Futures Contracts and, to a lesser extent, in Other Oil-Related Investments. The NAV of USO's shares relates directly to the value of these assets (less liabilities, including accrued but unpaid expenses), which in turn relates to the price of light, sweet crude oil in the marketplace. Crude oil prices depend on local, regional and global events or conditions that affect supply and demand for oil.

*Economic conditions impacting crude oil.* The demand for crude oil correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices. Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, pandemics (e.g. COVID-19) government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and other events or conditions (e.g. pandemics such as COVID-19), that impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil.

*Other crude oil demand-related factors.* Other factors that may affect the demand for crude oil and therefore its price, include technological improvements in energy efficiency; seasonal weather patterns, which affect the demand for crude oil associated with heating and cooling; increased competitiveness of alternative energy sources that have so far generally not been competitive with oil without the benefit of government subsidies or mandates; and changes in technology or consumer preferences that alter fuel choices, such as toward alternative fueled vehicles.

*Other crude oil supply-related factors.* Crude oil prices also vary depending on a number of factors affecting supply. For example, increased supply from the development of new oil supply sources and technologies to enhance recovery from existing sources tends to reduce crude oil prices to the extent such supply increases are not offset by commensurate growth in demand. Similarly, increases in industry refining or petrochemical manufacturing capacity may impact the supply of crude oil. World oil supply levels can also be affected by factors that reduce available supplies, such as adherence by member countries to the Organization of the Petroleum Exporting Countries ("OPEC") production quotas and the occurrence of wars, hostile actions, natural disasters, disruptions in competitors' operations, or unexpected unavailability of distribution channels that may disrupt supplies. Technological change can also alter the relative costs for companies in the petroleum industry to find, produce, and refine oil and to manufacture petrochemicals, which in turn may affect the supply of and demand for oil.

5

*Other factors impacting the crude oil market.* The supply of and demand for crude oil may also be impacted by changes in interest rates, inflation, and other local or regional market conditions, as well as by the development of alternative energy sources.

*Price Volatility May Possibly Cause the Total Loss of Your Investment.* Futures contracts have a high degree of price variability and are subject to occasional rapid and substantial changes. Consequently, you could lose all or substantially all of your investment in USO.

*Changes to U.S. tariff and import/export regulations may have a negative effect on USO's developments.* There has been ongoing discussion and commentary regarding potential significant changes to U.S. trade policies, treaties and tariffs. The current U.S. presidential administration, along with the U.S. Congress, has created significant uncertainty about the future relationship between the United States and other countries with respect to trade policies, treaties and tariffs. These developments, or the perception that any of them could occur, may have a material adverse effect on global economic conditions and the stability of global crude oil, generally. Any of these factors could depress economic activity and could have a material adverse effect on USO's business, financial condition and results of operations, which in turn would negatively impact USO and its shareholders.

*Uncertainty about presidential administration initiatives could negatively impact USO's business, financial condition and results of operations.* The current presidential administration has called for significant changes to U.S. trade, healthcare, immigration, foreign and government regulatory policy. Accordingly, there is significant uncertainty with respect to legislation, regulation and government policy at the federal level, as well as the state and local levels. Recent events have created heightened uncertainty and introduced new and difficult-to-quantify macroeconomic and political risks. There has been a corresponding increase in the uncertainty surrounding interest rates, inflation, foreign exchange rates, trade volumes and fiscal and monetary policy. To the extent the U.S. Congress or the current presidential administration implements changes to U.S. policy, those changes may impact, among other things, the U.S. and global economy, international trade and relations, unemployment, immigration, corporate taxes, healthcare, the U.S. regulatory environment, inflation, supply and demand for commodities (including crude oil), and other areas. Although USO cannot predict the impact, if any, of these changes to USO's business, they could adversely affect USO's business, financial condition, operating results and cash flows.

*Economic impacts due to Brexit.* In June 2016, the United Kingdom held a referendum in which voters approved an exit from the European Union ("Brexit") and, subsequently, on March 29, 2017, the U.K. government began the formal process of leaving the European Union. Brexit created political and economic uncertainty and instability in the global markets (including currency and credit markets), and especially in the United Kingdom and the European Union. Because the U.K. Parliament rejected Prime Minister Theresa May's proposed Brexit deal with the European Union in January 2019 and March 2019, and Prime Minister Theresa May's resignation which was effective June 7, 2019, there was increased uncertainty on the timing of Brexit. However, under current Prime Minister Boris Johnson, the House of Commons passed a Brexit deal on December 20, 2019 and the U.K. formally left the European Union on January 31, 2020. The U.K. is currently in a transition period until December 31, 2020, where agreements surrounding trade and other aspects of the U.K.'s future relationship with the European Union will need to be finalized. The resulting political and economic uncertainty and instability in the United Kingdom has also impacted the European Union, generally, as well as the global economy. In addition, the fiscal and monetary policies of foreign nations, such as Russia and China, may have a severe impact on the worldwide and U.S. crude oil markets. Such disruptions or changes could adversely impact the value of USO's crude oil investments.

6

*An investment in USO may provide little or no diversification benefits. Thus, in a declining market, USO may have no gains to offset losses from other investments, and an investor may suffer losses on an investment in USO while incurring losses with respect to other asset classes.*

Historically, Oil Futures Contracts and Other Oil-Related Investments have generally been non-correlated to the performance of other asset classes such as stocks and bonds. Non-correlation means that there is a low statistically valid relationship between the performance of futures and other commodity interest transactions, on the one hand, and stocks or bonds, on the other hand.

However, there can be no assurance that such non-correlation will continue during future periods. If, contrary to historic patterns, USO's performance were to move in the same general direction as the financial markets, investors will obtain little or no diversification benefits from an investment in USO's shares. In such a case, USO may have no gains to offset losses from other investments, and investors may suffer losses on their investment in USO at the same time they incur losses with respect to other investments.

Variables such as drought, floods, weather, pandemics, embargoes, tariffs and other political events may have a larger impact on crude oil prices and crude oil-linked instruments, including Oil Futures Contracts and Other Oil-Related Investments, than on traditional securities. These additional variables may create additional investment risks that subject USO's investments to greater volatility than investments in traditional securities.

Non-correlation should not be confused with negative correlation, where the performance of two asset classes would be opposite of each other. There is no historical evidence that the spot price of crude oil and prices of other financial assets, such as stocks and bonds, are negatively correlated. In the absence of negative correlation, USO cannot be expected to be automatically profitable during unfavorable periods for the stock market, or vice versa.

*Historical performance of USO and the Benchmark Futures Contract is not indicative of future performance.*

Past performance of USO or the Benchmark Futures Contract is not necessarily indicative of future results. Therefore, past performance of USO or the Benchmark Futures Contract should not be relied upon in deciding whether to buy shares of USO.

7

**Correlation Risk**

Investors purchasing shares to hedge against movements in the price of crude oil will have an efficient hedge only if the price investors pay for their shares closely correlates with the price of crude oil. Investing in USO's shares for hedging purposes involves the following risks:

- The market price at which the investor buys or sells shares may be significantly less or more than NAV.

- Daily percentage changes in NAV may not closely correlate with daily percentage changes in the price of the Benchmark Oil Futures Contract.

- Daily percentage changes in the price of the Benchmark Oil Futures Contract may not closely correlate with daily percentage changes in the price of light, sweet crude oil.

*The market price at which investors buy or sell shares may be significantly less or more than NAV.*

USO's NAV per share will change throughout the day as fluctuations occur in the market value of USO's portfolio investments. The public trading price at which an investor buys or sells shares during the day from their broker may be different from the NAV of the shares. Price differences may relate primarily to supply and demand forces at work in the secondary trading market for shares that are closely related to, but not identical to, the same forces influencing the prices of the light, sweet crude oil and the Benchmark Oil Futures Contract at any point in time. USCF expects that exploitation of certain arbitrage opportunities by Authorized Participants and their clients and customers will tend to cause the public trading price to track NAV per share closely over time, but there can be no assurance of that.

The NAV of USO's shares may also be influenced by non-concurrent trading hours between the NYSE Arca and the various futures exchanges on which crude oil is traded. While the shares trade on the NYSE Arca from 9:30 a.m. to 4:00 p.m. Eastern Time, the trading hours for the futures exchanges on which light, sweet crude oil trade may not necessarily coincide during all of this time. For example, while the shares trade on the NYSE Arca until 4:00 p.m. Eastern Time, liquidity in the global light sweet crude market will be reduced after the close of the NYMEX at 2:30 p.m. Eastern Time. As a result, during periods when the NYSE Arca is open and the futures exchanges on which light, sweet crude oil is traded are closed, trading spreads and the resulting premium or discount on the shares may widen and, therefore, increase the difference between the price of the shares and the NAV of the shares.

*Daily percentage changes in USO's NAV may not correlate with daily percentage changes in the price of the Benchmark Oil Futures Contract.*

It is possible that the daily percentage changes in USO's NAV per share may not closely correlate to daily percentage changes in the price of the Benchmark Oil Futures Contract. Non-correlation may be attributable to disruptions in the market for light, sweet crude oil, the imposition of position or accountability limits by regulators or exchanges, or other extraordinary circumstances. As USO approaches or reaches position limits with respect to the Benchmark Oil Futures Contract and other Oil Futures Contracts or in view of market conditions, USO may begin investing in Other Oil-Related Investments. In addition, USO is not able to replicate exactly the changes in the price of the Benchmark Oil Futures Contract because the total return generated by USO is reduced by expenses and transaction costs, including those incurred in connection with USO's trading activities, and increased by interest income from USO's holdings of Treasuries (defined below). Tracking the Benchmark Oil Futures Contract requires trading of USO's portfolio with a view to tracking the Benchmark Oil Futures Contract over time and is dependent upon the skills of USCF and its trading principals, among other factors.

*Daily percentage changes in the price of the Benchmark Oil Futures Contract may not correlate with daily percentage changes in the spot price of light, sweet crude oil.*

The correlation between changes in prices of the Benchmark Oil Futures Contract and the spot price of crude oil may at times be only approximate. The degree of imperfection of correlation depends upon circumstances such as variations in the speculative oil market, supply of and demand for Oil Futures Contracts (including the Benchmark Oil Futures Contract) and Other Oil-Related Investments, and technical influences in oil futures trading.

8

***Natural forces in the oil futures market known as "backwardation" and "contango" may increase USO's tracking error and/or negatively impact total return.***

The design of USO's Benchmark Oil Futures Contract is such that every month it begins by using the near month contract to expire until the near month contract is within two weeks of expiration, when, over a four day period, it transitions to the next month contract to expire as its benchmark contract and keeps that contract as its benchmark until it becomes the near month contract and close to expiration. In the event of a crude oil futures market where near month contracts trade at a higher price than next month to expire contracts, a situation described as "backwardation" in the futures market, then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to rise as it approaches expiration. Conversely, in the event of a crude oil futures market where near month contracts trade at a lower price than next month contracts, a situation described as "contango" in the futures market, then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to decline as it approaches expiration. When compared to total return of other price indices, such as the spot price of crude oil, the impact of backwardation and contango may cause the total return of USO's per share NAV to vary significantly. Moreover, absent the impact of rising or falling oil prices, a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return and investors could lose part or all of their investment. See "Additional Information About USO, its Investment Objective and Investments" for a discussion of the potential effects of contango and backwardation.

***Accountability levels, position limits, and daily price fluctuation limits set by the exchanges have the potential to cause tracking error, which could cause the price of shares to substantially vary from the price of the Benchmark Oil Futures Contract.***

Designated contract markets, such as the NYMEX and ICE Futures, have established accountability levels and position limits on the maximum net long or net short futures contracts in commodity interests that any person or group of persons under common trading control (other than as a hedge, which an investment by USO is not) may hold, own or control. In addition to accountability levels and position limits, the NYMEX and ICE Futures also set daily price fluctuation limits on futures contracts. The daily price fluctuation limit establishes the maximum amount that the price of a futures contract may vary either up or down from the previous day's settlement price. Once the daily price fluctuation limit has been reached in a particular futures contract, no trades may be made at a price beyond that limit.

The accountability levels for the Benchmark Oil Futures Contract and other Oil Futures Contracts traded on U.S.-based futures exchanges, are not a fixed ceiling, but rather a threshold above which the exchange may exercise greater scrutiny and control over an investor's positions. The NYMEX current accountability level for investments for any one month in the Benchmark Oil Futures Contract is 10,000 contracts. In addition, the NYMEX imposes an accountability level for all months of 20,000 net futures contracts for light, sweet crude oil. In addition, the ICE Futures Europe maintains the same accountability levels, position limits and monitoring authority for its light, sweet crude oil contract as the NYMEX. If USO and the Related Public Funds exceed these accountability levels for investments in the futures contracts for light, sweet crude oil, the NYMEX and ICE Futures Europe will monitor such exposure and may ask for further information on their activities including the total size of all positions, investment and trading strategy, and the extent of liquidity resources of USO and the Related Public Funds. If deemed necessary by the NYMEX and/or ICE Futures Europe, USO could be ordered to reduce its futures contracts traded on such exchanges to below the 10,000 single month and/or 20,000 all month accountability level.

Position limits differ from accountability levels in that they represent fixed limits on the maximum number of futures contracts that any person may hold and cannot allow such limits to be exceeded without express CFTC authority to do so. In addition to accountability levels and position limits that may apply at any time, the NYMEX and ICE Futures impose position limits on contracts held in the last few days of trading in the near month contract to expire.

The CFTC has proposed to adopt limits on speculative positions in 25 physical commodity futures and option contracts as well as swaps that are economically equivalent to such contracts in the agriculture, energy and metals markets (the "Position Limit Rules"). The Position Limit Rules would, among other things: identify which contracts are subject to speculative position limits; set thresholds that restrict the size of speculative positions that a person may hold in the spot month, other individual months, and all months combined; create an exemption for positions that constitute bona fide hedging transactions; impose responsibilities on designated contract markets ("DCMs") and swap execution facilities ("SEFs") to establish position limits or, in some cases, position accountability rules; and apply to both futures and swaps across four relevant venues: OTC, DCMs, SEFs as well as certain non-U.S. located platforms. The CFTC's first attempt at finalizing the Position Limit Rules, in 2011, was successfully challenged by market participants in 2012 and, since then, the CFTC has re-proposed them and solicited comments from market participants multiple times. At this time, it is unclear how the Position Limit Rules may affect USO, but the effect may be substantial and adverse. By way of example, the Position Limit Rules may negatively impact the ability of USO to meet its investment objectives through limits that may inhibit USCF's ability to sell additional Creation Baskets of USO.

9

Case 1:20-cv-04740-PGG Document 14-72 Filed 04/29/21 Page 15 of 79

Until such time as the Position Limit Rules are adopted, the regulatory architecture in effect prior to the adoption of the Position Limit Rules will govern transactions in commodities and related derivatives. Under that system, the CFTC enforces federal limits on speculation in nine agricultural products (e.g., corn, wheat and soy), while futures exchanges establish and enforce position limits and accountability levels for other agricultural products and certain energy products (e.g., oil and natural gas). As a result, USO may be limited with respect to the size of its investments in any commodities subject to these limits.

Under existing and recently adopted CFTC regulations, for the purpose of position limits, a market participant is generally required, subject to certain narrow exceptions, to aggregate all positions for which that participant controls the trading decisions with all positions for which that participant has a 10 percent or greater ownership interest in an account or position, as well as the positions of two or more persons acting pursuant to an express or implied agreement or understanding with that participant (the "Aggregation Rules"). The Aggregation Rules will also apply with respect to the Position Limit Rules if and when such Position Limit Rules are adopted. All of these limits may potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract. This may in turn prevent investors from being able to effectively use USO as a way to hedge against crude oil-related losses or as a way to indirectly invest in crude oil.

USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments. If USO encounters accountability levels, position limits, or price fluctuation limits for Oil Futures Contracts on the NYMEX or ICE Futures, it may then, if permitted under applicable regulatory requirements, purchase Oil Futures Contracts on other exchanges that trade listed crude oil futures or enter into swaps or other transactions to meet its investment objective. In addition, if USO exceeds accountability levels on either the NYMEX or ICE Futures and is required by such exchanges to reduce its holdings, such reduction could potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract.

**Tax Risk**

*An investor's tax liability may exceed the amount of distributions, if any, on its shares.*

Cash or property will be distributed at the sole discretion of USCF. USCF has not and does not currently intend to make cash or other distributions with respect to shares. Investors will be required to pay U.S. federal income tax and, in some cases, state, local, or foreign income tax, on their allocable share of USO's taxable income, without regard to whether they receive distributions or the amount of any distributions. Therefore, the tax liability of an investor with respect to its shares may exceed the amount of cash or value of property (if any) distributed.

*An investor's allocable share of taxable income or loss may differ from its economic income or loss on its shares.*

Due to the application of the assumptions and conventions applied by USO in making allocations for tax purposes and other factors, an investor's allocable share of USO's income, gain, deduction or loss may be different than its economic profit or loss from its shares for a taxable year. This difference could be temporary or permanent and, if permanent, could result in it being taxed on amounts in excess of its economic income.

10

*Items of income, gain, deduction, loss and credit with respect to shares could be reallocated, USO could be liable for U.S. Federal income tax, if the U.S. Internal Revenue Service ("IRS") does not accept the assumptions and conventions applied by USO in allocating those items, with potential adverse consequences for an investor.*

The U.S. tax rules pertaining to partnerships are complex and their application to large, publicly traded partnerships such as USO is in many respects uncertain. USO applies certain assumptions and conventions in an attempt to comply with the intent of the applicable rules and to report taxable income, gains, deductions, losses and credits in a manner that properly reflects shareholders' economic gains and losses. These assumptions and conventions may not fully comply with all aspects of the Internal Revenue Code (the "Code") and applicable Treasury Regulations, however, and it is possible that the IRS will successfully challenge USO's allocation methods and require USO to reallocate items of income, gain, deduction, loss or credit in a manner that adversely affects investors.

USO may be liable for U.S. federal income tax on any "imputed understatement" of tax resulting from an adjustment as a result of an IRS audit. The amount of the imputed understatement generally includes increases in allocations of items of income or gains to any investor and decreases in allocations of items of deduction, loss, or credit to any investor without any offset for any corresponding reductions in allocations of items of income or gain to any investor or increases in allocations of items of deduction, loss, or credit to any investor. If USO is required to pay any U.S. federal income taxes on any imputed understatement, the resulting tax liability would reduce the net assets of USO and would likely have an adverse impact on the value of the shares. Under certain circumstances, USO may be eligible to make an election to cause the investors to take into account the amount of any imputed understatement, including any interest and penalties. The ability of a publicly traded partnership such as USO to make this election is uncertain. If the election is made, USO would be required to provide investors who owned beneficial interests in the shares in the year to which the adjusted allocations relate with a statement setting forth their proportionate shares of the adjustment ("Adjusted K-1s"). The investors would be required to take the adjustment into account in the taxable year in which the Adjusted K-1s are issued.

*USO could be treated as a corporation for federal income tax purposes, which may substantially reduce the value of the shares.*

USO has received an opinion of counsel that, under current U.S. federal income tax laws, USO will be treated as a partnership that is not taxable as a corporation for U.S. federal income tax purposes, provided that (i) at least 90 percent of USO's annual gross income will be derived from (a) income and gains from commodities (not held as inventory) or futures, forwards, options, swaps and other notional principal contracts with respect to commodities, and (b) interest income, (ii) USO is organized and operated in accordance with its governing agreements and applicable law and (iii) USO does not elect to be taxed as a corporation for federal income tax purposes. Although USCF anticipates that USO has satisfied and will continue to satisfy the "qualifying income" requirement for all of its taxable years, that result cannot be assured. USO has not requested and will not request any ruling from the IRS with respect to its classification as a partnership not taxable as a corporation for federal income tax purposes. If the IRS were to successfully assert that USO is taxable as a corporation for federal income tax purposes in any taxable year, rather than passing through its income, gains, losses and deductions proportionately to shareholders, USO would be subject to tax on its net income for the year at corporate tax rates. In addition, although USCF does not currently intend to make distributions with respect to shares, any distributions would be taxable to shareholders as dividend income. Taxation of USO as a corporation could materially reduce the after-tax return on an investment in shares and could substantially reduce the value of the shares.

*USO is organized and operated as a limited partnership in accordance with the provisions of the LP Agreement and applicable state law, and therefore, USO has a more complex tax treatment than traditional mutual funds.*

USO is organized and operated as a limited partnership in accordance with the provisions of the LP Agreement and applicable state law. No U.S. federal income tax is paid by USO on its income. Instead, USO will furnish shareholders each year with tax information on IRS Schedule K-1 (Form 1065) and each U.S. shareholder is required to report on its U.S. federal income tax return its allocable share of the income, gain, loss and deduction of USO.

11

This must be reported without regard to the amount (if any) of cash or property the shareholder receives as a distribution from USO during the taxable year. A shareholder, therefore, may be allocated income or gain by USO but receive no cash distribution with which to pay the tax liability resulting from the allocation, or may receive a distribution that is insufficient to pay such liability.

In addition to federal income taxes, shareholders may be subject to other taxes, such as state and local income taxes, unincorporated business taxes, business franchise taxes and estate, inheritance or intangible taxes that may be imposed by the various jurisdictions in which USO does business or owns property or where the shareholders reside. Although an analysis of those various taxes is not presented here, each prospective shareholder should consider their potential impact on its investment in USO. It is each shareholder's responsibility to file the appropriate U.S. federal, state, local and foreign tax returns.

### *If USO is required to withhold tax with respect to any Non-U.S. shareholders, the cost of such withholding may be borne by all shareholders.*

Under certain circumstances, USO may be required to pay withholding tax with respect to allocations to Non-U.S. shareholders. Although the LP Agreement provides that any such withholding will be treated as being distributed to the Non-U.S. shareholder, USO may not be able to cause the economic cost of such withholding to be borne by the Non-U.S. shareholder on whose behalf such amounts were withheld since it does not generally expect to make any distributions. Under such circumstances, the economic cost of the withholding may be borne by all shareholders, not just the shareholders on whose behalf such amounts were withheld. This could have a material impact on the value of the shares.

### *The impact of U.S. tax reform on USO is uncertain.*

On December 22, 2017, H.R. 1, the bill formerly known as the Tax Cuts and Jobs Act of 2017 (the "Tax Act"), was signed into law. The Tax Act substantially alters the U.S. federal tax system in a variety of ways, including significant changes to the taxation of business entities, the deductibility of interest expense, and the tax treatment of capital investment. We cannot predict with certainty how any changes in the tax laws might affect the US economy or the demand for and the price of commodities. As a result, it is possible that the Tax Act, as well as any U.S. Treasury regulations, administrative interpretations or court decisions interpreting the Tax Act and any future legislation related to tax reform, could have unexpected or negative impacts on USO and some or all of its shareholders. Shareholders are urged to consult with their tax advisor regarding tax legislative, regulatory, or administrative developments and proposals and their potential effect on an investment in USO.

## OTC Contract Risk

### *USO will be subject to credit risk with respect to counterparties to OTC contracts entered into by USO or held by special purpose or structured vehicles.*

USO faces the risk of non-performance by the counterparties to the OTC contracts. Unlike in futures contracts, the counterparty to these contracts is generally a single bank or other financial institution, rather than a clearing organization backed by a group of financial institutions. As a result, there will be greater counterparty credit risk in these transactions. A counterparty may not be able to meet its obligations to USO, in which case USO could suffer significant losses on these contracts.

If a counterparty becomes bankrupt or otherwise fails to perform its obligations due to financial difficulties, USO may experience significant delays in obtaining any recovery in a bankruptcy or other reorganization proceeding. USO may obtain only limited recovery or may obtain no recovery in such circumstances.

### *Valuing OTC derivatives may be less certain than actively traded financial instruments.*

In general, valuing OTC derivatives is less certain than valuing actively traded financial instruments such as exchange traded futures contracts and securities or cleared swaps because the price and terms on which such OTC derivatives are entered into or can be terminated are individually negotiated, and those prices and terms may not reflect the best price or terms available from other sources. In addition, while market makers and dealers generally quote indicative prices or terms for entering into or terminating OTC contracts, they typically are not contractually obligated to do so, particularly if they are not a party to the transaction. As a result, it may be difficult to obtain an independent value for an outstanding OTC derivatives transaction.

12

**Other Risks**

*Certain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time.*

Futures positions cannot always be liquidated at the desired price. It is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market. A market disruption, such as a foreign government taking political actions that disrupt the market for its currency, its crude oil production or exports, or another major export, can also make it difficult to liquidate a position. Because both Oil Futures Contracts and Other Oil-Related Investments may be illiquid, USO's Oil Interests may be more difficult to liquidate at favorable prices in periods of illiquid markets and losses may be incurred during the period in which positions are being liquidated. The large size of the positions that USO may acquire increases the risk of illiquidity both by making its positions more difficult to liquidate and by potentially increasing losses while trying to do so.

OTC contracts that are not subject to clearing may be even less marketable than futures contracts because they are not traded on an exchange, do not have uniform terms and conditions, and are entered into based upon the creditworthiness of the parties and the availability of credit support, such as collateral, and in general, they are not transferable without the consent of the counterparty. These conditions make such contracts less liquid than standardized futures contracts traded on a commodities exchange and could adversely impact USO's ability to realize the full value of such contracts. In addition, even if collateral is used to reduce counterparty credit risk, sudden changes in the value of OTC transactions may leave a party open to financial risk due to a counterparty default since the collateral held may not cover a party's exposure on the transaction in such situations.

*USO is not actively managed and tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising.*

USO is not actively managed by conventional methods. Accordingly, if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract. USCF will seek to cause the NAV of USO's shares to track the Benchmark Oil Futures Contract during periods in which its price is flat or declining as well as when the price is rising.

*The NYSE Arca may halt trading in USO's shares, which would adversely impact an investor's ability to sell shares.*

USO's shares are listed for trading on the NYSE Arca under the market symbol "USO." Trading in shares may be halted due to market conditions or, in light of NYSE Arca rules and procedures, for reasons that, in the view of the NYSE Arca, make trading in shares inadvisable. In addition, trading is subject to trading halts caused by extraordinary market volatility pursuant to "circuit breaker" rules that require trading to be halted for a specified period based on a specified market decline. Additionally, there can be no assurance that the requirements necessary to maintain the listing of USO's shares will continue to be met or will remain unchanged.

The liquidity of the shares may also be affected by the withdrawal from participation of Authorized Participants, which could adversely affect the market price of the shares.

In the event that one or more Authorized Participants which have substantial interests in the shares withdraw from participation, the liquidity of the shares will likely decrease, which could adversely affect the market price of the shares and result in investors incurring a loss on their investment.

13

Shareholders that are not Authorized Participants may only purchase or sell their shares in secondary trading markets, and the conditions associated with trading in secondary markets may adversely affect investors' investment in the shares.

Only Authorized Participants may create or redeem Redemption Baskets. All other investors that desire to purchase or sell shares must do so through the NYSE Arca or in other markets, if any, in which the shares may be traded. Shares may trade at a premium or discount to NAV per share.

***The lack of an active trading market for USO's shares may result in losses on an investor's investment in USO at the time the investor sells the shares.***

Although USO's shares are listed and traded on the NYSE Arca, there can be no guarantee that an active trading market for the shares will be maintained. If an investor needs to sell shares at a time when no active trading market for them exists, the price the investor receives upon sale of the shares, assuming they were able to be sold, likely would be lower than if an active market existed.

***Limited partners and shareholders do not participate in the management of USO and do not control USCF, so they do not have any influence over basic matters that affect USO.***

The limited partners and shareholders take no part in the management or control, and have a minimal voice in USO's operations or business. Limited partners and shareholders must therefore rely upon the duties and judgment of USCF to manage USO's affairs. Limited partners and shareholders have no right to elect USCF on an annual or any other continuing basis. If USCF voluntarily withdraws, however, the holders of a majority of USO's outstanding shares (excluding for purposes of such determination shares owned, if any, by the withdrawing general partner and its affiliates) may elect its successor. USCF may not be removed as general partner except upon approval by the affirmative vote of the holders of at least 66 2/3 percent of USO's outstanding shares (excluding shares, if any, owned by USCF and its affiliates), subject to the satisfaction of certain conditions set forth in the LP Agreement.

***Limited partners may have limited liability in certain circumstances, including potentially having liability for the return of wrongful distributions.***

Under Delaware law, a limited partner might be held liable for USO's obligations as if it were a general partner if the limited partner participates in the control of the partnership's business and the persons who transact business with the partnership think the limited partner is the general partner.

A limited partner will not be liable for assessments in addition to its initial capital investment in any of USO's shares. However, a limited partner may be required to repay to USO any amounts wrongfully returned or distributed to it under some circumstances. Under Delaware law, USO may not make a distribution to limited partners if the distribution causes USO's liabilities (other than liabilities to partners on account of their partnership interests and nonrecourse liabilities) to exceed the fair value of USO's assets. Delaware law provides that a limited partner who receives such a distribution and knew at the time of the distribution that the distribution violated the law will be liable to the limited partnership for the amount of the distribution for three years from the date of the distribution.

14

*The LLC Agreement provides limited authority to the Non-Management Directors, and any Director of USCF may be removed by USCF's parent company, which is wholly owned by Concierge Technologies, Inc., a controlled public company where the majority of shares are owned by Nicholas Gerber along with certain other family members and certain other shareholders.*

USCF's Board of Directors (the "Board") currently consists of four Management Directors, each of whom are also executive officers or employees of USCF ("Management Directors"), and three Non-Management Directors, each of whom are considered independent for purposes of applicable NYSE Arca and SEC rules. Under USCF's Sixth Amended and Restated Limited Liability Company Agreement, dated as of May 15, 2015 (as amended from time to time, the ("LLC Agreement"), the Non-Management Directors have only such authority as the Management Directors expressly confer upon them, which means that the Non-Management Directors may have less authority to control the actions of the Management Directors than is typically the case with the independent members of a company's Board. In addition, any Director may be removed by written consent of Wainwright Holdings, Inc. ("Wainwright"), which is the sole member of USCF. The sole shareholder of Wainwright is Concierge Technologies, Inc., a company publicly traded under the ticker symbol "CNCG" ("Concierge"). Mr. Nicholas Gerber along with certain family members and certain other shareholders, own the majority of the shares in Concierge, which is the sole shareholder of Wainwright, the sole member of USCF. Accordingly, although USCF is governed by the Board, which consists of both Management Directors and Non-Management Directors, pursuant to the LLC Agreement, it is possible for Mr. Gerber to exercise his indirect control of Wainwright to effect the removal of any Director (including the Non-Management Directors which comprise the Audit Committee) and to replace that Director with another Director. Having control in one person could have a negative impact on USCF and USO, including their regulatory obligations.

*There is a risk that USO will not earn trading gains sufficient to compensate for the fees and expenses that it must pay and as such USO may not earn any profit.*

USO pays brokerage charges of approximately 0.17% of average total net assets based on brokerage fees of $3.50 per buy or sell, management fees of 0.45% of NAV on its average net assets, and OTC spreads and extraordinary expenses (*e.g.,* subsequent offering expenses, other expenses not in the ordinary course of business, including the indemnification of any person against liabilities and obligations to the extent permitted by law and required under the LP Agreement and under agreements entered into by USCF on USO's behalf and the bringing and defending of actions at law or in equity and otherwise engaging in the conduct of litigation and the incurring of legal expenses and the settlement of claims and litigation) that cannot be quantified.

These fees and expenses must be paid in all cases regardless of whether USO's activities are profitable. Accordingly, USO must earn trading gains sufficient to compensate for these fees and expenses before it can earn any profit.

*USO is subject to extensive regulatory reporting and compliance.*

USO is subject to a comprehensive scheme of regulation under the federal commodities and securities laws. USO could be subject to sanctions for a failure to comply with those requirements, which could adversely affect its financial performance (in the case of financial penalties) or ability to pursue its investment objective (in the case of a limitation on its ability to trade).

Because USO's shares are publicly traded, USO is subject to certain rules and regulations of federal, state and financial market exchange entities charged with the protection of investors and the oversight of companies whose securities are publicly traded. These entities include the Public Company Accounting Oversight Board (the "PCAOB"), the SEC, the CFTC, the National Futures Association (the "NFA"), and NYSE Arca and these authorities have continued to develop additional regulations or interpretations of existing regulations. USO's ongoing efforts to comply with these regulations and interpretations have resulted in, and are likely to continue resulting in, a diversion of management's time and attention from revenue-generating activities to compliance related activities.

USO is responsible for establishing and maintaining adequate internal control over financial reporting. USO's internal control system is designed to provide reasonable assurance to its management regarding the preparation and fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective may provide only reasonable assurance with respect to financial statement preparation and presentation.

15

***Regulatory changes or actions, including the implementation of new legislation, is impossible to predict but may significantly and adversely affect USO.***

The futures markets are subject to comprehensive statutes, regulations, and margin requirements. In addition, the CFTC and futures exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. Regulation of commodity interest transactions in the United States is a rapidly changing area of law and is subject to ongoing modification by governmental and judicial action. Considerable regulatory attention has been focused on non-traditional investment pools that are publicly distributed in the United States. In addition, the SEC, CFTC and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. Further, various national governments outside of the United States have expressed concern regarding the disruptive effects of speculative trading in the energy markets and the need to regulate the derivatives markets in general. The effect of any future regulatory change on USO is impossible to predict, but it could be substantial and adverse.

***USO is not a registered investment company so shareholders do not have the protections of the 1940 Act.***

USO is not an investment company subject to the 1940 Act. Accordingly, investors do not have the protections afforded by that statute, which, for example, requires investment companies to have a majority of disinterested directors and regulates the relationship between the investment company and its investment manager.

***Trading in international markets could expose USO to credit and regulatory risk.***

USO invests primarily in Oil Futures Contracts, a significant portion of which are traded on United States exchanges, including the NYMEX. However, a portion of USO's trades may take place on markets and exchanges outside the United States. Trading on such non-U.S. markets or exchanges presents risks because they are not subject to the same degree of regulation as their U.S. counterparts, including potentially different or diminished investor protections. In trading contracts denominated in currencies other than U.S. dollars, USO is subject to the risk of adverse exchange-rate movements between the dollar and the functional currencies of such contracts. Additionally, trading on non-U.S. exchanges is subject to the risks presented by exchange controls, expropriation, increased tax burdens and exposure to local economic declines and political instability. An adverse development with respect to any of these variables could reduce the profit or increase the loss earned on trades in the affected international markets.

***USO and USCF may have conflicts of interest, which may permit them to favor their own interests to the detriment of shareholders.***

USO is subject to actual and potential inherent conflicts involving USCF, various commodity futures brokers and Authorized Participants. USCF's officers, directors and employees do not devote their time exclusively to USO and also are directors, officers or employees of other entities that may compete with USO for their services. They could have a conflict between their responsibilities to USO and to those other entities. As a result of these and other relationships, parties involved with USO have a financial incentive to act in a manner other than in the best interests of USO and the shareholders. USCF has not established any formal procedure to resolve conflicts of interest. Consequently, investors are dependent on the good faith of the respective parties subject to such conflicts of interest to resolve them equitably. Although USCF attempts to monitor these conflicts, it is extremely difficult, if not impossible, for USCF to ensure that these conflicts do not, in fact, result in adverse consequences to the shareholders.

USO may also be subject to certain conflicts with respect to the Futures Commission Merchant ("FCM"), including, but not limited to, conflicts that result from receiving greater amounts of compensation from other clients, or purchasing opposite or competing positions on behalf of third party accounts traded through the FCM. In addition, USCF's principals, officers, directors or employees may trade futures and related contracts for their own account. A conflict of interest may exist if their trades are in the same markets and at the same time as USO trades using the clearing broker to be used by USO. A potential conflict also may occur if USCF's principals, officers, directors or employees trade their accounts more aggressively or take positions in their accounts which are opposite, or ahead of, the positions taken by USO.

16

***USO could terminate at any time and cause the liquidation and potential loss of an investor's investment and could upset the overall maturity and timing of an investor's investment portfolio.***

USO may terminate at any time, regardless of whether USO has incurred losses, subject to the terms of the LP Agreement. In particular, unforeseen circumstances, including the adjudication of incompetence, bankruptcy, dissolution, or removal of USCF as the general partner of USO could cause USO to terminate unless a majority interest of the limited partners within 90 days of the event elects to continue the partnership and appoints a successor general partner, or the affirmative vote of a majority in interest of the limited partners subject to certain conditions. However, no level of losses will require USCF to terminate USO. USO's termination would cause the liquidation and potential loss of an investor's investment. Termination could also negatively affect the overall maturity and timing of an investor's investment portfolio.

***USO does not expect to make cash distributions.***

USO has not previously made any cash distributions and intends to reinvest any realized gains in additional Oil Interests rather than distributing cash to limited partners, or other shareholders. Therefore, unlike mutual funds, commodity pools or other investment pools that actively manage their investments in an attempt to realize income and gains from their investing activities and distribute such income and gains to their investors, USO generally does not expect to distribute cash to limited partners. An investor should not invest in USO if the investor will need cash distributions from USO to pay taxes on its share of income and gains of USO, if any, or for any other reason. Nonetheless, although USO does not intend to make cash distributions, the income earned from its investments held directly or posted as margin may reach levels that merit distribution, *e.g.*, at levels where such income is not necessary to support its underlying investments in Oil Interests and investors adversely react to being taxed on such income without receiving distributions that could be used to pay such tax. If this income becomes significant then cash distributions may be made.

***An unanticipated number of redemption requests during a short period of time could have an adverse effect on USO's NAV.***

If a substantial number of requests for redemption of Redemption Baskets are received by USO during a relatively short period of time, USO may not be able to satisfy the requests from USO's assets not committed to trading. As a consequence, it could be necessary to liquidate positions in USO's trading positions before the time that the trading strategies would otherwise dictate liquidation.

***Money Market Reform***

The SEC adopted Rule 2a-7 under the 1940 Act on July 23, 2014, which became effective on October 14, 2016, to reform money market funds ("MMFs"). While the new rule applies only to MMFs, it may indirectly affect institutional investors such as USO. The new rule requires institutional prime MMFs to price their shares using market-based values instead of the amortized cost method (i.e., to use a "floating NAV per share" or "floating NAV"). Government and retail funds can continue to use the amortized cost method to value their portfolio securities. Additionally, liquidity fees and gates allow an MMF's board of directors to directly address runs on a fund. MMFs' boards of directors are required to implement rules to discourage and prevent runs by investors through the use of redemption fees and gates (temporary suspension of redemptions). The fees and gates could be imposed on a fund whose portfolios fail to meet certain liquidity thresholds although they are optional for government MMFs. USO currently invests in government MMFs, as well as Treasuries with a maturity date of two years or less, as an investment for assets not used for margin or collateral in the Oil Futures Contracts. USO does not hold any non-government MMFs and, currently, does not anticipate investing in any non-government MMFs. The new rule further decreases the likelihood that USO would invest in any non-governmental MMFs. However, if USO were to make investments in non-government MMFs in the future, such investments could negatively impact USO because of the changes to MMFs resulting from the new rule.

17

***The failure or bankruptcy of a futures commission merchant or clearing house could result in a substantial loss of USO's assets and could impair USO in its ability to execute trades.***

The Commodity Exchange Act and CFTC regulations impose several requirements on FCMs and clearing houses that are designed to protect customers, including mandating the implementation of risk management programs, internal monitoring and controls, capital and liquidity standards, customer disclosures, and auditing and examination programs. In particular, the Commodity Exchange Act and CFTC regulations require FCM and clearing houses to segregate all funds received from customers from proprietary assets. There can be no assurance that the requirements imposed by the Commodity Exchange Act and CFTC regulations will prevent losses to, or not materially adversely affect, USO or its investors.

In particular, in the event of an FCM's or clearing house's bankruptcy, USO could be limited to recovering either a pro rata share of all available funds segregated on behalf of the FCM's combined customer accounts or USO may not recover any assets at all. USO may also incur a loss of any unrealized profits on its open and closed positions. This is because if such a bankruptcy were to occur, USO would be afforded the protections granted to customers of an FCM, and participants to transactions cleared through a clearing house, under the United States Bankruptcy Code and applicable CFTC regulations. Such provisions generally provide for a pro rata distribution to customers of customer property held by the bankrupt FCM or an Exchange's clearing house if the customer property held by the FCM or the Exchange's clearing house is insufficient to satisfy all customer claims.

Bankruptcy of a clearing FCM can be caused by, among other things, the default of one of the FCM's customers. In this event, the Exchange's clearing house is permitted to use the entire amount of margin posted by USO (as well as margin posted by other customers of the FCM) to cover the amounts owed by the bankrupt FCM. Consequently, USO could be unable to recover amounts due to it on its futures positions, including assets posted as margin, and could sustain substantial losses.

Notwithstanding that USO could sustain losses upon the failure or bankruptcy of its FCM, the majority of USO's assets are held in Treasuries, cash and/or cash equivalents with USO's Custodian and would not be impacted by the bankruptcy of an FCM.

***The failure or bankruptcy of USO's Custodian could result in a substantial loss of USO's assets.***

The majority of USO's assets are held in Treasuries, cash and/or cash equivalents with the Custodian. The insolvency of the Custodian could result in a complete loss of USO's assets held by that Custodian, which, at any given time, would likely comprise a substantial portion of USO's total assets.

18

***Third parties may infringe upon or otherwise violate intellectual property rights or assert that USCF has infringed or otherwise violated their intellectual property rights, which may result in significant costs and diverted attention.***

It is possible that third parties might utilize USO's intellectual property or technology, including the use of its business methods, trademarks and trading program software, without permission. USCF has a patent for USO's business method and has registered its trademarks. USO does not currently have any proprietary software. However, if it obtains proprietary software in the future, any unauthorized use of USO's proprietary software and other technology could also adversely affect its competitive advantage. USO may not have adequate resources to implement procedures for monitoring unauthorized uses of its patents, trademarks, proprietary software and other technology. Also, third parties may independently develop business methods, trademarks or proprietary software and other technology similar to that of USCF or claim that USCF has violated their intellectual property rights, including their copyrights, trademark rights, trade names, trade secrets and patent rights. As a result, USCF may have to litigate in the future to protect its trade secrets, determine the validity and scope of other parties' proprietary rights, defend itself against claims that it has infringed or otherwise violated other parties' rights, or defend itself against claims that its rights are invalid. Any litigation of this type, even if USCF is successful and regardless of the merits, may result in significant costs, divert its resources from USO, or require it to change its proprietary software and other technology or enter into royalty or licensing agreements.

***Due to the increased use of technologies, intentional and unintentional cyber-attacks pose operational and information security risks.***

With the increased use of technologies such as the internet and the dependence on computer systems to perform necessary business functions, USO is susceptible to operational and information security risks. In general, cyber incidents can result from deliberate attacks or unintentional events such as a cyber-attack against USO, a natural catastrophe, an industrial accident, failure of USO's disaster recovery systems, or consequential employee error. Cyber-attacks include, but are not limited to, gaining unauthorized access to digital systems for purposes of misappropriating assets or sensitive information, corrupting data, or causing operational disruption. Cyber-attacks may also be carried out in a manner that does not require gaining unauthorized access, such as causing denial-of-service attacks on websites. Cyber security failures or breaches of USO's clearing broker or third party service provider (including, but not limited to, index providers, the administrator and transfer agent, the custodian), have the ability to cause disruptions and impact business operations, potentially resulting in financial losses, the inability of USO shareholders to transact business, violations of applicable privacy and other laws, regulatory fines, penalties, reputational damage, reimbursement or other compensation costs, and/or additional compliance costs. Adverse effects can become particularly acute if those events affect USO's electronic data processing, transmission, storage, and retrieval systems, or impact the availability, integrity, or confidentiality of our data.

In addition, substantial costs may be incurred in order to prevent any cyber incidents in the future. USO and its shareholders could be negatively impacted as a result. While USO has established business continuity plans, there are inherent limitations in such plans.

## ADDITIONAL INFORMATION ABOUT USO, ITS INVESTMENT OBJECTIVE AND INVESTMENTS

USO is a Delaware limited partnership organized on May 12, 2005. It operates pursuant to the terms of the Seventh Amended and Restated Agreement of Limited Partnership dated as of December 15, 2017 (as amended from time to time, the "LP Agreement"), which grants full management control of USO to USCF. USO maintains its main business office at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596.

The net assets of USO consist primarily of investments in Oil Futures Contracts and, to a lesser extent, in order to comply with regulatory requirements or in view of market conditions, Other Oil-Related Investments. Market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing.

19

USO invests substantially the entire amount of its assets in Oil Futures Contracts while supporting such investments by holding the amounts of its margin, collateral and other requirements relating to these obligations in short-term obligations of the United States of two years or less ("Treasuries"), cash and cash equivalents. The daily holdings of USO are available on USO's website at *www.uscfinvestments.com*.

USO invests in Oil Interests to the fullest extent possible without being leveraged or unable to satisfy its current or potential margin or collateral obligations with respect to its investments in Oil Interests. In pursuing this objective, the primary focus of USCF, is the investment in Oil Futures Contracts and the management of USO's investments in Treasuries, cash and/or cash equivalents for margining purposes and as collateral.

USO seeks to invest in a combination of Oil Interests such that the daily changes in its NAV, measured in percentage terms, will closely track the daily changes in the price of the Benchmark Oil Futures Contract, also measured in percentage terms. As a specific benchmark, USCF endeavors to place USO's trades in Oil Interests and otherwise manage USO's investments so that "A" will be within plus/ minus ten percent (10%) of "B", where:

- A is the average daily percentage change in USO's per share NAV for any period of 30 successive valuation days; i.e., any NYSE Arca trading day as of which USO calculates its per share NAV; and

- B is the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period.

USCF believes that market arbitrage opportunities will cause the daily changes in USO's share price on the NYSE Arca to closely track the daily changes in USO's per share NAV. USCF further believes that the daily changes in USO's NAV in percentage terms will closely track the daily changes in percentage terms in the Benchmark Oil Futures Contract, less USO's expenses.

The following two graphs demonstrate the correlation between the changes in USO's NAV and the changes in the Benchmark Oil Futures Contract. The first graph exhibits the daily changes in the last 30 valuation days ended December 31, 2019 the second graph measures monthly changes from December 2014 through December 2019.

*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS*



20

*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS*



USCF employs a "neutral" investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down. USO's "neutral" investment strategy is designed to permit investors generally to purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-effective manner, and/or to permit participants in the oil or other industries to hedge the risk of losses in their crude oil-related transactions. Accordingly, depending on the investment objective of an individual investor, the risks generally associated with investing in crude oil and/or the risks involved in hedging may exist. In addition, an investment in USO involves the risk that the daily changes in the price of USO's shares, in percentage terms, will not accurately track the daily changes in the Benchmark Oil Futures Contract, in percentage terms, and that daily changes in the Benchmark Oil Futures Contract in percentage terms, will not closely correlate with daily changes in the spot prices of light, sweet crude oil, in percentage terms.

As an example, for the year ended December 31, 2019, the actual total return of USO as measured by changes in its per share NAV was 33.26%. This was based on an initial per share NAV of $9.59 on December 31, 2018 and an ending per share NAV as of December 31, 2019 of $12.78. During this time period, USO made no distributions to its shareholders. However, if USO's daily changes in its per share NAV had instead exactly tracked the changes in the daily total return of the Benchmark Oil Futures Contract, USO would have had an estimated per share NAV of $12.61 as of December 31, 2019, for a total return over the relevant time period of 31.49%. The difference between the actual per share NAV total return of USO of 33.26% and the expected total return based on the Benchmark Oil Futures Contract of 31.49% was an error over the time period of 1.77%, which is to say that USO's actual total return outperformed the benchmark result by that percentage. USO incurs expenses primarily composed of the management fee, brokerage commissions for the buying and selling of futures contracts, and other expenses. The impact of these expenses tended to cause daily changes in the per share NAV of USO to track slightly lower than daily changes in the price of the Benchmark Oil Futures Contract.

**Impact of Contango and Backwardation on Total Returns**

Contango and backwardation are natural market forces that have impacted the total return on an investment in USO's shares during the past year relative to a hypothetical direct investment in crude oil. In the future, it is likely that the relationship between the market price of USO's shares and changes in the spot prices of light, sweet crude oil will continue to be impacted by contango and backwardation. It is important to note that this comparison ignores the potential costs associated with physically owning and storing crude oil, which could be substantial.

21

Several factors determine the total return from investing in futures contracts. One factor arises from "rolling" futures contracts that will expire at the end of the current month (the "near" or "front" month contract) forward each month prior to expiration. For a strategy that entails holding the near month contract, the price relationship between that futures contract and the next month futures contract will impact returns. For example, if the price of the near month futures contract is higher than the next futures month contract (a situation referred to as "backwardation"), then absent any other change, the price of a next month futures contract tends to rise in value as it becomes the near month futures contract and approaches expiration. Conversely, if the price of a near month futures contract is lower than the next month futures contract (a situation referred to as "contango"), then absent any other change, the price of a next month futures contract tends to decline in value as it becomes the near month futures contract and approaches expiration.

As an example, assume that the price of crude oil for immediate delivery, is $50 per barrel, and the value of a position in the near month futures contract is also $50. Over time, the price of crude oil will fluctuate based on a number of market factors, including demand for oil relative to supply. The value of the near month futures contract will likewise fluctuate in reaction to a number of market factors. If an investor seeks to maintain a position in a near month futures contract and not take delivery of physical barrels of crude oil, the investor must sell the current near month futures contract as it approaches expiration and invest in the next month futures contract. In order to continue holding a position in the current near month futures contract, this "roll" forward of the futures contract must be executed every month.

If the futures market is in backwardation, *e.g.*, when the price of the near month futures contract is higher than the price of the next month futures contract, the investor would buy a next month futures contract for a lower price than the current near month futures contract. Assuming the price of the next month futures contract was $49 per barrel, or 2% cheaper than the $50 near month futures contract, then, hypothetically, and assuming no other changes (e.g., to either prevailing crude oil prices or the price relationship between the spot price, the near month contract and the next month contract, and, ignoring the impact of commission costs and the income earned on cash and/or cash equivalents), the value of the $49 next month futures contract would rise to $50 as it approaches expiration. In this example, the value of an investment in the next month futures contract would tend to outperform the spot price of crude oil. As a result, it would be possible for the new near month futures contract to rise 12% while the spot price of crude oil may have risen a lower amount, e.g., only 10%. Similarly, the spot price of crude oil could have fallen 10% while the value of an investment in the futures contract might have fallen another amount, e.g., only 8%. Over time, if backwardation remained constant, this difference between the spot price and the futures contract price would continue to increase.

If the futures market is in contango, an investor would be buying a next month futures contract for a higher price than the current near month futures contract. Again, assuming the near month futures contract is $50 per barrel, the price of the next month futures contract might be $51 per barrel, or 2% more expensive than the front month futures contract. Hypothetically, and assuming no other changes, the value of the $51 next month futures contract would fall to $50 as it approaches expiration. In this example, the value of an investment in the second month would tend to underperform the spot price of crude oil. As a result, it would be possible for the new near month futures contract to rise only 10% while the spot price of crude oil may have risen a higher amount, e.g., 12%. Similarly, the spot price of crude oil could have fallen 10% while the value of an investment in the second month futures contract might have fallen another amount, e.g., 12%. Over time, if contango remained constant, this difference between the spot price and the futures contract price would continue to increase.

The chart below compares the daily price of the near month crude oil futures contract to the price of 13th month crude oil futures contract (i.e. a contract one year forward) over the last 10 years. When the price of the near month futures contract is higher than the price of the 13th month futures contract, the market would be described as being in backwardation. When the price of the near month futures contract is lower than the 13th month futures contract, the market would be described as being in contango. Although the price of the near month futures contract and the price of the 13th month futures contract tend to move together, it can be seen that at times the near month futures contract prices are higher than the 13th month futures contract prices (backwardation) and, at other times, the near month futures contract prices are lower than the 13th month futures contract prices (contango).

22

**\*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**



An alternative way to view the same data is to subtract the dollar price of the 13th month crude oil futures contract from the dollar price of the near month crude oil futures contract, as shown in the chart below. When the difference is positive, the market is in backwardation. When the difference is negative, the market is in contango. The crude oil market spent time in both backwardation and contango during the last ten years.

23

**\*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS**



An investment in a portfolio that owned only the near month crude oil futures contract would likely produce a different result than an investment in a portfolio that owned an equal number of each of the near 12 months' of crude oil futures contracts. Generally speaking, when the crude oil futures market is in backwardation, a portfolio of only the near month crude oil futures contract may tend to have a higher total return than a portfolio of 12 months' of the crude oil futures contract. Conversely, if the crude oil futures market was in contango, the portfolio containing only 12 months' of crude oil futures contracts may tend to outperform the portfolio holding only the near month crude oil futures contract.

Historically, the crude oil futures markets have experienced periods of contango and backwardation, with backwardation being in place somewhat less often than contango since oil futures trading started in 1983. Following the global financial crisis in the fourth quarter of 2008, the crude oil market moved into contango and remained in contango for a period of several years. During parts of 2009, the level of contango was unusually steep as a combination of slack U.S. and global demand for crude oil and issues involving the physical transportation and storage of crude oil at Cushing, Oklahoma, the primary pricing point for oil traded in the U.S., led to unusually high inventories of crude oil. A combination of improved transportation and storage capacity, along with growing demand for crude oil globally, moderated the inventory build-up and led to reduced levels of contango by 2011. However, at the end of November 2014, global crude oil inventories grew rapidly after OPEC voted to defend its market share against U.S. shale-oil producers, resulting in another period during which the crude oil market remained primarily in contango. This period of contango continued through December 31, 2017. Declining global crude oil inventories caused the market to flip into backwardation at the beginning of 2018 through late October 2018, at which point ongoing supply growth in the U.S., combined with increased OPEC production, once again led market participants to fear another global glut of crude oil. The crude oil market was primarily in contango the first half of 2019 and in backwardation from August through December 31, 2019.

24

Periods of contango or backwardation do not materially impact USO's investment objective of having the daily percentage changes in its per share NAV track the daily percentage changes in the price of the Benchmark Oil Futures Contract since the impact of backwardation and contango tend to equally impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract. It is impossible to predict with any degree of certainty whether backwardation or contango will occur in the future. It is likely that both conditions will occur during different periods. In managing USO's assets USCF does not use a technical trading system that issues buy and sell orders. USCF instead employs a quantitative methodology whereby each time a Creation Basket is sold, USCF purchases Oil Interests, such as the Benchmark Oil Futures Contract, that have an aggregate market value that approximates the amount of Treasuries and/or cash received upon the issuance of the Creation Basket.

The specific Oil Futures Contracts purchased depend on various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts with respect to the month of expiration, and the prevailing price volatility of particular contracts. While USCF has made significant investments in NYMEX Oil Futures Contracts, for various reasons, including the ability to enter into the precise amount of exposure to the crude oil market, position limits or other regulatory requirements limiting USO's holdings, and market conditions, it may invest in Oil Futures Contracts traded on other exchanges or invest in Other Oil-Related Investments. To the extent that USO invests in Other Oil-Related Investments, it would prioritize investments in contracts and instruments that are economically equivalent to the Benchmark Oil Futures Contract, including cleared swaps that satisfy such criteria, and then, to a lesser extent, it would invest in other types of cleared swaps and other contracts, instruments and non-cleared swaps, such as swaps in the over-the-counter market (or commonly referred to as the "OTC market"). If USO is required by law or regulation, or by one of its regulators, including a futures exchange, to reduce its position in the Benchmark Oil Futures Contracts to the applicable position limit or to a specified accountability level or if market conditions dictate it would be more appropriate to invest in Other Oil-Related Investments, a substantial portion of USO's assets could be invested in accordance with such priority in Other Oil-Related Investments that are intended to replicate the return on the Benchmark Oil Futures Contract. As USO's assets reach higher levels, it is more likely to exceed position limits, accountability levels or other regulatory limits and, as a result, it is more likely that it will invest in accordance with such priority in Other Oil-Related Investments at such higher levels. In addition, market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing. See "Risk Factors Involved With an Investment in USO" for a discussion of the potential impact of regulation on USO's ability to invest in OTC transactions and cleared swaps.

USCF may not be able to fully invest USO's assets in Benchmark Oil Futures Contracts having an aggregate notional amount exactly equal to USO's NAV. For example, as standardized contracts, the Benchmark Oil Futures Contracts are for a specified amount of a particular commodity, and USO's NAV and the proceeds from the sale of a Creation Basket are unlikely to be an exact multiple of the amounts of those contracts. As a result, in such circumstances, USO may be better able to achieve the exact amount of exposure to changes in price of the Benchmark Oil Futures Contract through the use of Other Oil-Related Investments, such as OTC contracts that have better correlation with changes in price of the Benchmark Oil Futures Contract.

USO anticipates that to the extent it invests in Oil Futures Contracts other than contracts on light, sweet crude oil (such as futures contracts for diesel-heating oil, natural gas, and other petroleum-based fuels) and Other Oil-Related Investments, it will enter into various non-exchange-traded derivative contracts to hedge the short-term price movements of such Oil Futures Contracts and Other Oil-Related Investments against the current Benchmark Oil Futures Contract.

USCF does not anticipate letting USO's Oil Futures Contracts expire and taking delivery of the underlying commodity. Instead, USCF will close existing positions, *e.g.*, when it changes the Benchmark Oil Futures Contracts or Other Oil-Related Investments or it otherwise determines it would be appropriate to do so and reinvests the proceeds in new Oil Futures Contracts or Other Oil-Related Investments. Positions may also be closed out to meet orders for Redemption Baskets and in such case proceeds for such baskets will not be reinvested.

25

The Benchmark Oil Futures Contract is changed from the near month contract to the next month contract over a four-day period. Each month, the Benchmark Oil Futures Contract changes starting at the end of the day on the date two weeks prior to expiration of the near month contract for that month. During the first three days of the period, the applicable value of the Benchmark Oil Futures Contract is based on a combination of the near month contract and the next month contract as follows: (1) day 1 consists of 75% of the then near month contract's price plus 25% of the price of the next month contract, divided by 75% of the near month contract's prior day's price plus 25% of the price of the next month contract, (2) day 2 consists of 50% of the then near month contract's price plus 50% of the price of the next month contract, divided by 50% of the near month contract's prior day's price plus 50% of the price of the next month contract and (3) day 3 consists of 25% of the then near month contract's price plus 75% of the price of the next month contract, divided by 25% of the near month contract's prior day's price plus 75% of the price of the next month contract. On day 4, the Benchmark Oil Futures Contract is the next month contract to expire at that time and that contract remains the Benchmark Oil Futures Contract until the beginning of the following month's change in the Benchmark Oil Futures Contract over a four-day period.

On each day during the four-day period, USCF anticipates it will "roll" USO's positions in Oil Interests by closing, or selling, a percentage of USO's positions in Oil Interests and reinvesting the proceeds from closing those positions in new Oil Interests that reflect the change in the Benchmark Oil Futures Contract.

The anticipated dates that the monthly four-day roll period will commence are posted on USO's website at *www.uscfinvestments.com*, and are subject to change without notice.

By remaining invested as fully as possible in Oil Futures Contracts or Other Oil-Related Investments, USCF believes that the daily changes in percentage terms of USO's NAV will continue to closely track the daily changes in percentage terms in the price of the Benchmark Oil Futures Contract. USCF believes that certain arbitrage opportunities result in the price of the shares traded on the NYSE Arca closely tracking the NAV of USO. Additionally, Oil Futures Contracts traded on the NYMEX have closely tracked the spot price of light, sweet crude oil. Based on these expected interrelationships, USCF believes that the changes in the price of USO's shares as traded on the NYSE Arca have closely tracked and will continue to closely track on a daily basis, the changes in the spot price of light, sweet crude oil on a percentage basis.

**What are the Trading Policies of USO?**

*Investment Objectives*

The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of the Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses. The Benchmark Oil Futures Contract is the futures contract on light, sweet crude oil as traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire.

*Liquidity*

USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking and liquidation of positions in these financial interests and in Other Oil-Related Investments that, in the opinion of USCF, may be readily liquidated with the original counterparty or through a third party assuming the position of USO.

*Spot Commodities*

While the crude Oil Futures Contracts traded can be physically settled, USO does not intend to take or make physical delivery. USO may from time to time trade in Other Oil-Related Investments, including contracts based on the spot price of crude oil.

26

*Leverage*

USCF endeavors to have the value of USO's Treasuries, cash and cash equivalents, whether held by USO or posted as margin or other collateral, at all times approximate the aggregate market value of its obligations under its Oil Futures Contracts and Other Oil-Related Investments. Commodity pools' trading positions in futures contracts or other related investments are typically required to be secured by the deposit of margin funds that represent only a small percentage of a futures contract's (or other commodity interest's) entire market value. While USCF has not and does not intend to leverage USO's assets, it is not prohibited from doing so under the LP Agreement.

*Borrowings*

Borrowings are not used by USO unless USO is required to borrow money in the event of physical delivery, if USO trades in cash commodities, or for short-term needs created by unexpected redemptions.

*OTC Derivatives (Including Spreads and Straddles)*

In addition to Oil Futures Contracts, there are also a number of listed options on the Oil Futures Contracts on the principal futures exchanges. These contracts offer investors and hedgers another set of financial vehicles to use in managing exposure to the crude oil market. Consequently, USO may purchase options on crude Oil Futures Contracts on these exchanges in pursuing its investment objective.

In addition to the Oil Futures Contracts and options on the Oil Futures Contracts, there also exists an active non-exchange-traded market in derivatives tied to crude oil. These derivatives transactions (also known as OTC contracts) are usually entered into between two parties in private contracts. Unlike most of the exchange-traded Oil Futures Contracts or exchange-traded options on the Oil Futures Contracts, each party to such contract bears the credit risk of the other party, *i.e.*, the risk that the other party may not be able to perform its obligations under its contract. To reduce the credit risk that arises in connection with such contracts, USO will generally enter into an agreement with each counterparty based on the Master Agreement published by the International Swaps and Derivatives Association, Inc. ("ISDA") that provides for the netting of its overall exposure to its counterparty.

USCF assesses or reviews, as appropriate, the creditworthiness of each potential or existing counterparty to an OTC contract pursuant to guidelines approved by the Board.

USO may enter into certain transactions where an OTC component is exchanged for a corresponding futures contract ("Exchange for Related Position" or "EFRP" transactions). In the most common type of EFRP transaction entered into by USO, the OTC component is the purchase or sale of one or more baskets of USO shares. These EFRP transactions may expose USO to counterparty risk during the interim period between the execution of the OTC component and the exchange for a corresponding futures contract. Generally, the counterparty risk from the EFRP transaction will exist only on the day of execution.

USO may employ spreads or straddles in its trading to mitigate the differences in its investment portfolio and its goal of tracking the price of the Benchmark Oil Futures Contract. USO would use a spread when it chooses to take simultaneous long and short positions in futures written on the same underlying asset, but with different delivery months.

During all of 2019, USO has limited its derivatives activities to Oil Futures Contracts and EFRP transactions.

*Pyramiding*

USO has not employed and will not employ the technique, commonly known as pyramiding, in which the speculator uses unrealized profits on existing positions as variation margin for the purchase or sale of additional positions in the same or another commodity interest.

27

**Prior Performance of USO**

***\*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS***

USCF manages USO which is a commodity pool that issues shares traded on the NYSE Arca. The chart below shows, as of December 31, 2019, the number of Authorized Participants, the total number of baskets created and redeemed since inception and the number of outstanding shares for USO.

| # of Authorized Participants | Baskets Purchased | Baskets Redeemed | Outstanding Shares |
|---|---|---|---|
| 15 | 31,121 | 30,205 | 91,600,000 |

Since the commencement of the offering of USO shares to the public on April 10, 2006 to December 31, 2019, the simple average daily changes in benchmark futures contract was (0.024)% while the simple average daily change in the NAV of USO over the same time period was (0.023)%. The average daily difference was (0.001)% (or (0.01) basis points, where 1 basis point equals 1/100 of 1%). As a percentage of the daily movement of the benchmark futures contract, the average error in daily tracking by the NAV was (0.025)%, meaning that over this time period USO's tracking error was within the plus or minus ten percent 10% range established as its benchmark tracking goal.

The table below shows the relationship between the trading prices of the shares and the daily NAV of USO, since inception through December 31, 2019. The first row shows the average amount of the variation between USO's closing market price and NAV, computed on a daily basis since inception, while the second and third rows depict the maximum daily amount of the end of day premiums and discounts to NAV since inception, on a percentage basis. USCF believes that maximum and minimum end of day premiums and discounts typically occur because trading in the shares continues on the NYSE Arca until 4:00 p.m. New York time while regular trading in the benchmark futures contract on the NYMEX ceases at 2:30 p.m. New York time and the value of the relevant benchmark futures contract, for purposes of determining its end of day NAV, can be determined at that time.

| | USO |
|---|---|
| Average Difference | $ (.00)% |
| Max Premium % | 6.75% |
| Max Discount % | 4.51% |

For more information on the performance of USO, see the Performance Tables below.

***\*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS***

**COMPOSITE PERFORMANCE DATA FOR USO**

Name of Pool: United States Oil Fund, LP

Type of Pool: Public, Exchange-Listed Commodity Pool

Inception of Trading: April 10, 2006

Aggregate Subscriptions (from inception through December 31, 2019): $70,521,221,719

Net Asset Value as of December 31, 2019: $1,170,976,258

Net Asset Value per Share as of December 31, 2019: $12.78

Worst Monthly Drawdown: November 2018 (22.11)%

28

Worst Peak-to-Valley Drawdown: June 2008 — February 2016: (92.07)%

Number of Shares (as of December 31, 2019): 91,600,000

|  | Rates of Return* | | | | |
| Month | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|
| January | (10.47)% | (12.34)% | (3.33)% | 7.28% | 17.831% |
| February | 1.39% | (6.93)% | 1.24% | (4.32)% | 5.752% |
| March | (7.76)% | 8.34% | (7.33)% | 5.65% | 4.603% |
| April | 21.52% | 15.91% | (3.20)% | 5.65% | 6.400% |
| May | (0.63)% | 5.31% | (2.92)% | (2.02)% | (16.32)% |
| June | (2.16)% | (2.77)% | (5.11)% | 10.77% | 8.985% |
| July | (21.48)% | (15.31)% | 8.45% | (4.86)% | 0.17% |
| August | 3.00% | 5.61% | (6.13)% | 2.73% | (5.68)% |
| September | (9.62)% | 6.38% | 8.30% | 5.38% | (1.57)% |
| October | 2.13% | 3.81% | 4.60% | (10.54)% | 0.27% |
| November | (13.10)% | 3.96% | 5.13% | (22.11)% | 1.86% |
| December | (14.77)% | 6.45% | 5.23% | (11.04)% | 10.94% |
| Annual Rate of Return | (45.31)% | 6.26% | 3.16% | (20.61)% | 33.26%** |

\* The monthly rate of return is calculated by dividing the ending NAV of a given month by the ending NAV of the previous month, subtracting 1 and multiplying this number by 100 to arrive at a percentage increase or decrease.

\*\* Through December 31, 2019.

Draw-down: Losses experienced by the fund over a specified period. Draw-down is measured on the basis of monthly returns only and does not reflect intra-month figures.

Worst Monthly Percentage Draw-down: The largest single month loss sustained during the most recent five calendar years and year-to-date.

Worst Peak-to-Valley Draw-down: The largest percentage decline in the NAV per share over the history of the fund. This need not be a continuous decline, but can be a series of positive and negative returns where the negative returns are larger than the positive returns. Worst Peak-to-Valley Draw-down represents the greatest cumulative percentage decline in month-end per share NAV is not equaled or exceeded by a subsequent month-end per share NAV.

### USO's Operations

### USCF and its Management and Traders

USCF is a single member limited liability company that was formed in the state of Delaware on May 10, 2005. USCF maintains its main business office at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596. USCF is a wholly-owned subsidiary of Wainwright, a Delaware corporation, which is a wholly owned subsidiary of Concierge Technologies, Inc. (publicly traded under the ticker CNCG) ("Concierge"). Mr. Nicholas Gerber (discussed below), along with certain family members and certain other shareholders, owns the majority of the shares in Concierge. Wainwright is a holding company that currently holds both USCF, as well as USCF Advisers LLC, an investment adviser registered under the Investment Advisers Act of 1940, as amended, ("USCF Advisers"). USCF Advisers serves as the investment adviser for the USCF SummerHaven SHPEN Index Fund ("BUYN"), the USCF SummerHaven SHPEI Index Fund ("BUY") and the USCF SummerHaven Dynamic Commodity Strategy No K-1 Fund ("SDCI"), each a series of the USCF ETF Trust. USCF Advisers LLC also served as the investment adviser to the USCF Commodity Strategy Fund, a series of the USCF Mutual Funds Trust, which liquidated all of its assets and distributed cash pro rata to all remaining shareholders in March 2019. USCF ETF Trust and USCF Mutual Funds Trust are registered under the 1940 Act. The Board of Trustees for the USCF ETF Trust and USCF Mutual Funds Trust consist of different independent trustees than those independent directors who serve on the Board of Directors of USCF. USCF is a member of the National Futures Association (the "NFA") and registered as a commodity pool operator ("CPO") with the Commodity Futures Trading Commission (the "CFTC") on December 1, 2005 and as a swaps firm on August 8, 2013.

29

https://www.sec.gov/Archives/edgar/data/1327068/000117120020000153/i20178_uso-424b3.htm

USCF serves as the general partner of USO. USCF also serves as the general partner of the United States Natural Gas Fund, LP ("UNG"), the United States 12 Month Oil Fund, LP ("USL"), the United States Gasoline Fund, LP ("UGA"), the United States 12 Month Natural Gas Fund, LP ("UNL") and the United States Brent Oil Fund, LP ("BNO"). USCF previously served as the general partner for the United States Short Oil Fund, LP ("DNO") and the United States Diesel-Heating Oil Fund, LP ("UHN"), both of which were liquidated in 2018.

USCF is also the sponsor of the United States Commodity Index Funds Trust ("USCIFT"), a Delaware statutory trust, and each of its series: the United States Commodity Index Fund ("USCI"), the United States Copper Index Fund ("CPER"), and the USCF Crescent Crypto Index Fund ("XBET"). XBET is currently in registration and has not commenced operations. USCF previously served as the sponsor for the United States Agriculture Index Fund ("USAG"), which was liquidated in 2018.

In addition, USCF is the sponsor of the USCF Funds Trust, a Delaware statutory trust, and each of its series, the United States 3x Oil Fund ("USOU") and the United States 3x Short Oil Fund ("USOD"), which listed their shares on the NYSE Arca on July 20, 2017 under the ticker symbols "USOU" and "USOD", respectively. Each of USOU and USOD liquidated all of its assets and distributed cash pro rata to all remaining shareholders in December 2019. UNG, UGA, UNL, USL, BNO, USCI and CPER are referred to collectively herein as the "Related Public Funds."

The Related Public Funds are subject to reporting requirements under the Securities Exchange Act of 1934, as amended ("Exchange Act") and, if registered under the 1940 Act, a Related Public Fund also must comply with the reporting requirements under the 1940 Act. For more information about each of the Related Public Funds, investors in USO may call 1-800-920-0259 or visit www.uscfinvestments.com or the SEC website at www.sec.gov.

USCF is required to evaluate the credit risk of USO to the futures commission merchant ("FCM"), oversee the purchase and sale of USO's shares by certain authorized participants ("Authorized Participants"), review daily positions and margin requirements of USO and manage USO's investments. USCF also pays the fees of ALPS Distributors, Inc., which serves as the marketing agent for USO (the "Marketing Agent"), and Brown Brothers Harriman & Co. ("BBH&Co."), which serves as the administrator (the "Administrator") and the custodian (the "Custodian") for USO. In no event may the aggregate compensation paid for the Marketing Agent and any affiliate of USCF for distribution-related services in connection with the offering of shares exceed ten percent (10%) of the gross proceeds of this offering.

The limited partners take no part in the management or control, and have a minimal voice in USO's operations or business. Limited partners have no right to elect USCF on an annual or any other continuing basis. If USCF voluntarily withdraws, however, the holders of a majority of USO's outstanding shares (excluding for purposes of such determination shares owned, if any, by the withdrawing general partner and its affiliates) may elect its successor. USCF may not be removed as general partner except upon approval by the affirmative vote of the holders of at least 66 2/3 percent of USO's outstanding shares (excluding shares, if any, owned by USCF and its affiliates), subject to the satisfaction of certain conditions set forth in the LP Agreement.

The business and affairs of USCF are managed by the Board, which is comprised of the Management Directors, each of whom are also executive officers and employees of USCF, and three independent directors who meet the independent director requirements established by the NYSE Arca Equities Rules and the Sarbanes-Oxley Act of 2002. The Management Directors have the authority to manage USCF pursuant to the terms of the LLC Agreement. Through its Management Directors, USCF manages the day-to-day operations of USO. The Board has an audit committee, which is made up of the three independent directors (Gordon L. Ellis, Malcolm R. Fobes III and Peter M. Robinson,). The audit committee is governed by an audit committee charter that is posted on USO's website at *www.uscfinvestments.com*. The Board has determined that each member of the audit committee meets the financial literacy requirements of the NYSE Arca and the audit committee charter. The Board has further determined that each of Messrs. Ellis and Fobes have accounting or related financial management expertise, as required by the NYSE Arca, such that each of them is considered an "Audit Committee Finance Expert" as such term is defined in Item 407(d)(5) of Regulation S-K.

30

USO has no executive officers. Pursuant to the terms of the LP Agreement, USO's affairs are managed by USCF.

The following are individual Principals, as that term is defined in Commodity Futures Trading Commission (the "CFTC") Rule 3.1, for USCF: John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Melinda D. Gerber, Andrew Ngim, Robert Nguyen, Peter Robinson, Scott Schoenberger, Gordon Ellis, Malcolm Fobes, Ray Allen, Kevin Baum, Carolyn Yu, and Wainwright. The individuals who are Principals due to their positions are John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Andrew Ngim, Robert Nguyen, Peter Robinson, Gordon Ellis, Malcolm Fobes, Ray Allen, Kevin Baum and Carolyn Yu. In addition, Wainwright is a Principal because it is the sole member of USCF. None of the Principals owns or has any other beneficial interest in USO. Ray Allen and John P. Love make trading and investment decisions for USO. John P. Love and Ray Allen direct the execution of execute trades on behalf of USO. In addition, Nicholas D. Gerber, John P. Love, Robert Nguyen, Ray Allen, Kevin Baum, Kathryn Rooney, Maya Lowry, and Ryan Katz are registered with the CFTC as Associated Persons of USCF and are NFA Associate Members. John P. Love and Ray Allen are also registered with the CFTC as swap Associated Persons.

**Ray W. Allen**, 63, Portfolio Manager of USCF since January 2008. Mr. Allen was the portfolio manager of: (1) UGA from February 2008 until March 2010, and then portfolio manager since May 2015, (2) United States Diesel-Heating Oil Fund, LP ("UHN") from April 2008 until March 2010, and then from May 2015 to September 2018, (3) UNL from November 2009 until March 2010, and then portfolio manager since May 2015. In addition, he has been the portfolio manager of: (1) United States Short Oil Fund, LP ("DNO") from September 2009 to September 2018, (2) USO and USL since March 2010, (3) BNO since June 2010, (4) UNG since May 2015, and (4) United States 3x Oil Fund ("USOU") and United States 3x Short Oil Fund ("USOD") from July 2017 to December 2019. Mr. Allen also has served as the portfolio manager of (1) the USCF Commodity Strategy Fund, a series of USCF Mutual Funds Trust, since October 2017, and (2) the USCF SummerHaven Dynamic Commodity Strategy No K-1 Fund, a series of the USCF ETF Trust, since May 2018. Mr. Allen has been a principal of USCF listed with the CFTC and NFA since March 2009 and has been registered as an associated person of USCF since July 2015 and from March 2008 to November 2012. Additionally, Mr. Allen has been approved as an NFA swap associated person of USCF since July 2015. As of February 2017, he also is an associated person and swap associated person of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Allen earned a B.A. in Economics from the University of California at Berkeley and holds an NFA Series 3 registration.

**Kevin A. Baum**, 49, has served as a Portfolio Manager of USCF since March 2016 and as the Chief Investment Officer of USCF since September 1, 2016. Prior to joining USCF, Mr. Baum temporarily retired from December 2015 to March 2016. Mr. Baum served as the Vice President and Senior Portfolio Manager for Invesco, an investment manager that manages a family of exchange-traded funds, from October 2014 through December 2015. Mr. Baum was temporarily retired from May 2012 through September 2014. From May 1993 to April 2012, Mr. Baum worked as the Senior Portfolio Manager, Head of Commodities for OppenheimerFunds, Inc., a global asset manager. Mr. Baum has been approved as an NFA principal, and associated person of USCF since April 2016 and, as of January 2017, a branch manager of USCF. As of February 2017, he also is an associated person, and branch manager of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Baum is a CFA Charterholder, CAIA Charterholder, earned a B.B.A. in Finance from Texas Tech University and holds an NFA Series 3 registration.

31

**Stuart P. Crumbaugh**, 56, Chief Financial Officer, Secretary and Treasurer of USCF since May 2015 and also the Chief Financial Officer of Concierge Technologies, Inc., the parent of Wainwright since December 2017. In addition, Mr. Crumbaugh has served as a director of Wainwright, the parent and sole member of USCF, since December 2016. Mr. Crumbaugh has been a principal of USCF listed with the CFTC and NFA since July 1, 2015 and, as of January 2017, he is a principal of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Since June 2015, Mr. Crumbaugh has been the Treasurer and Secretary of USCF Advisers. He also has served as a Management Trustee, Chief Financial Officer and Treasurer of (1) USCF ETF Trust since May 2015 and (2) USCF Mutual Funds Trust since October 2016. Mr. Crumbaugh joined USCF as the Assistant Chief Financial Officer on April 6, 2015. Prior to joining USCF, Mr. Crumbaugh was the Vice President Finance and Chief Financial Officer of Sikka Software Corporation, a software service healthcare company providing optimization software and data solutions from April 2014 to April 6, 2015. Mr. Crumbaugh served as a consultant providing technical accounting, IPO readiness and M&A consulting services to various early stage companies with the Connor Group, a technical accounting consulting firm, for the periods of January 2014 through March 2014; October 2012 through November 2012; and January 2011 through February 2011. From December 2012 through December 2013, Mr. Crumbaugh was Vice President, Corporate Controller and Treasurer of Auction.com, LLC, a residential and commercial real estate online auction company. From March 2011 through September 2012, Mr. Crumbaugh was Chief Financial Officer of IP Infusion Inc., a technology company providing network routing and switching software enabling software-defined networking solutions for major mobile carriers and network infrastructure providers. Mr. Crumbaugh earned a B.A. in Accounting and Business Administration from Michigan State University in 1987 and is a Certified Public Accountant – Michigan (inactive).

**Nicholas D. Gerber**, 57, Vice President since May 15, 2015. He also served as the Chairman of the Board of Directors of USCF from June 2005 through October 2019. Mr. Gerber also served as President and Chief Executive Officer of USCF from June 2005 through May 15, 2015 and Vice President since May 15, 2015. Mr. Gerber co-founded USCF in 2005 and prior to that, he co-founded Ameristock Corporation in March 1995, a California-based investment adviser registered under the Investment Advisers Act of 1940 from March 1995 until January 2013. Since January 26, 2015, Mr. Gerber also has served as the Chief Executive Officer, President, and Chairman of the Board of Directors of Concierge Technologies, Inc. ("Concierge"), which is a company publicly traded under the ticker symbol "CNCG." Concierge is the sole shareholder of Wainwright. Mr. Gerber also is the President and a director of Wainwright, a position he has held since March of 2004. From August 1995 to January 2013, Mr. Gerber served as Portfolio Manager of Ameristock Mutual Fund, Inc. On January 11, 2013, the Ameristock Mutual Fund, Inc. merged with and into the Drexel Hamilton Centre American Equity Fund, a series of Drexel Hamilton Mutual Funds. Drexel Hamilton Mutual Funds is not affiliated with Ameristock Corporation, the Ameristock Mutual Fund, Inc. or USCF. Mr. Gerber also has served USCF Advisers on the Board of Managers from June 2013 to present, as the President from June 2013 through June 18, 2015, and as Vice President from June 18, 2015 to present. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, since February 2017, is registered as a commodity pool operator, NFA member and swap firm. He also has served as Chairman of the Boards of Trustees of USCF ETF Trust since 2014 and USCF Mutual Funds Trust since October 2016, respectively, (USCF ETF Trust and together with USCF Mutual Funds Trust are referred to as the "Trusts") and each of the Trusts are investment companies registered under the 1940 Act, as amended. In addition, Mr. Gerber served as the President and Chief Executive Officer of USCF ETF Trust from June 2014 until December 2015. In the above roles, Mr. Gerber has gained extensive experience in evaluating and retaining third-party service providers, including custodians, accountants, transfer agents, and distributors. Mr. Gerber has been a principal of USCF listed with the CFTC and NFA since November 2005, an NFA associate member and associated person of USCF since December 2005 and a Branch Manager of USCF since May 2009. Additionally, effective as of January 2017, he is a principal of USCF Advisers and, effective as of February 2017, he is an associated person and branch manager of USCF Advisers. Mr. Gerber earned an MBA degree in finance from the University of San Francisco, a B.A. from Skidmore College and holds an NFA Series 3 registration.

**John P. Love**, 48, President and Chief Executive Officer of USCF since May 15, 2015, Management Director of USCF since October 2016, and Chairman of the Board of Directors of USCF since October 2019. Mr. Love previously served as a Senior Portfolio Manager for the Related Public Funds from March 2010 through May 15, 2015. Prior to that, while still at USCF, he was a Portfolio Manager beginning with the launch of USO in April 2006. Mr. Love was the portfolio manager of USO from April 2006 until March 2010 and the portfolio manager for USL from December 2007 until March 2010. Mr. Love has been the portfolio manager of UNG since April 2007, and the portfolio manager of UGA, and UNL since March 2010 and the portfolio manager of UHN from March 2010 to September 2018. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Love has served as on the Board of Managers of USCF Advisers since November 2016 and as its President since June 18, 2015. He also acted as co-portfolio manager of the Stock Split Index Fund, a series of the USCF ETF Trust for the period from September 2014 to December 2015, when he was promoted to the position of President and Chief Executive Officer of the USCF ETF Trust. Since October 2016 to present, he also has served as the President and Chief Executive of the USCF Mutual Funds Trust. Mr. Love also is a director of Wainwright, a position he has held since December 2016. Mr. Love has been a principal of USCF listed with the CFTC and NFA since January 17, 2006. Mr. Love has been registered as an associated person of USCF since February 2015 and from December 1, 2005 to April 16, 2009. Mr. Love has also been registered as a branch manager of USCF since March 2016. Additionally, Mr. Love has been approved as an NFA swap associated person since February 2015. Mr. Love is a principal of USCF Advisers LLC as of January 2017. Additionally, effective as of February 2017, he is an associated person, swap associated person, and branch manager of USCF Advisers. Mr. Love earned a B.A. from the University of Southern California, holds an NFA Series 3 and FINRA Series 7 registrations and is a CFA Charterholder.

32

*Andrew F Ngim*, 59, co-founded USCF in 2005 and has served as a Management Director since May 2005 and, since August 15, 2016, has served as the Chief Operating Officer of USCF. Mr. Ngim has served as the portfolio manager for USCI and CPER since January 2013 and for United States Agriculture Index Fund ("USAG") from January 2013 to September 2018. Mr. Ngim also served as USCF's Treasurer from June 2005 to February 2012. In addition, he has been on the Board of Managers and has served as the Assistant Secretary and Assistant Treasurer of USCF Advisers since its inception in June 2013. Prior to and concurrent with his services to USCF and USCF Advisers, from January 1999 to January 2013, Mr. Ngim served as a Managing Director for Ameristock Corporation, a California-based investment adviser, which he co-founded in March 1995, and was Co-Portfolio Manager of Ameristock Mutual Fund, Inc. from January 2000 to January 2013. Mr. Ngim also served as portfolio manager of (1) the Stock Split Index Fund from September 2014 to October 2017, and (2) the USCF Restaurant Leaders Fund from November 2016 to October 2017, both series of the USCF ETF Trust. Mr. Ngim also serves as the portfolio manager for three funds that are series of the USCF ETF Trust: (1) USCF SummerHaven SHPEI Index Fund from December 2017 to present, (2) USCF SummerHaven SHPEN Index Fund also from December 2017 to present, and (3) USCF SummerHaven Dynamic Commodity Strategy No K-1 Fund from May 2018 to present. Mr. Ngim serves as a Management Trustee of: (1) the USCF ETF Trust from August 2014 to the present and (2) the USCF Mutual Funds Trust from October 2016 to present. Mr. Ngim has been a principal of USCF listed with the CFTC and NFA since November 2005 and a principal of USCF Advisers LLC since January 2017. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Ngim earned his B.A. from the University of California at Berkeley.

*Robert L. Nguyen*, 60, Management Director and principal since July 2015. Mr. Nguyen served on the Board of Wainwright from December 2014 to December 2016. Mr. Nguyen co-founded USCF in 2005 and served as a Management Director until March 2012. Mr. Nguyen was an Investment Manager with Ribera Investment Management, an investment adviser registered under the Investment Advisers Act of 1940, from January 2013 to March 2015. Prior to and concurrent with his services to USCF, from January 2000 to January 2013, Mr. Nguyen served as a Managing Principal for Ameristock Corporation, a California-based investment adviser registered under the Investment Advisers Act of 1940, which he co-founded in March 1995. Mr. Nguyen was a principal of USCF listed with the CFTC and NFA from November 2005 through March 2012 and an associated person of USCF listed with the CFTC and NFA from November 2007 through March 2012. Mr. Nguyen has been a principal of USCF listed with the CFTC and NFA since July 2015 and an associated person of USCF listed with the CFTC and NFA since December 2015. As of February 2017, he also is an associated person USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Nguyen earned his B.S. from California State University at Sacramento, and holds NFA Series 3 and FINRA Series 7 registrations.

*Carolyn M. Yu*, 61, Chief Compliance Officer of USCF since February 2013. In addition, she served USCF as the General Counsel from May 2015 through April 2018 and the Assistant General Counsel from August 2011 through April 2015. Ms. Yu also served as the General Counsel of Concierge, the parent Wainwright from November 2017 through December 2018. Ms. Yu has served as (1) Chief Compliance Officer of USCF Advisers and USCF ETF Trust since May 2015 and of USCF Mutual Funds Trust since October 2016, (2) Chief AML Officer of USCF ETF Trust since May 2015 and of USCF Mutual Funds Trust since October 2016, and (3) Chief Legal Officer of USCF Advisers and USCF ETF Trust from May 2015 through April 2018 and of USCF Mutual Funds Trust from October 2016 through April 2018. Prior to May 2015, Ms. Yu was the Assistant Chief Compliance Officer and AML Officer of the USCF ETF Trust. Since August 2013, in the case of USCF, and January 2017, in the case of USCF Advisers LLC, Ms. Yu has been a principal listed with the CFTC and NFA. USCF Advisers LLC, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Ms. Yu earned her JD from Golden Gate University School of Law and a B.S. in business administration from San Francisco State University.

33

*Gordon L. Ellis*, 73, Independent Director of USCF since September 2005. Previously, Mr. Ellis was a founder of International Absorbents, Inc., Director and Chairman since July 1985 and July 1988, respectively, and Chief Executive Officer and President since November 1996. He also served as Chairman of Absorption Corp., a wholly-owned subsidiary of International Absorbents, Inc., which is a leading developer and producer of environmentally friendly pet care and industrial products, from May July 1985 until July 2010 when it was sold to Kinderhook Industries, a private investment banking firm and remained as a director until March 2013 when Absorption Corp was sold again to J. Rettenmaier & Söhne Group, a German manufacturing firm. Concurrent with that, he founded and has served as Chairman from November 2010 to present of Lupaka Gold Corp., a firm that acquires, explores, develops, and evaluates gold mining properties in Peru, South America. Mr. Ellis has his Chartered Directors designation from The Director's College (a joint venture of McMaster University and The Conference Board of Canada). He has been a principal of USCF listed with the CFTC and NFA since November 2005. Mr. Ellis is an engineer and earned an MBA in international finance.

*Malcolm R. Fobes III*, 55, Independent Director of USCF and Chairman of USCF's audit committee since September 2005. He founded and is the Chairman and Chief Executive Officer of Berkshire Capital Holdings, Inc., a California-based investment adviser registered under the Investment Advisers Act of 1940 that has been sponsoring and providing portfolio management services to mutual funds since June 1997. Mr. Fobes serves as Chairman and President of The Berkshire Funds, a mutual fund investment company registered under the 1940 Act. Since 1997, Mr. Fobes has also served as portfolio manager of the Berkshire Focus Fund, a mutual fund registered under the 1940 Act, which concentrates its investments in the electronic technology industry. He was also contributing editor of Start a Successful Mutual Fund: The Step-by-Step Reference Guide to Make It Happen (JV Books, 1995). Mr. Fobes has been a principal of USCF listed with the CFTC and NFA since November 2005. He earned a B.S. in finance with a minor in economics from San Jose State University in California.

*Peter M. Robinson*, 62, Independent Director of USCF since September 2005. Mr. Robinson has been a Research Fellow since 1993 with the Hoover Institution, a public policy think tank located on the campus of Stanford University. He authored three books and has been published in the New York Times, Red Herring, and Forbes ASAP and is the editor of Can Congress Be Fixed?: Five Essays on Congressional Reform (Hoover Institution Press, 1995). Mr. Robinson has been a principal of USCF listed with the CFTC and NFA since December 2005. He earned an MBA from the Stanford University Graduate School of Business, graduated from Oxford University in 1982 after studying politics, philosophy, and economics and graduated summa cum laude from Dartmouth College in 1979.

## USO's Service Providers

### Custodian, Registrar, Transfer Agent, and Administrator

In its capacity as the Custodian for USO, Brown Brothers Harriman & Co. ("BBH&Co." or the "Custodian") holds USO's Treasuries, cash and/or cash equivalents pursuant to a custodial agreement. BBH&Co. is also the registrar and transfer agent for the shares. In addition, in its capacity as Administrator for USO, BBH&Co. performs certain administrative and accounting services for USO and prepares certain SEC, NFA and CFTC reports on behalf of USO.

Currently, USCF pays BBH&Co. for its services, in the foregoing capacities, a minimum amount of $75,000 annually for its custody, fund accounting and fund administration services rendered to USO and each of the Related Public Funds, as well as a $20,000 annual fee for its transfer agency services. In addition, USCF pays BBH&Co. an asset-based charge of (a) 0.06% for the first $500 million of the Related Public Funds', combined net assets, (b) 0.0465% for the Related Public Funds' combined net assets greater than $500 million but less than $1 billion, and (c) 0.035% once the Related Public Funds' combined net assets exceed $1 billion. The annual minimum amount will not apply if the asset-based charge for all accounts in the aggregate exceeds $75,000. USCF also pays transaction fees ranging from $7 to $15 per transaction.

34

BBH&Co.'s principal business address is 50 Post Office Square, Boston, MA 02110. BBH&Co., a private bank founded in 1818, is neither a publicly held company nor insured by the Federal Deposit Insurance Corporation. BBH&Co. is authorized to conduct a commercial banking business in accordance with the provisions of Article IV of the New York State Banking Law, New York Banking Law §§160 – 181, and is subject to regulation, supervision, and examination by the New York State Department of Financial Services. BBH&Co. is also licensed to conduct a commercial banking business by the Commonwealths of Massachusetts and Pennsylvania and is subject to supervision and examination by the banking supervisors of those states.

**Marketing Agent**

USO also employs ALPS Distributors, Inc. ("ALPS Distributors") as the Marketing Agent, which is further discussed under "What is the Plan of Distribution?" USCF pays the Marketing Agent an annual fee. In no event may the aggregate compensation paid to the Marketing Agent and any affiliate of USCF for distribution-related services in connection with the offering of shares exceed ten percent (10%) of the gross proceeds of the offering.

ALPS Distributors' principal business address is 1290 Broadway, Suite 1000, Denver, CO 80203. ALPS Distributors is a broker-dealer registered with the U.S. Securities and Exchange Commission ("SEC") and is a member of FINRA and a member of the Securities Investor Protection Corporation.

**Futures Commission Merchant**

On October 8, 2013, USCF entered into a Futures and Cleared Derivatives Transactions Customer Account Agreement with RBC Capital Markets, LLC ("RBC Capital" or "RBC") to serve as USO's FCM, effective October 10, 2013. This agreement requires RBC Capital to provide services to USO, as of October 10, 2013, in connection with the purchase and sale of Oil Futures Contracts and Other Oil-Related Investments that may be purchased or sold by or through RBC Capital for USO's account. For the period October 10, 2013 and after, USO pays RBC Capital commissions for executing and clearing trades on behalf of USO.

RBC Capital's primary address is 500 West Madison Street, Suite 2500, Chicago, Illinois 60661. Effective October 10, 2013, RBC Capital became the futures clearing broker for USO. RBC Capital is registered in the United States with FINRA as a broker-dealer and with the CFTC as an FCM. RBC Capital is a member of various U.S. futures and securities exchanges.

RBC Capital is a large broker dealer subject to many different complex legal and regulatory requirements. As a result, certain of RBC Capital's regulators may from time to time conduct investigations, initiate enforcement proceedings and/or enter into settlements with RBC Capital with respect to issues raised in various investigations. RBC Capital complies fully with its regulators in all investigations being conducted and in all settlements it reaches. In addition, RBC Capital is and has been subject to a variety of civil legal claims in various jurisdictions, a variety of settlement agreements and a variety of orders, awards and judgments made against it by courts and tribunals, both in regard to such claims and investigations. RBC Capital complies fully with all settlements it reaches and all orders, awards and judgments made against it.

RBC Capital has been named as a defendant in various legal actions, including arbitrations, class actions and other litigation including those described below, arising in connection with its activities. Certain of the actual or threatened legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. RBC Capital is also involved, in other reviews, investigations and proceedings (both formal and informal) by governmental and self-regulatory agencies regarding RBC Capital's business, including among other matters, accounting and operational matters, certain of which may result in adverse judgments, settlements, fines, penalties, injunctions or other relief.

35

RBC Capital contests liability and/or the amount of damages as appropriate in each pending matter. In view of the inherent difficulty of predicting the outcome of such matters, particularly in cases where claimants seek substantial or indeterminate damages or where investigations and proceedings are in the early stages, RBC Capital cannot predict the loss or range of loss, if any, related to such matters; how or if such matters will be resolved; when they will ultimately be resolved; or what the eventual settlement, fine, penalty or other relief, if any, might be. Subject to the foregoing, RBC Capital believes, based on current knowledge and after consultation with counsel, that the outcome of such pending matters will not have a material adverse effect on the consolidated financial condition of RBC Capital.

On April 27, 2017, pursuant to an offer of settlement, a Panel of the Chicago Board of Trade Business Conduct Committee ("Panel") found that RBC Capital engaged in EFRP transactions which failed to satisfy the Rules of the Chicago Board of Trade ("Chicago Board of Trade") in one or more ways. Specifically, the Panel found that RBC Capital traders entered into EFRP trades in which RBC Capital accounts were on both sides of the transactions. While the purpose of the transactions was to transfer positions between the RBC Capital accounts, the Panel found that the manner in which the trades occurred violated the Chicago Board of Trade's prohibition on wash trades. The Panel found that RBC Capital thereby violated CBOT Rules 534 and (legacy) 538.B. and C. In accordance with the settlement offer, the Panel ordered RBC Capital to pay a $175,000 fine. On October 1, 2019, the CFTC issued an order filing and settling charges against RBCCM for the above activity, as well as related charges. The order required that RBCCM cease and desist from violating the applicable regulations, pay a $5 million civil monetary penalty, and comply with various conditions, including conditions regarding public statements and future cooperation with the Commission.

On June 18, 2015, in connection with the Municipalities Continuing Disclosure Cooperation initiative of the SEC, the SEC commenced and settled an administrative proceeding against RBC Capital for willful violations of Sections 17(a)(2) of the 1933 Act after the firm self-reported instances in which it conducted inadequate due diligence in certain municipal securities offerings and as a result, failed to form a reasonable basis for believing the truthfulness of certain material representations in official statements issued in connection with those offerings. RBC Capital paid a fine of $500,000.

RBC Capital and certain affiliates were named as defendants in a lawsuit relating to their role in transactions involving investments made by a number of Wisconsin school districts in certain collateralized debt obligations. These transactions were also the subject of a regulatory investigation, which was resolved in 2011. RBC Capital reached a final settlement with all parties in the civil litigation, and the civil action against RBC Capital was dismissed with prejudice on December 6, 2016.

Beginning in 2015, putative class actions were brought against RBC Capital and/or Royal Bank of Canada in the U.S., Canada and Israel. These actions were each brought against multiple foreign exchange dealers and allege, among other things, collusive behavior in foreign exchange trading. Various regulators are also conducting inquiries regarding potential violations of law by a number of banks and other entities, including RBC Capital, regarding foreign exchange trading. In August 2018, the U.S. District Court entered a final order approving RBC Capital's pending settlement with class plaintiffs. Certain institutional plaintiffs opted out of participating in the settlement and have brought their own claims. The Canadian class actions and one other U.S. action that is purportedly brought on behalf of different classes of plaintiffs also remain pending. Based on the facts currently known, it is not possible at this time for us to predict the ultimate outcome of these investigations or proceedings or the timing of their resolution.

On July 31, 2015, RBC Capital was added as a new defendant in a pending putative class action initially filed in November 2013 in the United States District Court for the Southern District of New York. The action is brought against multiple foreign exchange dealers and alleges collusive behavior, among other allegations, in foreign exchange trading. Based on the facts currently known, the ultimate resolution of these collective matters is not expected to have a material adverse effect on RBC.

On April 13, 2015, RBC Capital's affiliate, Royal Bank of Canada Trust Company (Bahamas) Limited ("RBC Bahamas"), was charged in France with complicity in tax fraud. RBC Bahamas believes that its actions did not violate French law and contested the charge in the French court. The trial of this matter has concluded and a verdict was delivered on January 12, 2017, acquitting the company and the other defendants and on June 29, 2018, the French appellate court affirmed the acquittals. The acquittals are being appealed.

Various regulators and competition and enforcement authorities around the world, including in Canada, the United Kingdom, and the U.S., are conducting investigations related to certain past submissions made by panel banks in connection with the setting of the U.S. dollar London interbank offered rate (LIBOR). These investigations focus on allegations of collusion between the banks that were on the panel to make submissions for certain LIBOR rates. Royal Bank of Canada, RBC Capital's indirect parent, is a member of certain LIBOR panels, including the U.S. dollar LIBOR panel, and has in the past been the subject of regulatory requests for information. In addition, Royal Bank of Canada and other U.S. dollar panel banks have been named as defendants in private lawsuits filed in the U.S. with respect to the setting of LIBOR including a number of class action lawsuits which have been consolidated before the U.S. District Court for the Southern District of New York. The complaints in those private lawsuits assert claims against us and other panel banks under various U.S. laws, including U.S. antitrust laws, the U.S. Commodity Exchange Act, and state law. On February 28, 2018, the motion by the plaintiffs in the class action lawsuits to have the class certified was denied in relation to Royal Bank of Canada. As such, unless that ruling is reversed on appeal, Royal Bank of Canada is no longer a defendant in any pending class action. Royal Bank of Canada is still a party to the various individual LIBOR actions. Based on the facts currently known, it is not possible at this time for us to predict the ultimate outcome of these investigations or proceedings or the timing of their resolution.

36

Thornburg Mortgage Inc. ("TMST") and RBC Capital were parties to a master repurchase agreement executed in September 2003 whereby TMST financed its purchase of residential mortgage-backed securities. Upon TMST's default during the financial crisis, RBC Capital valued TMST's collateral at allegedly deflated prices. After TMST's bankruptcy filing, TMST's trustee brought suit against RBC Capital in 2011 for breach of contract. In 2015, TMST was awarded more than $45 million in damages. RBC Capital has appealed. The appeals court set a briefing schedule and simultaneously ordered the parties to participate in a mediation. The parties subsequently reached an agreement to settle the matter; a motion to approve the settlement was filed with the bankruptcy court on January 10, 2016 and granted on February 27, 2017.

On October 14, 2014, the Delaware Court of Chancery (the "Court of Chancery") in a class action brought by former shareholders of Rural/Metro Corporation, held RBC Capital liable for aiding and abetting a breach of fiduciary duty by three Rural/Metro directors, but did not make an additional award for attorney's fees. A final judgment was entered on February 19, 2015 in the amount of US$93 million plus post judgment interest. RBC Capital appealed the Court of Chancery's determination of liability and quantum of damages, and the plaintiffs cross-appealed the ruling on additional attorneys' fees. On November 30, 2015, the Delaware Supreme Court affirmed the Court of Chancery with respect to both the appeal and cross-appeal. RBC Capital is cooperating with an investigation by the SEC relating to this matter. In particular, the SEC contended that RBC Capital caused materially false and misleading information to be included in the proxy statement that Rural filed to solicit shareholder approval for the sale in violation of section 14(A) of the Exchange Act and Rule 14A-9 thereunder. On August 31, 2016, RBC Capital was ordered by the SEC to cease and desist and paid $500,000 in disgorgement, plus interest of $77,759 and a civil penalty of $2 million.

Please see RBC Capital's Form BD, which is available on the FINRA BrokerCheck program, for more details.

RBC Capital will act only as clearing broker for USO and as such will be paid commissions for executing and clearing trades on behalf of USO. RBC Capital has not passed upon the adequacy or accuracy of this disclosure document. RBC Capital will not act in any supervisory capacity with respect to USCF or participate in the management of USCF or USO.

RBC Capital is not affiliated with USO or USCF. Therefore, neither USCF nor USO believes that there are any conflicts of interest with RBC Capital or its trading principals arising from its acting as USO's FCM.

**Introducing Broker**

BTIG, LLC, whose principal address is 600 Montgomery Street, Sixth Floor, San Francisco, CA, 94111, will act as an introducing broker for USO's futures trading. BTIG is registered with the U.S. Securities and Exchange Commission as a broker-dealer, with the CFTC as an introducing broker, and is a member of FINRA and other regulatory agencies and exchanges. In the normal course of its regulated business activities, BTIG receives examinations, subpoenas, and inquiries from the regulatory organizations that oversee its various business activities. From December 2014 through December 2019, BTIG has not been involved in any material litigation.

BTIG LLC is not affiliated with USO or USCF. Therefore, neither USCF nor USO believes that there will be any conflicts of interest with BTIG, LLC or its trading principals arising from its acting as USO's introducing broker.

37

**Commodity Trading Advisor**

Currently, USCF does not employ commodity trading advisors for the trading of USO contracts. USCF currently does, however, employ SummerHaven Investment Management, LLC as a trading Advisor for USCI and CPER. If, in the future, USCF does employ commodity trading advisors for USO, it will choose each advisor based on arm's-length negotiations and will consider the advisor's experience, fees and reputation.

**USO's Fees and Expenses**

This table describes the fees and expenses that you may pay if you buy and hold shares of USO. You should note that you may pay brokerage commissions on purchases and sales of USO's shares, which are not reflected in the table. Authorized Participants will pay applicable creation and redemption fees. *See* "Creation and Redemption of Shares— *Creation and Redemption Transaction Fee*," page 66.

**Annual Fund Operating Expenses (expenses that you pay each year as a percentage of the value of your investment)[1]**

| | |
|---|---|
| Management Fees | 0.45% |
| Distribution Fees | None |
| Other Fund Expenses | 0.34% |
|     Total Annual Fund Expenses | 0.79% |

(1)     Based on amounts for the year ended December 31, 2019. The individual expense amounts in dollar terms are shown in the table below. As used in this table, (i) Professional Expenses include expenses for legal, audit, tax accounting and printing; and (ii) Independent Director and Officer Expenses include amounts paid to independent directors and for officers' liability insurance.

| | | |
|---|---|---|
| Management fees | $ | 6,461,273 |
| Professional Expenses | $ | 1,440,997 |
| Brokerage commissions | $ | 2,423,017 |
| Licensing fees | $ | 215,376 |
| Registration fees | $ | 504,876 |
| Independent Directors and Officer Expenses | $ | 333,741 |

**Breakeven Analysis**

The breakeven analysis below indicates the approximate dollar returns and percentage required for the redemption value of a hypothetical initial investment in a single share to equal the amount invested twelve months after the investment was made. For purposes of this breakeven analysis, an initial selling price of $12.78 per share, which equals the NAV per share at the close of trading on December 31, 2019, is assumed. In order for a hypothetical investment in shares to break even over the next 12 months, assuming a selling price of $12.78 per share, the investment would have to generate a 0% or $0 return. A negative return would be required, because USO's assumed interest income, would cause USO's income to exceed its assumed expenses during this period.

38

This breakeven analysis refers to the redemption of baskets by Authorized Participants and is not related to any gains an individual investor would have to achieve in order to break even. The breakeven analysis is an approximation only. As used in this table, (i) Professional Expenses include expenses for legal, audit, tax accounting and printing; and (ii) Independent Director and Officer Expenses include amounts paid to independent directors and for officers' liability insurance.

| | | |
|---|---|---|
| Assumed initial selling price per share | $ | 12.78 |
| Management Fee (0.45%)[1] | $ | 0.058 |
| Creation Basket Fee (0.01%)[2] | $ | (0.001) |
| Estimated Brokerage Fee (0.17%)[3] | $ | (0.022) |
| Interest Income (1.6%)[4] | $ | (0.20) |
| Registration Fee (0.035%)[5] | $ | 0.004 |
| NYMEX Licensing Fee (0.015%)[6] | $ | 0.002 |
| Independent Directors' and Officers' Fees (0.017%)[7] | $ | 0.002 |
| Professional Expenses (0.10%)[8] | $ | 0.013 |
| Amount of trading income (loss) required for the redemption value at the end of one year to equal the initial selling price of the share | $ | 0 |
| Percentage of initial selling price per share | | 0% |

(1)     USO is contractually obligated to pay USCF a management fee based on average daily net assets and paid monthly of 0.45% per annum on its average daily net assets. Average daily net assets are calculated daily by taking the average of the total net assets of USO over the calendar year, i.e., the sum of daily total net assets divided by the number of calendar days in the year. On days when markets are closed, the total net assets are the total net assets from the last day when the market was open. See page 62 for a discussion of net assets of USO.

(2)     Authorized Participants are required to pay a Creation Basket fee of $1,000 for each order they place to create one or more baskets. This breakeven analysis assumes a hypothetical investment in a single share, which would equal the $1,000 Creation Basket fee divided by the total number of outstanding shares plus the 100,000 shares created by the Creation Basket, so the Creation Basket fee is $0.001.

(3)     This amount is based on the actual brokerage fees for USO calculated on an annualized basis and includes a per trade commission of $3.50.

(4)     USO earns interest on its assets, including its Treasuries holdings. USO estimates that, in 2020, it will earn approximately 1.6% in interest income on its Treasuries holdings. This is based on the rate of interest paid on obligations of the U.S. government with remaining maturities of six months as of December 31, 2019. USO rolls its Treasuries holdings every six months.

(5)     USO pays fees to the SEC and FINRA to register its shares for sale. This amount is based on actual registration fees for USO calculated on an annualized basis. This fee may vary in future years.

(6)     The NYMEX Licensing Fee is 0.015% on aggregate net assets of the Related Public Funds (except BNO, USCI, CPER). For more information see "USO's Fees and Expenses."

(7)     Independent Director and Officer Expenses include amounts paid to independent directors and for officers' liability insurance. The foregoing assumes that the assets of USO are aggregated with those of the Related Public Funds, that the aggregate fees paid to the independent directors for 2019 was $550,250 that the allocable portion of the fees borne by USO equals $333,741 and that USO has $1,435,838,329 in assets, which was the average amount of assets in 2019.

(8)     Professional Expenses include expenses for legal, audit, tax accounting and printing. USO estimates the costs attributable to Professional Expenses for 2019 were approximately $1,440,997. The number in the breakeven table assumes USO has $1,435,838,329 in average total assets during the calendar year ended December 31, 2019.

(9)     The breakeven amount, calculated based on the information in the table and the assumptions set forth in these notes, would require a negative rate of return of 0.782% (-0.782%), $-0.1. As a result, USO would have to lose market value by that percent or amount in order to break even, notwithstanding the fees and expenses charged to the USO. The breakeven amount is not permitted to be expressed as a negative number and therefore has been expressed as $0.

39

**Conflicts of Interest**

There are present and potential future conflicts of interest in USO's structure and operation you should consider before you purchase shares. USCF will use this notice of conflicts as a defense against any claim or other proceeding made. If USCF is not able to resolve these conflicts of interest adequately, it may impact USO's and the Related Public Funds' ability to achieve their investment objectives.

USO and USCF may have inherent conflicts to the extent USCF attempts to maintain USO's asset size in order to preserve its fee income and this may not always be consistent with USO's objective of having the value of its share's NAV track changes in the price of the Benchmark Oil Futures Contract.

USCF's officers, directors and employees, do not devote their time exclusively to USO. These persons are directors, officers or employees of other entities which may compete with USO for their services. They could have a conflict between their responsibilities to USO and to those other entities.

USCF has adopted policies that prohibit their principals, officers, directors and employees from trading futures and related contracts in which either USO or any of the Related Public Funds invests. These policies are intended to prevent conflicts of interest occurring where USCF, or their principals, officers, directors or employees could give preferential treatment to their own accounts or trade their own accounts ahead of or against USO or any of the Related Public Funds.

USCF has sole current authority to manage the investments and operations of USO, and this may allow it to act in a way that furthers its own interests which may create a conflict with your best interests. Limited partners have limited voting control, which will limit their ability to influence matters such as amendment of the LP Agreement, change in USO's basic investment policy, dissolution of USO, or the sale or distribution of USO's assets.

USCF serves as the general partner or sponsor to each of USO and the Related Public Funds. USCF may have a conflict to the extent that its trading decisions for USO may be influenced by the effect they would have on the other funds it manages. By way of example, if, as a result of reaching position limits imposed by the NYMEX, USO purchased oil futures contracts, this decision could impact USO's ability to purchase additional oil futures contracts if the number of contracts held by funds managed by USCF reached the maximum allowed by the NYMEX. Similar situations could adversely affect the ability of any fund to track its benchmark futures contract.

In addition, USCF is required to indemnify the officers and directors of the other funds, if the need for indemnification arises. This potential indemnification will cause USCF's assets to decrease. If USCF's other sources of income are not sufficient to compensate for the indemnification, then USCF may terminate and you could lose your investment.

Whenever a conflict of interest exists or arises between USCF on the one hand, and the partnership or any limited partner, on the other hand, any resolution or course of action by USCF in respect of such conflict of interest shall be permitted and deemed approved by all partners and will not constitute a breach of the LP Agreement or of any other agreement or of any duty stated or implied by law or equity, if the resolution or course of action is, or by operation of the LP Agreement is deemed to be, fair and reasonable to the partnership. If a dispute arises, under the LP Agreement it will be resolved either through negotiations with USCF or by courts located in the State of Delaware.

Under the LP Agreement, any resolution is deemed to be fair and reasonable to the partnership if the resolution is:

- approved by the audit committee, although no party is obligated to seek approval and USCF may adopt a resolution or course of action that has not received approval;

- on terms no less favorable to the limited partners than those generally being provided to or available from unrelated third parties; or

- fair to the limited partners, taking into account the totality of the relationships of the parties involved including other transactions that may be particularly favorable or advantageous to the limited partners.

40

The previous risk factors and conflicts of interest are complete as of the date of this prospectus; however, additional risks and conflicts may occur which are not presently foreseen by USCF. You may not construe this prospectus as legal or tax advice. Before making an investment in this fund, you should read this entire prospectus, which can be found on USO's website at *www.uscfinvestments.com*. You should also consult with your personal legal, tax, and other professional advisors.

### *Interests of Named Experts and Counsel*

USCF has employed Eversheds Sutherland (US) LLP to prepare this prospectus. Neither the law firm nor any other expert hired by USO to give advice on the preparation of this offering document has been hired on a contingent fee basis. None of them have any present or future expectation of interest in USCF, Marketing Agent, Authorized Participants, Custodian, Administrator or other service providers to USO.

### Ownership or Beneficial Interest in USO

As of December 31, 2019, no person owned more than five percent (5%) of the shares of USO. Also, as of such date, USCF and the principals of USCF do not own any of the shares of USO.

### USCF's Responsibilities and Remedies

Pursuant to the DRULPA ("Delaware Revised Uniform Limited Partnership Act"), parties may contractually modify or even eliminate fiduciary duties in a limited partnership agreement to the limited partnership itself, or to another partner or person otherwise bound by the limited partnership agreement. Parties may not, however, eliminate the implied covenant of good faith and fair dealing. Where parties unambiguously provide for fiduciary duties in a limited partnership agreement, those expressed duties become the standard that courts will use to determine whether such duties were breached. For this reason, USO's limited partnership agreement does not explicitly provide for any fiduciary duties so that common law fiduciary duty principles will apply to measure USCF's conduct.

A prospective investor should be aware that USCF has a responsibility to limited partners of USO to exercise good faith and fairness in all dealings. The fiduciary responsibility of a general partner to limited partners is a developing and changing area of the law and limited partners who have questions concerning the duties of USCF should consult with their counsel. In the event that a limited partner of USO believes that USCF has violated its fiduciary duty to the limited partners, he may seek legal relief individually or on behalf of USO under applicable laws, including under DRULPA and under commodities laws, to recover damages from or require an accounting by USCF. Limited partners may also have the right, subject to applicable procedural and jurisdictional requirements, to bring class actions in federal court to enforce their rights under the federal securities laws and the rules and regulations promulgated thereunder by the SEC. Limited partners who have suffered losses in connection with the purchase or sale of the shares may be able to recover such losses from USCF where the losses result from a violation by USCF of the federal securities laws. State securities laws may also provide certain remedies to limited partners. Limited partners should be aware that performance by USCF of its fiduciary duty is measured by the terms of the LP Agreement as well as applicable law. Limited partners are afforded certain rights to institute reparations proceedings under the Commodity Exchange Act ("CEA") for violations of the CEA or of any rule, regulation or order of the CFTC by USCF.

### Liability and Indemnification

Under the LP Agreement, neither a general partner nor any employee or other agent of USO nor any officer, director, stockholder, partner, employee or agent of a general partner (a "Protected Person") shall be liable to any partner or USO for any mistake of judgment or for any action or inaction taken, nor for any losses due to any mistake of judgment or to any action or inaction or to the negligence, dishonesty or bad faith of any officer, director, stockholder, partner, employee, agent of USO or any officer, director, stockholder, partner, employee or agent of such general partner, provided that such officer, director, stockholder, partner, employee, or agent of the partner or officer, director, stockholder, partner, employee or agent of such general partner was selected, engaged or retained by such general partner with reasonable care, except with respect to any matter as to which such general partner shall have been finally adjudicated in any action, suit or other proceeding not to have acted in good faith in the reasonable belief that such Protected Person's action was in the best interests of USO and except that no Protected Person shall be relieved of any liability to which such Protected Person would otherwise be subject by reason of willful misfeasance, gross negligence or reckless disregard of the duties involved in the conduct of the Protected Person's office.

41

USO shall, to the fullest extent permitted by law, but only out of USO assets, indemnify and hold harmless a general partner and each officer, director, stockholder, partner, employee or agent thereof (including persons who serve at USO's request as directors, officers or trustees of another organization in which USO has an interest as a shareholder, creditor or otherwise) and their respective Legal Representatives and successors (hereinafter referred to as a "*Covered Person*") against all liabilities and expenses, including but not limited to amounts paid in satisfaction of judgments, in compromise or as fines and penalties, and counsel fees reasonably incurred by any Covered Person in connection with the defense or disposition of any action, suit or other proceedings, whether civil or criminal, before any court or administrative or legislative body, in which such Covered Person may be or may have been involved as a party or otherwise or with which such person may be or may have been threatened, while in office or thereafter, by reason of an alleged act or omission as a general partner or director or officer thereof, or by reason of its being or having been such a general partner, director or officer, except with respect to any matter as to which such Covered Person shall have been finally adjudicated in any such action, suit or other proceeding not to have acted in good faith in the reasonable belief that such Covered Person's action was in the best interest of USO, and except that no Covered Person shall be indemnified against any liability to USO or limited partners to which such Covered Person would otherwise be subject by reason of willful misfeasance, bad faith, gross negligence or reckless disregard of the duties involved in the conduct of such Covered Person's office. Expenses, including counsel fees so incurred by any such Covered Person, may be paid from time to time by USO in advance of the final disposition of any such action, suit or proceeding on the condition that the amounts so paid shall be repaid to USO if it is ultimately determined that the indemnification of such expenses is not authorized hereunder.

**Meetings**

Meetings of limited partners may be called by USCF and may be called by it upon the written request of limited partners holding at least 20% of the outstanding shares of USO. USCF shall deposit written notice to all limited partners of the meeting and the purpose of the meeting, which shall be held on a date not less than 30 nor more than 60 days after the date of mailing of such notice, at a reasonable time and place. USCF may also call a meeting upon not less than 20 and not more than 60 days prior notice.

Each limited partner appoints USCF and each of its authorized officers as its attorney-in-fact with full power and authority in its name, place and stead to execute, swear to, acknowledge, deliver, file and record all ballots, consents, approval waivers, certificates and other instruments necessary or appropriate, in the sole discretion of USCF, to make, evidence, give, confirm or ratify any vote, consent, approval, agreement or other action that is made or given by the partner of USO. However, when the LP Agreement establishes a percentage of the limited partners required to take any action, USCF may exercise such power of attorney made only after the necessary vote, consent or approval of the limited partners.

**Termination Events**

USO will dissolve at any time upon the happening of any of the following events:

- The bankruptcy, dissolution, withdrawal, or removal of USCF, unless a majority in interest of the limited partners within 90 days after such event elects to continue USO and appoints a successor general partner; or

- The affirmative vote of a majority in interest of the limited partners, provided that prior to or concurrently with such vote, there shall have been established procedures for the assumption of USO's obligations arising under any agreement to which USO is a party and which is still in force immediately prior to such vote regarding termination, and there shall have been an irrevocable appointment of an agent who shall be empowered to give and receive notices, reports and payments under such agreements, and hold and exercise such other powers as are necessary to permit all other parties to such agreements to deal with such agent as if the agent were the sole owner of USO's interest, which procedures are agreed to in writing by each of the other parties to such agreements.

42

**Provisions of Law**

According to applicable law, indemnification of USCF is payable only if USCF determined, in good faith, that the act, omission or conduct that gave rise to the claim for indemnification was in the best interest of USO and the act, omission or activity that was the basis for such loss, liability, damage, cost or expense was not the result of negligence or misconduct and such liability or loss was not the result of negligence or misconduct by USCF, and such indemnification or agreement to hold harmless is recoverable only out of the assets of USO and not from the members, individually.

***Provisions of Federal and State Securities Laws***

This offering is made pursuant to federal and applicable state securities laws. The SEC and state securities agencies take the position that indemnification of USCF that arises out of an alleged violation of such laws is prohibited unless certain conditions are met.

Those conditions require that no indemnification of USCF or any underwriter for USO may be made in respect of any losses, liabilities or expenses arising from or out of an alleged violation of federal or state securities laws unless: (i) there has been a successful adjudication on the merits of each count involving alleged securities law violations as to the party seeking indemnification and the court approves the indemnification; (ii) such claim has been dismissed with prejudice on the merits by a court of competent jurisdiction as to the party seeking indemnification; or (iii) a court of competent jurisdiction approves a settlement of the claims against the party seeking indemnification and finds that indemnification of the settlement and related costs should be made, provided that, before seeking such approval, USCF or other indemnitee must apprise the court of the position held by regulatory agencies against such indemnification. These agencies are the SEC and the securities administrator of the State or States in which the plaintiffs claim they were offered or sold membership interests.

***Provisions of the 1933 Act and NASAA Guidelines***

Insofar as indemnification for liabilities arising under the 1933 Act may be permitted to USCF or its directors, officers, or persons controlling USO, USO has been informed that SEC and the various State administrators believe that such indemnification is against public policy as expressed in the 1933 Act and the North American Securities Administrators Association, Inc. ("NASAA") commodity pool guidelines and is therefore unenforceable.

**Books and Records**

USO keeps its books of record and account at its office located at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596 or at the offices of the Administrator at its office located at 50 Post Office Square, Boston, Massachusetts, 02110, or such office, including of an administrative agent, as it may subsequently designate upon notice. These books and records are open to inspection by any person who establishes to USO's satisfaction that such person is a limited partner upon reasonable advance notice at all reasonable times during the usual business hours of USO.

USO keeps a copy of USO's LP Agreement on file in its office which is available for inspection on reasonable advance notice at all reasonable times during its usual business hours by any limited partner.

**Statements, Filings, and Reports**

At the end of each fiscal year, USO will furnish to banks, broker dealers and trust companies ("DTC Participants") for distribution to each person who is a shareholder at the end of the fiscal year an annual report containing USO's audited financial statements and other information about USO. USCF is responsible for the registration and qualification of the shares under the federal securities laws and federal commodities laws and any other securities and blue-sky laws of the United States or any other jurisdiction as USCF may select. USCF is responsible for preparing all reports required by the SEC, NYSE Arca and the CFTC, but has entered into an agreement with the Administrator to prepare these reports as required by the SEC, CFTC and the NYSE Arca on USO's behalf.

43

The financial statements of USO will be audited, as required by law and as may be directed by USCF, by an independent registered public accounting firm designated from time to time by USCF. The accountants report will be furnished by USO to shareholders upon request. USO will make such elections, file such tax returns, and prepare, disseminate and file such tax reports, as it is advised by its counsel or accountants are from time to time required by any applicable statute, rule or regulation.

***Reports to Limited Partners***

In addition to periodic reports filed with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K, all of which can be accessed on the SEC's website at *www.sec.gov* or on USO's website at *www.uscfinvestments.com*, USO, pursuant to the LP Agreement, will provide the following reports to limited partners in the manner prescribed below:

*Annual Reports*. Within 90 days after the end of each fiscal year, USCF shall cause to be delivered to each limited partner who was a limited partner at any time during the fiscal year, an annual report containing the following:

(i)     financial statements of the partnership, including, without limitation, a balance sheet as of the end of the partnership's fiscal year and statements of income, partners' equity and changes in financial position, for such fiscal year, which shall be prepared in accordance with accounting principles generally accepted in the United States of America consistently applied and shall be audited by a firm of independent certified public accountants registered with the Public Company Accounting Oversight Board,

(ii)     a general description of the activities of the partnership during the period covered by the report, and

(iii)     a report of any material transactions between the partnership and USCF or any of its affiliates, including fees or compensation paid by the partnership and the services performed by USCF or any such affiliate for such fees or compensation.

*Quarterly Reports.* Within 45 days after the end of each quarter of each fiscal year, USCF shall cause to be delivered to each limited partner who was a limited partner at any time during the quarter then ended, a quarterly report containing a balance sheet and statement of income for the period covered by the report, each of which may be unaudited but shall be certified by USCF as fairly presenting the financial position and results of operations of the partnership during the period covered by the report. The report shall also contain a description of any material event regarding the business of the partnership during the period covered by the report.

*Monthly Reports*. Within 30 days after the end of each month, USCF shall cause to be posted on its website and, upon request, to be delivered to each limited partner who was a limited partner at any time during the month then ended, a monthly report containing an account statement, which will include a statement of income (loss) and a statement of changes in NAV, for the prescribed period. In addition, the account statement will disclose any material business dealings between the partnership, USCF, commodity trading advisor (if any), FCM, or the principals thereof that previously have not been disclosed in this prospectus or any amendment thereto, other account statements or annual reports.

USO will provide information to its shareholders to the extent required by applicable SEC, CFTC, and NYSE Arca requirements. An issuer, such as USO, of exchange-traded securities may not always readily know the identities of the investors who own those securities. USO will post the same information that would otherwise be provided in USO's reports to limited partners described above including its monthly account statements, which will include, without limitation, USO's NAV, on USO's website *www.uscfinvestments.com*.

44

**Fiscal Year**

The fiscal year of USO is the calendar year. USCF may select an alternate fiscal year.

**Governing Law; Consent to Delaware Jurisdiction**

The rights of USCF, USO, DTC (as registered owner of USO's global certificate for shares) and the shareholders, are governed by the laws of the State of Delaware. USCF, USO and DTC and, by accepting shares, each DTC Participant and each shareholder, consent to the jurisdiction of the courts of the State of Delaware and any federal courts located in Delaware. Such consent is not required for any person to assert a claim of Delaware jurisdiction over USCF or USO.

**Legal Matters**

*Litigation and Claims*

Within the past 5 years of the date of this prospectus, there have been no material administrative, civil or criminal actions against USCF, USO, or any principal or affiliate of any of them. This includes any actions pending, on appeal, concluded, threatened, or otherwise known to them.

*Legal Opinion*

Eversheds Sutherland (US) LLP is counsel to and advises USO and USCF with respect to the shares being offered hereby and has passed upon the validity of the shares being issued hereunder. Eversheds Sutherland (US) LLP has also provided USCF with its opinion with respect to federal income tax matters addressed herein.

*Experts*

Spicer Jeffries LLP, an independent registered public accounting firm, has audited the statements of financial condition of USO as of December 31, 2019 and December 31, 2018, including the schedule of investments as of December 31, 2019 and 2018, and the related statements of operations, changes in partners' capital and cash flows for the years ended December 31, 2019, 2018 and 2017, that appear in the annual report on Form 10-K that is incorporated by reference. The financial statements of USO in the Form 10-K were included herein in reliance upon the report of Spicer Jeffries LLP dated February 21, 2020, given on its authority of such firm as experts in accounting and auditing.

**U.S. Federal Income Tax Considerations**

The following discussion summarizes the material U.S. federal income tax consequences of the purchase, ownership and disposition of shares in USO, and the U.S. federal income tax treatment of USO, as of the date hereof. This discussion is applicable to a beneficial owner of shares who purchases shares in the offering to which this prospectus relates, including a beneficial owner who purchases shares from an Authorized Participant. Except where noted otherwise, it deals only with shares held as capital assets and does not deal with special situations, such as those of dealers in securities or currencies, financial institutions, tax-exempt entities, insurance companies, persons holding shares as a part of a position in a "straddle" or as part of a "hedging," "conversion" or other integrated transaction for federal income tax purposes, traders in securities or commodities that elect to use a mark-to-market method of accounting, or holders of shares whose "functional currency" is not the U.S. dollar. Furthermore, the discussion below is based upon the provisions of the Code , as amended, and regulations ("Treasury Regulations"), rulings and judicial decisions thereunder as of the date hereof, and such authorities may be repealed, revoked or modified so as to result in U.S. federal income tax consequences different from those discussed below.

Persons considering the purchase, ownership or disposition of shares should consult their own tax advisors concerning the United States federal income tax consequences in light of their particular situations as well as any consequences arising under the laws of any other taxing jurisdiction.

45

As used herein, a "U.S. shareholder" of a share means a beneficial owner of a share that is a U.S. person. A "U.S. person," for United States federal income tax purposes, is (i) a citizen or resident of the United States, (ii) a corporation or partnership created or organized in or under the laws of the United States or any political subdivision thereof, (iii) an estate the income of which is subject to United States federal income taxation regardless of its source or (iv) a trust (X) that is subject to the supervision of a court within the United States and the control of one or more United States persons as described in section 7701(a)(30) of the Code or (Y) that has a valid election in effect under applicable Treasury Regulations to be treated as a United States person. A "non-U.S. shareholder" is a holder that is not a U.S. shareholder and a "non-U.S. person" is an individual or entity that is not a U.S. person. If a partnership holds our shares, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our shares, you should consult your own tax advisor regarding the tax consequences.

USO has received the opinion of Eversheds Sutherland (US) LLP, counsel to USO, that the material U.S. federal income tax consequences to USO and to U.S. shareholders and non-U.S. shareholders will be as described below. In rendering its opinion, Eversheds Sutherland (US) LLP has relied on the facts described in this prospectus as well as certain factual representations made by USO and USCF. The opinion of Eversheds Sutherland (US) LLP is not binding on the IRS, and as a result, the IRS may not agree with the tax positions taken by USO. If challenged by the IRS, USO's tax positions might not be sustained by the courts. No ruling has been requested from the IRS with respect to any matter affecting USO or prospective investors.

EACH PROSPECTIVE INVESTOR IS ADVISED TO CONSULT ITS OWN TAX ADVISOR AS TO HOW U.S. FEDERAL INCOME TAX CONSEQUENCES OF AN INVESTMENT IN USO APPLY TO YOU AND AS TO HOW THE APPLICABLE STATE, LOCAL OR FOREIGN TAXES APPLY TO YOU.

### Tax Status of USO

USO is organized and operated as a limited partnership in accordance with the provisions of the LP Agreement and applicable state law. Under the Code, an entity classified as a partnership that is deemed to be a "publicly traded partnership" is generally taxable as a corporation for federal income tax purposes. The Code provides an exception to this general rule for a publicly traded partnership whose gross income for each taxable year of its existence consists of at least 90% "qualifying income" ("qualifying income exception"). For this purpose, section 7704 defines "qualifying income" as including, in pertinent part, interest (other than from a financial business), dividends and gains from the sale or disposition of capital assets held for the production of interest or dividends. In addition, in the case of a partnership a principal activity of which is the buying and selling of commodities (other than as inventory) or of futures, forwards and options with respect to commodities, "qualifying income" includes income and gains from such commodities and futures, forwards and options with respect to commodities. USO and USCF have represented the following to Eversheds Sutherland (US) LLP:

- At least 90% of USO's gross income for each taxable year will be derived from (i) income and gains from commodities (not held as inventory) or futures, forwards, options, swaps and other notional principal contracts with respect to commodities, and (ii) interest income;

- USO is organized and operated in accordance with its governing agreements and applicable law;

- USO has not elected, and will not elect, to be classified as a corporation for U.S. federal income tax purposes.

Based in part on these representations, Eversheds Sutherland (US) LLP is of the opinion that USO will be classified as a partnership for federal income tax purposes and that it is not taxable as a corporation for such purposes. USO's taxation as a partnership rather than a corporation will require USCF to conduct USO's business activities in such a manner that it satisfies the qualifying income exception on a continuing basis. No assurance can be given that USO's operations for any given year will produce income that satisfies the requirements of the qualifying income exception. Eversheds Sutherland (US) LLP will not review USO's ongoing compliance with these requirements and will have no obligation to advise USO or USO's shareholders in the event of any subsequent change in the facts, representations or applicable law relied upon in reaching its opinion.

46

If USO failed to satisfy the qualifying income exception in any year, other than a failure that is determined by the IRS to be inadvertent and that is cured within a reasonable time after discovery, USO would be taxable as a corporation for federal income tax purposes and would pay federal income tax on its income at regular corporate rates. In that event, shareholders would not report their share of USO's income or loss on their returns.

In addition, distributions to shareholders would be treated as dividends to the extent of USO's current and accumulated earnings and profits. Subject to holding period and other requirements, any such dividend would be a qualifying dividend subject to U.S. federal income tax at the lower maximum tax rates applicable to long-term capital gains. To the extent a distribution exceeded USO's earnings and profits, the distribution would be treated as a return of capital to the extent of a shareholder's basis in its shares, and thereafter as gain from the sale of shares. Accordingly, if USO were to be taxable as a corporation, it would likely have a material adverse effect on the economic return from an investment in USO and on the value of the shares.

The remainder of this summary assumes that USO is classified as a partnership for federal income tax purposes and that it is not taxable as a corporation.

**U.S. Shareholders**

*Tax Consequences of Ownership of Shares*

*Taxation of USO's Income.* No U.S. federal income tax is paid by USO on its income. Instead, USO files annual information returns, and each U.S. shareholder is required to report on its U.S. federal income tax return its allocable share of the income, gain, loss, deduction, and credit of USO. For example, shareholders must take into account their share of ordinary income realized by USO from accruals of interest on Treasuries and other investments, and their share of gain from Oil Interests. These items must be reported without regard to the amount (if any) of cash or property the shareholder receives as a distribution from USO during the taxable year. Consequently, a shareholder may be allocated income or gain by USO but receive no cash distribution with which to pay its tax liability resulting from the allocation, or may receive a distribution that is insufficient to pay such liability. Because USCF currently does not intend to make distributions, it is likely that in any year USO realizes net income and/or gain that a U.S. shareholder will be required to pay taxes on its allocable share of such income or gain from sources other than USO distributions. In addition, individuals with income in excess of $200,000 ($250,000 in the case of married individuals filing jointly) and certain estates and trusts are subject to an additional 3.8% tax on their "net investment income," which generally includes net income from interest, dividends, annuities, royalties, and rents, and net capital gains (other than certain amounts earned from trades or businesses). The income subject to the additional 3.8% tax includes any income from businesses involved in the trading of financial instruments or commodities.

*Allocations of USO's Profit and Loss.* Under Code section 704, the determination of a partner's distributive share of any item of income, gain, loss, deduction or credit is governed by the applicable organizational document unless the allocation provided by such document lacks "substantial economic effect." An allocation that lacks substantial economic effect nonetheless will be respected if it is in accordance with the partners' interests in the partnership, determined by taking into account all facts and circumstances relating to the economic arrangements among the partners. Subject to the discussion below, concerning certain conventions to be used by USO, allocations of USO income pursuant to the Partnership Agreement should be considered as having substantial economic effect or as being in accordance with a shareholder's interest in USO.

In general, USO applies a monthly closing-of-the-books convention in determining allocations of economic profit or loss to shareholders. Income, gain, loss and deduction are determined on a monthly "mark-to-market" basis, taking into account our accrued income and deductions and realized and unrealized gains and losses for the month. Items of taxable income, deduction, gain, loss and credit recognized by USO for federal income tax purposes for any taxable year are allocated among holders in a manner that equitably reflects the allocation of economic profit or loss.

Under the monthly allocation convention used by the USO, the investor who holds a share as of the close of business on the last trading day of the previous month will be treated for purposes of making allocations as if it owned the share throughout the current month even if such investor disposes of such share during the current month. For example, an investor who buys a share on April 10 of a year and sells it on May 20 of the same year will be allocated all of the tax items attributable to May (because he is deemed to hold it through the last day of May) but will not be allocated any of the tax items attributable to April. The tax items attributable to that share for April will be allocated to the person who is the actual or deemed holder of the share as of the close of business on the last trading day of March.

47

Under the monthly convention, an investor who purchases and sells a share during the same month, and therefore does not hold (and is not deemed to hold) the share at the close of business on the last trading day of either that month or the previous month, will receive no allocations with respect to that share for any period. Accordingly, investors may receive no allocations with respect to shares that they actually held, or may receive allocations with respect to shares attributable to periods that they did not actually hold the shares.

By investing in shares, a U.S. Shareholder agrees that, in the absence of new legislation, regulatory or administrative guidance, or judicial rulings to the contrary, it will file its U.S. income tax returns in a manner that is consistent with the monthly allocation convention as described above and with the IRS Schedule K-1 or any successor form provided to shareholders by USO.

In addition, for any month in which a Creation Basket is issued or a Redemption Basket is redeemed, USO generally will credit or debit the "book" capital accounts of its existing shareholders with any unrealized gain or loss on USO's assets. The capital accounts as adjusted in this manner will be used in making tax allocations intended to account for the differences between the tax basis and fair market value of the assets of USO at the time new shares are issued or outstanding shares are redeemed (so-called "reverse Code section 704(c) allocations"). The intended effect of these adjustments is to equitably allocate among shareholders any unrealized appreciation or depreciation in USO's assets existing at the time of a contribution or redemption for book and tax purposes.

USO applies certain conventions in determining and allocating items for tax purposes in order to reduce the complexity and costs of administration. USCF believes that application of these conventions is consistent with the intent of the partnership provisions of the Code and the applicable Treasury Regulations, and that the resulting allocations will have substantial economic effect or otherwise should be respected as being in accordance with shareholders' interests in USO for federal income tax purposes. The Code and existing Treasury Regulations do not expressly permit adoption of these conventions although the monthly allocation convention described above is consistent with methods permitted under the applicable Treasury Regulations, as well as the legislative history for the provisions that require allocations to appropriately reflect changes in ownership interests. It is possible that the IRS could successfully challenge USO's allocations methods on the ground that they do not satisfy the technical requirements off the Code or Treasury Regulations, requiring a shareholder to report a greater or lesser share of items of income, gain, loss, deduction, or credit than if our method were respected. USCF is authorized to revise our allocation method to conform to any method permitted under future Treasury Regulations.

The assumptions and conventions used in making tax allocations may cause a shareholder to be allocated more or less income or loss for federal income tax purposes than its proportionate share of the economic income or loss realized by USO during the period it held its shares. This "mismatch" between taxable and economic income or loss in some cases may be temporary, reversing itself in a later period when the shares are sold, but could be permanent.

*Section 754 Election*. USO has made the election permitted by section 754 of the Code, which election is irrevocable without the consent of the Service. The effect of this election is that, in connection with secondary market sales, we adjust the purchaser's proportionate share of the tax basis of our assets to fair market value, as reflected in the price paid for the shares, as if the purchaser had directly acquired an interest in our assets. The section 754 election is intended to eliminate disparities between a partner's basis in its partnership interest and its share of the tax bases of the partnership's assets, so that the partner's allocable share of taxable gain or loss on a disposition of an asset will correspond to its share of the appreciation or depreciation in the value of the asset since it acquired its interest. Depending on the price paid for shares and the tax bases of USO's assets at the time of the purchase, the effect of the section 754 election on a purchaser of shares may be favorable or unfavorable. In order to make the appropriate basis adjustments in a cost effective manner, USO will use certain simplifying conventions and assumptions. In particular, all transfers of shares in USO will be deemed to take place at a price (the "single monthly price") equal to the value of such share at the end of the Business Day during the month in which the transfer takes place on which the value of a share is lowest at close of the market. Adjustments to be made under Sections 734(b) and 743(b) of the Code will be made using the same monthly convention, including by reference to the single monthly price. It is possible the IRS will successfully assert that the conventions and assumptions applied are improper and require different basis adjustments to be made, which could adversely affect some shareholders.

48

*Mark to Market of Certain Exchange-Traded Contracts.* For federal income tax purposes, USO generally is required to use a "mark-to-market" method of accounting under which unrealized gains and losses on instruments constituting "section 1256 contracts" are recognized currently. A section 1256 contract is defined as: (1) a futures contract that is traded on or subject to the rules of a national securities exchange which is registered with the SEC, a domestic board of trade designated as a contract market by the CFTC, or any other board of trade or exchange designated by the Secretary of the Treasury, and with respect to which the amount required to be deposited and the amount that may be withdrawn depends on a system of "marking to market"; (2) a forward contract on exchange-traded foreign currencies, where the contracts are traded in the interbank market; (3) a non-equity option traded on or subject to the rules of a qualified board or exchange; (4) a dealer equity option; or (5) a dealer securities futures contract.

Under these rules, section 1256 contracts held by USO at the end of each taxable year, including for example Futures Contracts and options on Futures Contracts traded on a U.S. exchange or board of trade or certain foreign exchanges, are treated as if they were sold by USO for their fair market value on the last business day of the taxable year. A shareholder's distributive share of USO's net gain or loss with respect to each section 1256 contract generally is treated as long-term capital gain or loss to the extent of 60 percent thereof, and as short-term capital gain or loss to the extent of 40 percent thereof, without regard to the actual holding period ("60 – 40 treatment").

Many of USO's Futures Contracts and some of their other commodity interests will qualify as "section 1256 contracts" under the Code. Gain or loss recognized through disposition, termination or marking-to-market of USO's section 1256 contracts will be subject to 60-40 treatment and allocated to shareholders in accordance with the monthly allocation convention. Cleared swaps and other commodity swaps will most likely not qualify as section 1256 contracts. If a commodity swap is not treated as a section 1256 contract, any gain or loss on the swap recognized at the time of disposition or termination will be long-term or short-term capital gain or loss depending on the holding period of the swap.

*Limitations on Deductibility of Losses and Certain Expenses.* A number of different provisions of the Code may defer or disallow the deduction of losses or expenses allocated to you by USO, including but not limited to those described below.

A shareholder's deduction of its allocable share of any loss of USO is limited to the lesser of (1) the tax basis in its shares or (2) in the case of a shareholder that is an individual or a closely held corporation, the amount which the shareholder is considered to have "at risk" with respect to our activities. In general, the amount at risk will be your invested capital plus your share of any recourse debt of USO for which you are liable. Losses in excess of the lesser of tax basis or the amount at risk must be deferred until years in which USO generates additional taxable income against which to offset such carryover losses or until additional capital is placed at risk.

Noncorporate taxpayers are permitted to deduct capital losses only to the extent of their capital gains for the taxable year plus $3,000 of other income. Unused capital losses can be carried forward and used to offset capital gains in future years. In addition, a noncorporate taxpayer may elect to carry back net losses on section 1256 contracts to each of the three preceding years and use them to offset section 1256 contract gains in those years, subject to certain limitations. Corporate taxpayers generally may deduct capital losses only to the extent of capital gains, subject to special carryback and carryforward rules.

49

For taxable years beginning before January 1, 2026, otherwise deductible expenses incurred by noncorporate taxpayers constituting "miscellaneous itemized deductions," generally including investment-related expenses (other than interest and certain other specified expenses), are not deductible. For taxable years beginning on or after January 1, 2026, such miscellaneous itemized deductions are deductible only to the extent they exceed 2 percent of the taxpayer's adjusted gross income for the year. Although the matter is not free from doubt, we believe management fees we pay to USCF and other expenses we incur will constitute investment-related expenses subject to the miscellaneous itemized deduction limitation, rather than expenses incurred in connection with a trade or business, and will report these expenses consistent with that interpretation. In addition, for taxable years beginning on or after January 1, 2026, the Code imposes additional limitations on the amount of certain itemized deductions allowable to individuals with adjusted gross income in excess of certain amounts by reducing the otherwise allowable portion of such deductions by an amount equal to the lesser of:

- 3% of the individual's adjusted gross income in excess of certain threshold amounts; or

- 80% of the amount of certain itemized deductions otherwise allowable for the taxable year.

For taxable years beginning before January 1, 2026, noncorporate shareholders are entitled to a deduction (subject to certain limitations) equal to their "combined qualified business income." "Combined qualified business income" for this purpose includes 20% of a noncorporate taxpayer's "qualified publicly traded partnership income." In general, "qualified publicly traded partnership income" includes a noncorporate taxpayer's allocable share of "qualified items" of income, gain, deduction, and loss. A "qualified item" for this purpose is an item of income, gain deduction, or loss that is effectively connected with a US trade or business and includible income for the year. As discussed below, although the matter is not free from doubt, USO believes that the activities directly conducted by USO will not result in USO being engaged in a trade or business within in the United States. *See* "Non-U.S. Shareholders—Withholding on Allocations and Distributions" below. As a result, we do not anticipate that any of our items of income, gain, deduction, or loss will be reported as "qualified publicly traded partnership income" eligible for the deduction for "combined qualified business income." "Qualified publicly traded partnership income" also includes any gain or loss from the sale of an interest in a partnership to extent attributable to "unrealized receivables" or "inventory" under section 751. (For a discussion of section 751, *see* "Tax Consequences of Disposition of Shares" below.) A noncorporate taxpayer that recognizes any gain or loss from the sale of an interest in USO that is attributable to "unrealized receivables" or "inventory" under section 751 should consult with such taxpayer's tax advisor to determine whether any portion of such gain or loss constitutes "qualified publicly traded partnership income" eligible for the deduction for "combined qualified business income."

A taxpayer is generally prohibited from deducting business interest to the extent that it exceeds the sum of (i) business interest income of such taxpayer, (ii) 30% of the adjusted taxable income of such taxpayer, plus (iii) the floor plan financing interest of such taxpayer. In the case of partnerships, this determination is made at the partnership level. To the extent that the business income of the partnership exceeds the amount necessary to absorb all of the partnership's business interest, such excess amount is allocated to the partners as excess business income, which amount may be used against any business interest of the partner (but not any other partnerships). To the extent that the partnership has any disallowed business interest expense, such amount is allocated among the partners, reduces the partners' outside basis in their partnership interests by their allocable shares, and is carried forward to future years. Such carry forward may only be used as a deduction to the extent that the partnership has excess business income in the future. In the event that a partner transfers a partnership interest with any excess business interest carry forward amounts, such amounts increase the partner's basis in its partnership interest immediately before the transfer. Although it is not free from doubt, USO does not anticipate that it will be treated as engaged in a trade or business. As a result, USO does not anticipate that any portion of its interest expense (if any) will constitute business interest or that shareholders will be allocated any excess business income as a result of holding USO shares.

Noncorporate shareholders generally may deduct "investment interest expense" only to the extent of their "net investment income." Investment interest expense of a shareholder will generally include any interest accrued by USO and any interest paid or accrued on direct borrowings by a shareholder to purchase or carry its shares, such as interest with respect to a margin account. Net investment income generally includes gross income from property held for investment (including "portfolio income" under the passive loss rules but not, absent an election, long-term capital gains or certain qualifying dividend income) less deductible expenses other than interest directly connected with the production of investment income.

To the extent that we allocate losses or expenses to you that must be deferred or disallowed as a result of these or other limitations in the Code, you may be taxed on income in excess of your economic income or distributions (if any) on your shares. As one example, you could be allocated and required to pay tax on your share of interest income accrued by USO for a particular taxable year, and in the same year be allocated a share of a capital loss that you cannot deduct currently because you have insufficient capital gains against which to offset the loss. As another example, you could be allocated and required to pay tax on your share of interest income and capital gain for a year, but be unable to deduct some or all of your share of management fees and/or margin account interest incurred by you with respect to your shares. Shareholders are urged to consult their own professional tax advisors regarding the effect of limitations under the Code on your ability to deduct your allocable share of USO's losses and expenses.

50

*Tax Basis of Shares*

A shareholder's tax basis in its shares is important in determining (1) the amount of taxable gain or loss it will realize on the sale or other disposition of its shares, (2) the amount of non-taxable distributions that it may receive from USO and (3) its ability to utilize its distributive share of any losses of USO on its tax return. A shareholder's initial tax basis of its shares will equal its cost for the shares plus its share of USO's liabilities (if any) at the time of purchase. In general, a shareholder's "share" of those liabilities will equal the sum of (i) the entire amount of any otherwise nonrecourse liability of USO as to which the shareholder or an affiliate is the creditor (a "partner nonrecourse liability") and (ii) a *pro rata* share of any nonrecourse liabilities of USO that are not partner nonrecourse liabilities as to any shareholder.

A shareholder's tax basis in its shares generally will be (1) increased by (a) its allocable share of USO's taxable income and gain and (b) any additional contributions by the shareholder to USO and (2) decreased (but not below zero) by (a) its allocable share of USO's tax deductions and losses and (b) any distributions by USO to the shareholder. For this purpose, an increase in a shareholder's share of USO's liabilities will be treated as a contribution of cash by the shareholder to USO and a decrease in that share will be treated as a distribution of cash by USO to the shareholder. Pursuant to certain IRS rulings, a shareholder will be required to maintain a single, "unified" basis in all shares that it owns. As a result, when a shareholder that acquired its shares at different prices sells less than all of its shares, such shareholder will not be entitled to specify particular shares (*e.g.,* those with a higher basis) as having been sold. Rather, it must determine its gain or loss on the sale by using an "equitable apportionment" method to allocate a portion of its unified basis in its shares to the shares sold.

*Treatment of USO Distributions*. If USO makes non-liquidating distributions to shareholders, such distributions generally will not be taxable to the shareholders for federal income tax purposes except to the extent that the sum of (i) the amount of cash and (ii) the fair market value of marketable securities distributed exceeds the shareholder's adjusted basis of its interest in USO immediately before the distribution. Any cash distributions in excess of a shareholder's tax basis generally will be treated as gain from the sale or exchange of shares.

*Tax Consequences of Disposition of Shares*

If a shareholder sells its shares, it will recognize gain or loss equal to the difference between the amount realized and its adjusted tax basis for the shares sold. A shareholder's amount realized will be the sum of the cash or the fair market value of other property received plus its share of any USO debt outstanding.

Gain or loss recognized by a shareholder on the sale or exchange of shares held for more than one year will generally be taxable as long-term capital gain or loss; otherwise, such gain or loss will generally be taxable as short-term capital gain or loss. A special election is available under the Treasury Regulations that will allow shareholders to identify and use the actual holding periods for the shares sold for purposes of determining whether the gain or loss recognized on a sale of shares will give rise to long-term or short-term capital gain or loss. It is expected that most shareholders will be eligible to elect, and generally will elect, to identify and use the actual holding period for shares sold. If a shareholder fails to make the election or is not able to identify the holding periods of the shares sold, the shareholder may have a split holding period in the shares sold. Under such circumstances, a shareholder will be required to determine its holding period in the shares sold by first determining the portion of its entire interest in USO that would give rise to long-term capital gain or loss if its entire interest were sold and the portion that would give rise to short-term capital gain or loss if the entire interest were sold. The shareholder would then treat each share sold as giving rise to long-term capital gain or loss and short-term capital gain or loss in the same proportions as if it had sold its entire interest in USO.

Under Section 751 of the Code, a portion of a shareholder's gain or loss from the sale of shares (regardless of the holding period for such shares), will be separately computed and taxed as ordinary income or loss to the extent attributable to "unrealized receivables" or "inventory" owned by USO. The term "unrealized receivables" includes, among other things, market discount bonds and short-term debt instruments to the extent such items would give rise to ordinary income if sold by USO. However, the short-term capital gain on section 1256 contracts resulting from 60 – 40 treatment, described above, should not be subject to this rule.

51

If some or all of your shares are lent by your broker or other agent to a third party — for example, for use by the third party in covering a short sale — you may be considered as having made a taxable disposition of the loaned shares, in which case —

- you may recognize taxable gain or loss to the same extent as if you had sold the shares for cash;

- any of USO's income, gain, loss or deduction allocable to those shares during the period of the loan will not be reportable by you for tax purposes; and

- any distributions you receive with respect to the shares will be fully taxable, most likely as ordinary income.

Shareholders desiring to avoid these and other possible consequences of a deemed disposition of their shares should consider modifying any applicable brokerage account agreements to prohibit the lending of their shares.

*Other Tax Matters*

*Information Reporting.* We report tax information to the beneficial owners of shares. The IRS has ruled that assignees of partnership interests who have not been admitted to a partnership as partners but who have the capacity to exercise substantial dominion and control over the assigned partnership interests will be considered beneficial owners for federal income tax purposes. On the basis of such ruling, except as otherwise provided herein, we treat the following persons as partners for federal income tax purposes: (1) assignees of shares who are pending admission as limited partners, and (2) shareholders whose shares are held in street name or by another nominee and who have the right to direct the nominee in the exercise of all substantive rights attendant to the ownership of their shares. USO will furnish shareholders each year with tax information on IRS Schedule K-1 (Form 1065), which will be used by the shareholders in completing their tax returns.

Persons who hold an interest in USO as a nominee for another person are required to furnish to us the following information: (1) the name, address and taxpayer identification number of the beneficial owner and the nominee; (2) whether the beneficial owner is (a) a person that is not a U.S. person, (b) a foreign government, an international organization or any wholly-owned agency or instrumentality of either of the foregoing, or (c) a tax-exempt entity; (3) the amount and description of shares acquired or transferred for the beneficial owner; and (4) certain information including the dates of acquisitions and transfers, means of acquisitions and transfers, and acquisition cost for purchases, as well as the amount of net proceeds from sales. Brokers and financial institutions are required to furnish additional information, including whether they are U.S. persons and certain information on shares they acquire, hold or transfer for their own account. The nominee is required to supply the beneficial owner of the shares with the information furnished to us. Penalties may apply for failure to report required information.

*Additional 3.8% Tax on Net Investment Income.* Individuals with income in excess of $200,000 ($250,000 in the case of married individuals filing jointly) and certain estates and trusts are subject to an additional 3.8% tax on their "net investment income," which generally includes net income from interest, dividends, annuities, royalties, and rents, and net capital gains (other than certain amounts earned from trades or businesses). The income subject to the additional 3.8% tax includes any income from businesses involved in the trading of financial instruments or commodities.

*Partnership Audit Procedures.* The IRS may audit the federal income tax returns filed by USO. Partnerships are generally treated as separate entities for purposes of federal tax audits, judicial review of administrative adjustments by the IRS, and tax settlement proceedings. The tax treatment of partnership items of income, gain, loss and deduction are determined at the partnership level in a unified partnership proceeding rather than in separate proceedings with the shareholders.

52

USO may be liable for U.S. federal income tax on any "imputed understatement" of tax resulting from an adjustment as a result of an IRS audit. The amount of the imputed understatement generally includes increases in allocations of items of income or gains to any investor and decreases in allocations of items of deduction, loss, or credit to any investor without any offset for any corresponding reductions in allocations of items of income or gain to any investor or increases in allocations of items of deduction, loss, or credit to any investor. If USO is required to pay any U.S. federal income taxes on any imputed understatement, the resulting tax liability would reduce the net assets of USO and would likely have an adverse impact on the value of the shares. Under certain circumstances, USO may be eligible to make an election to cause the investors to take into account the amount of any imputed understatement, including any interest and penalties. The ability of a publicly traded partnership such as USO to make this election is uncertain. If the election is made, USO would be required to provide investors who owned beneficial interests in the shares in the year to which the adjusted allocations relate with a statement setting forth their proportionate shares of the adjustment ("Adjusted K-1s"). The investors would be required to take the adjustment into account in the taxable year in which the Adjusted K-1s are issued. The Code generally requires USO to designate one person as the "partnership representative" who has sole authority to conduct an audit with the IRS, challenge any adjustment in a court of law, and settle any audit or other proceeding. The LP Agreement appoints USCF as the partnership representative of USO.

*Tax Shelter Disclosure Rules.* In certain circumstances the Code and Treasury Regulations require that the IRS be notified of taxable transactions through a disclosure statement attached to a taxpayer's United States federal income tax return. In addition, certain "material advisers" must maintain a list of persons participating in such transactions and furnish the list to the IRS upon written request. These disclosure rules may apply to transactions irrespective of whether they are structured to achieve particular tax benefits. They could require disclosure by USO or shareholders if a shareholder incurs a loss in excess of a specified threshold from a sale or redemption of its shares or possibly in other circumstances. While these rules generally do not require disclosure of a loss recognized on the disposition of an asset in which the taxpayer has a "qualifying basis" (generally a basis equal to the amount of cash paid by the taxpayer for such asset), they apply to a loss recognized with respect to interests in a pass-through entity, such as the shares, even if the taxpayer's basis in such interests is equal to the amount of cash it paid. In addition, under recently enacted legislation, significant penalties may be imposed in connection with a failure to comply with these reporting requirements. *Investors should consult their own tax advisors concerning the application of these reporting requirements to their specific situation.*

*Tax-Exempt Organizations.* Subject to numerous exceptions, qualified retirement plans and individual retirement accounts, charitable organizations and certain other organizations that otherwise are exempt from federal income tax (collectively "exempt organizations") nonetheless are subject to the tax on unrelated business taxable income ("UBTI"). Generally, UBTI means the gross income derived by an exempt organization from a trade or business that it regularly carries on, the conduct of which is not substantially related to the exercise or performance of its exempt purpose or function, less allowable deductions directly connected with that trade or business. If USO were to regularly carry on (directly or indirectly) a trade or business that is unrelated with respect to an exempt organization shareholder, then in computing its UBTI, the shareholder must include its share of (1) USO's gross income from the unrelated trade or business, whether or not distributed, and (2) USO's allowable deductions directly connected with that gross income.

UBTI generally does not include dividends, interest, or payments with respect to securities loans and gains from the sale of property (other than property held for sale to customers in the ordinary course of a trade or business). Nonetheless, income on, and gain from the disposition of, "debt-financed property" is UBTI. Debt-financed property generally is income-producing property (including securities), the use of which is not substantially related to the exempt organization's tax-exempt purposes, and with respect to which there is "acquisition indebtedness" at any time during the taxable year (or, if the property was disposed of during the taxable year, the 12-month period ending with the disposition). Acquisition indebtedness includes debt incurred to acquire property, debt incurred before the acquisition of property if the debt would not have been incurred but for the acquisition, and debt incurred subsequent to the acquisition of property if the debt would not have been incurred but for the acquisition and at the time of acquisition the incurrence of debt was foreseeable. The portion of the income from debt-financed property attributable to acquisition indebtedness is equal to the ratio of the average outstanding principal amount of acquisition indebtedness over the average adjusted basis of the property for the year. USO currently does not anticipate that it will borrow money to acquire investments; however, USO cannot be certain that it will not borrow for such purpose in the future. In addition, an exempt organization shareholder that incurs acquisition indebtedness to purchase its shares in USO may have UBTI.

The federal tax rate applicable to an exempt organization shareholder on its UBTI generally will be either the corporate or trust tax rate, depending upon the shareholder's form of organization. USO may report to each such shareholder information as to the portion, if any, of the shareholder's income and gains from USO for any year that will be treated as UBTI; the calculation of that amount is complex, and there can be no assurance that USO's calculation of UBTI will be accepted by the Service. An exempt organization shareholder will be required to make payments of estimated federal income tax with respect to its UBTI.

53

*Regulated Investment Companies.* Interests in and income from "qualified publicly traded partnerships" satisfying certain gross income tests are treated as qualifying assets and income, respectively, for purposes of determining eligibility for regulated investment company ("RIC") status. A RIC may invest up to 25% of its assets in interests in a qualified publicly traded partnership. The determination of whether a publicly traded partnership such as USO is a qualified publicly traded partnership is made on an annual basis. USO expects to be a qualified publicly traded partnership in each of its taxable years. However, such qualification is not assured.

**Non-U.S. Shareholders**

Generally, non-U.S. persons who derive U.S. source income or gain from investing or engaging in a U.S. business are taxable on two categories of income. The first category consists of amounts that are fixed, determinable, annual and periodic income, such as interest, dividends and rent that are not connected with the operation of a U.S. trade or business ("FDAP"). The second category is income that is effectively connected with the conduct of a U.S. trade or business ("ECI"). FDAP income (other than interest that is considered "portfolio interest") is generally subject to a 30 percent withholding tax, which may be reduced for certain categories of income by a treaty between the U.S. and the recipient's country of residence. In contrast, ECI is generally subject to U.S. tax on a net basis at graduated rates upon the filing of a U.S. tax return. Where a non-U.S. person has ECI as a result of an investment in a partnership, the ECI is subject to a withholding tax at a rate of 37% (39.6%for taxable years beginning after December 31, 2025) individual shareholders and a rate of 21% for corporate shareholders.

*Withholding on Allocations and Distributions.* The Code provides that a non-U.S. person who is a partner in a partnership that is engaged in a U.S. trade or business during a taxable year will also be considered to be engaged in a U.S. trade or business during that year. Classifying an activity by a partnership as an investment or an operating business is a factual determination. Under certain safe harbors in the Code, an investment fund whose activities consist of trading in stocks, securities, or commodities for its own account generally will not be considered to be engaged in a U.S. trade or business unless it is a dealer is such stocks, securities, or commodities. This safe harbor applies to investments in commodities only if the commodities are of a kind customarily dealt in on an organized commodity exchange and if the transaction is of a kind customarily consummated at such place. Although the matter is not free from doubt, USO believes that the activities directly conducted by USO will not result in USO being engaged in a trade or business within in the United States. However, there can be no assurance that the IRS would not successfully assert that USO's activities constitute a U.S. trade or business.

In the event that USO's activities were considered to constitute a U.S. trade or business, USO would be required to withhold at the highest rate specified in Code section 1 (currently 37% (39.6% for taxable years beginning after December 31, 2026)) on allocations of our income to individual non-U.S. Shareholders and the highest rate specified in Code section 11(b) (currently 21%) on allocations of our income to corporate non-U.S. Shareholders, when such income is allocated or distributed. A non-U.S. shareholder with ECI will generally be required to file a U.S. federal income tax return, and the return will provide the non-U.S. shareholder with the mechanism to seek a refund of any withholding in excess of such shareholder's actual U.S. federal income tax liability. Any amount withheld by USO on behalf of a non-U.S. shareholder will be treated as a distribution to the non-U.S. shareholder to the extent possible. In some cases, USO may not be able to match the economic cost of satisfying its withholding obligations to a particular non-U.S. shareholder, which may result in such cost being borne by USO, generally, and accordingly, by all shareholders.

If USO is not treated as engaged in a U.S. trade or business, a non-U.S. shareholder may nevertheless be treated as having FDAP income, which would be subject to a 30 percent withholding tax (possibly subject to reduction by treaty), with respect to some or all of its distributions from USO or its allocable share of USO income. Amounts withheld on behalf of a non-U.S. shareholder will be treated as being distributed to such shareholder.

To the extent any interest income allocated to a non-U.S. shareholder that otherwise constitutes FDAP is considered "portfolio interest," neither the allocation of such interest income to the non-U.S. shareholder nor a subsequent distribution of such interest income to the non-U.S. shareholder will be subject to withholding, provided that the non-U.S. shareholder is not otherwise engaged in a trade or business in the U.S. and provides USO with a timely and properly completed and executed IRS Form W-8BEN, W-8BEN-E, or other applicable form. In general, "portfolio interest" is interest paid on debt obligations issued in registered form, unless the "recipient" owns 10 percent or more of the voting power of the issuer.

54

Most of USO's interest income qualifies as "portfolio interest." In order for USO to avoid withholding on any interest income allocable to Non-U.S. shareholders that would qualify as "portfolio interest," it will be necessary for all Non-U.S. shareholders to provide USO with a timely and properly completed and executed Form W-8BEN or W-8BEN-E (or other applicable form). If a Non-U.S. shareholder fails to provide a properly completed Form W-8BEN, W-8BEN-E, or other applicable form, USCF may request that the Non-U.S. shareholder provide, within 15 days after the request by USCF, a properly completed Form W-8BEN, W-8BEN-E, or other applicable form. If a Non-U.S. shareholder fails to comply with this request, the shares owned by such Non-U.S. shareholder will be subject to redemption.

*Gain from Sale of Shares.* Gain from the sale or exchange of the shares may be taxable to a non-U.S. shareholder if the non-U.S. shareholder is a nonresident alien individual who is present in the U.S. for 183 days or more during the taxable year. In such case, the nonresident alien individual will be subject to a 30 percent withholding tax on the amount of such individual's gain. In addition, if USO is treated as being engaged in a U.S. trade or business, a portion of the gain on the sale or exchange will be treated as effectively connected income subject to U.S. federal income tax to the extent that a sale of USO's assets would give rise to effectively connected income. Although the transferee of a partnership interest is generally required to withhold 10% of the proceeds from the sale of a partnership interest acquired from a non-U.S. partner if any portion of the gain would be treated as effectively connected income, the IRS has issued a notice in which it has indicated that such withholding requirement will not apply to transferees of publicly traded partnership interests until the IRS and Treasury issue regulations implementing such provision. However, this does not relieve a non-U.S. shareholder from U.S. income tax on any gain treated as effectively connected income.

*Branch Profits Tax on Corporate Non-U.S. Shareholders.* In addition to the taxes noted above, any non-U.S. shareholders that are corporations may also be subject to an additional tax, the branch profits tax, at a rate of 30 percent. The branch profits tax is imposed on a non-U.S. corporation's dividend equivalent amount, which generally consists of the corporation's after-tax earnings and profits that are effectively connected with the corporation's U.S. trade or business but are not reinvested in a U.S. business. This tax may be reduced or eliminated by an income tax treaty between the United States and the country in which the non-U.S. shareholder is a "qualified resident."

*Prospective non-U.S. shareholders should consult their tax advisor with regard to these and other issues unique to non-U.S. shareholders.*

## Backup Withholding

USO may be required to withhold U.S. federal income tax ("backup withholding") from all taxable distributions payable to: (1) any shareholder who fails to furnish USO with his, her or its correct taxpayer identification number or a certificate that the shareholder is exempt from backup withholding, and (2) any shareholder with respect to whom the IRS notifies USO that the shareholder has failed to properly report certain interest and dividend income to the IRS and to respond to notices to that effect. Backup withholding is not an additional tax and may be returned or credited against a taxpayer's regular federal income tax liability if appropriate information is provided to the IRS.

## Tax Agent

The beneficial owners who are of a type, as identified by the nominee through whom their Shares are held, that do not ordinarily have U.S. federal tax return filing requirements, collectively, Certain K-1 shareholders, have designated the General Partner as their tax agent, or the Tax Agent, in dealing with the Partnership. In light of such designation and pursuant to Treasury Regulation section 1.6031(b)-1T(c), as amended from time to time, the Partnership will provide to the Tax Agent Certain K-1 shareholders' statements as such term is defined under Treasury Regulation section 1.6031(b)-1T(a)(3), as amended from time to time.

55

**Foreign Account Tax Compliance Act Provisions**

Legislation commonly referred to as the "Foreign Account Tax Compliance Act," or "FATCA," generally imposes a 30% withholding tax on payments of certain types of income to foreign financial institutions ("FFIs") unless such FFIs (i) enter into an agreement with the U.S. Treasury to report certain required information with respect to accounts held by U.S. persons (or held by foreign entities that have U.S. persons as substantial owners) or (ii) reside in a jurisdiction that has entered into an intergovernmental agreement ("IGA") with the United States to collect and share such information and comply with the terms of such IGA and any enabling legislation or regulations. The types of income subject to the tax include U.S.- source interest and dividends. The information required to be reported includes the identity and taxpayer identification number of each account holder that is a U.S. person and transaction activity within the holder's account. In addition, subject to certain exceptions, this legislation also imposes a 30% withholding on payments to foreign entities that are not financial institutions unless the foreign entity certifies that it does not have a greater than 10% U.S. owner or provides the withholding agent with identifying information on each greater than 10% U.S. owner. Depending on the status of a Non-U.S. shareholder and the status of the intermediaries through which they hold their shares, Non-U.S. shareholders could be subject to this 30% withholding tax with respect to distributions on their shares and proceeds from the sale of their shares. Under certain circumstances, a Non-U.S. shareholder might be eligible for refunds or credits of such taxes.

**Other Tax Considerations**

In addition to federal income taxes, shareholders may be subject to other taxes, such as state and local income taxes, unincorporated business taxes, business franchise taxes, and estate, inheritance or intangible taxes that may be imposed by the various jurisdictions in which USO does business or owns property or where the shareholders reside. Although an analysis of those various taxes is not presented here, each prospective shareholder should consider their potential impact on its investment in USO. It is each shareholder's responsibility to file the appropriate U.S. federal, state, local, and foreign tax returns. Eversheds Sutherland (US) LLP has not provided an opinion concerning any aspects of state, local or foreign tax or U.S. federal tax other than those U.S. federal income tax issues discussed herein.

**Certain ERISA and Related Considerations**

*General*

Many employee benefit plans and individual retirement accounts ("IRAs") are subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") or the Code, or both. This section discusses certain considerations that arise under ERISA and the Code that a fiduciary of: (i) an employee benefit plan as defined in ERISA; (ii) a plan as defined in Section 4975 of the Code; or (iii) any collective investment vehicle, business trust, investment partnership, pooled separate account or other entity the assets of which are treated as comprised (at least in part) of "plan assets" under the ERISA plan asset rules ("plan asset entity"); who has investment discretion should take into account before deciding to invest in the entity's assets in USO. Employee benefit plans, plans defined under Section 4975 of the Code and plan asset entities are collectively referred to below as "plans", and fiduciaries with investment discretion are referred to below as "plan fiduciaries."

This summary is based on the provisions of ERISA, the Code and applicable guidance as of the date hereof. This summary is not intended to be complete, but only to address certain questions under ERISA and the Code. The summary does not include state or local law.

**Potential plan investors are urged to consult with their own professional advisors concerning the appropriateness of an investment in USO and the manner in which limited partnership interests should be purchased. USCF does not represent that the limited partnership interests hereby offered are appropriate for plans or any particular plan.**

*Special Investment Considerations*

Investments by plans governed by ERISA are subject to ERISA's fiduciary requirements, including the requirements of investment prudent and diversification. As a result, each plan fiduciary must consider the facts and circumstances that are relevant to their plan's specific circumstances when evaluating an investment in USO, including the role that an investment in USO would play in the plan's overall investment portfolio, taking into account the plan's purpose, the risk and loss of potential return with respect to the investment, the liquidity, the current return of the total portfolio relative to the anticipated cash flow needs of the plan, and the projected return of the portfolio and relative to the plan's investment objectives. Each plan fiduciary, before deciding to invest in USO, must be satisfied that its investment in the limited partnership interests in USO is prudent for the plan, that the investments of the plan are properly diversified and that an investment in USO complies with the terms of the plan.

56

*USO and Plan Assets*

Regulations issued under ERISA contains rules for determining when an investment by a plan in an equity interest of a limited partnership will result in the underlying assets of the partnership being deemed "plan assets" for purposes of ERISA and Section 4975 of the Code. Those rules provide that assets of a limited partnership will not be deemed to be assets of a plan that purchases an equity interest in the partnership if the equity interest purchased qualifies as a publicly-offered security. If the underlying assets of a limited partnership are considered to be assets of any plan for purposes of ERISA or Section 4975 of the Code, the operations of that partnership would be subject to and, in some cases, limited by, the provisions of ERISA and Section 4975 of the Code.

An equity interest will qualify as a publicly offered security if it is:

1. freely transferable (determined based on the relevant facts and circumstances);

2. part of a class of securities that is widely held (meaning that the class of securities is owned by 100 or more investors independent of the issuer and of each other); and

3. either (a) part of a class of securities registered under Section 12(b) or 12(g) of the Exchange Act or (b) sold to the plan as part of a public offering pursuant to an effective registration statement under the 1933 Act and the class of which such security is a part is registered under the Exchange Act within 120 days (or such later time as may be allowed by the SEC) after the end of the fiscal year of the issuer in which the offering of such security occurred.

Regulations under ERISA state that the determination of whether a security is "freely transferable" is to be made based on all of the relevant facts and circumstances. In the case of a security that is part of an offering in which the minimum investment is $10,000 or less, the following requirements, alone or in combination, ordinarily will not affect a finding that the security is freely transferable: (1) a requirement that no transfer or assignment of the security or rights relating to the security be made that would violate any federal or state law, (2) a requirement that no transfer or assignment be made without advance written notice given to the entity that issued the security, and (3) any restriction on the substitution of an assignee as a limited partner of a partnership, including a general partner consent requirement, provided that the economic benefits of ownership of the assignor may be transferred or assigned without regard to such restriction or consent (other than compliance with any of the foregoing restrictions).

USCF believes that the conditions described above are satisfied with respect to the limited partnership interests. USCF believes that the limited partnership interests therefore constitute publicly-offered securities, and the underlying assets of USO will not be deemed to be "plan assets" under applicable ERISA regulations.

*Prohibited Transactions*

ERISA and the Code generally prohibit certain transactions involving plans and persons who have certain specified relationships to plans.

In general, USO limited partnership interests may not be purchased with the assets of a plan if USCF, the clearing brokers, the trading advisors (if any), or any of their affiliates, agents or employees:

- exercise any discretionary authority or discretionary control with respect to management of the plan;

- exercise any authority or control with respect to management or disposition of the assets of the plan;

- render investment advice for a fee or other compensation, direct or indirect, with respect to any monies or other property of the plan;

- have any authority or responsibility to render investment advice with respect to any monies or other property of the plan; or

- have any discretionary authority or discretionary responsibility in the administration of the plan.

57

Also, a prohibited transaction may occur under ERISA or the Code when circumstances indicate that (1) the investment in an equity interest is made or retained for the purpose of avoiding application of the fiduciary standards of ERISA, (2) the investment in an equity interest constitutes an arrangement under which USO is expected to engage in transactions that would otherwise be prohibited if entered into directly by the plan purchasing the share, (3) the investing plan, by itself, has the authority or influence to cause USO to engage in such transactions, or (4) a person who is prohibited from transacting with the investing plan may, but only with the aid of certain of its affiliates and the investing plan, cause USO to engage in such transactions with such person.

### Special IRA Rules

Individual retirement accounts ("IRAs") are not subject to ERISA's fiduciary standards, but are subject to their own rules, including the prohibited transaction rules of Section 4975 of the Code, which generally mirror ERISA's prohibited transaction rules. For example, IRAs are subject to special custody rules and must maintain a qualifying IRA custodial arrangement separate and distinct from USO and its custodial arrangement. Otherwise, if a separate qualifying custodial arrangement is not maintained, an investment in the limited partnership interests will be treated as a distribution from the IRA. Additionally, IRAs are prohibited from investing in certain commingled investments, and USCF makes no representation regarding whether an investment in limited partnership interests is an inappropriate commingled investment for an IRA. Finally, in applying the prohibited transaction provisions of Section 4975 of the Code, in addition to the rules summarized above, the individual for whose benefit the IRA is maintained is also treated as the creator of the IRA. For example, if the owner or beneficiary of an IRA enters into any transaction, arrangement, or agreement involving the assets of his or her IRA to benefit the IRA owner or beneficiary (or his or her relatives or business affiliates) personally, or with the understanding that such benefit will occur, directly or indirectly, such transaction could give rise to a prohibited transaction that is not exempted by any available exemption. Moreover, in the case of an IRA, the consequences of a non-exempt prohibited transaction are that the IRA's assets will be treated as if they were distributed, causing immediate taxation of the assets (including any early distribution penalty tax applicable under Section 72 of the Code), in addition to any other fines or penalties that may apply.

### Exempt Plans

Governmental plans and church plans are generally not subject to ERISA, and the above-described prohibited transaction provisions described above do not apply to them. These plans are, however, subject to prohibitions against certain related-party transactions under Section 503 of the Code, which operate similar to the prohibited transaction rules described above. In addition, the fiduciary of any governmental or church plan should consider any applicable state or local laws and any restrictions and duties of common law imposed upon the plan.

No view is expressed as to whether an investment in USO (and any continued investment in USO), or the operation and administration of USO, is appropriate or permissible for any governmental plan or church plan under Code Section 503, or under any state, county, local or other law relating to that type of plan.

**Allowing an investment in USO is not to be construed as a representation by USO, USCF, any trading advisor, any clearing broker, the Marketing Agent or legal counsel or other advisors to such parties or any other party that this investment meets some or all of the relevant legal requirements with respect to investments by any particular plan or that this investment is appropriate for any such particular plan. The person with investment discretion should consult with the plan's attorney and financial advisors as to the propriety of an investment in USO in light of the circumstances of the particular plan, current tax law and ERISA.**

**THE FOREGOING SUMMARY OF ERISA CONSIDERATIONS IS BASED UPON ERISA, JUDICIAL DECISIONS, DEPARTMENT OF LABOR REGULATIONS AND RULINGS IN EXISTENCE ON THE DATE HEREOF, ALL OF WHICH ARE SUBJECT TO CHANGE. THE SUMMARY IS GENERAL IN NATURE AND DOES NOT ADDRESS EVERY ERISA ISSUE THAT MAY BE APPLICABLE TO AN INVESTMENT IN USO OR TO A PARTICULAR INVESTOR.**

### Form of Shares

*Registered Form.* Shares are issued in registered form in accordance with the LP Agreement. The Administrator has been appointed registrar and transfer agent for the purpose of transferring shares in certificated form. The Administrator keeps a record of all limited partners and holders of the shares in certificated form in the registry (the "Register"). USCF recognizes transfers of shares in certificated form only if done in accordance with the LP Agreement. The beneficial interests in such shares are held in book-entry form through participants and/or accountholders in DTC.

58

**Book Entry.** Individual certificates are not issued for the shares. Instead, shares are represented by one or more global certificates, which are deposited by the Administrator with DTC and registered in the name of Cede & Co., as nominee for DTC. The global certificates evidence all of the shares outstanding at any time. Shareholders are limited to (1) participants in DTC such as banks, brokers, dealers and trust companies ("DTC Participants"), (2) those who maintain, either directly or indirectly, a custodial relationship with a DTC Participant ("Indirect Participants"), and (3) those banks, brokers, dealers, trust companies and others who hold interests in the shares through DTC Participants or Indirect Participants, in each case who satisfy the requirements for transfers of shares. DTC Participants acting on behalf of investors holding shares through such participants' accounts in DTC will follow the delivery practice applicable to securities eligible for DTC's Same-Day Funds Settlement System. Shares are credited to DTC Participants' securities accounts following confirmation of receipt of payment.

**DTC.** DTC has advised USO as follows. It is a limited purpose trust company organized under the laws of the State of New York and is a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds securities for DTC Participants and facilitates the clearance and settlement of transactions between DTC Participants through electronic book-entry changes in accounts of DTC Participants.

**Transfer of Shares**

**Transfers of Shares Only Through DTC.** The shares are only transferable through the book-entry system of DTC. Limited partners who are not DTC Participants may transfer their shares through DTC by instructing the DTC Participant holding their shares (or by instructing the Indirect Participant or other entity through which their shares are held) to transfer the shares. Transfers are made in accordance with standard securities industry practice.

Transfers of interests in shares with DTC are made in accordance with the usual rules and operating procedures of DTC and the nature of the transfer. DTC has established procedures to facilitate transfers among the participants and/or accountholders of DTC. Because DTC can only act on behalf of DTC Participants, who in turn act on behalf of Indirect Participants, the ability of a person or entity having an interest in a global certificate to pledge such interest to persons or entities that do not participate in DTC, or otherwise take actions in respect of such interest, may be affected by the lack of a certificate or other definitive document representing such interest.

DTC has advised USO that it will take any action permitted to be taken by a shareholder (including, without limitation, the presentation of a global certificate for exchange) only at the direction of one or more DTC Participants in whose account with DTC interests in global certificates are credited and only in respect of such portion of the aggregate principal amount of the global certificate as to which such DTC Participant or Participants has or have given such direction.

**Transfer/Application Requirements.** All purchasers of USO's shares, and potentially any purchasers of shares in the future, who wish to become limited partners or other record holders and receive cash distributions, if any, or have certain other rights, must deliver an executed transfer application in which the purchaser or transferee must certify that, among other things, he, she or it agrees to be bound by USO's LP Agreement and is eligible to purchase USO's securities. Each purchaser of shares offered by this prospectus must execute a transfer application and certification. The obligation to provide the form of transfer application will be imposed on the seller of shares or, if a purchase of shares is made through an exchange, the form may be obtained directly through USO. Further, USCF may request each record holder to furnish certain information, including that record holder's nationality, citizenship or other related status. A record holder is a shareholder that is, or has applied to be, a limited partner. An investor who is not a U.S. resident may not be eligible to become a record holder or one of USO's limited partners if that investor's ownership would subject USO to the risk of cancellation or forfeiture of any of USO's assets under any federal, state or local law or regulation. If the record holder fails to furnish the information or if USCF determines, on the basis of the information furnished by the holder in response to the request, that such holder is not qualified to become one of USO's limited partners, USCF may be substituted as a holder for the record holder, who will then be treated as a non-citizen assignee, and USO will have the right to redeem those securities held by the record holder.

A transferee's broker, agent or nominee may complete, execute and deliver a transfer application and certification. USO may, at its discretion, treat the nominee holder of a share as the absolute owner. In that case, the beneficial holder's rights are limited solely to those that it has against the nominee holder as a result of any agreement between the beneficial owner and the nominee holder.

59

A person purchasing USO's existing shares, who does not execute a transfer application and certify that the purchaser is eligible to purchase those securities acquires no rights in those securities other than the right to resell those securities. Whether or not a transfer application is received or the consent of USCF obtained, our shares are securities and are transferable according to the laws governing transfers of securities.

Any transfer of shares will not be recorded by the transfer agent or recognized by USCF unless a completed transfer application is delivered to USCF or the Administrator. When acquiring shares, the transferee of such shares that completes a transfer application will:

- be an assignee until admitted as a substituted limited partner upon the consent and sole discretion of USCF and the recording of the assignment on the books and records of the partnership;

- automatically request admission as a substituted limited partner;

- agree to be bound by the terms and conditions of, and execute, our LP Agreement;

- represent that such transferee has the capacity and authority to enter into our LP Agreement;

- grant powers of attorney to USCF and any liquidator of us; and

- make the consents and waivers contained in our LP Agreement.

An assignee will become a limited partner in respect of the transferred shares upon the consent of USCF and the recordation of the name of the assignee on our books and records. Such consent may be withheld in the sole discretion of USCF.

If consent of USCF is withheld such transferee shall be an assignee. An assignee shall have an interest in the partnership equivalent to that of a limited partner with respect to allocations and distributions, including, without limitation, liquidating distributions, of the partnership. With respect to voting rights attributable to shares that are held by assignees, USCF shall be deemed to be the limited partner with respect thereto and shall, in exercising the voting rights in respect of such shares on any matter, vote such shares at the written direction of the assignee who is the record holder of such shares. If no such written direction is received, such shares will not be voted. An assignee shall have no other rights of a limited partner.

Until a share has been transferred on our books, we and the transfer agent may treat the record holder of the share as the absolute owner for all purposes, except as otherwise required by law or stock exchange regulations.

**What is the Plan of Distribution?**

*Buying and Selling Shares*

Most investors buy and sell shares of USO in secondary market transactions through brokers. Shares trade on the NYSE Arca under the ticker symbol "USO." Shares are bought and sold throughout the trading day like other publicly traded securities. When buying or selling shares through a broker, most investors incur customary brokerage commissions and charges. Investors are encouraged to review the terms of their brokerage account for details on applicable charges.

*Marketing Agent and Authorized Participants*

The offering of USO's shares is a best efforts offering. USO continuously offers Creation Baskets consisting of 100,000 shares through the Marketing Agent, to Authorized Participants. All Authorized Participants pay a $1,000 fee for each order to create or redeem one or more Creation Baskets or Redemption Baskets. The Marketing Agent receives, for its services as marketing agent to USO, $425,000 per annum plus an incentive fee of 0.0% on USO's assets from $0-500 million; 0.04% on USO's assets from $500 million-$4 billion; and 0.03% on USO's assets in excess of $4 billion provided, however, that in no event may the aggregate compensation paid to the Marketing Agent and any affiliate of USCF for distribution-related services in connection with this offering of shares exceed ten percent (10%) of the gross proceeds of this offering. The activities of the Marketing Agent may result in its being deemed a participant in a distribution in a manner that would render it a statutory underwriter and subject it to the prospectus delivery and liability provisions of the 1933 Act.

60

The offering of baskets is being made in compliance with Conduct Rule 2310 of FINRA. Accordingly, Authorized Participants will not make any sales to any account over which they have discretionary authority without the prior written approval of a purchaser of shares.

The per share price of shares offered in Creation Baskets on any subsequent day will be the total NAV of USO calculated shortly after the close of the core trading session on the NYSE Arca on that day divided by the number of issued and outstanding shares. An Authorized Participant is not required to sell any specific number or dollar amount of shares.

By executing an Authorized Participant Agreement, an Authorized Participant becomes part of the group of parties eligible to purchase baskets from, and put baskets for redemption to, USO. An Authorized Participant is under no obligation to create or redeem baskets, and an Authorized Participant is under no obligation to offer to the public shares of any baskets it does create.

As of December 31, 2019, USO had the following Authorized Participants: ABN Amro, BNP Paribas Securities Corp., Citadel Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities USA LLC, Deutsche Bank Securities Inc., Goldman Sachs & Company, JP Morgan Securities Inc., Merrill Lynch Professional Clearing Corp., Morgan Stanley & Company Inc., Nomura Securities International Inc., RBC Capital Markets LLC, SG Americas Securities LLC, UBS Securities LLC, and Virtu Financial BD LLC.

Because new shares can be created and issued on an ongoing basis, at any point during the life of USO, a "distribution", as such term is used in the 1933 Act, will be occurring. Authorized Participants, other broker-dealers and other persons are cautioned that some of their activities may result in their being deemed participants in a distribution in a manner that would render them statutory underwriters and subject them to the prospectus delivery and liability provisions of the 1933 Act. For example, the Initial Authorized Participant was a statutory underwriter with respect to its initial purchase of Creation Baskets. In addition, any purchaser who purchases shares with a view towards distribution of such shares may be deemed to be a statutory underwriter. Authorized Participants will comply with the prospectus-delivery requirements in connection with the sale of shares to customers. For example, an Authorized Participant, other broker-dealer firm or its client will be deemed a statutory underwriter if it purchases a basket from USO, breaks the basket down into the constituent shares and sells the shares to its customers; or if it chooses to couple the creation of a supply of new shares with an active selling effort involving solicitation of secondary market demand for the shares. Authorized Participants may also engage in secondary market transactions in shares that would not be deemed "underwriting". For example, an Authorized Participant may act in the capacity of a broker or dealer with respect to shares that were previously distributed by other Authorized Participants. A determination of whether a particular market participant is an underwriter must take into account all the facts and circumstances pertaining to the activities of the broker-dealer or its client in the particular case, and the examples mentioned above should not be considered a complete description of all the activities that would lead to designation as an underwriter and subject them to the prospectus-delivery and liability provisions of the 1933 Act.

Dealers who are neither Authorized Participants nor "underwriters" but are nonetheless participating in a distribution (as contrasted to ordinary secondary trading transactions), and thus dealing with shares that are part of an "unsold allotment" within the meaning of Section 4(a)(3)(C) of the 1933 Act, would be unable to take advantage of the prospectus-delivery exemption provided by Section 4(a)(3) of the 1933 Act.

USCF may qualify the shares in states selected by USCF and intends that sales be made through broker-dealers who are members of FINRA. Investors intending to create or redeem baskets through Authorized Participants in transactions not involving a broker-dealer registered in such investor's state of domicile or residence should consult their legal advisor regarding applicable broker-dealer or securities regulatory requirements under the state securities laws prior to such creation or redemption.

While the Authorized Participants may be indemnified by USCF, they will not be entitled to receive a discount or commission from USO for their purchases of Creation Baskets.

61

**Calculating Per Share NAV**

USO's per share NAV is calculated by:

• Taking the current market value of its total assets;

• Subtracting any liabilities; and

• Dividing that total by the total number of outstanding shares.

The Administrator calculates the per share NAV of USO once each NYSE Arca trading day. The per share NAV for a normal trading day is released after 4:00 p.m. New York time. Trading during the core trading session on the NYSE Arca typically closes at 4:00 p.m. New York time. The Administrator uses the NYMEX closing price (determined at the earlier of the close of the NYMEX or 2:30 p.m. New York time) for the Oil Futures Contracts traded on the NYMEX, but calculates or determines the value of all other USO investments (including Oil Futures Contracts not traded on the NYMEX, Other Oil-Related Investments and Treasuries) using market quotations, if available, or other information customarily used to determine the fair value of such investments as of the earlier of the close of the NYSE Arca or 4:00 p.m. New York time, in accordance with the current Administrative Agency Agreement among the Administrator, USO and USCF. "Other information" customarily used in determining fair value includes information consisting of market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other market data in the relevant market; or information of the types described above from internal sources if that information is of the same type used by USO in the regular course of its business for the valuation of similar transactions. The information may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilized. Third parties supplying quotations or market data may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

In addition, in order to provide updated information relating to USO for use by investors and market professionals, the NYSE Arca calculates and disseminates throughout the core trading session on each trading day an updated indicative fund value. The indicative fund value is calculated by using the prior day's closing per share NAV of USO as a base and updating that value throughout the trading day to reflect changes in the most recently reported trade price for the active light, sweet Oil Futures Contract on the NYMEX. The prices reported for those Oil Futures Contract months are adjusted based on the prior day's spread differential between settlement values for the relevant contract and the spot month contract. In the event that the spot month contract is also the Benchmark Oil Futures Contract, the last sale price for that contract is not adjusted. The indicative fund value share basis disseminated during NYSE Arca core trading session hours should not be viewed as an actual real time update of the per share NAV, because the per share NAV is calculated only once at the end of each trading day based upon the relevant end of day values of USO's investments.

The indicative fund value is disseminated on a per share basis every 15 seconds during regular NYSE Arca core trading session hours of 9:30 a.m. New York time to 4:00 p.m. New York time. The normal trading hours of the NYMEX are 9:00 a.m. New York time to 2:30 p.m. New York time. This means that there is a gap in time at the beginning and the end of each day during which USO's shares are traded on the NYSE Arca, but real-time NYMEX trading prices for Oil Futures Contracts traded on the NYMEX are not available. During such gaps in time, the indicative fund value will be calculated based on the end of day price of such Oil Futures Contracts from the NYMEX's immediately preceding trading session. In addition, other Oil Futures Contracts, Other Oil-Related Investments and Treasuries held by USO will be valued by the Administrator, using rates and points received from client-approved third-party vendors (such as Reuters and WM Company) and advisor quotes. These investments will not be included in the indicative fund value.

The NYSE Arca disseminates the indicative fund value through the facilities of CTA/CQ High Speed Lines. In addition, the indicative fund value is published on the NYSE Arca's website and is available through on-line information services such as Bloomberg and Reuters.

Dissemination of the indicative fund value provides additional information that is not otherwise available to the public and is useful to investors and market professionals in connection with the trading of USO shares on the NYSE Arca. Investors and market professionals are able throughout the trading day to compare the market price of USO and the indicative fund value. If the market price of USO shares diverges significantly from the indicative fund value, market professionals will have an incentive to execute arbitrage trades. For example, if USO appears to be trading at a discount compared to the indicative fund value, a market professional could buy USO shares on the NYSE Arca and sell short Oil Futures Contracts. Such arbitrage trades can tighten the tracking between the market price of USO and the indicative fund value and thus can be beneficial to all market participants.

62

USO reserves the right to adjust the Share price of USO in the future to maintain convenient trading ranges for investors. Any adjustments would be accomplished through stock splits or reverse stock splits. Such splits would decrease (in the case of a split) or increase (in the case of a reverse split) the proportionate net asset value per Share, but would have no effect on the net assets of the Fund or the proportionate voting rights of shareholders or limited partners.

**Creation and Redemption of Shares**

USO creates and redeems shares from time to time, but only in one or more Creation Baskets or Redemption Baskets. The creation and redemption of baskets are only made in exchange for delivery to USO or the distribution by USO of the amount of Treasuries and any cash represented by the baskets being created or redeemed, the amount of which is based on the combined NAV of the number of shares included in the baskets being created or redeemed determined as of 4:00 p.m. New York time on the day the order to create or redeem baskets is properly received.

Authorized Participants are the only persons that may place orders to create and redeem baskets. Authorized Participants must be (1) registered broker-dealers or other securities market participants, such as banks and other financial institutions, that are not required to register as broker-dealers to engage in securities transactions described below, and (2) DTC Participants. To become an Authorized Participant, a person must enter into an Authorized Participant Agreement with USCF. The Authorized Participant Agreement provides the procedures for the creation and redemption of baskets and for the delivery of the Treasuries and any cash required for such creation and redemptions. The Authorized Participant Agreement and the related procedures attached thereto may be amended by USO, without the consent of any limited partner or shareholder or Authorized Participant. Authorized Participants will pay a transaction fee of $1,000 to USO for each order they place to create or redeem one or more baskets. Authorized Participants who make deposits with USO in exchange for baskets receive no fees, commissions or other form of compensation or inducement of any kind from either USO or USCF, and no such person will have any obligation or responsibility to USCF or USO to effect any sale or resale of shares. As of December 31, 2019, 15 Authorized Participants had entered into agreements with USCF on behalf of USO. During the year ended December 31, 2019, USO issued 2,731 Creation Baskets and redeemed 3,347 Redemption Baskets.

Certain Authorized Participants are expected to be capable of participating directly in the physical crude oil market and the crude oil futures market. In some cases, Authorized Participants or their affiliates may from time to time buy or sell crude oil or Oil Interests and may profit in these instances. USCF believes that the size and operation of the crude oil market make it unlikely that an Authorized Participant's direct activities in the crude oil or securities markets will significantly affect the price of crude oil, Oil Interests or the price of the shares.

Each Authorized Participant is required to be registered as a broker-dealer under the Exchange Act and is a member in good standing with FINRA, or exempt from being or otherwise not required to be registered as a broker-dealer or a member of FINRA, and qualified to act as a broker or dealer in the states or other jurisdictions where the nature of its business so requires. Certain Authorized Participants may also be regulated under federal and state banking laws and regulations. Each Authorized Participant has its own set of rules and procedures, internal controls and information barriers as it determines is appropriate in light of its own regulatory regime.

Under the Authorized Participant Agreement, USCF, and USO under limited circumstances, have agreed to indemnify the Authorized Participants against certain liabilities, including liabilities under the 1933 Act, and to contribute to the payments the Authorized Participants may be required to make in respect of those liabilities.

The following description of the procedures for the creation and redemption of baskets is only a summary and an investor should refer to the relevant provisions of the LP Agreement and the form of Authorized Participant Agreement for more detail, each of which is incorporated by reference into this prospectus.

63

*Creation Procedures*

On any business day, an Authorized Participant may place an order with the Marketing Agent to create one or more baskets. For purposes of processing purchase and redemption orders, a "business day" means any day other than a day when any of the NYSE Arca, the NYMEX or the New York Stock Exchange is closed for regular trading. Purchase orders must be placed by 12:00 p.m. New York time or the close of regular trading on the NYSE Arca, whichever is earlier. The day on which the Marketing Agent receives a valid purchase order is referred to as the purchase order date.

By placing a purchase order, an Authorized Participant agrees to deposit Treasuries, cash or a combination of Treasuries and cash, as described below. Prior to the delivery of baskets for a purchase order, the Authorized Participant must also have wired to the Custodian the non-refundable transaction fee due for the purchase order. Authorized Participants may not withdraw a creation request, except as otherwise set forth in the procedures in the Authorized Participant Agreement.

The manner by which creations are made is dictated by the terms of the Authorized Participant Agreement. By placing a purchase order, an Authorized Participant agrees to (1) deposit Treasuries, cash, or a combination of Treasuries and cash with the Custodian of the fund, and (2) if required by USCF in its sole discretion, enter into or arrange for a block trade, an exchange for physical or exchange for swap, or any other OTC energy transaction (through itself or a designated acceptable broker) with the fund for the purchase of a number and type of futures contracts at the closing settlement price for such contracts on the purchase order date. If an Authorized Participant fails to consummate (1) and (2), the order shall be cancelled. The number and types of contracts specified shall be determined by USCF, in its sole discretion, to meet USO's investment objective and shall be purchased as a result of the Authorized Participant's purchase of shares.

*Determination of Required Deposits*

The total deposit required to create each basket ("Creation Basket Deposit") is the amount of Treasuries and/or cash that is in the same proportion to the total assets of USO (net of estimated accrued but unpaid fees, expenses and other liabilities) on the purchase order date as the number of shares to be created under the purchase order is in proportion to the total number of shares outstanding on the purchase order date. USCF determines, directly in its sole discretion or in consultation with the Administrator, the requirements for Treasuries and the amount of cash, including the maximum permitted remaining maturity of a Treasury and proportions of Treasury and cash that may be included in deposits to create baskets. The Marketing Agent will publish such requirements at the beginning of each business day. The amount of cash deposit required is the difference between the aggregate market value of the Treasuries required to be included in a Creation Basket Deposit as of 4:00 p.m. New York time on the date the order to purchase is properly received and the total required deposit.

*Delivery of Required Deposits*

An Authorized Participant who places a purchase order is responsible for transferring to USO's account with the Custodian the required amount of Treasuries and cash by the end of the second business day following the purchase order date. Upon receipt of the deposit amount, the Administrator directs DTC to credit the number of baskets ordered to the Authorized Participant's DTC account on the second business day following the purchase order date. The expense and risk of delivery and ownership of Treasuries until such Treasuries have been received by the Custodian on behalf of USO shall be borne solely by the Authorized Participant.

Because orders to purchase baskets must be placed by 12:00 p.m., New York time, but the total payment required to create a basket during the continuous offering period will not be determined until after 4:00 p.m., New York time, on the date the purchase order is received, Authorized Participants will not know the total amount of the payment required to create a basket at the time they submit an irrevocable purchase order for the basket. USO's NAV and the total amount of the payment required to create a basket could rise or fall substantially between the time an irrevocable purchase order is submitted and the time the amount of the purchase price in respect thereof is determined.

64

*Rejection of Purchase Orders*

USCF acting by itself or through the Marketing Agent shall have the absolute right but no obligation to reject a purchase order or a Creation Basket Deposit if:

- it determines that the investment alternative available to USO at that time will not enable it to meet its investment objective;

- it determines that the purchase order or the Creation Basket Deposit is not in proper form;

- it believes that the purchase order or the Creation Basket Deposit would have adverse tax consequences to USO, the limited partners or its shareholders;

- the acceptance or receipt of the Creation Basket Deposit would, in the opinion of counsel to USCF, be unlawful; or

- circumstances outside the control of USCF, Marketing Agent or Custodian make it, for all practical purposes, not feasible to process creations of baskets.

None of USCF, the Marketing Agent or the Custodian will be liable for the rejection of any purchase order or Creation Basket Deposit.

*Redemption Procedures*

The procedures by which an Authorized Participant can redeem one or more baskets mirror the procedures for the creation of baskets. On any business day, an Authorized Participant may place an order with the Marketing Agent to redeem one or more baskets. Redemption orders must be placed by 12:00 p.m. New York time or the close of regular trading on the NYSE Arca, whichever is earlier. A redemption order so received will be effective on the date it is received in satisfactory form by the Marketing Agent ("Redemption Order Date"). The redemption procedures allow Authorized Participants to redeem baskets and do not entitle an individual shareholder to redeem any shares in an amount less than a Redemption Basket, or to redeem baskets other than through an Authorized Participant.

By placing a redemption order, an Authorized Participant agrees to deliver the baskets to be redeemed through DTC's book-entry system to USO, as described below. Prior to the delivery of the redemption distribution for a redemption order, the Authorized Participant must also have wired to USO's account at the Custodian the non-refundable transaction fee due for the redemption order. An Authorized Participant may not withdraw a redemption order, except as otherwise set forth in the procedures in the Authorized Participant Agreement.

The manner by which redemptions are made is dictated by the terms of the Authorized Participant Agreement. By placing a redemption order, an Authorized Participant agrees to (1) deliver the Redemption Basket to be redeemed through DTC's book-entry system to USO's account with the Custodian not later than 3:00 p.m. New York time on the second business day following the effective date of the redemption order ("Redemption Distribution Date"), and (2) if required by USCF in its sole discretion, enter into or arrange for a block trade, an exchange for physical or exchange for swap, or any other OTC energy transaction (through itself or a designated acceptable broker) with the fund for the sale of a number and type of futures contracts at the closing settlement price for such contracts on the Redemption Order Date. If an Authorized Participant fails to consummate (1) and (2) above, the order shall be cancelled. The number and type of contracts specified shall be determined by USCF, in its sole discretion, to meet USO's investment objective and shall be sold as a result of the Authorized Participant's sale of shares.

*Determination of Redemption Distribution*

The redemption distribution from USO consists of a transfer to the redeeming Authorized Participant of an amount of Treasuries and/or cash that is in the same proportion to the total assets of USO (net of estimated accrued but unpaid fees, expenses and other liabilities) on the date the order to redeem is properly received as the number of shares to be redeemed under the redemption order is in proportion to the total number of shares outstanding on the date the order is received. USCF, directly or in consultation with the Administrator, determines the requirements for Treasuries and the amounts of cash, including the maximum permitted remaining maturity of a Treasury, and the proportions of Treasuries and cash that may be included in distributions to redeem baskets. The Marketing Agent will publish an estimate of the redemption distribution per basket as of the beginning of each business day.

65

*Delivery of Redemption Distribution*

The redemption distribution due from USO will be delivered to the Authorized Participant by 3:00 p.m. New York time on the second business day following the redemption order date if, by 3:00 p.m. New York time on such second business day, USO's DTC account has been credited with the baskets to be redeemed. If USO's DTC account has not been credited with all of the baskets to be redeemed by such time, the redemption distribution will be delivered to the extent of whole baskets received. Any remainder of the redemption distribution will be delivered on the next business day to the extent of remaining whole baskets received if USO receives the fee applicable to the extension of the redemption distribution date which USCF may, from time to time, determine and the remaining baskets to be redeemed are credited to USO's DTC account by 3:00 p.m. New York time on such next business day. Any further outstanding amount of the redemption order shall be cancelled. Pursuant to information from USCF, the Custodian will also be authorized to deliver the redemption distribution notwithstanding that the baskets to be redeemed are not credited to USO's DTC account by 3:00 p.m. New York time on the second business day following the redemption order date if the Authorized Participant has collateralized its obligation to deliver the baskets through DTC's book entry-system on such terms as USCF may from time to time determine.

*Suspension or Rejection of Redemption Orders*

USCF may, in its discretion, suspend the right of redemption, or postpone the redemption settlement date, (1) for any period during which the NYSE Arca or the NYMEX is closed other than customary weekend or holiday closings, or trading on the NYSE Arca or the NYMEX is suspended or restricted, (2) for any period during which an emergency exists as a result of which delivery, disposal or evaluation of Treasuries is not reasonably practicable, or (3) for such other period as USCF determines to be necessary for the protection of the limited partners or shareholders. For example, USCF may determine that it is necessary to suspend redemptions to allow for the orderly liquidation of USO's assets at an appropriate value to fund a redemption. If USCF has difficulty liquidating its positions, *e.g.*, because of a market disruption event in the futures markets, a suspension of trading by the exchange where the futures contracts are listed or an unanticipated delay in the liquidation of a position in an over the counter contract, it may be appropriate to suspend redemptions until such time as such circumstances are rectified. None of USCF, the Marketing Agent, the Administrator, or the Custodian will be liable to any person or in any way for any loss or damages that may result from any such suspension or postponement.

Redemption orders must be made in whole baskets. USCF will reject a redemption order if the order is not in proper form as described in the Authorized Participant Agreement or if the fulfillment of the order, in the opinion of its counsel, might be unlawful. USCF may also reject a redemption order if the number of shares being redeemed would reduce the remaining outstanding shares to 100,000 shares (*i.e.*, one basket) or less, unless USCF has reason to believe that the placer of the redemption order does in fact possess all the outstanding shares and can deliver them.

*Creation and Redemption Transaction Fee*

To compensate USO for its expenses in connection with the creation and redemption of baskets, an Authorized Participant is required to pay a transaction fee to USO of $1,000 per order to create or redeem baskets, regardless of the number of baskets in such order. An order may include multiple baskets. The transaction fee may be reduced, increased or otherwise changed by USCF. USCF shall notify DTC of any change in the transaction fee and will not implement any increase in the fee for the redemption of baskets until thirty (30) days after the date of the notice.

*Tax Responsibility*

Authorized Participants are responsible for any transfer tax, sales or use tax, stamp tax, recording tax, value added tax or similar tax or governmental charge applicable to the creation or redemption of baskets, regardless of whether or not such tax or charge is imposed directly on the Authorized Participant, and agree to indemnify USCF and USO if they are required by law to pay any such tax, together with any applicable penalties, additions to tax and interest thereon.

66

*Secondary Market Transactions*

As noted, USO creates and redeems shares from time to time, but only in one or more Creation Baskets or Redemption Baskets. The creation and redemption of baskets are only made in exchange for delivery to USO or the distribution by USO of the amount of Treasuries and cash represented by the baskets being created or redeemed, the amount of which will be based on the aggregate NAV of the number of shares included in the baskets being created or redeemed determined on the day the order to create or redeem baskets is properly received.

As discussed above, Authorized Participants are the only persons that may place orders to create and redeem baskets. Authorized Participants must be registered broker-dealers or other securities market participants, such as banks and other financial institutions that are not required to register as broker-dealers to engage in securities transactions. An Authorized Participant is under no obligation to create or redeem baskets, and an Authorized Participant is under no obligation to offer to the public shares of any baskets it does create. Authorized Participants that do offer to the public shares from the baskets they create will do so at per-share offering prices that are expected to reflect, among other factors, the trading price of the shares on the NYSE Arca, the NAV of USO at the time the Authorized Participant purchased the Creation Baskets and the NAV of the shares at the time of the offer of the shares to the public, the supply of and demand for shares at the time of sale, and the liquidity of the Oil Futures Contract market and the market for Other Oil-Related Investments. The prices of shares offered by Authorized Participants are expected to fall between USO's NAV and the trading price of the shares on the NYSE Arca at the time of sale. Shares initially comprising the same basket but offered by Authorized Participants to the public at different times may have different offering prices. An order for one or more baskets may be placed by an Authorized Participant on behalf of multiple clients. Authorized Participants who make deposits with USO in exchange for baskets receive no fees, commissions or other forms of compensation or inducement of any kind from either USO or USCF, and no such person has any obligation or responsibility to USCF or USO to effect any sale or resale of shares. Shares trade in the secondary market on the NYSE Arca. Shares may trade in the secondary market at prices that are lower or higher relative to their NAV per share. The amount of the discount or premium in the trading price relative to the NAV per share may be influenced by various factors, including the number of investors who seek to purchase or sell shares in the secondary market and the liquidity of the Oil Futures Contracts market and the market for Other Oil-Related Investments. While the shares trade during the core trading session on the NYSE Arca until 4:00 p.m. New York time, liquidity in the market for Oil Interests may be reduced after the close of the NYMEX at 2:30 p.m. New York time. As a result, during this time, trading spreads, and the resulting premium or discount, on the shares may widen.

## Use of Proceeds

USCF causes USO to transfer the proceeds from the sale of Creation Baskets to the Custodian or other custodian for trading activities. USCF will invest USO's assets in Oil Interests and investments in Treasuries, cash and/or cash equivalents. When USO purchases a Futures Contract and certain exchange-traded Other Oil-Related Investments, USO is required to deposit typically 5% to 30% with the selling FCM on behalf of the exchange a portion of the value of the contract or other interest as security to ensure payment for the obligation under Oil Interests at maturity. This deposit is known as initial margin. Counterparties in transactions in OTC contracts will generally impose similar collateral requirements on USO. USCF will invest the assets that remain after margin and collateral are posted in Treasuries, cash and/or cash equivalents Subject to these margin and collateral requirements, USCF has sole authority to determine the percentage of assets that are:

- held on deposit with the FCM or other custodian,

- used for other investments, and

- held in bank accounts to pay current obligations and as reserves.

67

Approximately 5% to 30% of USO's assets have normally been committed as margin for commodity futures contracts. However, from time to time, the percentage of assets committed as margin may be substantially more, or less, than such range. Ongoing margin and collateral payments will generally be required for both exchange-traded and OTC contracts based on changes in the value of the Oil Interests. Furthermore, ongoing collateral requirements with respect to OTC contracts are negotiated by the parties, and may be affected by overall market volatility, volatility of the underlying commodity or index, the ability of the counterparty to hedge its exposure under the Oil Interests, and each party's creditworthiness. In light of the differing requirements for initial payments under exchange-traded and OTC contracts and the fluctuating nature of ongoing margin and collateral payments, it is not possible to estimate what portion of USO's assets will be posted as margin or collateral at any given time. The Treasuries, cash and cash equivalents held by USO will constitute reserves that will be available to meet ongoing margin and collateral requirements. All interest income will be used for USO's benefit. USCF invests the balance of USO's assets not invested in Oil Interests or held in margin as reserves to be available for changes in margin. All interest income is used for USO's benefit.

An FCM, counterparty, government agency or commodity exchange could increase margin or collateral requirements applicable to USO to hold trading positions at any time. Moreover, margin is merely a security deposit and has no bearing on the profit or loss potential for any positions held.

The assets of USO posted as margin for Oil Futures Contracts are held in segregated accounts pursuant to the CEA and CFTC regulations.

If USO enters into a swap agreement, USO must post both collateral and independent amounts to its swap counterparty(ies). The amount of collateral USO posts changes according to the amounts owed by USO to its counterparty on a given swap transaction, while independent amounts are fixed amounts posted by USO at the start of a swap transaction. Collateral and independent amounts posted to swap counterparties will be held by a third-party custodian.

## INFORMATION YOU SHOULD KNOW

This prospectus contains information you should consider when making an investment decision about the shares. You may rely on the information contained in this prospectus. Neither USO nor USCF has authorized any person to provide you with different information and, if anyone provides you with different or inconsistent information, you should not rely on it. This prospectus is not an offer to sell the shares in any jurisdiction where the offer or sale of the shares is not permitted.

The information contained in this prospectus was obtained from us and other sources believed by us to be reliable.

You should rely only on the information contained in this prospectus or any applicable prospectus supplement or any information incorporated by reference to this prospectus. We have not authorized anyone to provide you with any information that is different. If you receive any unauthorized information, you must not rely on it. You should disregard anything we said in an earlier document that is inconsistent with what is included in this prospectus or any applicable prospectus supplement or any information incorporated by reference to this prospectus. Where the context requires, when we refer to this "prospectus," we are referring to this prospectus and (if applicable) the relevant prospectus supplement.

You should not assume that the information in this prospectus or any applicable prospectus supplement is current as of any date other than the date on the front page of this prospectus or the date on the front page of any applicable prospectus supplement.

We include cross references in this prospectus to captions in these materials where you can find further related discussions. The table of contents tells you where to find these captions.

68

**SUMMARY OF PROMOTIONAL AND SALES MATERIAL**

USO has used the following sales material it has prepared:

•   USO's website, *www.uscfinvestments.com;*

•   Press release dated the effective date of USO's initial registration statement; and

•   USO fact sheet available on USO's website.

The materials described above are not a part of this prospectus or the registration statement of which this prospectus is a part and have been submitted to the staff of the SEC for their review pursuant to Industry Guide 5. This section is provided here as a convenience to you.

**INTELLECTUAL PROPERTY**

USCF owns trademark registrations for UNITED STATES OIL FUND (U.S. Reg. No. 3240929) for "Investment services in the field of oil futures contracts and other oil interests," in use since April 30, 2006, USO UNITED STATES OIL FUND, LP (and Flame Design) (U.S. Reg. No. 4440928) for "Financial investment services in the field of oil futures contracts, cash-settled options on oil futures contracts, forward contracts for oil, over-the-counter transactions based on the price of oil, and indices based on the foregoing," in use since September 30, 2012, and THE ORIGINAL OIL ETF, (U.S. Reg. No. 4472747) for "Fund investment services in the field of oil futures contracts, cash-settled options on oil futures contracts, forward contracts for oil, over-the-counter transactions based on the price of oil, and indices based on the foregoing," in use since September 23, 2013. USCF relies upon these trademarks through which it markets its services and strives to build and maintain brand recognition in the market and among current and potential investors. So long as USCF continues to use these trademarks to identify its services, without challenge from any third party, and properly maintains and renews the trademark registrations under applicable laws, rules and regulations, it will continue to have indefinite protection for these trademarks under current laws, rules and regulations.

USCF owns trademark registrations for USCF (and Design) (U.S. Reg. No. 5127374) for "Fund investment services," in use since April 10, 2016, USCF (U.S. Reg No. 5040755) for "Fund investment services," in use since June 24, 2008, , and INVEST IN WHAT'S REAL (U.S. Reg. No. 5450808) for "Fund investment services," in use since April 2016 USCF relies upon these trademarks and service mark through which it markets its services and strives to build and maintain brand recognition in the market and among current and potential investors. So long as USCF continues to use these trademarks to identify its services, without challenge from any third party, and properly maintains and renews the trademark registrations under applicable laws, rules and regulations; it will continue to have indefinite protection for these trademarks under current laws, rules and regulations. USCF has been granted two patents Nos. 7,739,186 and 8,019,675, for systems and methods for an exchange traded fund (ETF) that tracks the price of one or more commodities.

**WHERE YOU CAN FIND MORE INFORMATION**

USCF has filed on behalf of USO a registration statement on Form S-3 with the SEC under the 1933 Act. This prospectus does not contain all of the information set forth in the registration statement (including the exhibits to the registration statement), parts of which have been omitted in accordance with the rules and regulations of the SEC. For further information about USO or the shares, please refer to the registration statement, which you may access online at *www.sec.gov*. Information about USO and the shares can also be obtained from USO's website, http://*www.uscfinvestments.com*. USO's website address is only provided here as a convenience to you and the information contained on or connected to the website is not part of this prospectus or the registration statement of which this prospectus is part. USO is subject to the informational requirements of the Exchange Act and USCF and USO will each, on behalf of USO, file certain reports and other information with the SEC under the Exchange Act. USCF will file an updated prospectus annually for USO pursuant to the 1933 Act. The reports and other information can be accessed online at *www.sec.gov*.

69

Case 1:20-cv-04740-PGG   Document 144-72   Filed 04/29/21   Page 75 of 79

**STATEMENT REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus includes "forward-looking statements" which generally relate to future events or future performance. In some cases, you can identify forward-looking statements by terminology such as "may," "will," "should," "expect," "plan," "anticipate," "believe," "estimate," "predict," "potential" or the negative of these terms or other comparable terminology. All statements (other than statements of historical fact) included in this prospectus and movements in the commodities markets and indexes that track such movements, USO's operations, USCF's plans and references to USO's future success and other similar matters, are forward-looking statements. These statements are only predictions. Actual events or results may differ materially. These statements are based upon certain assumptions and analyses USCF has made based on its perception of historical trends, current conditions and expected future developments, as well as other factors appropriate in the circumstances. Whether or not actual results and developments will conform to USCF's expectations and predictions, however, is subject to a number of risks and uncertainties, including the special considerations discussed in this prospectus, general economic, market and business conditions, changes in laws or regulations, including those concerning taxes, made by governmental authorities or regulatory bodies, and other world economic and political developments. See "Risk Factors Involved with an Investment in USO" Consequently, all the forward-looking statements made in this prospectus are qualified by these cautionary statements, and there can be no assurance that the events or developments that will or may occur in the future, including such matters as changes in inflation in the United States movements in the stock market, movements in the U.S. and foreign currencies, actual results or developments USCF anticipates will be realized or, even if substantially realized, that they will result in the expected consequences to, or have the expected effects on, USO's operations or the value of the shares.

**INCORPORATION BY REFERENCE OF CERTAIN INFORMATION**

We are a reporting company and file annual, quarterly and current reports and other information with the SEC. The rules of the SEC allow us to "incorporate by reference" information that we file with them, which means that we can disclose important information to you by referring you to those documents. The information incorporated by reference is an important part of this prospectus, and information that we file later with the SEC will automatically update and supersede this information. We incorporate by reference the documents listed below and any future filings we will make with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934 after the date of this Registration Statement on Form S-3 and prior to effectiveness of the registration statement, and after the date of this prospectus but prior to completion of our offering.

- Annual Report on Form 10-K for the year ended December 31, 2019 filed on February 21, 2020.

We will provide to each person to whom a prospectus is delivered, including any beneficial owner, a copy of these filings at no cost, upon written or oral request at the following address or telephone number:

United States Oil Fund, LP
Attention: Katie Rooney
1850 Mt. Diablo Boulevard, Suite 640
Walnut Creek, California 94596
510.522.9600

**Privacy Policy**

USO and USCF may collect or have access to certain nonpublic personal information about current and former investors. Nonpublic personal information may include information received from investors, such as an investor's name, social security number and address, as well as information received from brokerage firms about investor holdings and transactions in shares of USO.

USO and USCF do not disclose nonpublic personal information except as required by law or as described in their Privacy Policy. In general, USO and USCF restrict access to the nonpublic personal information they collect about investors to those of their and their affiliates' employees and service providers who need access to such information to provide products and services to investors.

USO and USCF maintain safeguards that comply with federal and applicable state law to protect investors' nonpublic personal information. These safeguards are reasonably designed to (1) ensure the security and confidentiality of investors' records and information, (2) protect against any anticipated threats or hazards to the security or integrity of investors' records and information, and (3) protect against unauthorized access to or use of investors' records or information that could result in substantial harm or inconvenience to any investor. Third-party service providers with whom USO and USCF share nonpublic personal information about investors must agree to follow appropriate standards of security and confidentiality, which includes safeguarding such nonpublic personal information physically, electronically and procedurally.

A copy of USO and USCF's current privacy policy is available at http://www.uscfinvestments.com.

70

Case 1:20-cv-04740-PGG   Document 144-2   Filed 04/29/21   Page 76 of 79

## APPENDIX A

### Glossary of Defined Terms

In this prospectus, each of the following terms have the meanings set forth after such term:

**1933 Act:** The Securities Act of 1933.

**1940 Act**: Investment Company Act of 1940.

**Adjusted K-1**: a statement to investors who owned beneficial interests in the shares in the year to which the adjusted allocations relate setting forth their proportionate shares of the adjustment.

**Administrator:** Brown Brothers Harriman & Co.

**Authorized Participant:** One that purchases or redeems Creation Baskets or Redemption Baskets, respectively, from or to USO.

**Backup Withholding**: U.S. federal income tax that is required to be withheld.

**BBH&Co.**: Brown Brothers Harriman & Co.

**Benchmark Oil Futures Contract:** The near month futures contract for light, sweet crude oil traded on the NYMEX unless the near month futures contract will expire within two weeks of the valuation day, in which case the Benchmark Oil Futures Contract is the next month futures contract for light, sweet crude oil traded on the NYMEX.

**BNO:** United States Brent Oil Fund, LP.

**Board**: USCF's board of directors.

**Business Day:** Any day other than a day when any of the NYSE Arca, the NYMEX or the New York Stock Exchange is closed for regular trading.

**CEA:** Commodity Exchange Act.

**CFTC:** Commodity Futures Trading Commission, an independent agency with the mandate to regulate commodity futures and options in the United States.

**Cleared Swap Contract:** A financial contract, whose value is designed to track the return on stocks, bonds, currencies, commodities, or some other benchmark, that is submitted to a central clearinghouse after it is either traded OTC or on an exchange or other trading platform.

**Code:** Internal Revenue Code.

**Commodity Pool:** An enterprise in which several individuals contribute funds in order to trade futures contracts or options on futures contracts collectively.

**Commodity Pool Operator or CPO:** Any person engaged in a business which is of the nature of an investment trust, syndicate, or similar enterprise, and who, in connection therewith, solicits, accepts, or receives from others, funds, securities, or property, either directly or through capital contributions, the sale of stock or other forms of securities, or otherwise, for the purpose of trading in any commodity for future delivery or commodity option on or subject to the rules of any contract market.

A-1

**Concierge**: Concierge Technologies, Inc., a company publicly traded under the ticker symbol "CNCG."

**CPER:** United States Copper Index Fund.

**Creation Basket:** A block of 100,000 shares used by USO to issue shares.

**Creation Basket Deposit**: the total deposit required to create each basket.

**Custodian:** Brown Brothers Harriman & Co.

**DCM**: designated contract market.

**DNO:** United States Short Oil Fund, LP.

**DTC:** The Depository Trust Company. DTC will act as the securities depository for the shares.

**DTC Participant:** An entity that has an account with DTC.

**DTEF:** A derivatives transaction execution facility.

**ECI**: income that is effectively connected with the conduct of a U.S. trade or business.

**ERISA**: Employee Retirement Income Security Act of 1974.

**Exchange Act:** The Securities Exchange Act of 1934.

**Exchange for Related Position (EFRP):** An off market transaction which involves the swapping (or exchanging) of an over-the-counter (OTC) position for a futures position. The OTC transaction must be for the same or similar quantity or amount of a specified commodity, or a substantially similar commodity or instrument. The OTC side of the EFRP can include swaps, swap options, or other instruments traded in the OTC market. In order that an EFRP transaction can take place, the OTC side and futures components must be "substantially similar" in terms of either value and or quantity. The net result is that the OTC position (and the inherent counterparty credit exposure) is transferred from the OTC market to the futures market. EFRPs can also work in reverse, where a futures position can be reversed and transferred to the OTC market.

**FDAP**: amounts that are fixed, determinable, annual and periodic income, such as interest, dividends and rent that are not connected with the operation of a U.S. trade or business.

**FCM**: Futures Commission Merchant.

**FFI**: foreign financial institution.

**FINRA:** Financial Industry Regulatory Authority, formerly the National Association of Securities Dealers.

**ICE Futures:** The leading electronic regulated futures and options exchange for global energy markets.

**IGA**: intergovernmental agreement.

**Indirect Participants:** Banks, brokers, dealers and trust companies that clear through or maintain a custodial relationship with a DTC Participant, either directly or indirectly.

**IRA**: individual retirement account.

**IRS**: U.S. Internal Revenue Service.

**ISDA**: International Swaps and Derivatives Association, Inc.

A-2

**Limited Liability Company (LLC):** A type of business ownership combining several features of corporation and partnership structures.

**LLC Agreement**: Sixth Amended and Restated Limited Liability Company Agreement of USCF, dated as of May 15, 2015 (as amended from time to time).

**LP Agreement:** The Seventh Amended and Restated Agreement of Limited Partnership effective as of December 15, 2017.

**Margin:** The amount of equity required for an investment in futures contracts.

**Management Directors**: The four management directors that are on USCF's board of directors.

**Marketing Agent:** ALPS Distributors, Inc.

**NAV:** Net asset value of USO.

**NFA:** National Futures Association.

**New York Mercantile Exchange (NYMEX):** The primary exchange on which futures contracts are traded in the U.S. USO expects to invest primarily in futures contracts, and particularly in futures contracts traded on the NYMEX. USO expressly disclaims any association with the Exchange or endorsement of USO by the Exchange and acknowledges that "NYMEX" and "New York Mercantile Exchange" are registered trademarks of such Exchange.

**NYSE Arca**: NYSE Arca stock exchange.

**Oil Futures Contracts:** Futures contracts for crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels that are traded on the NYMEX, ICE Futures or other U.S. and foreign exchanges.

**Oil Interests:** Futures Contracts and Other Oil-Related Investments.

**OPEC:** Organization of the Petroleum Exporting Countries.

**Option:** The right, but not the obligation, to buy or sell a futures contract or forward contract at a specified price on or before a specified date.

**Other Oil-Related Investments:** Other crude oil-related investments such as cash-settled options on Oil Futures Contracts, forward contracts for crude oil, and OTC transactions that are based on the price of crude oil, other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing.

**OTC Derivative:** A financial contract, whose value is designed to track the return on stocks, bonds, currencies, commodities, or some other benchmark, that is traded OTC or off organized exchanges.

**Position Limit Rules**: CFTC's proposed limits on speculative positions in certain physical commodity futures and option contracts and swaps that are economically equivalent to such contracts in the agriculture, energy and metals markets and rules addressing the circumstances under which market participants would be required to aggregate their positions with other persons under common ownership or control.

**Prudential Regulators:** The CFTC, the SEC and the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Farm Credit System and the Federal Housing Finance Agency, collectively.

**Redemption Basket:** A block of 100,000 shares used by USO to redeem shares.

A-3

**Redemption Order Date**: the date a redemption order is received in satisfactory form and approved by the Marketing Agent.

**Register**: the record of all Shareholders and holders of the shares in certificated form kept by the Administrator.

**Related Public Funds:** United States 12 Month Natural Gas Fund, LP ("UNL"); United States 12 Month Oil Fund, LP ("USL"); United States Brent Oil Fund, LP ("BNO"); United States Gasoline Fund, LP ("UGA"); United States Natural Gas Fund, LP ("UNG"); United States Copper Index Fund ("CPER"); United States Commodity Index Fund ("USCI").

**SEC:** Securities and Exchange Commission.

**SEF**: a swap execution facility.

**Secondary Market:** The stock exchanges and the OTC market. Securities are first issued as a primary offering to the public. When the securities are traded from that first holder to another, the issues trade in these secondary markets.

**Shareholders:** Holders of Shares.

**Shares:** Common shares representing fractional undivided beneficial interests in USO.

**Spot Contract:** A cash market transaction in which the buyer and seller agree to the immediate purchase and sale of a commodity, usually with a two-day settlement.

**Swap Contract:** Swap transactions generally involve contracts between two parties to exchange a stream of payments computed by reference to a notional amount and the price of the asset that is the subject of the swap. Some swap transactions are cleared through central counterparties. These transactions, known as cleared swaps, involve two counterparties first agreeing to the terms of a swap transaction, then submitting the transaction to a clearing house that acts as the central counterparty. Swap transactions that are not cleared through central counterparties are called "uncleared" or "over-the-counter" ("OTC") swaps.

**Tracking Error:** Possibility that the daily NAV of USO will not track the price of light, sweet crude oil.

**Treasuries:** Obligations of the U.S. government with remaining maturities of 2 years or less.

**UBTI**: unrelated business taxable income.

**UGA:** United States Gasoline Fund, LP.

**UHN:** United States Diesel-Heating Oil Fund, LP.

**UNG:** United States Natural Gas Fund, LP.

**UNL:** United States 12 Month Natural Gas Fund, LP.

**USAG:** United States Agriculture Index Fund

**USCF:** United States Commodity Funds LLC (the general partner), a Delaware limited liability company, which is registered as a CPO, who controls the investments and other decisions of USO.

**USCI:** United States Commodity Index Fund.

**USL:** United States 12 Month Oil Fund, LP.

**USO:** United States Oil Fund, LP.

**USOD:** United States 3x Oil Fund.

**USOU:** United States 3x Short Oil Fund.

**Valuation Day:** Any day as of which USO calculates its NAV.

**Wainwright:** Wainwright Holdings, Inc.

**You:** The owner or holder of shares.

A-4