# EXHIBIT 3

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

**FORM 10-K**

☒   **Annual report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the fiscal year ended December 31, 2019.**

**OR**

☐   **Transition report pursuant to Section 13 or 15(d) of the Securities Exchange Act of 1934 for the transition period from**     **to**     **.**

**Commission file number: 001-32834**

# United States Oil Fund, LP
**(Exact name of registrant as specified in its charter)**

| | |
|---|---|
| **Delaware** | **20-2830691** |
| **(State or other jurisdiction of** | **(I.R.S. Employer** |
| **incorporation or organization)** | **Identification No.)** |

**1850 Mt. Diablo Boulevard, Suite 640**
**Walnut Creek, California 94596**
**(Address of principal executive offices) (Zip code)**

**(510) 522-9600**
**(Registrant's telephone number, including area code)**
**Securities registered pursuant to Section 12(b) of the Act:**

| | |
|---|---|
| **Shares of United States Oil Fund, LP** | **NYSE Arca, Inc.** |
| **(Title of each class)** | **(Name of exchange on which registered)** |

**Securities registered pursuant to Section 12(g) of the Act: None**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act.   ☐   Yes   ☒   No

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act.   ☐   Yes   ☒   No

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days.   ☒   Yes   ☐   No

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).   ☒   Yes   ☐   No

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best of registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company" and "emerging growth company" in Rule 12b-2 of the Exchange Act

| | | | |
|---|---|---|---|
| Large accelerated filer | ☒ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided to Section 7(a)(2)(B) of the Securities Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).   ☐   Yes   ☒   No

The aggregate market value of the registrant's shares held by non-affiliates of the registrant as of June 30, 2019 was: $1,450,820,000.

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class: | Trading Symbol(s) | Name of each exchange on which registered: |
|---|---|---|
| Shares of United States Oil Fund, LP | USO | NYSE Arca, Inc. |

The registrant had 148,500,000 outstanding shares as of February 18, 2020.

**DOCUMENTS INCORPORATED BY REFERENCE:**
None.

Case 1:20-cv-04740-RGG   Document 144-3   Filed 04/29/21   Page 3 of 92

Table of Contents

**UNITED STATES OIL FUND, LP**

**Table of Contents**

| | Page |
|---|---|
| **Part I** | |
| Item 1. Business. | 1 |
| Item 1A. Risk Factors. | 26 |
| Item 1B. Unresolved Staff Comments. | 39 |
| Item 2. Properties. | 39 |
| Item 3. Legal Proceedings. | 39 |
| Item 4. Mine Safety Disclosures. | 39 |
| **Part II** | |
| Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities. | 39 |
| Item 6. Selected Financial Data. | 40 |
| Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations. | 40 |
| Item 7A. Quantitative and Qualitative Disclosures About Market Risk. | 56 |
| Item 8. Financial Statements and Supplementary Data. | 58 |
| Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure. | 77 |
| Item 9A. Controls and Procedures. | 77 |
| Item 9B. Other Information. | 77 |
| **Part III** | |
| Item 10. Directors, Executive Officers and Corporate Governance. | 78 |
| Item 11. Executive Compensation. | 84 |
| Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters. | 84 |
| Item 13. Certain Relationships and Related Transactions, and Director Independence. | 85 |
| Item 14. Principal Accountant Fees and Services. | 85 |
| **Part IV** | |
| Item 15. Exhibits and Financial Statement Schedules. | 86 |
| Exhibit Index. | 86 |
| Signatures. | 88 |

Table of Contents

## Part I

### Item 1. Business.

#### What is USO?

The United States Oil Fund, LP ("USO") is a Delaware limited partnership organized on May 12, 2005. USO maintains its main business office at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596. USO is a commodity pool that issues limited partnership interests ("shares") traded on the NYSE Arca, Inc. (the "NYSE Arca"). It operates pursuant to the terms of the Seventh Amended and Restated Agreement of Limited Partnership dated as of December 15, 2017 (as amended from time to time, the "LP Agreement"), which grants full management control to its general partner, United States Commodity Funds LLC ("USCF").

The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of the futures contract for light, sweet crude oil traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire (the "Benchmark Oil Futures Contract"), plus interest earned on USO's collateral holdings, less USO's expenses. USO's investment objective is *not* for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, *nor* is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period *greater than one day*.

USCF believes that it is not practical to manage the portfolio to achieve such an investment goal when investing in Oil Futures Contracts (as defined below) and Other Oil-Related Investments (as defined below). USO's shares began trading on April 10, 2006. USCF is the general partner of USO and is responsible for the management of USO.

#### Who is USCF?

USCF is a single member limited liability company that was formed in the state of Delaware on May 10, 2005. USCF maintains its main business office at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596. USCF is a wholly-owned subsidiary of Wainwright Holdings, Inc., a Delaware corporation ("Wainwright"), which is a wholly owned subsidiary of Concierge Technologies, Inc. (publicly traded under the ticker CNCG) ("Concierge"). Mr. Nicholas D. Gerber (discussed below), along with certain family members and certain other shareholders, owns the majority of the shares in Concierge. Wainwright is a holding company that currently holds both USCF, as well as USCF Advisers LLC, an investment adviser registered under the Investment Advisers Act of 1940, as amended. USCF Advisers LLC serves as the investment adviser for the USCF SummerHaven SHPEN Index Fund ("BUYN"), the USCF SummerHaven SHPEI Index Fund ("BUY") and USCF SummerHaven Dynamic Commodity Index Total Return$^{SM}$ ("SDCI"), each a series of the USCF ETF Trust. USCF Advisers LLC also served as the investment adviser to the USCF Commodity Strategy Fund, a series of the USCF Mutual Funds Trust, which liquidated all of its assets and distributed cash pro rata to all remaining shareholders in March 2019. USCF ETF Trust and USCF Mutual Funds Trust are registered under the Investment Company Act of 1940, as amended (the "1940 Act"). The Board of Trustees for USCF ETF Trust and USCF Mutual Funds Trust consist of different independent trustees than those independent directors who serve on the Board of Directors of USCF. USCF is a member of the National Futures Association (the "NFA") and registered as a commodity pool operator ("CPO") with the Commodity Futures Trading Commission (the "CFTC") on December 1, 2005 and as a swaps firm on August 8, 2013.

USCF serves as general partner of the United States Natural Gas Fund, LP ("UNG"), the United States 12 Month Oil Fund, LP ("USL"), the United States Gasoline Fund, LP ("UGA"), the United States 12 Month Natural Gas Fund, LP ("UNL") and the United States Brent Oil Fund, LP ("BNO"). USCF previously served as the general partner for the United States Short Oil Fund, LP ("DNO") and the United States Diesel-Heating Oil Fund, LP ("UHN"), both of which were liquidated in 2018.

USCF is also the sponsor of the United States Commodity Index Fund ("USCI"), the United States Copper Index Fund ("CPER"), and the USCF Crescent Crypto Index Fund ("XBET"), each a series of the United States Commodity Index Funds Trust ("USCIFT"). XBET is currently in registration and has not commenced operations. USCF previously served as the sponsor for the United States Agriculture Index Fund ("USAG"), which was liquidated in 2018.

1

Table of Contents

In addition, USCF is the sponsor of the USCF Funds Trust, a Delaware statutory trust, and each of its series, the United States 3x Oil Fund ("USOU") and the United States 3x Short Oil Fund ("USOD"), which listed their shares on the NYSE Arca on July 20, 2017 under the ticker symbols "USOU" and "USOD", respectively. Each of USOU and USOD liquidated all of its assets and distributed cash pro rata to all remaining shareholders in December 2019.

USO, UNG, UGA, UNL, USL, BNO, USCI and CPER are referred to collectively herein as the "Related Public Funds."

The Related Public Funds are subject to reporting requirements under the Securities Exchange Act of 1934, as amended (the "Exchange Act"). For more information about each of the Related Public Funds, investors in USO may call 1-800-920-0259 or visit www.uscfinvestments.com or the website of the Securities and Exchange Commission ("SEC") at www.sec.gov.

USCF is required to evaluate the credit risk of USO to the futures commission merchant ("FCM"), oversee the purchase and sale of USO's shares by certain authorized purchasers ("Authorized Participants"), review daily positions and margin requirements of USO and manage USO's investments. USCF also pays the fees of ALPS Distributors, Inc. ("ALPS Distributors"), which serves as the marketing agent for USO (the "Marketing Agent"), and Brown Brothers Harriman & Co. ("BBH&Co."), which serves as the administrator (the "Administrator") and the custodian (the "Custodian") for USO.

Limited partners have no right to elect USCF as the general partner on an annual or any other continuing basis. If USCF voluntarily withdraws as general partner, however, the holders of a majority of USO's outstanding shares (excluding for purposes of such determination shares owned, if any, by the withdrawing USCF and its affiliates) may elect its successor. USCF may not be removed as general partner except upon approval by the affirmative vote of the holders of at least 66 and 2/3 percent of USO's outstanding shares (excluding shares owned, if any, by USCF and its affiliates), subject to the satisfaction of certain conditions set forth in the LP Agreement.

USO has no executive officers or employees. Pursuant to the terms of the LP Agreement, USO's affairs are managed by USCF.

The business and affairs of USCF are managed by a board of directors (the "Board"), which is comprised of four management directors (the "Management Directors"), each of whom are also executive officers or employees of USCF, and three independent directors who meet the independent director requirements established by the NYSE Arca Equities Rules and the Sarbanes-Oxley Act of 2002. The Management Directors have the authority to manage USCF pursuant to the terms of the Sixth Amended and Restated Limited Liability Company Agreement of USCF, dated as of May 15, 2015 (as amended from time to time, the "LLC Agreement"). Through its Management Directors, USCF manages the day-to-day operations of USO. The Board has an audit committee which is made up of the three independent directors (Gordon L. Ellis, Malcolm R. Fobes III and Peter M. Robinson). For additional information relating to the audit committee, please see "*Item 10. Directors, Executive Officers and Corporate Governance – Audit Committee*" in this annual report on Form 10-K.

**How Does USO Operate?**

An investment in the shares provides a means for diversifying an investor's portfolio or hedging exposure to changes in oil prices. An investment in the shares allows both retail and institutional investors to easily gain this exposure to the crude oil market in a transparent, cost-effective manner.

2

[Table of Contents](#)

The net assets of USO consist primarily of investments in futures contracts for light, sweet crude oil, other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels that are traded on the NYMEX, ICE Futures or other U.S. and foreign exchanges (collectively, "Oil Futures Contracts") and, to a lesser extent, in order to comply with regulatory requirements or in view of market conditions, other oil-related investments such as cash-settled options on Oil Futures Contracts, forward contracts for oil, cleared swap contracts and non-exchange traded over-the-counter ("OTC") transactions that are based on the price of oil, other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing (collectively, "Other Oil-Related Investments"). Market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing. For convenience and unless otherwise specified, Oil Futures Contracts and Other Oil-Related Investments collectively are referred to as "Oil Interests" in this annual report on Form 10-K. USO invests substantially the entire amount of its assets in Oil Futures Contracts while supporting such investments by holding the amounts of its margin, collateral and other requirements relating to these obligations in short-term obligations of the United States of two years or less ("Treasuries"), cash and cash equivalents. The daily holdings of USO are available on USO's website at www.uscfinvestments.com.

The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of the futures contract for light, sweet crude oil traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire (the "Benchmark Oil Futures Contract"), plus interest earned on USO's collateral holdings, less USO's expenses. USO's investment objective is not for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, nor is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period greater than one day. USO may invest in interests other than the Benchmark Oil Futures Contract to comply with accountability levels and position limits. For a detailed discussion of accountability levels and position limits, see *"Item 1. Business - What are Oil Futures Contracts?"* below in this annual report on Form 10-K.

USCF employs a "neutral" investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down. USO's "neutral" investment strategy is designed to permit investors generally to purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-effective manner, and/or to permit participants in the oil or other industries to hedge the risk of losses in their crude oil-related transactions. Accordingly, depending on the investment objective of an individual investor, the risks generally associated with investing in crude oil and/or the risks involved in hedging may exist. In addition, an investment in USO involves the risk that the daily changes in the price of USO's shares, in percentage terms, will not accurately track the daily changes in the Benchmark Oil Futures Contract, in percentage terms, and that daily changes in the Benchmark Oil Futures Contract in percentage terms, will not closely correlate with daily changes in the spot prices of light, sweet crude oil, in percentage terms.

The Benchmark Oil Futures Contract is changed from the near month contract to the next month contract over a four-day period. Each month, the Benchmark Oil Futures Contract changes starting at the end of the day on the date two weeks prior to expiration of the near month contract for that month. During the first three days of the period, the applicable value of the Benchmark Oil Futures Contract is based on a combination of the near month contract and the next month contract as follows: (1) day 1 consists of 75% of the then near month contract's price plus 25% of the price of the next month contract, divided by 75% of the near month contract's prior day's price plus 25% of the price of the next month contract, (2) day 2 consists of 50% of the then near month contract's price plus 50% of the price of the next month contract, divided by 50% of the near month contract's prior day's price plus 50% of the price of the next month contract and (3) day 3 consists of 25% of the then near month contract's price plus 75% of the price of the next month contract, divided by 25% of the near month contract's prior day's price plus 75% of the price of the next month contract. On day 4, the Benchmark Oil Futures Contract is the next month contract to expire at that time and that contract remains the Benchmark Oil Futures Contract until the beginning of the following month's change in the Benchmark Oil Futures Contract over a four-day period.

On each day during the four-day period, USCF anticipates it will "roll" USO's positions in Oil Interests by closing, or selling, a percentage of USO's positions in Oil Interests and reinvesting the proceeds from closing those positions in new Oil Interests that reflect the change in the Benchmark Oil Futures Contract.

The anticipated dates that the monthly four-day roll period will commence are posted on USO's website at www.uscfinvestments.com, and are subject to change without notice.

3

Table of Contents

USO's total portfolio composition is disclosed on its website each business day that the NYSE Arca is open for trading. The website disclosure of portfolio holdings is made daily and includes, as applicable, the name and value of each Oil Interest, the specific types of Other Oil-Related Investments and characteristics of such Other Oil-Related Investments, the name and value of each Treasury and cash equivalent, and the amount of cash held in USO's portfolio. USO's website is publicly accessible at no charge. USO's assets used for margin and collateral are held in segregated accounts pursuant to the Commodity Exchange Act (the "CEA") and CFTC regulations.

The shares issued by USO may only be purchased by Authorized Participants and only in blocks of 100,000 shares, called "Creation Baskets". The amount of the purchase payment for a Creation Basket is equal to the aggregate NAV of the shares in the Creation Basket. Similarly, only Authorized Participants may redeem shares and only in blocks of 100,000 shares, called "Redemption Baskets". The amount of the redemption proceeds for a Redemption Basket is equal to the aggregate NAV of shares in the Redemption Basket. The purchase price for Creation Baskets and the redemption price for Redemption Baskets are the actual NAV calculated at the end of the business day when a request for a purchase or redemption is received by USO. The NYSE Arca publishes an approximate per share NAV intra-day based on the prior day's per share NAV and the current price of the Benchmark Oil Futures Contract, but the price of Creation Baskets and Redemption Baskets is determined based on the actual per share NAV calculated at the end of the day.

While USO issues shares only in Creation Baskets, shares are listed on the NYSE Arca and investors may purchase and sell shares at market prices like any listed security.

**What is USO's Investment Strategy?**

In managing USO's assets, USCF does not use a technical trading system that issues buy and sell orders. USCF instead employs a quantitative methodology whereby each time a Creation Basket is sold, USCF purchases Oil Interests, such as the Benchmark Oil Futures Contract, that have an aggregate market value that approximates the amount of Treasuries and/or cash received upon the issuance of the Creation Basket.

By remaining invested as fully as possible in Oil Futures Contracts or Other Oil-Related Investments, USCF believes that the daily changes in percentage terms in USO's per share NAV will continue to closely track the daily changes in percentage terms in the price of the Benchmark Oil Futures Contract. USCF believes that certain arbitrage opportunities result in the price of the shares traded on the NYSE Arca closely tracking the per share NAV of USO. Additionally, Oil Futures Contracts traded on the NYMEX have closely tracked the spot price of crude oil. Based on these expected interrelationships, USCF believes that the changes in the price of USO's shares traded on the NYSE Arca have closely tracked and will continue to closely track on a daily basis the changes in the spot price of light, sweet crude oil, on a percentage basis. For performance data relating to USO's ability to track its benchmark, see "*Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Tracking USO's Benchmark*" in this annual report on Form 10-K.

USCF endeavors to place USO's trades in Oil Futures Contracts and Other Oil-Related Investments and otherwise manage USO's investments so that "A" will be within plus/minus ten percent (10%) of "B", where:

- A is the average daily change in USO's per share NAV for any period of 30 successive valuation days; i.e., any NYSE Arca trading day as of which USO calculates its per share NAV; and
- B is the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period.

4

Case 1:20-cv-04740-RGG    Document 144-3    Filed 04/29/21    Page 8 of 92

Table of Contents

USCF believes that market arbitrage opportunities will cause the daily changes in USO's share price on the NYSE Arca to closely track the daily changes in USO's per share NAV on a percentage basis. USCF further believes that the net effect of these two expected relationships and the relationships described above between USO's per share NAV and the Benchmark Oil Futures Contract, will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, plus interest earned on USO's collateral holdings, less USO's expenses. For performance data relating to USO's ability to track its benchmark, see "*Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Tracking USO's Benchmark*" in this annual report on Form 10-K.

The specific Oil Futures Contracts purchased depend on various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts with respect to the month of expiration, and the prevailing price volatility of particular contracts. While USCF has made significant investments in NYMEX Oil Futures Contracts, for various reasons, including the ability to enter into the precise amount of exposure to the crude oil market, position limits or other regulatory requirements limiting USO's holdings, and market conditions, it may invest in futures contracts traded on other exchanges or invest in Other Oil-Related Investments. To the extent that USO invests in Other Oil-Related Investments, it would prioritize investments in contracts and instruments that are economically equivalent to the Benchmark Oil Futures Contract, including cleared swaps that satisfy such criteria, and then, to a lesser extent, it would invest in other types of cleared swaps and other contracts, instruments and non-cleared swaps, such as swaps in the OTC market. If USO is required by law or regulation, or by one of its regulators, including a futures exchange, to reduce its position in the Oil Futures Contracts to the applicable position limit or to a specified accountability level or if market conditions dictate it would be more appropriate to invest in Other Oil-Related Investments, a substantial portion of USO's assets could be invested in accordance with such priority in Other Oil-Related Investments that are intended to replicate the return on the Benchmark Oil Futures Contract. As USO's assets reach higher levels, it is more likely to exceed position limits, accountability levels or other regulatory limits and, as a result, it is more likely that it will invest in accordance with such priority in Other Oil-Related Investments at such higher levels. In addition, market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing. See *"Item 1. Business – Commodities Regulation"* in this annual report on Form 10-K for a discussion of the potential impact of regulation on USO's ability to invest in OTC transactions and cleared swaps.

USCF may not be able to fully invest USO's assets in the Oil Futures Contracts having an aggregate notional amount exactly equal to USO's NAV. For example, as standardized contracts, the Oil Futures Contracts are for a specified amount of a particular commodity, and USO's NAV and the proceeds from the sale of a Creation Basket are unlikely to be an exact multiple of the amounts of those contracts. As a result, in such circumstances, USO may be better able to achieve the exact amount of exposure to changes in price of the Benchmark Oil Futures Contract through the use of Other Oil-Related Investments, such as OTC contracts that have better correlation with changes in price of the Benchmark Oil Futures Contract.

USO anticipates that to the extent it invests in Oil Futures Contracts other than contracts on light, sweet crude oil (such as futures contracts for diesel-heating oil, natural gas, and other petroleum-based fuels) and Other Oil-Related Investments, it will enter into various non-exchange-traded derivative contracts to hedge the short-term price movements of such Oil Futures Contracts and Other Oil-Related Investments against the current Benchmark Oil Futures Contract.

USCF does not anticipate letting USO's Oil Futures Contracts expire and taking delivery of the underlying commodity. Instead, USCF closes existing positions, e.g., when it changes the Benchmark Oil Futures Contract or Other Oil-Related Investments or it otherwise determines it would be appropriate to do so and reinvests the proceeds in new Oil Futures Contracts or Other Oil-Related Investments. Positions may also be closed out to meet orders for Redemption Baskets and in such case proceeds for such baskets will not be reinvested.

5

Table of Contents

**What is the Crude Oil Market and the Petroleum-Based Fuel Market?**

USO may purchase Oil Futures Contracts traded on the NYMEX that are based on light, sweet crude oil. It may also purchase contracts on the ICE Futures or other U.S. and foreign exchanges. The NYMEX contracts provide for delivery of several grades of domestic and internationally traded foreign crudes, and, among other things, serves the diverse needs of the physical market. In Europe, Brent crude oil is the standard for futures contracts and is primarily traded on the ICE Futures Europe. Brent crude oil is the price reference for two-thirds of the world's traded oil. The ICE Brent Futures is a deliverable contract with an option to cash settle which trades in units of 1,000 barrels (42,000 U.S. gallons). The ICE Futures also offers a West Texas Intermediate ("WTI") crude oil futures contract which trades in units of 1,000 barrels. The WTI crude oil futures contract is cash settled against the prevailing market price for U.S. light sweet crude oil.

*Light, Sweet Crude Oil.* Light, sweet crudes are preferred by refiners because of their low sulfur content and relatively high yields of high-value products such as gasoline, diesel fuel, diesel-heating oil, and jet fuel. The price of light, sweet crude oil has historically exhibited periods of significant volatility.

Demand for petroleum products by consumers, as well as agricultural, manufacturing and transportation industries, determines demand for crude oil by refiners. Since the precursors of product demand are linked to economic activity, crude oil demand will tend to reflect economic conditions. However, other factors such as weather also influence product and crude oil demand.

Crude oil supply is determined by both economic and political factors. Oil prices (along with drilling costs, availability of attractive prospects for drilling, taxes and technology, among other factors) determine exploration and development spending, which influence output capacity with a lag. In the short run, production decisions by the Organization of Petroleum Exporting Countries ("OPEC") also affect supply and prices. Oil export embargoes and the current conflicts in the Middle East represent other routes through which political developments move the market. It is not possible to predict the aggregate effect of all or any combination of these factors.

*Diesel-Heating Oil.* Diesel-heating oil, also known as No. 2 fuel oil, accounts for 25% of the yield of a barrel of crude oil, the second largest "cut" from oil after gasoline. The diesel-heating Oil Futures Contract listed and traded on the NYMEX trades in units of 42,000 gallons (1,000 barrels) and is based on delivery in the New York harbor, the principal cash market center. The ICE Futures also offers a diesel-heating Oil Futures Contract which trades in units of 42,000 U.S. gallons (1,000 barrels). The diesel-heating Oil Futures Contract is cash-settled against the prevailing market price for diesel-heating oil delivered to the New York Harbor.

*Gasoline.* Gasoline is the largest single volume refined product sold in the U.S. and accounts for almost half of national oil consumption. The gasoline futures contract listed and traded on the NYMEX trades in units of 42,000 gallons (1,000 barrels) and is based on delivery at petroleum products terminals in the New York harbor, the major East Coast trading center for imports and domestic shipments from refineries in the New York harbor area or from the Gulf Coast refining centers. The price of gasoline has historically been volatile.

*Natural Gas.* Natural gas accounts for almost a quarter of U.S. energy consumption. The natural gas futures contract listed and traded on the NYMEX trades in units of 10,000 million British thermal units and is based on delivery at the Henry Hub in Louisiana, the nexus of 16 intra- and interstate natural gas pipeline systems that draw supplies from the region's prolific gas deposits. The pipelines serve markets throughout the U.S. East Coast, the Gulf Coast, the Midwest, and up to the Canadian border. The price of natural gas has historically been volatile.

**What are Oil Futures Contracts?**

Futures contracts are agreements between two parties. One party agrees to buy a commodity such as crude oil from the other party at a later date at a price and quantity agreed upon when the contract is made. Oil Futures Contracts are traded on futures exchanges, including the NYMEX. For example, the Benchmark Oil Futures Contract is traded on the NYMEX in units of 1,000 barrels. Oil Futures Contracts traded on the NYMEX are priced by floor brokers and other exchange members both through an "open outcry" of offers to purchase or sell the contracts and through an electronic, screen-based system that determines the price by matching electronically offers to purchase and sell. Additional risks of investing in Oil Futures Contracts are included in *"Item 1A. Risk Factors"* in this annual report on Form 10-K.

6

Table of Contents

*Accountability Levels, Position Limits and Price Fluctuation Limits.* Designated contract markets ("DCMs"), such as the NYMEX and ICE Futures, have established accountability levels and position limits on the maximum net long or net short futures contracts in commodity interests that any person or group of persons under common trading control (other than as a hedge, which an investment by USO is not) may hold, own or control. These levels and position limits apply to the futures contracts that USO invests in to meet its investment objective. In addition to accountability levels and position limits, the NYMEX and ICE Futures also set daily price fluctuation limits on futures contracts. The daily price fluctuation limit establishes the maximum amount that the price of a futures contract may vary either up or down from the previous day's settlement price. Once the daily price fluctuation limit has been reached in a particular futures contract, no trades may be made at a price beyond that limit.

The accountability levels for the Benchmark Oil Futures Contract and other Oil Futures Contracts traded on U.S.-based futures exchanges, such as the NYMEX, are not a fixed ceiling, but rather a threshold above which the NYMEX may exercise greater scrutiny and control over an investor's positions. The current accountability level for investments for any one month in the Benchmark Oil Futures Contract is 10,000 contracts. In addition, the NYMEX imposes an accountability level for all months of 20,000 net futures contracts for light, sweet crude oil. In addition, the ICE Futures maintains the same accountability levels, position limits and monitoring authority for its light, sweet crude oil contract as the NYMEX. If USO and the Related Public Funds exceed these accountability levels for investments in the futures contracts for light, sweet crude oil, the NYMEX and ICE Futures will monitor such exposure and may ask for further information on their activities including the total size of all positions, investment and trading strategy, and the extent of liquidity resources of USO and the Related Public Funds. If deemed necessary by the NYMEX and/or ICE Futures, USO could be ordered to reduce its Crude Oil Futures CL contracts to below the 10,000 single month and/or 20,000 all month accountability level. As of December 31, 2019, USO held 19,178 NYMEX WTI Crude Oil Futures CL Contracts and did not hold ICE WTI Crude Oil Futures contracts. USO exceeded accountability levels of the NYMEX during the year ended December 31, 2019 when it held a maximum of 33,818 Crude Oil Futures CL contracts, on the NYMEX, exceeding the "any" month limit. No action was taken by the NYMEX and USO did not reduce the number of Futures Contracts held as a result. USO did not exceed accountability levels imposed by the ICE Futures for the year ended December 31, 2019.

Position limits differ from accountability levels in that they represent fixed limits on the maximum number of futures contracts that any person may hold and cannot allow such limits to be exceeded without express CFTC authority to do so. In addition to accountability levels and position limits that may apply at any time, the NYMEX and ICE Futures impose position limits on contracts held in the last few days of trading in the near month contract to expire. It is unlikely that USO will run up against such position limits because USO's investment strategy is to close out its positions and "roll" from the near month contract to expire to the next month contract during a four-day period beginning two weeks from expiration of the contract. For the year ended December 31, 2019, USO did not exceed position limits imposed by the NYMEX and ICE Futures.

The CFTC has proposed to adopt limits on speculative positions in 25 physical commodity futures and option contracts as well as swaps that are economically equivalent to such contracts in the agriculture, energy and metals markets (the "Position Limit Rules"). The Position Limit Rules would, among other things: identify which contracts are subject to speculative position limits; set thresholds that restrict the size of speculative positions that a person may hold in the spot month, other individual months, and all months combined; create an exemption for positions that constitute bona fide hedging transactions; impose responsibilities on DCMs and swap execution facilities ("SEFs") to establish position limits or, in some cases, position accountability rules; and apply to both futures and swaps across four relevant venues: OTC, DCMs, SEFs as well as certain non-U.S. located platforms. The CFTC's first attempt at finalizing the Position Limit Rules, in 2011, was successfully challenged by market participants in 2012 and, since then, the CFTC has re-proposed them and solicited comments from market participants multiple times. At this time, it is unclear how the Position Limit Rules may affect USO, but the effect may be substantial and adverse. By way of example, the Position Limit Rules may negatively impact the ability of USO to meet its investment objectives through limits that may inhibit USCF's ability to sell additional Creation Baskets of USO. See *"The Commodity Interest Markets-Commodities Regulation"* in this annual report on Form 10-K for additional information.

Until such time as the Position Limit Rules are adopted, the regulatory architecture in effect prior to the adoption of the Position Limit Rules will govern transactions in commodities and related derivatives. Under that system, the CFTC enforces federal limits on speculation in nine agricultural products (e.g., corn, wheat and soy), while futures exchanges establish and enforce position limits and accountability levels for other agricultural products and certain energy products (e.g., oil and natural gas). As a result, USO may be limited with respect to the size of its investments in any commodities subject to these limits.

Under existing and recently adopted CFTC regulations, for the purpose of position limits, a market participant is generally required, subject to certain narrow exceptions, to aggregate all positions for which that participant controls the trading decisions with all positions for which that participant has a 10 percent or greater ownership interest in an account or position, as well as the positions of two or more persons acting pursuant to an express or implied agreement or understanding with that participant (the "Aggregation Rules"). The Aggregation Rules will also apply with respect to the Position Limit Rules if and when such Position Limit Rules are adopted.

7

Table of Contents

*Price Volatility.* The price volatility of Oil Futures Contracts generally has been historically greater than that for traditional securities such as stocks and bonds. Price volatility often is greater day-to-day as opposed to intra-day. Oil Futures Contracts tend to be more volatile than stocks and bonds because price movements for crude oil are more currently and directly influenced by economic factors for which current data is available and are traded by crude oil futures traders throughout the day. Because USO invests a significant portion of its assets in Oil Futures Contracts, the assets of USO, and therefore the prices of USO shares, may be subject to greater volatility than traditional securities.

*Marking-to-Market Futures Positions.* Oil Futures Contracts are marked to market at the end of each trading day and the margin required with respect to such contracts is adjusted accordingly. This process of marking-to-market is designed to prevent losses from accumulating in any futures account. Therefore, if USO's futures positions have declined in value, USO may be required to post "variation margin" to cover this decline. Alternatively, if USO's futures positions have increased in value, this increase will be credited to USO's account.

**Why Does USO Purchase and Sell Oil Futures Contracts?**

USO's investment objective is for the daily changes in percentage terms of its shares' per share NAV to reflect the daily changes in percentage terms of the Benchmark Oil Futures Contract, less USO's expenses. USO invests primarily in Oil Futures Contracts. USO seeks to have its aggregate NAV approximate at all times the aggregate market value of the Oil Futures Contracts (or Other Oil-Related Investments) it holds.

In connection with investing in Oil Futures Contracts and Other Oil-Related Investments, USO holds Treasuries, cash and/or cash equivalents that serve as segregated assets supporting USO's positions in Oil Futures Contracts and Other Oil-Related Investments. For example, the purchase of an Oil Futures Contract with a stated value of $10 million would not require USO to pay $10 million upon entering into the contract; rather, only a margin deposit, generally of 5% to 30% of the stated value of the Oil Futures Contract, would be required. To secure its Oil Futures Contract obligations, USO would deposit the required margin with the FCM and would separately hold, through its Custodian, Treasuries, cash and/or cash equivalents in an amount equal to the balance of the current market value of the contract, which at the contract's inception would be $10 million minus the amount of the margin deposit, or $9 million (assuming a 10% margin).

As a result of the foregoing, typically 5% to 30% of USO's assets are held as margin in segregated accounts with an FCM. In addition to the Treasuries and cash it posts with the FCM for the Oil Futures Contracts it owns, USO may hold, through the Custodian, Treasuries, cash and/or cash equivalents that can be posted as additional margin or as other collateral to support its OTC contracts. USO earns income from the Treasuries and/or cash equivalents that it purchases, and on the cash it holds through the Custodian or FCM. USO anticipates that the earned income will increase the NAV and limited partners' capital contribution accounts. USO reinvests the earned income, holds it in cash, or uses it to pay its expenses. If USO reinvests the earned income, it makes investments that are consistent with its investment objective.

**What are the Trading Policies of USO?**

*Liquidity*

USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking and liquidation of positions in these financial interests and Other Oil-Related Investments that, in the opinion of USCF, may be readily liquidated with the original counterparty or through a third party assuming the position of USO.

*Spot Commodities*

While the crude Oil Futures Contracts traded can be physically settled, USO does not intend to take or make physical delivery. USO may from time to time trade in Other Oil-Related Investments, including contracts based on the spot price of crude oil.

*Leverage*

USCF endeavors to have the value of USO's Treasuries, cash and cash equivalents, whether held by USO or posted as margin or other collateral, at all times approximate the aggregate market value of its obligations under its Oil Futures Contracts and Other Oil-Related Investments. Commodity pools' trading positions in futures contracts or other related investments are typically required to be secured by the deposit of margin funds that represent only a small percentage of a futures contract's (or other commodity interest's) entire market value. While USCF has not and does not intend to leverage USO's assets, it is not prohibited from doing so under the LP Agreement.

8

Table of Contents

*Borrowings*

Borrowings are not used by USO unless USO is required to borrow money in the event of physical delivery, if USO trades in cash commodities, or for short-term needs created by unexpected redemptions.

*OTC Derivatives (Including Spreads and Straddles)*

In addition to Oil Futures Contracts, there are also a number of listed options on the Oil Futures Contracts on the principal futures exchanges. These contracts offer investors and hedgers another set of financial vehicles to use in managing exposure to the crude oil market. Consequently, USO may purchase options on crude Oil Futures Contracts on these exchanges in pursuing its investment objective.

In addition to the Oil Futures Contracts and options on the Oil Futures Contracts, there also exists an active non-exchange-traded market in derivatives tied to crude oil. These derivatives transactions (also known as OTC contracts) are usually entered into between two parties in private contracts. Unlike most of the exchange-traded Oil Futures Contracts or exchange-traded options on the Oil Futures Contracts, each party to such contract bears the credit risk of the other party, *i.e.*, the risk that the other party may not be able to perform its obligations under its contract. To reduce the credit risk that arises in connection with such contracts, USO will generally enter into an agreement with each counterparty based on the Master Agreement published by the International Swaps and Derivatives Association, Inc. ("ISDA") that provides for the netting of its overall exposure to its counterparty.

USCF assesses or reviews, as appropriate, the creditworthiness of each potential or existing counterparty to an OTC contract pursuant to guidelines approved by USCF's Board.

USO may enter into certain transactions where an OTC component is exchanged for a corresponding futures contract ("Exchange for Related Position" or "EFRP" transactions). In the most common type of EFRP transaction entered into by USO, the OTC component is the purchase or sale of one or more baskets of USO shares. These EFRP transactions may expose USO to counterparty risk during the interim period between the execution of the OTC component and the exchange for a corresponding futures contract. Generally, the counterparty risk from the EFRP transaction will exist only on the day of execution.

USO may employ spreads or straddles in its trading to mitigate the differences in its investment portfolio and its goal of tracking the price of the Benchmark Oil Futures Contract. USO would use a spread when it chooses to take simultaneous long and short positions in futures written on the same underlying asset, but with different delivery months.

During the reporting period of this annual report on Form 10-K, USO limited its OTC activities to EFRP transactions.

*Pyramiding*

USO has not and will not employ the technique, commonly known as pyramiding, in which the speculator uses unrealized profits on existing positions as variation margin for the purchase or sale of additional positions in the same or another commodity interest.

**Who are the Service Providers?**

In its capacity as the Custodian for USO, BBH&Co. holds USO's Treasuries, cash and/or cash equivalents pursuant to a custodial agreement. BBH&Co. is also the registrar and transfer agent for the shares. In addition, in its capacity as Administrator for USO, BBH&Co. performs certain administrative and accounting services for USO and prepares certain SEC, NFA and CFTC reports on behalf of USO. USCF pays BBH&Co.'s fees for these services.

BBH&Co.'s principal business address is 50 Post Office Square, Boston, MA 02110-1548. BBH&Co., a private bank founded in 1818, is neither a publicly held company nor insured by the Federal Deposit Insurance Corporation. BBH&Co. is authorized to conduct a commercial banking business in accordance with the provisions of Article IV of the New York State Banking Law, New York Banking Law §§160–181, and is subject to regulation, supervision, and examination by the New York State Department of Financial Services. BBH&Co. is also licensed to conduct a commercial banking business by the Commonwealths of Massachusetts and Pennsylvania and is subject to supervision and examination by the banking supervisors of those states.

USO also employs ALPS Distributors as its marketing agent. USCF pays the Marketing Agent an annual fee. In no event may the aggregate compensation paid to the Marketing Agent and any affiliate of USCF for distribution-related services in connection with the offering of shares exceed ten percent (10%) of the gross proceeds of the offering.

9

Table of Contents

ALPS Distributors' principal business address is 1290 Broadway, Suite 1100, Denver, CO 80203. ALPS Distributors is a broker-dealer registered with the Financial Industry Regulatory Authority ("FINRA") and a member of the Securities Investor Protection Corporation.

On October 8, 2013, USCF entered into a Futures and Cleared Derivatives Transactions Customer Account Agreement with RBC Capital Markets, LLC ("RBC Capital" or "RBC") to serve as USO's FCM, effective October 10, 2013. This agreement requires RBC Capital to provide services to USO, as of October 10, 2013, in connection with the purchase and sale of Oil Futures Contracts and Other Oil-Related Investments that may be purchased or sold by or through RBC Capital for USO's account. For the period October 10, 2013 and after, USO pays RBC Capital commissions for executing and clearing trades on behalf of USO.

RBC Capital's primary address is 500 West Madison Street, Suite 2500, Chicago, Illinois 60661. Effective October 10, 2013, RBC Capital became the futures clearing broker for USO. RBC Capital is registered in the United States with FINRA as a broker-dealer and with the CFTC as an FCM. RBC Capital is a member of various U.S. futures and securities exchanges.

RBC Capital is a large broker dealer subject to many different complex legal and regulatory requirements. As a result, certain of RBC Capital's regulators may from time to time conduct investigations, initiate enforcement proceedings and/or enter into settlements with RBC Capital with respect to issues raised in various investigations. RBC Capital complies fully with its regulators in all investigations being conducted and in all settlements it reaches. In addition, RBC Capital is and has been subject to a variety of civil legal claims in various jurisdictions, a variety of settlement agreements and a variety of orders, awards and judgments made against it by courts and tribunals, both in regard to such claims and investigations. RBC Capital complies fully with all settlements it reaches and all orders, awards and judgments made against it.

RBC Capital has been named as a defendant in various legal actions, including arbitrations, class actions and other litigation including those described below, arising in connection with its activities. Certain of the actual or threatened legal actions include claims for substantial compensatory and/or punitive damages or claims for indeterminate amounts of damages. RBC Capital is also involved, in other reviews, investigations and proceedings (both formal and informal) by governmental and self-regulatory agencies regarding RBC Capital's business, including among other matters, accounting and operational matters, certain of which may result in adverse judgments, settlements, fines, penalties, injunctions or other relief.

RBC Capital contests liability and/or the amount of damages as appropriate in each pending matter. In view of the inherent difficulty of predicting the outcome of such matters, particularly in cases where claimants seek substantial or indeterminate damages or where investigations and proceedings are in the early stages, RBC Capital cannot predict the loss or range of loss, if any, related to such matters; how or if such matters will be resolved; when they will ultimately be resolved; or what the eventual settlement, fine, penalty or other relief, if any, might be. Subject to the foregoing, RBC Capital believes, based on current knowledge and after consultation with counsel, that the outcome of such pending matters will not have a material adverse effect on the consolidated financial condition of RBC Capital.

On April 27, 2017, pursuant to an offer of settlement, a Panel of the Chicago Board of Trade Business Conduct Committee ("Panel") found that RBC Capital engaged in EFRP transactions which failed to satisfy the Rules of the Chicago Board of Trade (the "Chicago Board of Trade") in one or more ways. Specifically, the Panel found that RBC Capital traders entered into EFRP trades in which RBC Capital accounts were on both sides of the transactions. While the purpose of the transactions was to transfer positions between the RBC Capital accounts, the Panel found that the manner in which the trades occurred violated the Chicago Board of Trade's prohibition on wash trades. The Panel found that RBC Capital thereby violated CBOT Rules 534 and (legacy) 538.B. and C. In accordance with the settlement offer, the Panel ordered RBC Capital to pay a $175,000 fine. On October 1, 2019, the CFTC issued an order filing and settling charges against RBCCM for the above activity, as well as related charges. The order required that RBCCM cease and desist from violating the applicable regulations, pay a $5 million civil monetary penalty, and comply with various conditions, including conditions regarding public statements and future cooperation with the CFTC.

On June 18, 2015, in connection with the Municipalities Continuing Disclosure Cooperation initiative of the SEC, the SEC commenced and settled an administrative proceeding against RBC Capital for willful violations of Sections 17(a)(2) of the Securities Act of 1933, as amended ("1933 Act") after the firm self-reported instances in which it conducted inadequate due diligence in certain municipal securities offerings and as a result, failed to form a reasonable basis for believing the truthfulness of certain material representations in official statements issued in connection with those offerings. RBC Capital paid a fine of $500,000.

RBC Capital and certain affiliates were named as defendants in a lawsuit relating to their role in transactions involving investments made by a number of Wisconsin school districts in certain collateralized debt obligations. These transactions were also the subject of a regulatory investigation, which was resolved in 2011. RBC Capital reached a final settlement with all parties in the civil litigation, and the civil action against RBC Capital was dismissed with prejudice on December 6, 2016.

10

Table of Contents

Beginning in 2015, putative class actions were brought against RBC Capital and/or Royal Bank of Canada in the U.S., Canada and Israel. These actions were each brought against multiple foreign exchange dealers and allege, among other things, collusive behavior in foreign exchange trading. Various regulators are also conducting inquiries regarding potential violations of law by a number of banks and other entities, including RBC Capital, regarding foreign exchange trading. In August 2018, the U.S. District Court entered a final order approving RBC Capital's pending settlement with class plaintiffs. Certain institutional plaintiffs opted out of participating in the settlement and have brought their own claims. The Canadian class actions and one other U.S. action that is purportedly brought on behalf of different classes of plaintiffs also remain pending. Based on the facts currently known, it is not possible at this time for us to predict the ultimate outcome of these investigations or proceedings or the timing of their resolution.

On April 13, 2015, RBC Capital's affiliate, Royal Bank of Canada Trust Company (Bahamas) Limited ("RBC Bahamas"), was charged in France with complicity in tax fraud. RBC Bahamas believes that its actions did not violate French law and contested the charge in the French court. The trial of this matter has concluded and a verdict was delivered on January 12, 2017, acquitting the company and the other defendants and on June 29, 2018, the French appellate court affirmed the acquittals. The acquittals are being appealed.

Various regulators and competition and enforcement authorities around the world, including in Canada, the United Kingdom, and the U.S., are conducting investigations related to certain past submissions made by panel banks in connection with the setting of the U.S. dollar London interbank offered rate ("LIBOR"). These investigations focus on allegations of collusion between the banks that were on the panel to make submissions for certain LIBOR rates. Royal Bank of Canada, RBC Capital's indirect parent, is a member of certain LIBOR panels, including the U.S. dollar LIBOR panel, and has in the past been the subject of regulatory requests for information. In addition, Royal Bank of Canada and other U.S. dollar panel banks have been named as defendants in private lawsuits filed in the U.S. with respect to the setting of LIBOR including a number of class action lawsuits which have been consolidated before the U.S. District Court for the Southern District of New York. The complaints in those private lawsuits assert claims against us and other panel banks under various U.S. laws, including U.S. antitrust laws, the U.S. Commodity Exchange Act, and state law. On February 28, 2018, the motion by the plaintiffs in the class action lawsuits to have the class certified was denied in relation to Royal Bank of Canada. As such, unless that ruling is reversed on appeal, Royal Bank of Canada is no longer a defendant in any pending class action. Royal Bank of Canada is still a party to the various individual LIBOR actions. Based on the facts currently known, it is not possible at this time for us to predict the ultimate outcome of these investigations or proceedings or the timing of their resolution.

Thornburg Mortgage Inc. ("TMST") and RBC Capital were parties to a master repurchase agreement executed in September 2003 whereby TMST financed its purchase of residential mortgage-backed securities. Upon TMST's default during the financial crisis, RBC Capital valued TMST's collateral at allegedly deflated prices. After TMST's bankruptcy filing, TMST's trustee brought suit against RBC Capital in 2011 for breach of contract. In 2015, TMST was awarded more than $45 million in damages. RBC Capital has appealed. The appeals court set a briefing schedule and simultaneously ordered the parties to participate in a mediation. The parties subsequently reached an agreement to settle the matter; a motion to approve the settlement was filed with the bankruptcy court on January 10, 2016 and granted on February 27, 2017.

On October 14, 2014, the Delaware Court of Chancery (the "Court of Chancery") in a class action brought by former shareholders of Rural/Metro Corporation, held RBC Capital liable for aiding and abetting a breach of fiduciary duty by three Rural/Metro directors, but did not make an additional award for attorney's fees. A final judgment was entered on February 19, 2015 in the amount of US$93 million plus post judgment interest. RBC Capital appealed the Court of Chancery's determination of liability and quantum of damages, and the plaintiffs cross-appealed the ruling on additional attorneys' fees. On November 30, 2015, the Delaware Supreme Court affirmed the Court of Chancery with respect to both the appeal and cross-appeal. RBC Capital is cooperating with an investigation by the SEC relating to this matter. In particular, the SEC contended that RBC Capital caused materially false and misleading information to be included in the proxy statement that Rural filed to solicit shareholder approval for the sale in violation of section 14(A) of the Exchange Act and Rule 14A-9 thereunder. On August 31, 2016, RBC Capital was ordered by the SEC to cease and desist and paid $500,000 in disgorgement, plus interest of $77,759 and a civil penalty of $2 million.

Please see RBC Capital's Form BD, which is available on the FINRA BrokerCheck program, for more details.

RBC will act only as clearing broker for USO and as such will be paid commissions for executing and clearing trades on behalf of USO. RBC has not passed upon the adequacy or accuracy of this annual report on Form 10-K. RBC will not act in any supervisory capacity with respect to USCF or participate in the management of USCF or USO.

RBC is not affiliated with USO or USCF. Therefore, neither USCF nor USO believes that there are any conflicts of interest with RBC or its trading principals arising from its acting as USO's FCM.

11

Table of Contents

On January 14, 2019, USCF entered into agreements with BTIG, LLC to serve as USO's introducing broker. Under the agreements, BTIG, LLC provide services to USO in connection with the purchase and sale of Oil Futures Contracts and Other Oil-Related Investments that may be purchased or sold by or through RBC Capital for USO's account. RBC pays BTIG, LLC in connection with certain trades on behalf of USO.

BTIG, LLC, whose principal address is 600 Montgomery Street, Sixth Floor, San Francisco, CA, 94111, will act as an introducing broker for USO's futures trading. BTIG is registered with the U.S. Securities and Exchange Commission as a broker-dealer, with the CFTC as an introducing broker, and is a member of FINRA and other regulatory agencies and exchanges. In the normal course of its regulated business activities, BTIG receives examinations, subpoenas, and inquiries from the regulatory organizations that oversee its various business activities. From January 2014 through December 2019, BTIG has not been involved in any material litigation.

BTIG LLC is not affiliated with USO or USCF. Therefore, neither USCF nor USO believes that there will be any conflicts of interest with BTIG, LLC or its trading principals arising from its acting as USO's introducing broker.

Currently, USCF does not employ commodity trading advisors for trading of USO contracts. USCF currently does, however, employ SummerHaven Investment Management, LLC as a trading advisor for USCI and CPER. If, in the future, USCF does employ commodity trading advisors for USO, it will choose each advisor based on arm's-length negotiations and will consider the advisor's experience, fees and reputation.

**Fees of USO**

*Fees and Compensation Arrangements with USCF and Non-Affiliated Service Providers*[1]

| Service Provider | Compensation Paid by USCF |
|---|---|
| BBH&Co., Custodian and Administrator | Minimum amount of $75,000 annually for its custody, fund accounting and fund administration services rendered to all funds, as well as a $20,000 annual fee for its transfer agency services. In addition, an asset-based charge of (a) 0.06% for the first $500 million of USO's and the Related Public Funds' combined net assets, (b) 0.0465% for USO's and the Related Public Funds' combined net assets greater than $500 million but less than $1 billion, and (c) 0.035% once USO's and the Related Public Funds' combined net assets exceed $1 billion.[2] |
| ALPS Distributors - Marketing Agent | $425,000 per annum plus an incentive fee as follows: 0.06% on USO's assets from $0-500 million; 0.04% on USO's assets from $500 million-$4 billion; and 0.03% on USO's assets in excess of $4 billion. |

[1] USCF pays this compensation.

[2] The annual minimum amount will not apply if the asset-based charge for all accounts in the aggregate exceeds $75,000. USCF also will pay transaction charge fees to BBH&Co., ranging from $7 to $15 per transaction for the funds.

***Compensation to USCF***

USO is contractually obligated to pay USCF a management fee based on 0.45% per annum on its average daily total net assets. Fees are calculated on a daily basis (accrued at 1/365 of the applicable percentage of total net assets on that day) and paid on a monthly basis. Total net assets are calculated by taking the current market value of USO's total assets and subtracting any liabilities.

12

Table of Contents

*Fees and Compensation Arrangements between USO and Non-Affiliated Service Providers*[3]

| Service Provider | Compensation Paid by USO |
|---|---|
| RBC Capital Futures Commission Merchant | Approximately $3.50 per buy or sell; charges may vary |

[3] USO pays this compensation.

*New York Mercantile Exchange Licensing Fee*[4] - 0.015% on all net assets

[4] Fees are calculated on a daily basis (accrued at 1/365 of the applicable percentage of NAV on that day) and paid on a monthly basis. USO is responsible for its pro rata share of the assets held by USO and the Related Public Funds, other than BNO, USCI and CPER.

*Expenses Paid or Accrued by USO from Inception through December 31, 2019 in dollar terms:*

| Expenses: | | Amount in Dollar Terms |
|---|---|---|
| Amount Paid or Accrued to USCF: | $ | 102,463,365 |
| Amount Paid or Accrued in Portfolio Brokerage Commissions: | $ | 35,579,999 |
| Other Amounts Paid or Accrued[5]: | $ | 31,575,220 |
| Total Expenses Paid or Accrued: | $ | 169,618,584 |

[5] Includes expenses relating to the registration of additional shares, legal fees, auditing fees, printing expenses, licensing fees, tax reporting fees, prepaid insurance expenses and miscellaneous expenses and fees and expenses paid to the independent directors of USCF.

*Expenses Paid or Accrued by USO from Inception through December 31, 2019 as a Percentage of Average Daily Net Assets:*

| Expenses: | Amount as a Percentage of Average Daily Net Assets |
|---|---|
| Amount Paid or Accrued to USCF: | 0.45% annualized |
| Amount Paid or Accrued in Portfolio Brokerage Commissions: | 0.16% annualized |
| Other Amounts Paid or Accrued[6]: | 0.14% annualized |
| Total Expenses Paid or Accrued: | 0.75% annualized |

[6] Includes expenses relating to the registration of additional shares, legal fees, auditing fees, printing expenses, licensing fees, tax reporting fees, prepaid insurance expenses and miscellaneous expenses and fees and expenses paid to the independent directors of USCF.

*Other Fees.* USO also pays the fees and expenses associated with its audit expenses, tax accounting and reporting requirements. These fees were approximately $1,441,000 for the fiscal year ended December 31, 2019. In addition, USO is responsible for paying its portion of the directors' and officers' liability insurance for USO and the Related Public Funds and the fees and expenses of the independent directors who also serve as audit committee members of USO and the Related Public Funds organized as limited partnerships and, as of July 8, 2011, those Related Public Funds organized as a series of a Delaware statutory trust. USO shares the fees and expenses on a pro rata basis with each Related Public Fund, as described above, based on the relative assets of each fund computed on a daily basis. These fees and expenses for the year ended December 31, 2019 were $556,951 for USO and the Related Public Funds. USO's portion of such fees and expenses for the year ended December 31, 2019 was $333,741.

**Form of Shares**

*Registered Form.* Shares are issued in registered form in accordance with the LP Agreement. The Administrator has been appointed registrar and transfer agent for the purpose of transferring shares in certificated form. The Administrator keeps a record of all limited partners and holders of the shares in certificated form in the registry. USCF recognizes transfers of shares in certificated form only if done in accordance with the LP Agreement. The beneficial interests in such shares are held in book-entry form through participants and/or accountholders in the Depository Trust Company ("DTC").

13

Table of Contents

**Book Entry.** Individual certificates are not issued for the shares. Instead, shares are represented by one or more global certificates, which are deposited by the Administrator with DTC and registered in the name of Cede & Co., as nominee for DTC. The global certificates evidence all of the shares outstanding at any time. Shareholders are limited to: (1) participants in DTC such as banks, brokers, dealers and trust companies ("DTC Participants"), (2) those who maintain, either directly or indirectly, a custodial relationship with a DTC Participant ("Indirect Participants"), and (3) those banks, brokers, dealers, trust companies and others who hold interests in the shares through DTC Participants or Indirect Participants, in each case who satisfy the requirements for transfers of shares. DTC Participants acting on behalf of investors holding shares through such participants' accounts in DTC will follow the delivery practice applicable to securities eligible for DTC's Same-Day Funds Settlement System. Shares are credited to DTC Participants' securities accounts following confirmation of receipt of payment.

**DTC.** DTC has advised USO as follows: It is a limited purpose trust company organized under the laws of the State of New York and is a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code and a "clearing agency" registered pursuant to the provisions of Section 17A of the Exchange Act. DTC holds securities for DTC Participants and facilitates the clearance and settlement of transactions between DTC Participants through electronic book-entry changes in accounts of DTC Participants.

**Calculating Per Share NAV**

USO's per share NAV is calculated by:

- Taking the current market value of its total assets;
- Subtracting any liabilities; and
- Dividing that total by the total number of outstanding shares.

The Administrator calculates the per share NAV of USO once each NYSE Arca trading day. The per share NAV for a normal trading day is released after 4:00 p.m. New York time. Trading during the core trading session on the NYSE Arca typically closes at 4:00 p.m. New York time. The Administrator uses the NYMEX closing price (determined at the earlier of the close of the NYMEX or 2:30 p.m. New York time) for the Oil Futures Contracts traded on the NYMEX, but calculates or determines the value of all other USO investments (including Oil Futures Contracts not traded on the NYMEX, Other Oil-Related Investments and Treasuries) using market quotations, if available, or other information customarily used to determine the fair value of such investments as of the earlier of the close of the NYSE Arca or 4:00 p.m. New York time, in accordance with the current Administrative Agency Agreement among BBH&Co., USO and USCF. "Other information" customarily used in determining fair value includes information consisting of market data in the relevant market supplied by one or more third parties including, without limitation, relevant rates, prices, yields, yield curves, volatilities, spreads, correlations or other market data in the relevant market; or information of the types described above from internal sources if that information is of the same type used by USO in the regular course of its business for the valuation of similar transactions. The information may include costs of funding, to the extent costs of funding are not and would not be a component of the other information being utilized. Third parties supplying quotations or market data may include, without limitation, dealers in the relevant markets, end-users of the relevant product, information vendors, brokers and other sources of market information.

In addition, in order to provide updated information relating to USO for use by investors and market professionals, the NYSE Arca calculates and disseminates throughout the core trading session on each trading day an updated indicative fund value. The indicative fund value is calculated by using the prior day's closing per share NAV of USO as a base and updating that value throughout the trading day to reflect changes in the most recently reported trade price for the active light, sweet Oil Futures Contracts on the NYMEX. The prices reported for those Oil Futures Contract months are adjusted based on the prior day's spread differential between settlement values for the relevant contract and the spot month contract. In the event that the spot month contract is also the Benchmark Oil Futures Contract, the last sale price for that contract is not adjusted. The indicative fund value share basis disseminated during NYSE Arca core trading session hours should not be viewed as an actual real time update of the per share NAV, because the per share NAV is calculated only once at the end of each trading day based upon the relevant end of day values of USO's investments.

The indicative fund value is disseminated on a per share basis every 15 seconds during regular NYSE Arca core trading session hours of 9:30 a.m. New York time to 4:00 p.m. New York time. The normal trading hours of the NYMEX are 9:00 a.m. New York time to 2:30 p.m. New York time. This means that there is a gap in time at the beginning and the end of each day during which USO's shares are traded on the NYSE Arca, but real-time NYMEX trading prices for Oil Futures Contracts traded on the NYMEX are not available. During such gaps in time, the indicative fund value will be calculated based on the end of day price of such Oil Futures Contracts from the NYMEX's immediately preceding trading session. In addition, other Oil Futures Contracts, Other Oil-Related Investments and Treasuries held by USO will be valued by the Administrator, using rates and points received from client-approved third party vendors (such as Reuters and WM Company) and advisor quotes. These investments will not be included in the indicative fund value.

14

Table of Contents

The NYSE Arca disseminates the indicative fund value through the facilities of CTA/CQ High Speed Lines. In addition, the indicative fund value is published on the NYSE Arca's website and is available through on-line information services such as Bloomberg and Reuters.

Dissemination of the indicative fund value provides additional information that is not otherwise available to the public and is useful to investors and market professionals in connection with the trading of USO shares on the NYSE Arca. Investors and market professionals are able throughout the trading day to compare the market price of USO and the indicative fund value. If the market price of USO shares diverges significantly from the indicative fund value, market professionals will have an incentive to execute arbitrage trades. For example, if USO appears to be trading at a discount compared to the indicative fund value, a market professional could buy USO shares on the NYSE Arca and sell short Oil Futures Contracts. Such arbitrage trades can tighten the tracking between the market price of USO and the indicative fund value and thus can be beneficial to all market participants.

**Creation and Redemption of Shares**

USO creates and redeems shares from time to time, but only in one or more Creation Baskets or Redemption Baskets. The creation and redemption of baskets are only made in exchange for delivery to USO or the distribution by USO of the amount of Treasuries and any cash represented by the baskets being created or redeemed, the amount of which is based on the combined NAV of the number of shares included in the baskets being created or redeemed determined after 4:00 p.m. New York time on the day the order to create or redeem baskets is properly received.

Authorized Participants are the only persons that may place orders to create and redeem baskets. Authorized Participants must be (1) registered broker-dealers or other securities market participants, such as banks and other financial institutions, that are not required to register as broker-dealers to engage in securities transactions as described below, and (2) DTC Participants. To become an Authorized Participant, a person must enter into an Authorized Participant Agreement with USCF on behalf of USO (each such agreement, an "Authorized Participant Agreement"). The Authorized Participant Agreement provides the procedures for the creation and redemption of baskets and for the delivery of the Treasuries and any cash required for such creations and redemptions. The Authorized Participant Agreement and the related procedures attached thereto may be amended by USO, without the consent of any limited partner or shareholder or Authorized Participant. Authorized Participants pay USO a $1,000 transaction fee for each order placed to create one or more Creation Baskets or to redeem one or more Redemption Baskets. Authorized Participants who make deposits with USO in exchange for baskets receive no fees, commissions or other form of compensation or inducement of any kind from either USO or USCF, and no such person will have any obligation or responsibility to USCF or USO to effect any sale or resale of shares. As of December 31, 2019, 15 Authorized Participants had entered into agreements with USCF on behalf of USO. During the year ended December 31, 2019, USO issued 2,731 Creation Baskets and redeemed 3,347 Redemption Baskets.

Certain Authorized Participants are expected to be capable of participating directly in the physical crude oil market and the crude oil futures market. In some cases, Authorized Participants or their affiliates may from time to time buy crude oil or sell crude oil or Oil Interests and may profit in these instances. USCF believes that the size and operation of the crude oil market make it unlikely that an Authorized Participant's direct activities in the crude oil or securities markets will significantly affect the price of crude oil, Oil Interests, or the price of the shares.

Each Authorized Participant is required to be registered as a broker-dealer under the Exchange Act and is a member in good standing with FINRA, or exempt from being or otherwise not required to be registered as a broker-dealer or a member of FINRA, and qualified to act as a broker or dealer in the states or other jurisdictions where the nature of its business so requires. Certain Authorized Participants may also be regulated under federal and state banking laws and regulations. Each Authorized Participant has its own set of rules and procedures, internal controls and information barriers as it determines is appropriate in light of its own regulatory regime.

Under the Authorized Participant Agreement, USCF, and USO under limited circumstances, have agreed to indemnify the Authorized Participants against certain liabilities, including liabilities under the Securities Act and to contribute to the payments the Authorized Participants may be required to make in respect of those liabilities.

The following description of the procedures for the creation and redemption of baskets is only a summary and an investor should refer to the relevant provisions of the LP Agreement and the form of Authorized Participant Agreement for more detail, each of which is incorporated by reference into this annual report on Form 10-K.

15

Table of Contents

### Creation Procedures

On any business day, an Authorized Participant may place an order with the Marketing Agent to create one or more baskets. For purposes of processing purchase and redemption orders, a "business day" means any day other than a day when any of the NYSE Arca, the NYMEX or the NYSE is closed for regular trading. Purchase orders must be placed by 12:00 p.m. New York time or the close of regular trading on the NYSE Arca, whichever is earlier. The day on which the Marketing Agent receives a valid purchase order is referred to as the purchase order date.

By placing a purchase order, an Authorized Participant agrees to deposit Treasuries, cash, or a combination of Treasuries and cash, as described below. Prior to the delivery of baskets for a purchase order, the Authorized Participant must also have wired to the Custodian the non-refundable transaction fee due for the purchase order. Authorized Participants may not withdraw a creation request, except as otherwise set forth in the procedures in the Authorized Participant Agreement.

The manner by which creations are made is dictated by the terms of the Authorized Participant Agreement. By placing a purchase order, an Authorized Participant agrees to (1) deposit Treasuries, cash, or a combination of Treasuries and cash with the Custodian, and (2) if required by USCF in its sole discretion, enter into or arrange for a block trade, an exchange for physical or exchange for swap, or any other OTC energy transaction (through itself or a designated acceptable broker) with USO for the purchase of a number and type of futures contracts at the closing settlement price for such contracts on the purchase order date. If an Authorized Participant fails to consummate (1) and (2), the order shall be cancelled. The number and type of contracts specified shall be determined by USCF, in its sole discretion, to meet USO's investment objective and shall be purchased as a result of the Authorized Participant's purchase of shares.

### Determination of Required Deposits

The total deposit required to create each basket ("Creation Basket Deposit") is the amount of Treasuries and/or cash that is in the same proportion to the total assets of USO (net of estimated accrued but unpaid fees, expenses and other liabilities) on the purchase order date as the number of shares to be created under the purchase order is in proportion to the total number of shares outstanding on the purchase order dates. USCF determines, directly in its sole discretion or in consultation with the Administrator, the requirements for Treasuries and the amount of cash, including the maximum permitted remaining maturity of a Treasury and proportions of Treasury and cash that may be included in deposits to create baskets. The Marketing Agent will publish such requirements at the beginning of each business day. The amount of cash deposit required is the difference between the aggregate market value of the Treasuries required to be included in a Creation Basket Deposit as of 4:00 p.m. New York time on the date the order to purchase is properly received and the total required deposit.

### Delivery of Required Deposits

An Authorized Participant who places a purchase order is responsible for transferring to USO's account with the Custodian the required amount of Treasuries and cash by the end of the second business day following the purchase order date. Upon receipt of the deposit amount, the Administrator directs DTC to credit the number of baskets ordered to the Authorized Participant's DTC account on the second business day following the purchase order date. The expense and risk of delivery and ownership of Treasuries until such Treasuries have been received by the Custodian on behalf of USO shall be borne solely by the Authorized Participant.

Because orders to purchase baskets must be placed by 12:00 p.m., New York time, but the total payment required to create a basket during the continuous offering period will not be determined until after 4:00 p.m. New York time on the date the purchase order is received, Authorized Participants will not know the total amount of the payment required to create a basket at the time they submit an irrevocable purchase order for the basket. USO's per share NAV and the total amount of the payment required to create a basket could rise or fall substantially between the time an irrevocable purchase order is submitted and the time the amount of the purchase price in respect thereof is determined.

16

Table of Contents

***Rejection of Purchase Orders***

USCF acting by itself or through the Marketing Agent shall have the absolute right but no obligation to reject a purchase order or a Creation Basket Deposit if:

- it determines that the investment alternative available to USO at that time will not enable it to meet its investment objective;
- it determines that the purchase order or the Creation Basket Deposit is not in proper form;
- it believes that the purchase order or the Creation Basket Deposit would have adverse tax consequences to USO, the limited partners or its shareholders;
- the acceptance or receipt of the Creation Basket Deposit would, in the opinion of counsel to USCF, be unlawful; or
- circumstances outside the control of USCF, Marketing Agent or Custodian make it, for all practical purposes, not feasible to process creations of baskets.

None of USCF, the Marketing Agent or the Custodian will be liable for the rejection of any purchase order or Creation Basket Deposit.

***Redemption Procedures***

The procedures by which an Authorized Participant can redeem one or more baskets mirror the procedures for the creation of baskets. On any business day, an Authorized Participant may place an order with the Marketing Agent to redeem one or more baskets. Redemption orders must be placed by 12:00 p.m. New York time or the close of regular trading on the NYSE Arca, whichever is earlier. A redemption order so received will be effective on the date it is received in satisfactory form by the Marketing Agent ("Redemption Order Date"). The redemption procedures allow Authorized Participants to redeem baskets and do not entitle an individual shareholder to redeem any shares in an amount less than a Redemption Basket, or to redeem baskets other than through an Authorized Participant.

By placing a redemption order, an Authorized Participant agrees to deliver the baskets to be redeemed through DTC's book-entry system to USO, as described below. Prior to the delivery of the redemption distribution for a redemption order, the Authorized Participant must also have wired to USO's account at the Custodian the non-refundable transaction fee due for the redemption order. An Authorized Participant may not withdraw a redemption order, except as otherwise set forth in the procedures in the Authorized Participant Agreement.

The manner by which redemptions are made is dictated by the terms of the Authorized Participant Agreement. By placing a redemption order, an Authorized Participant agrees to (1) deliver the Redemption Basket to be redeemed through DTC's book-entry system to USO's account with the Custodian not later than 3:00 p.m. New York time on the second business day following the effective date of the redemption order ("Redemption Distribution Date"), and (2) if required by USCF in its sole discretion, enter into or arrange for a block trade, an exchange for physical or exchange for swap, or any other OTC energy transaction (through itself or a designated acceptable broker) with USO for the sale of a number and type of futures contracts at the closing settlement price for such contracts on the Redemption Order Date. If an Authorized Participant fails to consummate (1) and (2) above, the order shall be cancelled. The number and type of contracts specified shall be determined by USCF, in its sole discretion, to meet USO's investment objective and shall be sold as a result of the Authorized Participant's sale of shares.

***Determination of Redemption Distribution***

The redemption distribution from USO consists of a transfer to the redeeming Authorized Participant of an amount of Treasuries and/or cash that is in the same proportion to the total assets of USO (net of estimated accrued but unpaid fees, expenses and other liabilities) on the date the order to redeem is properly received as the number of shares to be redeemed under the redemption order is in proportion to the total number of shares outstanding on the date the order is received. USCF, directly or in consultation with the Administrator, determines the requirements for Treasuries and the amounts of cash, including the maximum permitted remaining maturity of a Treasury, and the proportions of Treasuries and cash that may be included in distributions to redeem baskets. The Marketing Agent will publish an estimate of the redemption distribution per basket as of the beginning of each business day.

***Delivery of Redemption Distribution***

The redemption distribution due from USO will be delivered to the Authorized Participant by 3:00 p.m. New York time on the second business day following the redemption order date if, by 3:00 p.m. New York time on such second business day, USO's DTC account has been credited with the baskets to be redeemed. If USO's DTC account has not been credited with all of the baskets to be redeemed by such time, the redemption distribution will be delivered to the extent of whole baskets received. Any remainder of the redemption distribution will be delivered on the next business day to the extent of remaining whole baskets received if USO receives the fee

17

Table of Contents

applicable to the extension of the redemption distribution date which USCF may, from time to time, determine and the remaining baskets to be redeemed are credited to USO's DTC account by 3:00 p.m. New York time on such next business day. Any further outstanding amount of the redemption order shall be cancelled. Pursuant to information from USCF, the Custodian will also be authorized to deliver the redemption distribution notwithstanding that the baskets to be redeemed are not credited to USO's DTC account by 3:00 p.m. New York time on the second business day following the redemption order date if the Authorized Participant has collateralized its obligation to deliver the baskets through DTC's book entry-system on such terms as USCF may from time to time determine.

### Suspension or Rejection of Redemption Orders

USCF may, in its discretion, suspend the right of redemption, or postpone the redemption settlement date, (1) for any period during which the NYSE Arca or the NYMEX is closed other than customary weekend or holiday closings, or trading on the NYSE Arca or the NYMEX is suspended or restricted, (2) for any period during which an emergency exists as a result of which delivery, disposal or evaluation of Treasuries is not reasonably practicable, or (3) for such other period as USCF determines to be necessary for the protection of the limited partners or shareholders. For example, USCF may determine that it is necessary to suspend redemptions to allow for the orderly liquidation of USO's assets at an appropriate value to fund a redemption. If USCF has difficulty liquidating its positions, *e.g.*, because of a market disruption event in the futures markets, a suspension of trading by the exchange where the futures contracts are listed or an unanticipated delay in the liquidation of a position in an OTC contract, it may be appropriate to suspend redemptions until such time as such circumstances are rectified. None of USCF, the Marketing Agent, the Administrator, or the Custodian will be liable to any person or in any way for any loss or damages that may result from any such suspension or postponement.

Redemption orders must be made in whole baskets. USCF will reject a redemption order if the order is not in proper form as described in the Authorized Participant Agreement or if the fulfillment of the order, in the opinion of its counsel, might be unlawful. USCF may also reject a redemption order if the number of shares being redeemed would reduce the remaining outstanding shares to 100,000 shares (i.e., one basket) or less.

### Creation and Redemption Transaction Fee

To compensate USO for its expenses in connection with the creation and redemption of baskets, an Authorized Participant is required to pay USO a $1,000 transaction fee per order to create or redeem baskets, regardless of the number of baskets in such order. An order may include multiple baskets. The transaction fee may be reduced, increased or otherwise changed by USCF. USCF shall notify DTC of any change in the transaction fee and will not implement any increase in the fee for the redemption of baskets until 30 days after the date of the notice.

### Tax Responsibility

Authorized Participants are responsible for any transfer tax, sales or use tax, stamp tax, recording tax, value added tax or similar tax or governmental charge applicable to the creation or redemption of baskets, regardless of whether or not such tax or charge is imposed directly on the Authorized Participant, and agree to indemnify USCF and USO if they are required by law to pay any such tax, together with any applicable penalties, additions to tax and interest thereon.

### Secondary Market Transactions

As noted, USO creates and redeems shares from time to time, but only in one or more Creation Baskets or Redemption Baskets. The creation and redemption of baskets are only made in exchange for delivery to USO or the distribution by USO of the amount of Treasuries and cash represented by the baskets being created or redeemed, the amount of which will be based on the aggregate NAV of the number of shares included in the baskets being created or redeemed determined on the day the order to create or redeem baskets is properly received.

18

Table of Contents

As discussed above, Authorized Participants are the only persons that may place orders to create and redeem baskets. Authorized Participants must be registered broker-dealers or other securities market participants, such as banks and other financial institutions that are not required to register as broker-dealers to engage in securities transactions. An Authorized Participant is under no obligation to create or redeem baskets, and an Authorized Participant is under no obligation to offer to the public shares of any baskets it does create. Authorized Participants that do offer to the public shares from the baskets they create will do so at per-share offering prices that are expected to reflect, among other factors, the trading price of the shares on the NYSE Arca, the per share NAV of USO at the time the Authorized Participant purchased the Creation Baskets and the per share NAV of the shares at the time of the offer of the shares to the public, the supply of and demand for shares at the time of sale, and the liquidity of the Oil Futures Contract market and the market for Other Oil-Related Investments. The prices of shares offered by Authorized Participants are expected to fall between USO's per share NAV and the trading price of the shares on the NYSE Arca at the time of sale. Shares initially comprising the same basket but offered by Authorized Participants to the public at different times may have different offering prices. An order for one or more baskets may be placed by an Authorized Participant on behalf of multiple clients. Authorized Participants who make deposits with USO in exchange for baskets receive no fees, commissions or other form of compensation or inducement of any kind from either USO or USCF, and no such person has any obligation or responsibility to USCF or USO to effect any sale or resale of shares. Shares trade in the secondary market on the NYSE Arca. Shares may trade in the secondary market at prices that are lower or higher relative to their per share NAV. The amount of the discount or premium in the trading price relative to the per share NAV may be influenced by various factors, including the number of investors who seek to purchase or sell shares in the secondary market and the liquidity of the Oil Futures Contracts market and the market for Other Oil-Related Investments. While the shares trade during the core trading session on the NYSE Arca until 4:00 p.m. New York time, liquidity in the market for Oil Futures Contracts and Other Oil-Related Investments may be reduced after the close of the NYMEX at 2:30 p.m. New York time. As a result, during this time, trading spreads, and the resulting premium or discount, on the shares may widen.

**Investments**

USCF causes USO to transfer the proceeds from the sale of Creation Baskets to the Custodian or other custodian for trading activities. USCF will invest USO's assets in Oil Futures Contracts and Other Oil-Related Investments and investments in Treasuries, cash and/or cash equivalents. When USO purchases an Oil Futures Contract and certain exchange-traded Other Oil-Related Investments, USO is required to deposit 5% to 30% with the selling FCM on behalf of the exchange a portion of the value of the contract or other interest as security to ensure payment for the obligation under Oil Interests at maturity. This deposit is known as initial margin. Counterparties in transactions in OTC Oil Interests will generally impose similar collateral requirements on USO. USCF will invest the assets that remain after margin and collateral are posted in Treasuries, cash and/or cash equivalents subject to these margin and collateral requirements. USCF has sole authority to determine the percentage of assets that are:

- held on deposit with the FCM or other custodian;
- used for other investments, and
- held in bank accounts to pay current obligations and as reserves.

Ongoing margin and collateral payments will generally be required for both exchange-traded and OTC Oil Interests based on changes in the value of the Oil Interests. Furthermore, ongoing collateral requirements with respect to OTC Oil Interests are negotiated by the parties, and may be affected by overall market volatility, volatility of the underlying commodity or index, the ability of the counterparty to hedge its exposure under an Oil Interest, and each party's creditworthiness. In light of the differing requirements for initial payments under exchange-traded and OTC Oil Interests and the fluctuating nature of ongoing margin and collateral payments, it is not possible to estimate what portion of USO's assets will be posted as margin or collateral at any given time. The Treasuries, cash and cash equivalents held by USO will constitute reserves that will be available to meet ongoing margin and collateral requirements. All interest income will be used for USO's benefit.

An FCM, counterparty, government agency or commodity exchange could increase margin or collateral requirements applicable to USO to hold trading positions at any time. Moreover, margin is merely a security deposit and has no bearing on the profit or loss potential for any positions held.

The assets of USO posted as margin for Oil Futures Contracts are held in segregated accounts pursuant to the CEA and CFTC regulations.

If USO enters into a swap agreement, USO must post both collateral and independent amounts to its swap counterparty(ies). The amount of collateral USO posts changes according to the amounts owed by USO to its counterparty on a given swap transaction, while independent amounts are fixed amounts posted by USO at the start of a swap transaction. Collateral and independent amounts posted to swap counterparties will be held by a third party custodian.

19

Table of Contents

**The Commodity Interest Markets**

*General*

The CEA governs the regulation of commodity interest transactions, markets and intermediaries. The CEA provides for varying degrees of regulation of commodity interest transactions depending upon: (1) the type of instrument being traded (e.g., contracts for future delivery, forwards, options, swaps or spot contracts), (2) the type of commodity underlying the instrument (distinctions are made between instruments based on agricultural commodities, energy and metals commodities and financial commodities), (3) the nature of the parties to the transaction (e.g., retail or eligible contract participant), (4) whether the transaction is entered into on a principal-to-principal or intermediated basis, (5) the type of market on which the transaction occurs, and (6) whether the transaction is subject to clearing through a clearing organization.

The offer and sale of shares of USO, as well as shares of each Related Public Fund, is registered under the Securities Act. USO and the Related Public Funds are subject to the requirements of the Securities Act, the Exchange Act and the rules and regulations adopted thereunder as administered by the SEC. Firms' participation in the distribution of shares is regulated as described above, as well as by the self-regulatory association, FINRA.

*Futures Contracts*

A futures contract is a standardized contract traded on, or subject to the rules of, an exchange that calls for the future delivery of a specified quantity and type of a commodity at a specified time and place. Futures contracts are traded on a wide variety of commodities, including agricultural products, bonds, stock indices, interest rates, currencies, energy and metals. The size and terms of futures contracts on a particular commodity are identical and are not subject to any negotiation, other than with respect to price and the number of contracts traded between the buyer and seller.

The contractual obligations of a buyer or seller may generally be satisfied by taking or making physical delivery of the underlying commodity or by making an offsetting sale or purchase of an identical futures contract on the same or linked exchange before the designated date of delivery. The difference between the price at which the futures contract is purchased or sold and the price paid for the offsetting sale or purchase, after allowance for brokerage commissions, constitutes the profit or loss to the trader. Some futures contracts, such as stock index contracts, settle in cash (reflecting the difference between the contract purchase/sale price and the contract settlement price) rather than by delivery of the underlying commodity.

In market terminology, a trader who purchases a futures contract is long in the market and a trader who sells a futures contract is short in the market. Before a trader closes out his long or short position by an offsetting sale or purchase, his outstanding contracts are known as open trades or open positions. The aggregate amount of open positions held by traders in a particular contract is referred to as the open interest in such contract.

*Forward Contracts*

A forward contract is a contractual obligation to purchase or sell a specified quantity of a commodity at or before a specified date in the future at a specified price and, therefore, is economically similar to a futures contract. Unlike futures contracts, however, forward contracts are typically traded in the OTC markets and are not standardized contracts. Forward contracts for a given commodity are generally available for various amounts and maturities and are subject to individual negotiation between the parties involved. Moreover, generally there is no direct means of offsetting or closing out a forward contract by taking an offsetting position as one would a futures contract on a U.S. exchange. If a trader desires to close out a forward contract position, he generally will establish an opposite position in the contract but will settle and recognize the profit or loss on both positions simultaneously on the delivery date. Thus, unlike in the futures contract market where a trader who has offset positions will recognize profit or loss immediately, in the forward market a trader with a position that has been offset at a profit will generally not receive such profit until the delivery date, and likewise a trader with a position that has been offset at a loss will generally not have to pay money until the delivery date. Nevertheless, in some instances forward contracts now provide a right of offset or cash settlement as an alternative to making or taking delivery of the underlying commodity.

In general, the CFTC does not regulate the interbank and forward foreign currency markets with respect to transactions in contracts between certain sophisticated counterparties such as USO or between certain regulated institutions and retail investors. Although U.S. banks are regulated in various ways by the Federal Reserve Board, the Comptroller of the Currency and other U.S. federal and state banking officials, banking authorities do not regulate the forward markets to the same extent that the swap markets are regulated by the CFTC and SEC.

20

Table of Contents

Regulation exempts both foreign exchange swaps and foreign exchange forwards from the definition of "swap" and, by extension, certain regulatory requirements applicable to swaps (such as clearing and margin). The exemption does not extend to other foreign exchange derivatives, such as foreign exchange options, currency swaps and non-deliverable forwards.

While the U.S. government does not currently impose any restrictions on the movements of currencies, it could choose to do so. The imposition or relaxation of exchange controls in various jurisdictions could significantly affect the market for that and other jurisdictions' currencies. Trading in the interbank market also exposes USO to a risk of default since failure of a bank with which USO had entered into a forward contract would likely result in a default and thus possibly substantial losses to USO.

***Options on Futures Contracts***

Options on futures contracts are standardized contracts traded on an exchange. An option on a futures contract gives the buyer of the option the right, but not the obligation, to take a position at a specified price (the striking, strike, or exercise price) in the underlying futures contract or underlying interest. The buyer of a call option acquires the right, but not the obligation, to purchase or take a long position in the underlying interest, and the buyer of a put option acquires the right, but not the obligation, to sell or take a short position in the underlying interest.

The seller, or writer, of an option is obligated to take a position in the underlying interest at a specified price opposite to the option buyer if the option is exercised. The seller of a call option must stand ready to take a short position in the underlying interest at the strike price if the buyer should exercise the option. The seller of a put option, on the other hand, must stand ready to take a long position in the underlying interest at the strike price.

A call option is said to be in-the-money if the strike price is below current market levels and out-of-the-money if the strike price is above current market levels. Conversely, a put option is said to be in-the-money if the strike price is above the current market levels and out-of-the-money if the strike price is below current market levels.

Options have limited life spans, usually tied to the delivery or settlement date of the underlying interest. Some options, however, expire significantly in advance of such date. The purchase price of an option is referred to as its premium, which consists of its intrinsic value (which is related to the underlying market value) plus its time value. As an option nears its expiration date, the time value shrinks and the market and intrinsic values move into parity. An option that is out-of-the-money and not offset by the time it expires becomes worthless. On certain exchanges, in-the-money options are automatically exercised on their expiration date, but on others unexercised options simply become worthless after their expiration date.

Regardless of how much the market swings, the most an option buyer can lose is the option premium. The option buyer deposits his premium with his broker, and the money goes to the option seller. Option sellers, on the other hand, face risks similar to participants in the futures markets. For example, since the seller of a call option is assigned a short futures position if the option is exercised, his risk is the same as someone who initially sold a futures contract. Because no one can predict exactly how the market will move, the option seller typically posts margin to demonstrate his ability to meet any potential contractual obligations.

***Options on Forward Contracts or Commodities***

Options on forward contracts or commodities operate in a manner similar to options on futures contracts. An option on a forward contract or commodity gives the buyer of the option the right, but not the obligation, to take a position at a specified price in the underlying forward contract or commodity. However, unlike options on futures contracts, options on forward contracts or on commodities are individually negotiated contracts between counterparties and are typically traded in the OTC market. Therefore, options on forward contracts and physical commodities possess many of the same characteristics of forward contracts with respect to offsetting positions and credit risk that are described above.

***Swap Contracts***

Swap transactions generally involve contracts between two parties to exchange a stream of payments computed by reference to a notional amount and the price of the asset that is the subject of the swap. Swap contracts are principally traded off-exchange, although certain swap contracts are also being traded in electronic trading facilities and cleared through clearing organizations.

21

1/26/2021     Case 1:20-cv-04740-PGG   Document 144-8   Filed 04/29/21   Page 25 of 92

Table of Contents

Swaps are usually entered into on a net basis, that is, the two payment streams are netted out in a cash settlement on the payment date or dates specified in the agreement, with the parties receiving or paying, as the case may be, only the net amount of the two payments. Swaps do not generally involve the delivery of underlying assets or principal. Accordingly, the risk of loss with respect to swaps is generally limited to the net amount of payments that the party is contractually obligated to make. In some swap transactions one or both parties may require collateral deposits from the counterparty to support that counterparty's obligation under the swap agreement. If the counterparty to such a swap defaults, the risk of loss consists of the net amount of payments that the party is contractually entitled to receive less any collateral deposits it is holding.

Some swap transactions are cleared through central counterparties. "Clearing" refers to the process by which a trade that is bilaterally executed by two parties is submitted to a central clearing counterparty, via a clearing member (i.e., an FCM), and replaced by two mirror swaps, with the central clearing counterparty becoming the counterparty to both of the initial parties to the swap. These transactions, known as cleared swaps, involve two counterparties first agreeing to the terms of a swap transaction, then submitting the transaction to a clearing house that acts as the central counterparty. Once accepted by the clearing house, the original swap transaction is terminated and replaced by two mirror trades for which the central counterparty becomes the counterparty to each of the original parties based upon the trade terms determined in the original transaction. In this manner each individual swap counterparty reduces its risk of loss due to counterparty nonperformance because the clearing house acts as the counterparty to each transaction.

**Commodities Regulation**

Futures exchanges in the United States are subject to varying degrees of regulation under the CEA depending on whether such exchange is a designated contract market, exempt board of trade or electronic trading facility. Clearing organizations are also subject to the CEA and the rules and regulations adopted thereunder and administered by the CFTC. The CFTC is the governmental agency charged with responsibility for regulation of futures exchanges and commodity interest trading. The CFTC's function is to implement the CEA's objectives of preventing price manipulation and excessive speculation and promoting orderly and efficient commodity interest markets. In addition, the various exchanges and clearing organizations themselves exercise regulatory and supervisory authority over their member firms.

The CFTC also regulates the activities of "commodity trading advisors" and "commodity pool operators" and the CFTC has adopted regulations with respect to certain of such persons' activities. Pursuant to its authority, the CFTC requires a CPO, such as USCF, to keep accurate, current and orderly records with respect to each pool it operates. The CFTC may suspend, modify or terminate the registration of any registrant for failure to comply with CFTC rules or regulations. Suspension, restriction or termination of USCF's registration as a CPO would prevent it, until such time (if any) as such registration were to be reinstated, from managing, and might result in the termination of, USO or the Related Public Funds.

Under certain circumstances, the CEA grants shareholders the right to institute a reparations proceeding before the CFTC against USCF (as a registered commodity pool operator), as well as those of their respective employees who are required to be registered under the CEA. Shareholders may also be able to maintain a private right of action for certain violations of the CEA.

Pursuant to authority in the CEA, the NFA has been formed and registered with the CFTC as a registered futures association. The NFA is the only self-regulatory association for commodities professionals other than the exchanges. As such, the NFA promulgates rules governing the conduct of commodity professionals and disciplines those professionals that do not comply with such standards. The CFTC has delegated to the NFA responsibility for the registration of commodity pool operators. USCF is a member of the NFA. As a member of the NFA, USCF is subject to NFA standards relating to fair trade practices, financial condition, and consumer protection.

The CEA requires all FCMs, i.e., USO's clearing brokers, to meet and maintain specified fitness and financial requirements, to segregate customer funds from proprietary funds and account separately for all customers' funds and positions, and to maintain specified books and records open to inspection by the staff of the CFTC. The CFTC has similar authority over introducing brokers, or persons who solicit or accept orders for commodity interest trades but who do not accept margin deposits for the execution of trades. The CEA authorizes the CFTC to regulate trading by FCMs and by their officers and directors, permits the CFTC to require action by exchanges in the event of market emergencies, and establishes an administrative procedure under which customers may institute complaints for damages arising from alleged violations of the CEA.

The regulations of the CFTC and the NFA prohibit any representation by a person registered with the CFTC or by any member of the NFA, that registration with the CFTC, or membership in the NFA, in any respect indicates that the CFTC or the NFA, as the case may be, has approved or endorsed that person or that person's trading program or objectives. The registrations and memberships of the parties described in this summary must not be considered as constituting any such approval or endorsement. Likewise, no futures exchange has given or will give any similar approval or endorsement.

22

https://www.sec.gov/Archives/edgar/data/1327068/000110465920023944/uso-20191231x10k9feacd.htm     24/91

Table of Contents

CFTC regulations require enhanced customer protections, risk management programs, internal monitoring and controls, capital and liquidity standards, customer disclosures and auditing and examination programs for FCMs. These regulations are intended to afford greater assurances to market participants that customer segregated funds and secured amounts are protected, customers are provided with appropriate notice of the risks of futures trading and of the FCMs with which they may choose to do business, FCMs are monitoring and managing risks in a robust manner, the capital and liquidity of FCMs are strengthened to safeguard the continued operations, and the auditing and examination programs of the CFTC and the self-regulatory organizations are monitoring the activities of FCMs in a thorough manner.

USO's investors are afforded prescribed rights for reparations under the CEA against USCF (as a registered commodity pool operator), as well as its respective employees who are required to be registered under the CEA. Investors may also be able to maintain a private right of action for violations of the CEA. The CFTC has adopted rules implementing the reparation provisions of the CEA, which provide that any person may file a complaint for a reparations award with the CFTC for violation of the CEA against a floor broker or an FCM, introducing broker, commodity trading advisor, CPO, and their respective associated persons.

The regulation of commodity interest trading in the United States and other countries is an evolving area of the law. Below are discussed several key regulatory items that are relevant to USO. The various statements made in this summary are subject to modification by legislative action and changes in the rules and regulations of the CFTC, the NFA, the futures exchanges, clearing organizations and other regulatory bodies. In addition, with regard to any other rules that the CFTC or SEC may adopt in the future, the effect of any such regulatory changes on USO is impossible to predict, but it could be substantial and adverse.

***Futures Contracts and Position Limits***

The CFTC is generally prohibited by statute from regulating trading on non-U.S. futures exchanges and markets. The CFTC, however, has adopted regulations relating to the marketing of non-U.S. futures contracts in the United States. These regulations permit certain contracts on non-U.S. exchanges to be offered and sold in the United States.

As discussed above, the CFTC has proposed to adopt limits on speculative positions in 25 physical commodity futures and option contracts as well as swaps that are economically equivalent to such contracts in the agriculture, energy and metals markets. The Position Limit Rules would, among other things: identify which contracts are subject to speculative position limits; set thresholds that restrict the size of speculative positions that a person may hold in the spot month, other individual months, and all months combined; create an exemption for positions that constitute bona fide hedging transactions; impose responsibilities on DCMs and SEFs to establish position limits or, in some cases, position accountability rules; and apply to both futures and swaps across four relevant venues: OTC, DCMs, SEFs as well as certain non-U.S. located platforms. The CFTC's first attempt at finalizing the Position Limit Rules, in 2011, was successfully challenged by market participants in 2012 and, since then, the CFTC has re-proposed them and solicited comments from market participants multiple times. At this time, it is unclear how the Position Limit Rules may affect USO, but the effect may be substantial and adverse. By way of example, the Position Limit Rules may negatively impact the ability of USO to meet its investment objectives through limits that may inhibit USCF's ability to sell additional Creation Baskets of USO. See *"The Commodity Interest Markets-Commodities Regulation"* in this annual report on Form 10-K for additional information.

Until such time as the Position Limit Rules are adopted, the regulatory architecture in effect prior to the adoption of the Position Limit Rules will govern transactions in commodities and related derivatives. Under that system, the CFTC enforces federal limits on speculation in nine agricultural products (e.g., corn, wheat and soy), while futures exchanges establish and enforce position limits and accountability levels for other agricultural products and certain energy products (e.g., oil and natural gas). As a result, USO may be limited with respect to the size of its investments in any commodities subject to these limits.

Under existing and recently adopted CFTC regulations, for the purpose of position limits, a market participant is generally required, subject to certain narrow exceptions, to aggregate all positions for which that participant controls the trading decisions with all positions for which that participant has a 10 percent or greater ownership interest in an account or position, as well as the positions of two or more persons acting pursuant to an express or implied agreement or understanding with that participant. The Aggregation Rules will also apply with respect to the Position Limit Rules if and when such Position Limit Rules are adopted.

23

Table of Contents

**Margin Requirements**

Futures and Cleared Swaps

Original or initial margin is the minimum amount of funds that must be deposited by a commodity interest trader with the trader's broker to initiate and maintain an open position in futures contracts. Maintenance margin is the amount (generally less than the original margin) to which a trader's account may decline before he must deliver additional margin. A margin deposit is like a cash performance bond. It helps assure the trader's performance of the futures contracts that he or she purchases or sells.

Futures contracts are customarily bought and sold on initial margin that represents a very small percentage (ranging upward from 5%) of the aggregate purchase or sales price of the contract. Because of such low margin requirements, price fluctuations occurring in the futures markets may create profits and losses that, in relation to the amount invested, are greater than are customary in other forms of investment or speculation. As discussed below, adverse price changes in the futures contract may result in margin requirements that greatly exceed the initial margin. In addition, the amount of margin required in connection with a particular futures contract is set from time to time by the exchange on which the contract is traded and may be modified from time to time by the exchange during the term of the contract.

Brokerage firms, such as USO's clearing brokers, carrying accounts for traders in commodity interest contracts may not accept lower, and generally require higher, amounts of margin as a matter of policy to further protect themselves. The clearing brokers require USO to make margin deposits equal to exchange minimum levels for all commodity interest contracts. This requirement may be altered from time to time in the clearing brokers' discretion.

Margin requirements are computed each day by the relevant clearing organization and a trader's clearing broker. When the market value of a particular open commodity interest position changes to a point where the margin on deposit does not satisfy maintenance margin requirements, a margin call is made by the broker. With respect to trading by USO, USO (and not its investors personally) is subject to margin calls.

Finally, many major U.S. exchanges have passed certain cross margining arrangements involving procedures pursuant to which the futures and options positions held in an account would, in the case of some accounts, be aggregated and margin requirements would be assessed on a portfolio basis, measuring the total risk of the combined positions.

Options

When a trader purchases an option, there is no margin requirement; however, the option premium must be paid in full. When a trader sells an option, on the other hand, he or she may be required to deposit margin in an amount determined by the margin requirements established for the underlying interest and, in addition, an amount substantially equal to the current premium for the option. The margin requirements imposed on the selling of options, although adjusted to reflect the probability that out-of-the-money options will not be exercised, can in fact be higher than those imposed in dealing in the futures markets directly. Complicated margin requirements apply to spreads and conversions, which are complex trading strategies in which a trader acquires a mixture of options positions and positions in the underlying interest.

OTC Swaps

In October 2015, the Office of the Comptroller of the Currency, the Board of Governors of the Federal Reserve System, the FDIC, the Farm Credit Administration, and the Federal Housing Finance Agency (each an "Agency" and, collectively, the "Agencies") jointly adopted final rules to establish minimum margin and capital requirements for registered swap dealers, major swap participants, security-based swap dealers, and major security-based swap participants ("Swap Entities") that are subject to the jurisdiction of one of the Agencies (such entities, "Covered Swap Entities", and the joint final rules, the "Final Margin Rules").

24

Table of Contents

The Final Margin Rules will subject non-cleared swaps and non-cleared security-based swaps between Covered Swap Entities and Swap Entities, and between Covered Swap Entities and financial end users that have material swaps exposure (i.e., an average daily aggregate notional of $8 billion or more in non-cleared swaps calculated in accordance with the Final Margin Rules), to a mandatory two-way minimum initial margin requirement. The minimum amount of the initial margin required to be posted or collected would be either the amount calculated by the Covered Swap Entity using a standardized schedule set forth as an appendix to the Final Margin Rules, which provides the gross initial margin (as a percentage of total notional exposure) for certain asset classes, or an internal margin model of the Covered Swap Entity conforming to the requirements of the Final Margin Rules that is approved by the Agency having jurisdiction over the particular Covered Swap Entity. The Final Margin Rules specify the types of collateral that may be posted or collected as initial margin for non-cleared swaps and non-cleared security-based swaps with financial end users (generally cash, certain government, government-sponsored enterprise securities, certain liquid debt, certain equity securities, certain eligible publicly traded debt, and gold); and sets forth haircuts for certain collateral asset classes.

The Final Margin Rules require minimum variation margin to be exchanged daily for non-cleared swaps and non-cleared security-based swaps between Covered Swap Entities and Swap Entities and between Covered Swap Entities and all financial end-users (without regard to the swaps exposure of the particular financial end-user). The minimum variation margin amount is the daily mark-to-market change in the value of the swap to the Covered Swap Entity, taking into account variation margin previously posted or collected. For non-cleared swaps and security-based swaps between Covered Swap Entities and financial end-users, variation margin may be posted or collected in cash or non-cash collateral that is considered eligible for initial margin purposes. Variation margin is not subject to segregation with an independent, third-party custodian, and may, if permitted by contract, be rehypothecated.

The initial margin requirements of the Final Margin Rules are being phased in over time, and the variation margin requirements of the Final Margin Rules are currently in effect. USO is not a Covered Swap Entity under the Final Margin Rules but it is a financial end-user. Accordingly, USO is currently subject to the variation margin requirements of the Final Margin Rules. However, USO does not have material swaps exposure and, accordingly, USO will not be subject to the initial margin requirements of the Final Margin Rules.

The Dodd-Frank Wall Street Reform and Consumer Protection Act (the "Dodd-Frank Act") required the CFTC and the SEC to adopt their own margin rules to apply to a limited number of registered swap dealers, security-based swap dealers, major swap participants, and major security-based swap participants that are not subject to the jurisdiction of one of the Agencies. On December 16, 2015 the CFTC finalized its margin rules, which are substantially the same as the Final Margin Rules and have the same implementation timeline. The SEC adopted margin rules for security-based swap dealers and major security-based swap participants on June 21, 2019. The SEC's margin rules are generally aligned with the Final Margin Rules and the CFTC's margin rules, but they differ in a few key respects relating to timing for compliance and the manner in which initial margin must be segregated. USO does not currently engage in security-based swap transactions and, therefore, the SEC's margin rules are not expected to apply to USO.

***Mandatory Trading and Clearing of Swaps***

CFTC regulations require that certain swap transactions be executed on organized exchanges or "swap execution facilities" and cleared through regulated clearing organizations ("derivative clearing organizations" ("DCOs")), if the CFTC mandates the central clearing of a particular class of swap and such swap is "made available to trade" on a swap execution facility. Currently, swap dealers, major swap participants, commodity pools, certain private funds and entities predominantly engaged in activities that are financial in nature are required to execute on a swap execution facility, and clear, certain interest rate swaps and index-based credit default swaps. As a result, if USO enters into an interest rate or index-based credit default swap that is subject to these requirements, such swap will be required to be executed on a swap execution facility and centrally cleared. Mandatory clearing and "made available to trade" determinations with respect to additional types of swaps are expected in the future, and, when finalized, could require USO to electronically execute and centrally clear certain OTC instruments presently entered into and settled on a bi-lateral basis. If a swap is required to be cleared, initial and variation margin requirements are set by the relevant clearing organization, subject to certain regulatory requirements and guidelines. Additional margin may be required and held by USO's FCM.

***Other Requirements for Swaps***

In addition to the margin requirements described above, swaps that are not required to be cleared and executed on a SEF but that are executed bilaterally are also subject to various requirements pursuant to CFTC regulations, including, among other things, reporting and recordkeeping requirements and, depending on the status of the counterparties, trading documentation requirements and dispute resolution requirements.

25

Table of Contents

*Derivatives Regulations in Non-U.S. Jurisdictions*

In addition to U.S. laws and regulations, USO may be subject to non-U.S. derivatives laws and regulations if it engages in futures and/or swap transactions with non-U.S. persons. For example, USO may be impacted by European laws and regulations to the extent that it engages in futures transactions on European exchanges or derivatives transactions with European entities. Other jurisdictions impose requirements applicable to futures and derivatives that are similar to those imposed by the U.S., including position limits, margin, clearing and trade execution requirements.

**SEC Reports**

USO makes available, free of charge, on its website, its annual reports on Form 10-K, its quarterly reports on Form 10-Q, its current reports on Form 8-K and amendments to these reports filed or furnished pursuant to Section 13(a) or 15(d) of the Exchange Act as soon as reasonably practicable after these forms are filed with, or furnished to, the SEC. These reports are also available from the SEC through its website at: www.sec.gov.

**CFTC Reports**

USO also makes available its monthly reports and its annual reports required to be prepared and filed with the NFA under the CFTC regulations.

**Intellectual Property**

USCF owns trademark registrations for UNITED STATES OIL FUND (U.S. Reg. No. 3240929) for "Investment services in the field of oil futures contracts and other oil interests," in use since April 30, 2006, USO UNITED STATES OIL FUND, LP (and Flame Design) (U.S. Reg. No. 4440928) for "Financial investment services in the field of oil futures contracts, cash-settled options on oil futures contracts, forward contracts for oil, over-the-counter transactions based on the price of oil, and indices based on the foregoing," in use since September 30, 2012, and THE ORIGINAL OIL ETF, (U.S. Reg. No. 4472747) for "Fund investment services in the field of oil futures contracts, cash-settled options on oil futures contracts, forward contracts for oil, over-the-counter transactions based on the price of oil, and indices based on the foregoing," in use since September 23, 2013. USCF relies upon these trademarks through which it markets its services and strives to build and maintain brand recognition in the market and among current and potential investors. So long as USCF continues to use these trademarks to identify its services, without challenge from any third party, and properly maintains and renews the trademark registrations under applicable laws, rules and regulations, it will continue to have indefinite protection for these trademarks under current laws, rules and regulations.

USCF owns trademark registrations for USCF (and Design) (U.S. Reg. No. 5127374) for "Fund investment services," in use since April 10, 2016, USCF (U.S. Reg No. 5040755) for "Fund investment services," in use since June 24, 2008, and INVEST IN WHAT'S REAL (U.S. Reg. No. 5450808) for "Fund investment services," in use since April 2016. USCF relies upon these trademarks and service mark through which it markets its services and strives to build and maintain brand recognition in the market and among current and potential investors. So long as USCF continues to use these trademarks to identify its services, without challenge from any third party, and properly maintains and renews the trademark registrations under applicable laws, rules and regulations; it will continue to have indefinite protection for these trademarks under current laws, rules and regulations. USCF has been granted two patents Nos. 7,739,186 and 8,019,675, for systems and methods for an exchange traded fund (ETF) that tracks the price of one or more commodities.

**Item 1A. Risk Factors.**

*The following risk factors should be read in connection with the other information included in this annual report on Form 10-K, including Management's Discussion and Analysis of Financial Condition and Results of Operations and USO's financial statements and the related notes.*

26

Table of Contents

USO's investment objective is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of the Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses. USO seeks to achieve its investment objective by investing so that the average daily percentage change in USO's NAV for any period of 30 successive valuation days will be within plus/minus ten percent (10%) of the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period. USO's investment strategy is designed to provide investors with a cost-effective way to invest indirectly in crude oil and to hedge against movements in the spot price of light, sweet crude oil. An investment in USO involves investment risk similar to a direct investment in Oil Futures Contracts and Other Oil-Related Investments, and correlation risk, or the risk that investors purchasing shares to hedge against movements in the price of crude oil will have an efficient hedge only if the price they pay for their shares closely correlates with the price of crude oil. In addition to investment risk and correlation risk, an investment in USO involves tax risks, OTC risks, and other risks.

**Investment Risk**

*The NAV of USO's shares relates directly to the value of the Benchmark Oil Futures Contract and other assets held by USO and fluctuations in the prices of these assets could materially adversely affect an investment in USO's shares.*

The net assets of USO consist primarily of investments in Oil Futures Contracts and, to a lesser extent, in Other Oil-Related Investments. The NAV of USO's shares relates directly to the value of these assets (less liabilities, including accrued but unpaid expenses), which in turn relates to the price of light, sweet crude oil in the marketplace. Crude oil prices depend on local, regional and global events or conditions that affect supply and demand for oil.

    *Economic conditions impacting crude oil.* The demand for crude oil correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices. Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and other events or conditions that impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil.

    *Other crude oil demand-related factors.* Other factors that may affect the demand for crude oil and therefore its price, include technological improvements in energy efficiency; seasonal weather patterns, which affect the demand for crude oil associated with heating and cooling; increased competitiveness of alternative energy sources that have so far generally not been competitive with oil without the benefit of government subsidies or mandates; and changes in technology or consumer preferences that alter fuel choices, such as toward alternative fueled vehicles.

    *Other crude oil supply-related factors.* Crude oil prices also vary depending on a number of factors affecting supply. For example, increased supply from the development of new oil supply sources and technologies to enhance recovery from existing sources tends to reduce crude oil prices to the extent such supply increases are not offset by commensurate growth in demand. Similarly, increases in industry refining or petrochemical manufacturing capacity may impact the supply of crude oil. World oil supply levels can also be affected by factors that reduce available supplies, such as adherence by member countries to OPEC production quotas and the occurrence of wars, hostile actions, natural disasters, disruptions in competitors' operations, or unexpected unavailability of distribution channels that may disrupt supplies. Technological change can also alter the relative costs for companies in the petroleum industry to find, produce, and refine oil and to manufacture petrochemicals, which in turn may affect the supply of and demand for oil.

    *Other factors impacting the crude oil market.* The supply of and demand for crude oil may also be impacted by changes in interest rates, inflation, and other local or regional market conditions, as well as by the development of alternative energy sources.

    *Price Volatility May Possibly Cause the Total Loss of Your Investment.* Futures contracts have a high degree of price variability and are subject to occasional rapid and substantial changes. Consequently, you could lose all or substantially all of your investment in USO.

27

Table of Contents

***Changes to U.S. tariff and import/export regulations may have a negative effect on USO's developments.***

There has been ongoing discussion and commentary regarding potential significant changes to U.S. trade policies, treaties and tariffs. The current U.S. presidential administration, along with the U.S. Congress, has created significant uncertainty about the future relationship between the United States and other countries with respect to trade policies, treaties and tariffs. These developments, or the perception that any of them could occur, may have a material adverse effect on global economic conditions and the stability of global crude oil, generally. Any of these factors could depress economic activity and could have a material adverse effect on USO's business, financial condition and results of operations, which in turn would negatively impact USO and its shareholders.

***Uncertainty about presidential administration initiatives could negatively impact USO's business, financial condition and results of operations.***

The current presidential administration has called for significant changes to U.S. trade, healthcare, immigration, foreign and government regulatory policy. Accordingly, there is significant uncertainty with respect to legislation, regulation and government policy at the federal level, as well as the state and local levels. Recent events have created heightened uncertainty and introduced new and difficult-to-quantify macroeconomic and political risks. There has been a corresponding increase in the uncertainty surrounding interest rates, inflation, foreign exchange rates, trade volumes and fiscal and monetary policy. To the extent the U.S. Congress or the current presidential administration implements changes to U.S. policy, those changes may impact, among other things, the U.S. and global economy, international trade and relations, unemployment, immigration, corporate taxes, healthcare, the U.S. regulatory environment, inflation, supply and demand for commodities (including crude oil), and other areas. Although USO cannot predict the impact, if any, of these changes to USO's business, they could adversely affect USO's business, financial condition, operating results and cash flows.

***Economic impacts due to Brexit.***

In June 2016, the United Kingdom held a referendum in which voters approved an exit from the European Union ("Brexit") and, subsequently, on March 29, 2017, the U.K. government began the formal process of leaving the European Union. Brexit created political and economic uncertainty and instability in the global markets (including currency and credit markets), and especially in the United Kingdom and the European Union. Because the U.K. Parliament rejected Prime Minister Theresa May's proposed Brexit deal with the European Union in January 2019 and March 2019, and Prime Minister Theresa May's resignation which was effective June 7, 2019, there was increased uncertainty on the timing of Brexit. However, under current Prime Minister Boris Johnson, the House of Commons passed a Brexit deal on December 20, 2019 and the U.K. formally left the European Union on January 31, 2020. The U.K. is currently in a transition period until December 31, 2020, where agreements surrounding trade and other aspects of the U.K.'s future relationship with the European Union will need to be finalized. The resulting political and economic uncertainty and instability in the United Kingdom has also impacted the European Union, generally, as well as the global economy. In addition, the fiscal and monetary policies of foreign nations, such as Russia and China, may have a severe impact on the worldwide and U.S. commodity markets. Such disruptions or changes could adversely impact the value of USO's crude oil investments.

***Because USCF anticipates it will "roll" USO's positions in Oil Interests, it may be subject to the potential negative impact from rolling futures positions.***

USCF anticipates it will "roll" USO's positions in Oil Interests and, as a result, is subject to risks related to rolling. The contractual obligations of a buyer or seller holding a futures contract to expiration may generally be satisfied by settling in cash as designated in the contract specifications. Alternatively, futures contracts may be closed out prior to expiration by making an offsetting sale or purchase of an identical futures contract on the same or linked exchange before the designated date of settlement. Once this date is reached, the futures contract "expires." As the futures contracts held by USO near expiration, they are generally closed out and replaced by contracts with a later expiration. This process is referred to as "rolling." USO does not intend to hold futures contracts through expiration, but instead to "roll" its positions.

When the market for these contracts is such that the prices are higher in the more distant delivery months than in the nearer delivery months, the sale during the course of the "rolling process" of the more nearby contract would take place at a price that is lower than the price of the more distant contract. This pattern of higher futures prices for longer expiration futures contracts is often referred to as "contango." Alternatively, when the market for these contracts is such that the prices are higher in the nearer months than in the more distant months, the sale during the course of the "rolling process" of the more nearby contract would take place at a price that is higher than the price of the more distant contract. This pattern of higher futures prices for shorter expiration futures contracts is referred to as "backwardation."

28

Table of Contents

The presence of contango in certain futures contracts at the time of rolling would be expected to adversely affect USO's long positions, and positively affect USO's short positions. Similarly, the presence of backwardation in certain futures contracts at the time of rolling such contracts would be expected to adversely affect USO's short positions and positively affect USO's long positions.

There have been extended periods in which contango or backwardation has existed in the futures contract markets for various types of futures contracts, and such periods can be expected to occur in the future. These extended periods have in the past and can in the future cause significant losses for USO, and the periods can have as much or more impact over time than movements in the level of USO's Benchmark Oil Futures Contract.

*An investment in USO may provide little or no diversification benefits. Thus, in a declining market, USO may have no gains to offset losses from other investments, and an investor may suffer losses on an investment in USO while incurring losses with respect to other asset classes.*

Historically, Oil Futures Contracts and Other Oil-Related Investments have generally been non-correlated to the performance of other asset classes such as stocks and bonds. Non-correlation means that there is a low statistically valid relationship between the performance of futures and other commodity interest transactions, on the one hand, and stocks or bonds, on the other hand.

However, there can be no assurance that such non-correlation will continue during future periods. If, contrary to historic patterns, USO's performance were to move in the same general direction as the financial markets, investors will obtain little or no diversification benefits from an investment in USO's shares. In such a case, USO may have no gains to offset losses from other investments, and investors may suffer losses on their investment in USO at the same time they incur losses with respect to other investments.

Variables such as drought, floods, weather, embargoes, tariffs and other political events may have a larger impact on crude oil prices and crude oil-linked instruments, including Oil Futures Contracts and Other Oil-Related Investments, than on traditional securities. These additional variables may create additional investment risks that subject USO's investments to greater volatility than investments in traditional securities.

Non-correlation should not be confused with negative correlation, where the performance of two asset classes would be opposite of each other. There is no historical evidence that the spot price of crude oil and prices of other financial assets, such as stocks and bonds, are negatively correlated. In the absence of negative correlation, USO cannot be expected to be automatically profitable during unfavorable periods for the stock market, or vice versa.

*Historical performance of USO and the Benchmark Futures Contract is not indicative of future performance.*

Past performance of USO or the Benchmark Futures Contract is not necessarily indicative of future results. Therefore, past performance of USO or the Benchmark Futures Contract should not be relied upon in deciding whether to buy shares of USO.

**Correlation Risk**

Investors purchasing shares to hedge against movements in the price of crude oil will have an efficient hedge only if the price they pay for their shares closely correlates with the price of crude oil. Investing in USO's shares for hedging purposes involves the following risks:

- The market price at which the investor buys or sells shares may be significantly less or more than NAV.
- Daily percentage changes in NAV may not closely correlate with daily percentage changes in the price of the Benchmark Oil Futures Contract.
- Daily percentage changes in the prices of the Benchmark Oil Futures Contract may not closely correlate with daily percentage changes in the price of light, sweet crude oil.

29

Table of Contents

***The market price at which investors buy or sell shares may be significantly less or more than NAV.***

USO's NAV per share will change throughout the day as fluctuations occur in the market value of USO's portfolio investments. The public trading price at which an investor buys or sells shares during the day from their broker may be different from the NAV of the shares. Price differences may relate primarily to supply and demand forces at work in the secondary trading market for shares that are closely related to, but not identical to, the same forces influencing the prices of the light, sweet crude oil and the Benchmark Oil Futures Contract at any point in time. USCF expects that exploitation of certain arbitrage opportunities by Authorized Participants and their clients and customers will tend to cause the public trading price to track NAV per share closely over time, but there can be no assurance of that.

The NAV of USO's shares may also be influenced by non-concurrent trading hours between the NYSE Arca and the various futures exchanges on which crude oil is traded. While the shares trade on the NYSE Arca from 9:30 a.m. to 4:00 p.m. Eastern Time, the trading hours for the futures exchanges on which sweet, light crude oil trade may not necessarily coincide during all of this time. For example, while the shares trade on the NYSE Arca until 4:00 p.m. Eastern Time, liquidity in the global light, sweet crude market will be reduced after the close of the NYMEX at 2:30 p.m. Eastern Time. As a result, during periods when the NYSE Arca is open and the futures exchanges on which sweet, light crude oil is traded are closed, trading spreads and the resulting premium or discount on the shares may widen and, therefore, increase the difference between the price of the shares and the NAV of the shares.

***Daily percentage changes in USO's NAV may not correlate with daily percentage changes in the price of the Benchmark Oil Futures Contract.***

It is possible that the daily percentage changes in USO's NAV per share may not closely correlate to daily percentage changes in the price of the Benchmark Oil Futures Contract. Non-correlation may be attributable to disruptions in the market for light, sweet crude oil, the imposition of position or accountability limits by regulators or exchanges, or other extraordinary circumstances. As USO approaches or reaches position limits with respect to the Benchmark Oil Futures Contract and other Oil Futures Contracts or in view of market conditions, USO may begin investing in Other Oil-Related Investments. In addition, USO is not able to replicate exactly the changes in the price of the Benchmark Oil Futures Contract because the total return generated by USO is reduced by expenses and transaction costs, including those incurred in connection with USO's trading activities, and increased by interest income from USO's holdings of Treasury securities. Tracking the Benchmark Oil Futures Contract requires trading of USO's portfolio with a view to tracking the Benchmark Oil Futures Contract over time and is dependent upon the skills of USCF and its trading principals, among other factors.

***Daily percentage changes in the price of the Benchmark Oil Futures Contract may not correlate with daily percentage changes in the spot price of light, sweet crude oil.***

The correlation between changes in prices of the Benchmark Oil Futures Contract and the spot price of crude oil may at times be only approximate. The degree of imperfection of correlation depends upon circumstances such as variations in the speculative oil market, supply of and demand for Oil Futures Contracts (including the Benchmark Oil Futures Contract) and Other Oil-Related Investments, and technical influences in oil futures trading.

***Natural forces in the oil futures market known as "backwardation" and "contango" may increase USO's tracking error and/or negatively impact total return.***

The design of USO's Benchmark Oil Futures Contract is such that every month it begins by using the near month contract to expire until the near month contract is within two weeks of expiration, when, over a four day period, it transitions to the next month contract to expire as its benchmark contract and keeps that contract as its benchmark until it becomes the near month contract and close to expiration. In the event of a crude oil futures market where near month contracts trade at a higher price than next month to expire contracts, a situation described as "backwardation" in the futures market, then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to rise as it approaches expiration. Conversely, in the event of a crude oil futures market where near month contracts trade at a lower price than next month contracts, a situation described as "contango" in the futures market, then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to decline as it approaches expiration. When compared to total return of other price indices, such as the spot price of crude oil, the impact of backwardation and contango may cause the total return of USO's per share NAV to vary significantly. Moreover, absent the impact of rising or falling oil prices, a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return and investors could lose part or all of their investment. See "*Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations*" in this annual report on Form 10-K for a discussion of the potential effects of contango and backwardation.

30

Table of Contents

***Accountability levels, position limits, and daily price fluctuation limits set by the exchanges have the potential to cause tracking error, which could cause the price of shares to substantially vary from the price of the Benchmark Oil Futures Contract.***

Designated contract markets, such as the NYMEX and ICE Futures, have established accountability levels and position limits on the maximum net long or net short futures contracts in commodity interests that any person or group of persons under common trading control (other than as a hedge, which an investment by USO is not) may hold, own or control. In addition to accountability levels and position limits, the NYMEX and ICE Futures also set daily price fluctuation limits on futures contracts. The daily price fluctuation limit establishes the maximum amount that the price of a futures contract may vary either up or down from the previous day's settlement price. Once the daily price fluctuation limit has been reached in a particular futures contract, no trades may be made at a price beyond that limit.

As discussed above, the CFTC has proposed to adopt limits on speculative positions in 25 physical commodity futures and option contracts as well as swaps that are economically equivalent to such contracts in the agriculture, energy and metals markets. The Position Limit Rules would, among other things: identify which contracts are subject to speculative position limits; set thresholds that restrict the size of speculative positions that a person may hold in the spot month, other individual months, and all months combined; create an exemption for positions that constitute bona fide hedging transactions; impose responsibilities on DCMs and SEFs to establish position limits or, in some cases, position accountability rules; and apply to both futures and swaps across four relevant venues: OTC, DCMs, SEFs as well as certain non-U.S. located platforms. The CFTC's first attempt at finalizing the Position Limit Rules, in 2011, was successfully challenged by market participants in 2012 and, since then, the CFTC has re-proposed them and solicited comments from market participants multiple times. At this time, it is unclear how the Position Limit Rules may affect USO, but the effect may be substantial and adverse. By way of example, the Position Limit Rules may negatively impact the ability of USO to meet its investment objectives through limits that may inhibit USCF's ability to sell additional Creation Baskets of USO. See *"The Commodity Interest Markets-Commodities Regulation"* in this annual report on Form 10-K for additional information.

Until such time as the Position Limit Rules are adopted, the regulatory architecture in effect prior to the adoption of the Position Limit Rules will govern transactions in commodities and related derivatives. Under that system, the CFTC enforces federal limits on speculation in nine agricultural products (e.g., corn, wheat and soy), while futures exchanges establish and enforce position limits and accountability levels for other agricultural products and certain energy products (e.g., oil and natural gas). As a result, USO may be limited with respect to the size of its investments in any commodities subject to these limits.

Under existing and recently adopted CFTC regulations, for the purpose of position limits, a market participant is generally required, subject to certain narrow exceptions, to aggregate all positions for which that participant controls the trading decisions with all positions for which that participant has a 10 percent or greater ownership interest in an account or position, as well as the positions of two or more persons acting pursuant to an express or implied agreement or understanding with that participant. The Aggregation Rules will also apply with respect to the Position Limit Rules if and when such Position Limit Rules are adopted.

All of these limits may potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract. This may in turn prevent investors from being able to effectively use USO as a way to hedge against crude oil-related losses or as a way to indirectly invest in crude oil.

USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments. If USO encounters accountability levels, position limits, or price fluctuation limits for Oil Futures Contracts on the NYMEX or ICE Futures, it may then, if permitted under applicable regulatory requirements, purchase Oil Futures Contracts on other exchanges that trade listed crude oil futures or enter into swaps or other transactions to meet its investment objective. In addition, if USO exceeds accountability levels on either the NYMEX or ICE Futures and is required by such exchanges to reduce its holdings, such reduction could potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract.

## Tax Risk

***An investor's tax liability may exceed the amount of distributions, if any, on its shares.***

Cash or property will be distributed at the sole discretion of USCF. USCF has not and does not currently intend to make cash or other distributions with respect to shares. Investors will be required to pay U.S. federal income tax and, in some cases, state, local, or foreign income tax, on their allocable share of USO's taxable income, without regard to whether they receive distributions or the amount of any distributions. Therefore, the tax liability of an investor with respect to its shares may exceed the amount of cash or value of property (if any) distributed.

31

Table of Contents

***An investor's allocable share of taxable income or loss may differ from its economic income or loss on its shares.***

Due to the application of the assumptions and conventions applied by USO in making allocations for tax purposes and other factors, an investor's allocable share of USO's income, gain, deduction or loss may be different than its economic profit or loss from its shares for a taxable year. This difference could be temporary or permanent and, if permanent, could result in it being taxed on amounts in excess of its economic income.

***Items of income, gain, deduction, loss and credit with respect to shares could be reallocated, and for taxable periods beginning after December 31, 2017, USO could be liable for U.S. Federal income tax, if the U.S. Internal Revenue Service ("IRS") does not accept the assumptions and conventions applied by USO in allocating those items, with potential adverse consequences for an investor.***

The U.S. tax rules pertaining to partnerships are complex and their application to large, publicly traded partnerships such as USO is in many respects uncertain. USO applies certain assumptions and conventions in an attempt to comply with the intent of the applicable rules and to report taxable income, gains, deductions, losses and credits in a manner that properly reflects shareholders' economic gains and losses. These assumptions and conventions may not fully comply with all aspects of the Internal Revenue Code (the "Code") and applicable Treasury Regulations, however, and it is possible that the IRS will successfully challenge USO's allocation methods and require USO to reallocate items of income, gain, deduction, loss or credit in a manner that adversely affects investors. If this occurs, investors may be required to file an amended tax return and to pay additional taxes plus deficiency interest.

In addition, for periods beginning after December 31, 2017, USO may be liable for U.S. federal income tax on any "imputed understatement" of tax resulting from an adjustment as a result of an IRS audit. The amount of the imputed understatement generally includes increases in allocations of items of income or gains to any investor and decreases in allocations of items of deduction, loss, or credit to any investor without any offset for any corresponding reductions in allocations of items of income or gain to any investor or increases in allocations of items of deduction, loss, or credit to any investor. If USO is required to pay any U.S. federal income taxes on any imputed understatement, the resulting tax liability would reduce the net assets of USO and would likely have an adverse impact on the value of the shares. Under certain circumstances, USO may be eligible to make an election to cause the investors to take into account the amount of any imputed understatement, including any interest and penalties. The ability of a publicly traded partnership such as USO to make this election is uncertain. If the election is made, USO would be required to provide investors who owned beneficial interests in the shares in the year to which the adjusted allocations relate with a statement setting forth their proportionate shares of the adjustment ("Adjusted K-1s"). The investors would be required to take the adjustment into account in the taxable year in which the Adjusted K-1s are issued. The resulting tax liability on an investor of taking the adjustment into account in the year in which the Adjusted K-1 is issued may be less favorable to the investor than if the adjustment were taken into account in the reviewed year.

***USO could be treated as a corporation for federal income tax purposes, which may substantially reduce the value of the shares.***

USO has received an opinion of counsel that, under current U.S. federal income tax laws, USO will be treated as a partnership that is not taxable as a corporation for U.S. federal income tax purposes, provided that (i) at least 90 percent of USO's annual gross income will be derived from (a) income and gains from commodities (not held as inventory) or futures, forwards, options, swaps and other notional principal contracts with respect to commodities, and (b) interest income, (ii) USO is organized and operated in accordance with its governing agreements and applicable law and (iii) USO does not elect to be taxed as a corporation for federal income tax purposes. Although USCF anticipates that USO has satisfied and will continue to satisfy the "qualifying income" requirement for all of its taxable years, that result cannot be assured. USO has not requested and will not request any ruling from the IRS with respect to its classification as a partnership not taxable as a corporation for federal income tax purposes. If the IRS were to successfully assert that USO is taxable as a corporation for federal income tax purposes in any taxable year, rather than passing through its income, gains, losses and deductions proportionately to shareholders, USO would be subject to tax on its net income for the year at corporate tax rates. In addition, although USCF does not currently intend to make distributions with respect to shares, any distributions would be taxable to shareholders as dividend income. Taxation of USO as a corporation could materially reduce the after-tax return on an investment in shares and could substantially reduce the value of the shares.

***USO is organized and operated as a limited partnership in accordance with the provisions of the LP Agreement and applicable state law, and therefore, USO has a more complex tax treatment than traditional mutual funds.***

USO is organized and operated as a limited partnership in accordance with the provisions of the LP Agreement and applicable state law. No U.S. federal income tax is paid by USO on its income. Instead, USO will furnish shareholders each year with tax information on IRS Schedule K-1 (Form 1065) and each U.S. shareholder is required to report on its U.S. federal income tax return its allocable share of the income, gain, loss and deduction of USO.

32

Table of Contents

This must be reported without regard to the amount (if any) of cash or property the shareholder receives as a distribution from USO during the taxable year. A shareholder, therefore, may be allocated income or gain by USO but receive no cash distribution with which to pay the tax liability resulting from the allocation, or may receive a distribution that is insufficient to pay such liability.

In addition to federal income taxes, shareholders may be subject to other taxes, such as state and local income taxes, unincorporated business taxes, business franchise taxes and estate, inheritance or intangible taxes that may be imposed by the various jurisdictions in which USO does business or owns property or where the shareholders reside. Although an analysis of those various taxes is not presented here, each prospective shareholder should consider their potential impact on its investment in USO. It is each shareholder's responsibility to file the appropriate U.S. federal, state, local and foreign tax returns.

***If USO is required to withhold tax with respect to any Non-U.S. shareholders, the cost of such withholding may be borne by all shareholders.***

Under certain circumstances, USO may be required to pay withholding tax with respect to allocations to Non-U.S. shareholders. Although the LP Agreement provides that any such withholding will be treated as being distributed to the Non-U.S. shareholder, USO may not be able to cause the economic cost of such withholding to be borne by the Non-U.S. shareholder on whose behalf such amounts were withheld since it does not generally expect to make any distributions. Under such circumstances, the economic cost of the withholding may be borne by all shareholders, not just the shareholders on whose behalf such amounts were withheld. This could have a material impact on the value of the shares.

***The impact of U.S. tax reform on USO is uncertain.***

On December 22, 2017, H.R. 1, the bill formerly known as the Tax Cuts and Jobs Act of 2017 (the "Tax Act"), was signed into law. The Tax Act substantially alters the U.S. federal tax system in a variety of ways, including significant changes to the taxation of business entities, the deductibility of interest expense, and the tax treatment of capital investment. We cannot predict with certainty how any changes in the tax laws might affect the U.S. economy or the demand for and the price of commodities. As a result, it is possible that the Tax Act, as well as any U.S. Treasury regulations, administrative interpretations or court decisions interpreting the Tax Act and any future legislation related to tax reform, could have unexpected or negative impacts on USO and some or all of its shareholders. Shareholders are urged to consult with their tax advisor regarding tax legislative, regulatory, or administrative developments and proposals and their potential effect on an investment in USO.

### OTC Contract Risk

***USO will be subject to credit risk with respect to counterparties to OTC contracts entered into by USO or held by special purpose or structured vehicles.***

USO faces the risk of non-performance by the counterparties to the OTC contracts. Unlike in futures contracts, the counterparty to these contracts is generally a single bank or other financial institution, rather than a clearing organization backed by a group of financial institutions. As a result, there will be greater counterparty credit risk in these transactions. A counterparty may not be able to meet its obligations to USO, in which case USO could suffer significant losses on these contracts. The two-way margining requirements imposed by U.S. regulators, discussed in *"Item 1. Business – Commodities Regulation,"* are intended to mitigate this risk.

Nevertheless, if a counterparty becomes bankrupt or otherwise fails to perform its obligations due to financial difficulties, USO may experience significant delays in obtaining any recovery in a bankruptcy or other reorganization proceeding. USO may obtain only limited recovery or may obtain no recovery in such circumstances.

***Valuing OTC derivatives may be less certain that actively traded financial instruments.***

In general, valuing OTC derivatives is less certain than valuing actively traded financial instruments such as exchange traded futures contracts and securities or cleared swaps because the price and terms on which such OTC derivatives are entered into or can be terminated are individually negotiated, and those prices and terms may not reflect the best price or terms available from other sources. In addition, while market makers and dealers generally quote indicative prices or terms for entering into or terminating OTC contracts, they typically are not contractually obligated to do so, particularly if they are not a party to the transaction. As a result, it may be difficult to obtain an independent value for an outstanding OTC derivatives transaction.

33

Table of Contents

**Other Risks**

***Certain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time.***

Futures positions cannot always be liquidated at the desired price. It is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market. A market disruption, such as a foreign government taking political actions that disrupt the market for its currency, its crude oil production or exports, or another major export, can also make it difficult to liquidate a position. Because both Oil Futures Contracts and Other Oil-Related Investments may be illiquid, USO's Oil Interests may be more difficult to liquidate at favorable prices in periods of illiquid markets and losses may be incurred during the period in which positions are being liquidated. The large size of the positions that USO may acquire increases the risk of illiquidity both by making its positions more difficult to liquidate and by potentially increasing losses while trying to do so.

OTC contracts that are not subject to clearing may be even less marketable than futures contracts because they are not traded on an exchange, do not have uniform terms and conditions, and are entered into based upon the creditworthiness of the parties and the availability of credit support, such as collateral, and in general, they are not transferable without the consent of the counterparty. These conditions make such contracts less liquid than standardized futures contracts traded on a commodities exchange and could adversely impact USO's ability to realize the full value of such contracts. In addition, even if collateral is used to reduce counterparty credit risk, sudden changes in the value of OTC transactions may leave a party open to financial risk due to a counterparty default since the collateral held may not cover a party's exposure on the transaction in such situations.

***USO is not actively managed and tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising.***

USO is not actively managed by conventional methods. Accordingly, if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract. USCF will seek to cause the NAV of USO's shares to track the Benchmark Oil Futures Contract during periods in which its price is flat or declining as well as when the price is rising.

***The NYSE Arca may halt trading in USO's shares, which would adversely impact an investor's ability to sell shares.***

USO's shares are listed for trading on the NYSE Arca under the market symbol "USO." Trading in shares may be halted due to market conditions or, in light of NYSE Arca rules and procedures, for reasons that, in the view of the NYSE Arca, make trading in shares inadvisable. In addition, trading is subject to trading halts caused by extraordinary market volatility pursuant to "circuit breaker" rules that require trading to be halted for a specified period based on a specified market decline. Additionally, there can be no assurance that the requirements necessary to maintain the listing of USO's shares will continue to be met or will remain unchanged.

***The liquidity of the shares may also be affected by the withdrawal from participation of Authorized Participants, which could adversely affect the market price of the shares.***

In the event that one or more Authorized Participants which have substantial interests in the shares withdraw from participation, the liquidity of the shares will likely decrease, which could adversely affect the market price of the shares and result in investors incurring a loss on their investment.

***Shareholders that are not Authorized Participants may only purchase or sell their shares in secondary trading markets, and the conditions associated with trading in secondary markets may adversely affect investors' investment in the shares.***

Only Authorized Participants may create or redeem Redemption Baskets. All other investors that desire to purchase or sell shares must do so through the NYSE Arca or in other markets, if any, in which the shares may be traded. Shares may trade at a premium or discount to NAV per share.

***The lack of an active trading market for USO's shares may result in losses on an investor's investment in USO at the time the investor sells the shares.***

Although USO's shares are listed and traded on the NYSE Arca, there can be no guarantee that an active trading market for the shares will be maintained. If an investor needs to sell shares at a time when no active trading market for them exists, the price the investor receives upon sale of the shares, assuming they were able to be sold, likely would be lower than if an active market existed.

34

Table of Contents

***Limited partners may have limited liability in certain circumstances, including potentially having liability for the return of wrongful distributions.***

Under Delaware law, a limited partner might be held liable for USO's obligations as if it were a general partner if the limited partner participates in the control of the partnership's business and the persons who transact business with the partnership think the limited partner is the general partner.

A limited partner will not be liable for assessments in addition to its initial capital investment in any of USO's shares. However, a limited partner may be required to repay to USO any amounts wrongfully returned or distributed to it under some circumstances. Under Delaware law, USO may not make a distribution to limited partners if the distribution causes USO's liabilities (other than liabilities to partners on account of their partnership interests and nonrecourse liabilities) to exceed the fair value of USO's assets. Delaware law provides that a limited partner who receives such a distribution and knew at the time of the distribution that the distribution violated the law will be liable to the limited partnership for the amount of the distribution for three years from the date of the distribution.

***The LLC Agreement provides limited authority to the Non-Management Directors, and any Director of USCF may be removed by USCF's parent company, which is wholly owned by Concierge, a controlled public company where the majority of shares are owned by Nicholas D. Gerber along with certain other family members and certain other shareholders.***

USCF's Board of Directors currently consists of four Management Directors, each of whom are executive officers or employees of USCF, and three Non-Management Directors, each of whom are considered independent for purposes of applicable NYSE Arca and SEC rules. Under USCF's LLC Agreement, the Non-Management Directors have only such authority as the Management Directors expressly confer upon them, which means that the Non-Management Directors may have less authority to control the actions of the Management Directors than is typically the case with the independent members of a company's Board of Directors. In addition, any Director may be removed by written consent of Wainwright Holdings, Inc. ("Wainwright"), which is the sole member of USCF. The sole shareholder of Wainwright is Concierge Technologies, Inc., a company publicly traded under the ticker symbol "CNCG" ("Concierge"). Mr. Nicholas D. Gerber along with certain family members and certain other shareholders, owns the majority of the shares in Concierge, which is the sole shareholder of Wainwright, the sole member of USCF. Accordingly, although USCF is governed by the USCF Board of Directors, which consists of both Management Directors and Non-Management Directors, pursuant to the LLC Agreement, it is possible for Mr. Gerber to exercise his indirect control of Wainwright to effect the removal of any Director (including the Non-Management Directors which comprise the Audit Committee) and to replace that Director with another Director. Having control in one person could have a negative impact on USCF and USO, including their regulatory obligations.

***There is a risk that USO will not earn trading gains sufficient to compensate for the fees and expenses that it must pay and as such USO may not earn any profit.***

USO pays brokerage charges of approximately 0.10% of average total net assets based on brokerage fees of $3.50 per buy or sell, management fees of 0.45% of NAV on its average net assets, and OTC spreads and extraordinary expenses (e.g., subsequent offering expenses, other expenses not in the ordinary course of business, including the indemnification of any person against liabilities and obligations to the extent permitted by law and required under the LP Agreement and under agreements entered into by USCF on USO's behalf and the bringing and defending of actions at law or in equity and otherwise engaging in the conduct of litigation and the incurring of legal expenses and the settlement of claims and litigation) that cannot be quantified.

These fees and expenses must be paid in all cases regardless of whether USO's activities are profitable. Accordingly, USO must earn trading gains sufficient to compensate for these fees and expenses before it can earn any profit.

***USO is subject to extensive regulatory reporting and compliance.***

USO is subject to a comprehensive scheme of regulation under the federal commodities and securities laws. USO could be subject to sanctions for a failure to comply with those requirements, which could adversely affect its financial performance (in the case of financial penalties) or ability to pursue its investment objective (in the case of a limitation on its ability to trade).

Because USO's shares are publicly traded, USO is subject to certain rules and regulations of federal, state and financial market exchange entities charged with the protection of investors and the oversight of companies whose securities are publicly traded. These entities include the Public Company Accounting Oversight Board (the "PCAOB"), the SEC, the CFTC and NYSE Arca and these authorities have continued to develop additional regulations or interpretations of existing regulations. USO's ongoing efforts to comply with these regulations and interpretations have resulted in, and are likely to continue resulting in, a diversion of management's time and attention from revenue-generating activities to compliance related activities.

35

Table of Contents

USO is responsible for establishing and maintaining adequate internal control over financial reporting. USO's internal control system is designed to provide reasonable assurance to its management regarding the preparation and fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective may provide only reasonable assurance with respect to financial statement preparation and presentation.

***Regulatory changes or actions, including the implementation of new legislation is impossible to predict but may significantly and adversely affect USO.***

The futures markets are subject to comprehensive statutes, regulations, and margin requirements. In addition, the CFTC and futures exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. Regulation of commodity interest transactions in the United States is a rapidly changing area of law and is subject to ongoing modification by governmental and judicial action. Considerable regulatory attention has been focused on non-traditional investment pools that are publicly distributed in the United States. In addition, the SEC, CFTC and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. Further, various national governments outside of the United States have expressed concern regarding the disruptive effects of speculative trading in the energy markets and the need to regulate the derivatives markets in general. The effect of any future regulatory change on USO is impossible to predict, but it could be substantial and adverse. For a more detailed discussion of the regulations to be imposed by the CFTC and the SEC and the potential impacts thereof on USO, please see *"Item 1. Business – Commodities Regulation"* in this annual report on Form 10-K.

***USO is not a registered investment company so shareholders do not have the protections of the 1940 Act.***

USO is not an investment company subject to the 1940 Act. Accordingly, investors do not have the protections afforded by that statute, which, for example, requires investment companies to have a majority of disinterested directors and regulates the relationship between the investment company and its investment manager.

***Trading in international markets could expose USO to credit and regulatory risk.***

USO invests primarily in Oil Futures Contracts, a significant portion of which are traded on United States exchanges, including the NYMEX. However, a portion of USO's trades may take place on markets and exchanges outside the United States. Trading on such non-U.S. markets or exchanges presents risks because they are not subject to the same degree of regulation as their U.S. counterparts, including potentially different or diminished investor protections. In trading contracts denominated in currencies other than U.S. dollars, USO is subject to the risk of adverse exchange-rate movements between the dollar and the functional currencies of such contracts. Additionally, trading on non-U.S. exchanges is subject to the risks presented by exchange controls, expropriation, increased tax burdens and exposure to local economic declines and political instability. An adverse development with respect to any of these variables could reduce the profit or increase the loss earned on trades in the affected international markets.

***USO and USCF may have conflicts of interest, which may permit them to favor their own interests to the detriment of shareholders.***

USO is subject to actual and potential inherent conflicts involving USCF, various commodity futures brokers and Authorized Participants. USCF's officers, directors and employees do not devote their time exclusively to USO and also are directors, officers or employees of other entities that may compete with USO for their services. They could have a conflict between their responsibilities to USO and to those other entities. As a result of these and other relationships, parties involved with USO have a financial incentive to act in a manner other than in the best interests of USO and the shareholders. USCF has not established any formal procedure to resolve conflicts of interest. Consequently, investors are dependent on the good faith of the respective parties subject to such conflicts of interest to resolve them equitably. Although USCF attempts to monitor these conflicts, it is extremely difficult, if not impossible, for USCF to ensure that these conflicts do not, in fact, result in adverse consequences to the shareholders.

USO may also be subject to certain conflicts with respect to the FCM, including, but not limited to, conflicts that result from receiving greater amounts of compensation from other clients, or purchasing opposite or competing positions on behalf of third party accounts traded through the FCM. In addition, USCF's principals, officers, directors or employees may trade futures and related contracts for their own account. A conflict of interest may exist if their trades are in the same markets and at the same time as USO trades using the clearing broker to be used by USO. A potential conflict also may occur if USCF's principals, officers, directors or employees trade their accounts more aggressively or take positions in their accounts which are opposite, or ahead of, the positions taken by USO.

36

Table of Contents

***USO could terminate at any time and cause the liquidation and potential loss of an investor's investment and could upset the overall maturity and timing of an investor's investment portfolio.***

USO may terminate at any time, regardless of whether USO has incurred losses, subject to the terms of the LP Agreement. In particular, unforeseen circumstances, including the death, adjudication of incompetence, bankruptcy, dissolution, or removal of USCF as the general partner of USO could cause USO to terminate unless a majority interest of the limited partners within 90 days of the event elects to continue the partnership and appoints a successor general partner, or the affirmative vote of a majority in interest of the limited partners subject to certain conditions. However, no level of losses will require USCF to terminate USO. USO's termination would cause the liquidation and potential loss of an investor's investment. Termination could also negatively affect the overall maturity and timing of an investor's investment portfolio.

***USO does not expect to make cash distributions.***

USO has not previously made any cash distributions and intends to reinvest any realized gains in additional Oil Interests rather than distributing cash to limited partners. Therefore, unlike mutual funds, commodity pools or other investment pools that actively manage their investments in an attempt to realize income and gains from their investing activities and distribute such income and gains to their investors, USO generally does not expect to distribute cash to limited partners. An investor should not invest in USO if the investor will need cash distributions from USO to pay taxes on its share of income and gains of USO, if any, or for any other reason. Nonetheless, although USO does not intend to make cash distributions, the income earned from its investments held directly or posted as margin may reach levels that merit distribution, e.g., at levels where such income is not necessary to support its underlying investments in Oil Interests and investors adversely react to being taxed on such income without receiving distributions that could be used to pay such tax. If this income becomes significant then cash distributions may be made.

***An unanticipated number of redemption requests during a short period of time could have an adverse effect on USO's NAV.***

If a substantial number of requests for redemption of Redemption Baskets are received by USO during a relatively short period of time, USO may not be able to satisfy the requests from USO's assets not committed to trading. As a consequence, it could be necessary to liquidate positions in USO's trading positions before the time that the trading strategies would otherwise dictate liquidation.

***The Fund may potentially lose money on its holdings of money market mutual funds.***

The SEC adopted amendments to Rule 2a-7 under the 1940 Act which became effective in 2016, to reform money market funds ("MMFs"). While the rule applies only to MMFs, it may indirectly affect institutional investors such as USO. A portion of USO's assets that are not used for margin or collateral in the Futures Contracts currently are invested in government MMFs. USO does not hold any non-government MMFs and does not anticipate investing in any non-government MMFs. However, if USO invests in other types of MMFs besides government MMFs in the future, USO could be negatively impacted by investing in an MMF that does not maintain a stable $1.00 NAV or that has the potential to impose redemption fees and gates (temporary suspension of redemptions).

Although such government money market funds seek to preserve the value of an investment at $1.00 per share, there is no guarantee that they will be able to do so and USO may lose money by investing in a government money market fund. An investment in a government money market fund is not insured or guaranteed by the Federal Deposit Insurance Corporation, referred to herein as the FDIC, or any other government agency. The share price of a government money market fund can fall below the $1.00 share price. USO cannot rely on or expect a government money market fund's adviser or its affiliates to enter into support agreements or take other actions to maintain the government money market fund's $1.00 share price. The credit quality of a government money market fund's holdings can change rapidly in certain markets, and the default of a single holding could have an adverse impact on the government money market fund's share price. Due to fluctuations in interest rates, the market value of securities held by a government money market fund may vary. A government money market fund's share price can also be negatively affected during periods of high redemption pressures and/or illiquid markets.

37

Table of Contents

***The failure or bankruptcy of a futures commission merchant or clearing house could result in a substantial loss of USO's assets and could impair USO in its ability to execute trades.***

The Commodity Exchange Act and CFTC regulations impose several requirements on FCMs and clearing houses that are designed to protect customers, including mandating the implementation of risk management programs, internal monitoring and controls, capital and liquidity standards, customer disclosures, and auditing and examination programs. In particular, the Commodity Exchange Act and CFTC regulations require FCM and clearing houses to segregate all funds received from customers from proprietary assets. There can be no assurance that the requirements imposed by the Commodity Exchange Act and CFTC regulations will prevent losses to, or not materially adversely affect, USO or its investors.

In particular, in the event of an FCM's or clearing house's bankruptcy, USO could be limited to recovering either a pro rata share of all available funds segregated on behalf of the FCM's combined customer accounts or USO may not recover any assets at all. USO may also incur a loss of any unrealized profits on its open and closed positions. This is because if such a bankruptcy were to occur, USO would be afforded the protections granted to customers of an FCM, and participants to transactions cleared through a clearing house, under the United States Bankruptcy Code and applicable CFTC regulations. Such provisions generally provide for a pro rata distribution to customers of customer property held by the bankrupt FCM or an Exchange's clearing house if the customer property held by the FCM or the Exchange's clearing house is insufficient to satisfy all customer claims.

Bankruptcy of a clearing FCM can be caused by, among other things, the default of one of the FCM's customers. In this event, the Exchange's clearing house is permitted to use the entire amount of margin posted by USO (as well as margin posted by other customers of the FCM) to cover the amounts owed by the bankrupt FCM. Consequently, USO could be unable to recover amounts due to it on its futures positions, including assets posted as margin, and could sustain substantial losses.

Notwithstanding that USO could sustain losses upon the failure or bankruptcy of its FCM, the majority of USO's assets are held in Treasuries, cash and/or cash equivalents with the Custodian and would not be impacted by the bankruptcy of an FCM.

***The failure or bankruptcy of USO's Custodian could result in a substantial loss of USO's assets.***

The majority of USO's assets are held in Treasuries, cash and/or cash equivalents with the Custodian. The insolvency of the Custodian could result in a complete loss of USO's assets held by that Custodian, which, at any given time, would likely comprise a substantial portion of USO's total assets.

***Third parties may infringe upon or otherwise violate intellectual property rights or assert that USCF has infringed or otherwise violated their intellectual property rights, which may result in significant costs and diverted attention.***

It is possible that third parties might utilize USO's intellectual property or technology, including the use of its business methods, trademarks and trading program software, without permission. USCF has a patent for USO's business method and has registered its trademarks. USO does not currently have any proprietary software. However, if it obtains proprietary software in the future, any unauthorized use of USO's proprietary software and other technology could also adversely affect its competitive advantage. USO may not have adequate resources to implement procedures for monitoring unauthorized uses of its patents, trademarks, proprietary software and other technology. Also, third parties may independently develop business methods, trademarks or proprietary software and other technology similar to that of USCF or claim that USCF has violated their intellectual property rights, including their copyrights, trademark rights, trade names, trade secrets and patent rights. As a result, USCF may have to litigate in the future to protect its trade secrets, determine the validity and scope of other parties' proprietary rights, defend itself against claims that it has infringed or otherwise violated other parties' rights, or defend itself against claims that its rights are invalid. Any litigation of this type, even if USCF is successful and regardless of the merits, may result in significant costs, divert its resources from USO, or require it to change its proprietary software and other technology or enter into royalty or licensing agreements.

38

Table of Contents

***Due to the increased use of technologies, intentional and unintentional cyber-attacks pose operational and information security risks.***

With the increased use of technologies such as the Internet and the dependence on computer systems to perform necessary business functions, USO is susceptible to operational and information security risks. In general, cyber incidents can result from deliberate attacks or unintentional events such as a cyber-attack against USO, a natural catastrophe, an industrial accident, failure of USO's disaster recovery systems, or consequential employee error. Cyber-attacks include, but are not limited to, gaining unauthorized access to digital systems for purposes of misappropriating assets or sensitive information, corrupting data, or causing operational disruption. Cyber-attacks may also be carried out in a manner that does not require gaining unauthorized access, such as causing denial-of-service attacks on websites. Cyber security failures or breaches of USO's clearing broker or third party service provider (including, but not limited to, index providers, the administrator and transfer agent, the custodian), have the ability to cause disruptions and impact business operations, potentially resulting in financial losses, the inability of USO shareholders to transact business, violations of applicable privacy and other laws, regulatory fines, penalties, reputational damage, reimbursement or other compensation costs, and/or additional compliance costs. Adverse effects can become particularly acute if those events affect USO's electronic data processing, transmission, storage, and retrieval systems, or impact the availability, integrity, or confidentiality of our data.

In addition, substantial costs may be incurred in order to prevent any cyber incidents in the future. USO and its shareholders could be negatively impacted as a result. While USO has established business continuity plans, there are inherent limitations in such plans.

### Item 1B. Unresolved Staff Comments.

Not applicable.

### Item 2. Properties.

Not applicable.

### Item 3. Legal Proceedings.

Although USO may, from time to time, be involved in litigation arising out of its operations in the normal course of business or otherwise, USO is currently not a party to any pending material legal proceedings.

### Item 4. Mine Safety Disclosures.

Not applicable.

### Part II

### Item 5. Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities.

**Price Range of Shares**

USO's shares have traded on the NYSE Arca under the symbol "USO" since November 25, 2008. Prior to trading on the NYSE Arca, USO's shares traded on the American Stock Exchange (the "AMEX") under the symbol "USO" since its initial public offering on April 10, 2006 until November 24, 2008.

As of December 31, 2019, USO had approximately 84,280 holders of shares.

**Dividends**

USO has not made and does not currently intend to make cash distributions to its shareholders.

39

Table of Contents

**Issuer Purchases of Equity Securities**

USO does not purchase shares directly from its shareholders. In connection with its redemption of baskets held by Authorized Participants, USO redeemed 761 baskets (comprising 76,100,000 shares) and 3,347 baskets (comprising 334,700,000 shares) for the three and twelve months ended December 31, 2019, respectively. Monthly redemptions for the last three months are detailed below.

| Period | Total Number of Shares Redeemed | Average Price Per Share |
|---|---|---|
| 10/1/19 to 10/31/19 | 28,900,000 | $ 11.22 |
| 11/1/19 to 11/30/19 | 20,900,000 | 11.97 |
| 12/1/19 to 12/31/19 | 26,300,000 | 12.54 |
| Total | 76,100,000 | |

**Item 6. Selected Financial Data.**

*Financial Highlights (for the years ended December 31, 2019, 2018, 2017, 2016 and 2015)*

*(Dollar amounts in 000's except for per share information)*

| | Year ended December 31, 2019 | Year ended December 31, 2018 | Year ended December 31, 2017 | Year ended December 31, 2016 | Year ended December 31, 2015 |
|---|---|---|---|---|---|
| Total assets | $ 1,213,916 | $ 1,485,351 | $ 2,148,805 | $ 3,283,178 | $ 3,177,729 |
| Net realized and unrealized gain (loss) on futures transactions, inclusive of commissions | $ 449,670 | $ (313,109) | $ 72,487 | $ 674,231 | $ (1,276,606) |
| Net income (loss) | $ 473,456 | $ (291,275) | $ 78,972 | $ 666,553 | $ (1,288,413) |
| Weighted average limited partnership shares | 121,247,671 | 137,006,575 | 253,222,466 | 322,665,574 | 162,412,877 |
| Net income (loss) per share | $ 3.19 | $ (2.49) | $ 0.37 | $ 0.69 | $ (9.13) |
| Net income (loss) per weighted average share | $ 3.90 | $ (2.13) | $ 0.31 | $ 2.07 | $ (7.93) |
| Cash and cash equivalents at end of year | $ 1,026,973 | $ 1,223,160 | $ 1,846,631 | $ 2,920,518 | $ 2,725,177 |

**Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

The following discussion should be read in conjunction with the financial statements and the notes thereto of USO included elsewhere in this annual report on Form 10-K.

*Forward-Looking Information*

This annual report on Form 10-K, including this "Management's Discussion and Analysis of Financial Condition and Results of Operations," contains forward looking statements regarding the plans and objectives of management for future operations. This information may involve known and unknown risks, uncertainties and other factors that may cause USO's actual results, performance or achievements to be materially different from future results, performance or achievements expressed or implied by any forward-looking statements. Forward-looking statements, which involve assumptions and describe USO's future plans, strategies and expectations, are generally identifiable by use of the words "may," "will," "should," "expect," "anticipate," "estimate," "believe," "intend" or "project," the negative of these words, other variations on these words or comparable terminology. These forward-looking statements are based on assumptions that may be incorrect, and USO cannot assure investors that the projections included in these forward-looking statements will come to pass. USO's actual results could differ materially from those expressed or implied by the forward-looking statements as a result of various factors.

40

Table of Contents

USO has based the forward-looking statements included in this annual report on Form 10-K on information available to it on the date of this annual report on Form 10-K, and USO assumes no obligation to update any such forward-looking statements. Although USO undertakes no obligation to revise or update any forward-looking statements, whether as a result of new information, future events or otherwise, investors are advised to consult any additional disclosures that USO may make directly to them or through reports that USO files in the future with the SEC, including annual reports on Form 10-K, quarterly reports on Form 10-Q and current reports on Form 8-K.

**Introduction**

USO, a Delaware limited partnership, is a commodity pool that issues shares that may be purchased and sold on the NYSE Arca. The investment objective of USO is for the daily changes in percentage terms of its shares' per share NAV to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of the futures contract for light, sweet crude oil traded on the NYMEX that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire (the "Benchmark Oil Futures Contract"), plus interest earned on USO's collateral holdings, less USO's expenses. "Near month contract" means the next contract traded on the NYMEX due to expire. "Next month contract" means the first contract traded on the NYMEX due to expire after the near month contract.

USO's investment objective is *not* for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, *nor* is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period *greater than one day*. USCF believes that it is not practical to manage the portfolio to achieve such an investment goal when investing in Oil Futures Contracts and Other Oil-Related Investments.

USO seeks to achieve its investment objective by investing so that the average daily percentage change in USO's NAV for any period of 30 successive valuation days will be within plus/minus ten percent (10%) of the average daily percentage change in the price of the Benchmark Oil Futures Contract over the same period.

The regulation of commodity interest trading in the United States and other countries is an evolving area of the law. The various statements made in this summary are subject to modification by legislative action and changes in the rules and regulations of the SEC, FINRA, CFTC, the NFA, the futures exchanges, clearing organizations and other regulatory bodies. Pending final resolution of all applicable regulatory requirements, some examples of how new rules and regulations could impact USO are discussed in *"Item 1. Business"* and *"Item 1A. Risk Factors"* in this annual report on Form 10-K.

**Price Movements**

Crude oil futures prices were volatile during the year ended December 31, 2019 and exhibited moderate daily swings along with an uneven upward trend during the year. The price of the Benchmark Oil Futures Contract started the year at $45.41 per barrel. The high of the year was on April 23, 2019 when the price reached $66.30 per barrel. The low of the period was the starting price for the period, which was $45.41 per barrel. The year ended with the Benchmark Oil Futures Contract at $61.06 per barrel, an increase of approximately 34.46% over the year. USO's per share NAV began the year at $9.59 and ended the year at $12.78 on December 31, 2019, an increase of approximately 33.26% over the year. USO's per share NAV reached its high for the year on April 23, 2019 at $13.79 and its low for the period was at the beginning of the period when it was $9.59. The Benchmark Oil Futures Contract prices listed above began with the February 2019 contracts and ended with the February 2020 contracts. The increase of approximately 34.46% on the Benchmark Oil Futures Contract listed above is a hypothetical return only and could not actually be achieved by an investor holding Oil Futures Contracts. An investment in Oil Futures Contracts would need to be rolled forward during the time period described in order to simulate such a result. Furthermore, the change in the nominal price of these differing Oil Futures Contracts, measured from the start of the year to the end of the year, does not represent the actual benchmark results that USO seeks to track, which are more fully described below in the section titled "Tracking USO's Benchmark."

During the year ended December 31, 2019, the crude oil futures market was in both a state of contango and backwardation. On days when the market is in contango, the price of the near month crude Oil Futures Contract was lower than the price of the next month crude Oil Futures Contract, or contracts further away from expiration. On days when the market is in backwardation, the price of the near month crude Oil Futures Contract is higher than the price of the next month crude Oil Futures Contract or contracts further away from expiration. For a discussion of the impact of backwardation and contango on total returns, see "Term Structure of Crude Oil Prices and the Impact on Total Returns" below.

41

Table of Contents

**Valuation of Oil Futures Contracts and the Computation of the Per Share NAV**

The per share NAV of USO's shares is calculated once each NYSE Arca trading day. The per share NAV for a particular trading day is released after 4:00 p.m. New York time. Trading during the core trading session on the NYSE Arca typically closes at 4:00 p.m. New York time. The Administrator uses the NYMEX closing price (determined at the earlier of the close of the NYMEX or 2:30 p.m. New York time) for the contracts held on the NYMEX, but calculates or determines the value of all other USO investments, including ICE Futures contracts or other futures contracts, as of the earlier of the close of the NYSE Arca or 4:00 p.m. New York time.

**Results of Operations and the Crude Oil Market**

*Results of Operations.* On April 10, 2006, USO listed its shares on the AMEX under the ticker symbol "USO." On that day, USO established its initial offering price at $67.39 per share and issued 200,000 shares to the initial Authorized Participant, KV Execution Services, LLC, in exchange for $13,479,000 in cash. As a result of the acquisition of the AMEX by NYSE Euronext, USO's shares ceased trading on the AMEX and commenced trading on the NYSE Arca on November 25, 2008.

Since its initial offering of 17,000,000 shares, USO has registered ten subsequent offerings of its shares: 30,000,000 shares which were registered with the SEC on October 18, 2006, 50,000,000 shares which were registered with the SEC on January 30, 2007, 30,000,000 shares which were registered with the SEC on December 4, 2007, 100,000,000 shares which were registered with the SEC on February 7, 2008, 100,000,000 shares which were registered with the SEC on September 29, 2008, 300,000,000 shares which were registered with the SEC on January 16, 2009, 1,000,000,000 shares which were registered with the SEC on June 29, 2009, 500,000,000 shares which were registered with the SEC on April 28, 2015, 1,000,000,000 shares which were registered with the SEC on February 29, 2016 and 100,000,000 shares which were registered with the SEC on February 27, 2019. Shares offered by USO in the subsequent offerings were sold for cash at the shares' per share NAV as described in the applicable prospectus. As of December 31, 2019, USO had issued 3,112,100,000 shares, 91,600,000 of which were outstanding. As of December 31, 2019, there were 114,900,000 shares registered but not yet issued.

More shares may have been issued by USO than are outstanding due to the redemption of shares. Unlike funds that are registered under the 1940 Act, shares that have been redeemed by USO cannot be resold by USO. As a result, USO contemplates that additional offerings of its shares will be registered with the SEC in the future in anticipation of additional issuances and redemptions.

As of December 31, 2019, USO had the following Authorized Participants: ABN Amro, BNP Paribas Securities Corp., Citadel Securities LLC, Citigroup Global Markets Inc., Credit Suisse Securities USA LLC, Deutsche Bank Securities Inc., Goldman Sachs & Company, JP Morgan Securities Inc., Merrill Lynch Professional Clearing Corp., Morgan Stanley & Company Inc., Nomura Securities International Inc., RBC Capital Markets LLC, SG Americas Securities LLC, UBS Securities LLC and Virtu Financial BD LLC.

42

Table of Contents

For the Year Ended December 31, 2019 Compared to the Year Ended December 31, 2018; and for the Year Ended December 31, 2018 Compared to the Year Ended December 31, 2017

|  | For the Year Ended December 31, 2019 | | For the Year Ended December 31, 2018 | | For the Year Ended December 31, 2017 | |
| --- | --- | --- | --- | --- | --- | --- |
| Per share net asset value, end of year | $ | 12.78 | $ | 9.59 | $ | 12.08 |
| Average daily total net assets | $ | 1,435,838,329 | $ | 1,810,481,185 | $ | 2,644,791,758 |
| Dividend and interest income earned on Treasuries, cash and/or cash equivalents | $ | 32,418,312 | $ | 32,102,623 | $ | 21,566,994 |
| Annualized yield based on average daily total net assets | | 2.26 % | | 1.77 % | | 0.82 % |
| Management fee | $ | 6,461,273 | $ | 8,147,165 | $ | 11,901,563 |
| Total fees and other expenses excluding management fees | $ | 4,918,007 | $ | 5,015,059 | $ | 8,216,103 |
| Fees and expenses related to the registration or offering of additional shares | $ | 504,876 | $ | 349,290 | $ | 348,425 |
| Total commissions accrued to brokers | $ | 2,423,017 | $ | 2,538,611 | $ | 4,675,687 |
| Total commissions as annualized percentage of average total net assets | | 0.17 % | | 0.14 % | | 0.18 % |
| Commissions accrued as a result of rebalancing | $ | 2,052,263 | $ | 2,145,268 | $ | 4,112,340 |
| Percentage of commissions accrued as a result of rebalancing | | 84.70 % | | 84.51 % | | 87.95 % |
| Commissions accrued as a result of creation and redemption activity | $ | 370,754 | $ | 393,343 | $ | 563,347 |
| Percentage of commissions accrued as a result of creation and redemption activity | | 15.30 % | | 15.49 % | | 12.05 % |

*Portfolio Expenses.* USO's expenses consist of investment management fees, brokerage fees and commissions, certain offering costs, licensing fees, registration fees, the fees and expenses of the independent directors of USCF and expenses relating to tax accounting and reporting requirements. The management fee that USO pays to USCF is calculated as a percentage of the total net assets of USO. The fee is accrued daily and paid monthly.

The increase in the per share NAV for the year ended December 31, 2019, compared to the year ended December 31, 2018, was due primarily to higher prices for crude oil and the related increase in the value of the Oil Futures Contracts in which USO held and traded; and the decrease in the per share NAV for the year ended December 31, 2018, compared to the year ended December 31, 2017, was due primarily to lower prices for crude oil and the related decrease in the value of the Oil Futures Contracts in which USO held and traded.

Average interest rates earned on short-term investments held by USO, including cash, cash equivalents and Treasuries, were higher during the year ended December 31, 2019, compared to the year ended December 31, 2018; and were higher during the year ended December 31, 2018, compared to the year ended December 31, 2017. As a result, the amount of income earned by USO as a percentage of average daily total net assets was higher during the year ended December 31, 2019, compared to the year ended December 31, 2018; and was higher during the year ended December 31, 2018 compared to the year ended December 31, 2017. To the degree that the aggregate yield is higher, the net expense ratio, inclusive of income, will be lower.

The decrease in total fees and other expenses excluding management fees for the year ended December 31, 2019, compared to the year ended December 31, 2018 was due primarily to USO's smaller size as measured by total net assets; and the decrease in total fees and other expenses excluding management fees for the year ended December 31, 2018, compared to the year ended December 31, 2017, was due primarily to USO's smaller size as measured by total net assets.

The decrease in total commissions accrued to brokers for the year ended December 31, 2019, compared to the year ended December 31, 2018, was due primarily to a lower number of Oil Futures Contracts being held and traded; and the decrease in total commissions accrued to brokers for the year ended December 31, 2018, compared to the year ended December 31, 2017, was due primarily to lower number of Oil Futures Contracts being held and traded.

43

Table of Contents

For the Three Months Ended December 31, 2019 Compared to the Three Months Ended December 31, 2018; and for the Three Months Ended December 31, 2018 Compared to the Three Months Ended December 31, 2017

| | For the three months ended December 31, 2019 | | For the three months ended December 31, 2018 | | For the three months ended December 31, 2017 | |
|---|---|---|---|---|---|---|
| Per share net asset value, end of period | $ | 12.78 | $ | 9.59 | $ | 12.08 |
| Average daily total net assets | $ | 1,270,554,695 | $ | 1,634,107,826 | $ | 2,203,766,977 |
| Dividend and interest income earned on Treasuries, cash and/or cash equivalents | $ | 6,172,888 | $ | 8,977,264 | $ | 6,283,071 |
| Annualized yield based on average daily total net assets | | 1.93 % | | 2.18 % | | 1.13 % |
| Management fee | $ | 1,441,123 | $ | 1,853,481 | $ | 2,499,615 |
| Total fees and other expenses excluding management fees | $ | 1,058,857 | $ | 1,179,194 | $ | 2,073,956 |
| Fees and expenses related to the registration or offering of additional shares | $ | 75,057 | $ | 255,964 | $ | 87,822 |
| Total commissions accrued to brokers | $ | 527,183 | $ | 621,874 | $ | 900,573 |
| Total commissions as annualized percentage of average total net assets | | 0.16 % | | 0.15 % | | 0.16 % |
| Commissions accrued as a result of rebalancing | $ | 449,837 | $ | 494,197 | $ | 800,613 |
| Percentage of commissions accrued as a result of rebalancing | | 85.33 % | | 79.47 % | | 88.90 % |
| Commissions accrued as a result of creation and redemption activity | $ | 77,346 | $ | 127,677 | $ | 99,960 |
| Percentage of commissions accrued as a result of creation and redemption activity | | 14.67 % | | 20.53 % | | 11.10 % |

The increase in the per share NAV for the three months ended December 31, 2019, compared to the three months ended December 31, 2018, was due primarily to higher prices for crude oil and the related increase in the value of the Oil Futures Contracts in which USO held and traded; and the decrease in the per share NAV for the three months ended December 31, 2018, compared to the three months ended December 31, 2017, was due primarily to lower prices for crude oil and the related decrease in the value of the Oil Futures Contracts in which USO held and traded.

Average interest rates earned on short-term investments held by USO, including cash, cash equivalents and Treasuries, were lower during the three months ended December 31, 2019, compared to the three months ended December 31, 2018; and were higher during the three months ended December 31, 2018, compared to the three months ended December 31, 2017. As a result, the amount of income earned by USO as a percentage of average daily total net assets was lower during the three months ended December 31, 2019, compared to the three months ended December 31, 2018; and was higher during the three months ended December 31, 2018 compared to the three months ended December 31, 2017. To the degree that the aggregate yield is lower, the net expense ratio, inclusive of income, will be higher.

The decrease in total fees and other expenses excluding management fees for the three months ended December 31, 2019, compared to the three months ended December 31, 2018 was due primarily to USO's smaller size as measured by total net assets; and the decrease in total fees and other expenses excluding management fees for the three months ended December 31, 2018, compared to the three months ended December 31, 2017, was due primarily to USO's smaller size as measured by total net assets.

The decrease in total commissions accrued to brokers for the three months ended December 31, 2019, compared to the three months ended December 31, 2018, was due primarily to a lower number of Oil Futures Contracts being held and traded; and the decrease in total commissions accrued to brokers for the three months ended December 31, 2018, compared to the three months ended December 31, 2017, was due primarily to lower number of futures contracts being held and traded.

44

Table of Contents

**Tracking USO's Benchmark**

USCF seeks to manage USO's portfolio such that changes in its average daily per share NAV, on a percentage basis, closely track the daily changes in the average price of the Benchmark Oil Futures Contract, also on a percentage basis. Specifically, USCF seeks to manage the portfolio such that over any rolling period of 30-valuation days, the average daily change in USO's per share NAV is within a range of 90% to 110% (0.9 to 1.1) of the average daily change in the price of the Benchmark Oil Futures Contract. As an example, if the average daily movement of the price of the Benchmark Oil Futures Contract for a particular 30-valuation day time period was 0.50% per day, USCF would attempt to manage the portfolio such that the average daily movement of the per share NAV during that same time period fell between 0.45% and 0.55% (i.e., between 0.9 and 1.1 of the benchmark's results). USO's portfolio management goals do not include trying to make the nominal price of USO's per share NAV equal to the nominal price of the current Benchmark Oil Futures Contract or the spot price for light, sweet crude oil. USCF believes that it is not practical to manage the portfolio to achieve such an investment goal when investing in Oil Futures Contracts and Other Oil-Related Investments.

For the 30-valuation days ended December 31, 2019, the simple average daily change in the Benchmark Oil Futures Contract was 0.201%, while the simple average daily change in the per share NAV of USO over the same time period was 0.205%. The average daily difference was 0.004% (or 0.4 basis points, where 1 basis point equals 1/100 of 1%). As a percentage of the daily movement of the Benchmark Oil Futures Contract, the average error in daily tracking by the per share NAV was (2.461)%, meaning that over this time period USO's tracking error was within the plus or minus 10% range established as its benchmark tracking goal. A significant portion of the level of USO's relative tracking error as a percentage of the benchmark was due to periods of flat price returns. The first chart below shows the daily movement of USO's per share NAV versus the daily movement of the Benchmark Oil Futures Contract for the 30-valuation day period ended December 31, 2019, the last trading day in December. The second chart below shows the monthly total returns of USO as compared to the monthly value of the Benchmark Oil Futures Contract for the five years ended December 31, 2019.

45

Table of Contents

Since the commencement of the offering of USO's shares to the public on April 10, 2006 to December 31, 2019, the simple average daily change in the Benchmark Oil Futures Contract was (0.024)%, while the simple average daily change in the per share NAV of USO over the same time period was (0.023)%. The average daily difference was 0.001% (or 0.1 basis points, where 1 basis point equals 1/100 of 1%). As a percentage of the daily movement of the Benchmark Oil Futures Contract, the average error in daily tracking by the per share NAV was 0.337%, meaning that over this time period USO's tracking error was within the plus or minus 10% range established as its benchmark tracking goal.

*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS*



*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS*



46

Table of Contents

An alternative tracking measurement of the return performance of USO versus the return of its Benchmark Oil Futures Contract can be calculated by comparing the actual return of USO, measured by changes in its per share NAV, versus the expected changes in its per share NAV under the assumption that USO's returns had been exactly the same as the daily changes in its Benchmark Oil Futures Contract.

For the year ended December 31, 2019, the actual total return of USO as measured by changes in its per share NAV was 33.26%. This is based on an initial per share NAV of $9.59 as of December 31, 2018 and an ending per share NAV as of December 31, 2019 $12.78. During this time period, USO made no distributions to its shareholders. However, if USO's daily changes in its per share NAV had instead exactly tracked the changes in the daily total return of the Benchmark Oil Futures Contract, USO would have had an estimated per share NAV of $12.61 as of December 31, 2019, for a total return over the relevant time period of 31.49%. The difference between the actual per share NAV total return of USO of 33.26% and the expected total return based on the Benchmark Oil Futures Contract of 31.49% was an error over the time period of 1.77%, which is to say that USO's actual total return outperformed its benchmark by that percentage. USO incurs expenses primarily composed of the management fee, brokerage commissions for the buying and selling of futures contracts, and other expenses. The impact of these expenses, offset by interest and dividend income, and net of positive or negative execution, tends to cause daily changes in the per share NAV of USO to track slightly lower or higher than daily changes in the price of the Benchmark Oil Futures Contract.

By comparison, for the year ended December 31, 2018, the actual total return of USO as measured by changes in its per share NAV was (20.61)%. This was based on an initial per share NAV of $12.08 as of December 31, 2017 and an ending per share NAV as of December 31, 2018 of $9.59. During this time period, USO made no distributions to its shareholders. However, if USO's daily changes in its per share NAV had instead exactly tracked the changes in the daily total return of the Benchmark Oil Futures Contract, USO would have had an estimated per share NAV of $9.48 as of December 31, 2018, for a total return over the relevant time period of (21.52)%. The difference between the actual per share NAV total return of USO of (20.61)% and the expected total return based on the Benchmark Oil Futures Contract of (21.52)% was an error over the time period of 0.91%, which is to say that USO's actual total return outperformed its benchmark by that percentage. USO incurred expenses primarily composed of the management fee, brokerage commissions for the buying and selling of futures contracts, and other expenses. The impact of these expenses, offset by interest and dividend income, and net of positive or negative execution, tended to cause daily changes in the per share NAV of USO to track slightly lower or higher than daily changes in the price of the Benchmark Oil Futures Contract.

By comparison, for the year ended December 31, 2017, the actual total return of USO as measured by changes in its per share NAV was 3.16%. This was based on an initial per share NAV of $11.71 on December 31, 2016 and an ending per share NAV as of December 31, 2017 of $12.08. During this time period, USO made no distributions to its shareholders. However, if USO's daily changes in its per share NAV had instead exactly tracked the changes in the daily total return of the Benchmark Oil Futures Contract, USO would have had an estimated per share NAV of $12.07 as of December 31, 2017, for a total return over the relevant time period of 3.07%. There was no difference between the actual per share NAV total return of USO of 3.16% and the expected total return based on the Benchmark Oil Futures Contract of 3.07%, which is to say that USO's actual total return performed exactly the same as the benchmark result by that percentage. USO incurs expenses primarily composed of the management fee, brokerage commissions for the buying and selling of futures contracts, and other expenses. The impact of these expenses, offset by interest and dividend income, and net of positive or negative execution, tended to cause daily changes in the per share NAV of USO to track slightly lower than daily changes in the price of the Benchmark Oil Futures Contract.

There are currently three factors that have impacted or are most likely to impact USO's ability to accurately track Benchmark Oil Futures Contract.

First, USO may buy or sell its holdings in the then current Benchmark Oil Futures Contract at a price other than the closing settlement price of that contract on the day during which USO executes the trade. In that case, USO may pay a price that is higher, or lower, than that of the Benchmark Oil Futures Contract, which could cause the changes in the daily per share NAV of USO to either be too high or too low relative to the daily changes in the Benchmark Oil Futures Contract. During the year ended December 31, 2019, USCF attempted to minimize the effect of these transactions by seeking to execute its purchase or sale of the Benchmark Oil Futures Contract at, or as close as possible to, the end of the day settlement price. However, it may not always be possible for USO to obtain the closing settlement price and there is no assurance that failure to obtain the closing settlement price in the future will not adversely impact USO's attempt to track the Benchmark Oil Futures Contract.

47

Table of Contents

Second, USO incurs expenses primarily composed of the management fee, brokerage commissions for the buying and selling of futures contracts, and other expenses. The impact of these expenses tends to cause daily changes in the per share NAV of USO to track slightly lower than daily changes in the price of the Benchmark Oil Futures Contract. At the same time, USO earns dividend and interest income on its cash, cash equivalents and Treasuries. USO is not required to distribute any portion of its income to its shareholders and did not make any distributions to shareholders during the year ended December 31, 2019. Interest payments, and any other income, were retained within the portfolio and added to USO's NAV. When this income exceeds the level of USO's expenses for its management fee, brokerage commissions and other expenses (including ongoing registration fees, licensing fees and the fees and expenses of the independent directors of USCF), USO will realize a net yield that will tend to cause daily changes in the per share NAV of USO to track slightly higher than daily changes in the Benchmark Oil Futures Contract. If short-term interest rates rise above the current levels, the level of deviation created by the yield would increase. Conversely, if short-term interest rates were to decline, the amount of error created by the yield would decrease. When short-term yields drop to a level lower than the combined expenses of the management fee and the brokerage commissions, then the tracking error becomes a negative number and would tend to cause the daily returns of the per share NAV to underperform the daily returns of the Benchmark Oil Futures Contract. USCF anticipates that interest rates may continue to stagnate over the near future from historical lows. However, it is anticipated that fees and expenses paid by USO may continue to be lower than interest earned by USO. As such, USCF anticipates that USO could possibly outperform its benchmark so long as interest earned at least equals or exceeds the fees and expenses paid by USO.

Third, USO may hold Other Oil-Related Investments in its portfolio that may fail to closely track the Benchmark Oil Futures Contract's total return movements. In that case, the error in tracking the Benchmark Oil Futures Contract could result in daily changes in the per share NAV of USO that are either too high, or too low, relative to the daily changes in the Benchmark Oil Futures Contract. During the year ended December 31, 2019, USO did not hold any Other Oil-Related Investments. If USO increases in size, and due to its obligations to comply with regulatory limits, USO may invest in Other Oil-Related Investments which may have the effect of increasing transaction related expenses and may result in increased tracking error.

*Term Structure of Crude Oil Futures Prices and the Impact on Total Returns.* Several factors determine the total return from investing in futures contracts. One factor arises from "rolling" futures contracts that will expire at the end of the current month (the "near" or "front" month contract) forward each month prior to expiration. For a strategy that entails holding the near month contract, the price relationship between that futures contract and the next month futures contract will impact returns. For example, if the price of the near month futures contract is higher than the next futures month contract (a situation referred to as "backwardation"), then absent any other change, the price of a next month futures contract tends to rise in value as it becomes the near month futures contract and approaches expiration. Conversely, if the price of a near month futures contract is lower than the next month futures contract (a situation referred to as "contango"), then absent any other change, the price of a next month futures contract tends to decline in value as it becomes the near month futures contract and approaches expiration.

As an example, assume that the price of crude oil for immediate delivery, is $50 per barrel, and the value of a position in the near month futures contract is also $50. Over time, the price of crude oil will fluctuate based on a number of market factors, including demand for oil relative to supply. The value of the near month futures contract will likewise fluctuate in reaction to a number of market factors. If an investor seeks to maintain a position in a near month futures contract and not take delivery of physical barrels of crude oil, the investor must sell the current near month futures contract as it approaches expiration and invest in the next month futures contract. In order to continue holding a position in the current near month futures contract, this "roll" forward of the futures contract must be executed every month.

Contango and backwardation are natural market forces that have impacted the total return on an investment in USO's shares during the past year relative to a hypothetical direct investment in crude oil. In the future, it is likely that the relationship between the market price of USO's shares and changes in the spot prices of light, sweet crude oil will continue to be impacted by contango and backwardation. It is important to note that this comparison ignores the potential costs associated with physically owning and storing crude oil, which could be substantial.

48

Table of Contents

If the futures market is in backwardation, e.g., when the price of the near month futures contract is higher than the price of the next month futures contract, the investor would buy a next month futures contract for a lower price than the current near month futures contract. Assuming the price of the next month futures contract was $49 per barrel, or 2% cheaper than the $50 near month futures contract, then, hypothetically, and assuming no other changes (e.g., to either prevailing crude oil prices or the price relationship between the spot price, the near month contract and the next month contract, and, ignoring the impact of commission costs and the income earned on cash and/or cash equivalents), the value of the $49 next month futures contract would rise to $50 as it approaches expiration. In this example, the value of an investment in the next month futures contract would tend to outperform the spot price of crude oil. As a result, it would be possible for the new near month futures contract to rise 12% while the spot price of crude oil may have risen a lower amount, e.g., only 10%. Similarly, the spot price of crude oil could have fallen 10% while the value of an investment in the futures contract might have fallen another amount, e.g., only 8%. Over time, if backwardation remained constant, this difference between the spot price and the futures contract price would continue to increase.

If the futures market is in contango, an investor would be buying a next month futures contract for a higher price than the current near month futures contract. Again, assuming the near month futures contract is $50 per barrel, the price of the next month futures contract might be $51 per barrel, or 2% more expensive than the front month futures contract. Hypothetically, and assuming no other changes, the value of the $51 next month futures contract would fall to $50 as it approaches expiration. In this example, the value of an investment in the second month would tend to underperform the spot price of crude oil. As a result, it would be possible for the new near month futures contract to rise only 10% while the spot price of crude oil may have risen a higher amount, e.g., 12%. Similarly, the spot price of crude oil could have fallen 10% while the value of an investment in the second month futures contract might have fallen another amount, e.g., 12%. Over time, if contango remained constant, this difference between the spot price and the futures contract price would continue to increase.

49

Table of Contents

The chart below compares the daily price of the near month crude oil futures contract to the price of 13th month crude oil futures contract (i.e., a contract one year forward) over the last 10 years. When the price of the near month futures contract is higher than the price of the 13th month futures contract, the market would be described as being in backwardation. When the price of the near month futures contract is lower than the 13th month futures contract, the market would be described as being in contango. Although the price of the near month futures contract and the price of the 13th month futures contract tend to move together, it can be seen that at times the near month futures contract prices are higher than the 13th month futures contract prices (backwardation) and, at other times, the near month futures contract prices are lower than the 13th month futures contract prices (contango).

*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS*



50

Case 1:20-cv-04740-PGG Document 144-3 Filed 04/29/21 Page 54 of 92

Table of Contents

An alternative way to view the same data is to subtract the dollar price of the 13th month crude oil futures contract from the dollar price of the near month crude oil futures contract, as shown in the chart below. When the difference is positive, the market is in backwardation. When the difference is negative, the market is in contango. The crude oil market spent time in both backwardation and contango during the last ten years.

*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS*



An investment in a portfolio that owned only the near month crude oil futures contract would likely produce a different result than an investment in a portfolio that owned an equal number of each of the near 12 months' of crude oil futures contracts. Generally speaking, when the crude oil futures market is in backwardation, a portfolio of only the near month crude oil futures contract may tend to have a higher total return than a portfolio of 12 months' of the crude oil futures contract. Conversely, if the crude oil futures market was in contango, the portfolio containing only 12 months' of crude oil futures contracts may tend to outperform the portfolio holding only the near month crude oil futures contract.

Historically, the crude oil futures markets have experienced periods of contango and backwardation, with backwardation being in place somewhat less often than contango since oil futures trading started in 1983. Following the global financial crisis in the fourth quarter of 2008, the crude oil market moved into contango and remained in contango for a period of several years. During parts of 2009, the level of contango was unusually steep as a combination of slack U.S. and global demand for crude oil and issues involving the physical transportation and storage of crude oil at Cushing, Oklahoma, the primary pricing point for oil traded in the U.S., led to unusually high inventories of crude oil. A combination of improved transportation and storage capacity, along with growing demand for crude oil globally, moderated the inventory build-up and led to reduced levels of contango by 2011. However, at the end of November 2014, global crude oil inventories grew rapidly after OPEC voted to defend its market share against U.S. shale-oil producers, resulting in another period during which the crude oil market remained primarily in contango. This period of contango continued through December 31, 2017. Declining global crude oil inventories caused the market to flip into backwardation at the beginning of 2018 through late October 2018, at which point ongoing supply growth in the U.S., combined with increased OPEC production, once again led market participants to fear another global glut of crude oil. The crude oil market was primarily in contango the first half of 2019 and in backwardation from August through December 31, 2019.

51

Table of Contents

Periods of contango or backwardation do not materially impact USO's investment objective of having the daily percentage changes in its per share NAV track the daily percentage changes in the price of the Benchmark Oil Futures Contract since the impact of backwardation and contango tend to equally impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract. It is impossible to predict with any degree of certainty whether backwardation or contango will occur in the future. It is likely that both conditions will occur during different periods.

*Crude Oil* Market. During the year ended December 31, 2019, crude oil prices traded in a range between $45.33 to $66.30. Crude oil rose 34.46% from the end of 2018 through December 31, 2019 finishing the year at $54.07. Crude prices peaked in April and declined through October as a result of falling global growth forecasts, negative economic news, and persistently declining oil demand growth, all of which were at least partially the result of the ongoing trade wars. Prices briefly spiked 14.68% following the September 16, 2019 attacks on Saudi oil facilities that knocked out five percent of global daily supply, but quickly fell back on ongoing negative sentiment and economic news. Prices rose again in the fourth quarter of 2019, as global crude oil and liquid fuels inventories declined slightly, OPEC signaled and delivered further output cuts, the U.S. and China reached a "Phase One" trade deal, and further geopolitical risks surfaced. While OPEC has been aggressive about meeting target cuts, continued growth in U.S. shale production also threatens to oversupply the market relative to demand growth. All three major energy agencies (OPEC, EIA, IEA) have lowered their 2020 demand growth forecasts. Should demand continue moderating or turn negative, crude prices would likely fall further. However, geopolitical risk has increased, while a geopolitical risk premium only briefly materialized in the price of crude. Further surprise attacks on crude infrastructure or conflicts in the Middle East would likely create volatility to the upside, should such events occur.

C*rude Oil Price Movements in Comparison to Other Energy Commodities and Investment Categories.* USCF believes that investors frequently measure the degree to which prices or total returns of one investment or asset class move up or down in value in concert with another investment or asset class. Statistically, such a measure is usually done by measuring the correlation of the price movements of the two different investments or asset classes over some period of time. The correlation is scaled between 1 and -1, where 1 indicates that the two investment options move up or down in price or value together, known as "positive correlation," and -1 indicates that they move in completely opposite directions, known as "negative correlation." A correlation of 0 would mean that the movements of the two are neither positively nor negatively correlated, known as "non-correlation." That is, the investment options sometimes move up and down together and other times move in opposite directions.

For the ten-year time period between December 31, 2009 and December 31, 2019, the table below compares the monthly movements of crude oil prices versus the monthly movements of the prices of several other energy commodities, such as natural gas, diesel-heating oil, and unleaded gasoline, as well as several major non-commodity investment asset classes, such as large cap U.S. equities, U.S. government bonds and global equities. It can be seen that over this particular time period, the movement of crude oil on a monthly basis exhibited strong correlation with unleaded gasoline and diesel-heating oil, moderate correlation with the movements of large cap U.S. equities and global equities, limited correlation with natural gas, and moderate negative correlation with U.S. government bonds.

***PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS***

| Correlation Matrix<br>December 31, 2009 – December 31, 2019* | Large Cap U.S. Equities (S&P 500) | U.S. Gov't. Bonds (EFFAS U.S. Gov't. Bond Index) | Global Equities (FTSE World Index) | Unleaded Gasoline | Diesel-Heating Oil | Natural Gas | Crude Oil |
|---|---|---|---|---|---|---|---|
| Large Cap U.S. Equities (S&P 500) | 1.000 | (0.437) | 0.960 | 0.460 | 0.422 | 0.110 | **0.496** |
| U.S. Gov't. Bonds (EFFAS U.S. Gov't. Bond Index) | | 1.000 | (0.403) | (0.290) | (0.343) | (0.026) | **(0.395)** |
| Global Equities (FTSE World Index) | | | 1.000 | 0.481 | 0.452 | 0.106 | **0.524** |
| Unleaded Gasoline | | | | 1.000 | 0.668 | 0.101 | **0.650** |
| Diesel-Heating Oil | | | | | 1.000 | 0.094 | **0.778** |
| Natural Gas | | | | | | 1.000 | **0.063** |
| Crude Oil | | | | | | | **1.000** |

Source: Bloomberg, NYMEX

52

Table of Contents

The table below covers a more recent, but much shorter, range of dates than the above table. Over the one year period ended December 31, 2019, movements of crude oil displayed strong correlation with large cap U.S. equities, global equities, unleaded gasoline and diesel- heating oil and limited to negative correlation with movements with U.S. Government bonds, and natural gas.

*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS*

| Correlation Matrix 12 Months ended December 31, 2019* | Large Cap U.S. Equities (S&P 500) | U.S. Gov't. Bonds (EFFAS U.S. Gov't. Bond Index) | Global Equities (FTSE World Index) | Diesel- Unleaded Gasoline | Heating Oil | Natural Gas | Crude Oil |
|---|---|---|---|---|---|---|---|
| Large Cap U.S. Equities (S&P 500) | 1.000 | (0.576) | 0.989 | 0.631 | 0.891 | 0.490 | **0.925** |
| U.S. Gov't. Bonds (EFFAS U.S. Gov't. Bond Index) | | 1.000 | (0.593) | (0.487) | (0.686) | (0.276) | **(0.462)** |
| Global Equities (FTSE World Index) | | | 1.000 | 0.628 | 0.913 | 0.468 | **0.931** |
| Unleaded Gasoline | | | | 1.000 | 0.682 | 0.197 | **0.714** |
| Diesel-Heating Oil | | | | | 1.000 | 0.314 | **0.912** |
| Natural Gas | | | | | | 1.000 | **0.260** |
| Crude Oil | | | | | | | **1.000** |

Source: Bloomberg, NYMEX

Investors are cautioned that the historical price relationships between crude oil and various other energy commodities, as well as other investment asset classes, as measured by correlation may not be reliable predictors of future price movements and correlation results. The results pictured above would have been different if a different range of dates had been selected. USCF believes that crude oil has historically not demonstrated a strong correlation with equities or bonds over long periods of time. However, USCF also believes that in the future it is possible that crude oil could have long term correlation results that indicate prices of crude oil more closely track the movements of equities or bonds. In addition, USCF believes that, when measured over time periods shorter than ten years, there will always be some periods where the correlation of crude oil to equities and bonds will be either more strongly positively correlated or more strongly negatively correlated than the long term historical results suggest.

The correlations between crude oil, natural gas, diesel-heating oil and gasoline are relevant because USCF endeavors to invest USO's assets in Oil Futures Contracts and Other Oil-Related Investments so that daily changes in percentage terms in USO's per share NAV correlate as closely as possible with daily changes in percentage terms in the price of the Benchmark Oil Futures Contract. If certain other fuel-based commodity futures contracts do not closely correlate with the crude-oil futures contract, then their use could lead to greater tracking error. As noted above, USCF also believes that the changes in percentage terms in the price of the Benchmark Oil Futures Contract will closely correlate with changes in percentage terms in the spot price of light, sweet crude oil.

**Critical Accounting Policies**

Preparation of the financial statements and related disclosures in compliance with accounting principles generally accepted in the United States of America requires the application of appropriate accounting rules and guidance, as well as the use of estimates. USO's application of these policies involves judgments and actual results may differ from the estimates used.

USCF has evaluated the nature and types of estimates that it makes in preparing USO's financial statements and related disclosures and has determined that the valuation of its investments, which are not traded on a United States or internationally recognized futures exchange (such as forward contracts and OTC swaps) involves a critical accounting policy. The values which are used by USO for its Oil Futures Contracts are provided by its commodity broker who uses market prices when available, while OTC swaps are valued based on the present value of estimated future cash flows that would be received from or paid to a third party in settlement of these derivative contracts prior to their delivery date and valued on a daily basis. In addition, USO estimates interest and dividend income on a daily basis using prevailing rates earned on its cash and cash equivalents. These estimates are adjusted to the actual amount received on a monthly basis and the difference, if any, is not considered material.

53

Case 1:20-cv-04740-PGG Document 144-3 Filed 04/29/21 Page 57 of 92

Table of Contents

**Liquidity and Capital Resources**

USO has not made, and does not anticipate making, use of borrowings or other lines of credit to meet its obligations. USO has met, and it is anticipated that USO will continue to meet, its liquidity needs in the normal course of business from the proceeds of the sale of its investments, or from the Treasuries, cash and/or cash equivalents that it intends to hold at all times. USO's liquidity needs include: redeeming shares, providing margin deposits for its existing Oil Futures Contracts or the purchase of additional Oil Futures Contracts and posting collateral for its OTC swaps, if applicable, and payment of its expenses, summarized below under *"Contractual Obligations."*

USO currently generates cash primarily from: (i) the sale of baskets consisting of 100,000 shares ("Creation Baskets") and (ii) income earned on Treasuries, cash and/or cash equivalents. USO has allocated substantially all of its net assets to trading in Oil Interests. USO invests in Oil Interests to the fullest extent possible without being leveraged or unable to satisfy its current or potential margin or collateral obligations with respect to its investments in Oil Futures Contracts and Other Oil-Related Investments. A significant portion of USO's NAV is held in cash and cash equivalents that are used as margin and as collateral for its trading in Oil Interests. The balance of the assets is held in USO's account at its custodian bank and in Treasuries at the FCM. Income received from USO's investments in money market funds and Treasuries is paid to USO. During the year ended December 31, 2019, USO's expenses did not exceed the income USO earned and the cash earned from the sale of Creation Baskets and the redemption of Redemption Baskets. During the year ended December 31, 2018, USO's expenses did not exceed the income USO earned and the cash earned from the sale of Creation Baskets and the redemption of Redemption Baskets. To the extent expenses exceed income, USO's NAV will be negatively impacted.

USO's investments in Oil Interests may be subject to periods of illiquidity because of market conditions, regulatory considerations and other reasons. For example, most commodity exchanges limit the fluctuations in futures contracts prices during a single day by regulations referred to as "daily limits." During a single day, no trades may be executed at prices beyond the daily limit. Once the price of a futures contract has increased or decreased by an amount equal to the daily limit, positions in the contracts can neither be taken nor liquidated unless the traders are willing to effect trades at or within the specified daily limit. Such market conditions could prevent USO from promptly liquidating its positions in Oil Futures Contracts. During the year ended December 31, 2019, USO did not purchase or liquidate any of its positions while daily limits were in effect; however, USO cannot predict whether such an event may occur in the future.

Since March 23, 2007, USO has been responsible for expenses relating to: (i) management fees, (ii) brokerage fees and commissions, (iii) licensing fees for the use of intellectual property, (iv) ongoing registration expenses in connection with offers and sales of its shares subsequent to the initial offering, (v) other expenses, including tax reporting costs, (vi) fees and expenses of the independent directors of USCF and (vii) other extraordinary expenses not in the ordinary course of business, while USCF has been responsible for expenses relating to the fees of USO's Marketing Agent, Administrator and Custodian and registration expenses relating to the initial offering of shares. If USCF and USO are unsuccessful in raising sufficient funds to cover these respective expenses or in locating any other source of funding, USO will terminate and investors may lose all or part of their investment.

**Market Risk**

Trading in Oil Futures Contracts and Other Oil-Related Investments, such as forwards, involves USO entering into contractual commitments to purchase or sell oil at a specified date in the future. The aggregate market value of the contracts will significantly exceed USO's future cash requirements since USO intends to close out its open positions prior to settlement. As a result, USO is generally only subject to the risk of loss arising from the change in value of the contracts. USO considers the "fair value" of its derivative instruments to be the unrealized gain or loss on the contracts. The market risk associated with USO's commitments to purchase oil is limited to the aggregate market value of the contracts held. However, should USO enter into a contractual commitment to sell oil, it would be required to make delivery of the oil at the contract price, repurchase the contract at prevailing prices or settle in cash. Since there are no limits on the future price of oil, the market risk to USO could be unlimited.

USO's exposure to market risk depends on a number of factors, including the markets for oil, the volatility of interest rates and foreign exchange rates, the liquidity of the Oil Futures Contracts and Other Oil-Related Investments markets and the relationships among the contracts held by USO. Drastic market occurrences could ultimately lead to the loss of all or substantially all of an investor's capital.

54

Table of Contents

**Credit Risk**

When USO enters into Oil Futures Contracts and Other Oil-Related Investments, it is exposed to the credit risk that the counterparty will not be able to meet its obligations. The counterparty for the Oil Futures Contracts traded on the NYMEX and on most other futures exchanges is the clearinghouse associated with the particular exchange. In general, in addition to margin required to be posted by the clearinghouse in connection with cleared trades, clearinghouses are backed by their members who may be required to share in the financial burden resulting from the nonperformance of one of their members and, therefore, this additional member support should significantly reduce credit risk. USO is not currently a member of any clearinghouse. Some foreign exchanges are not backed by their clearinghouse members but may be backed by a consortium of banks or other financial institutions. There can be no assurance that any counterparty, clearinghouse, or their members or their financial backers will satisfy their obligations to USO in such circumstances.

USCF attempts to manage the credit risk of USO by following various trading limitations and policies. In particular, USO generally posts margin and/or holds liquid assets that are approximately equal to the market value of its obligations to counterparties under the Oil Futures Contracts and Other Oil-Related Investments it holds. USCF has implemented procedures that include, but are not limited to, executing and clearing trades only with creditworthy parties and/or requiring the posting of collateral or margin by such parties for the benefit of USO to limit its credit exposure. An FCM, when acting on behalf of USO in accepting orders to purchase or sell Oil Futures Contracts on United States exchanges, is required by CFTC regulations to separately account for and segregate as belonging to USO, all assets of USO relating to domestic Oil Futures Contracts trading. FCMs are not allowed to commingle USO's assets with their other assets. In addition, the CFTC requires FCMs to hold in a secure account USO's assets related to foreign Oil Futures Contracts trading.

In the future, USO may purchase OTC swaps, see *"Item 7A. Quantitative and Qualitative Disclosures About Market Risk"* in this annual report on Form 10-K for a discussion of OTC swaps.

As of December 31, 2019, USO held cash deposits and investments in Treasuries and money market funds in the amount of $1,176,245,411 with the custodian and FCM. Some or all of these amounts held by a custodian or an FCM, as applicable, may be subject to loss should USO's custodian or FCM, as applicable, cease operations.

**Off Balance Sheet Financing**

As of December 31, 2019, USO had no loan guarantee, credit support or other off-balance sheet arrangements of any kind other than agreements entered into in the normal course of business, which may include indemnification provisions relating to certain risks that service providers undertake in performing services which are in the best interests of USO. While USO's exposure under these indemnification provisions cannot be estimated, they are not expected to have a material impact on USO's financial position.

**European Sovereign Debt**

USO had no direct exposure to European sovereign debt as of December 31, 2019 and has no direct exposure to European sovereign debt as of the filing of this annual report on Form 10-K.

**Redemption Basket Obligation**

In order to meet its investment objective and pay its contractual obligations described below, USO requires liquidity to redeem shares, which redemptions must be in blocks of 100,000 shares called "Redemption Baskets." USO has to date satisfied this obligation by paying from the cash or cash equivalents it holds or through the sale of its Treasuries in an amount proportionate to the number of shares being redeemed.

**Contractual Obligations**

USO's primary contractual obligations are with USCF. In return for its services, USCF is entitled to a management fee calculated daily and paid monthly as a fixed percentage of USO's NAV, currently 0.45% of NAV on its average daily total net assets.

USCF agreed to pay the start-up costs associated with the formation of USO, primarily its legal, accounting and other costs in connection with USCF's registration with the CFTC as a CPO and the registration and listing of USO and its shares with the SEC, FINRA and NYSE Arca (formerly, AMEX), respectively. However, since USO's initial offering of shares, offering costs incurred in connection with registering and listing additional shares of USO have been directly borne on an ongoing basis by USO, and not by USCF.

55

1/26/2021 Case 1:20-cv-04740-PGG Document 144-3 Filed 04/29/21 Page 59 of 92
https://www.sec.gov/Archives/edgar/data/1327068/000110465920023944/uso-20191231x10k9feacd.htm

Table of Contents

USCF pays the fees of the Marketing Agent and the fees of BBH&Co., as well as BBH&Co.'s fees for performing administrative services, including those in connection with the preparation of USO's financial statements and its SEC, NFA and CFTC reports. USCF and USO have also entered into a licensing agreement with the NYMEX pursuant to which USO and the Related Public Funds, other than BNO, USCI and CPER, pay a licensing fee to the NYMEX. USO also pays the fees and expenses associated with its tax accounting and reporting requirements.

In addition to USCF's management fee, USO pays its brokerage fees (including fees to an FCM), OTC dealer spreads, any licensing fees for the use of intellectual property, and, subsequent to the initial offering, registration and other fees paid to the SEC, FINRA, or other regulatory agencies in connection with the offer and sale of shares, as well as legal, printing, accounting and other expenses associated therewith, and extraordinary expenses. The latter are expenses not incurred in the ordinary course of USO's business, including expenses relating to the indemnification of any person against liabilities and obligations to the extent permitted by law and under the LP Agreement, the bringing or defending of actions in law or in equity or otherwise conducting litigation and incurring legal expenses and the settlement of claims and litigation. Commission payments to an FCM are on a contract-by-contract, or round turn, basis. USO also pays a portion of the fees and expenses of the independent directors of USCF. See *Note 3* to the *Notes to Financial Statements* in *Item 8* of this annual report on Form 10-K.

The parties cannot anticipate the amount of payments that will be required under these arrangements for future periods, as USO's per share NAVs and trading levels to meet its investment objective will not be known until a future date. These agreements are effective for a specific term agreed upon by the parties with an option to renew, or, in some cases, are in effect for the duration of USO's existence. Either party may terminate these agreements earlier for certain reasons described in the agreements.

As of December 31, 2019, USO's portfolio consisted of 19,178 WTI Crude Oil Futures CL Contracts traded on the NYMEX. As of December 31, 2019, USO did not hold any Oil Futures Contracts traded on the ICE Futures. For a list of USO's current holdings, please see USO's website at www.uscfinvestments.com.

**Item 7A. Quantitative and Qualitative Disclosures About Market Risk.**

*Commodity Price Risk.*

USO is exposed to commodity price risk. In particular, USO is exposed to crude oil price risk through its holdings of Oil Futures Contracts together with any other derivatives in which it may invest, which are discussed below. As a result, fluctuations in the value of the Oil Futures Contracts that USO holds in its portfolio, as described in *"Contractual Obligations"* under *"Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations"* above, are expected to directly affect the value of USO's shares.

*OTC Contract Risk*

USO may purchase OTC Oil Interests, such as forward contracts or swap or spot contracts. Unlike most exchange-traded futures contracts or exchange-traded options on such futures, each party to an OTC swap bears the credit risk that the other party may not be able to perform its obligations under its contract.

USO may enter into certain transactions where an OTC component is exchanged for a corresponding futures contract ("Exchange for Related Position" or "EFRP" transactions). In the most common type of EFRP transaction entered into by USO, the OTC component is the purchase or sale of one or more baskets of USO shares. These EFRP transactions may expose USO to counterparty risk during the interim period between the execution of the OTC component and the exchange for a corresponding futures contract. Generally, the counterparty risk from the EFRP transaction will exist only on the day of execution.

Swap transactions, like other financial transactions, involve a variety of significant risks. The specific risks presented by a particular swap transaction necessarily depend upon the terms and circumstances of the transaction. In general, however, all swap transactions involve some combination of market risk, credit risk, counterparty credit risk, funding risk, liquidity risk and operational risk.

Highly customized swap transactions in particular may increase liquidity risk, which may result in a suspension of redemptions. Highly leveraged transactions may experience substantial gains or losses in value as a result of relatively small changes in the value or level of an underlying or related market factor.

56

https://www.sec.gov/Archives/edgar/data/1327068/000110465920023944/uso-20191231x10k9feacd.htm 58/91

Table of Contents

In evaluating the risks and contractual obligations associated with a particular swap transaction, it is important to consider that a swap transaction may be modified or terminated only by mutual consent of the original parties and subject to agreement on individually negotiated terms. Therefore, it may not be possible for USCF to modify, terminate or offset USO's obligations or its exposure to the risks associated with a transaction prior to its scheduled termination date.

To reduce the credit risk that arises in connection with such contracts, USO will generally enter into an agreement with each counterparty based on the Master Agreement published by the International Swaps and Derivatives Association that provides for the netting of its overall exposure to its counterparty, if the counterparty is unable to meet its obligations to USO due to the occurrence of a specified event, such as the insolvency of the counterparty.

USCF assesses or reviews, as appropriate, the creditworthiness of each potential or existing counterparty to an OTC swap pursuant to guidelines approved by USCF's board of directors (the "Board"). Furthermore, USCF on behalf of USO only enters into OTC swaps with counterparties who are, or are affiliates of, (a) banks regulated by a United States federal bank regulator, (b) broker-dealers regulated by the SEC, (c) insurance companies domiciled in the United States, or (d) producers, users or traders of energy, whether or not regulated by the CFTC. Any entity acting as a counterparty shall be regulated in either the United States or the United Kingdom unless otherwise approved by the Board after consultation with its legal counsel. Existing counterparties are also reviewed periodically by USCF. USO will also require that the counterparty be highly rated and/or provide collateral or other credit support. Even if collateral is used to reduce counterparty credit risk, sudden changes in the value of OTC transactions may leave a party open to financial risk due to a counterparty default since the collateral held may not cover a party's exposure on the transaction in such situations.

In general, valuing OTC derivatives is less certain than valuing actively traded financial instruments such as exchange-traded futures contracts and securities or cleared swaps because the price and terms on which such OTC derivatives are entered into or can be terminated are individually negotiated, and those prices and terms may not reflect the best price or terms available from other sources. In addition, while market makers and dealers generally quote indicative prices or terms for entering into or terminating OTC swaps, they typically are not contractually obligated to do so, particularly if they are not a party to the transaction. As a result, it may be difficult to obtain an independent value for an outstanding OTC derivatives transaction.

During the reporting period of this annual report on Form 10-K, USO limited its OTC activities to EFRP transactions.

USO anticipates that the use of Other Oil-Related Investments together with its investments in Oil Futures Contracts will produce price and total return results that closely track the investment goals of USO. However, there can be no assurance of this. OTC swaps may result in higher transaction-related expenses than the brokerage commissions paid in connection with the purchase of Oil Futures Contracts, which may impact USO's ability to successfully track the Benchmark Oil Futures Contract.

57

Table of Contents

**Item 8. Financial Statements and Supplementary Data.**

**United States Oil Fund, LP**
**Index to Financial Statements**

| Documents | Page |
|---|---|
| Management's Annual Report on Internal Control Over Financial Reporting. | 59 |
| Report of Independent Registered Public Accounting Firm. | 60 |
| Statements of Financial Condition at December 31, 2019 and 2018. | 62 |
| Schedules of Investments at December 31, 2019 and 2018. | 63 |
| Statements of Operations for the years ended December 31, 2019, 2018 and 2017. | 65 |
| Statements of Changes in Partners' Capital for the years ended December 31, 2019, 2018 and 2017. | 66 |
| Statements of Cash Flows for the years ended December 31, 2019, 2018 and 2017. | 67 |
| Notes to Financial Statements for the years ended December 31, 2019, 2018 and 2017. | 68 |

58

Table of Contents

**Management's Annual Report on Internal Control Over Financial Reporting.**

USCF assessed the effectiveness of USO's internal control over financial reporting as of December 31, 2019. In making this assessment, it used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control Integrated Framework (2013). Based on the assessment, USCF believes that, as of December 31, 2019, USO's internal control over financial reporting is effective.

59

Table of Contents

Table of Contents

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Partners of
United States Oil Fund, LP

**Opinions on the Financial Statements and Internal Control over Financial Reporting**

We have audited the accompanying statements of financial condition of United States Oil Fund, LP (the "Fund") as of December 31, 2019 and 2018, including the schedule of investments as of December 31, 2019 and 2018, and the related statements of operations, changes in partners' capital and cash flows for each of the years in the three-year period ended December 31, 2019, and the related notes (collectively referred to as the "financial statements"). We also have audited the Fund's internal control over financial reporting as of December 31, 2019, based on criteria established in Internal Control — Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of United States Oil Fund, LP as of December 31, 2019 and 2018, and the results of its operations and its cash flows for each of the years in the three-year period ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the Fund maintained, in all material respects, effective internal control over financial reporting as of December 31, 2019 based on criteria established in Internal Control — Integrated Framework (2013) issued by COSO.

**Basis for Opinion**

The Fund's management is responsible for these financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting included in the accompanying Management's Annual Report on Internal Control over Financial Reporting. Our responsibility is to express an opinion on the Fund's financial statements and an opinion on the Fund's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Fund in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the financial statements included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

60

Table of Contents

**Definition and Limitations of Internal Control over Financial Reporting**

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (1) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (2) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (3) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

**Critical Audit Matters**

Critical audit matters are matters arising from the current period audit of the financial statements that were communicated or required to be communicated to the audit committee and that: (1) relate to accounts or disclosures that are material to the financial statements and (2) involved our especially challenging, subjective, or complex judgments. We determined that there are no critical audit matters.

/s/ Spicer Jeffries LLP

We have served as the Fund's auditor since 2005.

Denver, Colorado
February 21, 2020

61

Table of Contents

**United States Oil Fund, LP**
**Statements of Financial Condition**
**At December 31, 2019 and 2018**

|  | December 31, 2019 | December 31, 2018 |
|---|---|---|
| **Assets** | | |
| Cash and cash equivalents (at cost $1,026,973,397 and $1,223,159,803, respectively) (Notes 2 and 5) | $ 1,026,973,397 | $ 1,223,159,803 |
| Equity in trading accounts: | | |
|   Cash and cash equivalents (at cost $149,272,014 and $433,776,173, respectively) | 149,272,014 | 433,776,173 |
|   Unrealized gain (loss) on open commodity futures contracts | 37,520,567 | (194,392,958) |
| Receivable for shares sold | — | 22,022,450 |
| Dividends receivable | 5,883 | 144,034 |
| Interest receivable | 28,199 | 29,030 |
| Prepaid insurance | 39,269 | 31,698 |
| Prepaid registration fees | 74,241 | 579,117 |
| ETF transaction fees receivable | 2,000 | 2,000 |
|     Total assets | $ 1,213,915,570 | $ 1,485,351,347 |
| **Liabilities and Partners' Capital** | | |
| Payable due to Broker | $ 8,820,649 | $ — |
| Payable for shares redeemed | 32,023,655 | 14,377,830 |
| General Partner management fees payable (Note 3) | 467,894 | 583,978 |
| Professional fees payable | 1,453,996 | 1,741,281 |
| Brokerage commissions payable | 89,961 | 89,961 |
| Directors' fees payable | 43,388 | 42,947 |
| License fees payable | 39,769 | 53,638 |
|     Total liabilities | 42,939,312 | 16,889,635 |
| **Commitments and Contingencies** (Notes 3, 4 and 5) | | |
| **Partners' Capital** | | |
|   General Partner | — | — |
|   Limited Partners | 1,170,976,258 | 1,468,461,712 |
|   Total Partners' Capital | 1,170,976,258 | 1,468,461,712 |
|     Total liabilities and partners' capital | $ 1,213,915,570 | $ 1,485,351,347 |
|   Limited Partners' shares outstanding | 91,600,000 | 153,200,000 |
|   Net asset value per share | $ 12.78 | $ 9.59 |
|   Market value per share | $ 12.81 | $ 9.66 |

*See accompanying notes to financial statements.*

62

Table of Contents

**United States Oil Fund, LP**
**Schedule of Investments**
**At December 31, 2019**

| | Notional Amount | | Number of Contracts | Value/ Unrealized Gain (Loss) on Open Commodity Contracts | | % of Partners' Capital |
|---|---|---|---|---|---|---|
| **Open Futures Contracts - Long** | | | | | | |
| **United States Contracts** | | | | | | |
| NYMEX WTI Crude Oil Futures CL February 2020 contracts, expiring January 2020* | $ | 1,133,488,110 | 19,178 | $ | 37,520,567 | 3.20 |

| | Principal Amount | | Market Value | | % |
|---|---|---|---|---|---|
| **Cash Equivalents** | | | | | |
| **United States Treasury Obligations** | | | | | |
| U.S. Treasury Bills: | | | | | |
| 2.05%, 1/02/2020 | $ | 25,000,000 | $ | 24,998,594 | 2.13 |
| 2.03%, 1/09/2020 | | 50,000,000 | | 49,977,667 | 4.27 |
| 2.01%, 1/16/2020 | | 50,000,000 | | 49,958,646 | 4.27 |
| 2.04%, 1/23/2020 | | 50,000,000 | | 49,938,369 | 4.26 |
| 2.02%, 1/30/2020 | | 50,000,000 | | 49,919,525 | 4.27 |
| 1.89%, 2/06/2020 | | 50,000,000 | | 49,906,251 | 4.26 |
| 1.87%, 2/13/2020 | | 50,000,000 | | 49,889,215 | 4.26 |
| 1.85%, 2/20/2020 | | 50,000,000 | | 49,872,569 | 4.26 |
| 1.85%, 2/27/2020 | | 50,000,000 | | 49,855,126 | 4.26 |
| 1.83%, 3/05/2020 | | 100,000,000 | | 99,677,067 | 8.51 |
| 1.84%, 3/19/2020 | | 50,000,000 | | 49,802,833 | 4.25 |
| 1.88%, 3/26/2020 | | 50,000,000 | | 49,780,417 | 4.25 |
| 1.70%, 4/02/2020 | | 50,000,000 | | 49,784,056 | 4.25 |
| 1.64%, 4/09/2020 | | 50,000,000 | | 49,775,875 | 4.25 |
| 1.60%, 4/16/2020 | | 50,000,000 | | 49,765,917 | 4.25 |
| 1.60%, 4/23/2020 | | 50,000,000 | | 49,750,458 | 4.25 |
| 1.59%, 4/30/2020 | | 50,000,000 | | 49,737,500 | 4.25 |
| 1.54%, 5/07/2020 | | 45,000,000 | | 44,757,906 | 3.82 |
| 1.55%, 5/14/2020 | | 30,000,000 | | 29,828,033 | 2.55 |
| 1.55%, 5/21/2020 | | 30,000,000 | | 29,819,638 | 2.55 |
| 1.58%, 5/28/2020 | | 30,000,000 | | 29,806,367 | 2.55 |
| 1.53%, 6/04/2020 | | 40,000,000 | | 39,738,222 | 3.39 |
| 1.53%, 6/11/2020 | | 30,000,000 | | 29,794,463 | 2.54 |
| 1.54%, 6/18/2020 | | 40,000,000 | | 39,712,700 | 3.39 |
| 1.57%, 6/25/2020 | | 40,000,000 | | 39,694,933 | 3.39 |
| **Total Treasury Obligations** | | | | 1,155,542,347 | 98.68 |
| | | | | | |
| **United States - Money Market Funds** | | | | | |
| Fidelity Investments Money Market Funds - Government Portfolio | | 20,000,000 | | 20,000,000 | 1.71 |
| **Total Cash Equivalents** | | | $ | 1,175,542,347 | 100.39 |

\* Collateral amounted to $149,272,014 on open futures contracts.

*See accompanying notes to financial statements.*

63

Table of Contents

**United States Oil Fund, LP**
**Schedule of Investments**
**At December 31, 2018**

| | Notional Amount | Number of Contracts | Value/ Unrealized Gain (Loss) on Open Commodity Contracts | % of Partners' Capital |
|---|---|---|---|---|
| **Open Futures Contracts - Long** | | | | |
| **United States Contracts** | | | | |
| NYMEX WTI Crude Oil Futures CL February 2019 contracts, expiring January 2019* | $ 1,662,952,358 | 32,340 | $ (194,392,958) | (13.24) |

| | | Principal Amount | Market Value | |
|---|---|---|---|---|
| **Cash Equivalents** | | | | |
| **United States Treasury Obligations** | | | | |
| U.S. Treasury Bills: | | | | |
| 2.10%, 1/10/2019 | | $ 60,000,000 | $ 59,968,800 | 4.08 |
| 2.13%, 1/17/2019 | | 50,000,000 | 49,953,111 | 3.40 |
| 2.15%, 1/24/2019 | | 70,000,000 | 69,904,965 | 4.76 |
| 2.18%, 1/31/2019 | | 60,000,000 | 59,892,250 | 4.08 |
| 2.20%, 2/07/2019 | | 50,000,000 | 49,888,229 | 3.40 |
| 2.19%, 2/14/2019 | | 60,000,000 | 59,840,867 | 4.07 |
| 2.20%, 2/21/2019 | | 50,000,000 | 49,845,583 | 3.39 |
| 2.24%, 2/28/2019 | | 50,000,000 | 49,821,569 | 3.39 |
| 2.38%, 3/07/2019 | | 50,000,000 | 49,787,396 | 3.39 |
| 2.28%, 3/14/2019 | | 50,000,000 | 49,774,500 | 3.39 |
| 2.33%, 3/21/2019 | | 50,000,000 | 49,747,639 | 3.39 |
| 2.34%, 3/28/2019 | | 50,000,000 | 49,724,084 | 3.39 |
| 2.37%, 4/04/2019 | | 50,000,000 | 49,697,104 | 3.38 |
| 2.41%, 4/11/2019 | | 60,000,000 | 59,602,500 | 4.06 |
| 2.42%, 4/18/2019 | | 50,000,000 | 49,644,076 | 3.38 |
| 2.43%, 4/25/2019 | | 50,000,000 | 49,620,000 | 3.38 |
| 2.46%, 5/02/2019 | | 60,000,000 | 59,510,958 | 4.05 |
| 2.47%, 5/09/2019 | | 50,000,000 | 49,567,111 | 3.38 |
| 2.48%, 5/16/2019 | | 50,000,000 | 49,540,625 | 3.37 |
| 2.50%, 5/23/2019 | | 50,000,000 | 49,513,847 | 3.37 |
| 2.49%, 5/30/2019 | | 50,000,000 | 49,491,434 | 3.37 |
| 2.51%, 6/06/2019 | | 50,000,000 | 49,463,750 | 3.37 |
| 2.51%, 6/13/2019 | | 50,000,000 | 49,438,555 | 3.37 |
| 2.49%, 6/20/2019 | | 50,000,000 | 49,419,167 | 3.37 |
| 2.49%, 6/27/2019 | | 20,000,000 | 19,758,100 | 1.35 |
| **Total Treasury Obligations** | | | 1,282,416,220 | 87.33 |
| | | | | |
| **United States - Money Market Funds** | | | | |
| Goldman Sachs Financial Square Funds - Government Fund - Class FS | | 17,000,000 | 17,000,000 | 1.16 |
| Morgan Stanley Institutional Liquidity Funds - Government Portfolio | | 35,000,000 | 35,000,000 | 2.38 |
| **Total Money Market Funds** | | | 52,000,000 | 3.54 |
| **Total Cash Equivalents** | | | $ 1,334,416,220 | 90.87 |

\* Collateral amounted to $433,776,173 on open futures contracts.

*See accompanying notes to financial statements.*

64

Table of Contents

*United States Oil Fund, LP*
*Statements of Operations*
*For the years ended December 31, 2019, 2018 and 2017*

| | Year ended December 31, 2019 | Year ended December 31, 2018 | Year ended December 31, 2017 |
|---|---|---|---|
| **Income** | | | |
| Gain (loss) on trading of commodity futures contracts: | | | |
| Realized gain (loss) on closed futures contracts | $ 220,179,889 | $ 1,603,334 | $ 70,673,279 |
| Change in unrealized gain (loss) on open futures contracts | 231,913,525 | (312,173,308) | 6,489,790 |
| Realized gain (loss) on short-term investments | 11,258 | (3,070) | — |
| Dividend income | 2,957,196 | 2,213,034 | 3,417,005 |
| Interest income* | 29,461,116 | 29,889,589 | 18,149,989 |
| ETF transaction fees | 312,000 | 358,000 | 360,000 |
| Total income (loss) | 484,834,984 | (278,112,421) | 99,090,063 |
| **Expenses** | | | |
| General Partner management fees (Note 3) | 6,461,273 | 8,147,165 | 11,901,563 |
| Professional fees | 1,440,997 | 1,539,401 | 2,437,428 |
| Brokerage commissions | 2,423,017 | 2,538,611 | 4,675,687 |
| Directors' fees and insurance | 333,741 | 316,185 | 357,844 |
| License fees | 215,376 | 271,572 | 396,719 |
| Registration fees | 504,876 | 349,290 | 348,425 |
| Total expenses | 11,379,280 | 13,162,224 | 20,117,666 |
| **Net income (loss)** | $ 473,455,704 | $ (291,274,645) | $ 78,972,397 |
| **Net income (loss) per limited partnership share** | $ 3.19 | $ (2.49) | $ 0.37 |
| **Net income (loss) per weighted average limited partnership share** | $ 3.90 | $ (2.13) | $ 0.31 |
| **Weighted average limited partnership shares outstanding** | 121,247,671 | 137,006,575 | 253,222,466 |

\*   Interest income does not exceed paid in kind of 5%.

*See accompanying notes to financial statements.*

65

Table of Contents

**United States Oil Fund, LP**
**Statements of Changes in Partners' Capital**
**For the years ended December 31, 2019, 2018 and 2017**

| | General Partner | | Limited Partners | | Total |
|---|---|---|---|---|---|
| **Balances, at December 31, 2016** | $ | — | $ | 3,101,956,669 | $ | 3,101,956,669 |
| Addition of 410,300,000 partnership shares | | — | | 4,177,335,976 | | 4,177,335,976 |
| Redemption of 508,100,000 partnership shares | | — | | (5,338,733,632) | | (5,338,733,632) |
| Net income (loss) | | — | | 78,972,397 | | 78,972,397 |
| **Balances, at December 31, 2017** | | — | | 2,019,531,410 | | 2,019,531,410 |
| Addition of 307,500,000 partnership shares | | — | | 3,972,118,855 | | 3,972,118,855 |
| Redemption of 321,500,000 partnership shares | | — | | (4,231,913,908) | | (4,231,913,908) |
| Net income (loss) | | — | | (291,274,645) | | (291,274,645) |
| **Balances, at December 31, 2018** | | — | | 1,468,461,712 | | 1,468,461,712 |
| Addition of 273,100,000 partnership shares | | — | | 3,196,742,422 | | 3,196,742,422 |
| Redemption of 334,700,000 partnership shares | | — | | (3,967,683,580) | | (3,967,683,580) |
| Net income (loss) | | — | | 473,455,704 | | 473,455,704 |
| **Balances, at December 31, 2019** | $ | — | $ | 1,170,976,258 | $ | 1,170,976,258 |

**Net Asset Value Per Share:**

| | | |
|---|---|---|
| At December 31, 2016 | $ | 11.71 |
| At December 31, 2017 | $ | 12.08 |
| At December 31, 2018 | $ | 9.59 |
| At December 31, 2019 | $ | 12.78 |

*See accompanying notes to financial statements.*

66

Table of Contents

**United States Oil Fund, LP**
**Statements of Cash Flows**
**For the years ended December 31, 2019, 2018 and 2017**

| | | Year ended December 31, 2019 | | Year ended December 31, 2018 | | Year ended December 31, 2017 |
|---|---|---|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | | | | |
| Net income (loss) | $ | 473,455,704 | $ | (291,274,645) | $ | 78,972,397 |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities: | | | | | | |
| Unrealized (gain) loss on open futures contracts | | (231,913,525) | | 312,173,308 | | (6,489,790) |
| (Increase) decrease in dividends receivable | | 138,151 | | 10,305 | | 68,612 |
| (Increase) decrease in interest receivable | | 831 | | 3,152 | | (32,182) |
| (Increase) decrease in prepaid insurance | | (7,571) | | (5,114) | | 1,590 |
| (Increase) decrease in prepaid registration fees | | 504,876 | | 349,290 | | 348,425 |
| (Increase) decrease in ETF transaction fees receivable | | — | | — | | 3,000 |
| Increase (decrease) in payable due to Broker | | 8,820,649 | | (57,283,329) | | (53,495,599) |
| Increase (decrease) in General Partner management fees payable | | (116,084) | | (215,644) | | (456,590) |
| Increase (decrease) in professional fees payable | | (287,285) | | (317,442) | | 229,229 |
| Increase (decrease) in brokerage commissions payable | | 0 | | (98,000) | | (48,000) |
| Increase (decrease) in directors' fees payable | | 441 | | (5,425) | | (5,918) |
| Increase (decrease) in license fees payable | | (13,869) | | (21,487) | | (75,801) |
| Net cash provided by (used in) operating activities | | 250,582,318 | | (36,685,031) | | 19,019,373 |
| | | | | | | |
| **Cash Flows from Financing Activities:** | | | | | | |
| Addition of partnership shares | | 3,218,764,872 | | 3,988,747,637 | | 4,138,684,744 |
| Redemption of partnership shares | | (3,950,037,755) | | (4,286,383,585) | | (5,336,829,913) |
| Net cash provided by (used in) financing activities | | (731,272,883) | | (297,635,948) | | (1,198,145,169) |
| | | | | | | |
| **Net Increase (Decrease) in Cash and Cash Equivalents** | | (480,690,565) | | (334,320,979) | | (1,179,125,796) |
| | | | | | | |
| **Total Cash, Cash Equivalents and Equity in Trading Accounts,** beginning of year | | 1,656,935,976 | | 1,991,256,955 | | 3,170,382,751 |
| **Total Cash, Cash Equivalents and Equity in Trading Accounts,** end of year | $ | 1,176,245,411 | $ | 1,656,935,976 | $ | 1,991,256,955 |
| | | | | | | |
| **Components of Cash and Cash Equivalents:** | | | | | | |
| Cash and Cash Equivalents | $ | 1,026,973,397 | $ | 1,223,159,803 | $ | 1,846,630,713 |
| Equity in Trading Accounts: | | | | | | |
| Cash and Cash Equivalents | | 149,272,014 | | 433,776,173 | | 144,626,242 |
| **Total Cash, Cash Equivalents and Equity in Trading Accounts** | $ | 1,176,245,411 | $ | 1,656,935,976 | $ | 1,991,256,955 |

*See accompanying notes to financial statements.*

67

Table of Contents

**United States Oil Fund, LP**
**Notes to Financial Statements**
**For the years ended December 31, 2019, 2018 and 2017**

**NOTE 1 — ORGANIZATION AND BUSINESS**

The United States Oil Fund, LP ("USO") was organized as a limited partnership under the laws of the state of Delaware on May 12, 2005. USO is a commodity pool that issues limited partnership shares ("shares") that may be purchased and sold on the NYSE Arca, Inc. (the "NYSE Arca"). Prior to November 25, 2008, USO's shares traded on the American Stock Exchange (the "AMEX"). USO will continue in perpetuity, unless terminated sooner upon the occurrence of one or more events as described in its Seventh Amended and Restated Agreement of Limited Partnership dated as of December 15, 2017 (the "LP Agreement"). The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of the futures contract for light, sweet crude oil traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire (the "Benchmark Oil Futures Contract"), plus interest earned on USO's collateral holdings, less USO's expenses.

USO's investment objective is *not* for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, *nor* is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period *greater than one day*.

United States Commodity Funds LLC ("USCF"), the general partner of USO, believes that it is not practical to manage the portfolio to achieve such an investment goal when investing in Oil Futures Contracts (as defined below) and Other Oil-Related Investments (as defined below). USO accomplishes its objective through investments in futures contracts for light, sweet crude oil and other types of crude oil, diesel-heating oil, gasoline, natural gas and other petroleum-based fuels that are traded on the NYMEX, ICE Futures or other U.S. and foreign exchanges (collectively, "Oil Futures Contracts") and other oil-related investments such as cash-settled options on Oil Futures Contracts, forward contracts for oil, cleared swap contracts and over-the-counter ("OTC") transactions that are based on the price of crude oil, diesel-heating oil, gasoline, natural gas and other petroleum-based fuels, Oil Futures Contracts and indices based on the foregoing (collectively, "Other Oil-Related Investments"). As of December 31, 2019, USO held 19,178 Oil Futures Contracts for light, sweet crude oil traded on the NYMEX and did not hold any Oil Futures Contracts for light, sweet crude oil traded on the ICE Futures Europe.

USO commenced investment operations on April 10, 2006 and has a fiscal year ending on December 31. USCF is responsible for the management of USO. USCF is a member of the National Futures Association (the "NFA") and became registered as a commodity pool operator with the Commodity Futures Trading Commission (the "CFTC") effective December 1, 2005 and a swaps firm on August 8, 2013. USCF is also the general partner of the United States Natural Gas Fund, LP ("UNG"), the United States 12 Month Oil Fund, LP ("USL") and the United States Gasoline Fund, LP ("UGA"), which listed their limited partnership shares on the AMEX under the ticker symbols "UNG" on April 18, 2007, "USL" on December 6, 2007 and "UGA" on February 26, 2008, respectively. As a result of the acquisition of the AMEX by NYSE Euronext, each of UNG's, USL's and UGA's shares commenced trading on the NYSE Arca on November 25, 2008. USCF is also the general partner of the United States 12 Month Natural Gas Fund, LP ("UNL") and the United States Brent Oil Fund, LP ("BNO"), which listed their limited partnership shares on the NYSE Arca under the ticker symbols "UNL" on November 18, 2009 and "BNO" on June 2, 2010, respectively. USCF previously served as the general partner for the United States Short Oil Fund, LP ("DNO") and the United States Diesel-Heating Oil Fund, LP ("UHN"), both of which were liquidated in 2018.

USCF is also the sponsor of the United States Commodity Index Fund ("USCI"), the United States Copper Index Fund ("CPER") and the USCF Crescent Crypto Index Fund ("XBET"), each a series of the United States Commodity Index Funds Trust ("USCIFT"). USCF previously served as the sponsor for the United States Agricultural Index Fund ("USAG") a series of USCIFT which was liquidated in 2018. XBET is currently in registration and has not commenced operations. USCI and CPER listed their shares on the NYSE Arca under the ticker symbols "USCI" on August 10, 2010 and "CPER" on November 15, 2011, respectively.

In addition, USCF is the sponsor of the USCF Funds Trust, a Delaware statutory trust, and each of its series, the United States 3x Oil Fund ("USOU") and the United States 3x Short Oil Fund ("USOD"), which listed their shares on the NYSE Arca on July 20, 2017 under the ticker symbols "USOU" and "USOD", respectively. Each of USOU and USOD liquidated all of its assets and distributed cash pro rata to all remaining shareholders in December 2019.

68

Table of Contents

USO, UNG, UGA, UNL, USL, BNO, USCI and CPER are referred to collectively herein as the "Related Public Funds."

USO issues shares to certain authorized purchasers ("Authorized Participants") by offering baskets consisting of 100,000 shares ("Creation Baskets") through ALPS Distributors, Inc., as the marketing agent (the "Marketing Agent"). The purchase price for a Creation Basket is based upon the NAV of a share calculated shortly after the close of the core trading session on the NYSE Arca on the day the order to create the basket is properly received.

Authorized Participants pay USO a $1,000 transaction fee for each order placed to create one or more Creation Baskets or to redeem one or more baskets ("Redemption Baskets"), consisting of 100,000 shares. Shares may be purchased or sold on a nationally recognized securities exchange in smaller increments than a Creation Basket or Redemption Basket. Shares purchased or sold on a nationally recognized securities exchange are not purchased or sold at the per share NAV of USO but rather at market prices quoted on such exchange.

In April 2006, USO initially registered 17,000,000 shares on Form S-1 with the U.S. Securities and Exchange Commission (the "SEC"). On April 10, 2006, USO listed its shares on the AMEX under the ticker symbol "USO" and switched to trading on the NYSE Arca under the same ticker symbol on November 25, 2008. On that day, USO established its initial per share NAV by setting the price at $67.39 and issued 200,000 shares in exchange for $13,479,000. USO also commenced investment operations on April 10, 2006, by purchasing Oil Futures Contracts traded on the NYMEX based on light, sweet crude oil. As of December 31, 2019, USO had registered a total of 3,227,000,000 shares.

## NOTE 2 — SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

**Basis of Presentation**

The financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America ("U.S. GAAP") as detailed in the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification. USO is an investment company and follows the accounting and reporting guidance in FASB Topic 946.

**Revenue Recognition**

Commodity futures contracts, forward contracts, physical commodities and related options are recorded on the trade date. All such transactions are recorded on the identified cost basis and marked to market daily. Unrealized gains or losses on open contracts are reflected in the statements of financial condition and represent the difference between the original contract amount and the market value (as determined by exchange settlement prices for futures contracts and related options and cash dealer prices at a predetermined time for forward contracts, physical commodities, and their related options) as of the last business day of the year or as of the last date of the financial statements. Changes in the unrealized gains or losses between periods are reflected in the statements of operations. USO earns income on funds held at the custodian or a futures commission merchant ("FCM") at prevailing market rates earned on such investments.

**Brokerage Commissions**

Brokerage commissions on all open commodity futures contracts are accrued on a full-turn basis.

**Income Taxes**

USO is not subject to federal income taxes; each partner reports his/her allocable share of income, gain, loss deductions or credits on his/her own income tax return.

In accordance with U.S. GAAP, USO is required to determine whether a tax position is more likely than not to be sustained upon examination by the applicable taxing authority, including resolution of any tax related appeals or litigation processes, based on the technical merits of the position. USO files an income tax return in the U.S. federal jurisdiction and may file income tax returns in various U.S. states. USO is not subject to income tax return examinations by major taxing authorities for years before 2016. The tax benefit recognized is measured as the largest amount of benefit that has a greater than fifty percent likelihood of being realized upon ultimate settlement. De-recognition of a tax benefit previously recognized results in USO recording a tax liability that reduces net assets. However, USO's conclusions regarding this policy may be subject to review and adjustment at a later date based on factors including, but not limited to, on-going analysis of and changes to tax laws, regulations and interpretations thereof. USO recognizes interest accrued related to unrecognized tax benefits and penalties related to unrecognized tax benefits in income tax fees payable, if assessed. No interest expense or penalties have been recognized as of and for the year ended December 31, 2019.

69

Table of Contents

**Creations and Redemptions**

Authorized Participants may purchase Creation Baskets or redeem Redemption Baskets only in blocks of 100,000 shares at a price equal to the NAV of the shares calculated shortly after the close of the core trading session on the NYSE Arca on the day the order is placed.

USO receives or pays the proceeds from shares sold or redeemed within two business days after the trade date of the purchase or redemption. The amounts due from Authorized Participants are reflected in USO's statements of financial condition as receivable for shares sold and amounts payable to Authorized Participants upon redemption are reflected as payable for shares redeemed.

Authorized Participants pay USO a $1,000 transaction fee for each order placed to create one or more Creation Baskets or to redeem one or more Redemption Baskets.

**Partnership Capital and Allocation of Partnership Income and Losses**

Profit or loss shall be allocated among the partners of USO in proportion to the number of shares each partner holds as of the close of each month. USCF may revise, alter or otherwise modify this method of allocation as described in the LP Agreement**.**

**Calculation of Per Share NAV**

USO's per share NAV is calculated on each NYSE Arca trading day by taking the current market value of its total assets, subtracting any liabilities and dividing that amount by the total number of shares outstanding. USO uses the closing price for the contracts on the relevant exchange on that day to determine the value of contracts held on such exchange.

**Net Income (Loss) Per Share**

Net income (loss) per share is the difference between the per share NAV at the beginning of each period and at the end of each period. The weighted average number of shares outstanding was computed for purposes of disclosing net income (loss) per weighted average share. The weighted average shares are equal to the number of shares outstanding at the end of the period, adjusted proportionately for shares added and redeemed based on the amount of time the shares were outstanding during such period. There were no shares held by USCF at December 31, 2019.

**Offering Costs**

Offering costs incurred in connection with the registration of additional shares after the initial registration of shares are borne by USO. These costs include registration fees paid to regulatory agencies and all legal, accounting, printing and other expenses associated with such offerings. These costs are accounted for as a deferred charge and thereafter amortized to expense over twelve months on a straight-line basis or a shorter period if warranted.

**Cash Equivalents**

Cash equivalents include money market funds and overnight deposits or time deposits with original maturity dates of six months or less.

**Reclassification**

Certain amounts in the accompanying financial statements were reclassified to conform to the current presentation.

**Use of Estimates**

The preparation of financial statements in conformity with U.S. GAAP requires USCF to make estimates and assumptions that affect the reported amount of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of the revenue and expenses during the reporting period. Actual results may differ from those estimates and assumptions.

70

Table of Contents

## NOTE 3 — FEES PAID BY THE FUND AND RELATED PARTY TRANSACTIONS

**USCF Management Fee**

Under the LP Agreement, USCF is responsible for investing the assets of USO in accordance with the objectives and policies of USO. In addition, USCF has arranged for one or more third parties to provide administrative, custody, accounting, transfer agency and other necessary services to USO. For these services, USO is contractually obligated to pay USCF a fee, which is paid monthly, equal to 0.45% per annum of average daily total net assets.

**Ongoing Registration Fees and Other Offering Expenses**

USO pays all costs and expenses associated with the ongoing registration of its shares subsequent to the initial offering. These costs include registration or other fees paid to regulatory agencies in connection with the offer and sale of shares, and all legal, accounting, printing and other expenses associated with such offer and sale. For the years ended December 31, 2019, 2018 and 2017, USO incurred $504,876, $349,290 and $348,425 respectively, in registration fees and other offering expenses.

**Independent Directors' and Officers' Expenses**

USO is responsible for paying its portion of the directors' and officers' liability insurance for USO and the Related Public Funds and the fees and expenses of the independent directors who also serve as audit committee members of USO and the Related Public Funds. USO shares the fees and expenses on a pro rata basis with each Related Public Fund, as described above, based on the relative assets of each Related Public Fund computed on a daily basis. These fees and expenses for the year ended December 31, 2019 were $556,951 for USO and the Related Public Funds. USO's portion of such fees and expenses for the year ended December 31, 2019 was $333,741. For the year ended December 31, 2018, these fees and expenses were $521,689 for USO and the Related Public Funds. USO's portion of such fees and expenses for the year ended December 31, 2018 was $316,185. For the year ended December 31, 2017, these fees and expenses were $536,375 for USO and the Related Public Funds. USO's portion of such fees and expenses for the year ended December 31, 2017 was $357,844.

**Licensing Fees**

As discussed in Note 4 below, USO entered into a licensing agreement with the NYMEX on April 10, 2006, as amended on October 20, 2011. Pursuant to the agreement, USO and the Related Public Funds, other than BNO, USCI and CPER, pay a licensing fee that is equal to 0.015% on all net assets. During the years ended December 31, 2019, 2018 and 2017, USO incurred $215,376, $271,572 and $396,719, respectively, under this arrangement.

**Investor Tax Reporting Cost**

The fees and expenses associated with USO's audit expenses and tax accounting and reporting requirements are paid by USO. These costs were approximately $1,440,997 for the year ended December 31, 2019, approximately $1,500,000 for the year ended December 31, 2018 and approximately $2,200,000 for the year ended December 31, 2017. Tax reporting costs fluctuate between years due to the number of shareholders during any given year.

**Other Expenses and Fees**

In addition to the fees described above, USO pays all brokerage fees and other expenses in connection with the operation of USO, excluding costs and expenses paid by USCF as outlined in *Note 4 – Contracts and Agreements* below.

## NOTE 4 — CONTRACTS AND AGREEMENTS

**Marketing Agent Agreement**

USO is party to a marketing agent agreement, dated as of March 13, 2006, as amended from time to time, with the Marketing Agent and USCF, whereby the Marketing Agent provides certain marketing services for USO as outlined in the agreement. The fees of the Marketing Agent, which are borne by USCF, include a marketing fee of $425,000 per annum plus the following incentive fee: 0.00% on USO's assets from $0 – $500 million; 0.04% on USO's assets from $500 million – $4 billion and 0.03% on USO's assets in excess of $4 billion. In no event may the aggregate compensation paid to the Marketing Agent and any affiliate of USCF for distribution-related services exceed 10% of the gross proceeds of USO's offering.

71

Table of Contents

The above fee does not include website construction and development, which are also borne by USCF.

**Brown Brothers Harriman & Co. Agreements**

USO is also party to a custodian agreement, dated March 13, 2006, as amended from time to time, with Brown Brothers Harriman & Co. ("BBH&Co.") and USCF, whereby BBH&Co. holds investments on behalf of USO. USCF pays the fees of the custodian, which are determined by the parties from time to time. In addition, USO is party to an administrative agency agreement, dated March 13, 2006, as amended from time to time, with USCF and BBH&Co., whereby BBH&Co. acts as the administrative agent, transfer agent and registrar for USO. USCF also pays the fees of BBH&Co. for its services under such agreement and such fees are determined by the parties from time to time.

Currently, USCF pays BBH&Co. for its services, in the foregoing capacities, a minimum amount of $75,000 annually for its custody, fund accounting and fund administration services rendered to USO and each of the Related Public Funds, as well as a $20,000 annual fee for its transfer agency services. In addition, USCF pays BBH&Co. an asset-based charge of (a) 0.06% for the first $500 million of the Related Public Funds' combined net assets, (b) 0.0465% for the Related Public Funds' combined net assets greater than $500 million but less than $1 billion, and (c) 0.035% once the Related Public Funds' combined net assets exceed $1 billion. The annual minimum amount will not apply if the asset-based charge for all accounts in the aggregate exceeds $75,000. USCF also pays BBH&Co. transaction fees ranging from $7 to $15 per transaction.

**Brokerage and Futures Commission Merchant Agreements**

On October 8, 2013, USO entered into a brokerage agreement with RBC to serve as USO's FCM effective October 10, 2013. The agreement with RBC requires it to provide services to USO in connection with the purchase and sale of Oil Futures Contracts and Other Oil-Related Investments that may be purchased and sold by or through RBC for USO's account. In accordance with the agreement, RBC charges USO commissions of approximately $7 to $8 per round-turn trade, including applicable exchange, clearing and NFA fees for Oil Futures Contracts and options on Oil Futures Contracts. Such fees include those incurred when purchasing Oil Futures Contracts and options on Oil Futures Contracts when USO issues shares as a result of a Creation Basket, as well as fees incurred when selling Oil Futures Contracts and options on Oil Futures Contracts when USO redeems shares as a result of a Redemption Basket. Such fees are also incurred when Oil Futures Contracts and options on Oil Futures Contracts are purchased or redeemed for the purpose of rebalancing the portfolio. USO also incurs commissions to brokers for the purchase and sale of Oil Futures Contracts, Other Oil-Related Investments or short-term obligations of the United States of two years or less ("Treasuries").

| | For the Year Ended December 31, 2019 | | For the Year Ended December 31, 2018 | | For the Year Ended December 31, 2017 | |
|---|---|---|---|---|---|---|
| Total commissions accrued to brokers | $ | 2,423,017 | $ | 2,538,611 | $ | 4,675,687 |
| Total commissions as annualized percentage of average total net assets | | 0.17 % | | 0.14 % | | 0.18 % |
| Commissions accrued as a result of rebalancing | $ | 2,052,263 | $ | 2,145,268 | $ | 4,112,340 |
| Percentage of commissions accrued as a result of rebalancing | | 84.70 % | | 84.51 % | | 87.95 % |
| Commissions accrued as a result of creation and redemption activity | $ | 370,754 | $ | 393,343 | $ | 563,347 |
| Percentage of commissions accrued as a result of creation and redemption activity | | 15.30 % | | 15.49 % | | 12.05 % |

The decrease in total commissions accrued to brokers for the year ended December 31, 2019, compared to the year ended December 31, 2018, was due primarily to a lower number of crude oil futures contracts being held and traded. The decrease in total commissions accrued to brokers for the year ended December 31, 2018, compared to the year ended December 31, 2017, was due primarily to lower number of futures contracts being held and traded. However, there can be no assurance that commission costs and portfolio turnover will not cause commission expenses to rise in future quarters.

**NYMEX Licensing Agreement**

USO and the NYMEX entered into a licensing agreement on April 10, 2006, as amended on October 20, 2011, whereby USO was granted a non-exclusive license to use certain of the NYMEX's settlement prices and service marks. Under the licensing agreement, USO and the Related Public Funds, other than BNO, USCI, CPER, USOU and USOD, pay the NYMEX an asset-based fee for the license, the terms of which are described in Note 3. USO expressly disclaims any association with the NYMEX or endorsement of USO by the NYMEX and acknowledges that "NYMEX" and "New York Mercantile Exchange" are registered trademarks of the NYMEX.

72

Table of Contents

**NOTE 5 — FINANCIAL INSTRUMENTS, OFF-BALANCE SHEET RISKS AND CONTINGENCIES**

USO may engage in the trading of futures contracts, options on futures contracts, cleared swaps and OTC swaps (collectively, "derivatives"). USO is exposed to both market risk, which is the risk arising from changes in the market value of the contracts, and credit risk, which is the risk of failure by another party to perform according to the terms of a contract.

USO may enter into futures contracts, options on futures contracts and cleared swaps to gain exposure to changes in the value of an underlying commodity. A futures contract obligates the seller to deliver (and the purchaser to accept) the future delivery of a specified quantity and type of a commodity at a specified time and place. Some futures contracts may call for physical delivery of the asset, while others are settled in cash. The contractual obligations of a buyer or seller may generally be satisfied by taking or making physical delivery of the underlying commodity or by making an offsetting sale or purchase of an identical futures contract on the same or linked exchange before the designated date of delivery. Cleared swaps are agreements that are eligible to be cleared by a clearinghouse, e.g., ICE Clear Europe, and provide the efficiencies and benefits that centralized clearing on an exchange offers to traders of futures contracts, including credit risk intermediation and the ability to offset positions initiated with different counterparties.

The purchase and sale of futures contracts, options on futures contracts and cleared swaps require margin deposits with an FCM. Additional deposits may be necessary for any loss on contract value. The Commodity Exchange Act requires an FCM to segregate all customer transactions and assets from the FCM's proprietary activities.

Futures contracts, options on futures contracts and cleared swaps involve, to varying degrees, elements of market risk (specifically commodity price risk) and exposure to loss in excess of the amount of variation margin. The face or contract amounts reflect the extent of the total exposure USO has in the particular classes of instruments. Additional risks associated with the use of futures contracts are an imperfect correlation between movements in the price of the futures contracts and the market value of the underlying securities and the possibility of an illiquid market for a futures contract. Buying and selling options on futures contracts exposes investors to the risks of purchasing or selling futures contracts.

All of the futures contracts held by USO through December 31, 2019 were exchange-traded. The risks associated with exchange-traded contracts are generally perceived to be less than those associated with OTC swaps since, in OTC swaps, a party must rely solely on the credit of its respective individual counterparties. However, in the future, if USO were to enter into non-exchange traded contracts, it would be subject to the credit risk associated with counterparty non-performance. The credit risk from counterparty non-performance associated with such instruments is the net unrealized gain, if any, on the transaction. USO has credit risk under its futures contracts since the sole counterparty to all domestic and foreign futures contracts is the clearinghouse for the exchange on which the relevant contracts are traded. In addition, USO bears the risk of financial failure by the clearing broker.

USO's cash and other property, such as Treasuries, deposited with an FCM are considered commingled with all other customer funds, subject to the FCM's segregation requirements. In the event of an FCM's insolvency, recovery may be limited to a pro rata share of segregated funds available. It is possible that the recovered amount could be less than the total of cash and other property deposited. The insolvency of an FCM could result in the complete loss of USO's assets posted with that FCM; however, the majority of USO's assets are held in investments in Treasuries, cash and/or cash equivalents with USO's custodian and would not be impacted by the insolvency of an FCM. The failure or insolvency of USO's custodian, however, could result in a substantial loss of USO's assets.

USCF invests a portion of USO's cash in money market funds that seek to maintain a stable per share NAV. USO is exposed to any risk of loss associated with an investment in such money market funds. As of December 31, 2019 and December 31, 2018, USO held investments in money market funds in the amounts of $20,000,000 and $52,000,000, respectively. USO also holds cash deposits with its custodian. Pursuant to a written agreement with BBH&Co., uninvested overnight cash balances are swept to offshore branches of U.S. regulated and domiciled banks located in Toronto, Canada; London, United Kingdom; Grand Cayman, Cayman Islands; and Nassau, Bahamas; which are subject to U.S. regulation and regulatory oversight. As of December 31, 2019 and December 31, 2018, USO held cash deposits and investments in Treasuries in the amounts of $1,156,245,411 and $1,604,935,976, respectively, with the custodian and FCM. Some or all of these amounts may be subject to loss should USO's custodian and/or FCM cease operations.

For derivatives, risks arise from changes in the market value of the contracts. Theoretically, USO is exposed to market risk equal to the value of futures contracts purchased and unlimited liability on such contracts sold short. As both a buyer and a seller of options, USO pays or receives a premium at the outset and then bears the risk of unfavorable changes in the price of the contract underlying the option.

USO's policy is to continuously monitor its exposure to market and counterparty risk through the use of a variety of financial, position and credit exposure reporting controls and procedures. In addition, USO has a policy of requiring review of the credit standing of each broker or counterparty with which it conducts business.

73

Table of Contents

The financial instruments held by USO are reported in its statements of financial condition at market or fair value, or at carrying amounts that approximate fair value, because of their highly liquid nature and short-term maturity.

## NOTE 6 — FINANCIAL HIGHLIGHTS

The following table presents per share performance data and other supplemental financial data for the years ended December 31, 2019, 2018 and 2017 for the shareholders. This information has been derived from information presented in the financial statements.

| | Year ended December 31, 2019 | Year ended December 31, 2018 | Year ended December 31, 2017 |
|---|---|---|---|
| **Per Share Operating Performance:** | | | |
| Net asset value, beginning of year | $ 9.59 | $ 12.08 | $ 11.71 |
| Total income (loss) | 3.28 | (2.39) | 0.45 |
| Total expenses | (0.09) | (0.10) | (0.08) |
| Net increase (decrease) in net asset value | 3.19 | (2.49) | 0.37 |
| Net asset value, end of year | $ 12.78 | $ 9.59 | $ 12.08 |
| | | | |
| **Total Return** | 33.26 % | (20.61)% | 3.16 % |
| | | | |
| **Ratios to Average Net Assets** | | | |
| Total income (loss) | 33.77 % | (15.36)% | 3.75 % |
| Management fees | 0.45 % | 0.45 % | 0.45 % |
| Expenses excluding management fees | 0.34 % | 0.28 % | 0.31 % |
| Net income (loss) | 32.97 % | (16.09)% | 2.99 % |

Total returns are calculated based on the change in value during the period. An individual shareholder's total return and ratio may vary from the above total returns and ratios based on the timing of contributions to and withdrawals from USO.

## NOTE 7 - QUARTERLY FINANCIAL DATA (Unaudited)

The following summarized (unaudited) quarterly financial information presents the results of operations and other data for three-month periods ended March 31, June 30, September 30 and December 31, 2019 and 2018.

| | First Quarter 2019 | Second Quarter 2019 | Third Quarter 2019 | Fourth Quarter 2019 |
|---|---|---|---|---|
| Total Income (Loss) | $ 424,069,433 | $ (22,663,248) | $ (80,441,230) | $ 163,870,029 |
| Total Expenses | 3,171,765 | 2,930,288 | 2,777,247 | 2,499,980 |
| Net Income (Loss) | $ 420,897,668 | $ (25,593,536) | $ (83,218,477) | $ 161,370,049 |
| Net Income (Loss) per Share | $ 2.91 | $ (0.37) | $ (0.85) | $ 1.50 |

| | First Quarter 2018 | Second Quarter 2018 | Third Quarter 2018 | Fourth Quarter 2018 |
|---|---|---|---|---|
| Total Income (Loss) | $ 174,518,482 | $ 256,619,443 | $ 51,601,604 | $ (760,851,950) |
| Total Expenses | 3,620,608 | 3,391,637 | 3,117,304 | 3,032,675 |
| Net Income (Loss) | $ 170,897,874 | $ 253,227,806 | $ 48,484,300 | $ (763,884,625) |
| Net Income (Loss) per Share | $ 1.02 | $ 1.92 | $ 0.45 | $ (5.88) |

74

Table of Contents

**NOTE 8 — FAIR VALUE OF FINANCIAL INSTRUMENTS**

USO values its investments in accordance with Accounting Standards Codification 820 – Fair Value Measurements and Disclosures ("ASC 820"). ASC 820 defines fair value, establishes a framework for measuring fair value in generally accepted accounting principles, and expands disclosures about fair value measurement. The changes to past practice resulting from the application of ASC 820 relate to the definition of fair value, the methods used to measure fair value, and the expanded disclosures about fair value measurement. ASC 820 establishes a fair value hierarchy that distinguishes between: (1) market participant assumptions developed based on market data obtained from sources independent of USO (observable inputs) and (2) USO's own assumptions about market participant assumptions developed based on the best information available under the circumstances (unobservable inputs). The three levels defined by the ASC 820 hierarchy are as follows:

Level I – Quoted prices (unadjusted) in active markets for *identical* assets or liabilities that the reporting entity has the ability to access at the measurement date.

Level II – Inputs other than quoted prices included within Level I that are observable for the asset or liability, either directly or indirectly. Level II assets include the following: quoted prices for *similar* assets or liabilities in active markets, quoted prices for identical or similar assets or liabilities in markets that are not active, inputs other than quoted prices that are observable for the asset or liability, and inputs that are derived principally from or corroborated by observable market data by correlation or other means (market-corroborated inputs).

Level III – Unobservable pricing input at the measurement date for the asset or liability. Unobservable inputs shall be used to measure fair value to the extent that observable inputs are not available.

In some instances, the inputs used to measure fair value might fall within different levels of the fair value hierarchy. The level in the fair value hierarchy within which the fair value measurement in its entirety falls shall be determined based on the lowest input level that is significant to the fair value measurement in its entirety.

The following table summarizes the valuation of USO's securities at December 31, 2019 using the fair value hierarchy:

| At December 31, 2019 | | Total | | Level I | | Level II | | Level III |
|---|---|---|---|---|---|---|---|---|
| Short-Term Investments | $ | 1,175,542,347 | $ | 1,175,542,347 | $ | — | $ | — |
| Exchange-Traded Futures Contracts | | | | | | | | |
| United States Contracts | | 37,520,567 | | 37,520,567 | | — | | — |

During the year ended December 31, 2019, there were no transfers between Level I and Level II.

The following table summarizes the valuation of USO's securities at December 31, 2018 using the fair value hierarchy:

| At December 31, 2018 | | Total | | Level I | | Level II | | Level III |
|---|---|---|---|---|---|---|---|---|
| Short-Term Investments | $ | 1,334,416,220 | $ | 1,334,416,220 | $ | — | $ | — |
| Exchange-Traded Futures Contracts | | | | | | | | |
| United States Contracts | | (194,392,958) | | (194,392,958) | | — | | — |

During the year ended December 31, 2018, there were no transfers between Level I and Level II.

Effective January 1, 2009, USO adopted the provisions of Accounting Standards Codification 815 — Derivatives and Hedging, which require presentation of qualitative disclosures about objectives and strategies for using derivatives, quantitative disclosures about fair value amounts and gains and losses on derivatives.

75

Table of Contents

**Fair Value of Derivative Instruments**

| Derivatives not Accounted for as Hedging Instruments | Statements of Financial Condition Location | Fair Value At December 31, 2019 | Fair Value At December 31, 2018 |
|---|---|---|---|
| Futures - Commodity Contracts | Assets | $ 37,520,567 | $ (194,392,958) |

**The Effect of Derivative Instruments on the Statements of Operations**

| Derivatives not Accounted for as Hedging Instruments | Location of Gain (Loss) on Derivatives Recognized in Income | For the year ended December 31, 2019 | | For the year ended December 31, 2018 | | For the year ended December 31, 2017 | |
|---|---|---|---|---|---|---|---|
| | | Realized Gain (Loss) on Derivatives Recognized in Income | Change in Unrealized Gain (Loss) on Derivatives Recognized in Income | Realized Gain (Loss) on Derivatives Recognized in Income | Change in Unrealized Gain (Loss) on Derivatives Recognized in Income | Realized Gain (Loss) on Derivatives Recognized in Income | Change in Unrealized Gain (Loss) on Derivatives Recognized in Income |
| Futures - Commodity Contracts | Realized gain (loss) on closed positions | $ 220,179,889 | | $ 1,603,334 | | $ 70,673,279 | |
| | Change in unrealized gain (loss) on open positions | | $ 231,913,525 | | $ (312,173,308) | | $ 6,489,790 |

**NOTE 9 - RECENT ACCOUNTING PRONOUNCEMENTS**

In August 2018, the FASB issued Accounting Standards Update ("ASU") No. 2018-13, which changes certain fair value measurement disclosure requirements. The new ASU, in addition to other modifications and additions, removes the requirement to disclose the amount and reasons for transfers between Level 1 and Level 2 of the fair value hierarchy, and the Funds' policy for the timing of transfers between levels. The amendments are effective for financial statements issued for fiscal years beginning after December 15, 2019, and interim periods within those fiscal years. The Fund has evaluated the implications of certain provisions of the ASU and has determined that there will be no material impacts to the financial statements.

**NOTE 10 — SUBSEQUENT EVENTS**

USO has performed an evaluation of subsequent events through the date the financial statements were issued. This evaluation did not result in any subsequent events that necessitated disclosures and/or adjustments.

76

Table of Contents

**Item 9. Changes in and Disagreements With Accountants on Accounting and Financial Disclosure.**

Not applicable.

**Item 9A. Controls and Procedures.**

**Disclosure Controls and Procedures**

USO maintains disclosure controls and procedures that are designed to ensure that information required to be disclosed in USO's periodic reports filed or submitted under the Securities Exchange Act of 1934, as amended, is recorded, processed, summarized and reported within the time period specified in the SEC's rules and forms.

The duly appointed officers of USCF, including its chief executive officer and chief financial officer, who perform functions equivalent to those of a principal executive officer and principal financial officer of USO if USO had any officers, have evaluated the effectiveness of USO's disclosure controls and procedures and have concluded that the disclosure controls and procedures of USO have been effective as of the end of the period covered by this annual report on Form 10-K.

**Management's Annual Report on Internal Control Over Financial Reporting**

USO is responsible for establishing and maintaining adequate internal control over financial reporting. USO's internal control system is designed to provide reasonable assurance to USCF and the Board of USCF regarding the preparation and fair presentation of published financial statements. All internal control systems, no matter how well designed, have inherent limitations. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. USCF's report on internal control over financial reporting is set forth above under the heading, *"Management's Annual Report on Internal Control Over Financial Reporting"* in Item 8 of this annual report on Form 10-K.

**Change in Internal Control Over Financial Reporting**

There were no changes in USO's internal control over financial reporting during USO's last fiscal quarter that have materially affected, or are reasonably likely to materially affect, USO's internal control over financial reporting.

**Item 9B. Other Information.**

**Monthly Account Statements**

Pursuant to the requirement under Rule 4.22 under the CEA, each month USO publishes an account statement for its shareholders, which includes a Statement of Income (Loss) and a Statement of Changes in Net Asset Value. The account statement is furnished to the SEC on a current report on Form 8-K pursuant to Section 13 or 15(d) of the Exchange Act and posted each month on USO's website at www.uscfinvestments.com.

77

Table of Contents

**Part III**

**Item 10. Directors, Executive Officers and Corporate Governance.**

**Principals and Key Personnel of USCF.** USO has no executive officers. Pursuant to the terms of the LP Agreement, USO's affairs are managed by USCF. The following principals of USCF serve in the below mentioned capacities:

| Name | Age | Capacity |
|---|---|---|
| Nicholas D. Gerber | 57 | Management Director, Vice President |
| Andrew F Ngim | 59 | Chief Operating Officer, Management Director and Portfolio Manager |
| Robert L. Nguyen | 60 | Management Director |
| John P. Love | 48 | Management Director, Chairman of the Board of Directors, President and Chief Executive Officer |
| Stuart P. Crumbaugh | 56 | Chief Financial Officer, Secretary and Treasurer |
| Carolyn M. Yu | 61 | Chief Compliance Officer |
| Ray W. Allen | 63 | Portfolio Manager |
| Kevin A. Baum | 49 | Chief Investment Officer, Portfolio Manager |
| Gordon L. Ellis | 73 | Independent Director |
| Malcolm R. Fobes III | 55 | Independent Director |
| Peter M. Robinson | 62 | Independent Director |

**Ray W. Allen**, 63, Portfolio Manager of USCF since January 2008. Mr. Allen was the portfolio manager of: (1) UGA from February 2008 until March 2010, and then portfolio manager since May 2015, (2) UHN from April 2008 until March 2010, and then portfolio manager since May 2015, (3) UNL from November 2009 until March 2010, and then portfolio manager since May 2015. In addition, he has been the portfolio manager of: (1) DNO since September 2009, (2) USO and USL since March 2010, (3) BNO since June 2010, (4) UNG since May 2015, and (4) USOU and USOD from July 2017 to December 2019. Mr. Allen also has served as the portfolio manager of (1) the USCF Commodity Strategy Fund, a series of USCF Mutual Funds Trust, since October 2017, and (2) the USCF SummerHaven Dynamic Commodity Strategy No K-1 Fund, a series of the USCF ETF Trust, since May 2018. Mr. Allen has been a principal of USCF listed with the CFTC and NFA since March 2009 and has been registered as an associated person of USCF since July 2015 and from March 2008 to November 2012. Additionally, Mr. Allen has been approved as an NFA swaps associated person of USCF since July 2015. As of February 2017, he also is an associated person and swap associated person of USCF Advisers, LLC ("USCF Advisers"). USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Allen earned a B.A. in Economics from the University of California at Berkeley and holds an NFA Series 3 registration.

**Kevin A. Baum**, 49, has served as a Portfolio Manager of USCF since March 2016 and as the Chief Investment Officer of USCF since September 1, 2016. Prior to joining USCF, Mr. Baum temporarily retired from December 2015 to March 2016. Mr. Baum served as the Vice President and Senior Portfolio Manager for Invesco, an investment manager that manages a family of exchange-traded funds, from October 2014 through December 2015. Mr. Baum was temporarily retired from May 2012 through September 2014. From May 1993 to April 2012, Mr. Baum worked as the Senior Portfolio Manager, Head of Commodities for OppenheimerFunds, Inc., a global asset manager. Mr. Baum has been approved as an NFA principal and associated person of USCF since April 2016 and, as of January 2017, a branch manager of USCF. As of February 2017, he also is an associated person and branch manager of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Baum is a CFA Charterholder, CAIA Charterholder, earned a B.B.A. in Finance from Texas Tech University and holds an NFA Series 3 registration.

78

Table of Contents

**Stuart P. Crumbaugh**, 56, Chief Financial Officer, Secretary and Treasurer of USCF since May 2015 and also the Chief Financial Officer of Concierge Technologies, Inc., the parent of Wainwright Holdings, Inc. ("Wainwright") since December 2017. In addition, Mr. Crumbaugh has served as a director of Wainwright, the parent and sole member of USCF, since December 2016. Mr. Crumbaugh has been a principal of USCF listed with the CFTC and NFA since July 1, 2015 and, as of January 2017, he is a principal of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Since June 2015, Mr. Crumbaugh has been the Treasurer and Secretary of USCF Advisers. He has served as a Management Trustee, Chief Financial Officer and Treasurer of (1) USCF ETF Trust since May 2015 and (2) USCF Mutual Funds Trust since October 2016. Mr. Crumbaugh joined USCF as the Assistant Chief Financial Officer on April 6, 2015. Prior to joining USCF, Mr. Crumbaugh was the Vice President Finance and Chief Financial Officer of Sikka Software Corporation, a software service healthcare company providing optimization software and data solutions from April 2014 to April 6, 2015. Mr. Crumbaugh served as a consultant providing technical accounting, IPO readiness and M&A consulting services to various early stage companies with the Connor Group, a technical accounting consulting firm, for the periods of January 2014 through March 2014; October 2012 through November 2012; and January 2011 through February 2011. From December 2012 through December 2013, Mr. Crumbaugh was Vice President, Corporate Controller and Treasurer of Auction.com, LLC, a residential and commercial real estate online auction company. From March 2011 through September 2012, Mr. Crumbaugh was Chief Financial Officer of IP Infusion Inc., a technology company providing network routing and switching software enabling software-defined networking solutions for major mobile carriers and network infrastructure providers. Mr. Crumbaugh earned a B.A. in Accounting and Business Administration from Michigan State University in 1987 and is a Certified Public Accountant – Michigan (inactive).

**Nicholas D. Gerber**, 57, Vice President since May 15, 2015. Mr. Gerber served as President and Chief Executive Officer of USCF from June 2005 through May 15, 2015 and Chairman of the Board of Directors of USCF from June 2005 through October 2019. Mr. Gerber co-founded USCF in 2005 and prior to that, he co-founded Ameristock Corporation in March 1995, a California-based investment adviser registered under the Investment Advisers Act of 1940 from March 1995 until January 2013. Since January 26, 2015, Mr. Gerber also has served as the Chief Executive Officer, President, and Chairman of the Board of Directors of Concierge Technologies, Inc. ("Concierge"), which is a company publicly traded under the ticker symbol "CNCG." Concierge is the sole shareholder of Wainwright. Mr. Gerber also is the President and a director of Wainwright, a position he has held since March of 2004. From August 1995 to January 2013, Mr. Gerber served as Portfolio Manager of Ameristock Mutual Fund, Inc. On January 11, 2013, the Ameristock Mutual Fund, Inc. merged with and into the Drexel Hamilton Centre American Equity Fund, a series of Drexel Hamilton Mutual Funds. Drexel Hamilton Mutual Funds is not affiliated with Ameristock Corporation, the Ameristock Mutual Fund, Inc. or USCF. Mr. Gerber also has served USCF Advisers on the Board of Managers from June 2013 to present, as the President from June 2013 through June 18, 2015, and as Vice President from June 18, 2015 to present. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, since February 2017, is registered as a commodity pool operator, NFA member and swap firm. He also has served as Chairman of the Boards of Trustees of USCF ETF Trust since 2014 and USCF Mutual Funds Trust since October 2016, respectively, (USCF ETF Trust and together with USCF Mutual Funds Trust are referred to as the "Trusts") and each of the Trusts are investment companies registered under the Investment Company Act of 1940, as amended. In addition, Mr. Gerber served as the President and Chief Executive Officer of USCF ETF Trust from June 2014 until December 2015. In the above roles, Mr. Gerber has gained extensive experience in evaluating and retaining third-party service providers, including custodians, accountants, transfer agents, and distributors. Mr. Gerber has been a principal of USCF listed with the CFTC and NFA since November 2005, an NFA associate member and associated person of USCF since December 2005 and a Branch Manager of USCF since May 2009. Additionally, effective as of January 2017, he is a principal of USCF Advisers and, effective as of February 2017, he is an associated person, swap associated person, and branch manager of USCF Advisers. Mr. Gerber earned an MBA degree in finance from the University of San Francisco, a B.A. from Skidmore College and holds an NFA Series 3 registration.

79

Table of Contents

**John P. Love**, 48, President and Chief Executive Officer of USCF since May 15, 2015, Management Director of USCF since October 2016 and Chairman of the Board of Directors of USCF since October 2019. Mr. Love previously served as a Senior Portfolio Manager for the Related Public Funds from March 2010 through May 15, 2015. Prior to that, while still at USCF, he was a Portfolio Manager beginning with the launch of USO in April 2006. Mr. Love was the portfolio manager of USO from April 2006 until March 2010 and the portfolio manager for USL from December 2007 until March 2010. Mr. Love has been the portfolio manager of UNG since April 2007, and the portfolio manager of UGA, UHN, and UNL since March 2010. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Love has served as on the Board of Managers of USCF Advisers since November 2016 and as its President since June 18, 2015. He also acted as co-portfolio manager of the Stock Split Index Fund, a series of the USCF ETF Trust for the period from September 2014 to December 2015, when he was promoted to the position of President and Chief Executive Officer of the USCF ETF Trust. Since October 2016 to present, he also has served as the President and Chief Executive of the USCF Mutual Funds Trust. Mr. Love also is a director of Wainwright, a position he has held since December 2016. Mr. Love has been a principal of USCF listed with the CFTC and NFA since January 17, 2006. Mr. Love has been registered as an associated person of USCF since February 2015 and from December 1, 2005 to April 16, 2009. Mr. Love has also been registered as a branch manager of USCF since March 2016. Additionally, Mr. Love has been approved as an NFA swaps associated person since February 2015. Mr. Love is a principal of USCF Advisers LLC as of January 2017. Additionally, effective as of February 2017, he is an associated person, swap associated person, and branch manager of USCF Advisers. Mr. Love earned a B.A. from the University of Southern California, holds an NFA Series 3 and FINRA Series 7 registrations and is a CFA Charterholder.

**Andrew F Ngim**, 59, co-founded USCF in 2005 and has served as a Management Director since May 2005 and, since August 15, 2016, has served as the Chief Operating Officer of USCF. Mr. Ngim has served as the portfolio manager for USCI, CPER and USAG since January 2013. Mr. Ngim also served as USCF's Treasurer from June 2005 to February 2012. In addition, he has been on the Board of Managers and has served as the Assistant Secretary and Assistant Treasurer of USCF Advisers since its inception in June 2013. Prior to and concurrent with his services to USCF and USCF Advisers, from January 1999 to January 2013, Mr. Ngim served as a Managing Director for Ameristock Corporation, a California-based investment adviser, which he co-founded in March 1995, and was Co-Portfolio Manager of Ameristock Mutual Fund, Inc. from January 2000 to January 2013. Mr. Ngim also served as portfolio manager of (1) the Stock Split Index Fund from September 2014 to October 2017, and (2) the USCF Restaurant Leaders Fund from November 2016 to October 2017, both series of the USCF ETF Trust. Mr. Ngim also serves as the portfolio manager for three funds that are series of the USCF ETF Trust: (1) USCF SummerHaven SHPEI Index Fund from December 2017 to present, (2) USCF SummerHaven SHPEN Index Fund also from December 2017 to present, and (3) USCF SummerHaven Dynamic Commodity Strategy No K-1 Fund from May 2018 to present. Mr. Ngim serves as a Management Trustee of: (1) the USCF ETF Trust from August 2014 to the present and (2) the USCF Mutual Funds Trust from October 2016 to present. Mr. Ngim has been a principal of USCF listed with the CFTC and NFA since November 2005 and a principal of USCF Advisers LLC since January 2017. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Ngim earned his B.A. from the University of California at Berkeley.

**Robert L. Nguyen**, 60, Management Director and principal since July 2015. Mr. Nguyen served on the Board of Wainwright from December 2014 to December 2016. Mr. Nguyen co-founded USCF in 2005 and served as a Management Director until March 2012. Mr. Nguyen was an Investment Manager with Ribera Investment Management, an investment adviser registered under the Investment Advisers Act of 1940, from January 2013 to March 2015. Prior to and concurrent with his services to USCF, from January 2000 to January 2013, Mr. Nguyen served as a Managing Principal for Ameristock Corporation, a California-based investment adviser registered under the Investment Advisers Act of 1940, which he co-founded in March 1995. Mr. Nguyen was a principal of USCF listed with the CFTC and NFA from November 2005 through March 2012 and an associated person of USCF listed with the CFTC and NFA from November 2007 through March 2012. Mr. Nguyen has been a principal of USCF listed with the CFTC and NFA since July 2015 and an associated person of USCF listed with the CFTC and NFA since December 2015. As of February 2017, he also is an associated person of USCF Advisers. USCF Advisers, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Mr. Nguyen earned his B.S. from California State University at Sacramento, and holds NFA Series 3 and FINRA Series 7 registrations.

80

Table of Contents

***Carolyn M. Yu***, 61, Chief Compliance Officer of USCF since February 2013. In addition, she served USCF as the General Counsel from May 2015 through April 2018 and the Assistant General Counsel from August 2011 through April 2015. Ms. Yu also served as the General Counsel of Concierge, the parent of Wainwright from November 2017 through December 2018. Ms. Yu has served as (1) Chief Compliance Officer of USCF Advisers and USCF ETF Trust since May 2015 and of USCF Mutual Funds Trust since October 2016, (2) Chief AML Officer of USCF ETF Trust since May 2015 and of USCF Mutual Funds Trust since October 2016, and (3) Chief Legal Officer of USCF Advisers and USCF ETF Trust from May 2015 through April 2018 and of USCF Mutual Funds Trust from October 2016 through April 2018. Prior to May 2015, Ms. Yu was the Assistant Chief Compliance Officer and AML Officer of the USCF ETF Trust. Since August 2013, in the case of USCF, and January 2017, in the case of USCF Advisers LLC, Ms. Yu has been a principal listed with the CFTC and NFA. USCF Advisers LLC, an affiliate of USCF, is an investment adviser registered under the Investment Advisers Act of 1940, and, as of February 2017, is registered as a commodity pool operator, NFA member and swap firm. Ms. Yu earned her JD from Golden Gate University School of Law and a B.S. in business administration from San Francisco State University.

***Gordon L. Ellis***, 73, Independent Director of USCF since September 2005. Previously, Mr. Ellis was a founder of International Absorbents, Inc., Director and Chairman since July 1985 and July 1988, respectively, and Chief Executive Officer and President since November 1996. He also served as Chairman of Absorption Corp., a wholly-owned subsidiary of International Absorbents, Inc., which is a leading developer and producer of environmentally friendly pet care and industrial products, from May July 1985 until July 2010 when it was sold to Kinderhook Industries, a private investment banking firm and remained as a director until March 2013 when Absorption Corp was sold again to J. Rettenmaier & Söhne Group, a German manufacturing firm. Concurrent with that, he founded and has served as Chairman from November 2010 to present of Lupaka Gold Corp., a firm that acquires, explores, develops, and evaluates gold mining properties in Peru, South America. Mr. Ellis has his Chartered Directors designation from The Director's College (a joint venture of McMaster University and The Conference Board of Canada). He has been a principal of USCF listed with the CFTC and NFA since November 2005. Mr. Ellis is an engineer and earned an MBA in international finance.

***Malcolm R. Fobes III***, 55, Independent Director of USCF and Chairman of USCF's audit committee since September 2005. He founded and is the Chairman and Chief Executive Officer of Berkshire Capital Holdings, Inc., a California-based investment adviser registered under the Investment Advisers Act of 1940 that has been sponsoring and providing portfolio management services to mutual funds since June 1997. Mr. Fobes serves as Chairman and President of The Berkshire Funds, a mutual fund investment company registered under the Investment Company Act of 1940. Since 1997, Mr. Fobes has also served as portfolio manager of the Berkshire Focus Fund, a mutual fund registered under the Investment Company Act of 1940, which concentrates its investments in the electronic technology industry. He was also contributing editor of Start a Successful Mutual Fund: The Step-by-Step Reference Guide to Make It Happen (JV Books, 1995). Mr. Fobes has been a principal of USCF listed with the CFTC and NFA since November 2005. He earned a B.S. in finance with a minor in economics from San Jose State University in California.

***Peter M. Robinson***, 62, Independent Director of USCF since September 2005. Mr. Robinson has been a Research Fellow since 1993 with the Hoover Institution, a public policy think tank located on the campus of Stanford University. He authored three books and has been published in the New York Times, Red Herring, and Forbes ASAP and is the editor of Can Congress Be Fixed?: Five Essays on Congressional Reform (Hoover Institution Press, 1995). Mr. Robinson has been a principal of USCF listed with the CFTC and NFA since December 2005. He earned an MBA from the Stanford University Graduate School of Business, graduated from Oxford University in 1982 after studying politics, philosophy, and economics and graduated summa cum laude from Dartmouth College in 1979.

81

Table of Contents

The following are individual Principals, as that term is defined in CFTC Rule 3.1, for USCF: John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Melinda D. Gerber, Andrew F Ngim, Robert L. Nguyen, Peter M. Robinson, Scott Schoenberger, Gordon L. Ellis, Malcolm R. Fobes III, Ray W. Allen, Kevin A. Baum, Carolyn M. Yu and Wainwright Holdings, Inc. The individuals who are Principals due to their positions are John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Andrew F Ngim, Robert L. Nguyen, Peter M. Robinson, Gordon L. Ellis, Malcolm R. Fobes III, Ray W. Allen, Kevin A. Baum and Carolyn M. Yu. In addition, Wainwright is a Principal because it is the sole member of USCF. None of the Principals owns or has any other beneficial interest in USO. Ray W. Allen and Andrew F Ngim make trading and investment decisions for USO. Ray W. Allen and Andrew F Ngim execute trades on behalf of USO. In addition, Nicholas D. Gerber, John P. Love, Robert L. Nguyen, Ray W. Allen, Kevin A. Baum, Kathryn Rooney, Maya Lowry, and Ryan Katz are registered with the CFTC as Associated Persons of USCF and are NFA Associate Members. John P. Love and Ray W. Allen are also registered with the CFTC as Swaps Associated Persons.

**Audit Committee**

The Board of USCF has an audit committee which is made up of the three independent directors (Gordon L. Ellis, Malcolm R. Fobes III, and Peter M. Robinson). The audit committee is governed by an audit committee charter that is posted on USO's website at www.uscfinvestments.com. Any shareholder of USO may also obtain a printed copy of the audit committee charter, free of charge, by calling 1-800-920-0259. The Board has determined that each member of the audit committee meets the financial literacy requirements of the NYSE Arca and the audit committee charter. The Board has further determined that each of Messrs. Ellis and Fobes have accounting or related financial management expertise, as required by the NYSE Arca, such that each of them is considered an "Audit Committee Financial Expert" as such term is defined in Item 407(d)(5) of Regulation S-K.

**Other Committees**

Since the individuals who perform work on behalf of USO are not compensated by USO, but instead by USCF, USO does not have a compensation committee. Similarly, since the directors noted above serve on the Board of USCF, there is no nominating committee of the Board that acts on behalf of USO. USCF believes that it is necessary for each member of the Board to possess many qualities and skills. USCF further believes that all directors should possess a considerable amount of business management and educational experience. When vacancies in USCF's Board occur, the members of the Board consider a candidate's management experience as well as his/her background, stature, conflicts of interest, integrity and ethics. In connection with this, the Board also considers issues of diversity, such as diversity of gender, race and national origin, education, professional experience and differences in viewpoints and skills. The Board does not have a formal policy with respect to diversity; however, the Board believes that it is essential that the Board members represent diverse viewpoints.

**Corporate Governance Policy**

The Board of USCF has adopted a Corporate Governance Policy that applies to USO and the Related Public Funds. USO has posted the text of the Corporate Governance Policy on its website at www.uscfinvestments.com. Any shareholder of USO may also obtain a printed copy of the Corporate Governance Policy, free of charge, by calling 1-800-920-0259.

**Code of Ethics**

USCF has adopted a Code of Business Conduct and Ethics (the "Code of Ethics") that applies to its principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, and also to USO. USO has posted the text of the Code of Ethics on its website at www.uscfinvestments.com. Any shareholder of USO may also obtain a printed copy of the Code of Ethics, free of charge, by calling 1-800-920-0259. USO intends to disclose any amendments or waivers to the Code of Ethics applicable to USCF's principal executive officer, principal financial officer, principal accounting officer or controller, or persons performing similar functions, on its website.

82

Table of Contents

**Executive Sessions of the Non-Management Directors**

In accordance with the Corporate Governance Policy of USCF, the non-management directors of the Board (who are the same as the independent directors of the Board) meet separately from the other directors in regularly scheduled executive sessions, without the presence of Management Directors or executive officers of USCF. The non-management directors have designated Gordon L. Ellis to preside over each such executive session. Interested parties who wish to make their concerns known to the non-management directors may communicate directly with Mr. Ellis by writing to 475 Milan Drive, No. 103, San Jose, CA 95134-2453 or by e-mail at uscf.director@gmail.com.

**Board Leadership Structure and Role in Risk Oversight**

The Board of USCF is led by a Chairman, Mr. John P. Love, who also serves as USCF's President and Chief Executive Officer. The Board's responsibilities include: (i) the selection, evaluation, retention and succession of the Chief Executive Officer and the oversight of the selection and performance of other executive officers, (ii) understanding, reviewing and monitoring the implementation of strategic plans, annual operating plans and budgets, (iii) the selection and oversight of USO's independent auditors and the oversight of USO's financial statements, (iv) advising management on significant issues, (v) the review and approval of significant company actions and certain other matters, (vi) nominating directors and committee members and overseeing effective corporate governance and (vii) the consideration of other constituencies, such as USCF's and USO's customers, employees, suppliers and the communities impacted by USO. The non-management directors have designated Gordon L. Ellis as the presiding independent director. Mr. Ellis' role as the presiding independent director includes presiding over each executive session of the non-management directors, facilitating communications by shareholders and employees with the non-management directors and may also include representing the non-management directors with respect to certain matters as to which the views of the non-management directors are sought pursuant to USO's Corporate Governance Policy.

The Board believes that Mr. Love is best situated to serve as Chairman of USCF because he is the director most familiar with the business of USCF as the President and CEO of USCF. Because of his background, he is most capable of effectively leading discussions and execution of new strategic objectives while facilitating information flow between USCF and the full Board, including the independent directors, which is essential to effective governance. The independent directors of USCF are actively involved in the oversight of USCF and, because of their varied backgrounds, provide different perspectives in connection with the oversight of USCF, USO and the Related Public Funds. USCF's independent directors bring expertise from outside USCF and the commodities industry, while Mr. Love brings company-specific and industry-specific experience and expertise.

**Risk Management**

The full Board is actively involved in overseeing the management and operation of USCF, including oversight of the risks that face USO and the Related Public Funds. For example, the Board has adopted an Investment Policy and a Policy for Use of Derivatives. The policies are intended to ensure that USCF takes prudent and careful action while entering into and managing investments taken by USO, including Oil Futures Contracts or Other Oil-Related Investments such as OTC swap contracts. Additionally, the policies are intended to provide assurance that there is sufficient flexibility in controlling risks and returns associated with the use of investments by USO. The policies, among other things, limit USO's ability to have too high of a concentration of its assets in non-exchange traded futures contracts or cleared swap contracts or concentrating its investments in too few counterparties, absent prior approval from the Board. Existing counterparties are reviewed periodically by the Board to ensure that they continue to meet the criteria outlined in the policies. The Board tasks USCF with assessing risks, including market risk, credit risk, liquidity risk, cash flow risk, basis risk, legal and tax risk, settlement risk, and operational risk.

There are certain risks that may arise as a result of a growth in assets under management. For example, if position limits are imposed on USO and the assets under management continue to increase, then USO may not be able to invest solely in the Benchmark Oil Futures Contract and may have to invest in OTC swap contracts or Other Oil-Related Investments as it seeks to track its benchmark. Other Oil Futures Contracts in which USO may invest may not track changes in the price of the Benchmark Oil Futures Contract. Other Oil-Related Investments, including OTC swap contracts, may also expose USO to increased counterparty credit risk and may be less liquid and more difficult to value than Oil Futures Contracts. USO and the Related Public Funds ameliorate the potential credit, liquidity and valuation risks by fully collateralizing any OTC swap contracts or other investments.

83

Table of Contents

**Other Information**

In addition to the certifications of the Chief Executive Officer and Chief Financial Officer of USCF filed or furnished with this annual report on Form 10-K regarding the quality of USO's public disclosure, USO will submit, within 30 days after filing this annual report on Form 10-K, to the NYSE Arca a certification of the Chief Executive Officer of USCF certifying that he is not aware of any violation by USO of NYSE Arca corporate governance listing standards.

**Section 16(a) Beneficial Ownership Reporting Compliance**

Section 16(a) of the Exchange Act requires directors and executive officers of USCF and persons who are beneficial owners of at least 10% of USO's shares to file with the SEC an Initial Statement of Beneficial Ownership of Securities on Form 3 within 10 calendar days of first becoming a director, executive officer or beneficial owner of at least 10% of USO's shares and a Statement of Changes of Beneficial Ownership of Securities on Form 4 within 2 business days of a subsequent acquisition or disposition of shares of USO. To USO's knowledge, based upon a review of copies of reports furnished to it with respect to the fiscal year ended December 31, 2019 and upon the written representations of the directors and executive officers of USCF, all of such persons have filed all required reports.

**Item 11. Executive Compensation.**

**Compensation to USCF and Other Compensation**

USO does not directly compensate any of the executive officers noted above. The executive officers noted above are compensated by USCF for the work they perform on behalf of USO and other entities controlled by USCF. USO does not reimburse USCF for, nor does it set the amount or form of any portion of, the compensation paid to the executive officers by USCF. USO pays fees to USCF pursuant to the LP Agreement under which it is obligated to pay USCF an annualized fee of 0.45% of average daily total net assets. For 2019, USO accrued aggregate management fees of $6,461,273.

**Director Compensation**

The following table sets forth compensation earned during the year ended December 31, 2019, by the directors of USCF. USO's portion of the aggregate fees paid for director's fees and insurance for the year ended December 31, 2019 was $333,741.

| Name | Fees Earned or Paid in Cash | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Change in Pension Value and Nonqualified Deferred Compensation Plan | All Other Compensation | Total |
|---|---|---|---|---|---|---|---|
| **Management Directors** | | | | | | | |
| Nicholas D. Gerber | $ — | NA | NA | NA | $ — | $ — | $ — |
| John P. Love | $ — | NA | NA | NA | $ — | $ — | $ — |
| Andrew F Ngim | $ — | NA | NA | NA | $ — | $ — | $ — |
| Robert L. Nguyen | $ — | NA | NA | NA | $ — | $ — | $ — |
| **Independent Directors** | | | | | | | |
| Peter M. Robinson | $ 62,926 | NA | NA | NA | $ — | $ — | $ 62,926 |
| Gordon L. Ellis | $ 62,926 | NA | NA | NA | $ — | $ — | $ 62,926 |
| Malcolm R. Fobes III[1] | $ 75,512 | NA | NA | NA | $ — | $ — | $ 75,512 |

[1] Mr. Fobes serves as chairman of the audit committee of USCF and receives additional compensation from USCF, in recognition of the additional responsibilities he has undertaken in this role.

**Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters.**

None of the directors or executive officers of USCF own any shares of USO. In addition, USO is not aware of any 5% holder of its shares.

84

Table of Contents

**Item 13. Certain Relationships and Related Transactions, and Director Independence.**

**Certain Relationships and Related Transactions**

USO has and will continue to have certain relationships with USCF and its affiliates. However, there have been no direct financial transactions between USO and the directors or officers of USCF that have not been disclosed herein. See *"Item 11. Executive Compensation"* and *"Item 12. Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters."* Any transaction with a related person that must be disclosed in accordance with SEC Regulation S-K item 404(a), including financial transactions by USO with directors or executive officers of USCF or holders of beneficial interests in USCF or USO of more than 5%, will be subject to the provisions regarding *"Resolutions of Conflicts of Interest; Standard of Care"* as set forth in Section 7.7 of the LP Agreement and will be reviewed and approved by the audit committee of the Board of USCF.

**Director Independence**

In February 2019, the Board undertook a review of the independence of the directors of USCF and considered whether any director has a material relationship or other arrangement with USCF, USO or the Related Public Funds that could compromise his ability to exercise independent judgment in carrying out his responsibilities. As a result of this review, the Board determined that each of Messrs. Fobes, Ellis and Robinson is an "independent director," as defined under the rules of NYSE Arca.

**Item 14. Principal Accountant Fees and Services.**

The fees for services billed to USO by its independent auditors for the last two fiscal years are as follows:

|  | 2019 | | 2018 | |
| --- | --- | --- | --- | --- |
| Audit fees | $ | 165,000 | $ | 165,000 |
| Audit-related fees | | — | | — |
| Tax fees | | — | | — |
| All other fees | | — | | — |
| | $ | 165,000 | $ | 165,000 |

Audit fees consist of fees paid to Spicer Jeffries LLP for (i) the audit of USO's annual financial statements included in the annual report on Form 10-K, and review of financial statements included in the quarterly reports on Form 10-Q and certain of USO's current reports on Form 8-K; (ii) the audit of USO's internal control over financial reporting included in the annual report on Form 10-K; and (iii) services that are normally provided by the Independent Registered Public Accountants in connection with statutory and regulatory filings of registration statements.

Tax fees consist of fees paid to Spicer Jeffries LLP for professional services rendered in connection with tax compliance and partnership income tax return filings.

The audit committee has established policies and procedures which are intended to control the services provided by USO's independent auditors and to monitor their continuing independence. Under these policies and procedures, no audit or permitted non-audit services (including fees and terms thereof), except for the de minimis exceptions for non-audit services described in Section 10A(i)(1)(B) of the Exchange Act, may be undertaken by USO's independent auditors unless the engagement is specifically pre-approved by the audit committee. The audit committee may form and delegate authority to subcommittees consisting of one or more members when appropriate, including the authority to grant pre-approvals of audit and permitted non-audit services, provided that decisions of such subcommittee to grant pre-approvals must be presented to the full audit committee at its next scheduled meeting.

85

Table of Contents

**Part IV**

**Item 15. Exhibits and Financial Statement Schedules.**

1.  See Index to Financial Statements on page 58.
2.  No financial statement schedules are filed herewith because (i) such schedules are not required or (ii) the information required has been presented in the aforementioned financial statements.
3.  Exhibits required to be filed by Item 601 of Regulation S-K.

**Exhibit Index**

Listed below are the exhibits which are filed or furnished as part of this annual report on Form 10-K (according to the number assigned to them in Item 601 of Regulation S-K):

| Exhibit Number | Description of Document |
| --- | --- |
| 3.1(1) | Certificate of Limited Partnership of the Registrant. |
| 3.2(8) | Seventh Amended and Restated Agreement of Limited Partnership. |
| 3.3(7) | Sixth Amended and Restated Limited Liability Company Agreement of USCF. |
| 4.1(10) | Description of Securities |
| 10.1(9) | Form of Initial Authorized Participant Agreement. |
| 10.2(2) | Marketing Agent Agreement. |
| 10.3(2) | Amendment Agreement to the Marketing Agent Agreement. |
| 10.4(3) | Amendment No. 2 to the Marketing Agent Agreement. |
| 10.5(4) | Third Amendment Agreement to the Marketing Agent Agreement. |
| 10.6(5) | License Agreement between United States Commodity Funds LLC and New York Mercantile Exchange, Inc. |
| 10.7(6) | Third Amendment to License Agreement between United States Commodity Funds LLC and New York Mercantile Exchange, Inc. |
| 10.8(2) | Custodian Agreement. |
| 10.9(2) | Amendment Agreement to the Custodian Agreement. |
| 10.10(3) | Amendment No. 2 to the Custodian Agreement. |
| 10.11(2) | Administrative Agency Agreement. |
| 10.12(2) | Amendment Agreement to the Administrative Agency Agreement. |
| 10.13(3) | Amendment No. 2 to the Administrative Agency Agreement. |
| 23.1(10) | Consent of Independent Registered Public Accounting Firm. |
| 31.1(10) | Certification of Principal Executive Officer Pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. |
| 31.2(10) | Certification of Principal Financial Officer Pursuant to Rule 13a-14(a) under the Securities Exchange Act of 1934. |
| 32.1(10) | Certification of Principal Executive Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U. S. C. 1350). |
| 32.2(10) | Certification of Principal Financial Officer Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (18 U. S. C. 1350). |
| 101.INS | XBRL Instance Document. |
| 101.SCH | XBRL Taxonomy Extension Schema. |
| 101.CAL | XBRL Taxonomy Extension Calculation Linkbase. |
| 101.DEF | XBRL Taxonomy Extension Definition Linkbase. |
| 101.LAB | XBRL Taxonomy Extension Label Linkbase. |
| 101.PRE | XBRL Taxonomy Extension Presentation Linkbase. |

(1)  Incorporated by reference to Registrant's Registration Statement on Form S-1 (File No. 333-124950) filed on May 16, 2005.
(2)  Incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the Quarter ended September 30, 2009, filed on November 9, 2009.
(3)  Incorporated by reference to Registrant's Quarterly Report on Form 10-Q for the Quarter ended June 30, 2012, filed on August 9, 2012.
(4)  Incorporated by reference to Registrant's Annual Report on Form 10-K for the year ended December 31, 2012, filed on February 27, 2013.

86

Table of Contents

(5)   Incorporated by reference to United States Natural Gas Fund, LP's Quarterly Report on Form 10-Q for the Quarter ended March 31, 2007, filed on June 1, 2007.

(6)   Incorporated by reference to the Registrant's Current Report on Form 8-K, filed on October 24, 2011.

(7)   Incorporated by reference to Registrant's Annual Report on Form 10-K for the year ended December 31, 2015, filed on February 26, 2016.

(8)   Incorporated by reference to Registrant's Current Report on Form 8-K, filed on December 15, 2017.

(9)   Incorporated by reference to Registrant's Form S-3 (File No. 333-209362), filed on February 3, 2016.

(10)  Filed herewith.

87

Table of Contents

Table of Contents

**SIGNATURES**

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned thereunto duly authorized.

**United States Oil Fund, LP (Registrant)**

By: United States Commodity Funds LLC, its general partner

By:  /s/ John P. Love
_____
John P. Love
President and Chief Executive Officer
(Principal executive officer)

Date: February 21, 2020

By:  /s/ Stuart P. Crumbaugh
_____
Stuart P. Crumbaugh
Chief Financial Officer
(Principal financial and accounting officer)

Date: February 21, 2020

88

Table of Contents

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, this Report has been signed below by the following persons on behalf of the Registrant in the capacities and on the dates indicated.

| Signature | Title (Capacity) | Date |
|---|---|---|
| /s/ Nicholas D. Gerber<br>Nicholas D. Gerber | Management Director | February 21, 2020 |
| /s/ John P. Love<br>John P. Love | Management Director | February 21, 2020 |
| /s/ Andrew F Ngim<br>Andrew F Ngim | Management Director | February 21, 2020 |
| /s/ Robert L. Nguyen<br>Robert L. Nguyen | Management Director | February 21, 2020 |
| /s/ Peter M. Robinson<br>Peter M. Robinson | Independent Director | February 21, 2020 |
| /s/ Gordon L. Ellis<br>Gordon L. Ellis | Independent Director | February 21, 2020 |
| /s/ Malcolm R. Fobes III<br>Malcolm R. Fobes III | Independent Director | February 21, 2020 |

89