**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE: UNITED STATES OIL FUND, LP SECURITIES LITIGATION | Case No. 1:20-cv-04740 (PGG) (GWG) |
| | Oral Argument Requested |
| This Document Relates To:  ALL ACTIONS | |

## USO DEFENDANTS' REPLY MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT

**TABLE OF CONTENTS**

I.      THE ALLEGED MISSTATEMENTS AND OMISSIONS ARE NOT
        ACTIONABLE UNDER THE SECURITIES ACT OR EXCHANGE ACT ................... 1

        A.      No Reasonable Investor Could Read the Registration Statements and Fail
                to Understand the Risks of Investing in the Fund..................................................... 2

        B.      Plaintiff Fails to Plausibly Allege Any Duty to Disclose Publicly
                Available Market Information or to Update the Registration Statements in
                Real Time to Describe Developing Market Conditions........................................ 12

        C.      Plaintiff's Other Arguments Fail to State a Claim................................................ 16

II.     THE CAC DOES NOT PLAUSIBLY ALLEGE SCIENTER ........................................ 19

III.    PLAINTIFF FAILS TO ALLEGE STANDING UNDER SECTION 11 OF THE
        SECURITIES ACT TO CHALLENGE THE REGISTRATION STATEMENTS.......... 22

IV.     CONCLUSION.................................................................................................................. 23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Alstom SA Sec. Litig.*,
406 F. Supp. 2d 433 (S.D.N.Y. 2005)......................................................................................21

*In re Ariad Pharm., Inc. Sec. Litig.*,
842 F.3d 744 (1st Cir. 2016)......................................................................................23

*Asay v. Pinduoduo Inc.*,
No. 18-cv-7625, 2020 WL 1530745 (S.D.N.Y. Mar. 30, 2020)...............................................19

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
493 F.3d 87 (2d Cir. 2007)......................................................................................20

*Barilli v. Sky Solar Holdings, Ltd.*,
389 F. Supp. 3d 232 (S.D.N.Y. 2019)................................................................2, 12, 16, 17

*Bettis v. Aixtron SE*,
No. 16-cv-25, 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016) .....................................12, 14, 16

*Caiafa v. Sea Containers Ltd.*,
525 F. Supp. 2d 398 (S.D.N.Y. 2007)......................................................................................22

*In re Century Aluminum Co. Sec. Litig.*,
729 F.3d 1104 (9th Cir. 2013) ......................................................................................23

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
No. 08-cv-7062, 2010 WL 4642554 (S.D.N.Y. Nov. 17, 2010)...............................................15

*In re Coty Inc. Sec. Litig.*,
No. 14-cv-919, 2016 WL 1271065 (S.D.N.Y. Mar. 29, 2016)...............................................19

*DeMaria v. Andersen*,
318 F.3d 170 (2d Cir. 2003)................................................................................11, 12, 22

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
986 F. Supp. 2d 487 (S.D.N.Y. 2013)......................................................................................13

*Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*,
873 F.3d 85 (2d Cir. 2017)......................................................................................11

*Hart v. Internet Wire, Inc.*,
145 F. Supp. 2d 360 (S.D.N.Y. 2001)......................................................................................20

*Ho v. Duoyuan Glob. Water, Inc.*,
   887 F. Supp. 2d 547 (S.D.N.Y. 2012)................................................................................23

*Holbrook v. Trivago N.V.*,
   No. 17-cv-8348, 2019 WL 948809 (S.D.N.Y. Feb. 26, 2019), *aff'd sub nom.*
   *Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019) ..........................................................17

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
   163 F.3d 102 (2d Cir. 1998)................................................................................................2, 14

*In re IPO Sec. Litig.*,
   471 F.3d 24 (2d Cir. 2006)......................................................................................................23

*Kalnit v. Eichler*,
   264 F.3d 131 (2d Cir. 2001)....................................................................................................21

*Lau v. Opera Ltd.*,
   No. 20-cv-674, 2021 WL 964642 (S.D.N.Y. Mar. 13, 2021)......................................12, 13, 23

*Litwin v. Blackstone Grp., L.P.*,
   634 F.3d 706 (2d Cir. 2011)....................................................................................................16

*Menora Mivtachim Ins. Ltd. v. Int'l Flavors & Fragrances Inc.*,
   No. 19-cv-7536, 2021 WL 1199035 (S.D.N.Y. Mar. 30, 2021)...............................................18

*Milman v. Box Hill Sys. Corp.*,
   72 F. Supp. 2d 220 (S.D.N.Y. 1999)......................................................................................16

*In re Morgan Stanley Info. Fund Sec. Litig.*,
   592 F.3d 347 (2d Cir. 2010)....................................................................................................12

*N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
   709 F.3d 109 (2d Cir. 2013)...............................................................................................13, 14

*Novak v. Kasaks*,
   216 F.3d 300 (2d Cir. 2000)....................................................................................................21

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
   No. 18-cv-9848, 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) .............................................14

*Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*,
   No. 15-cv-5999, 2017 WL 4403314 (S.D.N.Y. Sept. 30, 2017), *aff'd sub nom.*
   *Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x
   630 (2d Cir. 2019)....................................................................................................................14

*In re ProShares Tr. II Sec. Litig.*,
   No. 19-cv-886, 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F. App'x
   649 (2d Cir. 2021).................................................................................................4, 5, 6, 14, 15

*In re ProShares Tr. Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)..............................................................................................11, 12, 15

*Rombach v. Chang*,
  355 F.3d 164 (2d Cir. 2004)........................................................................................................2

*Schwab v. E\*TRADE Fin. Corp.*,
  258 F. Supp. 3d 418 (S.D.N.Y. 2017)......................................................................................22

*SEC v. Yorkville Advisors, LLC*,
  305 F. Supp. 3d 486 (S.D.N.Y. 2018)......................................................................................20

*Set Capital LLC v. Credit Suisse Grp. AG*,
  No. 19-cv-3466, 2021 WL 1619620 (2d Cir. Apr. 27, 2021) , *vacating in part*,
  No. 18-cv-2268, 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019) ...........................................4, 5

*In re Smith Barney Transfer Agent Litig.*,
  765 F. Supp. 2d 391 (S.D.N.Y. 2011)......................................................................................21

*SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*,
  No. 09-cv-5064, 2010 WL 2473595 (S.D.N.Y. June 17, 2010), *aff'd*, 448 F.
  App'x 116 (2d Cir. 2011) .........................................................................................................13

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008)......................................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007)..................................................................................................................22

*In re TVIX Sec. Litig.*,
  25 F. Supp. 3d 444 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v.
  Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014)..................................................................15

*In re UBS AG Sec. Litig.*,
  No. 07-cv-11225, 2012 WL 4471265 (S.D.N.Y. Sept. 28, 2012), *aff'd sub
  nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d
  173 (2d Cir. 2014).....................................................................................................................12

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006) .............................................................................................22

*Wallace v. IntraLinks*,
  No. 11-cv-8861, 2013 WL 1907685 (S.D.N.Y. May 8, 2013) ................................................22

*Willard v. UP Fintech Holding Ltd.*,
  No. 19-cv-10326, 2021 WL 1026571 (S.D.N.Y. Mar. 17, 2021).......................................16, 17

*Wilson v. Merrill Lynch & Co.*,
  671 F.3d 120 (2d Cir. 2011)............................................................................................18

**Statutes**

Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4 .................................. *passim*

Sections 11 and 15 of the Securities Act of 1933, 15 U.S.C. §§ 77k and 77o....................... *passim*

Sections 10(b) and 20(a) of the Securities Exchange Act of 1934,
  15 U.S.C. §§ 78j and 78t................................................................................................. *passim*

**Rules**

Fed. R. Civ. P. 8.............................................................................................................................2

Fed. R. Civ. P. 9(b) .................................................................................................................2, 20

**Regulations**

17 C.F.R. § 229.105 .....................................................................................................................19

17 C.F.R. § 229.303 .....................................................................................................................19

17 C.F.R. § 240.10b-5..................................................................................................................18

USO Defendants respectfully submit this reply memorandum in further support of their Motion to Dismiss the Consolidated Amended Complaint ("Motion") and in response to Plaintiff's Memorandum of Law in Opposition ("Opposition").[1]

## I.    THE ALLEGED MISSTATEMENTS AND OMISSIONS ARE NOT ACTIONABLE UNDER THE SECURITIES ACT OR EXCHANGE ACT

Plaintiff's Opposition confirms that its complaint fails to state a claim.  Boxed in by extensive disclosures in the Registration Statements warning of the very risks at issue in this case, the Opposition effectively concedes that Plaintiff's entire case rests on its theory that Defendants were required to describe in real time purported "adverse facts" about market events and conditions impacting USO and predict how they would culminate in investor losses in the future.  Specifically, Plaintiff's core theory is Defendants failed to disclose that USO's own large positions in WTI futures contracts allegedly "would contribute, and were already contributing," to market illiquidity, contango, imposition of regulatory limits, and ultimately large investor losses.  Opp. at 6.

The Registration Statements, however, fully and accurately disclosed all of the Fund features and risks as to which Plaintiff claims to have been misled.[2]  The Registration Statements further warned that market developments that impact supply and demand for crude oil affect prices of crude oil and oil futures contracts.  Defendants also kept investors fully apprised at all times of the potential for growth during the class period as well as the size and nature of the Fund's investment portfolio.  Specifically, Defendants disclosed the exact size of the share offerings on

---

[1] Capitalized terms not defined herein have the meaning set forth in Defendants' Memorandum of Law in Support of Their Motion to Dismiss ("Defs.' Mem.").

[2] The Opposition itself cites to the Registration Statements at Roy Decl. Ex. 1 and Ex. 2, *see* Opp. at 1 n.1, and does not dispute that the exhibits to Defendants' Motion are properly considered on a motion to dismiss as set forth in Defendants' opening brief.  *See* Defs.' Mem. at 5–6 n.2.

the first page of the challenged Registration Statements and provided *daily* updates about the precise size and makeup of USO's holdings. Defendants further updated investors each time USO reallocated its portfolio in response to regulatory limits (as it always disclosed that it could).

Contrary to Plaintiff's contention that Defendants were required to disclose public data and update investors in real time regarding the "specific impacts" of developing market conditions on USO, Opp. at 12, issuers are not required to disclose such readily publicly available information. *Barilli v. Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 254–55 (S.D.N.Y. 2019). Further, issuers have no duty to update statements that were reasonable at the time unless they "become[] misleading." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998). Plaintiff does not point to any disclosures that became misleading in light of the total mix of information available to investors. Rather, investors were well aware of the impact of unfolding market developments on oil prices – themselves seeking to "buy the dip" in USO share prices and "take advantage of rapidly evolving events in oil markets." CAC ¶¶ 6, 62.

### A. No Reasonable Investor Could Read the Registration Statements and Fail to Understand the Risks of Investing in the Fund

The Registration Statements fully disclosed all relevant Fund features, market conditions, and attendant investment risks as to which Plaintiff claims to have been misled – including risks related to the unprecedented events that allegedly caused investor losses during the class period.[3] Plaintiff fails to identify a single material misrepresentation or omission but instead complains that

---

[3] Plaintiff's Securities Act claims "are premised on allegations of fraud" and thus subject to the heightened pleading requirements of Rule 9(b). *Rombach v. Chang*, 355 F.3d 164, 170–71 (2d Cir. 2004). As the Opposition concedes, to avoid the heightened pleading requirements of Rule 9(b), Plaintiff was required to "organize the complaint 'in a way that allows the court to determine which allegations support which claim.'" Opp. at 14–15. Yet, Plaintiff devoted the first 86 pages of the CAC – including its entire "Substantive Allegations" section – to jointly describing its Securities Act and Exchange Act claims without differentiation. In any event, even under Rule 8, Plaintiff fails to state a Securities Act claim that is plausible on its face because the Registration Statements fully and accurately described the nature and risks of investing in USO.

Defendants failed to forecast and disclose the extent to which emerging market conditions (*i.e.*, COVID-19, an oil price war, and growing demand for Fund shares) would converge to affect USO during the class period.  But the alleged omission of specific "adverse facts" does not state a claim, as no reasonable investor could have been misled given the total mix of information about the nature of the risks of these very market conditions.

*First*, contrary to Plaintiff's core theory in this action, the Registration Statements plainly disclosed the precise size and nature of USO's positions in WTI futures contracts as well as the risk that USO's own large positions in WTI futures contracts may contribute to market illiquidity and Fund losses.  *See* Defs.' Mem. at 10–11, 24–26.  Significantly, Defendants disclosed daily the *exact size and nature of the Fund's investment holdings on its website*.  RS at 24.  The Registration Statements further warned of the potential negative impact of these large positions:

> **Certain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time.**
>
> Futures positions cannot always be liquidated at the desired price.  It is difficult to execute a trade at a specific price when there is a relatively small volume of buy and sell orders in a market.  A market disruption, such as a foreign government taking political actions that disrupt the market for its currency, its crude oil production or exports, or another major export, can also make it difficult to liquidate a position.  Because both Oil Futures Contracts and Other Oil-Related Investments may be illiquid, USO's Oil Interests may be more difficult to liquidate at favorable prices in periods of illiquid markets and losses may be incurred during the period in which positions are being liquidated.  **The large size of the positions that USO may acquire increases the risk of illiquidity both by making its positions more difficult to liquidate and by potentially increasing losses while trying to do so**.

*Id.* at 17 (emphasis added).  This disclosure explicitly warned that the Fund's own large positions in WTI futures contracts may contribute to illiquidity and increase Fund losses.  *Id.*  As expressly stated, USO sells its large positions in futures contracts prior to their expiration even if prices are unfavorable or losses may occur.  *Id.*  The Registration Statements further disclosed the risks of price volatility and total loss, including that "all or substantially all of an investment in USO could

be lost," *id.* at 9, and "***Price Volatility May Possibly Cause the Total Loss of Your Investment***." *Id.* at 10 ("Futures contracts have a high degree of price variability and are subject to occasional rapid and substantial changes."). As specifically disclosed, USO would nevertheless continue to invest to track its Benchmark even if doing so led to large losses. *Id.* at 17 ("***USO is not actively managed and tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising***.").

Reading these disclosures, any reasonable investor would have understood the risks of illiquidity and large losses posed by USO's own large positions in oil futures contracts as market developments unfolded in real time during the class period. The Opposition's argument that investors were nonetheless misled by a disclosure stating that USO invests in instruments that "in the opinion of USCF" have "sufficient volume" to allow USO to sell its positions (*i.e.*, for ready liquidation) is unavailing. Opp. at 20 (citing RS at 30). This disclosure did not promise that USO's investments were "highly" liquid or that their prices could not be affected by periods of illiquidity. *Id.* Taking this disclosure together with others that "[f]utures positions cannot always be liquidated at the desired price" and "***[c]ertain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time***," RS at 17, no reasonable investor could have believed that liquidity constraints could not negatively affect the price of USO's investments.

Plaintiff fails to – and cannot – distinguish a decision by Judge Denise Cote of this Court (affirmed by the Second Circuit, which Plaintiff omits to note) granting a motion to dismiss similar claims concerning nearly identical disclosures. *In re ProShares Tr. II Sec. Litig.*, No. 19-cv-886, 2020 WL 71007, at *7–8 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F. App'x 649 (2d Cir. 2021); *see also Set Capital LLC v. Credit Suisse Grp. AG*, No. 19-cv-3466, 2021 WL 1619620, at *14 n.94 (2d Cir. Apr. 27, 2021), *vacating in part*, No. 18-cv-2268, 2019 WL 4673433 (S.D.N.Y. Sept. 25,

2019) (vacating decision concerning exchange traded notes while reaffirming *ProShares Trust II* because it "addressed different disclosures related to a different underlying securities product – an exchange traded fund (ETF)"). In *ProShares Trust II*, as in the present action, plaintiffs filed a putative federal securities class action against an ETF sponsor, trust, several individuals, and several Authorized Participants after the ETF's shares dropped in value – alleging that the ETF's disclosures contained material misstatements or omissions in violation of the same securities laws and regulations at issue here. *ProShares Tr. II*, 2020 WL 71007, at *1, 5 & n.6. The ETF in *ProShares Trust II* also transacted in futures contracts in seeking its passive investment objective to track an underlying benchmark, and the plaintiffs' core theory was the allegedly undisclosed effect of the ETF's own large holdings on the market for the futures contracts. *Id.* at *2, 7. Judge Cote dismissed the claims in *ProShares Trust II* because the disclosures (which were nearly identical to the disclosures at issue in this action) were sufficient to "lead a reasonable investor to know that the Fund's own conduct in purchasing and selling [underlying] futures contracts could affect market liquidity and drive down the value of [Fund] shares." *Id.* at *7.

Despite conceding that "the registration statement at issue in *ProShares Trust II* contained similar disclosures to those included in the Registration Statements here," Plaintiff contends that *ProShares Trust II* is distinguishable because "Plaintiff here does not allege the Registration Statements simply failed to disclose the ***possibility*** that Defendants' conduct could cause illiquidity; rather, Plaintiff alleges that by the date of the Offerings, the Fund was already suffering from significant illiquidity, heightened volatility and the break-down of key metrics." Opp. at 23. But this attempted distinction fails. Judge Cote rejected plaintiffs' arguments that the class period disclosures misled investors by "reiterat[ing] 'verbatim' the same 'risk warnings and other statements' contained in the Registration Statement *even though those risks had grown*."

*ProShares Tr. II*, 2020 WL 71007, at \*8 (emphasis added) (finding plaintiffs did "not adequately plead that there was a duty to update the Registration Statement, as it already disclosed precisely what plaintiffs allege was omitted – that the degree of risk could increase over time"). As in *ProShares Trust II*, USO's nearly identical disclosures "adequately warn[ed] that the degree of risk could change over time depending on liquidity in the [underlying] futures contracts." *Id.*

*Second*, the Opposition concedes that Defendants disclosed "applicable regulatory accountability levels and position limits." Opp. at 21. Plaintiff's assertion that Defendants "failed to disclose, that at the time of the Offerings, USO was already approaching the regulatory thresholds and that simply investing the proceeds of the Offerings in near month futures contracts alone would guarantee USO to run up against regulatory limits following the March Offering, thus preventing it from readily taking and liquidating its positions," *see id.*, runs headlong into the actual disclosures. Not only did Defendants disclose "applicable regulatory accountability levels and position limits," *id.*, but they also disclosed that, "[a]s USO's assets reach higher levels, *it is more likely to exceed position limits, accountability levels or other regulatory limits.*" RS at 29 (emphasis added); *see also* Defs.' Mem. at 12–13, 29–31. Having warned of the potential effect of USO's growth, Defendants then disclosed (1) the exact size and nature of USO's daily investment holdings on its website, RS at 24, (2) the total number of outstanding USO shares trading in the secondary market, RS at 32, and (3) the exact size of USO's class period offerings (*i.e.*, the amount by which the Fund could grow further). RS at 1. The Registration Statements further disclosed that "USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments." *Id.* at 14. Reading these disclosures together, a reasonable investor would have understood that USO's ongoing growth posed a risk of the Fund reaching the fully disclosed

accountability levels and position limits. Having made these risks clear, the securities laws did not require Defendants to predict *when* or how close USO was to reaching the limit.

*Third*, Plaintiff's argument that USO became "*effectively* an actively managed fund" during the class period when it began purchasing futures contracts other than just the near-month WTI futures contracts, Opp. at 22, is directly undermined by Defendants' express disclosure explaining that USO seeks its passive investment objective vis-à-vis the Benchmark by investing in *various* oil futures contracts.[4] RS at 5. This includes not only "futures contracts for light, sweet crude oil" but also "other types of crude oil, diesel-heating oil, gasoline, natural gas, and other petroleum-based fuels" and other oil-related investments "to a lesser extent, in order to comply with regulatory requirements or in view of market conditions." *Id.* As disclosed, USCF may diversify USO's investment portfolio "for various reasons, including the ability to enter into the precise amount of exposure to the crude oil market, position limits or other regulatory requirements limiting USO's holdings, and market conditions." *Id.* at 29 ("The specific Oil Futures Contracts purchased depend on various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts *with respect to the month of expiration*, and the prevailing price volatility of particular contracts." (emphasis added)). Thus, when the exchanges and regulators began to impose regulatory limits towards the end of the class period due to unprecedented market events, USCF exercised its fully-disclosed discretion to invest in later month WTI futures *for the very purpose of continuing to meet USO's passive investment objective*, continually updating investors in real time of its diversification. *Id.* at 14, 29. No reasonable investor could read these disclosures and believe that USO would invest all of its assets all of the

---

[4] Notably, the Opposition admits that "USO told investors generally that it had 'discretion to diversify USO's investment portfolio by investing in WTI futures contracts with later expiration dates.'" Opp. at 21 (quoting Defs.' Mem. at 30).

time only in the near month WTI futures contracts.  Changing the mixture of portfolio holdings used as the *mechanism* for passively tracking the Fund's benchmark (as expressly authorized) does not in any way convert the Fund to "active" management.  *See* Defs.' Mem. at 9–10, 24, 29–31.

Moreover, despite unprecedented market turmoil and notwithstanding Plaintiff's allegations, USO met its investment objective throughout the class period by investing only in disclosed financial instruments so that the average daily percentage change in its NAV over any period of 30 successive valuation days remained well within plus or minus 10% of the average daily percentage change in the price of the Benchmark over the same period.  *See* Roy Decl. Ex. 4 (Excerpted Prospectus at 4 (June 12, 2020)).  Plaintiff focuses on an April 30, 2020 Form 8-K disclosure about tracking errors between USO's NAV and share price supposedly resulting in "significant deviations."  *See* Opp. at 22.  The Form 8-K does not state that USO failed to meet its investment objective, but rather states that the then recent tracking error was somewhat higher than the historically extremely small tracking error.  USO remained well within the plus or minus 10% range and met its investment objective at all times.

*Fourth*, Plaintiff incorrectly contends that the Registration Statements failed to disclose that USO's class period growth and large rolling positions in WTI futures would exacerbate Fund losses due to the "contango" environment.  Opp. at 6, 8, 24–26.  Defendants fully disclosed the risks of contango, including the risks posed by USO's own large rolling positions in a contango environment.[5]  Defs.' Mem. at 12, 26–29.  As noted above, USO disclosed the exact size and

_____

[5] The Opposition asserts that USO's own large positions in WTI futures "served as a catalyst for, and helped precipitate" the negative prices of May WTI futures on April 20, 2020, notwithstanding Plaintiff's concession that USO no longer held any May WTI futures at that point.  *See* Opp. at 7–8.  But Plaintiff merely speculates that Defendants' alleged "heavy selling" must have "set the table" for declining prices.  *Id.* at 26 n.14.  Plaintiff does not explain *how* USO's transition from May to June WTI futures contracts between April 7 and April 13 could have caused the price of May WTI futures to go negative *a week later* on April 20.  The Opposition also offers no argument

nature of its positions on its website daily, RS at 24, and made clear the potential impact of its large holdings in WTI futures on prices of those futures.  RS at 6, 17.  The Registration Statements warned that contango is present when USO "buy[s] a next month futures contract for a higher price than the current near month futures contract."  *Id.* at 26.  They cautioned that "a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return," *id.* at 13, yet, the Fund would "'roll' USO's positions," even during periods of contango, consistent with its investment objective and to avoid "taking delivery of the underlying commodity."  *Id.* at 29, 30.  A reasonable investor thus would have understood that USO's own large rolling trades could exacerbate the effects of contango and lead to investor losses.[6]

*Fifth*, the Opposition's assertions that the Registration Statements misled investors into believing that USO's share price would "closely track" daily changes in the Fund's NAV, WTI near month futures, and oil prices, Opp. at 28, is unavailing because, as the Opposition concedes, the Registration Statements warned that "there can be no assurance" that USO's share price and NAV will track.  Opp. at 27 n.15.  Indeed, the Registration Statements are replete with warnings of possible "tracking errors" or "non-correlation" among USO's NAV, USO's share price, the spot price of crude oil, and the value of the Benchmark.  *See* RS at 5, 6, 9, 12, 13, 14, 25, 30, 71; *see*

---

in response to the Motion's point that the negative price of May WTI futures on April 20 has no relevance whatsoever to USO or investor losses.  *See* Defs.' Mem. at 29.

[6] Moreover, the March Registration Statement did not mislead investors in stating:  "Periods of contango . . . do not materially impact USO's investment objective of having the daily percentage changes in its per share NAV track the daily percentage changes in the price of the Benchmark Oil Futures Contract since the impact of . . . contango tend[s] to equally impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract."  RS at 29; *see also* Defs.' Mem. at 28.  This disclosure did not promise that contango will not affect USO's *returns*.  Rather, it explained that contango does not materially impact USO's *ability to achieve its investment objective* "since the impact of . . . contango tend[s] to equally impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract."  RS at 29.

*also* Defs.' Mem. at 13, 14–15, 31–33. In fact, the Fund's own investment objective was to invest so that the daily percentage changes in its NAV and Benchmark over a 30-day period were within plus or minus 10% – a 20-point margin of error. RS at 5, 9, 24, 32. The Registration Statements specifically explained *how* a "discount or premium in the trading price relative to the NAV per share" could occur, *id.* at 71, including that "***[t]he market price at which investors buy or sell [USO] shares may be significantly less or more than NAV***" due to "non-concurrent trading hours" and "supply and demand forces at work in the secondary trading market." *Id.* at 12. A reasonable investor thus would have understood – as expressly disclosed – that it "may not be able to use USO as a cost-effective way to indirectly invest in crude oil or as a hedge against the risk of loss in crude oil-related transactions." *Id.* at 6.

*Sixth*, while the early 2020 market developments were unprecedented, the risks of those market developments were more than adequately disclosed. *See* Defs.' Mem. at 15–16, 33–35. Defendants clearly warned that market developments impacting supply and demand for crude oil – including changes in economic, financial, or market conditions as well as "hostile actions" among oil-producing nations – may impact prices of crude oil and oil futures contracts. *See, e.g.*, RS at 9–10. In fact, the March Registration Statement expressly disclosed that the COVID-19 global pandemic was the type of "general economic condition[]" that "impair[s] the functioning of financial markets and institutions [and] also may adversely impact the demand for crude oil." *Id*. at 9. This did not give "investors the false and misleading impression that COVID-19 did not present any existential threats to USO other than those impacting crude oil generally." *Id*. at 30. To the contrary, despite still being in the early, uncertain days of the pandemic and well before public health experts understood its nature, length, or full impact, Defendants expressly warned investors that "pandemics (e.g. COVID-19)" can impact demand for crude oil and, like "[t]he

occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices." RS at 9. These disclosures could not have led a reasonable investor "to conclude that [COVID-19] would not materially impact the Fund's performance." Opp. at 30 n.18.

Likewise, the Registration Statements warned: "Crude oil prices also vary depending on a number of factors affecting supply," including "political events," "hostile actions," and "adherence by member countries to the Organization of the Petroleum Exporting Countries ('OPEC') production quotas." RS at 9, 11. Such actions "may have a larger impact on crude oil prices and crude oil-linked instruments, including Oil Futures Contracts . . . than on traditional securities" and "may create additional investment risks that subject USO's investments to greater volatility than investments in traditional securities." *Id.* at 11. In particular, "[a] market disruption, such as a foreign government taking political actions that disrupt . . . its crude oil production or exports . . . can [] make it difficult [for USO] to liquidate a position" in futures contracts. *Id*. at 17. A reasonable investor would understand that major events like the global pandemic and the Saudi-Russian oil price war could adversely impact USO and lead to investor losses.

In sum, no reasonable investor could read the Registration Statements in the context of the "total mix of information" – including "all facts related to the statement or omission, its surrounding text, the offering documents, the securities, the structure of the transaction, and the market in which the transaction occurs" – without recognizing the risks of investing in USO. *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 151 (2d Cir. 2017); *see also In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013) (explaining that courts assess whether the challenged disclosure documents "read [] as a whole," "cover-to-

cover," and "taken together and in context, would have misl[ed] a reasonable investor about the nature of the [securities]" (quoting *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003))).

**B.    Plaintiff Fails to Plausibly Allege Any Duty to Disclose Publicly Available Market Information or to Update the Registration Statements in Real Time to Describe Developing Market Conditions**

Faced with the extensive disclosures in the Registration Statements, Plaintiff retreats to arguments that Defendants were required to disclose publicly available market information or update the Registration Statements in real time to describe developing market conditions and their alleged "specific impacts" on USO. *See, e.g.*, CAC ¶¶ 112, 116, 134, 141, 143, 147–48. But the securities laws do not require defendants to provide publicly available information or to update their disclosures to describe ongoing market developments in real time. Rather, Plaintiff must establish that Defendants had a duty to disclose the information in the first place. *See In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360–61 (2d Cir. 2010). Plaintiff cannot do so here.

*First*, Plaintiff has not plausibly alleged that Defendants had any duty to disclose publicly available market data or conditions. *See* Defs.' Mem. at 35–39. The case law on this point is clear. Defendants have "no duty to disclose information that is within the public domain through publication in the news media." *Barilli*, 389 F. Supp. 3d at 254–55; *accord In re UBS AG Sec. Litig.*, No. 07-cv-11225, 2012 WL 4471265, at *33 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014). Public market data and its effect on USO already was part of the total mix of information "readily accessible in the public domain." *See, e.g.*, *Bettis v. Aixtron SE*, No. 16-cv-25, 2016 WL 7468194, at *12 (S.D.N.Y. Dec. 20, 2016). As the CAC itself concedes, USO's website disclosed the size and nature of USO's investment portfolio, USO's NAV and monthly return, the trading volume in USO shares, and anticipated roll dates. CAC ¶ 178; *Lau v. Opera Ltd.*, No. 20-cv-674, 2021 WL 964642, at *7 (S.D.N.Y. Mar. 13, 2021) (explaining "statements cannot be misleading when the

defendants directed readers to the complete statistics available on" a public website).  Moreover, the CAC concedes that investors had access in real time to public market data describing prices of crude oil, WTI futures, and USO shares; trading volume in WTI futures; the size and nature of USO's investment portfolio; and USO's NAV and monthly return.  CAC ¶¶ 74–78, 81, 85–86, 91–94, 151; *see also* Defs.' Mem. at 35–36 n.15.  The impact of developing market conditions on oil prices also was widely publicized by major news organizations in real time in early 2020.  *See, e.g.*, Defs.' Mem. at 36 n.16; CAC ¶ 61 (citing *Reuters* on impact of COVID-19 on oil prices); CAC ¶ 148 (noting it "was already apparent to any investor alive at the time: that COVID-19 was in fact a thing that existed that could 'affect general economic conditions in the world'").  As "all the information Plaintiff claims was concealed by Defendants was publicly available . . . on these facts the law renders Defendants' purported misstatements immaterial."[7]  *See SRM Glob. Fund L.P. v. Countrywide Fin. Corp.*, No. 09-cv-5064, 2010 WL 2473595, at \*9 (S.D.N.Y. June 17, 2010) (citation and internal alterations omitted)), *aff'd*, 448 F. App'x 116 (2d Cir. 2011).

The Opposition attacks a strawman – asserting that "case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information."  Opp. at 37 (quoting *N.J. Carpenters Health Fund v. Royal Bank of Scotland Grp.,*

---

[7] Similarly, Plaintiff's arguments that the Registration Statements misled investors by providing historical data about USO's investment returns without also including data for the first quarter of 2020 fail.  Opp. at 29.  Unlike *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487 (S.D.N.Y. 2013), where plaintiffs alleged that defendant was required to disclose "the material negative impact on Facebook's revenues," *id.* at 513, Plaintiff has not pointed to any information *uniquely known* to Defendants.  Moreover, the challenged disclosures clearly were dated through December 31, 2019 and repeatedly warned:  "***PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS***."  RS at 24, 25, 27, 28, 32; *see also id.* at 9 ("***Past performance is not necessarily indicative of future results; all or substantially all of an investment in USO could be lost***.");  *id.* at 11("[P]ast performance of USO or the Benchmark Futures Contract should not be relied upon in deciding whether to buy shares of USO.").  In light of these prominent warnings, a reasonable investor would have understood that the clearly-labeled historical data did not purport to describe USO's performance in 2020.

*PLC*, 709 F.3d 109, 127 (2d Cir. 2013)).  But *New Jersey Carpenters*, where defendants cited a few "sporadic news reports," is easily distinguishable.  709 F.3d at 127.  By contrast, the impact of COVID-19 on oil prices was widely publicized by major news outlets in real time.  *See* Defs.' Mem. at 36 n.16; *see also Bettis*, 2016 WL 7468194, at *13 (distinguishing *New Jersey Carpenters* from situation where "the investing public could have learned about the [relevant events] as easily as [defendants'] executives could have").  Likewise, Plaintiff's reliance on *Panther Partners Inc. v. Jianpu Tech. Inc.*, No. 18-cv-9848, 2020 WL 5757628 (S.D.N.Y. Sept. 27, 2020) (Gardephe, J.), is misplaced.  In *Jianpu*, while the Court "acknowledg[ed] that the laws and regulations were publicly available," it held that defendants should have disclosed separate information regarding the non-public "*violations* of those laws and regulations . . . or the possible impact of those violations."  *Id.* at *13 (emphasis added).  Those allegations bear no resemblance to Plaintiff's allegations, as the impact of developing market conditions on the price of oil and oil futures was widely publicized by major news organizations in real time and Plaintiff has not pointed to any information uniquely known to Defendants.

*Second*, Defendants had no duty to update the disclosures in real time to describe developing market conditions in early 2020.  *See* Defs.' Mem. at 38–39.  Issuers have a duty to update statements that were reasonable at the time they were made only if they later "become[] misleading" in light of the total mix of information.  *Int'l Bus. Machs.*, 163 F.3d at 110; *see also Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co.*, No. 15-cv-5999, 2017 WL 4403314, at *13 (S.D.N.Y. Sept. 30, 2017) (Gardephe, J.), *aff'd sub nom. Pipefitters Union Local 537 Pension Fund v. Am. Express Co.*, 773 F. App'x 630 (2d Cir. 2019); *Proshares Tr. II*, 2020 WL 71007, at *8 (holding plaintiffs did "not adequately plead that there was a duty to update the Registration Statement, as it already disclosed precisely what plaintiffs allege was omitted – that

-14-

the degree of risk could increase over time"). Plaintiff has not pointed to *any* disclosure in the Registration Statements that became misleading in light of the early 2020 market developments. Moreover, Plaintiff has not plausibly alleged that disclosing the allegedly omitted information would have altered the total mix of information, which already included extensive risk disclosures, daily updates on the USCF website, the January 2020 account statement, widely circulated public data, and press coverage of ongoing market developments. *See, e.g.*, *Willard v. UP Fintech Holding Ltd.*, No. 19-cv-10326, 2021 WL 1026571, at \*7 (S.D.N.Y. Mar. 17, 2021) ("[A]ny omission was not material because it is not substantially likely that a reasonable investor would have viewed the allegedly missing [trading and commission] data . . . as 'significantly alter[ing] the total mix of information already made available'" (quoting *ProShares Tr.*, 728 F.3d at 102)).

*Third*, Defendants had no duty to predict and disclose the "specific impacts" that ongoing market developments would have on USO. Opp. at 35; *see also* Defs.' Mem. at 39–41. While in hindsight the specific impact of COVID-19 and the Saudi-Russian oil price war may seem obvious, claims alleging misstatements or omissions "cannot be based on a backward-looking assessment of the registration statement." *Willard*, 2021 WL 1026571, at \*4 (citations and internal quotation marks omitted). Defendants are not required to "predict the 'precise manner' in which . . . [the] risk might manifest itself, so long as the risk itself is clearly disclosed." *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08-cv-7062, 2010 WL 4642554, at \*14–15, 18 (S.D.N.Y. Nov. 17, 2010); *see also In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444, 457 (S.D.N.Y. 2014), *aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG*, 588 F. App'x 37 (2d Cir. 2014). The securities laws do not impose a duty to disclose changes to the *degree* of disclosed risk where the *nature* of the risk already was fully disclosed. *See, e.g.*, *ProShares Tr.*, 728 F.3d at 102, 104–05.

Even if Plaintiff alleged that Defendants could have known the "specific impact" of market developments in real time (which Plaintiff has not done), Plaintiff has not plausibly alleged that any market developments or their impact on USO was uniquely known to Defendants as of the date of either Registration Statement. *See, e.g.*, *Barilli*, 389 F. Supp. 3d at 254–55; *Bettis*, 2016 WL 7468194, at *13. Instead, the Opposition simply concludes that Defendants must have been "uniquely aware of the adverse facts impacting the Fund at the time" based on their alleged roles in managing the Fund (or as its purported "creators, issuers, [and] underwriters") and their alleged unspecified "proprietary market data and non-public modelling capabilities." Opp. at 6, 7, 47. These vague, conclusory allegations are insufficient to survive a motion to dismiss.[8]

## C.   Plaintiff's Other Arguments Fail to State a Claim

Plaintiff's other challenges to class period disclosures fail to state a claim. *See* Defs.' Mem. at 41–44. *First*, with respect to the alleged misrepresentations on the USCF website, the Opposition concedes they are based on the same alleged misstatements and omissions addressed above. *See* Opp. at 39. Thus, they fail for all of the same reasons.

*Second*, as for the March 20 and March 24 Form 8-Ks, Plaintiff cannot establish that disclosing additional financial information post-dating December 31, 2019 would have altered the total mix of information that already included the risk disclosures described above, daily financial information on the website, the January 2020 account statement, widely circulated public data, and press coverage of ongoing market developments. *See, e.g.*, *Willard*, 2021 WL 1026571, at *8 ("In

---

[8] The cases cited by Plaintiff for the proposition that "hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge" are distinguishable. Opp. at 37–38. Unlike in *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999), where plaintiffs alleged that defendant's prospectus failed to "reveal that sales were in material decline at the time of the Offering," Plaintiff does not point to any failure to disclose information *uniquely known* to Defendants. Far from the case in *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718–19 (2d Cir. 2011), where defendants allegedly entirely failed to disclose the risks of defendants' investment, the disclosures here extensively warned of the risks of investing in WTI futures contracts.

light of [the] total mix, a reasonable investor would not have considered the omitted interim financial information – assuming arguendo that it was available and even known to Defendants – material." (citation and internal quotation marks omitted)).

*Third*, the April 16 and April 22 Form 8-Ks disclosed USO's reallocation of its investment portfolio across later month futures contracts. *See* Roy Decl. Ex. 5 (Form 8-K at 2 (Apr. 16, 2020) ("until . . . market conditions and regulatory conditions permit otherwise")). The reallocation was entirely consistent with the Fund's disclosures that USO could invest in later month futures contracts. RS at 29. Plaintiff has not plausibly pled that Defendants had an obligation to provide any additional detail explaining investment decisions that were consistent with the Fund's disclosures – let alone that additional details would have materially impacted the total mix of information available to investors. *See Barilli*, 389 F. Supp. 3d at 262 (explaining that disclosure of additional detail about defendants' fully disclosed business model would not "have significantly altered the total mix of relevant information available"); *Holbrook v. Trivago N.V.*, No. 17-cv-8348, 2019 WL 948809, at \*14 (S.D.N.Y. Feb. 26, 2019) ("[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject," . . . and "a corporation is not required to disclose a fact merely because a reasonable investor would very much like to know that fact." (citations omitted)), *aff'd sub nom. Shetty v. Trivago N.V.*, 796 F. App'x 31 (2d Cir. 2019).

*Fourth*, in the April 21 Form 8-K, Defendants disclosed that the SEC had not yet declared effective the registration statement filed on April 20. Even if Defendants knew (or could have known) the reason for the SEC's inaction, disclosing additional information would not have altered the total mix of information. *See Holbrook*, 2019 WL 948809, at \*14–15. Defendants kept investors apprised of all material facts in real time by disclosing: (i) USO was running out of registered shares and may not be able to sell Creation Baskets, which could cause USO shares to

-17-

trade at a premium in the secondary market, *see* Roy Decl. Ex. 6 (Form 8-K at 2 (Apr. 20, 2020));

(ii) it ran out of shares; and (iii) the SEC had not yet declared the April 20 registration statement

effective, *see* Roy Decl. Ex. 7 (Form 8-K at 2 (Apr. 21, 2020)).[9]

In light of the extensive disclosures in the Registration Statements, the Opposition attempts

to reframe Plaintiff's "scheme liability" theory pursuant to Rule 10b-5(a) and (c) as if it were based

on different underlying allegations than the Rule 10b-5(b) claim.  *See* Opp. at 44; 17 C.F.R.

§ 240.10b-5.  But all of Plaintiff's claims are based on the same allegedly misleading statements

or omissions.  *Id.* (contending Plaintiff pled a scheme to grow the Fund by allegedly omitting from

the Registration Statements "critical facts and other information in order to create the false and

misleading impression that investing in USO was as risky as it had always been").  To pursue a

scheme liability theory based on misleading statements or omissions in the disclosure documents,

"a complaint must still adequately plead the predicate misconduct – making a false statement or

omission of material fact – to be actionable." [10]  *Menora Mivtachim Ins. Ltd. v. Int'l Flavors &*

*Fragrances Inc.*, No. 19-cv-7536, 2021 WL 1199035, at *32 (S.D.N.Y. Mar. 30, 2021)

("[P]laintiffs' scheme liability claims fail for the same reason as their material misrepresentation

and omission claims.").  As Plaintiff is well aware, USO Defendants devoted the vast majority of

their opening brief to addressing those allegations of false and misleading statements or omissions.

*See* Defs.' Mem. at 19–45.  USO Defendants' opening brief clearly did not "utterly ignore[]"

---

[9] The Opposition mentions SEC and CFTC investigations, Opp. at 42 n.28, but does not point to how any allegations in the CAC may be related, if at all, to those investigations.

[10] Moreover, to the extent Plaintiff challenges USO's decision to issue shares – which USO does as a part of its normal operations when its remaining shares are low so that it may meet investor demand and ensure that shares are available for Authorized Participants to purchase for Creation Baskets, RS at 2, 5, 64 – this decision is not actionable under the securities laws as, for the reasons explained herein, Plaintiff has not plausibly alleged any connection to a misrepresentation or omission.  *See, e.g.*, Defs.' Mem. at 23 n.10; *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011).

Plaintiff's allegations of scheme liability. *See* Opp. at 45. Plaintiff's scheme liability theory fails

for the reasons outlined above and in USO Defendants' opening brief.

For all of these reasons, Plaintiff fails to state a claim.[11]

## II.    THE CAC DOES NOT PLAUSIBLY ALLEGE SCIENTER

The Opposition insists that the Court should assume that USO Defendants acted with the

requisite state of mind to deceive, manipulate, or defraud because, as a part of their role "in

managing the day-to-day operations" of USO and their ordinary "reporting and operational

responsibilities," USO Defendants created USO, assessed its risks and performance, participated

in the underlying WTI futures market, and generated fully disclosed management fees. Opp. at 3,

52. These allegations are entirely conclusory. Plaintiff does not point to a single particularized

fact about USO Defendants' state of mind, and therefore Plaintiff has not met its burden of alleging

---

[11] Plaintiff has not pled a violation of Item 303, 17 C.F.R. § 229.303(a)(3)(ii), or Item 105, 17 C.F.R. § 229.105, of Regulation S-K. *See* Defs.' Mem. at 44–45. Plaintiff's Regulation S-K allegations are based on the same allegations that it made in challenging the disclosures in the Registration Statements. *See* Opp. at 33 (pointing to the same reasons "detailed above"); CAC ¶¶ 174–75 (pointing to the allegations "detailed in ¶¶65-138"). Thus, the Regulation S-K allegations fail for the same reasons. While the Opposition argues that USO Defendants' opening brief did not address Plaintiff's arguments about then-existing "uncertainties and events," as explained herein and throughout USO Defendants' opening brief, Plaintiff has not pointed to anything – trend, uncertainty, event, or otherwise – that USO Defendants were required to disclose that could have altered the total mix of information available to investors at the time. *See, e.g.*, *Asay v. Pinduoduo Inc.*, No. 18-cv-7625, 2020 WL 1530745, at *10 (S.D.N.Y. Mar. 30, 2020). Moreover, Plaintiff does not plausibly allege that USO Defendants had actual knowledge as to how the developing market conditions would impact the Fund. *See, e.g.*, *In re Coty Inc. Sec. Litig.*, No. 14-cv-919, 2016 WL 1271065, at *7 (S.D.N.Y. Mar. 29, 2016) (finding "broad, conclusory" allegations failed to plead with specificity facts demonstrating actual knowledge). Instead, Plaintiff points to allegedly developing market conditions, including a premium between the USO share price and NAV on a single day, and argues with the benefit of hindsight that USO Defendants must have known that developing market conditions "were likely to increase and continue to negatively impact the Fund, posing a high risk of catastrophic losses for investors and an existential threat to the Fund and its stated investment strategy and objective." CAC ¶¶ 175–76. Further, USO Defendants satisfied Item 105 by describing "the most significant factors that make an investment in the registrant or offering speculative or risky" in the "Risk Factors" section of the Registration Statements. *See* § 229.105.

with particularity the requisite scienter to satisfy the heightened pleading standards of the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, or Fed. R. Civ. P. 9(b). *See* Defs.' Mem. at 46–51. The heightened pleading standards require that Plaintiff "alleg[e] facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007) (citation omitted). Plaintiff has not done either.

*First*, Plaintiff's sole motive theory is that USO Defendants were motivated to conceal risks to induce investors to buy USO shares and thereby generate additional management fees. Opp. at 50–52. This motive has been consistently rejected by courts. *See, e.g.*, *SEC v. Yorkville Advisors, LLC*, 305 F. Supp. 3d 486, 512 (S.D.N.Y. 2018). Plaintiff cites *In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247 (S.D.N.Y. 2008), for the proposition that USO Defendants' receipt of management fees may support an inference of scienter. But in that case, the Court distinguished allegations that individual defendants used backdated options to personally benefit themselves (which were sufficient to plead scienter) from allegations "common to most high-level corporate employees" that defendants sought to increase company earnings or earn performance-based compensation (which were insufficient). *Id.* at 294–95. Here, Plaintiff has not alleged any personal benefit to or particularized conduct by any individual USO Defendant.

*Second*, Plaintiff cannot satisfy its heightened pleading burden to allege facts "constituting strong circumstantial evidence of conscious misbehavior or recklessness," *ATSI Commc'ns*, 493 F.3d at 99, by alleging "that a defendant 'merely ought to have known'" certain facts by virtue of their ordinary duties in managing the Fund. *Hart v. Internet Wire, Inc.*, 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001) (citation omitted). Rather, Plaintiff must plead facts showing that the misleading

nature of the statement was "either known to the defendant or so obvious that the defendant must have been aware of it" – essentially equivalent to an intent to defraud or mislead. *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (citations omitted) ("the strength of the circumstantial allegations must be correspondingly greater" if motive is not sufficiently alleged).

Instead of pointing to facts demonstrating conscious misbehavior or recklessness, Plaintiff describes the unprecedented market conditions and USO Defendants' role in managing the Fund. Plaintiff does not even attempt to identify the "unique insider knowledge" or "proprietary market data and non-public modelling capabilities" that it conclusorily contends USO Defendants possessed – let alone explain how the alleged data or capabilities could have enabled USO Defendants to obtain "direct knowledge of the [alleged] undisclosed events, adverse trends, and the breakdown in market fundamentals as a result of their own [alleged] market-distorting activities." Opp. at 3, 7, 45–47, 52.  Even accepting Plaintiff's implausible allegations as true for argument's sake, USO Defendants' alleged knowledge of certain facts or acute risks does not contradict or refute any disclosures.[12]  *See Novak v. Kasaks*, 216 F.3d 300, 308 (2d Cir. 2000).

Simply put, USO Defendants' role in creating USO, managing its day-to-day operations, assessing its risks and performance, and participating in the underlying WTI futures contracts

---

[12] Plaintiff feebly attempts to allege scienter by pointing to USO Defendants' signing of the Registration Statements. *See* Opp. at 48–49.  But in both cases cited by Plaintiff, the Courts found scienter based on particularized allegations that defendants knew their statements were false – not mere signing of the documents. *See e.g.*, *In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 402 (S.D.N.Y. 2011) ("[T]he Complaint adequately alleges that [defendant] knew facts or had access to information suggesting that his public statements were not accurate" in light of allegations that he "helped evaluate the Agreement, drafted a comprehensive memorandum concerning its details, and presented the proposal to the Smith Barney Funds' boards." (citation and internal quotation marks omitted)); *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 459–60 (S.D.N.Y. 2005) (finding officer defendants "should have been aware of the loan guarantees" omitted from disclosures for a "significant length of time (several years)").  Plaintiff has not described the conduct of any USO Defendant with particularity.  Instead, Plaintiff asks the Court to assume intent based on USO Defendants' roles in managing the Fund.  This is insufficient.

market cannot establish the requisite fraudulent intent.  Opp. at 52.  If these allegations were sufficient, scienter would be assumed every time a defendant creates an investment fund, monitors it, and participates in an underlying market.  Plaintiff's allegations are unfounded speculation.  Plaintiff has not established a "strong inference of scienter" that is "more than merely 'reasonable' or 'permissible'" but "cogent and compelling."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007).  The more plausible inference is that USO Defendants sought for USO to perform as disclosed and as required by securities laws.[13]

### III.   PLAINTIFF FAILS TO ALLEGE STANDING UNDER SECTION 11 OF THE SECURITIES ACT TO CHALLENGE THE REGISTRATION STATEMENTS

Plaintiff contends that it sufficiently pled standing for its Securities Act claims by merely alleging:  "Lead Plaintiff Nutit, A.S. purchased USO securities during the Class Period and shares of USO pursuant and/or traceable to the February Offering and the March Offering."  *See* Opp. 3–4, 54 (citing CAC ¶ 22).  This assertion fails as a matter of law.  *See* Defs.' Mem. at 51–53.

As the Opposition admits, secondary market purchasers must be able to trace their shares to the challenged registration statement.  Opp. at 53 ("It is well settled that 'aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under §11 of the [Securities] Act.'" (quoting *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007); *DeMaria*, 318 F.3d at 178)).  For this very reason, a mere general allegation of traceability is insufficient to plausibly allege standing – particularly if the secondary market

---

[13] The "core operations" doctrine is a "supplementary, but not an independent, means to plead scienter."  *Schwab v. E\*TRADE Fin. Corp.*, 258 F. Supp. 3d 418, 434 (S.D.N.Y. 2017) (citation omitted).  Because Plaintiff fails to allege *any* facts to establish that USO Defendants acted with the requisite intent, the supplementary doctrine cannot save its claim.  As such, the cases that Plaintiff relies on are misplaced.  *See Wallace v. IntraLinks*, No. 11-cv-8861, 2013 WL 1907685, at \*9 (S.D.N.Y. May 8, 2013) ("This is not the sole basis for this court finding scienter, but when added with the previously mentioned allegations, the court finds there are sufficient allegations of scienter."); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 233 (S.D.N.Y. 2006) (applying core operations doctrine to impute knowledge of fraudulent accounting practices).

also includes shares issued pursuant to unchallenged registration statements. *See Lau*, 2021 WL 964642, at \*14 (finding secondary market purchaser "failed to allege how the stocks she purchased were traceable to the stocks issued in the public offerings. Therefore, [she] lacks standing to bring the Section 11 claims asserted in this case"); *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 561 (S.D.N.Y. 2012) (dismissing claims that did "not offer any facts to support their conclusory statements that their shares can be traced to" a particular offering); *see also In re Ariad Pharm., Inc. Sec. Litig.*, 842 F.3d 744, 756 (1st Cir. 2016) ("[G]eneral allegation[s] that . . . shares are traceable to the offering in question is nothing more than a 'formulaic recitation' of that element" that fails to satisfy *Twombly*.); *In re Century Aluminum Co. Sec. Litig.*, 729 F.3d 1104, 1108 (9th Cir. 2013) ("[T]he conclusory allegation that plaintiffs 'purchased [the Company's] common stock directly traceable to the Company's Secondary Offering'" is insufficient.).

Plaintiff concedes that it did not buy "shares in a market containing only shares issued pursuant to the allegedly defective registration statement." *In re IPO Sec. Litig.*, 471 F.3d 24, 31 n.1 (2d Cir. 2006) (citation omitted); *see also* CAC ¶ 53. Yet, Plaintiff has not alleged any facts suggesting its shares were issued pursuant to either of the two challenged Registration Statements (rather than one of the many prior registration statements), let alone attempt to distinguish between the two challenged Registration Statements. Plaintiff asks the Court to reserve ruling on traceability until later in the case, Opp. at 54–55, but has not alleged it can *ever* prove that its shares purchased on the secondary market are traceable to either challenged Registration Statement.[14]

## IV.    CONCLUSION

For all of the foregoing reasons, the CAC should be dismissed with prejudice.

---

[14] As disclosed and as is true for all ETFs, investors can only buy and sell USO shares on the secondary market through Authorized Participants or other intermediaries. RS at 1, 18.

Dated:  April 29, 2021                    **ROPES & GRAY LLP**


*/s/ Amy D. Roy*
Robert A. Skinner (*admitted pro hac vice*)
Amy D. Roy *(admitted pro hac vice)*
Jessica M. Bergin (*admitted pro hac vice*)
Prudential Tower
800 Boylston Street
Boston, Massachusetts 02199-3600
Tel.:  (617) 951-7000
Fax:  (617) 951-7050
*robert.skinner@ropesgray.com*
*amy.roy@ropesgray.com*
*jessica.bergin@ropesgray.com*


*Attorneys for Defendants United States Oil Fund, LP, United States Commodity Funds LLC, John P. Love, Stuart P. Crumbaugh, Nicholas D. Gerber, Andrew F Ngim, Robert L. Nguyen, Peter M. Robinson, Gordon L. Ellis, and Malcolm R. Fobes III*