UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————— x

In re UNITED STATES OIL FUND, LP :    Civil Action No. 1:20-cv-04740-PGG-GWG
SECURITIES LITIGATION : 
                                                    :    <u>CLASS ACTION</u>

                                                    : 

This Document Relates To: : 

         ALL ACTIONS. : 

———————————————————————— x

**PLAINTIFF'S MEMORANDUM OF LAW IN
OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION .................................................................................................1

II.    STATEMENT OF FACTS ...................................................................................4

       A.     Background of USO.................................................................................4

       B.     USO Encounters Severe Adverse Trends and Exacerbates a Breakdown in
              Market Fundamentals by Rapidly Growing the Fund and Flooding the
              Market with WTI Futures ........................................................................5

       C.     USO Investors Suffer Catastrophic Losses as the Fund Is Forced to
              Abandon the Investment Strategy It Used to Solicit Billions of Dollars in
              Investor Capital.......................................................................................8

       D.     The USO Defendants Belatedly Acknowledge Undisclosed Adverse Facts
              After They Materialized.........................................................................10

III.   MOTION-TO-DISMISS STANDARD ..............................................................12

IV.    ARGUMENT ......................................................................................................13

       A.     Plaintiff Has Adequately Pleaded a §11 Claim Under the 1933 Act ....13

              1.     Section 11 Standards.................................................................13

              2.     Plaintiff's §11 Claim Need Only Satisfy Rule 8(a)(2)..............14

              3.     Even Under Rule 9(b), Plaintiff Has Satisfied Its Pleading Burden ..........16

              4.     Plaintiff Has Adequately Pleaded Material Misstatements and
                     Omissions in the Registration Statements.................................16

                     a.     The CAC Adequately Pleads Misrepresentations and
                            Omissions Regarding the Adverse Impacts from USO's
                            Rapid Growth and Outsized Positional Concentrations in
                            WTI Futures Contracts.................................................19

                     b.     The CAC Adequately Pleads Misrepresentations and
                            Omissions Regarding Structural Defects in the Fund and a
                            Breakdown in Market Fundamentals Impacting the Fund's
                            Performance and Ability to Achieve its Investment
                            Objective ......................................................................24

- i -

        c.     The CAC Adequately Pleads Misrepresentations and Omissions Regarding Undisclosed Material Impacts from Then-Existing Extreme Turmoil in Global Oil Markets ...............30

B.    Defendants Violated the Affirmative Disclosure Obligations Imposed by Items 303 and 105 ................................................................................................32

C.    The CAC Does Not Employ Hindsight Pleadings ..................................................35

D.    Publicity of General Market Conditions and the Availability of Limited Market Data Did Not Absolve Defendants of Their Duty to Disclose Material Facts Adversely Impacting the Fund ........................................................36

E.    Plaintiff Has Adequately Pleaded §10(b) Claims Under the 1934 Act .................38

      1.    Plaintiff Has Adequately Pleaded False and Misleading Statements Under Rule 10b-5(b) ....................................................................................38

      2.    Plaintiff Has Adequately Pleaded Manipulative Acts/Scheme Liability Under Rule 10b-5(a) and (c) ......................................................43

      3.    Plaintiff Has Adequately Pleaded Scienter ................................................45

            a.     Plaintiff Has Adequately Pleaded Conscious Misbehavior or Recklessness ...............................................................................47

            b.     Plaintiff Has Adequately Pleaded Motive and Opportunity ..........50

            c.     The Inference of Scienter Is at Least as Likely as Any Competing Nonculpable Inference ................................................52

F.    Plaintiff Has Adequately Pleaded Standing with Respect to the Securities Act Claims ............................................................................................................53

V.    CONCLUSION ...............................................................................................................55

## CASES

*Alki Partners, L.P. v. Windhorst*,
    472 F. App'x 7 (2d Cir. 2012) ..............................................................................................51

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ..............................................................................................................12

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
    493 F.3d 87 (2d Cir. 2007) ............................................................................................43, 44

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..............................................................................................................12

*Bettis v. Aixtron SE*,
    2016 WL 7468194
    (S.D.N.Y. Dec. 20, 2016) ......................................................................................................43

*Burstyn v. Worldwide Xceed Grp., Inc.*,
    2002 WL 31191741
    (S.D.N.Y. Sept. 30, 2002) ......................................................................................................40

*C.D.T.S. v. UBS AG*,
    2013 WL 6576031
    (S.D.N.Y. Dec. 13, 2013) ......................................................................................................50

*Caiafa v. Sea Containers Ltd.*,
    525 F. Supp. 2d 398 (S.D.N.Y. 2007) ..................................................................................53

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
    750 F.3d 227 (2d Cir. 2014) ..................................................................................................17

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
    2010 WL 4642554
    (S.D.N.Y. Nov. 17, 2010) ..............................................................................................31, 36

*CILP Assocs., L.P. v. PriceWaterhouse Coopers LLP*,
    735 F.3d 114 (2d Cir. 2013) ..................................................................................................46

*Citiline Holdings, Inc. v. iStar Fin. Inc.*,
    701 F. Supp. 2d 506 (S.D.N.Y. 2010) ..................................................................................54

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
    450 F. Supp. 3d 379 (S.D.N.Y. 2020) ......................................................................53, 54, 55

*City of Providence, R.I. v. Bats Glob. Mkts., Inc.*,
  878 F.3d 36 (2d Cir. 2017), *cert. denied sub nom. BATS Glob. Mkts., Inc. v.*
  *City of Providence, R.I.*, 139 S. Ct. 341 (2018) ..............................................................43, 44

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
  814 F. Supp. 2d 395 (S.D.N.Y. 2011).......................................................................13, 14, 15

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
  423 F. Supp. 2d 348 (S.D.N.Y. 2006)....................................................................................48

*Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*,
  433 F. Supp. 3d 515 (S.D.N.Y. 2020)....................................................................................48

*Cruz v. TD Bank, N.A.*,
  742 F.3d 520 (2d Cir. 2013)...................................................................................................55

*CVS Pharmacy, Inc. v. Press Am., Inc.*,
  377 F. Supp. 3d 359 (S.D.N.Y. 2019)....................................................................................29

*Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*,
  804 F.3d 178 (2d Cir. 2015)...................................................................................................29

*DeMaria v. Andersen*,
  318 F.3d 170 (2d Cir. 2003)...................................................................................................53

*Dembski v. Sec. & Exch. Comm'n*,
  437 F. Supp. 3d 286 (W.D.N.Y. 2020) ..................................................................................45

*Dodona I, LLC v. Goldman, Sachs & Co.*,
  847 F. Supp. 2d 624 (S.D.N.Y. 2012)....................................................................................21

*ECA, Local 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.*,
  553 F.3d 187 (2d Cir. 2009)........................................................................................17, 43, 46

*Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*,
  794 F.3d 297 (2d Cir. 2015)...................................................................................................46

*Estate of Ungar v. Palestinian Auth.*,
  451 F. Supp. 2d 607 (S.D.N.Y. 2006)....................................................................................45

*Ganino v. Citizens Utils. Co.*,
  228 F.3d 154 (2d Cir. 2000)...................................................................................................17

*Gould v. Winstar Commc'ns, Inc.*,
  692 F.3d 148 (2d Cir. 2012)..................................................46

*Guevoura Fund v. Sillerman*,
  2016 WL 4939372
  (S.D.N.Y. Sept. 12, 2016)..................................................44

*Gustafson v. Alloyd Co.*,
  513 U.S. 561 (1995)..................................................13

*Gustavia Home, LLC v. Hoyer*,
  362 F. Supp. 3d 71 (E.D.N.Y. 2019)..................................................29

*Halperin v. Ebanker USA.com, Inc.*,
  295 F.3d 352 (2d Cir. 2002)..................................................19

*Hart v. Internet Wire, Inc.*,
  145 F. Supp. 2d 360 (S.D.N.Y. 2001)..................................................48

*Heller v. Goldin Restructuring Fund, L.P.*,
  590 F. Supp. 2d 603 (S.D.N.Y. 2008)..................................................50

*Herman & MacLean v. Huddleston*,
  459 U.S. 375 (1983)..................................................13

*In re Alstom SA Sec. Litig.*,
  406 F. Supp. 2d 433 (S.D.N.Y. 2005)..................................................43, 49

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
  741 F. Supp. 2d 511 (S.D.N.Y. 2010)..................................................41

*In re Ariad Pharms., Inc. Sec. Litig.*,
  842 F.3d 744 (1st Cir. 2016)..................................................54

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
  763 F. Supp. 2d 423 (S.D.N.Y. 2011)..................................................19

*In re Bioscrip, Inc. Sec. Litig.*,
  95 F. Supp. 3d 711 (S.D.N.Y. 2015)..................................................17, 54

*In re Britannia Bulk Holdings Inc. Sec. Litig.*,
  665 F. Supp. 2d 404 (S.D.N.Y. 2009)..................................................36

*In re Century Aluminum Co. Sec. Litig.*,
  729 F.3d 1104 (9th Cir. 2013) ........................................................54

*In re CPI Card Grp. Inc. Sec. Litig.*,
  2017 WL 4941597
  (S.D.N.Y. Oct. 30, 2017) ...............................................................34

*In re Direxion Shares ETF Tr.*,
  279 F.R.D. 221 (S.D.N.Y. 2012) ...................................................23

*In re Express Scripts Holdings Co. Sec. Litig.*,
  773 F. App'x 9 (2d Cir. 2019) .......................................................35

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
  986 F. Supp. 2d 487 (S.D.N.Y. 2013).............................13, 29, 35, 39

*In re Gentiva Sec. Litig.*,
  932 F. Supp. 2d 352 (E.D.N.Y. 2013) ...........................................42

*In re Glob. Crossing, Ltd. Sec. Litig.*,
  313 F. Supp. 2d 189 (S.D.N.Y. 2003)............................................54

*In re Hi-Crush Partners L.P. Sec. Litig.*,
  2013 WL 6233561
  (S.D.N.Y. Dec. 2, 2013)................................................................49

*In re IAC/InterActiveCorp Sec. Litig.*,
  695 F. Supp. 2d 109 (S.D.N.Y. 2010).............................................14

*In re Initial Public Offerings Sec. Litig.*,
  471 F.3d 24 (2d Cir. 2006).............................................................55

*In re Marsh & Mclennan Cos., Sec. Litig.*,
  501 F. Supp. 2d 452 (S.D.N.Y. 2006).......................................53, 54

*In re McKesson HBOC, Inc. Sec. Litig.*,
  126 F. Supp. 2d 1248 (N.D. Cal. 2000) ..........................................21

*In re Mylan N.V. Sec. Litig.*,
  2018 WL 1595985
  (S.D.N.Y. Mar. 28, 2018) ..............................................................41

*In re OSG Sec. Litig.*,
  971 F. Supp. 2d 387 (S.D.N.Y. 2013)................................................................13, 14, 15

*In re Petrobras Sec. Litig.*,
  116 F. Supp. 3d 368 (S.D.N.Y. 2015)................................................................53

*In re ProShares Trust Sec. Litig.*,
  728 F.3d 96 (2d Cir. 2013)................................................................35

*In re Proshares Trust II Sec. Litig.*,
  2020 WL 71007
  (S.D.N.Y. Jan. 3, 2020)................................................................23

*In re Refco, Inc. Sec. Litig.*,
  503 F. Supp. 2d 611 (S.D.N.Y. 2007)................................................................14

*In re Reserve Fund Sec. & Derivative Litig.*,
  732 F. Supp. 2d 310 (S.D.N.Y. 2010)................................................................12, 24, 49, 50

*In re Salix Pharms., Ltd.*,
  2016 WL 1629341
  (S.D.N.Y. Apr. 22, 2016)................................................................36

*In re Smith Barney Transfer Agent Litig.*,
  765 F. Supp. 2d 391 (S.D.N.Y. 2011)................................................................49

*In re Take-Two Interactive Sec. Litig.*,
  551 F. Supp. 2d 247 (S.D.N.Y. 2008 )................................................................51

*In re TVIX Sec. Litig.*,
  25 F. Supp. 3d 444 (S.D.N.Y. 2014)................................................................35, 36

*In re UBS AG Sec. Litig.*,
  2012 WL 4471265
  (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's &
  Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d Cir. 2014)................................................................48

*In re Veeco Instruments, Inc. Sec. Litig.*,
  235 F.R.D. 220 (S.D.N.Y. 2006)................................................................50

*In re Wachovia Equity Sec. Litig.*,
  753 F. Supp. 2d 326 (S.D.N.Y. 2011)................................................................53, 54, 55

*In re WorldCom, Inc. Sec. Litig.*,
346 F. Supp. 2d 628 (S.D.N.Y. 2004)................................................................13

*Indiana Pub. Ret. Sys. v. SAIC, Inc.*,
818 F.3d 85 (2d Cir. 2016)................................................................39

*Kenney v. Clay*,
172 F. Supp. 3d 628 (N.D.N.Y. 2016)................................................................29

*Kleinman v. Elan Corp.*,
706 F.3d 145 (2d Cir. 2013)................................................................17

*Lindstrom v. TD Ameritrade, Inc.*
2020 WL 7398792
(N.D. Ill. Dec. 17, 2020)................................................................37

*Litwin v. Blackstone Grp., L.P.*,
634 F.3d 706 (2d Cir. 2011)................................................................13, 37

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
797 F.3d 160 (2d Cir. 2015)................................................................55

*McIntire v. China MediaExpress Holdings, Inc.*,
927 F. Supp. 2d 105 (S.D.N.Y. 2013)................................................................21

*Medina v. Tremor Video, Inc.*,
640 Fed. App'x 45 (2d Cir. 2016)................................................................32

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016)................................................................41, 43

*Meyer v. Jinkosolar Holdings Co., Ltd.*,
761 F.3d 245 (2d Cir. 2014)................................................................16, 28, 41

*Milman v. Box Hill Sys. Corp.*,
72 F. Supp. 2d 220 (S.D.N.Y. 1999)................................................................38, 40, 41

*New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*,
709 F.3d 109 (2d Cir. 2013)................................................................37

*Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc.*,
367 F. Supp. 3d 16 (S.D.N.Y. 2019)................................................................34

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S. Ct. 1318 (2015) ................................................................................................ 13

*Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*,
595 F.3d 86 (2d Cir. 2010) ........................................................................................ 17

*Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008), *aff'd*, 347 F. App'x 617 (2d Cir. 2009) ..................... 36

*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*,
681 F.3d 114 (2d Cir. 2012) ...................................................................................... 32

*Panther Partners Inc. v. Jianpu Tech. Inc.*,
2020 WL 5757628
(S.D.N.Y. Sept. 27, 2020) .................................................................................. *passim*

*Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*,
446 F. Supp. 2d 163 (S.D.N.Y. 2006) .................................................................... 50, 51

*Playboy Enters., Inc. v. Dumas*,
960 F. Supp. 710 (S.D.N.Y. 1997), *aff'd*, 159 F.3d 1347 (2d Cir. 1998) .............................. 29

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ......................................................................... 14, 15, 16, 17

*Rubinstein v. Credit Suisse Group AG*,
457 F. Supp. 3d 289 (S.D.N.Y. 2020) ..................................................................... 19, 36

*Sawabeh Info. Servs. Co. v. Brody*,
832 F. Supp. 2d 280 (S.D.N.Y. 2011) ........................................................................ 46

*SEC v. Knight*,
694 Fed. App'x 853 (2d Cir. 2017) ............................................................................ 46

*Set Capital LLC v. Credit Suisse Group AG*,
2019 WL 4673433
(S.D.N.Y. Sept. 25, 2019) ....................................................................................... 37

*Stadnick v. Vivint Solar, Inc.*,
861 F.3d 31 (2d Cir. 2017) ...................................................................................... 34

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ..................................................................... 46, 48, 49, 53

*Wallace v. IntraLinks*,
  2013 WL 1907685
  (S.D.N.Y. May 8, 2013).................................................................................................14, 50

*Wallace v. IntraLinks*,
  302 F.R.D. 310 (S.D.N.Y. 2014) ........................................................................................54

*Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*,
  28 F. Supp. 3d 93 (D. Mass. 2014) ......................................................................................42

**STATUTES, RULES AND REGULATIONS**

15 U.S.C.
  §77k............................................................................................................................. *passim*
  §77o.........................................................................................................................2, 55
  §78j(b)......................................................................................................................... *passim*
  §78u-4(b)(2).....................................................................................................................45
  §78t(a)...................................................................................................................2, 5, 55

Federal Rules of Civil Procedure
  Rule 8(a)(2)...............................................................................................................14, 15
  Rule 9(b).............................................................................................................14, 15, 16
  Rule 12(b)(6)....................................................................................................................12

17 C.F.R.
  §229.105.........................................................................................................................32
  §229.303(a)(3)(ii).............................................................................................................32
  §240.10b-5...............................................................................................38, 39, 43, 45

Lead plaintiff Nutit, A.S. ("Plaintiff") respectfully submits this memorandum of law in opposition to Defendants' motion to dismiss the consolidated amended complaint (the "CAC").[1]

# I. INTRODUCTION

This case arises from the unprecedented collapse of the largest oil-related exchange traded fund ("ETF") in the world, directly precipitated by Defendants' reckless and fraudulent conduct. During the Class Period,[2] Defendants sold billions of dollars' worth of USO shares to largely retail investors and amassed enormous positional concentration in the oil futures markets without disclosing that their actions were facilitating: (i) the collapse of oil futures prices; (ii) a liquidity crisis, as the Fund approached regulatory limits; (iii) a breakdown in the Fund's crucial tracking functions; and, critically, (iv) the complete abandonment of the Fund's investment strategy that was promoted to solicit investment in USO. Despite their obvious importance to purchasers of USO shares, these adverse facts were not disclosed until *after* investors lost billions of dollars and Defendants were ultimately forced to radically overhaul the Fund's operations and disclosures in response to investigations and/or interventions by the U.S. Securities and Exchange Commission

---

[1]    All references to "¶_" or "¶¶_" refer to the CAC (ECF No. 68). "Defendants" refers to: United States Oil Fund, LP ("USO" or the "Fund") (¶23); United States Commodity Funds LLC (the "Sponsor" or "USCF") (¶24); John P. Love and Stuart P. Crumbaugh (the "USO Officer Defendants") (¶¶25-26) (collectively, the "USO Defendants"); Nicholas D. Gerber, Andrew F. Ngim, Robert L. Nguyen, Peter M. Robinson, Gordon L. Ellis, Malcolm R. Fobes III (¶¶29-34) (collectively, with the USO Officer Defendants, the "Individual Defendants"); ABN AMRO, Goldman, Sachs & Company, J.P. Morgan Securities, Inc., Merrill Lynch Professional Clearing Corp., and Virtu Financial BD LLC (collectively, the "Authorized Participant Defendants") (¶36); ALPS Distributors, Inc. ("ALPS") (¶39) (collectively, with the Authorized Participant Defendants, the "Underwriter Defendants"). The Underwriter Defendants have joined in the motion to dismiss filed by the USO Defendants and the Individual Defendants (the "Motion").

"Def. Mem." refers to Defendants' memorandum of law in support of the Motion. "Ex. __" refers to exhibits to the Declaration of Amy D. Roy ("Roy Decl.") submitted in support of the Motion. "RS __" refers to the page numbers in the lower right-hand corner of both the February 25, 2020 and March 23, 2020 prospectuses attached as Exs. 1 and 2 to the Roy Decl. Unless otherwise noted, all emphasis in quoted material is added.

[2]    The "Class Period" refers to February 25, 2020 to April 28, 2020, inclusive.

("SEC"), Commodity Futures Trading Commission ("CFTC"), exchange regulators and market participants seeking to halt Defendants' destructive conduct and prevent further damage to USO investors.

Tellingly, Defendants do not challenge, and thus concede, numerous elements of Plaintiff's claims,[3] including: (1) the materiality of most alleged misrepresentations and omissions; (2) their connection to the purchase or sale of USO shares; (3) reliance; (4) damages; and (5) loss causation. Thus, the only disputed issues before the Court are: (1) whether Defendants' statements and omissions were false or misleading; (2) whether the USO Defendants acted with scienter (for the fraud claims); and (3) standing. Defendants' arguments on each of these grounds are baseless.

*First*, Plaintiff adequately alleges that Defendants made false and misleading statements, and omitted critical information, about USO's fundamental operations, objective, business and performance at the same time the Fund was adversely impacted not only from extreme market turmoil, but also from Defendants' own market destabilizing conduct in managing the Fund. Although Defendants point to a litany of irrelevant and boilerplate ***risk*** factors, they fail to cite a single instance in which any of the material ***facts*** then adversely impacting the Fund were ever disclosed to investors. That is because no such disclosures were ever made. For example, the CAC alleges that while Defendants assured investors that USO was a "cost-effective way to invest indirectly in crude oil," the Fund was in reality an extremely dangerous means of investing in oil that effectively guaranteed investors would suffer losses given the structural deficiencies and existential

---

[3] The CAC alleges claims against Defendants under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") for Defendants' false or misleading statements made during the Class Period, including in connection with USO's February 25, 2020 public offering (the "February Offering") and March 23, 2020 public offering (the "March Offering") (collectively, the "Offerings") of USO shares. References to the "February Registration Statement" and "March Registration Statement" (collectively, the "Registration Statements"), issued in connection with the February Offering and March Offering, respectively, have the same meaning as set forth in the CAC. *E.g.*, ¶1.

threats then negatively impacting USO. ¶¶65-138. Moreover, Defendants' claims of fraud-by-hindsight misrepresent and ignore the actual allegations of the CAC, and raise further factual issues demonstrating that the Motion should be denied. While Plaintiff has sufficiently pled that these adverse facts, trends and uncertainties – which must be taken as true as this stage – existed when Defendants' statements were made, Plaintiff is confident that its claims will be substantiated in discovery.

*Second*, with respect to its 1934 Act claims, Plaintiff has adequately pled a strong inference of scienter that is at least as compelling as any nonculpable inference. The CAC details the incontrovertible knowledge possessed by the USO Officer Defendants – as the CEO and CFO of the Fund's Sponsor - in managing the day-to-day operations of the largest oil ETF in existence and contributing to the adverse consequences that undermined the Fund's stated purpose and allowed them to reap millions of dollars in management fees. Furthermore, these Defendants, as part of their reporting and operational responsibilities, retained unique insider knowledge from their participation in and/or monitoring of the relevant markets and events adversely impacting the Fund's performance. These Defendants' assertion that they were unaware of their own actions in managing USO and how those actions negatively impacted the Fund, the markets in which it operated and USO investors, it is not only implausible, but preposterous. This assertion is certainly not ***more*** compelling than the common sense inference that the USO Defendants possessed scienter by virtue of the Sponsor's chief officers performing the necessary daily operations they claimed to have performed in managing the Fund.

*Finally*, Plaintiff adequately alleges tracing of its USO purchases necessary to confer standing for its 1933 Act claims. For those claims, the CAC alleges that Plaintiff purchased USO securities pursuant and/or traceable to the Offerings. These allegations are sufficient to establish

standing at this stage – nothing more is required. As discussed further below, Defendants have no meritorious defense to Plaintiff's well-pled claims. As a result, Plaintiff respectfully requests that the Court deny the Motion in its entirety.

## II.     STATEMENT OF FACTS

### A.     Background of USO

ETFs are similar to mutual funds in that ETFs issue shares and then use the proceeds from the sale of those shares to invest according to their stated investment strategy and objective, but differ in that ETFs issue their shares first to authorized participants through a marketing agent who then distributes and sells the shares to investors. ¶48. Oil ETFs, such as USO, allow retail investors to gain access to investable products tied to oil prices and the energy markets that can be easily traded directly in investors' brokerage accounts, and thus gain exposure to fluctuations in oil prices. ¶49. Oil ETFs are backed by futures contracts referencing barrels of oil in a particular oil market where investors seek to capture trading profits based on the price movement of oil. ¶¶49-51.

USO's investment objective was for its per share net asset value ("NAV")[4] to track the daily changes in percentage terms of the spot price of West Texas Intermediate ("WTI") light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of short-term WTI futures contracts (which USO refers to as the "Benchmark Oil Futures Contract") traded on the New York Mercantile Exchange (the "NYMEX"). ¶¶4, 53. Since its founding and continuing through most of the Class Period, USO held itself out as a passively-managed fund that simply invested nearly all of its assets into near months WTI futures contracts, regardless of whether doing so resulted in profits or losses for the Fund, so as to closely track the spot price of oil. ¶55. The

---

[4]     The Fund's NAV per share is calculated as the current market value of its total assets, minus any liabilities, and dividing that total by the total number of outstanding shares.

Fund was thus price-insensitive in that it followed its stated investment strategy whether or not the Sponsor thought the price for those contracts offered a favorable investment opportunity. ¶¶23, 55.

Because the Fund traded futures contracts without any expectation of ever taking or delivering the underlying asset, it historically "rolled" over its futures contract positions every month by selling its front month WTI contracts holdings and then using the proceeds to buy the next month's WTI future contracts. ¶57. When nearer month futures contracts trade at a lower price than later dated futures, the Fund will be able to purchase fewer contracts referencing a smaller amount of the underlying commodity, in an effect called "contango." ¶¶58-59. In this situation, the value of the near month futures contracts tends to decline as they approach expiration. ¶58. Contango causes USO to suffer losses by automatically rolling cheaper near month futures contracts each month into more expensive next month futures contracts, producing negative "roll yields," or the difference between the futures price return and spot price return over the same time period. ¶¶52, 59.[5]

**B.      USO Encounters Severe Adverse Trends and Exacerbates a Breakdown in Market Fundamentals by Rapidly Growing the Fund and Flooding the Market with WTI Futures**

By late January 2020, the World Health Organization ("WHO") declared the coronavirus ("COVID-19") a public health emergency. In February 2020, as the international spread of the pandemic took hold and local governments in the United States declared emergencies, COVID-19 began having a significant effect on commodity markets and oil prices began to slide. ¶¶60-61. At the same time, trading in WTI futures contracts accelerated as investors sought exposure to slumping oil prices, which coincided with a period of increased price volatility, indicating significant investment risk. ¶62. To address declining oil prices, on March 5, 2020, Saudi Arabia and other Organization of the Petroleum Exporting Countries ("OPEC") countries announced a proposal to cut

---

[5]      The opposite effect, known as "backwardation," occurs when near month futures contracts trade at a higher price than the next month futures contracts, and as a result the value of the near month futures contracts tend to rise as they approach expiration. *Id.*

oil output, but Russia and other non-OPEC countries abandoned negotiations a day later. ¶¶63-64. In response, on March 8, 2020, Saudi Arabia instigated a price war when it announced price discounts for its oil exports, threatening to flood the markets with supply as oil demand plummeted. *Id.* Russia in turn cut prices, and the countries soon inundated global markets with cheap oil, causing significant market turmoil. ¶64. On March 9, 2020, WTI crude oil declined 25% in the largest single-day drop since the Gulf War while WTI front month futures contracts volume reached a five-year single-day high. ¶65.

Furthermore, oil storage facilities which accepted WTI crude in Cushing, Oklahoma approached capacity, leaving traders and producers desperate for places to store excess oil – a consequence of USO plowing the proceeds from Defendants' share sales into WTI front month futures contracts without any intention to actually take delivery of the oil. ¶66. As excess oil supply surged and oil prices declined, storage facilities in Cushing reached capacity and were completely leased by mid-March 2020. ¶5. In the midst of this turmoil, USO decided to sell hundreds of millions of new shares, effectively throwing gas on the fire in an already volatile market by investing billions of dollars in proceeds from the Offerings into WTI front month futures contracts. ¶¶65, 71. This induced a surge in demand for WTI futures contracts without a commensurate increase in interest for oil delivery, further distorting market dynamics. ¶¶66, 69, 71.

Defendants, as the creators, issuers, underwriters and operators of the largest oil-related ETF in existence and active market-making players in the commodities and futures markets that determined the Fund's performance, possessed insider knowledge about the negative consequences and existential threats facing the Fund as a result of these converging adverse events as they unfolded. ¶¶68, 208-212. In particular, Defendants knew how their own activities in conducting the Offerings would contribute, and were already contributing, to the adverse impacts to USO investors

- 6 -

as a result of these converging trends. *Id.* USO investors, on the other hand, did not have access to the proprietary market data and non-public modelling capabilities, and were not apprised of the exacerbating effects of Defendants' conduct. ¶69.

Rather than disclose these known impacts to the Fund, Defendants chose to issue billions of dollars in new USO shares in the Offerings, taking advantage of investor interest in gaining exposure to low-cost oil and ignorance of the true adverse facts and market distortions impacting the Fund. ¶12. Through the Offerings, Defendants increased the number of USO shares issued and outstanding over year-end 2019 by ***more than 1,500%***. ¶77. The proceeds from the Offerings allowed Defendants to garner massive management fees and to profit from the widening spread between USO's NAV per share and market price. *Id.* USO, in turn, came to dominate the market for WTI near months futures contracts, controlling ***15% of the entire market*** for WTI near months futures contracts by mid-March 2020. *Id.* This already-staggering market share grew to an astronomical ***1/3 of the entire market*** by mid-April 2020 – as USO "'attracted legions of mom-and-pop investors who saw it as an easy and simple way to wager on oil.'" *Id.*

This massive position in near months WTI futures contracts by a single entity led to heightened price volatility and played a significant role in driving down the price of WTI front month futures contracts as USO sold billions of dollars' worth of those contracts regardless of price when it "rolled" into the next month futures contract in March and April. The Fund's dangerously large position also served as a catalyst for, and helped precipitate an unprecedented collapse of, WTI front month futures prices in mid-April 2020. ¶¶80-83. Indeed, USO sold approximately ***$3.8 billion*** worth of front month futures contracts over a four-day trading window during its April roll, triggering interest and liquidity in the May WTI futures contracts to abruptly plummet and causing bid and ask spreads to widen. ¶83. While regulators quickly intervened to limit USO's

market-distorting positions, they could not prevent the ensuing unprecedented collapse of WTI crude prices. On April 20, 2020, the day before the May WTI contract expiry, as the market was steeped in billions of dollars' worth of expiring futures contracts but virtually no available storage space, WTI front month futures contracts plunged to an alarming and unprecedented *-$37.63*. *Id*.

As Defendants grew USO by billions of dollars and increasingly dominated the WTI near months futures markets, their actions resulted in other notable structural defects in the Fund and exacerbated the breakdown of important market fundamentals impacting the Fund's performance. ¶87. During the Class Period, USO suffered from: (i) heightened detrimental contango effects and a rare super contango market dynamic; (ii) the extreme divergence of the price of USO shares from its per share NAV; and (iii) tracking failures that undermined the Fund's stated investment strategy and objective. *Id*. For example, by the time of the March Offering, contango between front and next month WTI contracts had climbed to 6.7 times the five-year historical average. ¶90. Likewise, by March 18, 2020, USO's shares jumped to a 9.14% premium over NAV, almost twice the premium from just five days earlier, which in turn was 59 basis points above its highest premium during the prior five years and significantly above its prior five-year average of -.0018%. ¶97. None of these adverse events, their root causes, or their ongoing negative impacts to the Fund were disclosed by Defendants to investors.

C.     **USO Investors Suffer Catastrophic Losses as the Fund Is Forced to Abandon the Investment Strategy It Used to Solicit Billions of Dollars in Investor Capital**

As a result of the undisclosed facts, events and trends impacting the Fund during the Class Period, USO investors suffered massive losses, including $200 million in February 2020, *$1.2 billion* in March 2020 and a stunning 81% decline in USO's per share NAV during the Class Period. ¶¶16, 107. Ultimately, between February and April 2020, the Fund lost *more than $4 billion* and experienced its worst monthly performances on record. ¶15. Although USO's price-

insensitive investment nature compounded investor losses, other, more sophisticated market participants with access to proprietary information and trading tools profited handsomely. ¶112.

Starting on April 16, 2020, USO began a series of shocking announcements when it revealed that it would abandon its stated investment strategy of purchasing primarily WTI front month futures contracts and rolling them forward, eventually giving the Fund's Sponsor *carte blanche* to invest in ***any*** oil-related investments that it saw fit and annihilating any pretense that the Fund was following the investment objective represented to investors during the Class Period. ¶¶116-124. USO announced that beginning April 17, 2020, it would hold only 80% of its assets in front month WTI contracts and 20% split between the second and third month WTI contracts, a change an analyst likened to "dropp[ing] a bomb on the energy markets." ¶116. USO would only later admit that regulators overseeing the NYMEX and the Intercontinental Exchange ("ICE") Futures (on which WTI futures trade) had imposed accountability level and position limits on the Fund that same day in order to mitigate USO's market-distorting effects. *Id.*

On April 21, 2020, USO announced that the SEC had not declared effective a registration statement filed the previous day (the "April Registration Statement"), through which Defendants had brazenly attempted to sell an ***additional 4 billion USO shares*** to the market. ¶117. The SEC apparently had refused to declare the registration statement effective out of concern for the negative impact to investors, preventing Defendants from flooding the market with even more USO shares. *Id.* USO announced further changes to its investment strategy on April 21, April 22 and April 24, revealing each time that it would push out its investments further along the WTI futures curve in an effort to reduce investment risk. ¶¶117-120. On April 24, 2020, USO finally disclosed the true reason for its rapid-fire investment overhaul: regulators overseeing NYMEX had, on April 16 – ***eight days before the belated disclosure*** – ordered the Fund to limit its positions in the June WTI futures

contract so as not to exceed accountability levels. ¶121. On April 27, USO changed its investment strategy yet again, stating it would hold *no positions* in the front month WTI futures contract. ¶122.

By the end of April, USO had been forced by regulators to radically change from a passive investment vehicle used to track the spot price of oil through front month WTI futures contracts to what was effectively an actively managed fund frantically struggling to avoid a total implosion and satisfy concerned regulators through a hodgepodge of oil-related investments. ¶125. This was *a direct result* of its outsized position in the WTI futures market due to its hyperbolic growth from the Offerings. ¶125. Indeed, USO's stated investment objective was *never feasible* at the time of the Offerings, and Defendants' representations highlighting the Fund's core strategy in order to solicit investment in the Offerings were materially false and misleading when made. *Id.*

### D. The USO Defendants Belatedly Acknowledge Undisclosed Adverse Facts After They Materialized

Beginning in April 2020, the USO Defendants began acknowledging that certain material facts and trends related to COVID-19, contango, market volatility, the Saudi/Russia oil price war and regulatory requirements existed early in the Class Period. ¶126. In fact, it was not until April 20, 2020 that Defendants belatedly disclosed in the April Registration Statement how destructive market dynamics had adversely impacted the Fund by *March 2020*, including an entirely new COVID-19 risk disclosure admitting that the global pandemic had been affecting the Fund's performance. *Id*. The April Registration Statement further stated that the Fund suffered the "[w]orst [m]onthly [d]rawdown" in its history in March 2020, losing 54.7% in a single month, and that it likely would not earn any significant interest income in 2020. ¶127.

Despite these belated disclosures, the April Registration Statement failed to disclose the direct role that Defendants played in exacerbating market volatility, illiquidity and structural defects the Fund had suffered during the Class Period by rapidly growing the size of the Fund. ¶¶127-133.

Nor did it disclose regulatory intervention that sought to curtail the growth and dangerous market concentration posed by the Fund, including the Sponsor's receipt of an April 16, 2020 letter (***four days before the April Registration Statement was filed***) from the Chicago Mercantile Exchange ("CME"), on behalf of the NYMEX, ordering the Fund to limit its front month WTI contract exposure. ¶¶121, 128. USO finally revealed on April 24, 2020 that USO had run up against regulatory positional limits almost immediately after the Fund's April roll period ended, stating that the CME ordered limits on the Fund's holdings of June, July, August and September contracts in April 16 ***and*** April 23 letters. ¶129.

On April 27, 2020, USO filed an amendment to the April Registration Statement (the "April Amendment"), which included additional disclosures regarding the convergence of adverse factors impacting the Fund and its performance during the Class Period, including that COVID-19 "has had, and is expected to continue to have, a material adverse impact on the crude oil markets and oil futures markets to the extent economic activity and the use of crude oil continues to be curtailed, which in turn has had a significant adverse effect on the prices of Oil Futures Contracts, including the Benchmark Oil Futures Contract [the "Benchmark Contract"], and Other Oil-Related Interests." ¶130. The April Amendment also finally disclosed that the Fund was suffering from the impacts of "super contango," noting that "***[i]n March 2020*** contango dramatically increased and reached historic levels in the wake of the COVID-19 crisis and oil price war causing an overabundance of supply, significantly curtailed demand and limited storage for excess crude oil." ¶131. On May 6, 2020, USO filed yet another amendment to the April Registration Statement (the "May Amendment") clarifying that the extraordinary market conditions that had destroyed the Fund's ability to follow its investment objective and caused billions of dollars in investor losses had

materially impacted the Fund by "***the beginning of March 2020***" – *i.e.*, well **before** the March Offering – despite the fact these specific impacts were not disclosed at the time.  ¶134.

By May 29, 2020, it was reported that the SEC and CFTC had launched investigations into USO regarding the Fund's disclosures to investors and rapid-fire changes to its investment strategy. ¶136.  The SEC required the Fund to revise many of its disclosures and representations to investors, including by requiring USO to prominently announce **on the cover page** of its prospectus that the Fund "**IS NOT A PROXY FOR TRADING DIRECTLY IN THE OIL MARKETS**."  *Id.* (emphasis in original).  Then, on August 17, 2020, the SEC issued a Wells Notice to several of the USO Defendants stating that the SEC preliminary determined that these Defendants had violated the 1933 Act and the 1934 Act in connection with their disclosures to investors regarding USO's investment strategy, and recommended pursuing an enforcement action.  ¶137.  Two days later, the CFTC issued a similar Wells Notice regarding violations of the Commodity Exchange Act.  ¶138.

As a result of Defendants' material misrepresentations and omissions during the Class Period, Plaintiff and members of the Class suffered billions of dollars in losses.

## III. MOTION-TO-DISMISS STANDARD

"'To survive a motion to dismiss [under Fed. R. Civ. P. 12(b)(6)], a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."'" *In re Reserve Fund Sec. & Derivative Litig.*, 732 F. Supp. 2d 310, 317-18 (S.D.N.Y. 2010) (Gardephe, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).  "'The court is to accept as true all facts alleged in the complaint,' [] and must 'draw all reasonable inferences in favor of the plaintiff.'"  *Reserve Fund*, 732 F. Supp. 2d at 318.

## IV.    ARGUMENT

### A.    Plaintiff Has Adequately Pleaded a §11 Claim Under the 1933 Act

#### 1.    Section 11 Standards

Section 11 of the 1933 Act "imposes strict liability on issuers and signatories, and negligence liability on underwriters, where 'any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading.'" *Panther Partners Inc. v. Jianpu Tech. Inc.*, 2020 WL 5757628, at \*6 (S.D.N.Y. Sept. 27, 2020) (Gardephe, J.) (quoting *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 505 (S.D.N.Y. 2013)). "Congress adopted §11 to ensure that issuers 'tell[] the whole truth' to investors." *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 135 S. Ct. 1318, 1331 (2015).  "This design reflects Congress' sense that underwriters, issuers, and accountants bear a 'moral responsibility to the public [that] is particularly heavy.'" *In re WorldCom, Inc. Sec. Litig.*, 346 F. Supp. 2d 628, 657 (S.D.N.Y. 2004) (quoting *Gustafson v. Alloyd Co.*, 513 U.S. 561, 581 (1995)).  A defendant need not even be aware that a misrepresentation or omission has been made.  *City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 424 (S.D.N.Y. 2011).

The pleading requirements for a Section 11 claim are "relatively minimal."  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 718 (2d Cir. 2011).  "A plaintiff need only plead a material misstatement or omission in the registration statement."  *In re OSG Sec. Litig.*, 971 F. Supp. 2d 387, 395 (S.D.N.Y. 2013).  As the Supreme Court has held, issuer liability under Section 11 is "virtually absolute, even for innocent misstatements."  *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983).

## 2.    Plaintiff's §11 Claim Need Only Satisfy Rule 8(a)(2)

Although Section 11 is a strict liability/negligence claim, Defendants argue that Plaintiff must satisfy the particularity requirements of Rule 9(b) of the Federal Rules of Civil Procedure, not the short-and-plain-statement pleading requirement of Rule 8(a)(2), because Plaintiff's Section 11 claim is "grounded in fraud." Def. Mem. at 20. Plaintiff has, however, satisfied the requirements for utilizing the Rule 8(a)(2) standard.

The Second Circuit has held that "while a plaintiff need allege no more than negligence to proceed under Section 11 [], claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." *Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004). "The mere act of pleading violations of Sections 10(b) [and] 11 . . . in the same complaint," however, "does not automatically subject the Section 11 . . . claims to a higher pleading standard." *OSG*, 971 F. Supp. 2d at 406. Even when "most, if not all, of the defendants[] were engaged in a massive fraud," that fact "does not take away plaintiffs' right to plead in the alternative that defendants violated provisions requiring only negligence." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 632 (S.D.N.Y. 2007). "[N]othing in *Rombach* or Rule 9(b) forecloses that pleading strategy." *In re IAC/InterActiveCorp Sec. Litig.*, 695 F. Supp. 2d 109, 116 (S.D.N.Y. 2010). Nor does it matter that the 1933 Act claims and the 1934 Act claims are based on the same statements. *See Wallace v. IntraLinks*, 2013 WL 1907685, at *11 (S.D.N.Y. May 8, 2013) ("The fact that the alleged misstatements supporting the Section 11 . . . claims are the same as those in the Section 10(b) claims is not dispositive.").[6]

When plaintiffs: (1) go "beyond the mere inclusion of a *pro forma* repudiation of a fraud theory" (*EnergySolutions*, 814 F. Supp. 2d at 424); (2) "frame[] their allegations with regard to the Securities Act counts in terms of negligence, claiming that the various defendants had a duty to

---

[6]    *See also id.* ("allegations that statements were 'materially false or misleading' and contained 'untrue statements of material fact' do not necessarily sound in fraud because such allegations simply track the language of Section 11").

investigate and ensure the truth of the statements in the Registration Statements" (*id.*); and (3) organize the complaint "'in a way that allows the court to determine which allegations support which claim'" (*OSG*, 971 F. Supp. 2d at 406), they have done all that *Rombach* requires.

Plaintiff has satisfied each of these requirements. The CAC does far more than merely disclaim fraud (which it does in ¶193). It also includes a separate section, entitled "1933 Act Allegations" (CAC at §VII), specifically discussing the Registration Statements (*see, e.g.*, ¶188), the false and misleading statements therein (*see, e.g.*, ¶¶139-177), the reasons for their falsity (*see, e.g.*, *id.*) and the 1933 Act counts themselves (Counts I and II; *see* ¶¶191-206), including the allegation that "[n]one of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the February Registration Statement and the March Registration Statement were true and without omissions of any material facts and were not misleading." ¶197. That entire section, including the counts, occurs ***before*** the section entitled "1934 Act Allegations," which pleads Plaintiff's scienter allegations. *See* ¶¶93-97.

Although Counts I and II incorporate by reference all the preceding paragraphs, they also expressly disavow all averments of fraud. *See* ¶193. Moreover, Plaintiff has the right to tell its story in a coherent, non-fragmented way, without triggering Rule 9(b). As Judge Koeltl has written, "complete isolation of Securities Act claims is not necessary to allow plaintiffs to plead a theory of negligence." *EnergySolutions*, 814 F. Supp. 2d at 424 n.12. Moreover, there is no inconsistency in alleging that a defendant willfully executed a scheme, on the one hand, and negligently failed to disclose it, on the other. Thus, the pleading standard of Rule 8(a)(2), not that of Rule 9(b), applies, and Plaintiff need only plead a "short and plain statement of the claim."

### 3. Even Under Rule 9(b), Plaintiff Has Satisfied Its Pleading Burden

Even if Rule 9(b) did apply, Plaintiff has met those pleading requirements. As the Second Circuit held in *Rombach*, Rule 9(b) requires a plaintiff only to: (1) specify the statements that the plaintiff contends were fraudulent; (2) identify the speaker; (3) state where and when the statements were made; and (4) explain why the statements were fraudulent. 355 F.3d at 170. First, the CAC identifies and quotes the specific statements from the Registration Statements alleged to be materially false or misleading. *See* ¶¶139-177. Second, the CAC pleads that the Individual Defendants signed the Registration Statements on behalf of themselves, USO and the Sponsor, that the Underwriter Defendants served as underwriters for the Offerings, and that each of the Defendants was responsible for the contents and dissemination of the Registration Statements. *See* ¶195.[7] Third, the CAC alleges that each false and misleading statement was made in the February Registration Statement and/or March Registration Statement. *See* ¶¶139, 144; *see also* ¶¶139-177. And fourth, the CAC contains detailed explanations for the falsity of these statements. *See* ¶¶139-177. Accordingly, even under Rule 9(b), Plaintiff has stated claims under the 1933 Act.

### 4. Plaintiff Has Adequately Pleaded Material Misstatements and Omissions in the Registration Statements

"[O]nce a company speaks on an issue or topic, there is a duty to tell the whole truth," "[e]ven when there is no existing independent duty to disclose [such] information" on the issue or topic. *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). The "'veracity of a

---

[7] While the Underwriter Defendants did not separately move to dismiss the CAC on any grounds other than those set forth in the USO Defendants and Individual Defendants' Motion, the Underwriter Defendants purport to dispute in their joinders in the Motion that they are "underwriters" eligible for liability under Section 11. Putting aside the fact that this purported argument is not before the Court in the Motion, the Registration Statements explicitly stated that the Authorized Participant Defendants may be "deemed participants in a distribution in a manner ***that would render them statutory underwriters and subject them to the prospectus delivery and liability provisions of the 1933 Act***." RS 65.

statement or omission is measured not by its literal truth, but by its ability to accurately inform rather than mislead'" investors; thus, even literally true statements can, through context and presentation, mislead investors. *In re Bioscrip, Inc. Sec. Litig.*, 95 F. Supp. 3d 711, 727 (S.D.N.Y. 2015) (quoting *Operating Local 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 92 (2d Cir. 2010)). "Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation." *Kleinman v. Elan Corp.*, 706 F.3d 145, 153 (2d Cir. 2013) (statements that are literally true may become misleading based upon "their context and manner of presentation").

An actionable misstatement or omission is one that, "viewed as a whole, would have misled a reasonable investor." *Rombach*, 355 F.3d at 178 n.11. "At the pleading stage, a plaintiff satisfies the materiality requirement . . . by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000). The requisite inquiry asks whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *ECA, Local 134 IBEW Joint Pension Tr. of Chic. v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009). "[A] complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Ganino*, 228 F.3d at 162; *see also Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 235 (2d Cir. 2014) (quoting same). "'[B]ecause the materiality element presents "a mixed question of law and fact," *it will rarely be dispositive in a motion to dismiss*[.]'" *Id.*

- 17 -

While Defendants contend that the CAC "points to no fact in the Registration Statements or elsewhere that is even arguably false or misleading and asserts no omission of material fact that renders the disclosures misleading" (Def. Mem. at 21), Plaintiff has set forth both the particular statements alleged to be false and misleading and the reasons for their falsity. ¶¶140-169. In particular, as detailed below, Plaintiff alleges that Defendants' statements and omissions were misleading because they failed to disclose that "the Fund exposed investors to the risk of imminent catastrophic loss during the Class Period as the Fund was suffering an undisclosed breakdown in market fundamentals and the convergence of numerous adverse events, trends and uncertainties that would ultimately force the Fund to abandon its investment strategy and objective." ¶11; *see also* ¶¶12, 140-143, 145-169.

Defendants cite to a raft of purported disclosures in the Registration Statements that they contend "fully and accurately disclosed all relevant Fund features and risks" (Def. Mem. at 23), but none of those disclosures reveal ***any*** of the adverse ***facts*** detailed in the CAC that render the misrepresentations and omissions in the Registration Statements false and misleading. Simply put, Defendants have failed to cite even a single instance in which any of the adverse facts alleged in the CAC were ever disclosed to investors. For example, at the time of the February Offering, Defendants failed to disclose the known adverse impacts that COVID-19 were having on the Fund, and were expected to continue to have on USO in the imminent future, and that "the February Offering itself would increase volatility and illiquidity in the markets in which USO operated and thereby threaten the Fund's performance, investment strategy and investment objective." ¶¶140-142. Nor did Defendants disclose a host of other material adverse trends, fundamental market disruptions and numerous existential threats, or their adverse impacts on the Fund, that existed at the time of the March Offering, including, *inter alia*: (i) sharply rising positional concentration, volatility and

market illiquidity as a result of USO's rapid growth; (ii) unprecedented and sustained investor inflows into the Fund; (iii) a growing oil storage crisis, including doubling of storage costs and complete leasing of storage tanks in Cushing; (iv) record single-day USO shares traded and WTI front month futures contracts traded; (v) the rapid tripling of the Fund's historical market share of WTI near months futures contracts; (vi) the divergence between the Fund's per share NAV and market price to historic levels; (vii) dramatically rising 15-day historical WTI front month futures volatility; (viii) the collapse in WTI front months futures prices and the per share NAV of the Fund; and (ix) accelerating super contango effects. ¶145.

Thus, because Defendants failed to "'disclose *hard facts* critical to appreciating the magnitude of the risks described,'" their "'[w]arnings of specific risks . . . do not shelter [them] from liability." *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 495 (S.D.N.Y. 2011); *see also Halperin v. Ebanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002) (warnings are ineffective when "the cautionary language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss").[8]

      a.      **The CAC Adequately Pleads Misrepresentations and Omissions Regarding the Adverse Impacts from USO's Rapid Growth and Outsized Positional Concentrations in WTI Futures Contracts**

The CAC alleges that the Registration Statements failed to disclose that Defendants' public issuance of over *1.4 billion* USO shares during the Class Period in the Offerings themselves would significantly increase volatility and illiquidity in the markets in which USO operated and thereby

---

[8]      Defendants' citation to *Rubinstein v. Credit Suisse Group AG*, 457 F. Supp. 3d 289 (S.D.N.Y. 2020), is inapposite. In *Rubinstein*, the disclosures at issue contained considerably more robust warnings that were not included in the Registration Statements here, including that the "ZIV ETN's were appropriate only for sophisticated, knowledgeable investors" and regarding the adverse impact of Defendants' own hedging activity. *Id.* Moreover, Plaintiffs in *Rubinstein* acknowledged that, unlike here, "as of the date of the Registration Statement, the stock market 'had been experiencing a period of historically *low* volatility' which caused ZIV and other similar inverse ETPs tied to the performance of VIX futures to *perform well.*" *Id.* at 298 n.7.

threaten the Fund's performance and investment strategy and objective.[9] ¶¶12, 142, 146, 150. Substantially all of the proceeds from the Offerings (after management and other fees collected by Defendants) were invested in a single asset: WTI near months futures contracts, which caused an acute illiquidity crises, and ultimately massive investor losses, as USO's positional control of WTI near months futures contracts grew to at least *15% of the entire market* before the March Offering, and as Defendants flooded the market with WTI contracts during the April roll. ¶77. Given the unprecedented adverse market disruptions and existential threats to the Fund at the time (¶¶60-135), the Offerings themselves were certain to (and did) force the Fund to run up against regulatory limits on USO's holdings and undermine the Fund's investment strategy. ¶¶12, 143, 146, 150, 165, 169.

Instead of disclosing these facts, Defendants assured investors in the Registration Statements that USO invests only in oil-related investments and futures contracts, that "are traded in sufficient volume to permit the ready taking and liquidation of positions" and "may be readily liquidated." ¶166. But these assurances only further misled investors of the true circumstances impacting the Fund at the time. Moreover, Defendants' argument that these purported disclosures do not represent that USO's investments were highly liquid "such that the price of these sales would be unaffected by periods of relative illiquidity" is misplaced. Def. Mem. at 26. Plaintiff does not allege that USO's investments were unaffected by illiquidity or that its investments could not "be negatively affected by liquidity constraints." *Id.* Rather, Plaintiff alleges that USO's extreme market concentration *already* caused severe market distortions and illiquidity that would cause further damage as billions of dollars' worth of WTI futures contracts flooded the market. ¶¶166-69.

---

[9] Defendants issued 400 million USO shares in the February Offering, representing almost four-and-a-half times the amount of outstanding shares at the end of 2019. ¶71. In the March Offering, Defendants issued another 1 billion USO shares, which, together with the February Offering, increased the number of outstanding USO shares over year-end 2019 by more than *1,500%*. *Id.*

And while the Registration Statements mentioned applicable regulatory accountability levels and position limits, they failed to disclose, that at the time of the Offerings, USO was already approaching the regulatory thresholds and that simply investing the proceeds of the Offerings in near month futures contracts alone would guarantee USO to run up against regulatory limits following the March Offering, thus preventing it from readily taking and liquidating its positions.[10] That USO told investors generally that it had "discretion to diversify USO's investment portfolio by investing in WTI futures contracts with later expiration dates" (Def. Mem. at 30), was simply insufficient to apprise investors "that USO was [in fact] approaching these limits or that the necessary positional growth caused by the March Offering itself would result in the Fund running afoul of regulators, thereby jeopardizing the Fund's entire investment strategy and undermining its investment objective." ¶167; *see Dodona I, LLC v. Goldman, Sachs & Co.*, 847 F. Supp. 2d 624, 647 (S.D.N.Y. 2012) ("a plaintiff can overcome risk disclosure statements and cautionary language 'if the language did not expressly warn of or did not directly relate to the risk that brought about plaintiffs' loss'").

Moreover, while Defendants claim that "USCF did not switch from passive to active management when it diversified USO's holdings as disclosed" (Def. Mem. at 31), the notion that USO simply chose to "diversify" its holdings beginning in mid-April 2020 and that it had adequately warned of the purported diversification is misleading at best. In truth, as the CAC alleges, the

---

[10]     Defendants mistakenly argue that the CAC's citations to "speculative, unattributed commentary does not meet the pleading requirements of *Twombly* and *Iqbal*." Def. Mem. at 30 n.13. While Defendants cite only two purported instances of unidentified sources in Plaintiff's 103 page complaint, Defendants ignore the other repeated references to **identified** sources throughout the CAC. *See, e.g.*, ¶¶61, 77, 86, 101, 106, 110, 112. In any event, "at this stage of the proceedings, the Court must accept the factual allegations contained in [such articles] as sufficiently reliable as a factual source for Plaintiff's allegations." *McIntire v. China MediaExpress Holdings, Inc*., 927 F. Supp. 2d 105, 124 (S.D.N.Y. 2013) (upholding allegations of false and misleading statements based in part on evidence including *Seeking Alpha* article); *see also In re McKesson HBOC, Inc. Sec. Litig*., 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000) ("Some defendants appear to argue that the newspaper articles should be discounted because they are hearsay. This objection is not well-taken, . . . plaintiffs are only required to plead facts, not to produce admissible evidence.").

radical overhaul that the Fund was forced to undergo in the span of only a few weeks "changed [USO] from a passive investment vehicle used to track the spot price of oil through front month WTI futures contracts to what was ***effectively*** an actively managed fund frantically struggling to avoid a total implosion and satisfy concerned regulators through a hodgepodge of oil-related investments." ¶125. Indeed, USO was forced to abandon its investment strategy and even admitted in an April 30, 2020 Form 8-K that the Fund now suffered "***significant deviations***" from its claimed investment objective due to its inability to invest entirely in the near months WTI futures market – an outcome resulting directly from the Fund's outsized position in the WTI futures market. *Id.* In truth, the Fund's stated investment strategy and objective were never feasible at the time of the Offerings, and Defendants' representations highlighting these purportedly core aspects of the Fund in order to solicit investment in the Offerings were materially false and misleading when made. *Id.*[11]

Defendants point to a host of disclosures that they argue adequately warned investors of the risks associated with illiquidity and the Fund's positional concentration. But without being able to cite a single instance in which any of the adverse facts alleged in the CAC were ever disclosed to investors, Defendants' arguments fail. They cite, for example, the disclosures that "[c]ertain of USO's investments ***could*** be illiquid, which ***could*** cause large losses to investors ***at any time or from time to time***" and "[t]he large size of the positions that USO ***may*** acquire increases the risk of illiquidity." Def. Mem. at 24-25. But these disclosures were insufficient to "illuminate the magnitude of the risk" associated with the extreme concentration of the WTI near futures market that USO had already acquired by the time of the March Offering and that had ***already*** caused

---

[11] For these reasons, the March Registration Statement's assertion that USO was "not actively managed" but instead employed a "'neutral' investment strategy" that simply "track[s] changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down" was misleading, particularly given that Defendants' actions in growing the Fund through the Offerings were directly responsible for transforming USO into an investment that in no way resembled a passively managed investment vehicle. ¶¶164-165.

considerable market distortion, including, *e.g.*, significant illiquidity, heightened volatility and divergent correlations in key performance metrics that would be exacerbated by the March Offering and position USO to run afoul of regulatory limits, causing massive investor losses. *In re Direxion Shares ETF Tr.*, 279 F.R.D. 221, 232 (S.D.N.Y. 2012) (denying motion to dismiss where ETF's purported risk disclosures were offset by then-existing contra-indicators). Indeed, the disclosure that USO "may acquire" large positions that could "increase [] the *risk* of liquidity" and "*potentially*" cause increased losses (Def. Mem. at 25) itself suggested that there was only a mere *possibility* of illiquidity and increased investor losses when USO *at the time* was suffering from acute illiquidity as it approached impending regulatory limits. *See* ¶¶166-169.

Defendants' reliance on *In re Proshares Trust II Securities Litigation*, 2020 WL 71007, at *7 (S.D.N.Y. Jan. 3, 2020), in arguing that a reasonable investor would have understood that "USO's large positions in WTI futures contracts could affect market liquidity, the Fund's ability to trade at favorable prices, and investor losses," is misplaced. Def. Mem. at 25-26. While the registration statement at issue in *Proshares Trust II* contained similar disclosures to those included in the Registration Statements here, the court concluded that the "primary omission" alleged by plaintiff was "that the late-afternoon rebalancing of the Fund's portfolio *could cause illiquidity* in the VIX futures contract market." 2020 WL 71007, at *7. But Plaintiff here does not allege the Registration Statements simply failed to disclose the *possibility* that Defendants' conduct could cause illiquidity; rather, Plaintiff alleges that by the date of the Offerings, the Fund was already suffering from significant illiquidity, heightened volatility and the break-down of key metrics that were sure to be exacerbated as Defendants issued billions of dollars' worth of USO shares during the Class Period.[12]

---

[12]    Moreover, *Proshares Trust II* is factually distinguishable in that the initial registration statement and prospectus at issue there were filed in May and July 2017, respectively, while the near collapse of the exchange-trade product at issue – SVXY – did not occur until February 2018, nearly *7 months later*. 2020 WL 71007, at *2-*3. Here, by contrast, the proximity in time between

*See Reserve Fund*, 732 F. Supp. 2d at 323 ("information concerning . . . the Fund's resulting liquidity crisis – information that contradicts or undermines Defendants' assurances as outlined in the Complaint . . . was 'apparent, or should have been apparent' . . . at the time the alleged false statements and omissions took place").

> **b.** **The CAC Adequately Pleads Misrepresentations and Omissions Regarding Structural Defects in the Fund and a Breakdown in Market Fundamentals Impacting the Fund's Performance and Ability to Achieve its Investment Objective**

The CAC alleges that, in addition to growing the Fund by billions of dollars and acquiring dangerously large positions in the WTI near months futures markets, USO also suffered from inadequately disclosed impacts from: (i) heightened detrimental contango effects and a rare super contango market dynamic; and (ii) the extreme divergence of the price of USO shares from its per share NAV and other tracking failures that undermined the Fund's stated investment strategy and objective. ¶¶87-106, 143, 145-147, 150-156, 159-165. Defendants, not surprisingly, argue in response that the risks associated with these structural defects were adequately disclosed to investors. But without disclosing any of the adverse material ***facts*** detailed in the CAC associated with these impacts, Defendants' argument fails.

For example, Defendants contend that they "fully disclosed the risks posed by USO's large trades in a contango environment." Def. Mem. at 26-28. To support this untenable argument, Defendants cite to various disclosures in the Registration Statements that they claim "warned of the resulting ***potential*** of investor losses from pursuing the Fund's strategy during contango," including "that the Fund's large monthly rolling trades in that environment ***could*** exacerbate those effects,"

---

Defendants' wrongful conduct and the near collapse of USO played out over the course of a significantly compressed time period. USO completed its second offering on March 23, 2020 in the midst of significant market turmoil and structural deficiencies which ultimately led to the May 2020 WTI futures contract closing at a negative price for the first time in history ***less than a month later*** (on April 20, 2020) due in large part to the selling panic induced by the Fund dumping billions of dollars' worth of the contract during its April roll.

that "'contango' *may* increase USO's tracking error and/or negatively impact total return" and that it was "*likely* that the relationship between the market price of USO's shares and changes in the spot prices of light, sweet crude oil will continue to be impacted by contango." *Id*. at 27-28.

Despite these hypothetical discussions of contango, the March Registration Statement failed to adequately disclose both the harmful effects from the "super contango" dynamic (an abnormally high level of contango) that the Fund was *already* suffering at the time of the March Offering and the underlying causes of the super contango environment that USO itself was fueling through the Fund's continued growth as a result of the Offerings. By the time of the March Offering, the super contango dynamic between near month and next month contracts rose to approximately *6.7 times* the five-year historical average, with even more extreme contango between front month and later-month contracts. ¶162. Instead of revealing these adverse facts, USO falsely assured investors in the March Registration Statement that "[p]eriods of contango . . . *do not materially impact USO's investment objective*" because contango and backwardation (where near month futures contracts trade a higher price than later month futures contracts) tend "to *equally* impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract." ¶161. But rather than being equally impacted by backwardation and contango, or worse, that the market environment in which the Fund was operating at the time was experiencing significant backwardation as depicted by charts in the March Registration Statement reflecting recent historical performance through the end of 2019 (¶¶161-162),[13] the Fund was in fact suffering from *extreme* super contango effects that had already caused and would continue to cause significant investor losses. ¶¶82, 88-95; *see Jianpu Tech.*, 2020 WL 5757628, at *12 (disclosures "framed as mere hypotheticals . . . imply that the risk [] is a theoretical one, rather than . . . a risk that has already materialized in the marketplace").

---

[13] Defendants did not include in the March Registration Statement any of the contango trends since December 31, 2019, including the alarming contango dynamic in the weeks and days leading up to the March Offering. ¶¶82, 88-95.

Moreover, the March Registration Statement never disclosed that USO itself was contributing to the contango dynamic by flooding the market with billions of dollars of WTI futures contracts untethered to physical delivery, and that USO's continued growth was certain to accelerate these effects. ¶¶89, 162-63. This exacerbated the market instability and caused investor losses, resulting in egulatory intervention and the complete overhaul of USO's investment objective, thus rendering the statement that "[p]eriods of contango . . . do not materially impact USO's investment objective," false and misleading.[14]

In addition to the misrepresentations and omissions about the adverse consequences from contango that the Fund was experiencing, the March Registration Statement misrepresented various tracking failures that undermined the Fund's stated investment strategy and objective. For example, the March Registration statement highlighted that USO had been "designed to permit investors generally to purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-effective manner." ¶153 ("[i]nvestors may choose to use USO as a means of investing indirectly in crude oil"). Consistent with this goal, the March Registration Statement assured investors that "market arbitrage opportunities *will* cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis," and that because the daily changes in prices of the Benchmark Contract have historically tracked daily spot oil prices, "the net effect of these relationships *will* be that the daily changes in the price of USO's shares . . . *will* closely track[] the daily changes in the spot price" of

---

[14]    Defendants argue that the CAC has no plausible explanation for "why the April 20 negative price of May WTI futures is relevant in any way whatsoever to the Fund or investor losses" because it transitioned from May to June WTI futures contracts by April 13, 2020 and thus no longer owned May WTI futures contracts on April 20, 2020. Def. Mem. at 29. The CAC makes clear, however, that Defendants' own conduct contributed heavily to the April oil crash as the April roll and resulting heavy selling that ensued "helped set the table for th[e] week's chaos" because, for example, "[e]ven if the rolling process doesn't immediately drive down crude prices, the large number of transactions involved can contribute to additional price swings," as *The Wall Street Journal* reported. ¶95.

oil. *Id.*[15]  The truthfulness of these representations was materially important to investors because if USO's share price exceeded its per share NAV price the Fund's investors would pay more for the shares than they were worth.  But in the lead up to, and at the time of the March Offering, and in stark contrast to the representations about USO's investment purpose and tracking correlation, USO suffered from ***extreme*** divergence of the price of USO shares, its per share NAV and the price of the Benchmark Contract.

For example, by March 13, 2020, USO closed at a 4.63% premium to NAV – 59 basis points above the highest premium over the prior five years and significantly higher than the five-year historical average of -.0018%.  ¶¶97, 155.  By March 18, 2020, the premium exploded to 9.14% – the highest price premium ***ever*** – signaling a dangerous divergence from historical norms and indicating severe structural deficiencies in the Fund.  ¶97.  Instead of revealing these materially adverse facts, the March Registration Statement provided investors with the Fund's historical premium over its NAV per share ***only*** through December 31, 2019, claiming that the maximum premium since the Fund's inception was 6.75% and downplaying the threat of continued volatility by attributing any rare instances of divergence between USO's per share NAV and market price to, *e.g.*, differences in timing between market hours for the NYSE and NYMEX exchanges.  ¶155.  Additionally, the March Registration Statement claimed that the "average daily difference" between USO's per share NAV and the price of the Benchmark Contract was -.001%, highlighting an almost perfect correlation since the Fund's inception despite the Fund experiencing significant divergence in these metrics in the time period leading up to the March Offering.  ¶¶103, 151.

---

[15]    While the March Registration Statement attempted to qualify the statement about USO's market price correlation with the per share NAV by asserting that "there can be no assurance of that" (Def. Mem. at 15 n.9), the tracking statements, viewed together and in context, were clear – the daily changes in USO's per share price were designed to, and did in fact, closely track the daily changes in USO's per share NAV and daily changes in spot oil prices.

Defendants' "correlation risk" disclosures in the March Registration Statement failed to adequately warn investors about the true nature of USO at the time of the March Offering. Def. Mem. at 31. Indeed, stating that USO's share price "*may* not" correlate with the spot price of crude oil, USO's NAV or the changes in the Benchmark Contract without apprising investors that the Fund was in fact experiencing significant deviations in these metrics at the time of the March Registration Statement, and that the divergences were due in large part to Defendants' own actions in issuing 1.2 billion USO shares through the Offerings, failed to apprise investors of the "whole truth," as required. *Jinkosolar*, 761 F.3d at 250. ¶156. As a result, the daily changes in USO's share price did not "closely track," and had materially diverged from, the daily changes in the Fund's NAV per share, as well as the daily changes of WTI near month futures and spot oil prices in several days leading up to the March Offering. ¶155. Moreover, USO was *not* a cost-effective means to invest, even indirectly, in crude oil. Rather, it was an incredibly expensive and highly risky means of investing in WTI futures contracts that guaranteed investors would suffer substantial losses due to the NAV premium and other structural deficiencies and negative impacts affecting the Fund. *Id.*[16] The SEC apparently agreed with this assessment when, following the end of the Class Period, it required USO to prominently state – *on the cover page of its prospectus* – that the Fund "**IS NOT A PROXY FOR TRADING DIRECTLY IN THE OIL MARKETS**" (¶136) (emphasis in original), a stark rebuke of the assertion that USO was a "cost-effective way to invest indirectly in crude oil." ¶¶143, 153.

---

[16] While Defendants point to the purported warning that investors "may not be able to use USO as a cost-effective way to indirectly invest in crude oil" (Def. Mem. at 31), they omit the qualifying clause to the disclosure – "*if* these correlations do not exist" (RS 6) – which is worded in hypothetical language and stands in stark contrast to both the Fund's stated design directly to the contrary ("USO's investment strategy is designed to provide investors with a cost-effective way to invest indirectly in crude oil") (RS 9) and the material adverse facts existing at the time of the March Offering. ¶¶60-135; *see Jianpu Tech.*, 2020 WL 5757628, at *11.

Finally, Defendants ***completely*** fail to address Plaintiff's argument that the historical investment returns provided in the March Registration Statement were materially false and misleading. ¶¶159-160. They have, therefore, conceded these allegations. *See, e.g.*, *CVS Pharmacy, Inc. v. Press Am., Inc*., 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019) ("a party may be deemed to have conceded an argument by failing to address it in its briefing").[17] Any attempt to address these allegations for the first time in Defendants' reply should be rejected. *See Playboy Enters., Inc. v. Dumas*, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997) ("Arguments made for the first time in a reply brief need not be considered by a court."), *aff'd*, 159 F.3d 1347 (2d Cir. 1998); *see also Kenney v. Clay*, 172 F. Supp. 3d 628, 639 (N.D.N.Y. 2016) ("It is ***well settled*** that a district court is free to disregard argument raised for the first time in reply papers.").

Any future attempt to refute these allegations, should the Court choose to consider them, should also be rejected. The CAC alleges that the March Registration Statement highlighted USO's ***33.26% total return*** for the year ending December 31, 2019 and that the worst monthly draw down in the Fund's history was a 22.11% loss. ¶¶159-160. But at the time of the March Offering, USO was in fact suffering the worst monthly draw down in history in March 2020 – a ***54.7% loss*** – and had suffered a ***$225 million realized trading loss*** on its futures contracts in February 2020, which was not disclosed until several days ***after*** the March Offering. *Id*. Thus, Defendants' statements and omissions regarding its historical performance were false and misleading as, at the time of the March Offering, the Fund was suffering losses far in excess of any pre-2020 precedent by hundreds of millions of dollars. *See Facebook*, 986 F. Supp. 2d at 513 (where "Facebook was aware of the material negative impact on Facebook's revenues the Company had suffered as a result of increasing

---

[17]    *See also Gustavia Home, LLC v. Hoyer*, 362 F. Supp. 3d 71, 86 (E.D.N.Y. 2019) ("a party 'concedes through silence' arguments made by its opponent that it fails to address"); *Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 187 (2d Cir. 2015) ("given their failure to address [the argument] . . . the district court assumed that Defendants conceded that issue").

mobile usage and the Company's product decisions ten days before the IPO[,] [t]hat Facebook identified the trend intra-quarter is of no issue . . . Defendants were required to disclose the issues even though it arose intra-quarter").

> ### c. The CAC Adequately Pleads Misrepresentations and Omissions Regarding Undisclosed Material Impacts from Then-Existing Extreme Turmoil in Global Oil Markets

The Registration Statements also contained misleading statements of material facts and omitted material facts by failing to apprise investors of the material threats and adverse impacts from COVID-19 and the Saudi/Russia oil price war that erupted in early March 2020 and converged with a growing oil storage crisis to create intense turmoil in oil markets.  For example, the February Registration Statement failed to make any mention of COVID-19 at all, let alone provide any specific adverse impacts to USO associated with the developing pandemic despite the fact that the economic responses to COVID-19 had *already* presented known material adverse events that were impacting the Fund's performance and were expected to continue to adversely impact the Fund in the imminent future, including heightened volatility in the WTI futures markets as a result of the sharp reduction in demand for oil.  ¶¶140-141.  Any doubts about the seriousness of the adverse impacts from COVID-19 vanished by the time of the March Offering (¶¶60-62, 67), but the March Registration Statement simply mentioned the pandemic in a boilerplate risk disclosure regarding general "[e]conomic conditions impacting crude oil" that was otherwise identical to USO's past statements.  ¶147.[18]  This bare mention gave investors the false and misleading impression that COVID-19 did not present any existential threats to USO other than those impacting crude oil

---

[18]     To be sure, Plaintiff does not allege that Defendants should have predicted the severity of COVID-19.  However, at the time of the Offerings, the seriousness of the pandemic was already known such that, if it was not adequately disclosed (or disclosed at all), it was reasonable for investors to conclude that it would not materially impact the Fund's performance.

generally, despite the adverse impact that COVID-19 had in conjunction with other material adverse events impacting the Fund in the run-up to the March Offering. ¶148.[19]

In response, Defendants contend that the Registration Statements' risk disclosures about general economic conditions that "*may* adversely impact the demand for crude oil," along with "non-exhaustive examples of '[e]conomic conditions impacting crude oil'" provided investors with adequate knowledge of the risks facing the Fund at the time of the Offerings. Def. Mem. at 33-35. But Defendants' later disclosures, including in the April Registration Statement filed just weeks after the March Offering, made clear that COVID-19 was a severe and destructive force that had adversely *impacted* the Fund by at least March 2020. ¶126 (referencing March 2020 declaration of the WHO declaring COVID-19 a pandemic in separate disclosure dedicated to the "COVID-19 Risk"); *id.* (detailing risks posed by the response to the outbreak that could "affect the value, volatility, pricing and liquidity of some investments" and explaining that, *e.g.*, those risks could "negatively impact the USO's performance and your investment in USO"). Defendants' citation to *Charter Township of Clinton Police & Fire Retirement System v. KKR Financial Holdings LLC*, 2010 WL 4642554, at *18 (S.D.N.Y. Nov. 17, 2010), is misplaced. Plaintiff does not criticize the Registration Statements' risk disclosures for failing to "'predict the precise manner in which the risks will manifest themselves,'" as in *Charter Township*. *Id.* Rather, the material adverse impacts to the Fund from COVID-19 and the Saudi/Russia price war had *already* affected USO at the time of the February and/or March Offerings such that the failure to disclose the ongoing and continued

---

[19]    For similar reasons, Defendants' mere reference to *potential* risks posed by "conflict between oil-producing nations" (Def. Mem. at 34) – *i.e.*, failing to mention the Saudi/Russia oil price war at all – when it had been raging for several weeks at the time of the March Registration Statement, was false and misleading and failed to apprise investors of the ongoing threat to the Fund from the dispute.   In particular, and as later revealed *following* the Offerings, the dispute, along with extraordinary market conditions that had caused investors to suffer billions of dollars in losses, had materially impacted the Fund by "*the beginning of March 2020*" – *i.e.*, well in advance of the March Offering – despite the fact that these specific impacts and threats to the Fund's performance were omitted from the March Registration Statement.   ¶¶132, 134.

impacts from these extreme market events violated Defendants' disclosure duties under the securities laws.

## B. Defendants Violated the Affirmative Disclosure Obligations Imposed by Items 303 and 105

Defendants were also obligated to provide investors with certain disclosures about the events, trends and uncertainties associated with an investment in USO under Items 303 and 105 of SEC Regulation S-K. ¶¶170-177. Item 303 requires a company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. §229.303(a)(3)(ii).[20] Item 105 (formerly Item 503) requires, in the "Risk Factors" section of registration statements and prospectuses (as well as in an issuer's periodic filings), "a discussion of the most significant factors that make an investment in the registrant or offering speculative or risky" and requires each risk factor to "adequately describe[] the risk." 17 C.F.R. §229.105. "Item [105] has no knowledge requirement." *Jianpu Tech.*, 2020 WL 5757628, at *10.

The CAC alleges that Defendants' failure to disclose the converging adverse events, trends, uncertainties and breakdown in market fundamentals that were then adversely impacting the Fund, including how Defendants' own activities in managing the Fund and in conducting the Offerings exacerbated these impacts, violated Item 303 because these undisclosed facts were known to Defendants and were then having (and would continue to have) a material impact on USO's financial condition. ¶¶11-13, 66, 68, 141, 145, 174. The CAC also alleges that Defendants violated Item 105 because these specific risks were not adequately disclosed, or even disclosed at all, even though they

---

[20] Item 303 "imposes a disclosure duty 'where a trend, demand, commitment, event or uncertainty is both [1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial condition or results of operations.'" *Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 681 F.3d 114, 120 (2d Cir. 2012). Plaintiffs asserting a claim under Item 303 need only allege facts sufficient to support a "plausible inference" of actual knowledge. *E.g.*, *Medina v. Tremor Video, Inc.*, 640 Fed. App'x 45, 48 (2d Cir. 2016).

were some of the most significant factors that made an investment in USO speculative or risky. ¶¶175-177. While the Registration Statements acknowledged the materiality of certain categories of potentially adverse risks, they failed to disclose the most significant adverse events that were already then occurring, instead copying risk discussions from past USO offerings verbatim without materially updating (or updating at all) relevant disclosures despite the materially adverse impacts to the Fund resulting from newly-developed events, trends and uncertainties. ¶¶60-138.

Defendants argue that they are not liable under Items 303 and 105 because: (i) the Registration Statements' disclosures "'included ample warning' of the impact of all of the risks outlined in the CAC"; and (ii) the CAC fails to plead that the developing risks could have established a "trend" that required disclosure. Def. Mem. at 45. First, as detailed above, the purported risk disclosures in the Registration Statements were inadequate because they omitted materially adverse *facts* necessary to make those purported disclosures not misleading. *See Jianpu Tech.*, 2020 WL 5757628, at *11; *supra* §IV.A.4. Indeed, the Registration Statements offered only generic, boilerplate discussions of future *potential* adverse impacts to the Fund that "may" or "could" occur if general categories of contingent circumstances later developed, while failing to disclose that *any* of the extreme adverse events, trends and uncertainties identified in the CAC were *already* affecting the Fund, providing contra-indicators that undermined the purported contingencies and having a material impact on the Fund's financial condition and performance. For example, the March Registration Statement stated that the "public trading price at which an investor buys or sells shares . . . *may* be different from the NAV of the shares," without disclosing that USO had suffered the highest price premium in its history on March 18, 2020 (9.14%) – just five days before the March Offering – and a premium greater than the highest premium recorded during the prior five years on three of the six

days leading up to the March Offering such that the Fund's trading price – by the time of the offering – had repeatedly been materially different from its NAV per share. ¶¶97, 155, 176.[21]

Second, Defendants' argument that there was no "trend" that required disclosure ignores that the disclosure obligation under Item 303 extends beyond "trends" and includes "uncertainties" and "events." SEC's Interpretive Release on Item 303, dated May 18, 1989 (available at 1989 WL 1092885, at *4) (disclosure duty exists "where a trend, demand, commitment, ***event or uncertainty*** is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation"); *see also Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc*., 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (quoting same). Defendants cannot focus only on "trends," while ignoring "uncertainties" and "events." Moreover, Defendants' suggestion that Plaintiff failed to plead a "trend" because the CAC's allegations concern too short of a time period should be rejected because "'whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage.'" *Id.* (quoting *In re CPI Card Grp. Inc. Sec. Litig*., 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017)).[22] Defendants' "duty under Item 303 was triggered before the Registration Statement became effective," and because they were "aware of the material negative impact on [USO's] revenues the [Fund] had suffered as a result of" the material adverse trends, events or uncertainties before the

---

[21] *See also, e.g*., ¶80 (15-day WTI front month volatility increasing nearly ***three-fold*** over prior two-year peak by March 19, 2020, despite warning that certain variables ***may*** "'create additional investment risks that subject USO's investments to greater volatility than investments in traditional securities'" (Def. Mem. at 16; RS 11)); ¶90 (contango jumping to ***6.7 times*** the five-year historical average by March 23, 2020, despite warning that periods of contango "'***may*** increase USO's tracking error and/or negatively impact total return'" (Def. Mem. at 12); ¶77 (USO's positional concentration of WTI near months futures contracts growing to ***15% of the entire market*** by mid-March 2020, despite warning that "'[t]he large size of the positions that USO ***may*** acquire increases the risk of illiquidity both by making its positions more difficult to liquidate and by ***potentially*** increasing losses while trying to do so'" (Def. Mem. at 11)). For these reasons, Defendants' citation to *Stadnick v. Vivint Solar, Inc*., 861 F.3d 31, 36 (2d Cir. 2017), is inapposite.

[22] For this reason, Defendants' cited authorities in which the alleged trends playing out over particular time periods did not require disclosure are inapposite. Def. Mem. at 45.

March Offering, "Defendants were required to disclose the issues even though [they] arose intra-quarter." *Facebook*, 986 F. Supp. 2d at 513.

## C.     The CAC Does Not Employ Hindsight Pleadings

In a strained attempt to misrepresent the well-plead allegations in the CAC, Defendants argue that Plaintiff alleges, in hindsight, that "Defendants should have predicted in advance and further detailed the 'specific impacts' that market developments would have on USO 'during the class period.'"  Def. Mem. at 39.  But rather than relying on "'20/20 hindsight'" and alleging that Defendants did not "'anticipate[] future events'" or "predict the 'precise manner' in which [Defendants'] risk might manifest itself" (*id*. at 40), the CAC alleges that by the start of the Class Period and at the time of Defendants' false and misleading statements, adverse market dynamics and Defendants' own actions had converged to create materially adverse trends and uncertainties that threatened the firm's very existence.  ¶¶61-135.  These adverse facts, trends and uncertainties were not disclosed, or were inadequately disclosed, to investors, effectively reassuring them at the time of the Offerings that USO was as risky as it had always been.

The CAC does not contend that Defendants were required "to predict and disclose all possible negative results across any market scenario" (Def. Mem. at 39-40), as in *In re ProShares Trust Securities Litigation*, where the plaintiffs alleged, according to the court, that defendants should have disclosed predictions made by "an undisclosed mathematical formula," showing the performance of "(1) hypothetical investments over (2) hypothetical periods of time during (3) hypothetically volatile market conditions."  728 F.3d 96, 104-05 (2d Cir. 2013).  Likewise, since the CAC does not attempt to hold Defendants liable for failing to predict something that later materialized, the additional fraud-by-hindsight cases they cite are inapplicable.  *See, e.g.*, *In re Express Scripts Holdings Co. Sec. Litig.*, 773 F. App'x 9, 15 (2d Cir. 2019) ("[d]efendants could not have known . . . negotiations . . . would ultimately fail"); *In re TVIX Sec. Litig.*, 25 F. Supp. 3d 444,

452 (S.D.N.Y. 2014) (failure to predict that funds "would become worthless in two years" was not actionable); *Panther Partners, Inc. v. Ikanos Commc'ns, Inc*., 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008) (failure to explain why defendant should have known that "increased ordering from Japanese customers in 2003 and 2004 would somehow inevitably lead to a decrease in ordering in 2006"), *aff'd*, 347 F. App'x 617 (2d Cir. 2009).[23]

Because the CAC alleges Defendants failed to disclose **then-existing materially adverse facts**, the Court should "reject [Defendants'] incantation of fraud-by-hindsight[.]" *In re Salix Pharms., Ltd.*, 2016 WL 1629341, at *17 (S.D.N.Y. Apr. 22, 2016).[24]

**D.** **Publicity of General Market Conditions and the Availability of Limited Market Data Did Not Absolve Defendants of Their Duty to Disclose Material Facts Adversely Impacting the Fund**

Defendants contend the fact that "[i]nvestors – along with the rest of the world – had ready access in real time to the day-to-day market data and the developments that transpired in early 2020" supports their conclusion that "[t]he securities laws do not require defendants to update their disclosures to provide this publicly available information." Def. Mem. at 35. This is false and,

---

[23]    *See also Charter Twp*., 2010 WL 4642554, at *18 (failure to predict precise manner in which financing risk might manifest itself); *In re Britannia Bulk Holdings Inc. Sec. Litig*., 665 F. Supp. 2d 404, 408 (S.D.N.Y. 2009) (alleged problems began after the offering at issue); *Rubinstein*, 457 F. Supp. 3d at 298 n.7 ("Defendants were not required to *project* future volatility spikes and predict their effect on the value of the ZIV ETNs.") (emphasis in original).

[24]    Defendants' contention that the CAC takes "numerous contradictory positions that undermine its plausibility" (Def. Mem. at 40) ignores the CAC's context in an effort to muddy the CAC's allegations. For example, Defendants claim that "the CAC laments both that USO *offered shares* in February and March and that it *ran out of shares* in April." *Id*. (emphasis in original). Defendants ignore, however, Plaintiff's allegations that the Registration Statements failed to disclose that the Offerings themselves all but guaranteed that the Fund would run up against regulatory limits. ¶12. That USO ran out of shares in April was thus a result of Defendants' own misconduct. ¶117. Defendants claim that "[t]he CAC also faults Defendants for diversifying USO's holdings in response to the imposition of regulatory limits[] while contradictorily faulting Defendants for failing to 'limit the market turmoil' until required." Def. Mem. at 40. But the imposition of regulatory limits requiring Defendants to diversify their holdings was also a result of Defendants' own actions in rapidly growing the Fund during the Class Period. ¶125. Thus, these positions are entirely consistent and Defendants' cited cases suggesting otherwise are irrelevant.

further, misses the point. Plaintiff alleges that the Registration Statements omitted material facts and threats impacting the Fund, and contained risk disclosures that were nearly identical to prior offering materials despite the fact that the previously discussed material adverse trends, events and uncertainties were having *present* and significant adverse impacts on the Fund.

Defendants' contention that "defendants are not required to disclose data that is otherwise readily publicly available to investors" is further misplaced. Def. Mem. at 35; *New Jersey Carpenters Health Fund v. Royal Bank of Scotland Grp., PLC*, 709 F.3d 109, 127 (2d Cir. 2013) ("'case law does not support the sweeping proposition that an issuer of securities is never required to disclose publicly available information'"). Defendants' citation to *Set Capital LLC v. Credit Suisse Group AG*, 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019), illustrates precisely why Defendants' disclosures here were inadequate. In *Set Capital*, the court held that "the previous spikes in volatility *and* their effect on the VIX Futures Index were public information readily available to investors." *Id*. at *4. Here, however, while certain market events were publicly reported and certain data metrics were publicly available, the actual and potential impact of the material adverse trends, events and uncertainties on the Fund, both individually and collectively, were uniquely known to Defendants and *not* adequately disclosed. ¶68.[25] *See Jianpu Tech*., 2020 WL 5757628, at *13 ("Acknowledging that the laws and regulations were publicly available, Jianpu did not disclose the existence and extent of violations of those laws and regulations by financial service providers operating on its platform, or the possible impact of those violations on Jianpu's future business."); *see also Litwin*, 634 F.3d at 718–19 (rejecting argument that "facts [were] publicly known at the

---

[25]     Defendants' citation to *Lindstrom v. TD Ameritrade, Inc.* is inapposite. In *Lindstrom*, plaintiff was not suing an issuer but TD Ameritrade Futures & Forex (TDAFF), with whom he simply had a brokerage account. 2020 WL 7398792, at *1 (N.D. Ill. Dec. 17, 2020). As the court aptly explained: "[t]he problem for Lindstrom is that he fails to identify any duty that TDAFF owed to Lindstrom to inform him of market trends." *Id.* at *3.

time of the IPO" and explaining that the "potential future *impact* was certainly not public knowledge") (emphasis in original).

Additionally, as Defendants acknowledge, "issuers have a duty to update statements that were reasonable at the time they were made only if they later 'become[] misleading.'" Def. Mem. at 38 (internal citations omitted). But even if Defendants' statements were reasonable at the time they were made – and they were not – Defendants never updated their disclosures despite the increasingly alarming materially adverse facts that continued to develop. *See, e.g.*, ¶¶74-78, 82-86, 90-92, 98-100, 107-113. Moreover, Defendants' contention that "the securities laws do not impose a duty to disclose changes to the *degree* of disclosed risk where the *nature* of the risks already was fully disclosed" (Def. Mem. at 39) (emphasis in original), rings hollow because "hypothetical warnings will not eliminate liability based on the failure to disclose present knowledge." *Milman v. Box Hill Sys. Corp.*, 72 F. Supp. 2d 220, 231 (S.D.N.Y. 1999).

### E. Plaintiff Has Adequately Pleaded §10(b) Claims Under the 1934 Act

Rule 10b-5, promulgated under Section 10(b) of the 1934 Act, provides that it is unlawful "(a) [t]o employ any device, scheme, or artifice to defraud, (b) [t]o make any untrue statement of a material fact or to omit to state a material fact . . . or (c) [t]o engage in any act, practice, or course of business which operates . . . as a fraud or deceit . . . ." 17 C.F.R. §240.10b-5. As explained in the sections that follow, Plaintiff has adequately pleaded violations of both the false-and-misleading statements provision of Rule 10b-5(b) and the scheme-liability provisions of Rules 10b-5(a) and (c).

#### 1. Plaintiff Has Adequately Pleaded False and Misleading Statements Under Rule 10b-5(b)

Under Rule 10b-5(b), "'a plaintiff must allege that [each] defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate

cause of its injury.'" *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016). Since, as alleged in ¶224, Plaintiff's Rule 10b-5(b) claim is based on the same materially false and misleading statements and omissions as its Section 11 claim, Plaintiff respectfully directs the Court to §IV.A.4 above concerning the falsity element of the claim.

Defendants are mistaken that the additional false and misleading statements made during the Class Period (¶¶178-187), alleged in support of Plaintiffs' 1934 Act claims, "fail as a matter of law," (Def. Mem. at 41), and their arguments are meritless. For example, Defendants contend that the statements on USO's website and in the Fund's factsheet "fail for all of the same reasons" as the statements in the Registration Statement. Def. Mem. at 42. Because Defendants' arguments as to the statements in the Registration Statements are meritless (*see supra* §IV.A.4), the statements on USO's website and in the factsheet are similarly false and misleading for the reasons discussed above. Moreover, Defendants claim that they had no obligation to disclose "the Fund's interim financial condition in early 2020" in the March 20 and 24 Forms 8-K, which disclosed USO's financial condition through December 31, 2019 but omitted current financial trends that the Fund was experiencing that varied widely from the information presented in the Forms 8-K. Def. Mem. at 42. This argument fails for the same reasons discussed above regarding the March Registration Statement, *supra* §IV.A.4.b; *see also Facebook*, 986 F. Supp. 2d at 513 (defendant required to disclose intra-quarter financials where it was "aware of the material negative impact on [defendant's] revenues" ten days before the offering).

Defendants further argue that the financial disclosures in the March Forms 8-K are meritless because, based on the "total mix" of information, "no reasonable investor would have been misled about the nature and risks of the Fund." Def. Mem. at 42. But this argument is a nonstarter as well as there was in fact a "substantial likelihood that the disclosure of the omitted [information] would

have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Burstyn v. Worldwide Xceed Grp., Inc.*, 2002 WL 31191741, at *6 (S.D.N.Y. Sept. 30, 2002). For example, the March 24 Form 8-K highlighted the Fund's 33.26% return for 2019 but failed to disclose that USO was suffering the **worst monthly draw down in the Fund's history** in March 2020 and was on track to lose $1.2 billion by the end of the month. ¶¶160, 184-185. Thus, the statements regarding the Sponsor's and the Fund's historical performance were materially false and misleading because the actual historical performance of the Sponsor and its largest client, the Fund, had radically diverged from the presented trends. *Id.*

The CAC alleges facts – including that the Fund **suffered close to $1 billion in losses by the time of the March Offering** – that were in existence when the statements about the Fund's historical performance were made. ¶¶184-185. Thus, a reasonable investor would have viewed the omitted information as significantly altering the total mix of information available regardless of Defendants' purported disclosures about "sudden total loss" (Def. Mem. at 42), the existence of financial information about USO on its website or other public data and press coverage about general market developments. *See Milman*, 72 F. Supp. 2d at 231 (rejecting defendants' argument that "the securities laws do not require a company to disclose information regarding sales results for a quarter in progress" where the plaintiffs alleged that, prior to the issuer's initial public offering, defendants had knowledge of a trend that had already had a material negative impact on the issuer's net sales).

Defendants also contend that the Registration Statements disclosed the specific risks associated with the Fund's April 16, 2020 and April 22, 2020 changes to its investment portfolio and that they "updated investors in real time." Def. Mem. at 4, 43. In doing so, Defendants assert that "even if Defendants had an obligation to explain investment decisions," they adequately disclosed the specific reasons for the abrupt changes. *Id.* Defendants are wrong because, without revealing

any of the material facts detailed in the CAC, the generalized and hypothetical risk disclosures in the Registration Statements regarding regulatory limits were insufficient. *See Milman*, 72 F. Supp. 2d at 231. Also, once Defendants chose to speak in the April 16, 2020 and April 22, 2020 Forms 8-K regarding the abrupt changes to USO's investment portfolio, they assumed a duty "to tell the whole truth." *Jinkosolar*, 761 F.3d at 250.[26] But Defendants failed to do so. For example, the April 16 Form 8-K stated that "[a]ny investments by USO in crude oil futures contracts will be subject to any applicable limits on such futures contracts as ***may*** be imposed by the NYMEX," and "[t]he foregoing ***may*** impact the performance of USO" (Ex. 5.), despite USO receiving the April 16 CME letter ordering the Fund to limit its front month WTI contract exposure and the fact that the Fund's performance was ***already*** adversely impacted. In fact, the undisclosed April 16 CME letter confirmed that Defendants did not update investors "in real time," signaled a sharp curtailment of the Sponsor's investment discretion and undermined USO's stated investment objective in a way that the April 16 and April 22 Forms 8-K were required to disclose in order to make the statements made therein both accurate and complete, and therefore not misleading.[27]

Finally, Defendants contend that, with respect to the April 21 8-K, the CAC fails to allege how Defendants "even knew or could have known the reason for the SEC's inaction [in failing to declare effective the April Registration Statement for the sale of an additional 4 billion USO shares] – let alone that this information would materially impact the total mix of information

---

[26] *See also In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *4 (S.D.N.Y. Mar. 28, 2018) (duty to tell the whole truth is "in short, a rule against telling 'half-truths'''); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 531 (S.D.N.Y. 2010) "[W]arnings of specific risks . . . do not shelter defendants from liability if they fail to disclose hard facts critical to appreciating the magnitude of the risks described"); *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 583 (S.D.N.Y. 2016) (defendants have an obligation to be accurate ***and*** complete).

[27] For the same reasons, Defendants' contention that the April 16, 2020 Form 8-K's statement that USO would alter its investment allocation "until further notice and market conditions and regulatory conditions permit otherwise" failed to apprise investors of the drastic regulatory restriction imposed on the Fund. Def. Mem. at 43.

available to investors." Def. Mem. at 43-44. In support of this argument, Defendants argue that they "kept investors apprised of all material facts in real time." *Id.* But this assertion is belied by the undisclosed "hard facts" that Defendants omitted during the Class Period. By April 16, the USO Defendants received the first CME letter limiting the Fund's exposure to June WTI futures contracts, which was not disclosed until ***after*** the April 21 8-K was filed. Additionally, USO's only futures commissions merchant sharply curtailed the Fund's ability to invest in front month futures contracts. ¶116. And the CAC alleges that the SEC apparently refused to declare the April Registration Statement effective out of concern for the negative consequences to investors from another massive USO share issuance – a highly plausible conclusion that must be accepted as true at this stage. ¶117. These facts strongly indicate that Defendants knew – but failed to disclose – why the SEC intervened: to prevent Defendants from causing further harm to investors by further inflating the size of the Fund.[28] *Id.* Thus, while Defendants assumed a duty "to tell the ***whole*** truth," they failed to apprise investors of the significance of the SEC's refusal to declare the April Registration Statement effective, which prevented the Fund from issuing any new shares.

Moreover, Defendants' contention that Plaintiff has not alleged that the reasons for the SEC's inaction would materially impact the total mix of information (Def. Mem. at 43-44) is misplaced as "[t]he Second Circuit has repeatedly stated that 'materiality is a mixed question of law and fact,' which should not be decided on a motion to dismiss unless the alleged misstatements or omissions

---

[28] Defendants mistakenly claim that the SEC and CFTC investigations "do not lend any legal support to [Plaintiff's] claims" and that the CAC does not allege how the investigations relate to the challenged disclosures. Def. Mem. at 42 n.17. The CAC alleges that the SEC investigation specifically relates to "the changes made to USO's investment strategy and limits placed upon the Fund by regulators." ¶137. Additionally, Defendants are wrong that the investigations do not lend any legal support to Plaintiff's claims. *See In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) ("Certainly, courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view of the purported facts as they relate to scienter."); *see also Washtenaw Cnty. Emps. Ret. Sys. v. Avid Tech., Inc.*, 28 F. Supp. 3d 93, 115 (D. Mass. 2014) ("Here, the government investigation can be seen as one more piece of the puzzle, a series of circumstances that add up to a strong inference of scienter.").

are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *Menaldi*, 164 F. Supp. 3d at 585 (quoting *JP Morgan*, 553 F.3d at 197). In any event, had Defendants disclosed the known reasons for the SEC's inaction in declaring the registration statement effective, investors would have learned that extraordinary regulatory intervention was necessitated by USO's own market distorting effects. ¶¶115, 117. Thus, the failure to provide the specific reasons for the SEC's inaction is not so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.[29]

### 2. Plaintiff Has Adequately Pleaded Manipulative Acts/Scheme Liability Under Rule 10b-5(a) and (c)

"To state a claim for scheme liability, a plaintiff must present facts showing '(1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance.'" *Menaldi*, 164 F. Supp. 3d at 577. "Because scheme liability 'does not require an allegation that the defendant made a statement,' claims brought under Rule 10b-5(a) and (c) 'need not comport with Subsection (b)(1) of the PSLRA, which requires that a plaintiff set forth each statement alleged to have been misleading, and facts giving rise to this belief.'" *Id.* (quoting *In re Alstom SA Sec. Litig.*, 406 F. Supp. 2d 433, 474-75 (S.D.N.Y. 2005)). As the Second Circuit has held: "a private plaintiff must set forth, 'to the extent possible, what manipulative acts were performed, which defendants performed them, when the manipulative acts were performed, and what effect the scheme had on the market for the securities at issue.'" *City of Providence, R.I. v. Bats Glob. Mkts., Inc.*, 878 F.3d 36, 48 (2d Cir. 2017), *cert. denied sub nom. BATS Glob. Mkts., Inc. v. City of Providence, R.I.*, 139 S. Ct. 341 (2018) (quoting *ATSI Commc'ns,*

---

[29] Defendants' citation to *Bettis v. Aixtron SE*, 2016 WL 7468194 (S.D.N.Y. Dec. 20, 2016), only undercuts their argument. Def. Mem. at 44. In *Bettis*, the court aptly stated that "[t]he real problem with Plaintiff's claim is that, by his own admission, the information that he claims was omitted was public information, equally available to the Defendants and investors alike." 2016 WL 7468194, at *12. Here, as discussed above, Defendants omitted critical information and thus did not tell the whole truth.

*Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 102 (2d Cir. 2007)).  At this juncture, it is sufficient to "merely . . . describ[e] the manipulative acts that had been performed and alleg[e] what role the managing directors generally played in the scheme."  *Guevoura Fund v. Sillerman*, 2016 WL 4939372, at *10 (S.D.N.Y. Sept. 12, 2016).

Plaintiff has satisfied these requirements by pleading that the USO Defendants deceived the investing public regarding USO's business and performance by failing to disclose materially adverse facts then-impacting the Fund, artificially inflated the price of USO shares through their conduct in managing the Fund and caused investors to purchase USO shares at artificially inflated prices. ¶¶207, 209, 216.  The USO Defendants did so by, *inter alia*, issuing the Registration Statements, which omitted critical facts and other information in order to create the false and misleading impression that investing in USO was as risky as it had always been.  The Fund, however, faced a convergence of material, undisclosed events, trends and uncertainties stemming from extraordinary market conditions and Defendants' own efforts to rapidly grow the Fund by taking advantage of increased interest in the oil markets.  The USO Defendants succeeded by growing the Fund into the largest oil-related ETF in the world, increasing the size of USO by more than **930%** and reaping millions of dollars in fees.  This created a dangerous positional concentration in the oil futures markets and caused severe and catastrophic market-distorting effects.  Ultimately, investors suffered billions in losses.  *See, e.g.*, ¶¶2, 8, 12.  The details of this scheme are alleged throughout the CAC, as described above.

*City of Providence*, in which the Second Circuit vacated the dismissal of scheme-liability claims, is instructive.  There, defendants contended that "their alleged conduct was not manipulative or deceptive because it was disclosed to the public. . . ."  878 F.3d at 50.  The plaintiffs responded that the defendants "may have told ordinary investors about the *existence* of proprietary data feeds

and co-location services, but . . . the exchanges did not publicly disclose the full range or cumulative effect that such services would have on the market, the trading public, or the prices of securities." *Id.* (emphasis in original). The Second Circuit agreed with the plaintiffs, acknowledging that "[i]t is true that 'the market is not misled when a transaction's terms are fully disclosed,'" but finding that "there is a contested question of fact as to the extent and accuracy of the disclosure. We must, at this stage, accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of plaintiffs, including that the exchanges failed to disclose or omitted material facts to the investing public concerning these products and services." *Id.* So too here, where Plaintiff alleges that Defendants failed to disclose "the full range or cumulative effect" that Defendants' own conduct in pursuing the Offerings in the midst of significant market turmoil and severe existential threats "would have on the market, the trading public, or the prices of [USO] securities." *Id.*

Defendants' Motion, however, utterly ignores Plaintiff's allegations of scheme liability under Rule 10b-5(a) & (c). *See* Count III, ¶¶224-228; *see also* ¶¶207-208 (referencing the USO Defendants' "fraudulent scheme"), 216 (referencing Defendants' "scheme to deceive"). Having failed to challenge these claims, Defendants cannot now seek their dismissal. *See Dembski v. Sec. & Exch. Comm'n*, 437 F. Supp. 3d 286, 295 (W.D.N.Y. 2020) ("the Second Circuit considers arguments not raised in an appellant's opening brief to be forfeited"); *Estate of Ungar v. Palestinian Auth.*, 451 F. Supp. 2d 607, 611 (S.D.N.Y. 2006) ("[A]s a general rule, courts will not consider arguments raised for the first time in a reply brief"). Thus, on this basis alone, the claim should not be dismissed. In any event, Plaintiff has more than adequately alleged scheme liability.

### 3. Plaintiff Has Adequately Pleaded Scienter

To plead scienter, a complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. §78u-4(b)(2). The requisite scienter can be established by alleging facts showing either that defendants acted with a

"reckless disregard for the truth," *SEC v. Knight*, 694 Fed. App'x 853, 856 (2d Cir. 2017), or that

they had the "motive and opportunity to commit fraud." *JP Morgan*, 553 F.3d at 198. To plead

recklessness, the conduct alleged must be "'highly unreasonable, representing an extreme departure

from the standards of ordinary care to the extent that the danger was either known to the defendant

or so obvious that the defendant must have been aware of it.'" *CILP Assocs., L.P. v.

PriceWaterhouse Coopers LLP*, 735 F.3d 114, 127 n.11 (2d Cir. 2013) (quoting *Gould v. Winstar

Commc'ns, Inc.*, 692 F.3d 148, 158–59 (2d Cir. 2012)). Recklessness may be established by alleging

"[c]ircumstantial evidence [to] support an inference of scienter in a variety of ways, including where

defendants . . . knew facts or had access to information suggesting that their public statements were

not accurate." *Emps.' Ret. Sys. of Gov't of V.I. v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015). To

raise a strong inference via the motive-and-opportunity prong, a plaintiff must allege that the

defendant "benefitted in some concrete and personal way from the purported fraud." *JP Morgan*,

553 F.3d at 198 (internal quotation marks and citation omitted).

"The inference that the defendant acted with scienter" need only be "at least as compelling as

any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues &

Rights, Ltd.*, 551 U.S. 308, 324 (2007). "The inquiry . . . is whether *all* of the facts alleged, taken

collectively, give rise to a strong inference of scienter, not whether any individual allegation,

scrutinized in isolation, meets that standard." *Id.* at 322-23 (emphasis in original). The inference

"need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing

inferences,'" *id.* 322-24, and a tie "goes to the plaintiff." *Sawabeh Info. Servs. Co. v. Brody*, 832 F.

Supp. 2d 280, 295 (S.D.N.Y. 2011).

The CAC adequately alleges scienter because the USO Defendants had direct knowledge of

the aforementioned undisclosed events, adverse trends, and the breakdown in market fundamentals

as a result of their own market-distorting activities while they made false and misleading statements to investors about the Fund and/or omitted material information that was necessary to make their statements not misleading. ¶¶207-215. The USO Defendants – through their roles in creating, managing and operating the Fund, as well as being dominant players in the complex commodities and futures markets impacting the Fund's performance – were uniquely aware of the adverse facts impacting the Fund at the time. ¶¶210-212. Given these facts, the USO Defendants' argument that "Plaintiff asserts no facts whatsoever that could suggest the requisite state of mind" (Def. Mem. at 47) amounts to a claim that they could not see the hands in front of their faces.

### a. Plaintiff Has Adequately Pleaded Conscious Misbehavior or Recklessness

Because of the USO Officer Defendants' positions with the Fund and/or the Sponsor, including as executive officers and principles of the Sponsor – and their access to material non-public information (proprietary market data, sophisticated analytical tools, predictive modelling capabilities) – they would, at a minimum, be reckless in not understanding and recognizing the previously discussed material, undisclosed adverse facts (and their impact on the Fund) detailed in the CAC (¶¶60-138) stemming not only from extraordinary market conditions, but also Defendants' own activities in operating USO. ¶¶208-212. The USO Officer Defendants' positions and access to this information thus provided them with knowledge that their statements were false and misleading.

In contesting the CAC's well-pled scienter allegations, however, Defendants contend that the CAC's "assertion that the USO Defendants are knowledgeable about historical or day-to-day market conditions concerning crude oil or oil futures contracts [] does not support an inference that the subsequent market developments were so obvious that it was reckless for the USO Defendants not to have made additional disclosures." Def. Mem. at 49. But the CAC does not allege recklessness based on the USO Defendants' failure to disclose and predict subsequent unknowable market

developments. Rather, the CAC alleges that the USO Defendants are liable for, at a minimum, recklessly failing to disclose adverse facts actually **_known_** to them about USO that were necessary to make their statements not misleading. ¶207.[30]

By the start of the Class Period, and certainly by the March Offering when the Fund had already been negatively impacted by more severe undisclosed adverse trends and breakdown in market fundamentals that Defendants themselves inflamed through their efforts to rapidly grow the Fund, the USO Defendants "'knew facts or had access to information suggesting that [their] public statements [were] not accurate.'" *Constr. Laborers Pension Tr. for S. Cal. v. CBS Corp.*, 433 F. Supp. 3d 515, 548 (S.D.N.Y. 2020). Indeed, by April 2020, the USO Defendants began acknowledging that certain destructive market dynamics related to, *e.g*., COVID-19, contango, market volatility and the Saudi/Russia oil price war had adversely impacted the Fund early in the Class Period. ¶¶126-134. Thus, Plaintiff does not, as Defendants contend, ask the Court to simply "**_assume_** scienter" (Def. Mem. at 48). Rather, by the USO Defendants' **_own_** later-revealed admissions, these Defendants knew but did not disclose to USO investors their knowledge of material adverse facts impacting the Fund. *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*, 423 F. Supp. 2d 348, 361 (S.D.N.Y. 2006) ("'[A]n egregious refusal to see the obvious . . . may in some cases give rise to an inference of . . . recklessness.'").

Further, the Individual Defendants' signing of the Registration Statements, contrary to Defendants' argument (Def. Mem. at 50), lends further support to the CAC's allegations of scienter.

---

[30] Defendants' citation to *In re UBS AG Securities Litigation*, 2012 WL 4471265, at *16 (S.D.N.Y. Sept. 28, 2012), *aff'd sub nom. City of Pontiac Policemen's & Firemen's Retirement System v. UBS AG*, 752 F.3d 173 (2d Cir. 2014), is inapposite as Plaintiff does not merely allege "general facts" about a "downturn" in the oil markets. *Hart v. Internet Wire, Inc*., 145 F. Supp. 2d 360, 368 (S.D.N.Y. 2001), is likewise distinguishable as Plaintiff does not merely allege that Defendants "ought to have known" of "allegedly undisclosed risks." Rather, when viewed collectively, Plaintiff's allegations sufficiently establish that Defendants knew or were reckless in not knowing the undisclosed facts detailed in the CAC. ¶212; *Tellabs*, 551 U.S. at 310 ("the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically").

*See Alstom*, 406 F. Supp. 2d at 459 (finding the signing of SEC filings containing misrepresentations as support that scienter has been adequately pled); *see also In re Smith Barney Transfer Agent Litig.*, 765 F. Supp. 2d 391, 402 (S.D.N.Y. 2011) (finding the signing of numerous prospectuses as support for a determination of scienter to withstand a motion to dismiss). Defendants' citation to *Tellabs*, 551 U.S. 308, 323–24, is misplaced. *Tellabs* does not address the signing of registration statements or other SEC filings at all. It does, however, discuss the critical inquiry of a court's scienter analysis – "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard" – which, as applied here, supports the CAC's scienter allegations. *Id.* at 310, 323, 326 (emphasis in original).

Additionally, "[t]o fulfill the scienter pleading requirement, a plaintiff may rely on the 'core operations doctrine,' which permits an inference that a company and its senior executives have knowledge of information concerning the 'core operations' of a business." *In re Hi-Crush Partners L.P. Sec. Litig.*, 2013 WL 6233561, at *26 (S.D.N.Y. Dec. 2, 2013). "Core operations include matters 'critical to the long term viability' of the company and events affecting 'a significant source of income.'" *Id.* Here, the core operations doctrine bolsters the inference of scienter because Defendants' misleading statements and omissions concerned critical aspects of USO's business. *See, e.g., Reserve Fund*, 732 F. Supp. 2d at 323 ("The Fund's liquidity crisis . . . went to the Fund's 'core operations' and were of critical importance to the Fund.").

A court must consider the factual allegations of the complaint in their entirety, and take into account only those "plausible opposing inferences" – *i.e.*, plausible nonculpable explanations for the defendant's conduct – that may be "rationally drawn from the facts alleged." *Tellabs*, 551 U.S. at 310, 314. Accordingly, it is Defendants' burden to demonstrate that the allegations give rise to an

inference of nonculpable conduct that is stronger than the inference of scienter. *Id.* Defendants have failed to do so here.[31]

### b. Plaintiff Has Adequately Pleaded Motive and Opportunity

The CAC alleges that the USO Defendants were highly incentivized to induce investors to purchase USO shares by concealing materially adverse facts from them. In addition to the proceeds from the Offerings, the Sponsor and USO Officer Defendants received millions of dollars through their management of the Fund. ¶¶8, 10, 111, 213. During the Class Period, the Sponsor and USO Officer Defendants grew the Fund into the largest oil-related ETF in the world and increased its size by more than **930%**, thereby reaping millions in fees as the Fund's total NAV grew. ¶¶2, 111, 213, 215. Indeed, "courts in this district have found that a desire to generate additional fee income may provide a sufficient motive to commit fraud, particularly where the defendant possesses a personal stake in the business and the fee income." *Reserve Fund*, 732 F. Supp. 2d at 320 (discussing cases); *Heller v. Goldin Restructuring Fund, L.P.*, 590 F. Supp. 2d 603, 620–21 (S.D.N.Y. 2008) (finding sufficient motive where defendants "possessed the unique incentive, as managers of a[n] . . . investment fund in which they possessed a personal financial stake," to attempt to maximize not only their "personal financial investment" but also their "potential receipt of management fees").[32]

---

[31] Despite Defendants' contention that "'[s]cienter must be separately pled and individually supportable as to each defendant'" (Def. Mem. at 50) (quoting *C.D.T.S. v. UBS AG*, 2013 WL 6576031, at *6 (S.D.N.Y. Dec. 13, 2013), knowledge of Defendants' scheme and course of business that operated as a fraud or deceit on purchasers of USO shares "may be imputed to [the Fund's] officers." *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 233 (S.D.N.Y. 2006); *see also Wallace*, 2013 WL 1907685, at *8-*9 (fact that "CEO and CFO . . . would likely remain informed about developments with a crucial part of [the company's] business" provided "additional evidence" of scienter).

[32] *Cf. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 446 F. Supp. 2d 163, 187 (S.D.N.Y. 2006) (acknowledging that "[u]nlike a motive to increase stock prices, shared by all corporate insiders*,* a motive to generate increased fees based on inflated NAV figures would be 'a concrete and personal benefit to the individual defendants resulting from the fraud,'" but determining that the complaint lacked sufficient fee allegations to support motive finding). Thus,

Nonetheless, Defendants dispute the existence of a legally meaningful motive, arguing that the USO Defendants received no concrete personal benefit, and that the profit motivation Plaintiff alleges is insufficient. Def. Mem. at 47. But while all similar corporate entities and actors possess profit motive, the USO Defendants pursued that motive by vastly increasing the size of the Fund in order to reap millions in management fees, while creating a dangerous positional concentration in the oil futures markets and causing investors to suffer billions in losses. Indeed, the Sponsor received approximately $6.3 million in management fees during the first half of 2020 while investors suffered over $2.5 billion in net losses during the same period. ¶¶8, 111, 213. This is roughly the same amount of management fees generated during the entirety of 2019 (when USO reported $473 million in net profit). *Id.* Indeed, USO accounted for more than **50%** of the Sponsor's entire management fees receivable in 2019. ¶24. These allegations are sufficient to establish motive.[33]

Moreover, the Sponsor and USO Officer Defendants could not have received millions in fees in the absence of the materially false and misleading statements and omissions concerning the convergence of material, undisclosed facts stemming from extraordinary market conditions and Defendants' own efforts to rapidly inflate the Fund. *See In re Take-Two Interactive Sec. Litig.*, 551 F. Supp. 2d 247, 294-295 (S.D.N.Y. 2008 ) (finding motive and noting that "[a]lthough the desire to improve a company's earnings in order to bolster one's income or bonus prospects may be a 'generalized' desire common to most high-level corporate employees, the desire to inflate a company's earnings in order to hide options backdating is a much more particularized desire specific to participants in the [alleged] scheme"). Had the USO Defendants adequately disclosed those facts,

---

Defendants' citation to *Alki Partners, L.P. v. Windhorst*, 472 F. App'x 7, 10 (2d Cir. 2012) (summary order), and other cases in which defendants possessed no concrete personal benefit or otherwise merely alleged a desire to earn fees, are inapposite.

[33] There is little doubt that the USO Defendants had the opportunity to perpetrate the fraud alleged in the CAC. *See Pension Comm.*, 446 F. Supp. 2d at 181 ("Regarding the 'opportunity' prong, courts often assume that corporations, corporate officers, and corporate directors would have the opportunity to commit fraud if they so desired.").

including the effect of the Fund's own conduct, it would have likely upset the scheme. In other words, because the fraudulent statements and omissions were an integral part of the scheme in which the Sponsor and USO Officer Defendants had a significant motive to participate, these defendants also possessed a significant motive to make those fraudulent statements and omissions. *See id.* Thus, the USO Defendants had a motive sufficient to establish scienter.

> **c.      The Inference of Scienter Is at Least as Likely as Any Competing Nonculpable Inference**

Finally, the inference that the USO Defendants acted with scienter is at least as compelling as any inference of non-fraudulent conduct. Defendants' assertion that the USO Defendants "sought for USO to perform as described in the Registration Statements . . . despite extraordinary market developments" is misplaced. Def. Mem. at 50. Plaintiff's thorough allegations plead that the USO Defendants acted with scienter as they had direct knowledge of, or were reckless in not knowing, the aforementioned undisclosed facts, adverse trends and the breakdown in market fundamentals as a result of Defendants' own market-distorting activities while they made false and misleading statements to investors about the Fund.

The CAC adequately alleges scienter because the USO Defendants, as a result of their central market role, had direct knowledge of, access to, and utilization of, proprietary data feeds, vast amounts of relevant market data, daily analysis of the complex and interrelated markets impacting the Fund, sophisticated investment and trading tools and communication with a diverse range of key market players while they made false and misleading statements to investors about the Fund. *See supra* §IV.E.3.a. Given that the USO Defendants were thoroughly aware that the Fund faced a convergence of material, undisclosed facts and trends impacting the Fund, and given that the Registration Statements and other Class Period statements omitted materially adverse facts impacting theFund, the inference of scienter is at least as likely as – indeed, more likely than – any

competing inference of innocent market activity. *See Tellabs*, 551 U.S. at 314 (holding that the inference of scienter need only "be cogent and at least as compelling as any opposing inference of nonfraudulent intent").

**F.     Plaintiff Has Adequately Pleaded Standing with Respect to the Securities Act Claims**

Defendants argue that Plaintiff has not shown that it has standing to bring claims under Section 11 of the Securities Act because Plaintiff has not adequately alleged that it purchased its shares pursuant to either challenged Registration Statement – rather than pursuant to one of USO's earlier registration statements. Def. Mem. at 51-53. Defendants are wrong.

"It is well settled that 'aftermarket purchasers who can trace their shares to an allegedly misleading registration statement have standing to sue under §11 of the [Securities] Act.'" *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 407 (S.D.N.Y. 2007) (quoting *DeMaria v. Andersen*, 318 F.3d 170, 178 (2d Cir. 2003)). "To establish standing under §11 at the motion-to-dismiss stage, therefore, Plaintiffs need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'" *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020); *see also In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015) (The "'pleading requirement for Section 11 standing is satisfied by "***general allegations*** that plaintiff purchased pursuant to or traceable to [a] false registration statement.""'); *In re Marsh & Mclennan Cos., Sec. Litig.*, 501 F. Supp. 2d 452, 491 (S.D.N.Y. 2006) (same). At the pleading stage, Section 11 "plaintiffs are not 'required to explain *how* their shares can be traced.'" *Petrobras*, 116 F. Supp. at 384 (emphasis in original); *In re Wachovia Equity Sec. Litig.*, 753 F.

Supp. 2d 326, 373 (S.D.N.Y. 2011) (same); *Citiline Holdings, Inc. v. iStar Fin. Inc.*, 701 F. Supp. 2d 506, 511 (S.D.N.Y. 2010) (same).[34]

The CAC alleges that "Lead Plaintiff Nutit, A.S. purchased USO securities during the Class Period and shares of USO pursuant and/or traceable to the February Offering and the March Offering." ¶22 (citing earlier-filed certification at ECF No. 45-2). "This is enough to confer standing at this stage to assert a §11 claim." *Evoqua*, 450 F. Supp. 3d at 403. "Nothing more is required[.]" *Marsh & Mclennan*, 501 F. Supp. 2d at 491. Defendants' reliance on *In re Century Aluminum Co. Securities Litigation*, 729 F.3d 1104, 1108 (9th Cir. 2013), and *In re Ariad Pharmaceuticals, Inc. Securities Litigation*, 842 F.3d 744, 756 (1st Cir. 2016), is misplaced because the Second Circuit has never endorsed the Ninth or First Circuit's strict pleading standards for Section 11 standing.[35] Rather, district courts within the Second Circuit routinely hold that general allegations of standing are sufficient at this stage. *See, e.g.*, *BioScrip*, 95 F. Supp. 3d at 746 ("[T]o establish standing under §11 at the motion to dismiss stage, Plaintiffs need only assert that they purchased shares 'issued pursuant to, or traceable to the public offerings.'"); *Wallace v. IntraLinks*, 302 F.R.D. 310, 319 (S.D.N.Y. 2014) ("tracing is a merits issue that the court need not consider at

---

[34] In *In re Global Crossing, Ltd. Securities Litigation*, 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003), cited by Defendants, the court recognized that "general allegations that plaintiff purchased 'pursuant to' or traceable to false registration statement have been held sufficient to state a claim." The court merely dismissed the Section 11 claim with leave to replead because the plaintiff had made no such general allegation. *Id.*

[35] Moreover, in *Century Aluminum*, the court made clear that its ruling was based in part on the fact that defendants submitted extrinsic evidence in the form of a prospectus supplement noting that 49 million shares of Century Aluminum common stock were in the market at the time of the secondary offering – *two times* the number of shares issued in connection with the secondary offering at issue. 729 F.3d at 1110. Defendants make no such argument here. At best, *had* Defendants made a similar argument here, they could only point to the number of outstanding shares referenced in the Registration Statements as of December 31, 2019 (almost two months before the February Registration Statement) – 91,600,000 – which is approximately *7.6%* of the number of shares issued in connection with the Offerings. RS 32. In any event, Defendants themselves admit that the Offerings were conducted to fill investor demand. Def. Mem. at 17.

the class certification stage").[36]  Defendants provide no compelling reason why the Court should look to case law outside this Circuit with standards for standing that conflict with those in ***this*** Circuit.

Just last year, the court in *Evoqua* rejected a similar challenge to the standing of one of the lead plaintiffs to assert a Section 11 claim where ***two*** public offerings were at issue and the lead plaintiff alleged simply that "it purchased Evoqua stock pursuant or traceable to the ***offering***s."  450 F. Supp. 3d at 403.  These general allegations were sufficient at the motion to dismiss stage to confer standing to assert a Section 11 claim.  *Id*. (citing *Wachovia Equity*, 753 F. Supp. 2d at 373) ("[T]he pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased pursuant to or traceable to [a] false registration statement") (internal quotation marks omitted).  Thus, Plaintiff's allegation that it purchased shares of USO pursuant and/or traceable to the February Offering and the March Offering are sufficient at this stage.

## V.      CONCLUSION[37]

For all the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety.[38]

---

[36]      *In re Initial Public Offerings Securities Litigation* is inapposite because it was a class certification decision that did not involve the requirements for pleading traceability.  471 F.3d 24, 31 n.1 (2d Cir. 2006) (noting in *dicta* that a Section 11 plaintiff must ultimately *prove* that their shares are traceable to the registration statement at issue).

[37]      Defendants' only basis for contesting Plaintiffs' control-person claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act is Plaintiffs' purported failure to plead primary violations of Section 11 of the Securities Act or Section 10(b) of the Exchange Act.  *See* Def. Mem. at 41 n.22.  Because, as shown above, Plaintiff has adequately alleged primary violations, the Court should reject this argument.

[38]      If the Court grants Defendants' motion in whole or in part, Plaintiff respectfully requests leave to amend, which is typically freely given.  *See Cruz v. TD Bank, N.A.*, 742 F.3d 520, 523 (2d Cir. 2013) ("[I]t is the usual practice upon granting a motion to dismiss to allow leave to replead"); *see also Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015) ("Without the benefit of a ruling, many a plaintiff will not see the necessity of amendment or be in a position to weigh the practicality and possible means of curing specific deficiencies.").

DATED: March 30, 2021

Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
VINCENT M. SERRA

*/s/ David A. Rosenfeld*

DAVID A. ROSENFELD

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
EITAN KIMELMAN
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: 212/697-6484
212/697-7296 (fax)
peretz@bgandg.com
eitan@bgandg.com

*Additional Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I, David A. Rosenfeld, hereby certify that on March 30, 2021, I caused a true and correct copy of the foregoing document to be served on all defense counsel of record by providing them with copies via electronic mail.

_____
             */s/ David A. Rosenfeld*
             DAVID A. ROSENFELD