UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| | x | |
| In re UNITED STATES OIL FUND, LP SECURITIES LITIGATION | : : : | Civil Action No. 1:20-cv-04740-PGG |
| | : | CLASS ACTION |
| | : | |
| This Document Relates To: | : : | |
| ALL ACTIONS. | : : | |
| | x | |

**NOTICE OF SUPPLEMENTAL AUTHORITY**

With the Court's permission (ECF No. 153), Plaintiff respectfully submits this Notice of Supplemental Authority to address a controlling legal decision issued after Plaintiff served its Memorandum of Law in Opposition to Defendants' Motion to Dismiss (ECF No. 151; "Opposition") and cited in the USO Defendants' Reply Memorandum of Law in Support of Their Motion to Dismiss the Consolidated Amended Complaint (ECF No. 145; "Reply").[1] The Second Circuit's holdings in *Set Capital LLC v. Credit Suisse Group AG*, No. 19-cv-3466, 2021 WL 1619620 (2d Cir. Apr. 27, 2021), *vacating in part*, No. 18-cv-2268, 2019 WL 4673433 (S.D.N.Y. Sept. 25, 2019) (attached hereto as Exhibit 1), are directly on point with the issues raised by Defendants' motion to dismiss and further confirm that the motion should be denied and the case allowed to proceed to discovery.

Defendants cite *Set Capital* in their Reply without meaningfully discussing its most pertinent holdings or strong relation to the facts of this case. *See* Reply at 4-5. Defendants attempt to bypass the Second Circuit's highly relevant analysis by simply stating, without further elaboration, that *Set Capital* "vacat[ed] [the] decision concerning exchange traded notes." *Id.*

The reason Defendants attempt to side-step the actual holdings of *Set Capital* is clear. The Second Circuit in *Set Capital* held that conduct essentially indistinguishable from the conduct at issue in this case rendered defendants' statements regarding purported risk warnings materially misleading when made and reversed the trial court's dismissal of claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 and Sections 11 and 15 of the Securities Act of 1933. *See* 2021 WL 1619620, at *15.

---

[1] Capitalized terms not otherwise defined herein have the same meanings ascribed to them in Plaintiff's Opposition. The Underwriter Defendants have joined in the Reply filed by the USO Defendants and the Individual Defendants. ECF Nos. 148, 150.

In *Set Capital*, the plaintiffs alleged that Credit Suisse intentionally grew an exchange traded product – VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes ("XIV Notes") – beyond acceptable risk limits for short-term financial gain, causing an imminent liquidity crisis and breakdown in market fundamentals that caused the value of the notes to collapse, injuring investors. *Id.* at \*4-\*5. Defendants "flooded the market with millions of XIV Notes just days before their value collapsed" even though "Credit Suisse knew" these actions "would exacerbate the illiquidity" impacting the fund. *Id.* at \*3, \*8. These acts are the mirror image of Defendants' actions in this case. Here, the USO Defendants are likewise alleged to have intentionally grown USO (the largest oil-related exchange traded fund in the world) beyond acceptable risk limits for short-term financial gain, causing an imminent liquidity crisis and breakdown in market fundamentals that caused the Fund to collapse, injuring investors. ¶¶208-215. Central to both cases are the fund managers' decisions to issue millions of additional securities into an already illiquid market without providing clear and accurate warnings to investors about the negative consequences of their actions.

In *Set Capital*, the Second Circuit further held that defendants' laundry list of purported risk warnings were not only inadequate, but themselves materially misleading. As the Second Circuit held, "cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." 2021 WL 1619620, at \*14. "[T]here is a 'critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge that the event *will* occur'—particularly where that distinction holds 'enormous significance' for investors." *Id.* (emphasis in original) (citation omitted).

- 2 -

The Second Circuit's holding regarding so-called "risk warnings" which fail to disclose known adverse facts eviscerates Defendants' primary argument in support of dismissal, especially at this stage of proceedings where all facts must be taken as true and all inferences drawn in Plaintiff's favor. But Defendants' purported risk warnings were in some ways even more misleading than in *Set Capital* because Defendants wholly omitted some of the most important risks then facing the Fund, while falsely reassuring investors that all of the most important risks were in fact disclosed. For example, Defendants failed to detail any risks related to the extraordinary market conditions impacting USO during the Class Period, instead simply citing "pandemics" without elaboration in a boilerplate list of macro events that could potentially impact the Fund, while otherwise providing identical risk warnings to past statements. *E.g.*, ¶147. Defendants' failure to meaningfully update disclosures to investors during the Class Period despite the extraordinary events impacting the Fund created the false and misleading impression that an investment in the Fund was no more risky than before. *Id*.

Like in *Set Capital*, Defendants also made numerous affirmatively false statements along with their purported risk warnings, for example claiming that "USO invests only in Oil Futures Contracts and Other Oil-Related Investments . . . *traded in sufficient volume to permit the ready taking and liquidation of positions*" and that "*may be readily liquidated*." *E.g.*, ¶166. In truth, the Fund was investing in a highly illiquid market during the Class Period, due in large part to the USO Defendants' decision to conduct massive follow-on securities offerings. ¶169. Defendants also falsely assured investors that USO was a "cost-effective way to invest indirectly in crude oil," when in fact it was highly inappropriate for this purpose because of the adverse facts impacting the Fund during the Class Period. *E.g*., ¶143. Later, after investors lost billions, Defendants would be forced to admit by regulators that the Fund "**IS NOT A PROXY FOR TRADING**

**DIRECTLY IN THE OIL MARKETS**.'' ¶136.  Defendants fail to point to even a single instance in which these adverse facts were disclosed until after the damage had been done.  Importantly, as in *Set Capital*, the omitted conduct not only relates to ongoing and future events that Defendants knew with certainty would occur, but also to ***past historical*** adverse facts which were already adversely impacting the Fund throughout the Class Period but not disclosed by Defendants.  *E.g.*, ¶¶149, 160, 162.  The Second Circuit's decision makes clear that it was materially misleading for Defendants to conceal adverse circumstances then occurring and that they themselves had created and instead discuss simply "risks," *i.e.*, ***potential*** future events that may or may not occur.  *See Set Capital*, 2021 WL 1619620, at *13.

These facts also distinguish this case and *Set Capital* from *ProShares Trust II*.[2]  *ProShares Trust II* did not involve a fund manager ***itself*** intentionally creating the circumstances of its own fund's demise by flooding the market with new share issuances.  Rather, the fund (a volatility fund) in *ProShares Trust II* suffered collateral damage as a result of a severe market dislocation created by ***others***, most notably Credit Suisse's decision to massively grow the XIV, which precipitated a liquidity crisis in volatility markets.  *See* 2020 WL 71007, at *2-*3.  In *ProShares Trust II*, the plaintiffs alleged that the defendants should have disclosed relevant risks, which

---

[2]   *In re ProShares Tr. II Sec. Litig.*, No. 19-cv-886, 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F. App'x 649 (2d Cir. 2021).  In *Set Capital*, the Second Circuit notes the distinction between ETFs (which are exchange-traded bundles of securities structured as equity investments) and ETNs (which are exchange-traded bundles of securities structured as debt investments).  *See* 2021 WL 1619620, at *14 n.94.  However, according to the Second Circuit, the key distinction which rendered Credit Suisse's "different disclosures" from *ProShares Trust II* misleading was the fact that Credit Suisse's "own trading" was alleged to have caused the liquidity crisis negatively impacting its fund.  *Id.*  The CAC here similarly details how the USO Defendants' own trading negatively impacted USO, as the USO Defendants issued millions of dollars' worth of additional USO shares and then reinvested offering proceeds in a highly illiquid WTI futures market, knowingly exacerbating market distortions which drove down the price of USO as a result of their trading activities.  *E.g.*, ¶¶66-68, 77-106.

caused the fund to suffer losses when it attempted to rebalance its portfolio in an illiquid market –

illiquidity caused by Credit Suisse's decision to flood the market with XIV Notes.  Here, unlike in

*ProShares Trust II* but just like in *Set Capital*, the USO Defendants **themselves** precipitated the

Fund's total implosion by knowingly issuing millions of additional USO shares during the Class

Period despite extreme market illiquidity.  *E.g.*, ¶¶71-116.  In addition, as the managers of the

largest oil-related exchange-traded product in the world, the USO Defendants were intimately

aware of the extreme damage being caused by their actions yet concealed these adverse effects

from investors in order to serve their own short-term financial interests.

The Second Circuit in *Set Capital* also found that scienter had been adequately alleged

because of numerous facts also present in this case, including, *inter alia*: (i) the defendants' central

roles in the relevant markets, which had made them acutely aware of illiquidity risks; (ii) the

defendants' decision to conduct massive security offerings despite then-present market conditions,

knowing that the offerings were certain to exacerbate illiquidity; (iii) the defendants' failure to

accurately disclose the adverse events and risks facing the XIV Notes; (iv) the massive economic

impact of the product's demise; (v) defendants' pecuniary interest in growing the XIV Notes

beyond acceptable risk limits; and (vi) the presence of an SEC investigation into the circumstances

of the XIV Notes' collapse.  *See* 2021 WL 1619620, at \*9-\*11.

*Set Capital* strongly militates in favor of finding scienter adequately alleged in this case.

Indeed, in certain ways, Defendants' scienter is even more compellingly alleged here.  Credit

Suisse is a massive multinational bank and financial services company, yet, based on similar facts

to those alleged in this case, the Second Circuit found that plaintiffs had adequately pled scienter

as to senior executives who were not involved in the day-to-day management of the XIV Notes.

*Id.*  Even though the fund at issue implicated only a small portion of Credit Suisse's overall

business, the Second Circuit imputed knowledge of the misconduct all the way up to Credit Suisse's CEO. *Id.* Here, by contrast, there is no need to connect the dots up the management chain: the USO Defendants were ***themselves*** personally responsible for the day-to-day management of the Fund, as well as the makers of the materially false and misleading statements at issue. ¶¶208-215. USO served as the primary revenue source for the Fund manager, and the USO Officer Defendants were personally and directly involved in creating the conditions of the Fund's demise through their daily management of the Fund and directly benefited from the millions of dollars in increased management fees that resulted from their decision to massively increase USO's size. *Id*. The commonsense inference that these individuals were aware of their own actions is far more compelling than the competing inference that they were somehow unaware of their own conduct in running the Fund.

The Second Circuit's holdings in *Set Capital* are directly applicable to this case and militate in favor of denying Defendants' motion to dismiss in their entirety.

DATED:  May 6, 2021                              Respectfully submitted,

                                                 ROBBINS GELLER RUDMAN
                                                   & DOWD LLP
                                                 SAMUEL H. RUDMAN
                                                 DAVID A. ROSENFELD
                                                 VINCENT M. SERRA
                                                 WILLIAM A. MASSA


                                                 */s/ David A. Rosenfeld*
                                                 DAVID A. ROSENFELD

- 6 -

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
vserra@rgrdlaw.com
wmassa@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL  60606
Telephone:  312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
EITAN KIMELMAN
60 East 42nd Street, Suite 4600
New York, NY  10165
Telephone:  212/697-6484
212/697-7296 (fax)
peretz@bgandg.com
eitan@bgandg.com

*Additional Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I, David A. Rosenfeld, hereby certify that on May 6, 2021, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.



*/s/ David A. Rosenfeld*
DAVID A. ROSENFELD