# EXHIBIT 1

2021 WL 1619620
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

SET CAPITAL LLC, Stefan Jager, Nikolay Drozhzhinov,

Aleksandr Gamburg, ACM, Ltd., Lead Plaintiffs-Appellants,

Rajan Chahal, individually and on behalf of all others

similarly situated, Shaolei Qiu, Glenn Eisenberg, Plaintiffs,

v.

CREDIT SUISSE GROUP AG, David R. Mathers, Tidjane Thiam, Credit Suisse AG, Credit

Suisse International, Janus Henderson Group PLC, Janus Index & Calculation Services

LLC, Janus Distributors, LLC, dba Janus Henderson Distributors, Defendants-Appellees.

No. 19-3466-cv
|
August Term, 2019
|
Argued: April 30, 2020
|
Decided: April 27, 2021

Appeal from the United States District Court for the Southern District of New York.(Torres, *J.*)

**Attorneys and Law Firms**

Michael Eisenkraft (Laura H. Posner, Carol V. Gilden, and Eric S. Berelovich, on the brief), Cohen Milstein Sellers & Toll PLLC, New York, New York, for Appellants Set Capital LLC, Stefan Jager, Nikolay Drozhzhinov, Aleksandr Gamburg, and ACM, Ltd.

Herbert Scott Washer (David G. Januszewski, Nola B. Heller, Peter J. Linken, on the brief), Cahill Gordon & Reindel LLP, New York, New York, for Appellees Credit Suisse Group AG, Credit Suisse AG, Credit Suisse International, Tidjane Thiam, and David R. Mathers

Jason M. Halper (Jared J. Stanisci, Gillian Groarke Burns, Tianyin Luo, Victor M. Bieger, on the brief), Cadwalader, Wickersham & Taft LLP, New York, New York, for Appellees Janus Henderson Group PLC, Janus Index & Calculation Services LLC, and Janus Distributors, LLC

Before: Walker, Pooler, and Lynch, Circuit Judges.

**Opinion**

John M. Walker, Jr., Circuit Judge:

**\*1** Set Capital LLC, Stefan Jager, Nikolay Drozhzhinov, Aleksandr Gamburg, and ACM, Ltd. (collectively, Set Capital) brought this securities class action lawsuit against Credit Suisse Group AG, Credit Suisse AG, and Credit Suisse International (collectively, Credit Suisse); Credit Suisse's CEO Tidjane Thiam and CFO David R. Mathers (together, the Individual Defendants); and Janus Henderson Group PLC, Janus Index & Calculation Services LLC, and Janus Distributors, LLC, doing business as Janus Henderson Distributors (collectively, Janus). Set Capital principally alleges that, on February 5, 2018, Credit

2021 WL 1619620

Suisse, Janus, and the Individual Defendants executed a complex fraud to collapse the market for VelocityShares Daily Inverse VIX Short Term Exchange Traded Notes (XIV Notes), earning hundreds of millions of dollars in profit at their investors' expense. The district court (Torres, *J.*) dismissed the complaint for failure to plead a strong inference of scienter. For the reasons that follow, we AFFIRM in part and VACATE and REMAND in part.

## BACKGROUND

This appeal stems from the February 5, 2018 collapse of the market for certain investment vehicles called XIV Notes. XIV Notes were a derivative financial product that increased in value when the market was calm and decreased in value when the market was volatile. The notes were issued by Credit Suisse and priced based on the inverse of a volatility index called the S&P 500 VIX Short-Term Futures Index (VIX Futures Index).

This case concerns Set Capital's allegation that, after observing prior episodes of market volatility, Credit Suisse discerned an ability to depress prices for XIV Notes by purchasing VIX futures contracts on days when volatility spiked. In essence, Set Capital claims that Credit Suisse used this knowledge as part of a scheme to sell millions of XIV Notes before engineering a near-total collapse in their price through just 15 minutes of its own trading. Set Capital further alleges that Janus, although not directly involved in this manipulative scheme, exacerbated the damage by failing to publish accurate prices for XIV Notes during the window of time when the value of those notes collapsed. The complaint alleges that the scheme cost investors $1.8 billion while at the same time allowing Credit Suisse to realize more than $475 million in gains.

In the background section that follows, we explain in detail: (1) the characteristics of XIV Notes, including their relationship to the VIX Futures Index; (2) the way Credit Suisse's trading impacted prices for XIV Notes during prior episodes of market volatility; (3) the extent to which Credit Suisse and Janus warned investors about risks of investing in XIV Notes; and (4) the remarkable collapse of XIV Notes following significant volatility on February 5, 2018. As always at this stage of the litigation, we draw our discussion of the facts from the complaint, which must be taken as true.[1]

[1]    *See* J. App. at 26–125 (complaint).

### 1. The Characteristics of XIV Notes

**\*2**  XIV Notes were Exchange Traded Notes (ETNs) issued and sold by Credit Suisse and placed and marketed by Janus. The notes were traded on NASDAQ and were related to the Chicago Board Options Exchange's VIX Index (VIX Index). The VIX Index is not an asset, but rather a measure of expected volatility in the stock market. When the market expects higher volatility, the VIX Index increases. When the market expects lower volatility, the VIX Index decreases. Because it measures expected swings in the market, the VIX Index is sometimes referred to as Wall Street's "fear index" or "fear gauge."[2]

[2]    *See* Compl. ¶ 50.

Although the VIX Index is not a tradable asset, investors may take a position on future levels of market volatility by purchasing futures contracts on the VIX Index.[3] When viewed in the aggregate, the prices of these futures contracts provide a window into whether investors expect market volatility to rise or fall over a specified period of time. To help investors digest this information, S&P created the S&P 500 VIX Short-Term Futures Index (VIX Futures Index), which tracks a portfolio of short-term futures contracts on the VIX Index.

[3]    A futures contract is an agreement to purchase or sell a particular commodity on a later date at a predetermined price.

The XIV Notes at issue in this case were designed to track the inverse (or opposite) of the VIX Futures Index. This inverse relationship between XIV Notes and the VIX Futures Index meant that investors in XIV Notes would profit from low volatility in the stock market. As market volatility declined and prices underlying the VIX Futures Index decreased, the value of XIV

Notes would increase by an equivalent amount. The converse, of course, was also true. As market volatility increased and prices underlying the VIX Futures Index rose, the value of XIV Notes would decline proportionally.

In the event of early redemption, acceleration, or maturity of the XIV Notes, Credit Suisse agreed to pay noteholders based on the notes' "closing indicative value." An affiliate of Janus, Janus Index & Calculation Services LLC (JIC), calculated the closing indicative value at the end of each trading day using a formula that automatically adjusted the notes' value based on the inverse of price changes observed on the VIX Futures Index.[4] Because the closing indicative value was calculated only once each day, JIC also computed an "intraday indicative value" every 15 seconds, which was used by investors trading their notes in the secondary market.[5] JIC used the same formula to automatically calculate this value, which was promptly distributed by NASDAQ. Although the intraday indicative value reflected only a theoretical price for XIV Notes, the secondary market price tracked the intraday indicative value on a typical day.

[4]    JIC had "the sole ability to calculate and disseminate the Closing Indicative Value" of the XIV Notes. J. App. at 187.

[5]    The Offering Documents (to be described) state that "JIC or its affiliate is responsible for computing and disseminating the Intraday Indicative Value." *Id.* at 135, 145.

To receive a payment from Credit Suisse based on the closing indicative value, XIV noteholders could redeem their notes early or attempt to hold their notes through maturity. But noteholders could not fully control the timing of their notes' redemption: As disclosed to investors, Credit Suisse could accelerate the redemption of all XIV Notes either at its option or upon the occurrence of one or more pre-defined "Acceleration Events."[6] If Credit Suisse accelerated the notes at its option, noteholders would receive a payment based on the closing indicative value on a predetermined date no earlier than five business days after receiving notice of the acceleration. If Credit Suisse declared an Acceleration Event, noteholders would receive a payment based on the closing indicative value on the day the acceleration was declared. As relevant here, one Acceleration Event would occur if, at any point, the intraday indicative value of the XIV Notes fell such that it was less than or equal to 20 percent of the prior day's closing indicative value.[7]

[6]    An affiliate of Credit Suisse, Credit Suisse International (CSI), had "the sole ability to make determinations with respect to ... certain Acceleration Events." *Id.* at 187.

[7]    *Id.* at 184.

### 2. Prior Episodes of Market Volatility Impacting XIV Notes

**\*3**  Due to sustained periods of stability in the market, XIV noteholders for the most part saw the value of XIV Notes climb from 2010 until 2018. On three occasions in 2011, 2015, and 2016, however, significant episodes of market volatility caused the value of VIX futures contracts to spike and, correspondingly, the value of XIV Notes to drop. During these three volatility spikes, Credit Suisse, as well as other issuers of volatility-related ETNs, bought large quantities of VIX futures contracts, which were increasing in value, in order to offset or "hedge" against potential losses in the ETNs they issued, which were decreasing in value.[8] Each time they attempted to do so, however, there was insufficient liquidity in the VIX futures market—that is, not enough VIX futures contracts to meet the hedging demand. As a result of this liquidity squeeze, Credit Suisse's hedging purchases caused the price of VIX futures contracts to spike over and above what would have been expected based on market volatility alone. At the same time, these spikes caused the value of XIV Notes—the inverse of the VIX Futures Index—to temporarily plummet.

[8]    In these circumstances, Credit Suisse routinely hedged by taking short positions on VIX futures contracts. Thus, a drop in the VIX Futures Index would increase Credit Suisse's obligations to XIV noteholders but would also allow Credit Suisse to profit from its short position. *See* Compl. ¶ 66.

Pursuant to Credit Suisse's internal risk protocols, all three of these liquidity incidents were promptly reported to Credit Suisse's Capital Allocation and Risk Management Committee (CARMC), of which the Individual Defendants were members.

Set Capital LLC v. Credit Suisse Group AG, --- F.3d ---- (2021)
2021 WL 1619620

In response, Credit Suisse sought alternative ways to hedge its own exposure to XIV Notes. On July 1, 2016, Credit Suisse announced (July 2016 Announcement) that it may condition all future sales of XIV Notes on the counterparty's agreement "to sell to Credit Suisse certain hedging instruments consistent with Credit Suisse's hedging strategy, including but not limited to swaps."[9]

9       Compl. ¶ 75.

Following the July 2016 Announcement, Credit Suisse increased the volume of XIV Notes in the market. On June 30, 2017, it offered an additional 5,000,000 notes on top of the roughly 9,000,000 notes that were already issued and outstanding. And on January 29, 2018, it offered another 16,275,000 notes on top of the roughly 10,800,000 notes then-outstanding. While only a portion of the 16,275,000 notes were ultimately sold between January 29 and February 5, this last offering flooded the market with millions of XIV Notes just days before their value collapsed.[10] Notably, Credit Suisse offered and issued these notes despite shareholder pressure to eliminate sales of volatility-related ETNs. It also took these actions even though increasing the volume of XIV Notes outstanding would require Credit Suisse, in the event of another jump in market volatility, to increase its hedging activity by purchasing additional VIX futures contracts. As Credit Suisse knew, these purchases would exacerbate the illiquidity that contributed to the three prior price drops of XIV Notes in 2011, 2015, and 2016.

10      Between January 29 and February 2, 2018, Credit Suisse issued at least 4,200,000 of the 16,275,000 XIV Notes offered, increasing the volume of XIV Notes outstanding by more than 38.9%. This increase does not account for additional sales of XIV Notes that may have occurred between February 3 and February 5, 2018, at which point the market for XIV Notes collapsed.

   *3. Disclosures in the Offering Documents*
Credit Suisse and Janus issued a prospectus for the XIV Notes as well as a supplement (together, the Offering Documents) in connection with their offering of the 16,275,000 notes on January 29, 2018. The Offering Documents detailed the structure of XIV Notes (referred to in the documents as "ETNs"), the conditions under which Credit Suisse would pay XIV noteholders, and the methods for calculating the closing and intraday indicative values.

The Offering Documents also contained numerous warnings concerning risks of investing in XIV Notes. They informed investors that XIV Notes were "designed as short-term trading vehicles for investors managing their portfolios on a daily basis."[11] They warned investors that "[t]he long term expected value of your ETNs is zero," and emphasized that "[i]f you hold your ETNs as a long term investment, it is likely that you will lose all or a substantial portion of your investment."[12]

11      J. App. at 166–67 (emphasis omitted).

12      *Id.* at 154 (emphases omitted).

**\*4** The Offering Documents also cautioned investors that Credit Suisse intended to hedge its exposure to XIV Notes through trading in related securities, including VIX futures contracts used to calculate the VIX Futures Index. In one section, the Offering Documents stated that "this hedging activity could affect the value of the [VIX Futures] Index, and accordingly the value of the ETNs."[13] In another section, they stated, "Although we and our affiliates have no reason to believe that our or their hedging activities will have a material impact on the level of the applicable underlying [VIX Futures] Index, there can be no assurance that the level of the applicable underlying Index will not be affected."[14] The Offering Documents acknowledged that Credit Suisse's hedging trades "may result in [Credit Suisse's] receipt of a profit, even if the market value of the ETNs declines,"[15] and further warned that Credit Suisse's trading activity "may present a conflict" between the bank's interests and the interests of investors.[16]

13      *Id.* at 151.

14      *Id.* at 188.

15      *Id.* at 151.

16      *Id.* at 163.

The Offering Documents additionally advised investors of risks related to the pricing of XIV Notes and Credit Suisse's rights to accelerate the notes. With respect to the pricing of XIV Notes, they disclosed that the intraday indicative value may not accurately reflect the economic value of XIV Notes traded on the secondary market. They advised that "[t]he Intraday Indicative Value calculation is not intended as a price or quotation, or as an offer or solicitation for the purchase, sale, redemption, acceleration or termination of your ETNs, nor will it reflect hedging or transaction costs, credit considerations, market liquidity or bid-offer spreads."[17] The Offering Documents further warned that the published prices on the VIX Futures Index could be subject to "delay or postponement," which in turn would affect the accuracy of the intraday indicative value.[18] With respect to acceleration, they specifically advised investors that Credit Suisse retained the right to accelerate the notes at any time[19] and warned that, in the event of an acceleration, investors were "likely to lose part or all of [their] initial investment."[20]

17      *Id.* at 177.

18      *Id.*

19      Credit Suisse could declare an optional acceleration on any business day. *See id.* at 183. It could declare an Acceleration Event only in certain circumstances. *Id.*

20      J. App. at 130, 140, 148, 152.

Following their review of the Offering Documents, Set Capital purchased XIV Notes during the class period of January 29 through February 5, 2018. During this period, Credit Suisse sold XIV Notes for prices as high as $135 per note, and the market cap for XIV Notes increased to approximately $1.9 billion.

   *4. Market Volatility on February 5, 2018 and the Collapse of the Market for XIV Notes*
On February 5, 2018, the S&P 500 dropped 4.1 percent. As before, this spike in market volatility increased prices for VIX futures contracts comprising the VIX Futures Index and accordingly decreased the value of XIV Notes. Over the course of regular trading on February 5, the intraday indicative value of the nearly 15 million XIV Notes outstanding dropped more than 30 percent from $108.37 to $72.59.

Within 15 minutes after the close of regular trading at 4:00 p.m., Credit Suisse purchased more than 105,000 VIX futures contracts to hedge its exposure in sales of XIV Notes. Credit Suisse's purchases amounted to roughly one-fourth of the entire VIX futures market, which drove up trading to more than 167 times the usual volume. As was the case with the three prior incidents of market volatility, Credit Suisse's hedging trades contributed to a liquidity squeeze that caused the prices of VIX futures contracts to skyrocket. By 4:09 p.m., just nine minutes into Credit Suisse's hedge, this further spike in prices on the VIX Futures Index caused the value of XIV Notes to plummet to approximately $20. Six minutes later, by 4:15 p.m., Credit Suisse's continued purchases of VIX futures contracts drove down the value of XIV Notes to just over $4—a drop of more than 96 percent from the prior day's closing indicative value.[21]

21      The complaint alleges that, based on historical data, a 4 percent drop in the S&P 500 should have caused prices for VIX futures contracts to jump by approximately 15 to 25 percent. As a result of Credit Suisse's hedging trades, those prices in fact increased by nearly 100 percent. *See* Compl. ¶ 170.

 **\*5**  On top of all this, for one hour from 4:09 p.m. to 5:09 p.m., the intraday indicative value for XIV Notes was not updated every 15 seconds as required and did not reflect an accurate valuation of the notes. Instead, during this hour, the intraday indicative value updated only sporadically and valued the XIV Notes at about $24 to $27 per note (the Flatline Value). This

published Flatline Value persisted notwithstanding that, in reality, each note almost immediately was worth between $4.22 and $4.40.[22] It was not until 5:09 p.m. (and after more than thirty minutes during which the intraday indicative value failed to update at all) that NASDAQ disseminated the correct intraday indicative value of $4.22.[23] During this hour, investors purchased more than $700 million in XIV Notes at inflated secondary market prices based on their incorrect belief that XIV Notes had weathered the spike in market volatility without triggering an Acceleration Event.

[22]     As Janus points out in its brief, the complaint does not allege that the intraday indicative value failed to accurately track the inverse of the VIX Futures Index, because that index had itself flatlined during the one hour in question. *See* Br. of Def.-Appellee Janus at 30–31; J. App. at 414–71.

[23]     At 4:09:48 p.m., the intraday indicative value of the XIV Notes was reported as $27.0855, before updating at 4:12:33 p.m. to a value of $27.1951, updating at 4:12:47 p.m. to a value of $26.3182 and then, at 4:13:03 p.m., updating to a value of $24.8933. There were slight fluctuations in the intraday indicative value until 4:38:34 p.m. when the value froze at $24.6961. *See* Compl. ¶ 174. There was no update thereafter until 5:09:05 p.m. when the value was reported as $4.2217. *Id.*

But, of course, an Acceleration Event had occurred: The intraday indicative value of the XIV Notes plummeted more than 80 percent from the prior day's closing indicative value. Accordingly, on February 6, 2018, Credit Suisse issued a press release stating that the XIV Notes had experienced an Acceleration Event and that Credit Suisse would permanently cease issuing new XIV Notes. Shortly thereafter, Credit Suisse delivered an irrevocable call notice for all notes outstanding, selecting February 15 as the accelerated valuation date. On February 21, Credit Suisse terminated all XIV Notes and paid each investor $5.99 per note, the closing indicative value on February 15, 2018. This resulted in approximately $1.8 billion in market losses to investors, many of whom were Credit Suisse's own clients.

On April 25, 2018, Credit Suisse's quarterly report stated that its equity sales and trading division earned approximately $490 million for its own account in the prior fiscal quarter "due to more favorable trading conditions, particularly higher levels of volatility which benefited our derivatives business."[24] Although Credit Suisse's records are not publicly available, Set Capital estimates that Credit Suisse earned between $475 and $542 million in profits when it redeemed the XIV Notes.

[24]     Compl. ¶¶ 16, 194.

### 5. Prior Proceedings

After several plaintiffs sued Credit Suisse and Janus following the collapse of the XIV Notes, the actions were consolidated and Set Capital, one of the lead plaintiffs, filed a class action complaint. The complaint principally asserts three theories of primary liability under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (Exchange Act)[25] and Section 11 of the Securities Act of 1933 (Securities Act).[26] First, Set Capital claims that Credit Suisse and the Individual Defendants engaged in a scheme to manipulate the market in violation of Section 10(b) by issuing millions of XIV Notes in January and February 2018 knowing or recklessly disregarding that their own hedging activity would trigger a liquidity squeeze in VIX futures contracts, destroy the value of XIV Notes, and allow Credit Suisse to accelerate the notes' redemption at a substantial loss to investors while locking in a profit for its own account. Second, Set Capital claims that Credit Suisse and Janus made a material misstatement or omission in violation of Sections 9(a) and 10(b) by failing to correct the Flatline Value during afterhours trading on February 5. Third, Set Capital claims that the Offering Documents issued by Credit Suisse and Janus contained material misstatements or omissions in violation of Sections 10(b) and 11 by repeatedly warning of "risks" they knew were certain to occur. In addition, Set Capital claims that Credit Suisse and Janus are secondarily liable as "control persons" of Credit Suisse International (CSI) and JIC under Section 15 of the Securities Act[27] and Section 20(a) of the Exchange Act.[28]

[25]     *See* 15 U.S.C. § 78i(a) (Section 9(a)); 15 U.S.C. § 78j(b) (Section 10(b)).

[26]     *See* 15 U.S.C. § 77k (Section 11).

27      *See* 15 U.S.C. § 77*o* (Section 15).

28      *See* 15 U.S.C. § 78t(a) (Section 20(a)).

 **\*6** Credit Suisse, Janus, and the Individual Defendants moved to dismiss the complaint on November 2, 2018. On August 16, 2019, the magistrate judge (Netburn, *J.*) recommended dismissal of all claims on the basis that Set Capital failed to plead a primary violation of Section 10(b), which overlaps in substance with the elements of Sections 9(a) and 11. Specifically, the magistrate judge concluded that Set Capital failed to allege an actionable misstatement or omission in the Offering Documents and that, although Set Capital sufficiently alleged acts of market manipulation and a misrepresentation in the Flatline Value, the complaint failed to support a strong inference of scienter. Because in the magistrate judge's view the complaint failed to allege a primary violation, the magistrate judge also recommended dismissal of Set Capital's secondary claims under Sections 15 and 20(a). On September 25, the district court issued an order adopting the recommendations of the magistrate judge in full and dismissing the action with prejudice. This appeal followed.

## DISCUSSION

We review a district court's dismissal of a complaint for failure to state a claim *de novo*, "accepting all factual claims in the complaint as true, and drawing all reasonable inferences in the plaintiff's favor."[29] "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "[30] A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[31]

29      *Anschutz Corp. v. Merrill Lynch & Co., Inc.*, 690 F.3d 98, 107 (2d Cir. 2012) (quoting *Famous Horse Inc. v. 5th Ave. Photo Inc.*, 624 F.3d 106, 108 (2d Cir. 2010)).

30      *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).

31      *Cavello Bay Reinsurance Ltd. v. Shubin Stein*, 986 F.3d 161, 165 (2d Cir. 2021) (quoting *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937).

A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA).[32] Rule 9(b) requires litigants to "state with particularity the circumstances constituting fraud."[33] To do so, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."[34] The PSLRA, in turn, requires a plaintiff alleging securities fraud to (1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is misleading was formed, and (3) state with particularity facts giving rise to a "strong inference" that the defendant acted with scienter—the required state of mind.[35]

32      *See* *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007).

33      Fed. R. Civ. P. 9(b).

34      *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 167 (2d Cir. 2021) (quoting *Anschutz*, 690 F.3d at 108).

35      15 U.S.C. § 78u–4(b)(2)(A); *see also Anschutz*, 690 F.3d at 108.

In this appeal, Set Capital argues that the district court erred by dismissing its market manipulation and Flatline Value claims for failure to plead a strong inference of scienter. Set Capital also argues that the district court erred when it concluded that the complaint does not allege actionable misstatements or omissions in the Offering Documents. For the reasons that follow, we agree with Set Capital in part. We conclude that the complaint plausibly alleges a strong inference of scienter to support

Case 1:20-cv-04740-PGG   Document 154-1   Filed 05/06/21   Page 9 of 18

Set Capital's claim for market manipulation, and that it has identified actionable misstatements or omissions in the Offering Documents. We agree with the district court, however, that the complaint does not support a strong inference that Credit Suisse and Janus acted with scienter when they failed to correct the Flatline Value during afterhours trading on February 5.

## I. The Manipulative Scheme

**\*7**  In proscribing the use of a "manipulative or deceptive device or contrivance,"[36] Section 10(b) of the Exchange Act "prohibits not only material misstatements but also manipulative acts."[37] To state a claim for market manipulation under Section 10(b), a plaintiff must plausibly allege "(1) manipulative acts; (2) damage (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange."[38]

[36]  *See* 15 U.S.C. § 78j(b) (Section 10(b)); *see also* 17 C.F.R. § 240.10b-5 (SEC Rule 10b-5).

[37]  *ATSI*, 493 F.3d at 99; *see also Lorenzo v. SEC*, ––– U.S. ––––, 139 S. Ct. 1094, 1101, 1105, 203 L.Ed.2d 484 (2019) (explaining that Section 10(b) of the Exchange Act and SEC Rule 10b-5 "capture a wide range of conduct" and are "intended to root out all manner of fraud in the securities industry").

[38]  *ATSI*, 493 F.3d at 101.

As we have described above, Set Capital claims that Credit Suisse and the Individual Defendants manipulated the market by issuing millions of additional XIV Notes knowing or recklessly disregarding the virtual certainty that their own hedging activity would trigger a liquidity squeeze in VIX futures contracts, destroy the value of XIV Notes, and allow Credit Suisse to accelerate and redeem the notes at a substantial loss to investors while locking in a profit for its own account. Credit Suisse and the Individual Defendants contend that, even accepting these allegations as true, the complaint fails to allege a "manipulative act" and does not plead a strong inference of "scienter." We disagree and hold that Set Capital has alleged a plausible claim of liability for market manipulation.

### A. Manipulative Act

We turn first to the threshold question of whether Set Capital has plausibly alleged a "manipulative act." As the Supreme Court has observed, the word "manipulative" is "virtually a term of art when used in connection with securities markets."[39] It "refers generally to practices, such as wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity,"[40] and "connotes intentional or willful conduct designed to deceive or defraud investors by controlling or artificially affecting the price of securities."[41] For market activity to "artificially" affect a security's price, we generally ask whether the transaction or series of transactions "sends a false pricing signal to the market"[42] or otherwise distorts estimates of the "underlying economic value" of the securities traded.[43] While a defendant may manipulate the market through open-market transactions,[44] some misrepresentation or nondisclosure is required.[45] Deception is the gravamen of a claim for market manipulation, and "the market is not misled when a transaction's terms are fully disclosed."[46]

[39]  *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 199, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

[40]  *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 476, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977).

[41]  *Ernst & Ernst*, 425 U.S. at 199, 96 S.Ct. 1375.

[42]  *ATSI*, 493 F.3d at 100.

[43]  *Id.* (quoting *Sullivan & Long, Inc. v. Scattered Corp.*, 47 F.3d 857, 861 (7th Cir. 1995)).

44    *See id.* at 100–02.

45    *Wilson v. Merrill Lynch & Co., Inc.*, 671 F.3d 120, 130 (2d Cir. 2011); *cf. Lorenzo*, 139 S. Ct. at 1100–01 (holding that "dissemination of false or misleading statements with intent to defraud" can qualify as a "manipulative or deceptive device" prohibited by Section 10(b) and SEC Rule 10b-5(a) and (c)).

46    *Wilson*, 671 F.3d at 130 (internal quotation marks, alteration, and citation omitted).

 **\*8**  The complaint alleges manipulative conduct that is actionable under Section 10(b). Accepting the well-pleaded facts as true, three prior volatility spikes in 2011, 2015, and 2016 demonstrated the impact of Credit Suisse's hedging trades. Each time volatility spiked, Credit Suisse's hedging contributed to a liquidity squeeze in VIX futures contracts that depressed the value of XIV Notes further than what would have been expected from market volatility alone. The complaint alleges that Credit Suisse and the Individual Defendants used this knowledge as part of an undisclosed scheme to profit at their investors' expense. By offering 5,000,000 XIV Notes on June 30, 2017 and another 16,275,000 notes on January 29, 2018—millions of which were ultimately issued—Credit Suisse exacerbated the risk of illiquidity in the VIX futures market and created conditions in which it knew that its hedging trades would destroy the value of XIV Notes during the next volatility spike. When that spike occurred days later on February 5, 2018, Credit Suisse executed on the alleged scheme. It purchased more than 105,000 VIX futures contracts, caused the price of XIV Notes to plummet by more than 96 percent, and declared an Acceleration Event to lock in its profit. If proven at trial, this alleged conduct was manipulative under our precedents.

Credit Suisse argues that the complaint fails to allege any "artificial" impact on the price of XIV Notes because its hedging trades were "done openly" for the legitimate purpose of "manag[ing] risk," not deceiving investors.[47] To be sure, it is generally true that short selling or other hedging activity is not, by itself, manipulative—even when it occurs in high volumes and even when it impacts the market price for a security.[48] But here, the complaint alleges more than routine hedging activity: It alleges that Credit Suisse flooded the market with millions of additional XIV Notes for the very purpose of enhancing the impact of its hedging trades and collapsing the market for the notes. In this context, it is no defense that Credit Suisse's transactions were visible to the market and reflected otherwise legal activity. Open-market transactions that are not inherently manipulative may constitute manipulative activity when accompanied by manipulative intent.[49] In some cases, as here, "scienter is the only factor that distinguishes legitimate trading from improper manipulation."[50] To the extent Credit Suisse claims it hedged for a legitimate purpose, its position contradicts the complaint. As we discuss in detail below, Set Capital specifically alleges that Credit Suisse executed its hedging trades on February 5 for a manipulative purpose—to trigger a liquidity squeeze that would destroy the value of XIV Notes.

47    Br. of Def.-Appellee Credit Suisse at 45–46.

48    *See ATSI*, 493 F.3d at 101.

49    *See id.* at 100 (requiring only "market activity aimed at deceiving investors as to how other market participants have valued a security").

50    *Id.* at 102; *see also Koch v. S.E.C.*, 793 F.3d 147, 153–54 (D.C. Cir. 2015), *cert. denied*, 577 U.S. 1235, 136 S.Ct. 1492, 194 L.Ed.2d 586 (2016) (holding that a "burst of trading" on the open market, combined with manipulative intent, was enough to violate the Exchange Act); *Markowski v. S.E.C.*, 274 F.3d 525, 529 (D.C. Cir. 2001) (holding that "manipulation can be illegal solely because of the actor's purpose" (internal quotation marks omitted)).

 **B. Scienter**

We turn next to the element of scienter. To establish scienter, "a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."[51] As the Supreme Court has instructed, we evaluate the sufficiency of a complaint's allegations of scienter "holistically," considering "*all* of the facts alleged, taken collectively," rather than "any individual allegation, scrutinized

2021 WL 1619620

in isolation."[52] For an inference of scienter to be "strong," as required by the PSLRA, "a reasonable person must deem it cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged."[53] Accepting the facts alleged in the complaint as true, and drawing all reasonable inferences in Set Capital's favor, we conclude that the allegations of scienter are at least as compelling as the competing inferences urged by Credit Suisse.

[51]     *Rombach v. Chang*, 355 F.3d 164, 176 (2d Cir. 2004) (quoting *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000)).

[52]     *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 323, 326, 127 S.Ct. 2499, 168 L.Ed.2d 179 (2007).

[53]     *ATSI*, 493 F.3d at 99 (quoting *Tellabs*, 551 U.S. at 324, 127 S.Ct. 2499) (alterations omitted).

*Evidence of Conscious Misbehavior or Recklessness*

 **\*9**  The complaint alleges circumstantial evidence of conscious misbehavior or recklessness that, when viewed holistically and together with the allegations of motive and opportunity, supports a strong inference of scienter.

First, the complaint plausibly alleges that Credit Suisse and the Individual Defendants knew that, on days when market volatility increased, Credit Suisse's hedging trades would cause a spike in the price for VIX futures contracts and an equally significant drop in the price for XIV Notes. As alleged in the complaint, Credit Suisse and the Individual Defendants would have become aware of this dynamic by observing the impact of their hedging trades during the three prior volatility spikes. On each of those occasions, Credit Suisse observed a liquidity squeeze in the VIX futures market which, as it caused prices for VIX futures contracts to spike, contributed to a sharp drop in the price for XIV Notes. A juror could reasonably infer that Credit Suisse was aware of this dynamic not only because the bank is a highly sophisticated financial institution and had experienced it first-hand on prior occasions, but also because of the actions that Credit Suisse and the Individual Defendants took in response. Just seven days after the third spike in 2016, Credit Suisse (with approval from CARMC) issued the July 2016 Announcement conditioning the sale of new ETNs on the counterparty's agreement to sell to Credit Suisse additional hedging instruments. Drawing all inferences in favor of Set Capital, a reasonable juror could conclude from this evidence that Credit Suisse recognized the danger of illiquidity in the VIX futures market and identified alternative ways to protect itself.

Second, the complaint plausibly alleges that Credit Suisse knowingly or recklessly exacerbated the liquidity squeeze it had already observed in the VIX futures market by increasing the number of XIV Notes outstanding through its offerings of June 30, 2017 and January 29, 2018. When Credit Suisse offered 16,275,000 XIV Notes on the latter date, it knew that the scale of its hedging strategy would have to increase to account for its additional sales even though the liquidity in the VIX futures market would remain roughly the same. From these facts, a reasonable juror could conclude that Credit Suisse and the Individual Defendants sold millions of these notes either knowing or recklessly disregarding a substantial risk that, when the next volatility event occurred, Credit Suisse's hedging trades would have an even greater negative impact on the value of XIV Notes than they had before. Moreover, the complaint specifically alleges that the Individual Defendants were aware of this risk, as Credit Suisse's expansion of XIV Notes breached internal risk limits and thus required approval by CARMC. Accepting these allegations as true, the complaint invites a reasonable inference that Credit Suisse increased the volume of XIV Notes for a manipulative purpose—specifically, to ensure that Credit Suisse's hedging trades would destroy the value of XIV Notes during the next volatility spike so that Credit Suisse could profit by declaring an Acceleration Event.

In addition to these central facts, the complaint alleges supporting evidence of conscious misbehavior or recklessness that bolsters the inference of manipulative intent. Most significantly, Credit Suisse made false or misleading public statements regarding the expected impact of its hedging trades and the basis for Credit Suisse's decision to declare an Acceleration Event. In the Offering Documents, for example, Credit Suisse minimized the expected impact of its hedging trades by stating that its hedging activity "could affect" the value of the VIX Futures Index[54] while at the same time affirming that it had "no reason to believe" that any impact would be "material."[55] One of the Individual Defendants, Credit Suisse CEO Tidjane Thiam, also stated

on February 14, 2018 that Credit Suisse announced an Acceleration Event because XIV Notes had "stopped trading," when in fact they had not.[56] Although these statements are relevant only if we assume the truth of other allegations in the complaint, they tend to support a culpable inference because the complaint plausibly alleges that Credit Suisse and Thiam "knew facts or had access to information suggesting that their public statements were not accurate."[57] In addition to these facts, the massive economic impact of the alleged manipulation, as well as the SEC's decision to investigate Credit Suisse following the collapse of the XIV Notes, strengthen the inference that Set Capital asks us to draw.[58]

[54]    J. App. at 151.

[55]    *Id.* at 188.

[56]    Compl. ¶ 208.

[57]    *Emps.' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 306 (2d Cir. 2015) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 199 (2d Cir. 2009)).

[58]    *See Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000) (finding that the magnitude of the fraud supported an inference of conscious misbehavior or recklessness); *In re Gentiva Sec. Litig.*, 932 F. Supp. 2d 352, 380 (E.D.N.Y. 2013) (observing that, "while the existence of an [SEC] investigation alone is not sufficient to give rise to a requisite cogent and compelling inference of scienter," "courts have considered a governmental investigation as one piece of the puzzle when taking a 'holistic' view").

**\*10**  Credit Suisse principally argues that inconsistencies and contradictions in the complaint render Set Capital's theory of scienter "implausible on [its] face."[59] In its view, the complaint alleges that Credit Suisse had fully hedged itself by acquiring alternative hedging instruments after the July 2016 Announcement. Thus, Credit Suisse would have had no need to trade VIX futures contracts at all on February 5, 2018 and therefore could not have manipulated the market for XIV Notes by doing so. Credit Suisse further argues that, if its positions in XIV Notes were indeed fully hedged, its sales of XIV Notes in January and February 2018 would not have breached internal risk limits and therefore would not have been brought to the attention of the Individual Defendants. While the district court credited this argument, we find it unpersuasive. Viewed in the light most favorable to Set Capital, the complaint does not allege that Credit Suisse had "fully" hedged its position. Rather, it alleges that Credit Suisse had the *right* to obtain alternative hedging instruments but did not significantly hedge its position until February 5, 2018, when it purchased 105,000 VIX futures contracts and caused the value of the XIV Notes to collapse.

[59]    Br. of Def.-Appellee Credit Suisse at 28.

Credit Suisse also contends that the July 2016 Announcement does not qualify as a "specific document" demonstrating that Credit Suisse understood the impact of its hedging activity and knew that a future volatility spike would occur.[60] We disagree. At the time of the July 2016 Announcement, Credit Suisse had observed five years of low market volatility punctuated by three volatility spikes. During each spike in volatility, Credit Suisse's hedging trades created a liquidity squeeze that depressed the value of XIV Notes. Although we readily acknowledge that "no market movements are certain,"[61] sophisticated investors like Credit Suisse routinely analyze patterns in market data to attempt to predict and profit from future market activity. Here, the July 2016 Announcement was issued only seven days after the most significant volatility spike in 2016 and it granted Credit Suisse the right to obtain additional instruments to hedge its exposure to sales of XIV Notes. Drawing all inferences in favor of Set Capital, the announcement directly reflected Credit Suisse's awareness of the impact of its hedging strategy as well as its view that occasional spikes in market volatility would likely continue.

[60]    *Id.* at 29–31; *see also Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 196 (2d Cir. 2008) (explaining that, to plead scienter based on a defendant's knowledge of facts showing its public statements were inaccurate, a plaintiff "must specifically identify the reports or statements" demonstrating knowledge of such facts).

[61]    *See* J. App. at 510 (Opinion of Netburn, *J.*).

Finally, Credit Suisse and the Individual Defendants argue that the SEC's investigation cannot animate Set Capital's "far-fetched" theory of scienter, and that the magnitude of the alleged fraud was necessarily *de minimis* because Credit Suisse fully hedged its position.[62] We agree with Credit Suisse that neither the SEC investigation nor the magnitude of the alleged fraud independently raises a compelling inference of manipulative intent; we view these facts principally as supporting culpable inferences drawn from stronger allegations discussed earlier. We disagree, however, with Credit Suisse's renewed assertion that its hedging made it economically impossible for the bank to profit. Accepting the facts alleged in the complaint as true, even Credit Suisse's own quarterly report on April 25, 2018 acknowledged that it profited substantially from "higher levels of volatility which benefited [its] derivatives business."[63] Thus, while not independently sufficient, these facts add circumstantial evidence of conscious misbehavior or recklessness and bolster the inference of manipulative intent.

[62]    Br. of Def.-Appellee Credit Suisse at 34–35.

[63]    Compl. ¶¶ 16, 194.

*Evidence of Motive or Opportunity*

The complaint also points to evidence supporting Credit Suisse's motive and opportunity to engage in the alleged manipulative scheme. First, the structure of the XIV Notes, which would allow Credit Suisse to profit if the value of the notes collapsed, provided both motive and opportunity for Credit Suisse to manipulate the market. Credit Suisse's effort, through its January 29 offering, to more than double the volume of XIV Notes outstanding enhanced the opportunity for manipulative acts in the days leading up to the market's collapse. Second, the complaint plausibly alleges that Thiam was under significant pressure to shift Credit Suisse's investment arm away from volatile assets like XIV Notes. Accepting these allegations as true, Credit Suisse's scheme to expand and then destroy the value of XIV Notes would have allowed the bank to profit substantially while realizing Thiam's strategic goal of "right-sizing" Credit Suisse's investment division.[64] Third, the complaint alleges that, in March 2018, Thiam was awarded a $10.2 million bonus for successfully shifting Credit Suisse away from volatile assets such as XIV Notes. We conclude that, on balance, these allegations support a strong inference of scienter when viewed together with the evidence of conscious misbehavior or recklessness.

[64]    *Id.* ¶¶ 119–20.

**\*11**  Credit Suisse first argues that the structure of the XIV Notes does not demonstrate motive or opportunity to commit fraud because Credit Suisse had fully hedged its exposure to sales of XIV Notes. We have already rejected this argument in a related context, and we conclude that it is no more persuasive here. Even assuming that Credit Suisse had fully hedged its position, Credit Suisse's argument does not account for its offer to more than double the volume of XIV Notes in the market, use its hedging trades to depress prices for XIV Notes, and leverage the favorable redemption rights that it built into the Offering Documents so that it could profit at investors' expense. As alleged in the complaint, this perfect storm was created through Credit Suisse's market activity, but it would not have been possible without the self-dealing structure of the XIV Notes.

Credit Suisse also challenges Set Capital's theory of Thiam's motive to manipulate the market. Specifically, it asserts that "it would have been illogical for Mr. Thiam and Credit Suisse to attempt to *reduce* Credit Suisse's exposure to risky assets by *increasing* its exposure to risky assets."[65] Credit Suisse also points to the fact that it "made good on Thiam's promise" to reduce exposure to such assets by closing two other VIX-related ETNs through the "simple exercise" of its right to do so—without an allegation of fraud.[66] But these arguments falter in the face of the facts alleged in the complaint. If Thiam intended to reduce Credit Suisse's exposure to XIV Notes, then his decision to issue millions of additional XIV Notes makes sense only if he knew that Credit Suisse could quickly eliminate its exposure through the alleged manipulative scheme.[67] The fact that Credit Suisse could have offloaded these risky assets without expanding its position does not diminish the inference of scienter but rather supports it.

65      Br. of Def.-Appellee Credit Suisse at 22.

66      *See id.* at 22–23; *see also* Compl. ¶ 214.

67      The allegations here thus go beyond "ordinary profit motive," Br. of Def.-Appellee Credit Suisse at 24, which cannot alone establish
        a strong inference of scienter. *See Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) ("[A] generalized motive, one which could
        be imputed to any publicly-owned, for-profit endeavor ... does not support a strong inference of fraudulent intent.").

Finally, Credit Suisse argues that Thiam's $10.2 million bonus had no connection to the February 2018 collapse of XIV Notes because it was issued as compensation for the prior fiscal year. While Set Capital emphasizes that the discretionary bonus was paid after the XIV Notes collapsed and specifically celebrated that Thiam's "strategic shift" was "paying off,"[68] we agree with Credit Suisse that the culpable inference here is not strong because the complaint alleges that the bonus was compensation for 2017. We therefore accord this fact only limited weight.

68      *See* Compl. ¶ 212.

In summary, we conclude that the complaint plausibly alleges both motive and opportunity to commit a manipulative act, as well as strong circumstantial evidence of conscious misbehavior or recklessness. Taken together, these allegations are "cogent and at least as compelling as any opposing inference of nonfraudulent intent."[69] We therefore VACATE and REMAND to the district court to reinstate the manipulative scheme claims. Because we remand as to the primary violation, Set Capital's secondary "control person" claims under Section 20(a) of the Exchange Act are reinstated as well.

69      *Tellabs*, 551 U.S. at 314, 127 S.Ct. 2499.

## II. The Failure to Correct the Flatline Value

Sections 9(a) and 10(b) of the Exchange Act prohibit materially false or misleading statements in connection with the purchase or sale of a security.[70] To state a claim for a material misrepresentation or omission under these provisions, a plaintiff must allege "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."[71]

70      *See* 15 U.S.C. § 78i(a)(4) (Section 9(a)); 15 U.S.C. § 78j(b) (Section 10(b)).

71      *Stoneridge Inv. Partners, LLC v. Sci.-Atlanta, Inc.*, 552 U.S. 148, 157, 128 S.Ct. 761, 169 L.Ed.2d 627 (2008) (Section 10(b) and
        Rule 10b-5). Section 9(a)(4) of the Exchange Act closely parallels this standard. *See I.B. Trading, Inc. v. Tripoint Glob. Equities,
        LLC*, 280 F. Supp. 3d 524, 539–40 (S.D.N.Y. 2017) (Section 9(a)(4)).

**\*12**  Set Capital claims that Credit Suisse and Janus, through their subsidiaries CSI and JIC, made material misstatements by failing to correct the intraday indicative value when it flatlined for nearly one hour on the evening of February 5, 2018. CSI and JIC contend that there was no misrepresentation in the Flatline Value because it accurately reflected the inverse of the VIX Futures Index (which itself had failed to update) and that, in any event, the complaint fails to allege scienter. Assuming without deciding that the Flatline Value materially misled investors, we agree that the complaint fails to allege a strong inference of scienter for these claims.

The complaint does not allege any facts showing that either CSI or JIC had motive or opportunity to falsify the Flatline Value.[72] The complaint does not identify specific evidence that CSI profited by selling XIV Notes in the secondary market at prices reflecting the inflated Flatline Value. Nor does it allege that CSI benefitted by delaying investors' realization that an Acceleration Event had occurred. Likewise, the complaint does not allege facts demonstrating that JIC, which was simply a "Calculation Agent," materially benefitted by failing to correct the Flatline Value.

72      *See Rombach*, 355 F.3d at 176 (holding that complaint may establish scienter through facts showing that defendants "had both motive and opportunity to commit fraud").

Without an adequate showing of motive or opportunity, Set Capital argues that the complaint nonetheless alleges scienter based on strong circumstantial evidence of conscious misbehavior or recklessness.[73] Specifically, Set Capital argues as follows. According to the Offering Documents, CSI and JIC were jointly listed as "Calculation Agents" responsible for announcing a "Market Disruption Event," which could occur if S&P "fails to publish or compute the [VIX Futures Index]."[74] In order to identify computing errors in the VIX Futures Index, CSI and JIC would have been required to monitor the VIX Futures Index and compare it to the values of its underlying inputs—i.e., the real-time prices for VIX futures contracts. Because careful monitoring would have allowed CSI and JIC to observe the flatline in the VIX Futures Index, they must have known that a derivative flatline was reflected in the intraday indicative value. We are unpersuaded.

73      *See Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) ("Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious [misbehavior or recklessness] by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." (citation omitted)).

74      Compl. ¶ 152.

First and foremost, CSI was under no obligation to calculate or monitor the intraday indicative value. Although the Offering Documents referred to CSI as a "Calculation Agent" for some purposes, the Offering Documents specified that "JIC or its affiliate"—not CSI—was "responsible for computing and disseminating the Intraday Indicative Value."[75] Thus, we are not convinced that CSI's status as a "Calculation Agent" is specific evidence of scienter.

75      J. App. at 135, 145, 195.

Second, the complaint does not set forth facts raising a strong inference that JIC knew that the intraday indicative value had flatlined. As stated in the supplement, JIC calculated the intraday indicative value every 15 seconds using an automated formula "based on the most recent intraday level of [the VIX Futures] Index at the particular time."[76] The complaint alleges in a conclusory fashion that JIC had access to real-time pricing data for VIX futures contracts such that it *could have* monitored the accuracy of the VIX Futures Index. But the complaint does not point to any "specific reports or statements" showing that JIC could access this data or that it ever monitored the Index.[77] The Offering Documents specified that JIC would rely on a third party, S&P, to accurately calculate the VIX Futures Index. It would be unreasonable to infer that, despite this plain effort to reduce JIC's administrative burden, JIC nonetheless devoted resources to calculating a redundant pricing index for VIX futures contracts.

76      *Id.* at 135.

77      *See Teamsters*, 531 F.3d at 196 (finding allegation of "access to ... raw data" insufficient to support strong inference of scienter where plaintiffs did not "specifically identify the reports or statements containing this information" (citation omitted)).

**\*13** Finally, the Offering Documents do not support a finding of scienter. While the Offering Documents provide that a Market Disruption Event may occur if S&P "fails to publish or compute the [VIX Futures Index]," they afford CSI and JIC "discretion in making [that] determination[ ]."[78] Because neither CSI nor JIC was required to declare a Market Disruption Event—either immediately or at any time—there can be no reasonable inference that either entity "[n]ecessarily" monitored the accuracy of the VIX Futures Index.[79] Moreover, the Offering Documents warned investors that published prices on the VIX Futures Index "may occasionally be subject to delay or postponement," which in turn "will affect" the accuracy of the intraday indicative value.[80] In light of these facts, the complaint does not allege a compelling inference of scienter.

78      J. App. at 159.

79   *See* Br. of Pls.-Appellants at 46.

80   J. App. at 177.

In summary, we hold, as the district court found, that the complaint fails to plausibly plead that CSI and JIC knowingly or recklessly failed to correct the Flatline Value. We therefore AFFIRM the district court's dismissal of these claims.[81]

81   Set Capital does not point to any circumstantial evidence showing that the Individual Defendants knowingly or intentionally failed to correct the Flatline Value. We therefore affirm the district court's dismissal of these claims as to the Individual Defendants as well.

### III. Misstatements or Omissions in the Offering Documents

Section 10(b) of the Exchange Act and Section 11 of the Securities Act also prohibit material misstatements or omissions in registration statements filed with the SEC.[82] Unlike claims brought under Section 10(b), a plaintiff bringing a claim under Section 11 "need not allege scienter, reliance, or loss causation."[83] Instead, Section 11 imposes absolute liability on the issuer of a registration statement if: "(1) the statement 'contained an untrue statement of a material fact,' (2) the statement 'omitted to state a material fact required to be stated therein,' or (3) the omitted information was 'necessary to make the statements therein not misleading.' "[84] In this Circuit, "a statement or omission is material if a reasonable investor would view it as significantly altering the total mix of information made available."[85]

82   *See* 15 U.S.C. § 78j(b) (Section 10(b)); 15 U.S.C. § 77k (Section 11).

83   *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

84   *Stadnick v. Vivint Solar, Inc.*, 861 F.3d 31, 36 (2d Cir. 2017) (quoting 15 U.S.C. § 77k(a)); *see also Synchrony*, 988 F.3d at 172.

85   *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 146 (2d Cir. 2017) (internal quotation marks, alteration, and citation omitted).

Set Capital claims that the Offering Documents misled investors by repeatedly warning of "risks" they knew were certain to occur. Among other things, they allege that the Offering Documents misrepresented Credit Suisse's knowledge of the impact of its hedging activity and failed to disclose Credit Suisse's plan to increase the volume of XIV Notes in the market before triggering an Acceleration Event. Credit Suisse disputes these claims and asserts that the Offering Documents contained full and robust disclosures of the very risks that came to pass. Although we acknowledge that many risks were disclosed, we agree with Set Capital that the Offering Documents contain actionable misrepresentations or omissions.

The Offering Documents warned investors of extensive risks related to the purchase of XIV Notes. They urged that the notes were intended for "sophisticated investors to manage daily trading risks"[86] and advised purchasers that, should they hold the notes long term, "it is likely that [they] will lose all or a substantial portion of [their] investment."[87] They also prominently disclosed Credit Suisse's intention to hedge its exposure to sales of XIV Notes.[88] But, with respect to the impact of that hedging, the Offering Documents provided a more equivocal advisory. They stated that, while "there can be no assurance that the level of the [VIX Futures] Index will not be affected," Credit Suisse and the Individual Defendants "have no reason to believe that [their] ... hedging activities will have a material impact on the level of the [VIX Futures] Index."[89]

86   J. App. at 130.

87   *Id.* at 154 (emphasis omitted).

88   *See, e.g.*, *id.* at 154–55, 161–62, 188.

89   *Id.* at 188.

**\*14**  As we explained in *Wilson v. Merrill Lynch & Co., Inc.*, "the law is well settled that so-called 'half-truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud."[90] In a similar vein, cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again.[91] As the D.C. Circuit explained in *Dolphin & Bradbury, Inc. v. SEC*, there is a "critical distinction between disclosing the risk a future event *might* occur and disclosing actual knowledge that the event *will* occur"—particularly where that distinction holds "enormous significance" for investors.[92]

[90]  *Wilson*, 671 F.3d at 130 (alterations omitted) (quoting *SEC v. Gabelli*, 653 F.3d 49, 57 (2d Cir. 2011), *rev'd on other grounds*, 568 U.S. 442, 133 S.Ct. 1216, 185 L.Ed.2d 297 (2013)); *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016) (discussing the rule against half-truths).

[91]  *Wilson*, 671 F.3d at 130; *see also Rombach*, 355 F.3d at 173.

[92]  512 F.3d 634, 640 (D.C. Cir. 2008); *see also In re Harman Int'l Indus., Inc. Sec. Litig.*, 791 F.3d 90, 102–03 (D.C. Cir. 2015) (explaining that "[a] warning that identifies a potential risk, but implies that no such problems were on the horizon even if a precipice was in sight," would not qualify as a "meaningful cautionary statement" for purposes of safe harbor (citation and alteration omitted)); *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 244, 247 (5th Cir. 2009) (holding that warnings "d[id] not qualify as meaningful cautionary language" because they "did not disclose that defendants knew from past experience that the [risks] posed an imminent threat of business and financial ruin and that some damage from these risks had already materialized").

Here, the complaint alleges that, following three prior volatility spikes, Credit Suisse and the Individual Defendants knew with virtual certainty that, upon the next volatility spike, their hedging activity would significantly depress the value of XIV Notes. It further alleges that Credit Suisse issued millions of additional XIV Notes without disclosing its intent to capitalize on this dynamic and trigger an Acceleration Event. Accepting these well pleaded allegations as true, the Offering Documents misrepresented Credit Suisse's knowledge and intent when they warned that Credit Suisse's hedging activity "could" or "may" impact prices of XIV Notes but affirmed that Credit Suisse had "no reason to believe" that it would. While these warnings could have possibly sufficed when Credit Suisse first issued XIV Notes, the bank conceded in its briefing below that the warnings remained unchanged for nearly a decade despite three episodes of market volatility putting to rest any uncertainty as to the price-impact of Credit Suisse's hedging.[93] Likewise, the Offering Documents omitted material facts when they stated that Credit Suisse's hedging trades "may present" a conflict of interest. As alleged in the complaint, Credit Suisse had already structured the market for XIV Notes to ensure that the next volatility spike would allow it to profit at its own investors' expense. These misstatements, if proven at trial, would materially alter the mix of information available to Credit Suisse's investors.[94]

[93]  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) (finding cautionary statement in Form 10-Q inadequate in light of "[t]he consistency of the defendants' language over time despite the new information they received").

[94]  We recognize that, in *In re Proshares Tr. II Sec. Litig.*, we affirmed the district court's dismissal of claims arising out of similar market events—namely, illiquidity in the VIX futures market during afterhours trading on February 5, 2018. *See* 839 F. App'x 649, 651 (2d Cir. 2021) (summary order). While there are superficial similarities between the two cases, our decision in *Proshares* addressed different disclosures related to a different underlying securities product—an exchange traded fund (ETF), which bundles securities together. *See In re Proshares Trust II Sec. Litig.*, No. 19 cv 0886 (DLC), 2020 WL 71007, at \*1 (S.D.N.Y. Jan. 3, 2020). In part because of the material differences between ETFs and ETNs, the complaint in *Proshares* did not allege market manipulation or the failure to fully disclose a conflict of interest. *See id.* Here, unlike in *Proshares*, the complaint plausibly alleges that Credit Suisse gave itself the right to accelerate the notes it issued such that it could use its own trading to depress their price, force redemptions, and profit at its investors' expense. Compl. ¶ 7.

**\*15**  For the reasons discussed in Section I, above, we have already concluded that the complaint alleges a strong inference of scienter with respect to the manipulative scheme. Because the Offering Documents misrepresented Credit Suisse's knowledge and its intent to engage in manipulative acts, we conclude that the complaint pleads actionable misrepresentations or omissions that must be reinstated and therefore REMAND these claims to the district court. Moreover, because we remand as to the

2021 WL 1619620

primary violations, Set Capital's secondary "control person" claims under Section 15 of the Securities Act and Section 20(a) of the Exchange Act are reinstated as well.[95]

[95]     Set Capital asserts a Section 15 claim against Janus in its capacity as an alleged "control person" of Credit Suisse and the Individual Defendants. *See* Compl. ¶¶ 317–21. While Janus argues that this last surviving claim against it should be dismissed because it did not control either Credit Suisse or the Individual Defendants, *see* Br. of Def.-Appellee Janus at 33–34, the district court did not address the viability of Janus's control person allegations. We therefore leave it to the district court to address this claim in the first instance on remand.

\* \* \*

To summarize this opinion, the dismissals of the market manipulation claim, the actionable misstatements and omissions claims, and the related "control person" claims are vacated. We affirm the dismissal of the Flatline Value claims. Our decision today to reinstate the foregoing claims is based on what we determine to be plausible allegations by Set Capital in the complaint. We express no view nor prediction as to how the proof of these claims may unfold but simply hold that these claims cannot be dismissed at this stage of the litigation.

**CONCLUSION**

For the foregoing reasons, we VACATE the judgment dismissing the claims pertaining to the manipulative scheme, the alleged misstatements or omissions in the offering documents, and the corresponding liability of control persons. We therefore REMAND those claims for further proceedings. We AFFIRM the judgment dismissing the claims for failure to correct the Flatline Value, while VACATING the district court's denial of leave to amend those claims.

**All Citations**

--- F.3d ----, 2021 WL 1619620

---

**End of Document**

© 2021 Thomson Reuters. No claim to original U.S. Government Works.

 © 2021 Thomson Reuters. No claim to original U.S. Government Works.