# EXHIBIT 1

Case 1:20-cv-04740-PGG   Document 167-1   Filed 03/27/23   Page 1 of 34

**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | |
|---|---|
| OPTIMUM STRATEGIES FUND I, LP, | |
| *Plaintiff*, | No. 3:22-cv-00511 (MPS) |
| v. | |
| UNITED STATES OIL FUND, LP and UNITED STATES COMMODITY FUND, LLC, | |
| *Defendants*. | |

**RULING ON MOTION TO DISMISS**

## I.      INTRODUCTION

Plaintiff Optimum Strategies Fund I, LP, brings this action against Defendants United States Oil Fund, LP ("USO" or "the Fund") and United States Commodity Fund, LLC ("USCF") alleging violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b), and Rule 10b-5, 17 C.F.R. § 240.10b-5 (Count One); Section 20(a) of the Exchange Act (Count Two); and the Connecticut Uniform Securities Act ("CUSA"), Conn. Gen. Stat. § 36b-3 (Count Three).  In its operative complaint (ECF No. 12), Optimum contends that Defendants failed to disclose, or made false or misleading statements regarding, "material adverse information" affecting USO's "business, operations and risks," ECF No. 12 at ¶ 83. Defendants have moved to dismiss Plaintiff's Second Amended Complaint in its entirety under Fed. R. Civ. P. 12(b)(6) for failure to state a claim.  For the reasons stated below, I GRANT Defendants' motion.

1

## II.     BACKGROUND

### A.     Factual Allegations[1]

### 1.     The Parties

USO is a "commodity pool operator" and "a security called an exchange-traded fund" ("ETF") "that provides investment exposure to oil markets." ECF No. 12 at ¶ 3.[2] According to the complaint, "USO grew to become the largest oil-related ETF in existence, and ultimately sold billions of dollars' worth of USO shares to investors." *Id.* at ¶ 77.

The Fund is "organized as a limited partnership that issues shares that trade on the NYSE Arca stock exchange ("NYSE Arca")." ECF No. 32-2 at 2. USO pays its general partner, Defendant United States Commodity Fund, LLC ("USCF"), "a management fee and grants USCF full management control of USO." ECF No. 12 at ¶ 4. "USCF created the Fund, designed its investment objective, assessed its risks and likely performance, and [was] responsible for the daily management of the Fund." *Id.* at ¶ 73. Together, USCF and USO "drafted and disseminated statements on behalf of the Fund to the investing public and held themselves out as the persons and entities most knowledgeable about the Fund and the Factors impacting the Fund and its risk profile." *Id.*

---

[1] The facts in this section, which I accept as true for the purposes of this motion, are drawn primarily from the second amended complaint. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). I also consider documents incorporated by reference in the complaint and provided as exhibits to Defendants' motion to dismiss, save for Defendants' Ex. 14 (ECF No. 32-15), a table purportedly representing USO "Historical Share Prices from May 21, 2020 to June 29, 2020," which the complaint does not incorporate by reference. On a Rule 12(b)(6) motion to dismiss, a court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on [such a motion], in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). But "[a] necessary prerequisite for taking into account materials extraneous to the complaint is that the plaintiff *rely* on the terms and effect of the document in drafting the complaint; mere notice or possession is not enough." *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 231 (2d Cir. 2016) (internal quotation marks omitted) (emphasis in original). As it is not apparent that Plaintiff relied on the figures in Defs. Ex. 14 in drafting its complaint, I will not consider the information contained therein.

[2] I use ECF page numbers when citing documents in the record.

Plaintiff Optimum Strategies Fund I, LP, ("Optimum" or the "Plaintiff"), "a Delaware limited partnership with a general partner, Optimum Strategies, LLC, a Connecticut limited liability company…," *id.* at ¶ 1, is a purchaser of USO securities, *id.* at ¶¶ 63-66.

**2.     The Fund**

An ETF, like a mutual fund, is a financial product that "issues shares and then uses the proceeds from the sale of th[o]se shares to invest according to its stated investment strategy and objective.  However, unlike mutual funds, ETFs issue their shares first to authorized participants through a marketing agent," rather than issuing them directly to retail investors.  *Id.* at ¶ 9. Those authorized participants then "distribute[] and sell[] the shares to investors."  *Id.* at ¶ 9.

"Oil ETFs [like the Fund] [facilitate investment] in products tied to oil prices and/or the energy market that can be easily traded directly in investors' brokerage accounts."  *Id.* at ¶ 10. "[O]il ETFs are not backed by the physical stock or asset, but rather trade futures contracts for barrels of oil in a particular oil market."  *Id.* at ¶ 10.[3]  As "most retail investors are not equipped to buy and sell barrels of oil or authorized to trade oil futures contracts directly, [] they [may] [purchase shares in] ETFs such as USO to make investments based on the price of oil."  *Id.* at ¶ 10.

USO shares trade on the NYSE Arca, an ETF exchange.  *See id.* at ¶ 28 n.1.  "Shares trade on the NYSE Arca after they are initially purchased by 'Authorized Participants,' institutional firms that purchase shares in blocks of 100,000 shares called 'baskets' through USO's marketing agent," *id.* at ¶ 16, also known as its futures commission merchant ("FCM").

---

[3] "A futures contract is a legal agreement to buy or sell a particular commodity at a predetermined price at a specified time in the future.  The buyer of a futures contract assumes the obligation to buy and receive the underlying asset at a specified date, while the seller of a futures contract assumes an obligation to deliver the underlying asset at a specified date…As futures contracts approach maturity, their prices tend to converge with prices in the physical spot market."  ECF No. 12 at ¶ 11.

*Id.* at ¶ 29. "USO continuously issues new shares until its inventory is exhausted. To the extent USO's inventory is exhausted," authorized participants must wait "until a new registration statement to register the offering of additional shares is filed and declared effective" by the SEC to purchase additional baskets. *Id.* at 28 ¶ n.1.

USO's overall investment objective "is to track a benchmark of short-term oil futures contracts," ECF No. 32-2 at 2, or, more specifically, for its per share net asset value ("NAV")— the value of the Fund's total assets minus its total liabilities divided by the number of its outstanding shares—"to reflect the daily changes in percentage terms of the spot price of West Texas Intermediate ("WTI") light, sweet crude oil delivered to Cushing, Oklahoma," as measured by the changes in price of oil futures contracts. ECF No. 12 at ¶ 13. To measure changes in the spot price of oil and track its NAV per share, the Fund refers "to the daily changes in the price of specified short-term WTI futures contracts traded on the New York Mercantile Exchange (the "NYMEX") – which USO dubs the 'Benchmark Oil Futures Contract.'" *Id.* "The Fund's Benchmark Oil Futures Contract refers to the WTI futures contract that is the nearest month contract to mature (i.e., the 'front' month), except when the nearest month contract is within two weeks of expiration, in which case it refers to the futures contract that is the next month contract to mature." *Id.* at ¶ 14.

To achieve its investment objective, USO invested in futures contracts such that "the average daily percentage change in its NAV over any 30-day period will be within plus or minus 10% of the daily percentage change in the price of the Benchmark Oil Futures Contract over the same period." *Id.* "Until recently," the complaint alleges, "USO's stated investment strategy was to invest substantially all of its assets in front month WTI futures contracts, which were then

4

rolled, in order to closely track the Benchmark Oil Futures Contract." *Id.*[4] "Although the Prospectus discloses that USO may invest in 'Oil Futures Contracts' other than the Benchmark Oil Futures Contract, as well as 'Other Oil-Related Investments'," Plaintiff alleges that "prior to mid-April 2020, USO had historically invested primarily in the Benchmark Oil Futures Contract." *Id.* at ¶ 23.

### 3. COVID-19 and the Commodity Markets

In early 2020, the United States declared the spread of the COVID-19 virus to be a public health emergency. *Id.* at ¶ 17. "By February 2020, COVID-19 had begun to have a significant impact on commodity markets," including the price of crude oil. *Id.* at ¶ 18. As alleged in the complaint, "the convergence of the rapid spread of COVID-19 and disputes between major oil-producing countries created turmoil in oil markets." *Id.* at ¶ 17.

At around the same time, Optimum alleges, "trading in WTI futures contracts accelerated as investors tried to capitalize on the volatility of the markets." *Id.* at ¶ 19. "By the end of February, more than one million WTI front month futures contracts were being exchanged daily, nearly double the five-year averages. Between February 26, 2020 and March 2, 2020, the 15-day historical price volatility for front month WTI futures contracts jumped from 30% to 44%," meaning "front month WTI futures contracts were becoming increasingly risky." *Id.* And efforts by some nations in March 2020 to discount oil prices in the face of decreased demand for crude oil due to the COVID-19 pandemic "threatened to overwhelm global oil markets with supply." *Id.* at ¶¶ 18-19, 21.

---

[4] "When the futures contracts held by an oil ETF approach maturity, the ETF must 'roll' its position to a future dated futures contract by selling the contract approaching maturity and replacing the maturing contract with a replacement contract with a different maturity date in order to avoid having to take physical delivery of the oil." ECF No. 12 at ¶ 12.

**4.     April 2020 Changes in USO's Investment Strategy**

"On April 3, 2020, the first of a series of April exchange notices were issued to certain market participants addressing the possibility of negative pricing of energy futures contracts. Before these issuances, there was market uncertainty as to whether futures exchanges would support oil going negative, i.e., whether oil futures contracts could settle at a price below zero." *Id.* at ¶ 25.

Also around this time, "USO experienced record daily inflows [of investment] into the pool." *Id.* at ¶ 27. "For example, on April 13, 2020, USO experienced its second-largest inflows in the pool's history, and then, on April 16, 17, and 20, 2020, it experienced single-day record inflows, with each day surpassing the prior day's newly-established record." *Id.* at ¶ 27. Due to the increase in investments, USO exhausted its inventory of shares on April 21, 2020. *Id.* at ¶ 28. That same day, USO "filed a…Form 8-K announcing" its exhaustion of existing shares. *Id.* at ¶ 28. The following day, USO's FCM "imposed certain limitations on USO pursuant to its account agreement"—namely, the "New Creations Limit." *Id.* at ¶ 29. The New Creations Limit barred USO from investing in oil futures contracts and limited it to "U.S. Treasuries or cash equivalents"; alternatively, USO could elect to hold cash. *Id.* at ¶ 30. The FCM reiterated the New Creations Limit to USO via email on April 23 and April 24. *Id.* at ¶¶ 29, 31. USO responded to the April 24 email, which stated that "[FCM] is not prohibiting the rebalance of the portfolio but [FCM] is not willing to expand the risk profile of the clearing relationship through new creations and additional increases in risk" by stating that USO would "keep [the FCM] posted on all developments" and that it "underst[ood]" the FCM's comments. *Id.* at ¶ 31.

"Beginning in mid-April 2020," as a result of the previously discussed "market events" and the limitations imposed by its FCM, "USO gradually changed the composition of its

investment portfolio…decreasing its concentration of investments in the Benchmark Oil Futures Contract and leading to a diversification of investments ranging from the front month futures contracts to contracts which matured in later months." *Id.* at ¶ 24.

### 5. The Relevant Disclosures

The complaint identifies two distinct categories of allegedly misleading statements and material omissions: (1) statements issued in connection with the Fund's March 2020 public offering of USO shares (the "March Offering"); and (2) statements issued during and after April and May 2020.  The statements identified in each category are reproduced below.

### a. The March Offering

The complaint identifies the statements below from Defendants' "March registration statement," [5] filed in connection with USO's March Offering, *see* ECF No. 32-2, as being materially misleading or as having omitted material information.

In its March registration statement, USO represented that "'[i]nvestors may choose to use USO as a means of investing indirectly in crude oil'" and "that USO had been 'designed to permit investors generally to purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-effective manner.'" *Id.* at ¶ 50.

Defendants' registration statement "likewise represented that USO's market price would 'closely track' the daily changes in the spot price of WTI oil, reinforcing the false and misleading notion that investors could use USO as a cost-effective means of gaining exposure to crude oil prices." *Id.*  Specifically, the March registration statement advised investors as follows:

---

[5] Although Plaintiff refers to a "March registration statement" throughout its complaint as if it were a single document, Defendants assert that the term in fact encompasses several documents: (1) a registration statement filed by USCF with the SEC on March 19; (2) an amendment filed March 23; and (3) "the prospectus filed and declared effective by the SEC on March 23," ECF No. 32-1 at 13 n.1 (citing Defs. Ex. 1), all filed in connection with Defendants' March registration and offering of additional shares.

> USCF believes that market arbitrage opportunities will cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis.  USCF further believes that daily changes in prices of the Benchmark Oil Futures Contract have historically closely tracked the daily changes in spot prices of light, sweet crude oil.  USCF believes that the net effect of these relationships will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track[] the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses.

*Id.* (emphasis omitted).  Similarly, the March registration statement claimed that "'the changes in the price of USO's shares as traded on the NYSE Arca *have closely tracked and will continue to closely track* on a daily basis, the changes in the spot price of light, sweet crude oil on a percentage basis.'"  *Id.* at ¶ 51 (emphasis in original).

The complaint also alleges that Defendants represented in the March registration statement that "USCF employed a 'neutral' investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down."  *Id.* at ¶ 52 (cleaned up).  "The registration statement similarly highlighted that USO was 'not actively managed,' but instead simply 'tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising.'"  *Id.*  On this point, the registration statement further explained that "'*if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract.*'"  *Id.* (emphasis in original).

According to the complaint, USO also claimed in its March registration statement to be "highly liquid," representing to investors that "'USO invests only in Oil Futures Contracts and Other Oil-Investments that…are traded in sufficient volume to permit the ready taking and liquidation of positions in these financial interests and in Other Oil-Related Investments

8

that…may be readily liquidated with the original counterparty or th[r]ough a third party assuming the position of USO." *Id.* at ¶ 53. The March registration statement further represented that "'[t]he large size of the positions that USO may acquire increases the risk of illiquidity,' without disclosing the significant illiquidity threats that USO was already experiencing as a result of the market-dominating positions that the Fund had already taken and was planning to take as a result of the March Offering." *Id.* at ¶ 58.

These disclosures were inadequate, Optimum argues, because they "failed to disclose [that] USO was approaching [regulatory position] limits or that the necessary positional growth caused by the March Offering itself would result in the Fund running afoul of regulators, thereby jeopardizing the Fund's entire investment strategy and undermining its investment objective." *Id.* at ¶ 54.

**b.      USO's Disclosures After the New Creations Limit**

Optimum's claims principally concern the alleged omissions and misstatements made by Defendants about changes in USO's investment strategy and the regulatory limitations imposed upon USO that necessitated those changes—in particular, the trading restrictions imposed by USO's FCM.

In an April 16, 2020 Form 8-K filed with the SEC, USO announced "that the Fund would substantially revise its investment strategy beginning the next day, such that the Fund would only invest 80% of its portfolio in front month WTI futures contracts." *Id.* at ¶ 61. But this filing did not disclose the reasons for this abrupt strategy change, including "that on April 16, 2020, the CME,[6] on behalf of the NYMEX, had sent a letter to USO specifically ordering it to limit the Fund's exposure to June WTI futures contracts." *Id.* "Substantially[] the same material

---

[6] The complaint does not define the acronym, CME, but it likely stands for "Chicago Mercantile Exchange."

omissions were again made by Defendant in connection with a Form 8-K filed by USO on April 22, 2020, which also announced that the Fund had changed its investment objective but failed to provide the specific reasons and extraordinary regulatory intervention that had necessitated those changes." *Id.*

On April 21, 2020, "USO filed with the SEC on Form 8-K an announcement that the SEC had yet to declare effective an S-3 registration statement for the sale of an additional four (4) billion USO shares, which had been filed the previous day." *Id.* at ¶ 62. The complaint alleges that "[t]his statement was materially misleading because it failed to disclose the specific reasons for the SEC's refusal to declare the registration statement effective." *Id.* According to the complaint, "the SEC would not declare the registration statement effective until nearly eight (8) weeks later, and only after the Defendant materially revised the disclosures to investors." *Id.*

According to the complaint, "USO first publicly referenced certain 'risk mitigation measures' imposed by the FCM" "[i]n a Form 8-K dated April 24, 2020." *Id.* at ¶ 32. "USO stated in the April 24 Form 8-K that…'risk mitigation measures imposed by USO's futures commission merchant . . . further limit USO and other market participants from investing in crude oil futures contracts in certain months,' thereby 'caus[ing] USO to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract." *Id.* "The April 24 form 8-K did not mention the FCM's limit on USO's ability, if it had shares available for sale, to invest the proceeds generated by new creations in any oil futures contracts." *Id.*

USO added in an April 27, 2020 Form 8-K that its investment intentions could change due to "'additional or different risk mitigation measures taken by USO's FCM with respect to USO acquiring additional Oil Futures contracts . . . .'" *Id.* at ¶ 33. The complaint alleges that

this language would not have encompassed the "New Creations Limit" because the FCM had already imposed that limit five days earlier. *Id.*

And in a Form 8-K dated April 30, USO "explicitly referred back to its references to futures commission merchant 'risk mitigation measures' in prior Filings, stating" the following:

> [a]s previously disclosed, various factors including, but not limited to, . . . risk mitigation measures imposed by FCMs on USO and other market participants, have severely limited USO's ability to invest in the Benchmark Oil Futures Contract and certain of the other investments in which USO traditionally would have invested in a substantial portion of its portfolio.

*Id.* at ¶ 34.

These disclosures regarding the "risk mitigation measures" imposed by its FCM, Optimum alleges, were incomplete, as they "did not fully disclose the New Creations Limit, rendering statements [USO] made misleading." *Id.* at ¶ 35. The limit remained in place through late-April and into May 2020, "with the FCM periodically re-emphasizing in e-mails and conversations with USO that the FCM was not willing to expand the risk profile of their clearing relationship through new creations." *Id.*

According to the complaint, "[d]uring this same time period, USO had advised the FCM of its belief that its registration statement may imminently be declared effective, and USO sought relief from the New Creations Limit in anticipation of such a declaration." *Id.* at ¶ 36. "Between around May 6 and 10, 2020, USO and the FCM, including, at times, legal counsel for both entities, discussed, among other things, USO's plans in the event that it was able to issue new shares, including whether USO had informed SEC staff of the New Creations Limit." *Id.* at ¶ 37. "For example, on May 10, 2020, the FCM asked USO whether SEC staff knew of 'position limits imposed by both the exchange and FCM and the impact that would have on new

11

creations?' USO responded that on 'advice of counsel' it was 'unable to disclose information about conversations with our regulators.'" *Id.*

USO filed another pre-effective amendment to its Registration Statement on May 11. *Id.* at ¶ 38. "This pre-effective amendment again did not fully disclose the New Creations Limit." *Id.* That same day, the FCM informed the SEC of the New Creations Limit. *Id.* The SEC on May 13 issued a comment letter on USO's May 11 pre-effective amendment, requesting information on "'the specific constraints placed on you by your FCM and how those constraints impact your ability to invest in the Benchmark Oil Futures Contract, the ICE WTI Contract or any other oil futures contracts.'" *Id.* The complaint alleges that Defendants' failure to inform investors from April 24 through May 21 of the constraints placed on the Fund by the FCM and their effect on the Fund's ability to meet its objectives made their filings materially misleading. *Id.* at ¶ 39.

**6.      Subsequent Regulatory Intervention**

After receiving the SEC's comment letter, USO revised the language it had used in previous disclosures to provide more detail about the risk-mitigation limits imposed by its FCM. *Id.* at ¶ 40. For example, in a pre-effective amendment dated May 21, USO explained that the FCM "has expressly informed USO that, until further notice, USO may not hold positions in the Benchmark Futures Oil Futures Contract and that it may not purchase any other Oil Futures Contracts for USO's portfolio through [its] [FCM] whether or not such purchases would be within the limits permitted by the exchanges." *Id.* The same amendment added:

> [I]f USO were to again offer Creation Baskets for purchase, it is anticipated that the limitations being imposed by the exchanges and USO's FCM will significantly limit USO's ability to invest the proceeds of the purchases of Creation Baskets in Oil Futures Contracts. Assuming this to be the case, if USO sells Creation Baskets again, USO would invest in other permitted investments, including Other Oil-Related Interests, and

12

may hold larger amounts of Treasuries, cash and cash equivalents, which will further impair USO's ability to meet its investment objective."

*Id.* at ¶ 41.

"[A]s disclosed in Forms 8-K dated May 29 and June 9, 2020," "USO was eventually able to enter into agreements with additional futures commission merchants," "which would allow USO to invest the proceeds of the sale of new USO shares in oil futures contracts." *Id.* at ¶ 42. USO's Registration Statement was declared effective by the SEC on June 12, enabling it to file a prospectus for the offering of new shares "for the first time since April 21, 2020." *Id.* at ¶ 43.

"On May 29, 2020, it was reported that [both] the SEC and the CFTC had [] launched investigations into USO regarding the propriety of the Fund's disclosures to investors and the Fund's rapid-fire changes to its investment strategy." *Id.* at ¶ 44. The complaint further alleges that "[a]round this same time, the SEC required the Fund to revise many of its disclosures and representations to investors, including by requiring USO to prominently announce on the cover page of its prospectus that the Fund '**IS NOT A PROXY FOR TRADING DIRECTLY IN THE OIL MARKETS**.'" *Id.* (emphasis in original). Several months later, on August 17, 2020, the SEC issued a Wells Notice to USO. *Id.* at ¶ 45.[7] The Notice indicated that "that the SEC had made a preliminary determination to recommend that…an enforcement action [be filed] against USO for violating the 1933 Act and 1934 Act and Rule 10b-5 thereunder with respect to the Fund's disclosures to investors." *Id.* The CFTC issued a similar Wells Notice to USO on August 19. *Id.* at ¶ 46. And on November 8, 2021, the SEC issued a cease-and-desist order against Defendants for "incomplete [and] misleading disclosures to the market." *Id.* at ¶ 47.

---

[7] "A Wells Notice is a notice that the SEC sends to an individual or entity at the conclusion of an investigation informing the recipient that the SEC's enforcement division intends to recommend an enforcement action against them." *Fries v. N. Oil & Gas, Inc.*, 285 F. Supp. 3d 706, 712 (S.D.N.Y. 2018).

**7. Optimum's Investment in the Fund**

Optimum invested in the Fund by purchasing call option contracts on USO securities. Specifically, Optimum purchased around 5000 call options on USO between April 20 and April 28, 2020, with expiration dates ranging from June 2020 to January 2021. *See id.* at ¶¶ 63-66. "[W]hen the truth about USO's misconduct was revealed, the value of USO securities declined precipitously as the prior artificial inflation no longer propped up the prices of such securities." *Id.* at ¶ 78. As a result, the complaint alleges, the price of Optimum's USO call options dropped and ultimately "expired worthless." *Id.* at ¶ 79.

**B. Procedural History**

Before responsive pleadings were filed, Optimum twice amended its complaint. *See* ECF Nos. 1, 7, 12. Defendants filed a motion to dismiss. ECF No. 32. I then gave Optimum a further opportunity to amend its complaint, "to plead[] as many facts as possible, consistent with Rule 11, to address the alleged defects discussed in Defendants' memorandum of law," indicating that I would not allow further amendments after this opportunity. ECF No. 35. Instead of amending again, Plaintiff responded to the motion to dismiss, and Defendants filed a reply. ECF Nos. 39, 40. I stayed discovery in accordance with the PSLRA's automatic stay provision, 15 U.S.C. § 78u-4(b)(3)(B). *See* ECF No. 31.

**III. LEGAL STANDARD**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (internal citations omitted). Where "faced with a Rule 12(b)(6) motion to dismiss a § 10(b)

action, courts must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). "Although all allegations contained in the complaint are assumed to be true, this tenet is 'inapplicable to legal conclusions.'" *Wilson v. Dantas*, 746 F.3d 530, 535 (2d Cir. 2014) (quoting *Iqbal*, 556 U.S. at 678).

"A complaint alleging securities fraud must also satisfy heightened pleading requirements set forth in Federal Rule of Civil Procedure 9(b) and the Private Securities Litigation Reform Act of 1995 (PSLRA)." *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021). Under Rule 9(b), a plaintiff alleging fraud "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). To satisfy this requirement, a plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Set Cap. LLC*, 996 F.3d at 75 (internal quotation marks omitted). "The PSLRA, in turn, requires a plaintiff alleging securities fraud to (1) specify each misleading statement, (2) set forth the facts on which a belief that a statement is misleading was formed, and (3) state with particularity facts giving rise to a strong inference that the defendant acted with scienter—the required state of mind." *Id.* Where a plaintiff alleges that a defendant made a false statement or omission, the PSLRA also requires that the plaintiff's complaint "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1).

15

## IV. DISCUSSION

Optimum asserts three claims against Defendants: (1) a securities fraud claim under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b) (the "Exchange Act") and its implementing rule, Rule 10b-5, 17 C.F.R. § 240.10b-5, against both USO and USCF; (2) a claim for control person liability under § 20(a) of the Exchange Act against USCF; and (3) a claim under §§ 36b-29(a) and 36b-4 of the Connecticut Uniform Securities Act ("CUSA") against USO.

### A. Count One: § 10(b) and Rule 10b-5

Section 10(b) provides that it shall be unlawful to "use or employ, in connection with the purchase or sale of any security registered on a national securities exchange…any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe…." 15 U.S.C. § 78j(b). And Rule 10b-5 provides that it shall be unlawful for any person, in connection with the purchase or sale of a security, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading." 17 C.F.R. § 240.10b-5(b). "To state a claim under Section 10(b) and Rule 10b-5, a plaintiff must plead: (1) a misstatement or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of securities; (4) reliance; (5) economic loss; and (6) loss causation." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 351–52 (2d Cir. 2022).

In their motion to dismiss, Defendants contend that the complaint fails to sufficiently plead three of the necessary elements of a securities fraud claim: (1) an actionable misstatement or omission; (2) scienter; and (3) loss causation. Because I find that the complaint fails to allege

16

scienter and loss causation, I do not address whether Optimum adequately pleaded material misrepresentations or omissions.

**1. Scienter**

Defendants argue that Optimum has failed to allege facts giving rise to a "strong inference" of scienter, as is required by the PSLRA to state a Section 10(b) claim. *See* ECF No. 12 at 20-42.

"Section 10(b) and Rule 10b-5 require [a] plaintiff[] to allege a state of mind demonstrating 'an intent to deceive, manipulate or defraud,' also known as scienter." *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp. 3d 401, 425 (S.D.N.Y. 2014) (quoting *Ganino v. Citizens Utilities Co.*, 228 F.3d 154, 168 (2d Cir. 2000)). "While [a court] normally draw[s] reasonable inferences in the non-movant's favor on a motion to dismiss," the PSLRA "establishes a more stringent rule for inferences involving scienter, and requires that a plaintiff's complaint 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 194 (2d Cir. 2008) (quoting 15 U.S.C. § 78u-4(b)(2)). "To qualify as 'strong' within the intendment of [the PSLRA]," "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 314 (2007). The Supreme Court in *Tellabs* further explained that for a plaintiff to plead enough facts to warrant a "strong inference" of scienter,

> [i]t does not suffice that a reasonable factfinder plausibly could infer from the complaint's allegations the requisite state of mind. Rather, to determine whether a complaint's scienter allegations can survive threshold inspection for sufficiency, a court governed by [the PSLRA] must engage in a comparative evaluation; it must consider, not only inferences urged by the plaintiff…but also competing inferences rationally drawn

from the facts alleged.  An inference of fraudulent intent may be plausible, yet less cogent than other, nonculpable explanations for the defendant's conduct.

*Id.*  Therefore, "[a] complaint will survive [a motion to dismiss] only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference [of non-fraudulent intent] one could draw from the facts alleged."  *Id.* at 324.

"To establish scienter, a complaint may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud."  *Set Cap. LLC*, 996 F.3d at 78 (internal citation and quotation marks omitted).  In this Circuit, a "strong inference" of scienter has been found under one of these theories where, for instance, "the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor."  *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000) (internal citations omitted).

Here, Optimum attempts to allege both motive and opportunity and conscious misbehavior or recklessness.  *See* ECF No. 12 at ¶¶ 70-77.  I take each argument in turn below.

a.      **Motive and Opportunity**

"In order to raise a strong inference of scienter through 'motive and opportunity' to defraud," a plaintiff "must allege that [Defendants or their officers] benefitted in some concrete and personal way from the purported fraud."  *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009) (internal quotation marks omitted).  "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do

18

not constitute 'motive' for purposes of this inquiry." *Id.* "[W]hat is required…is not a bare invocation of magic words such as 'motive and opportunity' but an allegation of facts showing the type of particular circumstances that [Second Circuit] case law has recognized will render motive and opportunity probative of a strong inference of scienter." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir. 2000) (internal quotation marks omitted). These "particular circumstances" do not include generalized motives common to all corporations and corporate officers, such as the incentive to keep a company's stock price high to increase executive compensation, a company's desire to maintain a high bond or credit rating, or the incentive to maintain the appearance of corporate profitability or the success of an investment. *See, e.g.*, *JP Morgan Chase Co.*, 553 F.3d at 198 ("Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry."); *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 268 (2d Cir. 1996) (holding that a corporation's desire for its "investment [to] appear profitable,"—"a generalized motive, one which could be imputed to any publicly-owned, for-profit endeavor,"—"is not sufficiently concrete for purposes of inferring scienter."); *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Companies, Inc.*, 75 F.3d 801, 814 (2d Cir. 1996) ("We do not agree that a company's desire to maintain a high bond or credit rating qualifies as a sufficient motive for fraud in these circumstances, because '[i]f scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions.'") (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 54 (2d Cir. 1995)); *Acito*, 47 F.3d at 54 (holding that "Plaintiffs' allegation that defendants were motivated to defraud the public because an inflated stock price would increase their compensation" was insufficient to plead

19

scienter). Instead, the "particular circumstances" warranting a "strong inference" of motive are those involving more specific, more acute incentives than those that would apply to most or all corporations and corporate executives. *See JP Morgan Chase Co.*, 553 F.3d at 198, 201 ("[T]he 'motive' showing is generally met when corporate insiders allegedly make a misrepresentation in order to sell their own shares at a profit" or in cases in which a plaintiff makes "a showing of a direct link between [corporate officers'] compensation package and the fraudulent statements because of the magnitude of the compensation and the defendants' motive to sweep problems under the rug …."); *Employees' Ret. Sys. of Gov't of the Virgin Islands v. Blanford*, 794 F.3d 297, 308 (2d Cir. 2015) (Plaintiffs successfully pleaded motive where they "detail[ed]" personal gains from efforts to deceive investors and auditors about company's inventory, including Defendants' conveniently-timed stock sales—which allegedly occurred "shortly after [specific] quarterly investor calls [identified by Plaintiffs] during which [Defendant-executives] reassured investors of the strength and continued growth of [the] business."); *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74–75 (2d Cir. 2001) (Plaintiffs successfully pleaded motive and opportunity to defraud where they alleged that individual defendant, "vice president for finance and investor relations" for corporation-defendant, *id.* at 67, "sold 80 percent of his holdings within a matter of days for a not insignificant profit," prior to a February 1997 press release disclosing expected losses, "after having sold no Scholastic stock since 1995," almost two years before the sale); *In re SLM Corp. Sec. Litig.*, 740 F. Supp. 2d 542, 557–58 (S.D.N.Y. 2010) (Plaintiff successfully pleaded motive where it alleged that corporation-defendant and CEO-defendant were motivated to artificially inflate a company's share price because (1) CEO-defendant would receive a payout consisting of "'approximately $225 million'" and "stock options 'tied to exercise prices above the market price of [the relevant security] at that time'" under a proposed merger between

20

corporation-defendant and another corporation; and (2) had the share price fallen below the "trigger price" in its "equity forward contracts," corporation-defendant "would have been required to repurchase approximately $2 billion in shares, an event that would have torpedoed the merger and [the individual defendant's] payout.").

Here, Optimum argues that Defendants had motive to commit fraud because USCF benefitted—by earning more in management fees—from increased investment in the Fund. As these management fees "were paid monthly at 0.45% per annum of the Fund's average daily net assets[,]" it follows, Optimum contends, that "the profits realized by USCF [were] directly related to the amount of assets invested in USO." ECF No. 12 at ¶ 76. Had USCF and USO "disclosed the true events, trends and uncertainties impacting the Fund during the period from February 2020 to May 2020," Optimum argues, "USCF would have received substantially less fees because investors [like] Plaintiff' might have "[paid] less to invest in the Fund or refused to invest in USO entirely." ECF No. 12 at ¶ 77. These allegations, without more, are insufficient to sustain a motive and opportunity theory, because they plead no more than the same general incentives every fund manager has to grow the size of the fund. *Compare La Pietra v. RREEF America, L.L.C.*, 738 F. Supp.2d 432, 444 (S.D.N.Y. 2010) ("The plaintiffs' only allegation with regard to motive is that the defendants were motivated to make material misrepresentations by their desire to earn greater management fees, because those fees were calculated based on the Funds' total managed assets …. This allegation des not adequately demonstrate motive under the PSLRA."), *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008) ("The desire to earn management fees is a motive generally possessed by [asset] managers, and as such, does not suffice to allege a 'concrete and personal benefit' resulting from fraud. To accept a generalized allegation of motive based on a desire to continue to

21

obtain management fees would read the scienter requirement out of the statute.") (internal citation omitted), *In re Fannie Mae 2008 Sec. Lit.*, 742 F. Supp. 2d 382, 403 (S.D.N.Y. 2010) (Plaintiffs' allegations that Fannie Mae omitted material information in disclosures to investors to "appease" and retain the business of its largest customer, thereby enabling its executives to earn large bonuses, did not warrant a strong inference of motive because they did not suggest a "concrete and personal benefit" from the fraud, i.e., one above and beyond general motives to earn a profit), *and Schnell v. Conseil, Inc.*, 43 F. Supp. 2d 438, 449 (S.D.N.Y. 1999) ("While plaintiff does suggest that Sands artificially inflated the price of NALF stock in order to realize greater transaction fees, these allegations alone cannot shown an improper motive."), *with Abu Dhabi Commercial Bank v. Morgan Stanley & Co. Inc.*, 651 F.Supp. 2d 155 (S.D.N.Y.2009) (plaintiffs adequately pled motive of rating agencies where they alleged that "[i]n exchange for their allegedly unreasonably high ratings, the [r]ating [a]gencies each received fees in excess of *three times their normal fees* for rating [the relevant security] *as well as* fees that increased in tandem with the [relevant security's] growth.") (emphasis added)).

I find that, without more, Optimum has not pleaded enough facts concerning motive to show that an inference of scienter is at least as compelling as any nonfraudulent inference.

**b.     Conscious or Reckless Misbehavior**

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks omitted).  To adequately allege a "conscious misbehavior" theory, a plaintiff must present "a strong showing of reckless disregard for the truth" – that is, "conscious recklessness—*i.e.*, a state of mind approximating actual intent, and

22

not merely a heightened form of negligence." *S. Cherry St., LLC v. Hennessee Grp. LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (internal quotation marks omitted). "In elaborating as to what may constitute recklessness in the context of a private securities fraud action, [the Second Circuit has] referred to conduct that at the least is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it, or to evidence that the defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud …." *Id.* (cleaned up).

Optimum contends that Defendants "knowingly or recklessly fail[ed] to disclose adverse facts known to them about USO" and "knew, or at the very least were reckless in not knowing, that the public documents and statements they issued…in the name of the Fund were materially false and misleading." ECF No. 12 at ¶¶ 70, 71. In response, Defendants point to the allegations at paragraphs 71-75 of the complaint, which comprise most of the complaint's allegations included under the subheading "[t]he USO Defendant's scienter," *id.* at pp. 22-25, arguing that "[r]ather than allege facts demonstrating conscious misbehavior or recklessness, [Optimum] simply describes Defendants' role in managing the Fund." ECF No. 32-2 at 45. The complaint there alleges that Defendants, "as the creators, issuers and operators of the largest oil-related ETF in existence … each possessed unique insider knowledge about the adverse facts, events, trends, and uncertainties" described in the complaint, that USCF was the manager of the fund and "designed its investment objective," that the Defendants had "proprietary and privileged access to complex and detailed market information" and "real-time and up-to-date data and analysis about, inter alia, crude spot prices, oil storage constraints, oil futures markets, the value of the Fund's holdings, short interest in the Fund, events and uncertainties impacting the price of oil-

related securities, market demand for USO shares, the Fund's performance, market distortions, liquidity, volatility, and the complex convergence of these myriad factors and how they were affecting the Fund and the risks and performance of the fund." *Id.* at ¶¶ 73-74. The complaint also alleges that Defendants exchanged information with "various market players" "regarding the function of USO and the markets in which the fund operated," and "the true performance of USO and the events, trends and uncertainties impacting the Fund as they were unfolding," *id.* at ¶ 75.

I agree with Defendants that these allegations are insufficient to plead conscious or reckless misbehavior. As the Defendants note, these allegations boil down to a description of the general knowledge of the business and market conditions that Defendants acquired from their roles in and day-to-day operation of the fund. If such allegations were enough to allege conscious misbehavior, then no issuer of securities or fund manager could avoid a finding of scienter whenever inaccurate statements were made in SEC filings. *See In re MSC Indus. Direct Co., Inc.*, 283 F. Supp. 2d 838, 848-49 (E.D.N.Y. 2003) (agreeing with defendants that "general knowledge of [company's] sales and inventory does not show conscious misbehavior or recklessness" in case alleging that defendants made materially false and misleading statements concerning company's financial health); *see also Metzler Inv. GMBH v. Corinthian Colleges, Inc.*, 540 F.3d 1049, 1068 (9th Cir. 2008) ("corporate management's general awareness of the day-to-day workings of the company's business does not establish scienter — at least absent some additional allegation of specific information conveyed to management and related to the fraud.").

In addition, the complaint points to no facts suggesting that "the danger [of misleading investors] was either known to the defendant or so obvious that the defendant must have been aware of it." *South Cherry Street, LLC*, 573 F.3d at 109. The complaint does not allege, for

example, any facts suggesting that it was "obvious" to Defendants when they issued the March registration statement that the impact of COVID-19 would cause oil to "[go] negative on April 20, 2020," that the FCM would react to that development by imposing the restrictions that it did, that, in April 2020, USO would "experience[] record daily inflows into the pool," or that such sudden growth would significantly impact its investment objective. ECF No. 12 ¶¶ 27, 29. Nor does the complaint point to specific information in the Defendants' possession at the time they made the challenged disclosures that contradicted any of the statements in those disclosures. Under the PSLRA, "[w]here [a] plaintiff[] contend[s] defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 196 (2d Cir. 2008); *see also Sec. & Exchange Comm'n v. Allison*, 588 F. Supp. 3d 509, 523 (S.D.N.Y. 2022) ("[G]eneral allegations of red flags are insufficient to demonstrate scienter…. Plaintiff must identify specific information that defendants knew, had access to, or had a duty to review.") (internal citations omitted). The complaint does not identify specific information of which Defendants were aware (or obvious information they ignored) that would have shown that the statements USO was making in public filings were materially misleading.

To be sure, the complaint does specifically allege that on April 23, 2020 the FCM "e-mailed formal notification of the New Creation Limit to USO," and that the New Creation Limit was not adequately disclosed to investors in the April 24, 2020 8-K. ECF No. 12 ¶¶ 31, 32. But even if Defendants' disclosures concerning the New Creation Limit were not ideal during this period, any danger that investors would be misled was not "obvious," *S. Cherry St., LLC*, 573 F.3d at 109, in light of the disclosures the Defendants did make and in light of other circumstances at the time. The April 20, 2020 8-K, which was issued three days before the FCM

25

formally imposed the New Creation Limit, ECF No. 12 ¶ 31, discussed in detail the risks attending the possibility that USO itself would have to suspend new creations if it ran out of shares covered by an existing registration statement, including the risk that there could be "significant deviations from USO's investment objective, i.e, for the daily changes in percentage terms of its shares' per share net asset value …. to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma …."  ECF No. 32-5 at 3.  While the document did not discuss the imposition of a limit by the FCM, which occurred three days later, its detailed discussion of the possibility that "USO management would have to suspend … [the] purchase [of] new creation baskets until such time as [a new] registration statement [became effective]," *id.*, disclosed a substantially identical risk from the investor's standpoint, *i.e.*, the risk that there would be "significant deviations from USO's investment objective." *Id.*   And the April 24 8-K, issued the day after the FCM imposed the limit, noted that, among other things, "current and evolving regulatory limitations," "regulator concerns about the size of its positions," and "risk mitigation measures imposed by USO's future commission merchant" had led USO to invest in non-Benchmark oil future contracts and could lead it to invest in "Other Oil-related Interests," and that, as a result, "investors in USO should expect that there will be continued deviations between the performance of USO's investments and the Benchmark Futures Contract and that USO may not be able to…meet its investment objective."  ECF No. 32-4 at 3-4; *see also* ECF No. 32-1 at 36-39.  While neither this language nor subsequent disclosures specifically called out the risk that the FCM would bar Defendants from investing in new oil futures contracts altogether, the nature of the risk to investors such an occurrence would entail was disclosed ("significant deviations from USO's investment objective" and "investors in USO should expect that there will be continued deviations ….").

Further, the circumstances when the New Creations Limit was imposed on April 23, 2020 made it far from "obvious" that failing to disclose the particulars about it posed a danger to investors. As Defendants point out and the complaint acknowledges, USO "exhausted its inventory on April 21, 2020," and promptly announced that it was "suspending new creations of shares," which meant that "new creations" were "suspended until a new registration statement … [was] … declared effective," which did not occur until June 2020. ECF No. 12 at ¶¶ 28 & n.1, 43. This undermines Plaintiff's suggestion that the failure to disclose the details of the FCM's imposition of the New Creations Limit until May 21, 2020, ECF No. 12 ¶¶ 39-40, was material, inasmuch as the New Creations Limit would have no impact on Defendants' operations until a new registration statement became effective.

Finally, while one can debate whether USO's pre-May 21, 2020 disclosures were sufficiently detailed regarding the New Creations Limit, neither the April 23 email from the FCM, nor any other document to which the complaint points, "contradict[ed]" Defendants' disclosures, *Novak*, 216 F.3d 308, or amounted to "contrary facts," *Teamsters Loc. 445 Freight Div. Pension Fund,* 531 F.3d at 196, of the type needed to support a strong inference of scienter. So even with regard to the New Creations Limit – the only allegation Plaintiff points to in its brief when addressing scienter, ECF No. 39 at 25 – the complaint fails to plead facts suggesting conscious misbehavior or recklessness.

Having considered "whether all of the facts alleged, taken collectively, give rise to a strong inference of scienter," *Tellabs, Inc.*, 551 U.S. at 323, I find that they do not. To the contrary, there is another inference to be drawn from Plaintiff's allegations in this case that is more compelling than the inference of fraud Plaintiff would have me draw: that in the face of an unprecedented global pandemic, Defendants were making disclosures in uncharted waters and

erred on the side of making broad, general statements about actual and potential investment risks rather than describing rapidly shifting events in detail.  This explanation is consistent with Defendants' references in the April  20 8-K to possible risks of suspensions in new creations before the FCM formally imposed the New Creations Limit, ECF No. 32-5 at 3 ("In the event that there was a suspension in the ability of Authorized Purchasers to purchase additional Creation Baskets …."), and their broad reference to "regulatory requirements" and "risk mitigation measures imposed by USO's futures commission merchant" in the April 24 8-K, ECF No. 32-4 at 4.  An attitude of uncertainty and caution about the unsettled and unprecedented environment at the dawn of the COVID-19 pandemic is, I find, a more compelling inference to draw than the inference of intentional or reckless wrongdoing urged by Plaintiff.

## 2.    Loss Causation

Even if Optimum had adequately alleged scienter, its complaint must be dismissed for a second, independent reason: its failure to plead loss causation—*i.e.*, that the losses it allegedly suffered are traceable to Defendants' misconduct—as is required to state a securities fraud claim. *See, e.g.*, *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345–46 (2005).[8]

"Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted).  To sufficiently allege loss causation, "the plaintiff's complaint must plead that the loss was foreseeable and caused by the materialization of the risk concealed by the fraudulent statement."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87,

---

[8] "It is long settled that a securities-fraud plaintiff must prove both transaction and loss causation."  *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted).  "Transaction causation is akin to reliance, and requires only an allegation that but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction."  *Id.* (internal quotation marks omitted).  Defendants do not dispute transaction causation here, so I assume without deciding that the complaint pleads transaction causation.

107 (2d Cir. 2007). "Generally, plaintiffs sufficiently plead loss causation when they allege that their share's price fell significantly after the truth became known through an express, corrective disclosure or through events constructively disclosing the fraud like the materialization of [the] risk concealed." *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 179 (2d Cir. 2020) (footnotes and internal quotation marks omitted).

The complaint alleges generally that Optimum's loss—that its call options on USO securities "expired worthless"—was the result of Defendants' failure to disclose material information. *See* ECF No. 12 at ¶¶ 78-79. Optimum alleges that "when the truth about USO's misconduct was revealed, the value of USO securities declined precipitously as the prior artificial inflation no longer propped up the prices of such securities." ECF No. 12 at ¶ 78. The complaint further alleges that "[t]he price of [Optimum's] call options on USO dropped as well as a result of USO and USCF's misleading statements," with the result that Optimum's "options expired worthless." *Id.* at ¶ 79; *see also* ECF No. 39 at 26. "Before and during the time of plaintiff's purchases of USO call options, USO issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of USO call options to be artificially inflated. Plaintiff purchased USO call options at those artificially inflated prices, causing [it] to suffer losses of $79,919.97." ECF No. 12 at ¶ 80.

These allegations are conclusory. By themselves, they identify no specific risk that materialized in a way that triggered Plaintiff's loss and no specific revelation of "the truth" that caused the value of Plaintiff's holdings to drop at a particular time. Even when these allegations are linked to others in the complaint, they are inadequate. The only allegation of misleading conduct Optimum stands by in its opposition brief—in the face of Defendants' argument that it has failed to allege *any* fraudulent statements or misleading omissions—is the failure to disclose

29

the details of the New Creations Limit immediately after the FCM imposed it on April 23, 2020. *See* ECF No. 39 at 24-26 ("USO made a partial and incomplete disclosure [because] USO did not disclose the New Creations Limit imposed by the FCM."). But as Defendants note, the complaint "makes no factual allegations demonstrating that Defendants' [] nondisclosure of the [New Creations Limit] had any bearing on the value of USO shares or stock options." ECF No. 40 at 9. In fact, the complaint does not allege any facts suggesting that USO's stock price was affected in any way by this nondisclosure. There are no allegations suggesting, for example, that after USO made the corrective disclosure regarding the New Creations Limit on May 21, 2020, there was a drop in the price of its stock or any associated options. *See* ECF No. 12 at ¶¶ 39-41. Indeed, apart from an allegation about variations between USO's share price and its per share net asset value, ECF No. 12 at ¶ 52, and the conclusory allegation that "when the truth about USO's misconduct was revealed, the value of USO securities declined precipitously," *id.* at ¶ 78, the complaint contains no allegations concerning the price of USO securities at any time.

At this stage, Optimum was required to "allege facts that support an inference that [Defendants'] misstatements and omissions concealed the circumstances that bear upon the loss suffered such that [Optimum] would have been spared all or an ascertainable portion of that loss absent the fraud." *Lentell*, 396 F.3d at 175. As in *Lentell*, there are no allegations in the complaint suggesting "that the market reacted negatively to [the] corrective disclosure," *i.e.*, the May 21, 2020 disclosure about the New Creations Limit, "and no allegation that [USO] misstated or omitted risks that did lead to the loss. This is fatal under Second Circuit precedent." *Id.*

Apart from the lack of factual allegations to support it, the notion that the nondisclosure of the FCM's imposition of the New Creations Limit caused Optimum's losses is implausible.

30

As Defendants note, Optimum "offers no theory whatsoever as to how the [New Creations Limit] imposed by the FCM had any impact on USO's performance or operation – let alone how it could have caused [Optimum] to suffer losses." ECF No. 32-1 at 47. "[T]o establish loss causation, a plaintiff must allege…that the *subject* of the fraudulent statement or omission was the cause of the actual loss suffered." *Lentell*, 396 F.3d at 175 (emphasis in original). As noted above, the allegations of the complaint do not suggest that the FCM's imposition of the New Creations Limit had an impact on USO's operations, and in fact the complaint acknowledges that USO could not issue new securities during much of the period the Limit was in effect for the independent reason that the SEC had not approved its registration statement. *See* ECF No. 12 at ¶ 30 ("[T]he New Creations Limit presented the likelihood of substantial tracking error between USO's investment objective and its NAV *whenever new shares were registered*….) (emphasis added). Most of Plaintiff's option purchases took place during the same period. *Id.* at ¶¶ 63-66. While it is conceivable that the FCM's imposition of the Limit somehow affected call option prices once it was fully disclosed, conceivable is several steps short of plausible, and Optimum's complaint is silent on whether, how, or when such an impact might have occurred. In short, there are no allegations in the complaint from which I can infer that the fact that Optimum's call options "expired worthless" was a foreseeable result of Defendants' failure to disclose the details of the New Creations Limit to investors until May 21, 2020. *See, e.g.*, *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp.*, Inc., 343 F.3d 189, 197 (2d Cir. 2003) ("[T]he damages suffered by plaintiff must be a foreseeable consequence of any misrepresentation or material omission.") (internal quotation marks omitted). Because the complaint fails to adequately plead a connection

31

between the loss suffered and the alleged misconduct, Count One must be dismissed on this basis as well. [9]

## B.      Count Two: § 20(a) of the Exchange Act

"To state a claim under Sections 20(a) and 20A of the Exchange Act, a plaintiff must allege a primary violation, such as one under Section 10(b) and Rule 10b-5." *Arkansas Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 356 (2d Cir. 2022).  Because I have determined that Optimum has failed to state a claim under §10(b) and Rule 10b-5, Optimum's § 20(a) claim must also be dismissed.

## C.      Count Three: CUSA

As all claims over which I have original jurisdiction have been dismissed, I decline to exercise supplemental jurisdiction over Optimum's state law claim and dismiss that claim without prejudice.  *See Cellular Tech. Servs. Co. v. TruePosition, Inc.*, 609 F. Supp. 2d 223, 247 (D. Conn. 2009) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered under the [supplemental] jurisdiction doctrine—judicial economy, convenience, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims.") (quoting *Valencia ex rel. Franco v. Lee*, 316 F.3d 299, 305 (2d Cir.2003)).

---

[9] Defendants urge me to, "in conducting [my] mandatory review of Plaintiff's compliance with Fed. R. Civ. P. 11 pursuant to the PSLRA, *see* 15 U.S.C. § 78u-4(c)(1), consider inadequacies in Plaintiff's opposition brief.  ECF No. 40 at 3 n.3.  While Plaintiff's brief is short on analysis and appears to abandon many of the fraud claims in the complaint, I do not find that it, or the complaint, violates the "objective unreasonableness" standard of Rule 11. *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 579 F.3d 143, 150 (2d Cir. 2009).

## V. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss Optimum's Second Amended Complaint [ECF No. 32] is GRANTED as follows: Counts One and Two are dismissed with prejudice and Count Three is dismissed without prejudice.

IT IS SO ORDERED.

     /s/     

Michael P. Shea, U.S.D.J.

Dated:       Hartford, Connecticut
               March 15, 2023