**Robbins Geller**
**Rudman & Dowd** LLP

| | | |
|---|---|---|
| Boca Raton | Melville | San Diego |
| Chicago | Nashville | San Francisco |
| Manhattan | Philadelphia | Washington, D.C. |

David A. Rosenfeld
drosenfeld@rgrdlaw.com

April 20, 2023

<u>VIA ECF</u>

The Honorable Paul G. Gardephe
United States District Judge
Thurgood Marshall
United States Courthouse
40 Foley Square, Room 2204
New York, NY  10007

> Re:    *In re United States Oil Fund, LP Securities Litigation*,
> <u>Case No. 1:20-cv-04740 (PGG) (S.D.N.Y.)</u>

Dear Judge Gardephe:

We write on behalf of Lead Plaintiff Nutit, A.S. ("Plaintiff") in response to the USO Defendants' and the Individual Defendants' ("Defendants") Notice of Supplemental Authority (ECF No. 169; the "Notice") regarding the recently issued opinion in *Gomez v. Credit Suisse AG*, No. 1:22-cv-00115 (S.D.N.Y.) (Cronan, J.) ("*Gomez*").[1]  Plaintiff's response is set forth below.

Contrary to Defendants' assertion that *Gomez* supports their arguments in the motion to dismiss, *Gomez* is highly distinguishable and further demonstrates why Defendants' motion should be denied.  Plaintiff in *Gomez* alleged that a press release was materially false and misleading for failing to disclose that market conditions indicated that a short squeeze was imminent, such that the price of the exchange traded notes ("ETNs") at issue – DGAZ – would become completely dislocated from the underlying index value.  ECF No. 169-1 at 10.  While Defendants attempt to analogize the facts of *Gomez* to this case, even a casual reading of Judge Cronan's opinion reveals several significant and disparate facts and findings that render *Gomez* inapposite.

The press release upon which plaintiff's claims were based in *Gomez*, for example, "explicitly referred [investors] to the risk disclosures in the Offering Documents." *Gomez* at 8, 18-19.  Plaintiff alleged, however, "that Defendant's 'general conditional warnings of events that may occur in the future are insufficient' because 'a specific risk had materialized, in the form [of] an imminent short squeeze'" whereby the price of DGAZ would rise significantly above its indicative value. *Id*. at 19.  But that premium did not even begin to build until approximately "twenty-four days after the delisting and forty-three days after the Press Release" – far from a risk that had ***already*** materialized. *Id*. at 9.

---

[1]    Capitalized terms not otherwise defined herein have the same meanings ascribed to them in Plaintiff's brief in opposition to Defendants' motion to dismiss.  ECF No. 151.  Unless otherwise noted below, all references to "¶_" or "¶¶_" refer to the Consolidated Amended Complaint.  ECF No. 68; the "CAC."  All emphasis is added unless otherwise noted.

**Robbins Geller**
**Rudman & Dowd** LLP

The Honorable Paul G. Gardephe
April 20, 2023
Page 2

Moreover, defendant's past experience delisting a different ETN indicated that the price of DGAZ would **decrease** (not increase) following delisting and trade at a **discount** (not a premium) to the underlying indicative value of the index. *Id*. at 21, 28-29. In this context, it is unsurprising that the court in *Gomez* both: (1) noted that "'the securities laws do not require issuers to predict the precise manner in which disclosed risks will manifest themselves,'" and (2) determined that defendant's warning that it "cannot predict with certainty what impact, if any, these events will have on the public trading price of the ETNs," along with pointing investors to risk disclosures in the offering documents, were sufficient to apprise investors of the then-pending risks associated with DGAZ.[2] *Id*. at 19-21.

As to plaintiff's claim for market manipulation, which was based on defendant's decision to delist DGAZ along with its sizeable inventory of the ETN and substantial short interest therein, the court in *Gomez* determined that plaintiff's complaint was woefully devoid of facts that could support a plausible inference of manipulation. *Id*. at 24. Specifically, Judge Cronan found that plaintiff did not even allege that **defendants** in fact manipulated the market for DGAZ; rather, plaintiff alleged that defendant's conduct created a situation whereby "'*institutions* holding long positions *could* manipulate trade prices to force individuals to cover their short positions." *Id*. (quoting plaintiff's complaint) (emphasis in original). Thus, according to the court, while defendant's "decision may have created a potential for market manipulation by others, there are no allegations that Credit Suisse itself engaged in the manipulation." *Id*.; *see also id.* at 29 (referencing the "lack of allegations that Defendant participated in the DGAZ market apart from maintaining a large inventory of notes"). In this sense, *Gomez* is more analogous to *ProShares Trust II*,[3] whereby the fund at issue suffered collateral damage as a result of a severe market dislocation created by **others**, than the scenario here, where Plaintiff alleges the Fund manager itself intentionally created the circumstances leading to its own fund's demise by flooding the market with new share issuances despite extreme market illiquidity. *See* ECF No. 154 at 4; ¶¶71-116.

As to scienter, the court in *Gomez* determined that plaintiff's theory of motive – including the potential for defendant to earn investor fees – contained "significant problems," none of which are at issue here. *Gomez* at 26-28. In fact, the plaintiff's theory made no economic sense to the court as the decision to delist represented only approximately $135,600 in investor fees, which "pale[d] in comparison to the millions of dollars Defendant could have made by selling into the short squeeze, making any inference of fraudulent intent even less plausible." *Id*. at 27. And because "[p]revious experience showed that when Defendant delisted an ETN, retail investors sold to institutional

---

[2]  It is also worth noting that the offering documents in *Gomez* advised investors that "DGAZ is intended only for sophisticated investors and only to be held for less than a day," and warned that "*[i]f you hold the ETNs for more than one day, it is possible that you will suffer significant losses in the ETNs*." *Id*. at 4 (emphasis in original). But plaintiff initiated her short positions in DGAZ on May 27, 2020 and May 29, 2020, held them through the June 22, 2020 press release and did not cover her shorts until after the excessive premium buildup – *months* after she initiated her positions. *Id*. at 10.

[3]  *In re ProShares Tr. II Sec. Litig.*, 2020 WL 71007 (S.D.N.Y. Jan. 3, 2020), *aff'd*, 839 F. App'x 649 (2d Cir. 2021).

**ROBBINS GELLER**
**Rudman & Dowd** LLP

The Honorable Paul G. Gardephe
April 20, 2023
Page 3

investors who then redeemed large blocks with Defendant for the market value[,] . . . Defendant's experience would suggest that the decision to delist would ***decrease*** the potential to earn investor fees, whereas if Defendant continued issuing and listing DGAZ, it could earn investor fees until the notes mature—in 2032." *Id*. at 28. Here, by contrast, the CAC details how the Sponsor and USO Officer Defendants in fact reaped millions of dollars in fees as the Fund's total NAV grew. ¶¶8, 111, 213. Indeed, the Sponsor received approximately $6.3 million in management fees in the first half of 2020 – roughly the same amount of management fees generated during the entirety of 2019. *Id*.

Moreover, the court in *Gomez* rejected plaintiff's assertion that defendant's decision to delist DGAZ rather than accelerate the notes (whereby defendant purchases all outstanding notes at the average indicative value for a specified period) was reckless. This is because: (1) defendant "could not predict with absolute certainty how investors would act following the delisting," particularly because past experience suggested that the price of ETNs decreases, rather than increases, following delisting; (2) the premium did not begin until twenty-four days after the delisting, and a "reasonable inference is that this was likely because defendant took care to safeguard the interests of DGAZ investors in its decision to delist rather than to accelerate"; (3) defendant gave investors over two-and-a-half weeks following its announcement to delist to cover their shorts before supply was decreased; (4) defendant chose to delist not just DGAZ but eight other ETNs; and (5) defendant gave clear warnings, including in the press release itself, that delisting could affect supply and demand.[4] The CAC's allegations of recklessness here, on the other hand, do not contain any such pitfalls. ECF No. 151 at 47-50.

For these reasons, and as set forth in its prior submissions, Plaintiff respectfully submits that Defendants' motion to dismiss should be denied in its entirety.

---

[4]    Separately, Defendants argue that Plaintiff's response to their prior Notice of Supplemental Authority (ECF No. 167) "relies on non-existent allegations" in furtherance of its scienter allegations, and conclude that "Plaintiff cannot plead scienter . . . by bootstrapping purported facts included only in its November 2021 Notice regarding the FCM limitation." ECF 169 at 2-3, n.1. But the CAC itself addresses the very limitation imposed on the Fund by its futures commission merchant and the related disclosures at issue in *In the Matter of United States Commodity Funds LLC & United States Oil Fund, LP*, SEC Release No. 11006, 2021 WL 5205955 (Nov. 8, 2021) ("SEC Order") even though the SEC Order was not issued until almost a year after Plaintiff filed the CAC. ¶¶132-133 (discussing "marketplace limits placed on the Fund," "'risk mitigation measures imposed . . . by USO's futures commission merchant'" and "'limits imposed by its futures commission merchants'" in April 27, 2020); ¶¶126, 132-133 (discussing same April 20, 2020 registration statement and subsequent public filings and pre-effective amendments referred to in the SEC Order, ECF No. 158-1 at 2, 5-6). Indeed, while Plaintiff could not have predicted the specific facts later revealed in the SEC Order, those facts are entirely consistent with the CAC allegations, including the USO Defendants' participation in a fraudulent scheme that deceived the investing public regarding USO's business and risks, artificially inflated the prices of USO securities and caused members of the Class to purchase those securities at artificially inflated prices, separate and apart from the USO Defendant's lability for statements in the February and March Registration Statements, among others.

**Robbins Geller
Rudman & Dowd** LLP

The Honorable Paul G. Gardephe
April 20, 2023
Page 4

Respectfully submitted,

*/s/ David A. Rosenfeld*

David A. Rosenfeld

cc:    All Counsel of Record (via ECF)