UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE: UNITED STATES OIL FUND, LP
SECURITIES LITIGATION

**MEMORANDUM**
**OPINION & ORDER**

20 Civ. 4740 (PGG)

PAUL G. GARDEPHE, U.S.D.J.:

This is a consolidated putative class action brought on behalf of purchasers of

Defendant United States Oil Fund, LP ("USO" or "the Fund") securities and shares between

February 25, 2020 and April 28, 2020 (the "Class Period").  The shares were issued in

connection with a February 25, 2020 public offering (the "February Offering"), and a March 23,

2020 public offering (the "March Offering").  The Consolidated Amended Complaint

("Amended Complaint") alleges that United States Commodity Funds LLC ("USCF") – the

sponsor and general and managing partner for USO – certain senior officers and directors of

USCF (the "USO Officer Defendants"), and USO (collectively, the "USO Defendants"),

underwriters for the offer and sale of USO shares during the Class Period (the "Authorized

Participant Defendants"), and ALPS Distributors, Inc., an underwriter and marketing agent for

the offer and sale of USO shares during the Class Period (collectively, "Defendants"), made false

and misleading statements during the Class Period regarding certain "new risks or . . . known

adverse events, trends and uncertainties impacting the Fund."  (Am. Cmplt. (Dkt. No. 68) ¶ 12)

The Amended Complaint asserts claims under Sections 11 and 15 of the

Securities Act of 1933 (the "Securities Act"), Sections 10(b) and 20(a) of the Securities

Exchange Act of 1934 (the "Exchange Act"), and Securities and Exchange Commission ("SEC")

Rule 10b-5 in connection with several of Defendants' public statements during the Class Period.

(Id. ¶¶ 191-206; 224-234)

Defendants have moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.  (USO Def. Mot. (Dkt. No. 142); see also Authorized Participant Def. Joinder Ltr. (Dkt No. 147); ALPS Distributors Joinder Ltr. (Dkt. No. 149))  Defendants contend that (1) all claims should be dismissed for failure to plead facts showing that they made false or misleading statements or omitted material facts (USO Def. Br. (Dkt. No. 143) at 32);[1] (2) the Section 10(b) and Rule 10b-5 claims should be dismissed for failure to plead facts establishing a strong inference of scienter (id. at 57); and (3) the Section 11 claims should be dismissed for failure to plead standing (id. at 62).

For the reasons stated below, Defendants' motion will be granted, and the Amended Complaint will be dismissed in its entirety.

## BACKGROUND

### I.    FACTS[2]

#### A.    The Parties

Lead Plaintiff Nutit, A.S. ("Plaintiff") "purchased USO securities during the Class Period and shares of USO pursuant and/or traceable to the February Offering and the March Offering. . . ."  (Am. Cmplt. (Dkt. No. 68) ¶ 22)  Plaintiff alleges that it purchased 535,374

---

[1]  The page numbers of documents referenced in this opinion correspond to the page numbers designated by this District's Electronic Case Files ("ECF") system.

[2]  The Court's factual statement is drawn from the Amended Complaint, including documents incorporated by reference in the Amended Complaint, such as the "February Registration Statement" and "March Registration Statement" discussed below.  See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (in deciding a motion to dismiss, a court may "consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

shares of USO during the Class Period and suffered losses of $13,563,689.13. (See Sept. 16, 2020 Order (Dkt. No. 63) at 7)

Defendant USO is "a commodity pool operator and exchange-traded security that provides investment exposure to oil markets." (Am. Cmplt. (Dkt. No. 68) ¶ 23) USO is a Delaware limited partnership that maintains its main office in California. (Id.) Shares of USO trade on the New York Stock Exchange under the symbol "USO." (Id.)

Defendant United States Commodity Funds LLC ("USCF") is the sponsor and general and managing partner for the Fund. (Id. ¶ 24) USCF is a single-member limited liability company that was formed in Delaware and maintains its main office in California. (Id.) USCF is paid a management fee by USO and has full management control over the Fund. "USO is the largest fund operated by USCF and was responsible for more than 50% of [USCF's] entire management fees receivable in 2019." (Id.)

Defendant John P. Love is a Principal of USCF and has served as the President and Chief Executive Officer of USCF since May 15, 2015, the Managing Director of USCF since October 2016, and the Chairman of the Board of Directors of USCF since October 2019. "Defendant Love makes trading and investment decisions for USO and directs the execution of trades on behalf of USO." (Id. ¶ 25)

Defendant Stuart P. Crumbaugh is a Principal of USCF and has served as the Chief Financial Officer, Secretary, and Treasurer of USCF since May 2015. (Id. ¶ 26)

Defendant Nicholas D. Gerber served as a Managing Director and Vice President of USCF during the Class Period. (Id. ¶ 29)

Defendant Andrew F. Ngim co-founded USCF and served as its Managing Director and Chief Operating Officer during the Class Period. (Id. ¶ 30)

Defendant Robert L. Nguyen co-founded USCF and served as its Management Director during the Class Period. (Id. ¶ 31)

Defendants Peter M. Robinson, Gordon L. Ellis, and Malcolm R. Fobes III served as Directors of USCF during the Class Period. (Id. ¶¶ 32-34)

Defendants ABN Amro, BNP Paribas Securities Corporation, Citadel Securities LLC, Citigroup Global Markets, Inc., Credit Suisse Securities USA LLC, Deutsche Bank Securities Inc., Goldman Sachs & Company, J.P. Morgan Securities Inc., Merrill Lynch Professional Clearing Corporation, Morgan Stanley & Company Inc., Nomura Securities International Inc., RBC Capital Markets LLC, SG Americas Securities LLC, UBS Securities LLC, and Virtu Financial BD LLC (the "Authorized Participant Defendants") served as underwriters for the offer and sale of USO shares during the Class Period. (Id. ¶ 36)

Defendant ALPS Distributors, Inc. served as both marketing agent and underwriter for USO during the Class Period. (Id. ¶ 39)

## B.    **USO, the Authorized Participant Defendants, and ALPS**

### 1.    **USO**

USO is an exchange traded fund ("ETF") that was organized in 2005 and began offering shares to the public in 2006. (Id. ¶¶ 2, 53) An ETF "issues shares and then uses the proceeds from the sale of these shares to invest according to its stated investment strategy and objective." (Id. ¶ 48) "ETFs issue their shares first to authorized participants through a marketing agent who then distribute and sell the shares to investors," allowing "the ETFs to trade on an exchange throughout the trading day without being directly created or redeemed by the commodity pool operator," i.e., USO itself. (Id.)

USO is an oil-related ETF that invests in futures contracts (id. ¶¶ 2, 5) "referencing barrels of oil in a particular oil market." (Id. ¶ 49) "A futures contract is a legal

agreement to buy or sell a particular commodity at a predetermined price at a specified time in the future. The buyer of a futures contract takes on the obligation to buy and receive the underlying asset when the futures contract expires, while the seller of a futures contract takes on the obligation to deliver the underlying asset at expiration." (Id. ¶ 50) "Many traders and portfolio managers are not interested in delivering or receiving the barrels of oil referenced by oil futures contracts," however, and instead "seek to capture trading profits based on the price moves of oil. Futures contracts can be utilized for this purpose without requiring receipt of the underlying physical asset, so long as the trade is closed before contract expiration." (Id. ¶ 51) Accordingly, "[w]hen the futures contracts held by an oil ETF [like USO] approach expiry, the ETF must 'roll' its position to a further dated futures contract in order to avoid having to take physical delivery of the oil." (Id.)

USO's "stated investment objective is for its per share net asset value ('NAV') to track the daily changes in percentage terms of the spot price of West Texas Intermediate ('WTI') light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of short-term WTI futures contracts." (Id. ¶ 4) USO's "NAV per share is calculated as the current market value of its total assets, minus any liabilities, and dividing that total by the total number of outstanding shares." (Id. ¶ 56) While "the market price for USO shares can reflect either a premium or a discount to the Fund's NAV per share," the fact that authorized participants could "buy new shares or redeem outstanding shares from the Fund" meant that "arbitrage opportunities had historically caused daily changes in USO's share price on the" New York Stock Exchange "to closely track daily changes in USO's NAV." (Id.)

The "spot price" is the current market price for a barrel of oil. (Id. ¶ 52) USO "measures changes in the spot price of oil by reference to the daily changes in the price of

specified short-term WTI futures contracts traded on the New York Mercantile Exchange (the 'NYMEX') – which USO dubs the 'Benchmark Oil Futures Contract' – plus interest earned on USO's collateral holdings, less USO's expenses." (Id. ¶ 53) USO's "Benchmark Oil Futures Contract refers to the WTI futures contract that is the nearest month contract to expire (i.e., the 'front' month), except when the nearest month contract is within two weeks of expiration, in which case it refers to the futures contract that is the next month contract to expire." (Id. ¶ 54)

USO "historically rolled over its futures contract positions every month by selling its front month WTI futures contracts holdings and then using the proceeds to buy the next month's WTI futures contracts. When the front month WTI futures contract was within two weeks of expiry, USO transitioned its positions to the next month futures contracts over a four trading day period, a sequence it repeated every month." (Id. ¶ 57)

### 2.     Authorized Participant Defendants

The Authorized Participant Defendants each executed an authorized participant agreement with USO and USCF for the sale of USO shares to the public. These agreements granted the Authorized Participant Defendants "exclusive authorization to purchase and redeem shares of USO in blocks of 100,000 shares, dubbed 'Baskets.'" (Id. ¶ 37) The Authorized Participant Defendants were able to purchase Baskets from the Fund at USO's end-of-day NAV price, but were required to pay a $1,000 fee for each order to create or redeem Baskets. The Authorized Participant Defendants could then sell the shares from these Baskets to the investing public at a per-share market price. (Id.)

> The Authorized Participant Defendants received profits from the spread between the NAV at which they received USO shares from the Fund and the market price at which the shares were sold to the investing public. For example, if USO shares were trading at a premium to NAV, the Authorized Participant Defendants would purchase Baskets from the Fund at the lower NAV and sell shares from these Baskets to investors at the higher market price. Conversely, if USO shares were trading at a discount to NAV, the Authorized Participant would purchase shares in the secondary market, at the lower

market price, and redeem Baskets derived from those shares at the higher NAV. This mechanism was designed to ensure that the market price of USO shares tracked closely to the Fund's NAV per share.

(Id. ¶ 38)

The Authorized Participant Defendants purchased and redeemed Baskets throughout the Class Period. (Id. ¶ 37)

### 3.    ALPS

While serving as underwriter and marketing agent for shares of USO, "Defendant ALPS solicited investment in [the February and March] offerings and distributed and sold USO shares from the offerings on behalf of the Fund to the Authorized Participant Defendants. [USCF] paid an annual fee to Defendant ALPS for the purpose of marketing and distributing the shares sold in USO share offerings, including the February Offering and the March Offering. Specifically, Defendant ALPS received $425,000 per annum plus an incentive fee of 0.0% on USO's assets from $0-500 million; 0.04% on USO's assets from $500 million-$4 billion; and 0.03% on USO's assets in excess of $4 billion, subject to a cap of 10% of the gross proceeds from share offerings conducted during the year." (Id. ¶ 39)

### C.    Pre-Class Period Events

### 1.    COVID-19 Pandemic

In early January 2020, the World Health Organization announced that a new coronavirus strain, later dubbed COVID-19, had been discovered in China. Within weeks, both the WHO and the United States declared COVID-19 a public health emergency. (Id. ¶ 60)

COVID-19 began to have a significant impact on commodity markets by early February 2020, and the price of WTI crude fell below $50 per barrel on February 4, 2020. Two weeks earlier, the price of WTI crude had been $58 per barrel. (Id. ¶ 61) Furthermore, "[o]n February 13, 2020, China began turning away oil tankers as the country's lockdown intensified,"

and "[o]n February 24, 2020, <u>Reuters</u> reported that oil prices, including crude futures, slid 4% 'as the rapid spread of [the] coronavirus in several countries outside China left investors concerned about a hit to demand.'" (<u>Id.</u>)

**D.    Events During the Class Period:  February 25, 2020 to April 28, 2020**

**1.    February 2020:  The February Offering and Volatility in the Oil Markets**

On February 25, 2020 – the first day of the Class Period – USO filed a prospectus with the SEC (the "February 2020 Registration Statement") in order to register and offer for sale more than 400 million shares of USO (the "February 2020 Offering").  The 400 million shares offered in the February Offering represented more than 4.4 times the number of all USO shares that were outstanding as of December 31, 2019.  (<u>Id.</u> ¶¶ 71, 139)  "[T]he February [2020] Registration Statement . . . contained . . . risk discussions that were almost *identical* to the Fund's prior offering materials. . . ."  (<u>Id.</u> ¶ 12 (emphasis in Am. Cmplt.))

The next day – February 26, 2020 – trading in USO increased by 19%, while daily trading volume in front month WTI futures increased by 16%.  (<u>Id.</u> ¶ 72)  "By February 27, 2020, WTI front month daily trading volume increased to over 1 million contracts traded, almost double the five-year average."  (<u>Id.</u>)  The 15-day historical price volatility for front month WTI futures contracts also jumped from 30% to 44% between February 26, 2020 and March 2, 2020, while the price of WTI front month futures contracts fell 16% between February 21, 2020 and February 28, 2020.  The drop in the price of WTI front month futures contracts corresponded with a steep drop in crude oil prices.  (<u>Id.</u> ¶ 62)

In February 2020, USO suffered investment losses of more than $200 million, "largely as a result of the precipitous price declines in WTI futures at the end of the month around the time of the February Offering" (<u>id.</u> ¶ 107), and as of March 2, 2020, USO shares were

trading at a 1.42% premium over NAV, while the five-year historical average for the USO share price premium over NAV was only 0.0018%.  (Id. ¶ 97)

### 2. March 2020: Effects of the Saudi-Russia Oil Price War and COVID-19 on Oil Markets, USO's March Roll, and the March Offering

In response to falling oil prices, "on March 5, 2020, Saudi Arabia and other Organization of the Petroleum Exporting Countries ('OPEC') countries announced a proposal to cut oil output by 1.5 million barrels a day, or about 1.5% of global daily production."  The proposal required the cooperation of Russia and other non-OPEC oil exporting countries, however, and on March 6, 2020, Russia walked away from negotiations with OPEC.  (Id. ¶ 63) In response, on March 8, 2020, Saudia Arabia announced price discounts for its oil exports of $6 to $8 per barrel to customers in the United States, Europe, and Asia.  "Russia responded in kind, and soon the two countries were flooding global markets with cheap oil. . . ."  (Id. ¶ 64)

At the same time, oil markets began to experience an increase in the "market force[] known as . . . 'contango.'  Contango occurs where nearer month futures contracts trade at a lower price than later dated futures contracts.  In this situation, the value of the near month futures contracts tends to decline as they approach expiration.  Extraordinary market conditions in crude oil markets can also cause a phenomenon known as 'super contango,' which refers to an abnormally high level of contango."  (Id. ¶ 58)

"On March 9, 2020, the price of WTI crude oil fell 33% before settling at $31.13 per barrel, a 25% decline and the biggest single-day drop since the 1991 Gulf War" (id. ¶ 65), WTI front month prices crashed 25%, (id. ¶ 80), and "the front month to next month contango increased to $0.34, more than double the contango effect present just two trading days before."  (Id. ¶ 65)  That same day, more than 1.7 million WTI front month futures contracts were traded, a figure "26% greater than the largest single-day trading volume in at least five years" (id.), and

"USO experienced daily trading volume of over *154 million* shares traded, more than five times greater than the five-year historical daily average and 40% greater than the prior single-day volume peak in USO trading over the preceding five years." (Id. ¶ 69 (emphasis in Am. Cmplt.))

Over a four-day trading period between March 6, 2020, and March 11, 2020, USO rolled the April WTI futures contracts it held into May WTI futures contracts. The price of the April WTI futures contracts dropped "from $45.90 the day before the roll began to $31.50 the day after the roll ended – a 31% price decline." (Id. ¶ 82)

On March 13, 2020, the price of USO shares increased more than 6%, even though USO's NAV per share and the price of May WTI futures contracts held by USO increased by less than 1%. (Id. ¶ 103) That day, "USO closed at a 4.63% premium to NAV, 59 basis points above the highest premium recorded during the prior five years." (Id. ¶ 97)

That same day, storage rates at oil storage facilities accepting WTI crude in Cushing, Oklahoma rose to approximately 50 cents per barrel per month, an increase of approximately 100% over the prior month. "Inventories at Cushing rose by more than 640,000 barrels during the week, and terminal storage clearing houses booked six times their ordinary deal volume. By mid-March [2020], all tanks housed in Cushing had been leased for storage, and traders and producers scrambled to find alternatives for oil delivery. This included the drastic step, in certain instances, of booking large crude tankers that provided floating storage." (Id. ¶ 66)

By March 18, 2020, WTI crude oil had fallen below $21 per barrel, less than half of its price two weeks before and an 18-year low. (Id. ¶ 67) That same day, 190 million USO shares were traded (id. ¶ 73), and USO shares closed at a premium of 9.14% to NAV. (Id. ¶ 97)

By mid-March 2020, USO controlled an estimated 15% of the entire market for WTI near-month futures contracts.  (Id. ¶ 77)

By March 19, 2020, the historical 15-day price volatility of WTI front month contracts had risen to 210%.  The previous largest 15-day volatility peak in the preceding two years was 74%.  (Id. ¶ 80)  That same day, the contango dynamic rose to $0.69.  The five-year historical average was $0.35.  (Id. ¶ 90)

On March 23, 2020, USO filed a prospectus with the SEC (the "March Registration Statement") in order to register and offer for sale more than one billion USO shares (the "March 2020 Offering").  (Id. ¶¶ 71, 144)  "[T]he March [2020] Registration Statement contained . . . risk discussions that were almost identical to the Fund's prior offering materials. . . ."  (Id. ¶ 12 (emphasis omitted))   That same day, USO's NAV per share and the price of May WTI futures contracts held by USO increased by 3%, but the price of USO shares declined by more than 1%.  (Id. ¶ 103)

By March 23, 2020, contango had risen to $2.12, approximately 6.7 times the five-year historical average, and by March 25, 2020, contango exceeded the prior five-year peak. (Id. ¶ 90)

In March 2020, USO suffered investment losses of $1.2 billion.  (Id. ¶ 107)

### 3.    April 2020:  USO Roll Between April 7, 2020 and April 13, 2020

Over a four-day trading period between April 7, 2020 and April 13, 2020, USO rolled the May WTI futures contracts it held into June WTI futures contracts.  (Id. ¶ 82)  During this roll, USO sold approximately $3.8 billion worth of front month futures contracts.  (Id. ¶ 83) The price of May WTI futures contracts dropped "from $26.08 the day before the roll began to $20.11 the day after the roll ended – a 23% price decline."  (Id. ¶ 82)

On April 7, 2020 — the first day of USO's April roll — contango rose to $5.06. (Id. ¶ 90)  On April 14, 2020 — the day following the final day of the USO's April roll — contango rose to $7.29, more than 2.5 times the prior five-year peak.  (Id.)  A week after the USO's April roll ended, contango grew to $58.06, more than 22 times the prior contango peak in the five-year period before March 2020.  (Id. ¶ 92)

### 4.    The April 16, 2020 Form 8-K

By mid-April, USO controlled more than one-third of the market for WTI near months futures contracts.  (Id. ¶ 77)  In an April 16, 2020 Form 8-K, however, USO stated "that, beginning April 17, 2020, it would hold only 80% of its assets in front month WTI contracts and 20% split between the second and third month WTI contracts."  (Id. ¶ 116)  USO further stated "that it had been forced to change its investment strategy to deal with what it described as 'market conditions and regulatory conditions.'"  (Id. ¶ 98)  "USO would later admit in subsequent SEC filings that [on April 16, 2020] regulators overseeing the NYMEX and the Intercontinental Exchange ('ICE') Futures (on which WTI futures trade) had imposed accountability level and position limits on the Fund . . . in order to mitigate USO's market-distorting effects.  In addition, RBC Capital Markets, LLC, USO's only futures commissions merchant (through whom the Fund placed futures orders) sharply curtailed the Fund's ability to invest in front month futures contracts."  (Id. ¶ 116)

### 5.    The April 20, 2020 Registration Statement

On April 20, 2020, WTI front month futures contracts fell to a negative price – negative $37.63 – for the first time.  (Id. ¶ 83)  That same day, USO filed a prospectus with the SEC (the "April 2020 Registration Statement") seeking to register and sell an additional four billion shares of USO.  (Id. ¶¶ 99, 117)  The April 2020 Registration Statement includes a new section entitled "COVID-19 Risk" (id. ¶ 126) which states that

[a]n outbreak of infectious respiratory illness caused by a novel coronavirus known as COVID-19 was first detected in China in December 2019 and has now been detected globally. *In March 2020*, the World Health Organization declared the COVID-19 outbreak a pandemic. COVID-19 has resulted in numerous deaths, travel restrictions, closed international borders, enhanced health screenings at ports of entry and elsewhere, disruption of and delays in healthcare service preparation and delivery, prolonged quarantines and the imposition of both local and more widespread "work from home" measures, cancellations, supply chain disruptions, and lower consumer demand, as well as general concern and uncertainty. The ongoing spread of COVID-19 has had, and is expected to continue to have, a material adverse impact on local economies in the affected jurisdictions and also on the global economy, as cross border commercial activity and market sentiment are increasingly impacted by the outbreak and government and other measures seeking to contain its spread. The impact of COVID-19, and other infectious illness outbreaks that may arise in the future, could adversely affect individual issuers and capital markets in ways that cannot necessarily be foreseen. In addition, *actions taken by government and quasi-governmental authorities and regulators throughout the world in response to the COVID-19 outbreak, including significant fiscal and monetary policy changes, may affect the value, volatility, pricing and liquidity of some investments or other assets, including those held by or invested in by USO*. Public health crises caused by the COVID-19 outbreak may exacerbate other pre-existing political, social and economic risks in certain countries or globally. The duration of the COVID-19 outbreak and its ultimate impact on USO and[] on the global economy, cannot be determined with certainty. *The COVID-19 pandemic and its effects may last for an extended period of time, and could result in significant and continued market volatility, exchange trading suspensions and closures, declines in global financial markets, higher default rates, and a substantial economic downturn or recession. The foregoing could impair the USO's ability to maintain operational standards (such as with respect to satisfying redemption requests), disrupt the operations of USO's service providers, adversely affect the value and liquidity of USO's investments, and negatively impact the USO's performance and your investment in USO.* The extent to which COVID-19 will affect USO and USO's service providers and portfolio investments will depend on future developments, which are highly uncertain and cannot be predicted, including new information that may emerge concerning the severity of COVID-19 and the actions taken to contain COVID-19. *Given the significant economic and financial market disruptions associated with the COVID-19 pandemic, the valuation and performance of the USO's investments could be impacted adversely.*

(Id. (emphasis in Am. Cmplt.))

The April 2020 Registration Statement also acknowledges "that the Fund had suffered the '[w]orst [m]onthly [d]rawdown' in its history in March 2020, losing 54.7% in a single month"; "that the Fund would be unable to achieve any significant interest income for all of 2020 due to losses suffered since the start of the year"; and "that, '[g]iven market volatility in

2020 arising from the COVID-19 pandemic and other geopolitical issues, USO believes it is reasonable to assume that *it will not earn any significant interest income in 2020*.'" (Id. ¶ 127 (emphasis in Am. Cmplt.))

However, the April 2020 Registration Statement does not reveal that UCSF had "recei[ved] . . . an April 16, 2020 letter (*four days before the registration statement was filed*), ordering the Fund to limit its front month WTI contract exposure." (Id. ¶ 128 (emphasis in Am. Cmplt.))

### 6.    The April 21, 2020 Form 8-K

On April 21, 2020, investors traded more than one billion USO shares, and the price premium over NAV for USO shares rose to 36.46%. (Id. ¶ 99)  That same day, USO filed a Form 8-K stating that the SEC had not declared the April 2020 Registration Statement effective (id. ¶ 117) – meaning that USO was unable to issue any new shares (id. ¶ 99) – and announced "that it was altering its investment strategy once again, further pushing out its investments along the WTI futures curve in an effort to reduce investment risk." (Id. ¶ 118)

### 7.    The April 22, 2020 Form 8-Ks

On April 22, 2020, the price of USO shares declined 11%; USO's NAV per share increased 12%; and the number of June WTI futures contracts held by USO increased 19%. (Id. ¶ 104)  USO filed a Form 8-K that day stating that it "would undergo a 1-for-8 reverse split of shares after market close on April 28, 2020." A "reverse split" "reduces the number of shares outstanding in a company or fund into fewer and proportionally higher priced shares." (Id. ¶ 119)  In a second Form 8-K filed later that day, USO "announc[ed] that it had changed its investment strategy, once again pushing its positions further down the WTI futures curve." (Id. ¶ 120)

### 8.    The April 24, 2020 Form 8-K

In an April 24, 2020 Form 8-K, USO again announced that it was altering its

investment strategy, and disclosed that it

> had received letters from the Chicago Mercantile Exchange ("CME") on behalf of the
> NYMEX Market Regulation Department, the regulatory body overseeing the NYMEX,
> on April 16, 2020, ordering the Fund to limit its positions in the June WTI futures
> contracts so as not to exceed accountability levels of 10,000 futures contracts – *eight
> days before the belated disclosure*, and the same day on which the USO Defendants had
> first announced changes to the Fund's investment strategy.  The Form 8-K also revealed
> that the USO Defendants had received another order from regulatory authorities on April
> 23, 2020 imposing limits on the Fund's positions further down the WTI futures curve,
> which had again corresponded with additional changes to the Fund's investment strategy.

(Id. ¶ 121 (emphasis in Am. Cmplt.))

### 9.    The April 27, 2020 Amendment to the April Registration Statement

On April 27, 2020, USO filed an amendment to the April 2020 Registration

Statement on Form S-3/A (the "April 2020 Amendment").  The amendment contains additional

disclosures about certain factors impacting the Fund, including the COVID-19 pandemic,

increasing contango, "the Saudi/Russia oil price war, the sale of an enormous amount of USO

shares in a short period of time[,] . . . significant market volatility[,] and the regulatory and

marketplace limits placed on the Fund."  (Id. ¶¶ 130-32)

The April 2020 Amendment also "acknowledge[s] that the Fund risked

substantially diverging from its benchmark and failing to meet its investment objective because

of market conditions and its inability to sufficiently invest according to its previously claimed

investment strategy and investment objective."  (Id. ¶ 133)

### 10.    The April 27, 2020 Form 8-K

"[O]n April 27, 2020, USO filed a Form 8-K with the SEC announcing that it was

once again altering its investment strategy. . . . Instead of investing entirely in front month WTI

futures contracts and then rolling those positions forward, USO stated it would hold *no positions*

in the front month WTI futures contract.  Instead, the Fund would invest approximately 30% in the second month WTI futures contract, 15% in the third month WTI futures contract, 15% in the fourth month WTI futures contract, 15% in the fifth month WTI futures contract, 15% in the sixth month WTI futures contract, and 10% in the June 2021 WTI futures contract.  USO also increased its roll period from 4 to 10 days in response to 'regulatory requirements' and 'risk mitigation measures imposed by USO's futures commission merchant,' i.e., to mitigate the disruptive effects of USO turning over its massive positions every month."  (Id. ¶ 122 (emphasis in Am. Cmplt.))

### 11.    The April 28, 2020 Form 8-K

On April 28, 2020, USO filed a Form 8-K disclosing that it "had suffered a[] . . . $466 million realized trading loss and $725 million unrealized trading loss on its futures positions during the month [of March], resulting in a net $1.2 billion loss for the Fund."  (Id. ¶ 113)

### E.    Post-Class Period Events

### 1.    The April 30, 2020 Form 8-K

"[O]n April 30, 2020, USO filed a notice with the SEC on Form 8-K disclosing that the Fund was once again changing its investment strategy and would likely continue to make such changes going forward," and thus "would provide future updates on its investments on the Fund's website pursuant to a complex waterfall formula. . . ."  (Id. ¶ 123)

In April 2020, USO suffered investment losses of more than $2.6 billion.  (Id. ¶ 107)

### 2.    The May 6, 2020 Amendment to the April Registration Statement

On May 6, 2020, USO filed another amendment to the April Registration Statement on Form S-3/A (the "May 2020 Amendment").  "The May [2020] Amendment made

clear that the extraordinary market conditions that had destroyed the ability of the Fund to follow its investment objective and caused investors to suffer billions of dollars in losses had materially impacted the Fund by '*the beginning of March 2020*' – i.e., *before* the March Offering – despite the fact that these specific impacts and threats to the Fund's performance were omitted from the March Registration Statement." (Id. ¶ 134 (emphasis in Am. Cmplt.))

"[I]n May 2020, the price of WTI front month futures contracts rallied more than 88%, while the price of USO shares rose only about 35%." (Id. ¶¶ 104, 114)

### 3. The May 27, 2020 Form 8-K

On May 27, 2020, USO disclosed in a monthly account statement filed with the SEC "that it had suffered a *$3.7 billion* realized trading loss, which, after being offset by unrealized trading gains, caused the Fund to suffer a net $2.6 billion loss for the month [of April 2020]." (Id. ¶ 113 (emphasis in Am. Cmplt.))

### 4. SEC and CFTC Investigations into USO

"On August 17, 2020, the SEC issued a Wells Notice to Defendants USCF, USO and Love" which "stated that the SEC had made a preliminary determination to recommend that the SEC file an enforcement action against these Defendants for violating the 1933 Act and 1934 Act and Rule 10b-5 thereunder with respect to the Fund's disclosures to investors and actions during the Class Period, specifically regarding the changes made to USO's investment strategy and the limits placed upon the Fund by regulators." (Id. ¶ 137)

"On August 19, 2020, the [Commodity Futures Trading Commission (the 'CFTC')] issued a Wells Notice to Defendants USCF, USO and Love" which "stated that the CFTC had made a preliminary determination to recommend that the CFTC file an enforcement action against these Defendants for violating the Commodity Exchange Act and CFTC Regulations with respect to the Fund's disclosures to investors and recent activities." (Id. ¶ 138)

II.    **PROCEDURAL HISTORY**

On June 19, 2020, the first of three putative securities fraud class action lawsuits was filed on behalf of those who purchased USO securities during the Class Period (February 25, 2020 to April 28, 2020). (Dkt. No. 1) On September 16, 2020, this Court consolidated the three actions and appointed Lead Plaintiff and Lead Counsel. (Sept. 16, 2020 Order (Dkt. No. 63))

Plaintiff filed the Amended Complaint on November 30, 2020. (Am. Cmplt. (Dkt. No. 68))

On January 28, 2021, Plaintiff filed a notice of voluntary dismissal as to Defendants BNP Paribas Securities Corp., Credit Suisse Securities (USA) LLC, Citigroup Global Markets Inc., Citadel Securities LLC, Deutsche Bank Securities Inc., Morgan Stanley & Company, Inc. (n/k/a Morgan Stanley & Company, LLC), Nomura Securities International, Inc., RBC Capital Markets, LLC, SG Americas Securities LLC, and UBS Securities LLC. (Dkt. No. 138)

On January 29, 2021, the USO Defendants moved to dismiss the Amended Complaint pursuant to Rule 12(b)(6). (USO Def. Mot. (Dkt. No. 142)) Plaintiff filed its opposition on March 30, 2021 (Pltf. Opp. (Dkt. No. 151)), and the USO Defendants filed their reply on April 29, 2021. (USO Def. Reply (Dkt. No. 145))

On April 29, 2021, the remaining Authorized Participant Defendants and Defendant ALPS Distributors, Inc. joined the USO Defendants' motion to dismiss as to the claims asserted against them. (Authorized Participant Def. Joinder Ltr. (Dkt No. 147); ALPS Distributors Joinder Ltr. (Dkt. No. 149))

On May 6, 2021, Plaintiff filed its first notice of supplemental authority. (Dkt. No. 154) On May 13, 2021, the USO Defendants moved for leave to reply to Plaintiff's first notice of supplemental authority. (Dkt. No. 155)

On November 24, 2021, Plaintiff filed a second notice of supplemental authority. (Dkt. No. 158)  On December 6, 2021, the USO Defendants moved for leave to reply to Plaintiff's second notice of supplemental authority.  (Dkt. No. 159)

In March 29, 2022 orders, this Court stated that it would consider the USO Defendants' May 13, 2021 and December 6, 2021 letters filed in response to Plaintiff's first and second notices of supplemental authority.  (Dkt. Nos. 161, 162)

On March 27, 2023, the USO Defendants filed their first notice of supplemental authority.  (Dkt. No. 167)  On March 31, 2023, Plaintiff responded to the USO Defendants' notice of supplemental authority.  (Dkt. No. 168)

On April 12, 2023, the USO Defendants filed a second notice of supplemental authority.  (Dkt. No. 169)  On April 20, 2023, Plaintiff responded to the USO Defendants' second notice of supplemental authority.  (Dkt. No. 170)

## DISCUSSION

## I.    LEGAL STANDARD

### A.    Rule 12(b)(6) Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 554, 570 (2007)). "In considering a motion to dismiss . . . the court is to accept as true all facts alleged in the complaint," Kassner v. 2nd Ave. Delicatessen Inc., 496 F.3d 229, 237 (2d Cir. 2007) (citing Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 87 (2d Cir. 2002)), and must "draw all reasonable inferences in favor of the plaintiff."  Id. (citing Fernandez v. Chertoff, 471 F.3d 45, 51 (2d Cir. 2006)).

A complaint is inadequately pled "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement,'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557), and does not provide factual allegations sufficient "to give the defendant fair notice of what the claim is and the grounds upon which it rests." Port Dock & Stone Corp. v. Oldcastle N.E., Inc., 507 F.3d 117, 121 (2d Cir. 2007) (citing Twombly, 550 U.S. at 555). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to establish entitlement to relief. Iqbal, 556 U.S. at 678.

## II.    SECTION 10(b) CLAIMS

The Amended Complaint alleges that Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 by issuing a number of false or misleading statements during the Class Period. (Am. Cmplt. (Dkt. No. 68) ¶¶ 224-28)  The statements at issue are contained in (1) the February 2020 Registration Statement, (2) the March 2020 Registration Statement, and (3) other documents filed with the SEC or posted to USO's website during the Class Period. (Am. Cmplt. (Dkt. No. 68) ¶¶ 207-09, 224-28)

In moving to dismiss, Defendants contend that none of the statements cited in the Amended Complaint is false or misleading. (USO Def. Br. (Dkt. No. 143) at 32-56)  According to Defendants, the statements cited by Plaintiff sufficiently disclose the Fund features and risks that allegedly caused its value to decline and were not required to be updated to disclose publicly available or ongoing market developments in real time.  (See id.)  Defendants further argue that "[n]o reasonable investor could have been misled about the risks of investing in the Fund, given the total mix of information provided in the Registration Statements and otherwise publicly available," and thus all the claims in the Amended Complaint "fail as a matter of law."  (Id. at 56)  Defendants also argue that Plaintiff's Section 10(b) and Rule 10b-5 claims should be dismissed for failure to plead facts establishing a strong inference of scienter.  (Id. at 57)

A.    **Applicable Law**

Section 10(b) of the Securities Exchange Act of 1934 makes it unlawful "for any person, directly or indirectly . . . [t]o use or employ, in connection with the purchase or sale of any security . . . , any manipulative or deceptive device or contrivance. . . ." 15 U.S.C. § 78j. Pursuant to SEC Rule 10b-5, it is unlawful

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.

To state a material misstatement or omission claim under Section 10(b) and Rule 10b-5, a plaintiff must "allege that the defendant (1) made misstatements or omissions of material fact, (2) with scienter, (3) in connection with the purchase or sale of securities, (4) upon which the plaintiff relied, and (5) that the plaintiff's reliance was the proximate cause of its injury." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 105 (2d Cir. 2007) (citing Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005)).

"A statement is misleading if a reasonable investor, in the exercise of due care, would have received a false impression from the statement." Plumbers & Steamfitters Local 137 Pension Fund v. Am. Express Co., No. 15 CIV. 5999 (PGG), 2017 WL 4403314, at *13 (S.D.N.Y. Sept. 30, 2017) (internal quotation marks and citation omitted). "In general[,] there is no duty to disclose a fact . . . merely because a reasonable investor would very much like to know that fact. . . ." Meyer v. Jinkosolar Holdings Co., 761 F.3d 245, 250 (2d Cir. 2014)

(internal quotation marks and citation omitted). "[D]isclosure is required," however, "when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." Id. (internal quotation marks and citations omitted). In other words, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." Id.

"That duty is not boundless, however." In re Vroom, Inc. Sec. Litig., No. 21 CIV. 2477 (PGG), 2025 WL 862125, at *13 (S.D.N.Y. Mar. 18, 2025) (internal quotations marks and citation omitted). "'"[R]evealing one fact about a subject does not trigger a duty to reveal all facts on the subject."'" Id. (quoting Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (quoting Richman v. Goldman Sachs Group, Inc., 868 F.Supp.2d 261, 274 (S.D.N.Y. 2012))). "'[T]he proper inquiry requires an examination of defendant's representations, taken together and in context.'" Meyer, 761 F.3d at 250 (quoting In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 366 (2d Cir. 2010)). "In other words, [courts] look to the total mix of available information." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *13 (internal quotation marks and citation omitted).

"'A complaint alleging securities fraud pursuant to Section 10(b) of the Securities Exchange Act is subject to two heightened pleading standards.'" In re Cannavest Corp. Sec. Litigs., 307 F. Supp. 3d 222, 236 (S.D.N.Y. 2018) (quoting In re Gen. Elec. Co. Sec. Litig., 857 F. Supp. 2d 367, 383 (S.D.N.Y. 2012)). "First, the complaint must satisfy Federal Rule of Civil Procedure 9(b), which requires that the complaint 'state with particularity the circumstances constituting fraud.'" Id. (quoting Fed. R. Civ. P. 9(b)). This requirement "serves to provide a defendant with fair notice of a plaintiff's claim, safeguard his reputation from improvident charges of wrongdoing, and protect him against strike suits." ATSI Commc'ns, 493 F.3d at 99. Accordingly, a securities fraud complaint based on misstatements must "'(1) specify the

statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where

and when the statements were made, and (4) explain why the statements were fraudulent.'"

Rombach v. Chang, 355 F.3d 164, 170 (2d Cir. 2004) (quoting Mills v. Polar Molecular Corp.,

12 F.3d 1170, 1175 (2d Cir. 1993)).

    Second, the complaint must meet the pleading requirements of the Private

Securities Litigation Reform Act of 1995 (the "PSLRA"), 15 U.S.C. § 78u-4(b).  The PSLRA

requires a plaintiff to "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); see also Tellabs,

Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 313 (2007) ("The PSLRA requires plaintiffs

to state with particularity both the facts constituting the alleged violation, and the facts

evidencing scienter, i.e., the defendant's intention 'to deceive, manipulate, or defraud.'" (quoting

Ernst & Ernst v. Hochfelder, 425 U.S. 185, 194 & n.12 (1976))).  "To qualify as 'strong' within

the intendment of [the PLSRA][,] . . . an inference of scienter must be more than merely

plausible or reasonable – it must be cogent and at least as compelling as any opposing inference

of nonfraudulent intent."  Tellabs, 551 U.S. at 314; see also id. ("[T]o determine whether a

complaint's scienter allegations can survive threshold inspection for sufficiency, a court

governed by [the PLSRA] must engage in a comparative evaluation; it must consider, not only

inferences urged by the plaintiff . . . but also competing inferences rationally drawn from the

facts alleged.").  As discussed above, "[a] complaint will survive . . . only if a reasonable person

would deem the inference of scienter cogent and at least as compelling as any opposing inference

one could draw from the facts alleged."  Id. at 324.

B.    **Alleged False or Misleading Statements**

    1.    **Statements about "Risk Factors Involved with an Investment in USO"
in the February 2020 and March 2020 Registration Statements**

The Amended Complaint challenges statements made in the February 2020 and

March 2020 Registration Statements concerning "RISK FACTORS INVOLVED WITH AN

INVESTMENT IN USO." The Amended Complaint alleges that these statements were false and

misleading because they did not adequately disclose the risks to the Fund flowing from the

COVID-19 pandemic and the Saudi/Russia oil price war. (Am. Cmplt. (Dkt. No. 68) ¶¶ 141,

147-49 (emphasis in Am. Cmplt.))

    a.    **February 2020 Registration Statement**

The February 2020 Registration Statement states the following under a section

entitled "**RISK FACTORS INVOLVED WITH AN INVESTMENT IN USO**":

> ***Economic conditions impacting crude oil.*** The demand for crude oil correlates closely
> with general economic growth rates. The occurrence of recessions or other periods of
> low or negative economic growth will typically have a direct adverse impact on crude oil
> prices. Other factors that affect general economic conditions in the world or in a major
> region, such as changes in population growth rates, periods of civil unrest, government
> austerity programs, or currency exchange rate fluctuations, can also impact the demand
> for crude oil. Sovereign debt downgrades, defaults, inability to access debt markets due
> to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal,
> monetary, or political systems such as the European Union, and other events or
> conditions that impair the functioning of financial markets and institutions also may
> adversely impact the demand for crude oil.

(Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 10 (emphasis in Feb. 2020

Registration Stmt.))

    In the Amended Complaint, Plaintiff complains that "provid[ing] a list of all of

the purportedly material 'RISK FACTORS INVOLVED WITH AN INVESTMENT IN USO'

yet fail[ing] to even mention COVID-19, create[ed] the false and misleading impression that the

pandemic was not a material risk impacting the Fund at the time and render[ed] the boilerplate

discussion of risks provided therein (copied almost verbatim from past SEC filings) materially

false and misleading when made." (Am. Cmplt. (Dkt. No. 68) ¶ 141 (emphasis in Am. Cmplt.))

       The Amended Complaint alleges the following facts about the effects of the

COVID-19 pandemic on oil markets before the February 2020 Registration Statement was filed

on February 25, 2020:

> 60. In early 2020, the convergence of the rapid spread of COVID-19 and disputes between major oil-producing countries created turmoil in oil markets. In early January 2020, the World Health Organization ("WHO") announced the discovery of a new coronavirus strain in China, later dubbed COVID-19. On January 23, 2020, Chinese authorities placed the 11 million person city of Wuhan under quarantine in an effort to contain the rapid spread of the virus. A week later, the WHO declared COVID-19 a global public-health emergency, and the next day the United States banned foreign nationals from entering the U.S. if they had travelled to China within the prior two weeks. Shortly thereafter, the U.S. declared COVID-19 a public health emergency.
>
> 61. By February 2020, COVID-19 had begun to have a significant impact on commodity markets. On February 4, 2020, the price of WTI crude fell below $50 per barrel, from more than $58 per barrel just two weeks previously. By February 9, 2020, the death toll in China had surpassed that of the SARS epidemic in the early 2000s. Between February 12 and 21, 2020, the international expansion of COVID-19 accelerated, with South Korea, Iran and Italy suffering outbreaks. On February 13, 2020, China began turning away oil tankers as the country's lockdown intensified. On February 24, 2020, Reuters reported that oil prices, including crude futures, slid 4% "as the rapid spread of [the] coronavirus in several countries outside China left investors concerned about a hit to demand."

(Id. ¶¶ 60-61)

       Based on these allegations, Plaintiff argues that "the material adverse impacts to

the Fund from COVID-19 . . . had *already* affected USO at the time of the February [2020]

. . . Offering[] such that the failure to disclose the ongoing and continued impacts from [this]

extreme market event[] violated Defendants' disclosure duties under the securities laws." (Pltf.

Opp. (Dkt. No. 151) at 42-43 (emphasis in Pltf. Opp.))

Defendants respond that Plaintiff has not "alleged that Defendants could have known the 'specific impact' of market developments in real time," and "has not plausibly alleged that any market developments or their impact on USO was uniquely known to Defendants as of the date of [the February 2020] Registration Statement." (USO Def. Reply (Dkt. No. 145) at 22 (citing Barilli v. Sky Solar Holdings, Ltd., 389 F. Supp. 3d 232, 254-55 (S.D.N.Y. 2019); Bettis v. Aixtron SE, No. 16-cv-25, 2016 WL 7468194, at *13 (S.D.N.Y. Dec. 20, 2016)))

The Court concludes that Plaintiff's allegations are not sufficient to plausibly plead that "the material adverse impacts to the Fund from COVID-19 . . . had already affected USO at the time of the February . . . Offering[]. . . ." (Pltf. Opp. (Dkt. No. 151) at 42 (emphasis omitted))  The Amended Complaint's allegations demonstrate that the price of crude oil dropped in February 2020, and that China had already begun taking significant measures to address the pandemic.  But the global effects of the pandemic, the likely duration of those effects, and the catastrophic effect on the oil markets was far from clear as of February 25, 2020.  Nor has Plaintiff pled facts suggesting that Defendants had any unique knowledge as to these matters. See Barilli, 389 F. Supp. 3d at 255 (finding that information concerning "the general state of the Japanese solar market . . . was not information uniquely within Defendants' control and thus Defendants had no duty to disclose such information"); Bettis, 2016 WL 7468194, at *13 ("[T]here are no facts to suggest that Aixtron, a German company, had any greater access to information regarding Chinese government subsidies than Plaintiff himself.").

Moreover, facts pled in the Amended Complaint undermine Plaintiff's claim that the COVID-19 pandemic's adverse impacts to the Fund were clear to Defendants and unknown to investors as of February 25, 2020.  The Amended Complaint pleads that "[d]uring the Class Period, retail investors began pouring hundreds of millions of dollars into USO – facilitated by

the February Offering and the March Offering – in an attempt to 'buy the dip,' believing (correctly) that the price of oil would rebound as economies exited lockdown periods [related to COVID-19] and the Saudi/Russia oil price war ended." (Am. Cmplt. (Dkt. No. 68) ¶ 6)  This allegation – far from demonstrating that investors were misled by the February 2020 Registration Statement – suggests that investors correctly concluded that the negative effects on the oil markets of the pandemic and the Saudi/Russian oil price war would be temporary.

Contradictory factual allegations of this sort are indicative of a failure to plead a plausible claim.  See In re Columbia Tuition Refund Action, 523 F. Supp. 3d 414, 424 n.1 (S.D.N.Y. 2021) (quoting Lenart v. Coach Inc., 131 F. Supp. 3d 61, 67 (S.D.N.Y. 2015)) ("'[W]here a plaintiff's own pleadings are internally inconsistent, a court is neither obligated to reconcile nor accept the contradictory allegations in the pleadings as true. . . .'") (alteration in original); Green v. Covidien LP, No. 18 CIV 2939 (PGG), 2021 WL 1198833, at *15 (S.D.N.Y. Mar. 30, 2021) ("Plaintiff's contradictory pleadings provide further reason to deny leave to amend."); Am. Centennial Ins. Co. v. Seguros La Republica, S.A., No. 91 CIV. 1235 (MJL), 1996 WL 304436, at *16 (S.D.N.Y. June 5, 1996) (quoting Trans World Airlines, Inc. v. Hughes, 449 F.2d 51, 63 (2d Cir. 1971), rev'd sub nom. Hughes Tool Co. v. Trans World Airlines, Inc., 409 U.S. 363 (1973)) ("Allegations are not well pleaded if they are 'made indefinite or erroneous by other allegations in the same complaint[]. . . .'").

In sum, the Amended Complaint does not adequately allege that statements about risk factors included in the February 2020 Registration Statement were materially false or misleading.

### b.    March 2020 Registration Statement

The Amended Complaint alleges that the following language in the March 2020 Registration Statement was false and misleading:

> Economic conditions impacting crude oil. The demand for crude oil correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices. Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, *pandemics (e.g. COVID-19)*[,] government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and other events or conditions *(e.g. pandemics such as COVID-19),* that impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil.

(Am. Cmplt. (Dkt. No. 68) ¶ 147 (emphasis in Am. Cmplt.))

According to Plaintiff, these risk disclosures were false and misleading "because [they] said nothing *at all* about the Saudi/Russia oil price war, even though it had already been raging for two weeks at the time." (Am. Cmplt (Dkt. No. 68) ¶ 149 (emphasis in Am. Cmplt.)) Plaintiff further contends that "the material adverse impacts to the Fund from . . . the Saudi/Russia price war had *already* affected USO at the time of the . . . March Offering[] such that the failure to disclose the ongoing and continued impacts from [this] extreme market event[] violated Defendants' disclosure duties under the securities laws." (Pltf. Opp. (Dkt. No. 151) at 42-43 (emphasis in Pltf. Opp.))

Plaintiff also alleges that the references to COVID-19 in the March 2020 Registration Statement were false and misleading because

> simply append[ing] COVID-19 to an existing laundry list of potentially disruptive market events without any substantive discussion whatsoever of how the pandemic was actually impacting the Fund at the time of the offering or could impact the Fund going forward. . . . gave investors the false and misleading impression that COVID-19 did not present any specific risks to USO other than those impacting oil-related securities generally, when in fact it had converged with other material adverse events in the lead up to the March Offering that together threatened the Fund's very existence.

(Am. Cmplt. (Dkt. No. 68) ¶ 148)

i.    **Failure to Disclose Risk Presented
by Saudi-Russia Price War**

The Amended Complaint alleges the following facts about the effects of the

Saudi/Russia price war on oil markets as of March 23, 2020, when the March 2020 Registration

Statement was filed:

> 63. To deal with slumping oil prices, on March 5, 2020, Saudi Arabia and
> other Organization of the Petroleum Exporting Countries ("OPEC") countries
> announced a proposal to cut oil output by 1.5 million barrels a day, or about 1.5% of
> global daily production. However, for the proposal to work, Russia and other non-
> OPEC oil exporting countries would also need to agree to limit production. On
> March 6, 2020, after a two day meeting in Vienna to attempt to reach a deal, Russia
> walked away from negotiations. Shortly thereafter, Saudi Arabia abruptly switched
> from a strategy of appeasement to instigating an all-out price war.
>
> 64. On March 8, 2020, Saudi Arabia shocked global oil markets by announcing price
> discounts for its oil exports of $6 to $8 per barrel to its customers in Europe, Asia and
> the United States. The move threatened to overwhelm global oil markets with supply
> even as demand plummeted due to the increasing coronavirus restrictions being
> pursued by government authorities around the world. Russia responded in kind, and
> soon the two countries were flooding global markets with cheap oil as they sought to
> capitalize on a unique opportunity to potentially put smaller competitors out of
> business.
>
> 65. These dramatic events created significant turmoil in oil markets. On March 9,
> 2020, the price of WTI crude oil fell 33% before settling at $31.13 per barrel, a 25%
> decline and the biggest single-day drop since the 1991 Gulf War. . . .
>
> . . . .
>
> 72. . . . . [O]n March 9, 2020 – the first trading day following the launch of the
> Saudi/Russia oil price war – trading in WTI futures contracts exploded to record
> heights, reaching over 1.7 million contracts traded, more than 26% above the
> previous trading peak in the last five years. . . .

(Am. Cmplt. (Dkt. No. 68) ¶¶ 63-65, 72)

In moving to dismiss, Defendants contend that the challenged language in the

March 2020 Registration Statement was not false or misleading when considered in conjunction

with other portions of the March 2020 Registration Statement "disclos[ing] the risks posed by

conflict between oil-producing nations. . . ." (See USO Def. Br. (Dkt. No. 143) at 45-46)  And

Defendants further contend that Plaintiff has not "alleged that Defendants could have known the

'specific impact' of market developments [associated with the Saudi/Russia oil price war] in real

time," and "has not plausibly alleged that any market developments [related to the Saudi/Russia

price war] or their impact on USO was uniquely known to Defendants as of the date of [the

March 2020] Registration Statement." (USO Def. Reply (Dkt. No. 145) at 22 (citing Barilli, 389

F. Supp. 3d at 254-55; Bettis, 2016 WL 7468194, at *13))

       As to "risks posed by conflict between oil-producing nations" (USO Def. Br.

(Dkt. No. 143) at 45-46), Defendants point out that the March 2020 Registration Statement

warns of risks associated with "*[o]ther crude oil supply-related factors*":

> Crude oil prices also vary depending on a number of factors affecting supply.  For
> example, increased supply from the development of new oil supply sources and
> technologies to enhance recovery from existing sources tends to reduce crude oil prices to
> the extent such supply increases are not offset by commensurate growth in demand.
> Similarly, increases in industry refining or petrochemical manufacturing capacity may
> impact the supply of crude oil.  World oil supply levels can also be affected by factors
> that reduce available supplies, such as adherence by member countries to the
> Organization of the Petroleum Exporting Countries ("OPEC") production quotas and the
> occurrence of wars, hostile actions, natural disasters, disruptions in competitors'
> operations, or unexpected unavailability of distribution channels that may disrupt
> supplies.  Technological change can also alter the relative costs for companies in the
> petroleum industry to find, produce, and refine oil and to manufacture petrochemicals,
> which in turn may affect the supply of and demand for oil.

(Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 10 (emphasis in Mar. 2020

Registration Stmt.))

       And in a section entitled "**Other Risks**," the March 2020 Registration Statement

cites the risk that a foreign government could take action that affects its crude oil production or

exports:

> Futures positions cannot always be liquidated at the desired price.  It is difficult to
> execute a trade at a specific price when there is a relatively small volume of buy and sell

> orders in a market. A market disruption, such as a foreign government taking political
> actions that disrupt the market for its currency, its crude oil production or exports, or
> another major export, can also make it difficult to liquidate a position. Because both Oil
> Futures Contracts and Other Oil-Related Investments may be illiquid, USO's Oil Interests
> may be more difficult to liquidate at favorable prices in periods of illiquid markets and
> losses may be incurred during the period in which positions are being liquidated. The
> large size of the positions that USO may acquire increases the risk of illiquidity both by
> making its positions more difficult to liquidate and by potentially increasing losses while
> trying to do so.

(Id. at 18 (emphasis in Mar. 2020 Registration Stmt.))

Given the March 2020 Registration Statement's disclosures that "[w]orld oil supply levels can . . . be affected by . . . adherence by member countries to [OPEC] production quotas," and by "[a] market disruption, such as a foreign government taking political actions that disrupt the market for . . . its crude oil production or exports," and that such developments "can . . . make it difficult to liquidate" positions held by the Fund, the March 2020 Registration Statement's failure to more specifically address risks to the Fund posed by the nascent Saudi/Russia oil price war cannot plausibly be regarded as an attempt to falsely represent to investors that the Fund did not face risks from the oil price conflict between Saudi Arabia and Russia. Nor, given this larger context, would a reasonable investor "have received a false impression from the statement." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *11 (internal quotations and citation omitted).

And while Plaintiff contends in briefing that "the material adverse impacts to the Fund from . . . the Saudi/Russia price war. . . had *already* affected USO at the time of the . . . March Offering" (Pltf. Opp. (Dkt. No. 151) at 42 (emphasis in original)), the Amended Complaint does not plead facts supporting this assertion. Acknowledging that the initiation of the price war on March 8, 2020 had created turmoil in the crude oil market as of March 23, 2020 – when the March 2020 Registration Statement was filed – the significance and duration of the

price war was not clear, and Plaintiff has not pled facts showing that USO had unique knowledge regarding the significance and duration of the price war at that time.

### ii.    **COVID-19 Pandemic Disclosure**

As discussed above, Plaintiff complains that the March 2020 Registration Statement's identification of the COVID-19 pandemic as a risk factor that could impact the crude oil market was false and misleading because

> simply append[ing] COVID-19 to an existing laundry list of potentially disruptive market events without any substantive discussion whatsoever of how the pandemic was actually impacting the Fund at the time of the offering or could impact the Fund going forward. . . . gave investors the false and misleading impression that COVID-19 did not present any specific risks to USO other than those impacting oil-related securities generally, when in fact it had converged with other material adverse events in the lead up to the March Offering that together threatened the Fund's very existence.

(Am. Cmplt.  (Dkt. No. 68) ¶ 148)

Defendants respond that the March 2020 Registration Statement expressly warns of the risks presented by the COVID-19 pandemic, "despite still being in the early, uncertain days of the pandemic and well before public health experts understood its nature, length, or full impact. . . ."  According to Defendants, "[t]hese disclosures could not have led a reasonable investor to conclude that [the COVID-19 pandemic] would not materially impact the Fund's performance."  (USO Def. Reply (Dkt. No. 145) at 16-17 (internal quotation marks and citation omitted))

"'[W]hen a registration statement warns of the exact risk that later materialized, a [securities fraud] claim will not lie as a matter of law.'" In re ProShares Tr. Sec. Litig., 728 F.3d 96, 102 (2d Cir. 2013) (discussing a Section 11 claim) (quoting In re ProShares Tr. Sec. Litig., 889 F. Supp. 2d 644, 653 (S.D.N.Y. 2012), aff'd, 728 F.3d 96 (2d Cir. 2013)); see also Ashland Inc. v. Morgan Stanley & Co., 652 F.3d 333, 338 (2d Cir. 2011) (rejecting Section 10(b) claim

where the "statement explicitly disclosed the very . . . risks about which appellants claim to have been misled."). Accordingly, in listing the COVID-19 pandemic as a risk to USO's business, Defendants did not falsely represent to investors that USO did not face risks from the COVID-19 pandemic.

Plaintiff argues, however, that "the material adverse impacts to the Fund from COVID-19 . . . had *already* affected USO at the time of the . . . March Offering, such that the failure to disclose the ongoing and continued impacts from [this] extreme market event[] violated Defendants' disclosure duties under the securities laws." (Pltf. Opp. (Dkt. No. 151) at 42-43 (emphasis in Pltf. Opp.))

In addition to the facts discussed above concerning the alleged effects of the COVID-19 pandemic on the crude oil market as of February 25, 2020, when the February 2020 Registration Statement was filed, the Amended Complaint pleads the following facts about the effects of the COVID-19 pandemic on the crude oil market as of March 23, 2020, when the March 2020 Registration Statement was filed:

> 61. . . . On February 25, 2020, San Francisco declared a local emergency, with several California counties following suit over the ensuing week. The United States reported its first death from COVID-19 on February 29, 2020 (though later reports would confirm that an earlier death in fact occurred on February 6, 2020).
>
> . . . .
>
> 67. . . . On March 8, 2020, Italy placed all 60 million of its residents on lockdown. On March 11, 2020, the WHO declared the outbreak a pandemic, the United States banned all travel from 26 European countries, and President Trump declared a national emergency. On March 20, 2020, the Governor of New York announced a stay-at-home order just hours after the Governor of California ordered a similar shelter-in-place order. By March 23, 2020, New York City had confirmed 21,000 cases, making it the epicenter of the outbreak in the United States. . . .

(Am. Cmplt. (Dkt. No. 68) ¶¶ 61, 67)

The Amended Complaint further alleges that "[t]he price of oil fell in tandem with the continued drop in demand and increase in supply" related to these February and March 2020 events (id. ¶ 67), and in briefing Plaintiff argues that "the material adverse impacts to the Fund from COVID-19 . . . had *already* affected USO at the time of the March Offering." Acknowledging that – by March 23, 2020 – when the March 2020 Registration Statement was filed – certain states and municipalities in the United States, as well as foreign governments and international agencies, had taken emergency actions in connection with COVID-19, the significance and duration of the pandemic and its effect on the crude oil market were not clear at that time, and Plaintiff has not pled facts showing that USO had unique knowledge at that time regarding these matters.[3]

In sum, the Amended Complaint does not adequately allege that statements about risk factors included in the March 2020 Registration Statement were materially false or misleading.

### 2.    Statements About Liquidity and Illiquidity in the February and March 2020 Registration Statements

The Amended Complaint asserts that language in the February and March 2020 Registration Statements concerning the Fund's liquidity was false and misleading because Defendants did not adequately disclose illiquidity issues threatening the Fund.  (Am. Cmplt. (Dkt. No. 68) ¶¶ 143, 166, 168)

---

[3]  While Plaintiff argues that "Defendants' later disclosures, including in the April [2020] Registration Statement filed just weeks after the March Offering, made clear that COVID-19 was a severe and destructive force that had adversely *impacted* the Fund by at least March 2020" (Pltf. Opp. (Dkt. No. 151) at 42 (emphasis in Pltf. Opp.) (citing Am. Cmplt. (Dkt. No. 68) ¶ 126)), the later disclosures cited in the Amended Complaint were made with the benefit of hindsight, and do not demonstrate that Defendants were aware on March 23, 2020 – the filing date of the March 2020 Registration Statement – that the COVID-19 pandemic was having a severe negative impact on the Fund.  (See Am. Cmplt. (Dkt. No. 68) ¶ 126)

a.    **Statements Regarding Liquidity**

The Amended Complaint challenges language in the February 2020 Registration Statement stating that the WTI futures contracts in which USO invests are "'***traded in sufficient volume to permit the ready taking and liquidation of positions***' and could 'be ***readily liquidated*** with the original counterparty or through a third party assuming the position of USO.'" (Am. Cmplt. (Dkt. No. 68) ¶ 143 (emphasis in Am. Cmplt.)) According to Plaintiff, this language was "materially false and misleading when made because the February Offering interjected considerable volatility and illiquidity into the markets, as the offering itself would cause USO to grow to dominate WTI near months futures markets and the Fund to experience insufficient liquidity. . . ." (Id.)

The Amended Complaint further alleges that the March 2020 Registration Statement misleadingly "claimed that the Fund's investments remained highly liquid at the time of the March Offering," citing the following language:

> **Liquidity**
>
> ***USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking and liquidation of positions*** in these financial interests and in Other Oil-Related Investments that, in the opinion of USCF, ***may be readily liquidated with the original counterparty or through a third party assuming the position of USO.***

(Id. ¶ 166 (emphasis in Am. Cmplt.)) The Amended Complaint alleges that this statement was "materially false and misleading when made," because (1) "[b]y mid-March 2020, USO had more than tripled its share of WTI near term futures contracts to 15% of the entire market, a highly dangerous position for any single entity," which "had already caused distortions in the relevant markets impacting the Fund by the date of the March Offering, including, inter alia, significant illiquidity"; and (2) "USO was planning to invest substantially all of the proceeds

from the March Offering into these same contracts, thereby guaranteeing to further increase

illiquidity. . . ." (Id. ¶ 169)

   Defendants respond that the excerpts cited by Plaintiff are non-actionable opinion.

(USO Def. Br. (Dkt. No. 143) at 37)  According to Defendants, the challenged

> passage [in the February and March Registration Statements] did not promise that the
> prices of USO's investments would be unaffected by market illiquidity.  Rather, it simply
> stated that USO invests in instruments that "in the opinion of USCF" have sufficient
> volume to allow for ready liquidation – that is, enough volume to allow USO to sell its
> positions.  By no means was this a representation that USO's investments were "highly"
> liquid such that the price of these sales would be unaffected by periods of relative
> illiquidity.  Indeed, reading this "Liquidity" statement alongside disclosures that
> "[f]utures positions cannot always be liquidated at the desired price" and "*[c]ertain of
> USO's investments could be illiquid, which could cause large losses to investors at any
> time or from time to time,*" a reasonable investor would understand that the price of
> USO's investments could be negatively affected by liquidity constraints.

(Id. (quoting Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 18, 31

(emphasis in Feb. 2020 Registration Stmt.); Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.)

(Dkt. No. 144-2) at 18, 31 (emphasis in Mar. 2020 Registration Stmt.) (internal citations

omitted)))

   Statements of opinion "include subjective statements that reflect judgments as to

values that [are] not objectively determinable." In re Gen. Elec. Co. Sec. Litig., 856 F.Supp.2d

645, 653 (S.D.N.Y. 2012) (internal quotation marks and citation omitted).  For example,

"[s]tatements that 'express expectations about the future rather than presently existing, objective

facts' are . . . statements of opinion." In re Aratana Therapeutics Inc. Sec. Litis., 315 F. Supp. 3d

737, 758 (S.D.N.Y. 2018) (quoting Fialkov v. Alcobra Ltd., No. 14 CIV. 09906 (GBD), 2016

WL 1276455, at *6 (S.D.N.Y. Mar. 30, 2016)).  "Such statements, often marked by phrases such

as 'I believe,' are inactionable so long as the speaker actually held the belief professed, did not

supply an untrue supporting fact, and did not omit information rendering the statement

misleading." Id. (citing Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,

135 S. Ct. 1318, 1326-27 (2015)).

To adequately allege that a statement of opinion was misleading because of the

omission of material information, an

> investor must identify particular (and material) facts going to the basis for the
> issuer's opinion – facts about the inquiry the issuer did or did not conduct or the
> knowledge it did or did not have – whose omission makes the opinion statement
> at issue misleading to a reasonable person reading the statement fairly and in
> context.

Tongue v. Sanofi, 816 F.3d 199, 209 (2d Cir. 2016) (quoting Omnicare, 135 S. Ct. at 1332).

The Supreme Court has made clear, however, that establishing liability on such a

theory "'is no small task. . . .'" Id. at 210 (quoting Omnicare, 135 S. Ct. at 1332).

"'[R]easonable investors understand that opinions sometimes rest on a weighing of competing

facts'"; therefore, "a statement of opinion 'is not necessarily misleading when an issuer knows,

but fails to disclose, some fact cutting the other way.'" Id. (quoting Omnicare, 135 S. Ct. at

1329). Moreover, "'an omission that renders misleading a statement of opinion when viewed in

a vacuum may not do so once that statement is considered, as is appropriate, in a broader

frame.'" Id. (quoting Omnicare, 135 S. Ct. at 1330). "The core inquiry is whether the omitted

facts would 'conflict with what a reasonable investor would take from the statement itself.'" Id.

(quoting Omnicare, 135 S. Ct. at 1329).

Here, the challenged statement in the February 2020 and March 2020 Registration

Statements reads as follows:

> USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the
> opinion of USCF, are traded in sufficient volume to permit the ready taking and
> liquidation of positions in these financial interests and in Other Oil-Related Investments
> that, in the opinion of USCF, may be readily liquidated with the original counterparty or
> through a third party assuming the position of USO.

(Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 31; id., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 31)

The challenged language in each registration statement is explicitly presented as an opinion. Both registration statements state at two points that the Fund only makes investments "that, in the opinion of USCF," can be easily liquidated. Plaintiff asserts, however, that this language was "materially false and misleading when made" in (1) February 2020, "because the February Offering interjected considerable volatility and illiquidity into the markets, as the offering itself would cause USO to grow to dominate WTI near months futures markets and the Fund to experience insufficient liquidity. . . . "; and (2) March 2020, because (a) "[b]y mid-March 2020, USO had more than tripled its share of WTI near term futures contracts to 15% of the entire market, a highly dangerous position for any single entity," and as a result "had already caused distortions in the relevant markets impacting the Fund by the date of the March Offering, including, inter alia, significant illiquidity"; and (b) "USO was planning to invest substantially all of the proceeds from the March Offering into these same contracts, thereby guaranteeing to further increase illiquidity. . . . " (Am. Cmplt. (Dkt. No. 68) ¶¶ 143, 169) The alleged omissions cited by Plaintiff do not render misleading the challenged language in the February and March Registration Statements, however.

As Defendants point out, "[t]he Registration Statements . . . disclosed the size of USO's [C]lass [P]eriod offerings, as well as the total number of outstanding USO shares trading in the secondary market" (USO Def. Br. (Dkt. No. 143) at 36 (internal citations omitted) (citing Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 2, 33; Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 2, 33)) The Registration Statements also informed investors that "'USO has not limited the size of its offering and is committed to utilizing

substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments,'" (id. (quoting Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 15; Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 15)); that "'[f]utures positions cannot always be liquidated at the desired price'"; and that "'*[c]ertain of USO's investments could be illiquid, which could cause large losses to investors at any time or from time to time*.'" (Id. at 22 (quoting Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 18 (emphasis in Feb. 2020 Registration Stmt.); Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 18 (emphasis in Mar. 2020 Registration Stmt.))) A reasonable investor considering the challenged language and Defendants' disclosures as a whole would thus understand the scope of the Fund's investments and that (1) the price of investments made by the Fund could be negatively affected by liquidity issues, and (2) that the Fund's investments could become illiquid, resulting in large losses to investors.

Accordingly, the challenged statements of opinion are not actionable.

### b.    Statement Regarding Illiquidity

The March 2020 Registration Statement states that "'[t]he large size of the positions that USO *may acquire* increases *the risk* of illiquidity. . . .'" (Am. Cmplt. (Dkt. No. 68) ¶ 168 (emphasis in Am. Cmplt.)) According to Plaintiff, this language was false and misleading because it did not "disclos[e] the significant illiquidity threats that USO was then experiencing as a result of the market-dominating positions that the Fund had *already* taken and was planning to take as a result of the March Offering." (Id.) (emphasis in Am. Cmplt.) But the related allegations described above – that (1) "[b]y mid-March 2020, USO had more than tripled its share of WTI near term futures contracts to 15% of the entire market, a highly dangerous position for any single entity"; (2) that USO's purchases "had already caused distortions in the relevant markets impacting the Fund by the date of the March Offering, including, inter alia,

significant illiquidity"; and (3) "USO was planning to invest substantially all of the proceeds from the March Offering into these same contracts, thereby guaranteeing to further increase illiquidity" (Am. Cmplt. (Dkt. No. 68) ¶ 169) – do not plausibly demonstrate that the Fund was suffering significant illiquidity threats as of March 23, 2020, when the March 2020 Registration Statement was filed.[4]  Moreover, as discussed above, the March 2020 Registration Statement explicitly and repeatedly warns of the illiquidity risk and discloses the size of the March Offering, the total number of outstanding USO shares trading in the secondary market, and USO's plan to invest the proceeds of the March Offering in more oil futures contracts.  (See Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 2, 15, 18, 33)  Accordingly, the language in the March 2020 Registration Statement stating that "[t]he large size of the positions that USO may acquire increases the risk of illiquidity" is not actionably false or misleading.

3. **Statements in the February and March 2020 Registration Statements About Whether the Price of USO Shares Will Track Changes in the Spot Price of Oil, Oil Securities, and Per Share NAV**

The Amended Complaint challenges statements in the February and March 2020 Registration Statements about whether the price of the Fund's shares will track changes in the spot price of oil, oil securities, and per share NAV.  The Amended Complaint alleges that these statements were false and misleading because they did not adequately disclose divergences between these metrics.  (Am. Cmplt. (Dkt. No. 68) ¶¶ 143, 155-56)

---

[4]  The Amended Complaint's allegation that USO's purchases "had already caused distortions in the relevant markets impacting the Fund by the date of the March Offering, including, inter alia, significant illiquidity," are conclusory, and are not supported by plausible factual allegations. Similarly, the Amended Complaint does not provide any factual support for its conclusory assertion that – by March 23, 2020 – the WTI near term futures contract market was experiencing distortions due to significant illiquidity issues, and that USO itself was suffering illiquidity threats, as a result of USO's ownership of 15% of the WTI near term futures contracts market.

###### a.    February 2020 Registration Statement

According to the Amended Complaint, the February 2020 Registration Statement represents that "'the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis *will closely track*[] the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses.'" Plaintiff contends that this statement was "materially false and misleading when made because the February Offering . . . would cause . . . significant per share NAV to price divergence." (Am. Cmplt. (Dkt. No. 68) ¶ 143 (emphasis in Am. Cmplt.))

Defendants counter that "'[i]t is not a material omission to fail to predict future market performance'" (USO Def. Br. (Dkt. No. 143) at 51 (quoting In re TVIX Sec. Litig., 25 F. Supp. 3d 444, 452 (S.D.N.Y. 2014), aff'd sub nom. Elite Aviation LLC v. Credit Suisse AG, 588 F. App'x 37 (2d Cir. 2014))), and that "'Defendants need not be clairvoyant,' and . . . are not expected to 'anticipate[] future events.'" (Id. (quoting In re Express Scripts Holdings Co. Sec. Litig., 773 F. App'x 9, 15 (2d Cir. 2019) (summary order) (internal quotation marks omitted) (citing Novak v. Kasaks, 216 F.3d 300, 309 (2d Cir. 2000)))) Defendants further argue that "'[t]he Securities Law requires accuracy as to current facts, not omniscience as to future events[,]' and '[a] Registration Statement is not required to predict the "precise manner" in which [a] [defendant's] financing risk might manifest itself, so long as the risk itself is clearly disclosed.'" (Id. (quoting Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC, No. 08-cv-7062, 2010 WL 4642554, at *14-15, 18 (S.D.N.Y. Nov. 17, 2010))) Defendants further assert that "Plaintiff cannot rely on '20/20 hindsight' to challenge disclosures in the Registration Statements." (Id. (citing Rubinstein v. Credit Suisse Grp. AG, 457 F. Supp. 3d 289, 295 (S.D.N.Y. 2020); Panther Partners, Inc. v. Ikanos Commc'ns, Inc., 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008), aff'd, 347 F. App'x 617 (2d Cir. 2009)))

"It is well-established in the Second Circuit that a plaintiff alleging securities fraud may not substantiate a claim by pleading 'fraud by hindsight.'" In re Manulife Fin. Corp. Sec. Litig., 276 F.R.D. 87, 99 (S.D.N.Y. 2011) (quoting Jackson Nat'l Life Ins. Co. v. Merrill Lynch & Co., Inc., 32 F.3d 697, 703 (2d Cir. 1994)); see also Russo v. Bruce, 777 F. Supp. 2d 505, 522 (S.D.N.Y. 2011) ("'[A]llegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.' '[P]laintiffs may not plead fraud by hindsight.'" (quoting Novak, 216 F.3d at 309, and then Slayton v. Am. Exp. Co., 604 F.3d 758, 776 (2d Cir. 2010)) (internal citations omitted)); In re ProShares Tr. Sec. Litig., 889 F. Supp. 2d 644, 656 (S.D.N.Y. 2012), aff'd, 728 F.3d 96 (2d Cir. 2013) ("It is not a material omission to fail to predict future market performance." (citing, inter alia, I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co., 936 F.2d 759, 763 (2d Cir. 1991))).

Accordingly, Defendants were not required to predict in the February 2020 Registration Statement that the February Offering would "cause . . . significant per share NAV to price divergence. . . ." (Am. Cmplt. (Dkt. No. 68) ¶ 143) Because Plaintiff alleges only "fraud-by-hindsight," the challenged statement in the February 2020 Registration Statement is not actionable.

### b.    March 2020 Registration Statement

The Amended Complaint challenges the following statements in the March 2020 Registration Statement:

> "*USCF believes that maximum and minimum end of day premiums and discounts typically occur because trading in the shares continues on the NYSE Arca until 4:00 p.m. New York time while regular trading in the benchmark futures contract on the NYMEX ceases at 2:30 p.m. New York time and the value of the relevant benchmark futures contract, for purposes of determining its end of day NAV, can be determined at that time*";

". . . USCF believes *that market arbitrage opportunities will cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis.* USCF further believes that daily changes in prices of the Benchmark Oil Futures Contract have historically closely tracked the daily changes in spot prices of light, sweet crude oil. USCF believes that *the net effect of these relationships will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track, the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses.*"; and

"the changes in the price of USO's shares as traded on the NYSE Arca *have closely tracked and will continue to closely track* on a daily basis, the changes in the spot price of light, sweet crude oil on a percentage basis."

(Am. Cmplt. (Dkt. No. 68) ¶¶ 153-55 (emphasis in Am. Cmplt.))

According to Plaintiff, these statements were "materially false and misleading when made, because . . . USO and the markets in which it operated were suffering distortions and unprecedented volatility that had caused, and would continue to cause, the key metrics noted in the March Registration Statement to materially diverge. As a result, the daily changes in the price of USO did not 'closely track' and had materially diverged from the daily changes in the Fund's NAV per share, as well as the daily changes on WTI near month futures contracts and spot crude prices on multiple days leading up to the March Offering." (Id. ¶ 156)

Defendants respond that the challenged statements were not false or misleading when considered in conjunction with other statements made in the March 2020 Registration Statement. (See USO Def. Br. (Dkt. No. 143) at 25-26)

The March 2020 Registration Statement informs investors that

*[t]he market price at which investors buy or sell shares may be significantly less or more than NAV.*

USO's NAV per share will change throughout the day as fluctuations occur in the market value of USO's portfolio investments. The public trading price at which an investor buys or sells shares during the day from their broker may be different from the NAV of the shares. Price differences may relate primarily to supply and demand forces at work in the secondary trading market for shares that are closely related to, but not identical to, the

same forces influencing the prices of the light, sweet crude oil and the Benchmark Oil Futures Contract at any point in time. USCF expects that exploitation of certain opportunities by Authorized Participants and their clients and customers will tend to cause the public trading price to track NAV per share closely over time, but there can be no assurance of that.

The NAV of USO's shares may also be influenced by non-concurrent trading hours between the NYSE Arca and the various futures exchanges on which crude oil is traded. While the shares trade on the NYSE Arca from 9:30 a.m. to 4:00 p.m. Eastern Time, the trading hours for the futures exchanges on which light, sweet crude oil trade may not necessarily coincide during all of this time. For example, while the shares trade on the NYSE Arca until 4:00 p.m. Eastern Time, liquidity in the global light sweet crude market will be reduced after the close of the NYMEX at 2:30 p.m. Eastern Time. As a result, during periods when the NYSE Arca is open and the futures exchanges on which light, sweet crude oil is traded are closed, trading spreads and the resulting premium or discount on the shares may widen and, therefore, increase the difference between the price of the shares and the NAV of the shares.

(Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 13 (emphasis in Mar. 2020

Registration Stmt.))

The March 2020 Registration Statement also states that

[USO] [s]hares trade in the secondary market on the NYSE Arca. Shares may trade in the secondary market at prices that are lower or higher relative to their NAV per share. The amount of the discount or premium in the trading price relative to the NAV per share may be influenced by various factors, including the number of investors who seek to purchase or sell shares in the secondary market and the liquidity of the Oil Futures Contracts market and the market for Other Oil-Related Investments. While the shares trade during the core trading session on the NYSE Arca until 4:00 p.m. New York time, liquidity in the market for Oil Interests may be reduced after the close of the NYMEX at 2:30 p.m. New York time. As a result, during this time, trading spreads, and the resulting premium or discount, on the shares may widen.

(Id. at 72)

Given these disclosures, the challenged statements in the March 2020 Registration

Statement are not actionable, because a reasonable investor would understand that there is a risk

that the correlation between changes in the price of USO shares and the Fund's per share NAV

could be affected by a number of factors, "including the number of investors who seek to

purchase or sell shares in the secondary market and the liquidity of the Oil Futures Contracts

market and the market for Other Oil-Related Investments." (Id.) Accordingly, a reasonable investor would not "have received a false impression from the [challenged] statement[s]." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *11 (internal quotation marks and citation omitted).

### 4. Statements in the March 2020 Registration Statement Concerning the Fund's Historical Performance

The Amended Complaint challenges language in the March 2020 Registration Statement concerning the Fund's historical performance. (See Am. Cmplt. (Dkt. No. 68) ¶¶ 151-52, 155, 159-62)

According to the Amended Complaint, "the March Registration Statement claimed that the 'average daily price difference was (0.001)% [] or (0.01) basis points' between USO's per share NAV and the price of its benchmark contracts," and included a chart showing the correlation between USO's monthly returns and monthly benchmark futures contracts using data between December 2014 and December 31, 2019. (Id. ¶ 151) The Amended Complaint further alleges that this statement was false and misleading when made because it "represented that USO had almost perfectly matched its investment objective [of having the daily changes in percentage terms of its per share NAV reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma] since inception." According to Plaintiff, however, "the rapid growth of USO, which would accelerate as a result of the March Offering, meant that USO's stated investment strategy was already impracticable at the time of the offering and that the Fund could not achieve its investment objective." (Id. ¶¶ 151-52)

Plaintiff also complains that "[t]he March Registration Statement . . . provided the Fund's historical price premium over per share NAV through December 31, 2019, but did not provide this information for 2020." (Id. ¶ 155) According to the Amended Complaint, "[t]he

registration statement used this constrained historical view to claim that the maximum price premium experienced by the Fund was 6.75%, **when in fact the Fund had suffered a 9.14% premium on March 18, 2020**," and "had suffered an extraordinarily high price premium of 4.63% or greater on **three of the six days** leading up to the March Offering. . . ." (Id. (emphasis in Am. Cmplt.))  Plaintiff alleges that "[t]hese representations were materially false and misleading when made because the Fund was suffering drastic price premiums at the time of the March Offering that were far outside historical norms. . . ." (Id.)

And because the "the March Registration Statement provided USO's historical investment returns [only] through the end of 2019," investors were not informed of "the hundreds of millions of dollars in losses that had been suffered by the Fund since the beginning of 2020.  For example, the registration statement stated, 'for the year ended December 31, 2019, the actual total return of USO as measured by changes in its per share NAV was 33.26% . . . based on an initial per share NAV of $9.59 on December 31, 2018 and an ending per share NAV as of December 31, 2019 of $12.78.'" (Id. ¶ 159)  "The registration statement also claimed that the worst monthly draw down in the Fund's history was in November 2018, during which the Fund had suffered a 22.11% loss," and provided "'Rates of Return'" between January 2015 and December 2019, "which notably omitted the Fund's horrendous rates of return since the start of 2020."  (Id.)

According to Plaintiff, the March 2020 Registration Statement's discussion of historical performance was "materially false and misleading when made" because (1) "USO was in fact suffering the worst monthly draw down in its history in March 2020, a **54.7% loss**, more than double the worst historical monthly performance provided in the March Registration Statement"; (2) "[i]n February 2020, USO had suffered a $225 million realized trading loss on its

futures contracts, which would not be disclosed until March 27, 2020 – after the March Offering

launched"; and (3) "by the time of the March Offering the Fund had suffered close to $1 billion

in additional losses in March alone and was on track to lose *$1.2 billion* by the end of the

month." "Thus, the statements in the March Registration Statement regarding USO's historical

performance were materially false and misleading because the actual historical performance of

the Fund had radically diverged from these trends by the time of the [March 2020] offering."

(Id. ¶ 160 (emphasis in Am. Cmplt.))

   Finally, Plaintiff complains that the March 2020 Registration Statement

"discussed the potential effects of 'contango,' but failed to disclose the deleterious super

contango dynamic that the Fund was suffering at the time of the March Offering. . . .'" (Id. ¶

161) In support of this assertion, Plaintiff alleges that Defendants "provided [– in the March

2020 Registration Statement –] . . . charts of the purported market environment in which the

Fund was operating, which ended in December 2019 at a time that the market was experiencing

significant backwardation" (id.), a term for the market force "occur[ring] when near month

futures contracts trade at a higher price than the next month futures contracts. . . ." (Id. ¶ 58)

According to Plaintiff, "[b]y the time of the March Offering, the WTI futures front month to next

month contracts were already in a super contango dynamic of $2.12, roughly 6.7 times the five-

year historical average. The front month and the twelfth month WTI contracts were in an even

more extreme contango dynamic of $9.97, compared to a backwardation between these two

contracts of $0.11 at the time of the February Offering." (Id. ¶ 162) Accordingly, "the

statements in the March Registration Statement regarding the contango and backwardation

dynamics impacting the Fund were materially false and misleading because the actual contango

effects had radically diverged from these trends by the time of the offering." (Id.)

Defendants counter that all of "the challenged disclosures clearly were dated through December 31, 2019[,] and repeatedly warned [that] '*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS.'" (USO Def. Reply (Dkt. No. 145) at 19 n.7 (citing Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 25-26, 28-29, 33) (emphasis in Mar. 2020 Registration Stmt.))[5] Defendants also point out that the March 2020 Registration Statement warns that, because "'[p]ast performance is not necessarily indicative of future results[,] all or substantially all of an investment in USO could be lost,'" and that "'[p]ast performance of USO or the Benchmark Futures Contract should not be relied upon in deciding whether to buy shares of USO.'" (Id. (citing Roy Decl., Ex. 2 (Mar. Registration Stmt.) (Dkt. No. 144-2) at 10, 12) (emphasis in USO Def. Reply)) According to Defendants, "[i]n light of these prominent warnings, a reasonable investor would have understood that the clearly-labeled historical data did not purport to describe USO's performance in 2020." (Id.)

"[I]t is black letter law in this Circuit that '[t]he disclosure of accurate historical data does not become misleading even if less favorable results might be predictable by the company in the future.'" In re Omega Healthcare Invs., Inc. Sec. Litig., 563 F. Supp. 3d 259, 277 (S.D.N.Y. 2021) (quoting In re Initial Pub. Offering Sec. Litig., 358 F. Supp. 2d 189, 210

---

[5] Defendants address the Amended Complaint's allegations about the March 2020 Registration Statement's treatment of historical data for the first time in their reply. Plaintiff therefore argue that Defendants "have . . . conceded these allegations" (Pltf. Opp. (Dkt. No. 151) at 40 (citing CVS Pharmacy, Inc. v. Press Am., Inc., 377 F. Supp. 3d 359, 383 (S.D.N.Y. 2019))), and that arguments made "for the first time in Defendants' reply should be rejected." (Id. (citing Playboy Enters., Inc. v. Dumas, 960 F. Supp. 710, 720 n.7 (S.D.N.Y. 1997), aff'd, 159 F.3d 1347 (2d Cir. 1998); Kenney v. Clay, 172 F. Supp. 3d 628, 639 (N.D.N.Y. 2016))) A district court has discretion to consider arguments raised for the first time in a reply brief, however, see Ruggiero v. Warner-Lambert Co., 424 F.3d 249, 252 (2d Cir. 2005), and this Court chooses to exercise that discretion here.

(S.D.N.Y. 2004) (citation omitted)).  "Indeed, the Second Circuit previously 'easily rejected' the argument that a company's 'statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-term unsustainability of its business model,' noting that '[i]t is clear that a violation of federal securities law cannot be premised upon a company's disclosure of accurate historical data.'"  Id. (quoting Boca Raton Firefighters & Police Pension Fund v. Bahash, 506 F. App'x 32, 38-39 (2d Cir. 2012) (summary order) (citation omitted)); see also Pollio v. MF Glob., Ltd., 608 F. Supp. 2d 564, 571 (S.D.N.Y. 2009) ("It is well-established . . . that '[d]efendants may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy.'" (quoting In re Nokia Corp. Sec. Litig., 423 F.Supp.2d 364, 395 (S.D.N.Y. 2006))).

Here, Plaintiff does not allege that Defendants' statements regarding the Fund's historical performance or the historical market environment for crude oil were inaccurate. Instead, Plaintiff's sole complaint is that Defendants' presentation of historical data ended with 2019, when catastrophic results in 2020 were already known.  (See Am. Cmplt. (Dkt. No. 68) ¶¶ 155, 160, 162 (contending that the "constrained historical view" presented in the March 2020 Registration Statement is actionably false and misleading given that the "performance of the Fund" and the market forces impacting the Fund in early 2020 "had radically diverged from these trends by the time of the [March 2020] offering."))  In presenting this historical data, however, the March 2020 Registration Statement does not make representations, promises, or predictions about the future.  To the contrary, the historical data is presented under a heading stating that "*PAST PERFORMANCE IS NOT NECESSARILY INDICATIVE OF FUTURE RESULTS." (See, e.g., Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 26, 29, 33 (emphasis in Mar. 2020 Registration Stmt.))

For all these reasons, the Court concludes that the statements in the March 2020 Registration Statement regarding historical data are not actionable. See Shemian v. Rsch. In Motion Ltd., No. 11 CIV. 4068 RJS, 2013 WL 1285779, at *22 (S.D.N.Y. Mar. 29, 2013), aff'd, 570 F. App'x 32 (2d Cir. 2014) ("Defendants' statements about their past financial results are not actionable. . . . Because Plaintiff never alleges that Defendants' statements regarding [Research In Motion's] financial results – including those regarding [the Company's] quarterly earnings and relative market share in Europe and Latin America – were inaccurate, those statements do not create actionable misrepresentations."); see also Steinberg v. Ericsson LM Tel. Co., No. 07 CV. 9615 (RPP), 2008 WL 5170640, at *9 (S.D.N.Y. Dec. 10, 2008) (rejecting argument that historical market share and revenue data presented by defendant were misleading, because "[a]s the slides accompanying these statements indicate, [defendant] was providing historical market share and historical revenue data[,]" and defendant "did not make a specific promise or prediction of third-quarter results or size of market share.").

5.     **Statements in the February and March 2020 Registration Statements Concerning the Effects of Contango on the Fund**

The February and March 2020 Registration Statements state that "'[p]eriods of contango . . . ***do not materially impact USO's investment objective*** of having the daily percentage changes in its per share NAV track the daily percentage changes in the price of the Benchmark Oil Futures Contract]" (Am. Cmplt. (Dkt. No. 68) ¶¶ 143, 161 (emphasis in Am. Cmplt.)), because "contango and backwardation tend[] 'to equally impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract.'" (Id. ¶ 161)

The Amended Complaint alleges that these statements were "materially false and misleading when made." As to the February 2020 Registration Statement, Plaintiff claims that "the February Offering interjected considerable volatility and illiquidity into the markets, as the

50

offering itself would cause USO to grow to dominate WTI near months futures markets and the Fund to experience . . . unprecedented market contango. . . ." (Id. ¶ 143)  The Amended Complaint goes on to allege that "the statements in the March Registration Statement regarding the contango and backwardation dynamics impacting the Fund were materially false and misleading because [the Fund]. . . . was [then] suffering from extreme super contango effects that had caused and would continue to cause the Fund to suffer hundreds of millions of dollars in losses."  (Id. ¶ 162)

In response, Defendants argue that Plaintiff has "confuse[d] an impact on USO's investment objective with an impact on USO's returns," noting that the statements in the February and March 2020 Registration Statements challenged by Plaintiff state that

> "[p]eriods of contango or backwardation [*i.e., the reverse of contango*] do not materially impact USO's investment objective of having the daily percentage changes in its per share NAV track the daily percentage changes in the price of the Benchmark Oil Futures Contract *since the impact of backwardation and contango tend to equally impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract.*"

(USO Def. Br. (Dkt. No. 143) at 39 (citing Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 30; Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 30) (emphasis in USO Def. Br.))

According to Defendants, these statements "simply . . . [explain] that contango does not materially impact the Fund's ability to achieve its investment objective of tracking the Benchmark because contango tends to equally affect USO's share price and the Benchmark." These statements do not represent "that contango will not affect USO's returns."  (Id.)

The Court concludes that a reasonable investor would understand the challenged statements in the registration statements as representing that contango tends to affect the daily percentage changes in the price of USO's shares and the price of crude oil equally – not as

asserting that contango does not materially affect the Fund's returns. Accordingly, the statements about the effects of contango on the Fund's investment objective challenged in the Amended Complaint are not actionable.

> The Amended Complaint further complains that
>
> > the March Registration Statement misleadingly stated that "a prolonged period of contango *could* have a significant negative impact on USO's per share NAV and total return." The characterization of contango as a potential, contingent future risk that "*could* have a significant negative impact" on the Fund was materially misleading because the Fund was *already* suffering severe negative impacts from a super contango dynamic at the time.

(Am. Cmplt. (Dkt. No. 68) ¶ 163 (emphasis in Am. Cmplt.)) According to Plaintiff, as of March 2020, contango had already "caused and would continue to cause the Fund to suffer hundreds of millions of dollars in losses." (Id. ¶ 162) The challenged statement was therefore misleading, because "disclosures 'framed as mere hypotheticals . . . imply that the risk [] is a theoretical one, rather than . . . a risk that has already materialized in the marketplace.'" (Pltf. Opp. (Dkt. No. 151) at 36 (quoting Panther Partners Inc. v. Jianpu Tech. Inc., No. 18 CIV. 9848 (PGG), 2020 WL 5757628, at *12 (S.D.N.Y. Sept. 27, 2020)))

> Defendants respond that they "fully disclosed the risks of contango, including the risks posed by USO's own large rolling positions in a contango environment." (USO Def. Reply (Dkt. No. 145) at 14-15)

> As an initial matter, the challenged statement is part of a longer passage in the March 2020 Registration Statement, which states that ". . . a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return and investors could lose part or all of their investment." (Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 14)

Plaintiff complains that the challenged statement was misleading because it presents the risk of a negative impact on the return of USO shares as merely theoretical, when the negative impact of a super contango dynamic had already been realized. (See Pltf. Opp. (Dkt. No. 151) at 36 ("[T]he March Registration Statement failed to adequately disclose . . . the harmful effects from the 'super contango' dynamic (an abnormally high level of contango) that the Fund was *already* suffering at the time of the March Offering. . . ." (emphasis in Pltf. Opp.)); Am. Cmplt. (Dkt. No. 68) ¶ 163 ("The characterization of contango as a potential, contingent future risk that '*could* have a significant negative impact' on the Fund was materially misleading because the Fund was *already* suffering severe negative impacts from a super contango dynamic at the time" (emphasis in Am. Cmplt.)) The Amended Complaint does not plead facts demonstrating, however, that at the time of the March 2020 Registration Statement the Fund was already experiencing severe negative impacts due to unusually high levels of contango.

As an initial matter, the Amended Complaint describes the contango effects on the WTI front month futures market as first rising to "super contango" levels on March 23, 2020 – the day the March 2020 Registration Statement was filed. (See Am. Cmplt. (Dkt. No. 68) ¶¶ 145, 162) According to the Amended Complaint, these levels were not seen prior to that time. For example, the Amended Complaint represents that, "[b]y the start of the February Offering" on February 25, 2020, the WTI near month futures market was experiencing "relatively modest" "contango effects" of "$0.16 per barrel." (Id. ¶ 90) And by March 9, 2020, "contango [had] increased to $0.34, more than double the contango effect present just two trading days before" (id. ¶ 65), but still below "the preceding five-year historical average of $0.35." (Id. ¶ 90)

"[O]n March 19, 2020, this contango dynamic had risen to $0.69," and "[b]y the launch of the March Offering, on March 23, 2020, contango had jumped to $2.12, roughly 6.7

times the five-year historical average." (Id.) As noted above, however, the Amended Complaint does not plead facts demonstrating that the Fund was already suffering "severe negative impacts" as a result. For example, while the Amended Complaint pleads that "the Fund suffered investment losses of more than $200 million" "[i]n February 2020 alone," the Amended Complaint alleges that those losses were "largely . . . a result of the precipitous price declines in WTI futures at the end of the month around the time of the February Offering" (id. ¶ 107), when "the [falling] price of WTI front month futures . . . correspond[ed] with a sharp decline in crude oil prices." (Id. ¶ 62) And, as noted above, the WTI near month futures market was experiencing "relatively modest" "contango effects" of "$0.16 per barrel" at that time. (Id. ¶ 90) And while the Amended Complaint alleges that "by the time of the March Offering the Fund had suffered close to $1 billion in additional losses in March alone" (id. ¶ 160), the Amended Complaint does not provide factual support for the assertion that those losses were attributable to the nascent super contango dynamic.

Accordingly, Plaintiff has not pled facts demonstrating that the March 2020 Registration Statement's disclosure that ". . . a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return" (Roy Decl., Ex. 2 (Mar. Registration Stmt.) (Dkt. No. 144-2) at 14), was materially false or misleading. In particular, Plaintiff has not pled facts showing that the risk of the Fund experiencing negative effects due to a super contango dynamic had "already materialized in the marketplace" as of the March Registration Statement's filing date of March 23, 2020. See Panther Partners Inc. v. Jianpu Tech. Inc., No. 18 CIV. 9848 (PGG), 2020 WL 5757628, at *12 (S.D.N.Y. Sept. 27, 2020).

In sum, the challenged statements in the March 2020 Registration Statement concerning contango are not actionable.

### 6.   Statements about Regulatory Position Limits in the March 2020 Registration Statement

The Amended Complaint challenges the following statements in the March 2020

Registration Statement describing regulatory position limits applicable to the Fund:

"***The NYMEX current accountability level for investments for any one month in the Benchmark Oil Futures Contract is 10,000 contracts.*** In addition, the NYMEX imposes an accountability level for all months of 20,000 net futures contracts for light, sweet crude oil. In addition, the ICE Futures Europe maintains the same accountability levels, position limits and monitoring authority for its light, sweet crude oil contract as the NYMEX. If USO and the Related Public Funds exceed these accountability levels for investments in the futures contracts for light, sweet crude oil, the NYMEX and ICE Futures Europe will monitor such exposure and may ask for further information on their activities including the total size of all positions, investment and trading strategy, and the extent of liquidity resources of USO and the Related Public Funds. If deemed necessary by the NYMEX and/or ICE Futures Europe, USO could be ordered to reduce its futures contracts traded on such exchanges to below the 10,000 single month and/or 20,000 all month accountability level.

***USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments.*** If USO encounters accountability levels, position limits, or price fluctuation limits for Oil Futures Contracts on the NYMEX or ICE Futures, it may then, if permitted under applicable regulatory requirements, purchase Oil Futures Contracts on other exchanges that trade listed crude oil futures or enter into swaps or other transactions to meet its investment objective. In addition, if USO exceeds accountability levels on either the NYMEX or ICE Futures and is required by such exchanges to reduce its holdings, such reduction could potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract."

(Am. Cmplt. (Dkt. No. 68) ¶ 167 (emphasis in Am. Cmplt.))[6]

---

[6] The March 2020 Registration Statement explains that "[d]esignated contract markets, such as the NYMEX and ICE Futures, have established accountability levels and position limits on the maximum net long or net short futures contracts in commodity interests that any person or group of persons under common trading control (other than as a hedge, which an investment by USO is not) may hold, own or control. . . . [A]ccountability levels for the Benchmark Oil Futures Contract and other Oil Futures Contracts traded on U.S.-based futures exchanges[] are not a fixed ceiling, but rather a threshold above which the exchange may exercise greater scrutiny and control over an investor's positions. . . . Position limits[, however,] differ from accountability levels in that they represent fixed limits on the maximum number of futures contracts that any person may hold and cannot allow such limits to be exceeded without express CFTC authority to do so. In addition to accountability levels and position limits that may apply at any time, the NYMEX and ICE Futures impose position limits on contracts held in the last few days of trading

The Amended Complaint alleges that the challenged statements were false and misleading because

> USO was set to run up against regulatory limits as a result of the March Offering, and the [Chicago Mercantile Exchange] intervened shortly thereafter to prohibit the Fund from investing all of the proceeds of the offering in front month futures contracts, contrary to the Fund investment strategy portrayed in the March Registration Statement. Notably, the April 16 and April 23, 2020 [Chicago Mercantile Exchange] letters ordered USO to reduce its near months futures contracts positions as a result of its massive size, despite the fact that the Fund had simply invested the proceeds of the February Offering and the March Offering, demonstrating that the positions necessitated by these offerings alone ran afoul of regulatory limits.

(Id. ¶ 169)

Defendants respond that the challenged statements were not false or misleading when considered in conjunction with other statements made in the March 2020 Registration Statement. (See USO Def. Br. (Dkt. No. 143) at 23-24)

As to accountability levels and regulatory limits, the March 2020 Registration Statement includes the following additional disclosures:

> The accountability levels for the Benchmark Oil Futures Contract and other Oil Futures Contracts traded on U.S.-based futures exchanges, are not a fixed ceiling, but rather a threshold above which the exchange may exercise greater scrutiny and control over an investor's positions. The NYMEX current accountability level for investments for any one month in the Benchmark Oil Futures Contract is 10,000 contracts. In addition, the NYMEX imposes an accountability level for all months of 20,000 net futures contracts for light, sweet crude oil. In addition, the ICE Futures Europe maintains the same accountability levels, position limits and monitoring authority for its light, sweet crude oil contract as the NYMEX. If USO and the Related Public Funds exceed these accountability levels for investments in the futures contracts for light, sweet crude oil, the NYMEX and ICE Futures Europe will monitor such exposure and may ask for further information on their activities including the total size of all positions, investment and trading strategy, and the extent of liquidity resources of USO and the Related Public Funds. If deemed necessary by the NYMEX and/or ICE Futures Europe, USO could be ordered to reduce its futures contracts traded on such exchanges to below the 10,000 single month and/or 20,000 all month accountability level.

---

in the near month contract to expire." (Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 14)

(Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 14)

The March 2020 Registration Statement goes on to state that

[t]he futures markets are subject to comprehensive statutes, regulations, and margin requirements. In addition, the CFTC and futures exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. Regulation of commodity interest transactions in the United States is a rapidly changing area of law and is subject to ongoing modification by governmental and judicial action. Considerable regulatory attention has been focused on non-traditional investment pools that are publicly distributed in the United States. In addition, the SEC, CFTC and the exchanges are authorized to take extraordinary actions in the event of a market emergency, including, for example, the retroactive implementation of speculative position limits or higher margin requirements, the establishment of daily price limits and the suspension of trading. Further, various national governments outside of the United States have expressed concern regarding the disruptive effects of speculative trading in the energy markets and the need to regulate the derivatives markets in general. The effect of any future regulatory change on USO is impossible to predict, but it could be substantial and adverse.

(Id. at 21)

In support of the March 2020 Registration Statement's characterization of accountability levels as "not a fixed ceiling, but rather a threshold above which the exchange may exercise greater scrutiny and control over an investor's positions," Defendants point to USO's February 21, 2020 Form 10-K, in which it disclosed that it had "'exceeded accountability levels of the NYMEX during the year ended December 31, 2019 when it held a maximum of 33,818 Crude Oil Futures CL contracts, on the NYMEX, exceeding the 'any' month limit. No action was taken by the NYMEX and USO did not reduce the number of Futures Contracts held as a result.'" (USO Def. Br. (Dkt. No. 143) at 24 n.7 (quoting Roy Decl., Ex. 3 (Feb. 21, 2020 USO Form 10-K) (Dkt. No. 144-3) at 10)) Defendants further argue that "even though [they] had no way of predicting investor demand for shares, the Registration Statements plainly warned that USO would continue to issue shares and, in turn, would continue to invest in futures

contracts even as USO's assets grew." (Id. at 41 (citing Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 15))

The Court concludes that Plaintiff has not pled facts demonstrating that – if USO were to exceed regulatory limits for crude oil futures contracts – exchanges would invariably require USO to reduce its holdings or restrict its ability to invest in front month futures contracts.[7] And in arguing that action the Chicago Mercantile Exchange took in April 2020 demonstrates that statements USO made in February and March 2020 were false and misleading, Plaintiff engages in twenty-twenty hindsight.

Given that the March 2020 Registration Statement warns that "USO could be ordered to reduce its futures contracts" if it exceeded regulatory limits, and that the effect of such regulatory action could be "substantial and adverse" (see Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 14, 21), the challenged language describing the relevant regulatory position limits– and USO's intention to invest all proceeds it received in oil futures contracts – cannot plausibly be regarded as an attempt to falsely represent to investors that the Fund faced no risk of regulatory action after the March Offering.  Nor would a reasonable investor "have received a false impression from the [challenged language]" given these warnings.  Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *11 (internal quotation marks and citations omitted).

---

[7] The Amended Complaint also does not plead facts demonstrating that USO was set to run up against pre-existing position limits as a result of the March Offering.  Instead, the Amended Complaint merely alleges that "after the *very first* monthly roll following the launch of the March Offering, [the Chicago Mercantile Exchange] on behalf of the NYMEX intervened to impose strict positional limits on the Fund, thereby precipitating a rapid-fire and complete overhaul of the Fund's investment strategy and sharp divergence from its stated investment objective."  (Am. Cmplt. (Dkt. No. 68) ¶ 152 (emphasis in Am. Cmplt.))

Accordingly, the challenged language in the March 2020 Registration Statement regarding applicable regulatory limits and the potential for adverse regulatory action is not actionable.

### 7. Statements about the Fund's Investment Strategy in the March 2020 Registration Statement

The Amended Complaint challenges the following statements in the March 2020 Registration Statement concerning the Fund's investment strategy:

> that the Sponsor employed a "'neutral' investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down";

> that USO was "not actively managed," but instead simply "tracks the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising"; and

> that "***if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract***."

(Am. Cmplt. (Dkt. No. 68) ¶¶ 150, 164 (emphasis in Am. Cmplt.))

According to Plaintiff, these statements were false and misleading when made, because

> the growth of USO and the precarious market conditions facing the Fund posed an existential threat to the Fund's investment objective and strategy and caused the Fund to run up against regulatory limits, forcing the Fund to radically overhaul its investment approach. Only a few weeks after the March Offering, USO was forced to change from a passive investment vehicle used to track the spot price of oil through current WTI futures contracts to what was effectively an actively managed fund . . . struggling to avoid a[n] . . . implosion and satisfy concerned regulators though a hodgepodge of oil-related investments that caused the Fund to deviate significantly from its stated investment objective.

(Id. ¶ 165; see also id. ¶ 150 (asserting that the challenged statements about the Fund's investment objective were false and misleading because "the March Registration Statement . . . failed to disclose . . . the fact that the March Offering ***itself*** would cause USO to

run up against regulatory limits that sharply constrained the Sponsor's investment

discretion. . . ." (emphasis in Am. Cmplt.)))

Defendants argue that the challenged statements were not false or misleading

when considered in conjunction with other statements in the March 2020 Registration Statement

concerning the Fund's investment strategy (see USO Def. Br. (Dkt. No. 143) at 20-21, 41),

including the following:

> The specific Oil Futures Contracts purchased depend on various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts with respect to the month of expiration, and the prevailing price volatility of particular contracts. While USCF has made significant investments in NYMEX Oil Futures Contracts, for various reasons, including the ability to enter into the precise amount of exposure to the crude oil market, position limits or other regulatory requirements limiting USO's holdings, and market conditions, it may invest in Oil Futures Contracts traded on other exchanges or invest in Other Oil-Related Investments To the extent that USO invests in Other Oil-Related Investments, it would prioritize investments in contracts and instruments that are economically equivalent to the Benchmark Oil Futures Contract, including cleared swaps that satisfy such criteria, and then, to a lesser extent, it would invest in other types of cleared swaps and other contracts, instruments and non-cleared swaps, such as swaps in the over-the-counter market (or commonly referred to as the 'OTC market'). If USO is required by law or regulation, or by one of its regulators, including a futures exchange, to reduce its position in the Benchmark Oil Futures Contracts to the applicable position limit or to a specified accountability level or if market conditions dictate it would be more appropriate to invest in Other Oil-Related Investments, a substantial portion of USO's assets could be invested in accordance with such priority in Other Oil-Related Investments that are intended to replicate the return on the Benchmark Oil Futures Contract. As USO's assets reach higher levels, it is more likely to exceed position limits, accountability levels or other regulatory limits. In addition, market conditions that USCF currently anticipates could cause USO to invest in Other Oil-Related Investments include those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing."

(Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 30)

Defendants also cite the following additional language from the March 2020

Registration Statement:

> USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments. If USO encounters accountability levels, position limits, or price fluctuation limits for Oil

Futures Contracts on the NYMEX or ICE Futures, it may then, if permitted under applicable regulatory requirements, purchase Oil Futures Contracts on other exchanges that trade listed crude oil futures or enter into swaps or other transactions to meet its investment objective. In addition, if USO exceeds accountability levels on either the NYMEX or ICE Futures and is required by such exchanges to reduce its holdings, such reduction could potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract.

(Id. at 15)

While Plaintiff cites statements from the March 2020 Registration Statement representing that the Fund has a "neutral" investment strategy and simply tracks the Benchmark Oil Futures Contract, Defendants point out that the March 2020 Registration Statement discloses that the Fund may diverge from its typical investment behavior and make active decisions about which "Oil Futures Contracts" to purchase based "on various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts with respect to the month of expiration, and the prevailing price volatility of particular contracts." The additional disclosures cited by Defendants state that – while the Fund may change the composition of its investments – the Fund's investment decisions will remain guided by the goal of "replicat[ing] the return on the Benchmark Oil Futures Contract."

A reasonable investor reading all of the statements in the March 2020 Registration Statement concerning the Fund's investment practices and objectives "together and in context," see Meyer, 761 F.3d at 250 (internal quotation marks and citation omitted), would not be left with the impression that the Fund invariably pursued a neutral investment strategy and always simply tracked the Benchmark Oil Futures Contract. The March 2020 Registration Statement describes scenarios in which UCSF engages in more active management of the Fund's investments, while still aiming to replicate the return on the Benchmark Oil Futures Contract. In particular, the Fund discloses that (1) "[t]he specific Oil Futures Contracts purchased depend on

various factors, including a judgment by USCF as to the appropriate diversification of USO's investments in futures contracts with respect to the month of expiration, and the prevailing price volatility of particular contracts"; and (2) it might modify the composition of its investments if it "exceeds position limits, accountability levels or other regulatory limits." (Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 30)

In sum, when the challenged statements about the Fund's "neutral investment strategy" are considered "together and in context" with these other statements, Meyer, 761 F.3d at 250 (internal quotation marks and citation omitted), the March 2020 Registration Statement cannot plausibly be regarded as falsely represent to investors that the Fund will unfailingly and without exception passively pursue the "neutral investment strategy" described above.[8] Nor, given this larger context, would a reasonable investor "have received a false impression from the statement[s]." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *11 (internal quotation marks and citation omitted). The challenged statements in the March 2020 Registration Statement concerning the Fund's "neutral investment strategy" are thus not actionable.

---

[8] Moreover, while Plaintiff alleges that the challenged statements were false and misleading because "the March Registration Statement . . . failed to disclose . . . the fact that the March Offering itself would cause USO to run up against regulatory limits that sharply constrained the Sponsor's investment discretion" – as discussed above – the Amended Complaint does not plead facts demonstrating that – if USO were to exceed regulatory limits for crude oil futures contracts through the March Offering – an exchange would invariably take action requiring USO to reduce its holdings or restrict its ability to invest in front month futures contracts, and thus necessarily "sharply constrain[] the Sponsor's investment discretion."

8.     **Language in February and March 2020 Registration
Statements Suggesting that an Investment in USO
Was a Proxy for Investing in the Crude Oil Market**

The February 2020 Registration Statement states "that '*[i]nvestors may choose to
use USO as a means of investing indirectly in crude oil*[,]' and that 'USO's investment strategy
is designed to provide investors with a *cost-effective way to invest indirectly in crude oil*.'"
(Am. Cmplt. (Dkt. No. 68) ¶ 143 (emphasis in Am. Cmplt.))  The Amended Complaint alleges
that these statements were false and misleading, and that "the USO Defendants . . . later
admit[ted] that an 'investment in USO is *not* a proxy for investing in the oil markets. . . .'"  (Id.
(emphasis in Am. Cmplt.))  Plaintiff also alleges that "the February Offering interjected
considerable volatility and illiquidity into the markets, as the offering itself would cause USO to
grow to dominate WTI near months futures markets and the Fund to experience insufficient
liquidity, to run up against regulatory limits, significant per share NAV to price divergence, and
other breakdowns in market fundamentals."  (Id.)

The Amended Complaint similarly challenges language in the March 2020
Registration Statement stating that "'[i]nvestors may choose to use USO as a means of investing
indirectly in crude oil,'" and "that USO had been 'designed to permit investors generally to
purchase and sell USO's shares for the purpose of investing indirectly in crude oil in a cost-
effective manner.'"  (Id. ¶ 153)

Plaintiff contends that these statements in the February and March 2020
Registration Statements were materially false and misleading when made, because "the February
Offering interjected considerable volatility and illiquidity into the markets, as the offering itself
would cause . . . significant per share NAV to price divergence. . . ." (Id. ¶ 143)  Plaintiff further
contends that

USO and the markets in which it operated were suffering distortions and unprecedented volatility that had caused, and would continue to cause, the key metrics noted in the March Registration Statement to materially diverge. As a result. . . . , USO was not a cost-effective means to invest, even indirectly, in crude oil, but in fact an incredibly expensive and highly risky means of investing in WTI futures contracts that guaranteed investors would suffer substantial losses due to the NAV premium, super contango dynamic, negative roll yield, Fund structural deficiencies, marketplace distortions and other issues impacting USO at the time. . . ."

(Id. ¶ 156)

Defendants respond that the challenged statements were not false and misleading when considered in conjunction with other statements in the February and March 2020 Registration Statements. (USO Def. Br. (Dkt. No. 143) at 43-44)

The February and March 2020 Registration Statements include the following warnings regarding use of an investment in USO as an indirect means of investing in the crude oil market:

Investors should be aware that USO's investment objective is *not* for its NAV or market price of shares to equal, in dollar terms, the spot price of light, sweet crude oil or any particular futures contract based on light, sweet crude oil, *nor* is USO's investment objective for the percentage change in its NAV to reflect the percentage change of the price of any particular futures contract as measured over a time period *greater than one day.* (Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 6 (emphasis in Feb. 2020 Registration Stmt.); Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 6 (emphasis in Mar. 2020 Registration Stmt.))

To the extent that investors use USO as a means of indirectly investing in crude oil, there is the risk that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis, will not closely track the daily changes in the spot price of light, sweet crude oil on a percentage basis. This could happen if the price of shares traded on the NYSE Arca does not correlate closely with the value of USO's NAV; the changes in USO's NAV do not correlate closely with the changes in the price of the Benchmark Oil Futures Contract; or the changes in the price of the Benchmark Oil Futures Contract do not closely correlate with the changes in the cash or spot price of crude oil. This is a risk because if these correlations do not exist, then investors may not be able to use USO as a cost-effective way to indirectly invest in crude oil or as a hedge against the risk of loss in crude oil-related transactions." (Roy Decl., Ex. 1 (Feb. 2020 Registration Stmt.) (Dkt. No. 144-1) at 7; Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 7)

Given these warnings, the language in the February and March 2020 Registration Statements suggesting that investors might view a USO investment as a cost-effective means to invest indirectly in the crude oil market cannot be regarded as an attempt to falsely represent to investors that investing in the Fund provided an exact proxy for investing directly in the crude oil market.[9] Nor, given these warnings, would a reasonable investor "have received a false impression from the [challenged language]." Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *11 (internal quotation marks and citation omitted).

Accordingly, the language in the February and March 2020 Registration Statements about use of "USO as a [cost-effective] means of investing indirectly in crude oil" is not actionable.

### 9. Language in the March 2020 Registration Statement About When USO Would Roll its Oil Futures Contracts

According to the Amended Complaint, the March 2020 Registration Statement represents "that USO would roll its benchmark WTI futures contracts 'from the near month contract to the next month contract over a four-day period.'" The March 2020 Registration Statement further represents that "'USCF does not anticipate letting USO's Oil Futures Contracts expire and taking delivery of the underlying commodity'"; USCF will instead "'close existing positions, e.g., when it changes the Benchmark Oil Futures Contracts or Other Oil-Related

_____

[9] The Amended Complaint asserts that "[a]round [May 29, 2020], the SEC required the Fund to revise many of its disclosures and representations to investors, including by requiring USO to prominently announce on the cover page of its prospectus that the Fund '**IS NOT A PROXY FOR TRADING DIRECTLY IN THE OIL MARKETS**.' This new disclosure stood in stark contrast with Defendants' prior representations during the Class Period that 'USO's investment strategy is designed to provide investors with a cost-effective way to invest indirectly in crude oil.'" (Am. Cmplt. (Dkt. No. 68) ¶ 136 (emphasis in Am. Cmplt.)) The SEC's actions in late May 2020 do not demonstrate, however, that the challenged language in the February and March 2020 Registration Statements was false or misleading at the time each registration statement was filed.

Investments or it otherwise determines it would be appropriate to do so and reinvests the proceeds in new Oil Futures Contracts or Other Oil-Related Investments.'" (Am. Cmplt. (Dkt. No. 68) ¶ 157)

The Amended Complaint alleges that these statements were false and misleading when made because "the massive size of the Fund, which was being accelerated by the March Offering, had caused USO to acquire a dominant and dangerous position in WTI near months futures contracts," and "[a]s a result, when the Fund attempted to roll its futures contracts forward, this caused market-distorting effects that not only caused USO investors to suffer tremendous losses, but also threatened market-wide stability." Accordingly, "USO was not exiting its positions as 'appropriate,' but rather in a manner that had caused and would continue to cause extreme, undisclosed adverse impacts to the Fund and which threatened the Fund's stated investment strategy and objective." (Id. ¶ 158)

In this regard, the Amended Complaint further alleges that

> when USO rolled from the April WTI contract into the May WTI contract from March 6, 2020 to March 11, 2020, the price of the April WTI plummeted 31% and the price of USO shares fell 32%. As USO sold billions of dollars of WTI futures contracts in a short period of time without any regard to price, this placed intense downward pressure on WTI futures prices. Indeed, the roll period immediately following the March Offering led to the first negative oil prices in history and caused regulators to intervene to prevent the Fund from causing further severe market disruptions. . . . USO was forced to more than double its roll period to 10 days following the March Offering in response to regulatory and market pressures in order to mitigate these dangers.

(Id.)

Defendants respond that the challenged statements were not false and misleading when considered in conjunction with other statements in the March 2020 Registration Statement. (USO Def. Br. (Dkt. No. 143) at 21)

The March 2020 Registration Statement informs investors that

USCF does not anticipate letting USO's Oil Futures Contracts expire and taking delivery of the underlying commodity.  Instead, USCF will close existing positions, e.g., when it changes the Benchmark Oil Futures Contracts or Other Oil-Related Investments or it otherwise determines it would be appropriate to do so and reinvests the proceeds in new Oil Futures Contracts or Other Oil-Related Investments.  (Roy Decl., Ex. 2 (Mar. 2020 Registration Stmt.) (Dkt. No. 144-2) at 30)

The anticipated dates that the monthly four-day roll period will commence are posted on USO's website at *www.uscfinvestments.com*, and are subject to change without notice. (Id. at 31)

Given the Fund's disclosures about how the anticipated roll dates might change without notice, and would depend on USCF's analysis of when such a roll would be appropriate, the statements about the Fund's roll strategy cited in the Amended Complaint cannot be regarded as an attempt to falsely represent to investors that the Fund would roll its investments only when such a roll would have wholly positive effects on the Fund.  Nor would a reasonable investor "have received a false impression from the [challenged] statement[s]" given these disclosures. Plumbers & Steamfitters Local 137 Pension Fund, 2017 WL 4403314, at *11 (internal quotation marks and citations omitted).

Accordingly, the challenged statements about when the Fund would roll its contracts are not actionable.

### 10.    Other Alleged Omissions in the February and March 2020 Registration Statements

The Amended Complaint alleges that the February 2020 Registration Statement "failed to disclose that the February Offering itself would increase volatility and illiquidity in the markets in which USO operated and thereby threaten the Fund's performance, investment strategy and investment objective."  (Am. Cmplt. (Dkt. No. 68) ¶ 142)

The Amended Complaint further alleges that the March 2020 Registration Statement does not adequately disclose that

the Fund was facing severe adverse trends, fundamental market disruptions and numerous existential threats at the time of the March Offering, including, inter alia: (i) sharply rising positional concentration, volatility and market illiquidity as a result of the Fund's rapid growth in early March 2020, including as a result of the billions of dollars' worth of shares sold in the February Offering; (ii) unprecedented and sustained investor inflows into the Fund; (iii) a growing oil storage crisis in Cushing, Oklahoma, which had already resulted in the doubling of storage costs and the complete leasing of all tanks by mid-March 2020; (iv) the smashing of prior records in both USO shares traded and WTI front month futures contracts traded in a single day, by 72% and 26%, respectively; (v) the rapid tripling of the Fund's historical market share of WTI near months futures contacts to more than 15% by mid-March 2020; (vi) the widening divergence between the Fund's per share NAV and market price, including to more than double the Fund's pre-March 2020 peak historical price premium on March 18, 2020; (vii) the fact that the 15-day historical WTI front month futures volatility had risen seven fold in a matter of days by March 19, 2020; (viii) the collapse in WTI front months futures prices and the per share NAV of the Fund in the lead up to the offering; and (ix) accelerating super contango effects, which had risen to 6.7 times the historical average by March 23, 2020.

(Am. Cmplt. (Dkt. No. 68) ¶ 145)

   The Amended Complaint further complains that "the March Registration Statement failed to disclose the underlying causes of the contango environment, including that **_USO itself_** was contributing to the contango dynamic[,] . . . and the fact that the continued growth of the Fund through the March Offering was certain to exacerbate these effects." (Id. ¶ 162 (emphasis in Am. Cmplt.))

   Defendants respond that "investors were fully informed about USO's features and risks, including the risk of sudden total loss due to USO's growth and 'price-insensitive participation' in the oil futures contracts market during periods of illiquidity and volatility. Defendants were not required to predict precisely how the disclosed risks could materialize or update the disclosed risks in real time as they came to fruition in full public view in early 2020." (USO Def. Br. (Dkt. No. 143) at 15-16 (internal citations omitted)) Defendants further argue that "the Registration Statements fully disclosed the risks posed by USO's large trades in a

contango environment, . . . and Plaintiff's conclusory theory of USO's market impact is unsupported by any plausible factual allegation." (Id. at 38)

"An omission is actionable under federal securities laws 'only when the [defendant] is subject to a duty to disclose the omitted facts.'" City of Roseville Employees' Ret. Sys. v. EnergySolutions, Inc., 814 F. Supp. 2d 395, 410 (S.D.N.Y. 2011) (quoting In re Time Warner Inc. Sec. Litig., 9 F.3d 259, 267 (2d Cir.1993)). "Such a duty may arise when there is 'a corporate insider trad[ing] on confidential information,' a 'statute or regulation requiring disclosure,' or a corporate statement that would otherwise be 'inaccurate, incomplete, or misleading.'" Stratte-McClure v. Morgan Stanley, 776 F.3d 94, 101 (2d Cir. 2015) (quoting Glazer v. Formica Corp., 964 F.2d 149, 157 (2d Cir. 1992)), abrogated on other grounds by Macquarie Infrastructure Corp. v. Moab Partners, L. P., 601 U.S. 257 (2024). As noted earlier, "there is no duty to disclose a fact . . . 'merely because a reasonable investor would very much like to know that fact. . . .'" Meyer, 761 F.3d at 250 (quoting In re Time Warner., 9 F.3d at 267). "'Even if information is material, there is no liability under Rule 10b-5 unless there is a duty to disclose it.'" Glazer, 964 F.2d at 156 (quoting Backman v. Polaroid Corp., 910 F.2d 10, 12 (1st Cir. 1990)).

On this point, Plaintiff merely argues that Defendants' statements were misleading absent the missing information. (See Pltf. Opp. (Dkt. No. 151) at 29-30, 37) For the reasons explained above, this Court has concluded that the statements cited by Plaintiff were not misleading. Accordingly, Defendants' statements did not give rise to a duty to disclose.

*       *       *       *

For the reasons stated above, the Amended Complaint does not adequately allege any actionable false statement or misleading omission with respect to the February and March

2020 Registration Statements.  As discussed below, however, even if the alleged misstatements were actionally false or misleading, Plaintiff's Section 10(b) claims would still fail, because Plaintiff has not adequately pled scienter.

### C.    Whether the Amended Complaint Adequately Pleads Scienter

#### 1.    Applicable Law

As noted above, the PSLRA requires that a plaintiff seeking to plead scienter "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2)(A); Slayton, 604 F.3d at 766.  "Under this heightened pleading standard for scienter, a 'complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'"  Slayton, 604 F.3d at 766 (quoting Tellabs, 551 U.S. at 324).  "In determining whether a strong inference exists, the allegations are not to be reviewed independently or in isolation"; instead, "the facts alleged must be 'taken collectively.'"  Id. (quoting Tellabs, 551 U.S. at 323).

"The plaintiff may satisfy [this pleading] requirement by alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness."  ATSI Commc'ns, 493 F.3d at 99.  "[I]f Plaintiffs cannot make [a] 'motive' showing, then they [can] raise a strong inference of scienter under the 'strong circumstantial evidence' prong, 'though the strength of the circumstantial allegations must be correspondingly greater' if there is no motive."  ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co., 553 F.3d 187, 198-99 (2d Cir. 2009) (quoting Kalnit v. Eichler, 264 F.3d 131, 142 (2d Cir. 2001)).

"Motive to commit fraud entails '"concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged."'"  Cannavest, 307 F. Supp.

3d at 244 (quoting Novak, 216 F.3d at 307 (quoting Shields v. Citytrust Bancorp, Inc., 25 F.3d

1124, 1130 (2d Cir. 1994))).  In alleging motive, "[a] plaintiff may not rely on 'motives

possessed by virtually all corporate insiders,' . . . [and] instead must allege 'that defendants

benefitted in some concrete and personal way from the purported fraud.'"  Id. (quoting Novak,

216 F.3d at 307-08).  Generic motives, such as the desire "to increase or maintain profit . . . is

insufficient."  Defer LP v. Raymond James Fin., Inc., 654 F. Supp. 2d 204, 217 (S.D.N.Y. 2009).

> To adequately plead "conscious misbehavior or recklessness," a plaintiff must

allege conduct that is, "at the least, . . . highly unreasonable and which represents an extreme

departure from the standards of ordinary care to the extent that the danger was either known to

the defendant or so obvious that the defendant must have been aware of it."  Kalnit, 264 F.3d at

142 (internal quotation marks and citation omitted).  "Although this is a highly fact-based

inquiry, . . . '[s]ecurities fraud claims typically have sufficed to state a claim based on

recklessness when they have specifically alleged defendants' knowledge of facts or access to

information contradicting their public statements.'"  Id. (quoting Novak, 216 F.3d at 308).

> **2.**     **Analysis**

>> **a.**     **Motive and Opportunity**

> The Amended Complaint alleges that "the USO Defendants had the motive and

opportunity to commit fraud and were highly incentivized to induce investors to commit assets to

USO by concealing the true risks of such investments."  Because USCF and the USO Officer

Defendants received "fees for their management of Fund assets. . . . [,] paid monthly at 0.45%

per annum of the Fund's average daily net assets," "the profits realized by the Sponsor and the

USO Officer Defendants were directly related to the amount of assets invested in USO.  As a

result, as USO grew substantially in size, average monthly management fees paid by USO to the

Sponsor grew in tandem."  (Am. Cmplt. (Dkt. No. 68) ¶ 213)  "In March and April 2020 alone,

the management fees paid by USO increased *74%* over the average monthly amount paid by the

Fund in 2019," and "during the first half of 2020, USO paid $6.3 million in management fees,

roughly equal to the amount of management fees paid by the Fund during the *entirety* of

2019. . . . [,] despite the fact that investors had suffered over *$2.5 billion* in net losses during this

time period. . . ." (Id. (emphasis in Am. Cmplt.))  "Furthermore, USO was by far the largest

investment fund managed by the USO Defendants, responsible for more than 50% of all Sponsor

management fees receivable in 2019," and "became even more critical to their overall profit-

generating abilities and the central pillar of the record-setting profits enjoyed by the USO

Defendants in 2020." (Id. ¶ 214)  According to Plaintiff, "[i]f the USO Defendants had disclosed

the true events, trends and uncertainties impacting the Fund during the Class Period, the Sponsor

and USO Officer Defendants would have received substantially less fees because Lead Plaintiff

and the Class would have paid less to invest in the Fund or refused to invest in USO entirely."

(Id. ¶ 215)

   To the extent that the Amended Complaint's motive allegations are premised on

the USO Defendants' desire to increase profits and management fees, Plaintiff has alleged no

more than a generic motive possessed by all corporate insiders.  Such a motive does not

constitute a "concrete and personal" benefit as to any of the USO Defendants.  Novak, 216 F.3d

at 307.  This type of generic motive is indistinguishable from a generic desire "to increase . . .

profit. . . ."  Defer LP, 654 F. Supp. 2d at 217; see also Sec. & Exch. Comm'n v. Yorkville

Advisors, LLC, 305 F. Supp. 3d 486, 512 (S.D.N.Y. 2018) ("The mere 'desire to earn

management fees . . . does not suffice to allege a 'concrete and personal benefit' resulting from

the fraud.  To accept a generalized allegation of motive based on a desire to continue to obtain

management fees would read the scienter requirement out of the statute.'" (quoting Edison Fund

v. Cogent Inv. Strategies Fund, Ltd., 551 F. Supp. 2d 210, 227 (S.D.N.Y. 2008))); In re Merrill

Lynch Auction Rate Sec. Litig., 851 F. Supp. 2d 512, 528 (S.D.N.Y. 2012), aff'd sub nom.

Louisiana Pac. Corp. v. Merrill Lynch & Co., 571 F. App'x 8 (2d Cir. 2014) ("[A]n allegation

that defendants' motive was merely to increase or maintain profit such as this is insufficient.  The

Court of Appeals has been clear that similar allegations of a generalized motive that could be

imputed to any for-profit endeavor are not concrete enough to infer scienter." (internal quotation

marks and citations omitted)).

And while Plaintiff argues that "'courts in this district have found that a desire to

generate additional fee income may provide a sufficient motive to commit fraud, particularly

where the defendant possesses a personal stake in the business and the fee income'" (Pltf. Opp.

(Dkt. No. 151) at 61 (quoting In re Rsrv. Fund Sec. & Derivative Litig., 732 F. Supp. 2d 310,

320 (S.D.N.Y. 2010), and then citing Heller v. Goldin Restructuring Fund, L.P., 590 F. Supp. 2d

603, 620–21 (S.D.N.Y. 2008))), the cases cited by Plaintiff are not on point.

In In re Rsrv. Fund Sec. & Derivative Litig., 732 F. Supp. 2d 310, 313 (S.D.N.Y.

2010), the SEC brought securities fraud claims against "Defendants Reserve Management

Company, Inc. ('RMCI'), Resrv Partners, Inc., Bruce Bent Sr., and Bruce Bent II" based on their

conduct in connection with the Reserve Primary Fund, a large money market fund.  As to

defendants' motive to commit fraud, this Court found that "Defendants' personal stake in the

success of the [Reserve] Primary Fund [went] far beyond that held by typical officers and

directors":

> It is undisputed, for example, that the Bents had "significant holdings" in the [Reserve]
> Primary Fund.  Moreover, RMCI and Resrv Partners – which the Bents own and control
> – act as the investment adviser and distributor of the [Reserve Primary] Fund,
> respectively, and are paid fees for their services.  Accordingly, the Bents have a direct,
> personal financial stake in the [Reserve Primary] Fund and in these entities and a motive
> to maximize not only their personal financial investment but also their entities'

management fees. The Bents also have an enormous reputational stake in the [Reserve] Primary Fund. Bent Sr. founded RMCI and its flagship, the [Reserve] Primary Fund, more than thirty-five years ago; he "is the public face" of RMCI and its funds; and his family, including Bent II, control the Reserve Funds and their associated entities.

Id. at 320 (internal citations omitted).

And in Heller v. Goldin Restructuring Fund, L.P., 590 F. Supp. 2d 603, 621

(S.D.N.Y. 2008), the court similarly explained that

Defendants' financial motivation is not merely the universal incentive of corporate officers to increase stock prices. . . . Rather, Defendants possessed the unique incentive, as managers of a struggling, privately-owned investment fund in which they possessed a personal financial stake, to raise sufficient capital so that the Goldin Fund could reach its investment objectives. . . . [T]he Court finds that Plaintiff has adequately pleaded that Defendants were motivated by a "concrete and personal benefit," given not only Defendants' potential receipt of management fees, but also their additional personal financial investment in the under-capitalized Goldin Fund, a fund that needed to obtain a certain level of capital commitment in order to create a diverse investment portfolio and thereby achieve "a measure of risk diversification" for its investors.

Id. (emphasis in Heller) (internal citations omitted).

While here the Amended Complaint alleges that "profits realized by the Sponsor and the USO Officer Defendants were directly related to the amount of assets invested in USO," and that "USO was by far the largest investment fund managed by the USO Defendants, responsible for more than 50% of all Sponsor management fees receivable in 2019," these allegations do not establish that the USO Defendants had the type of personal financial stake seen in In re Rsrv. Fund and in Heller – a personal financial stake that goes "far beyond that held by typical officers and directors."

In sum, the Amended Complaint does not plead facts demonstrating that any Defendant had a motive to commit fraud. Accordingly – in order for Plaintiff to establish scienter through conscious misbehavior or recklessness – "the strength of [its] circumstantial

allegations must be . . . greater." Kalnit, 264 F.3d at 142 (internal quotation marks and citations omitted).

### b. **Conscious Misbehavior and Recklessness**

The Amended Complaint alleges that

> the USO Defendants: (i) knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Fund during the Class Period were materially false and misleading when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

(Am. Cmplt. (Dkt. No. 68) ¶ 208)

In this regard, the Amended Complaint alleges that

> 208. . . . . The USO Defendants, by virtue of their receipt of information reflecting the true facts regarding USO, their control over, and/or receipt and/or modification of the Fund's allegedly materially misleading misstatements and/or their associations with the Fund and/or the Sponsor which made them privy to confidential proprietary information concerning USO, were active and culpable participants in the fraudulent scheme alleged herein.

> 209. . . . . [B]ecause of their positions with the Fund and/or the Sponsor and their access to material non-public information, the USO Officer Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were materially false and misleading. . . .

> 210. The USO Defendants, as the creators, issuers and operators of the largest oil-related ETF in existence and dominant players in the complex commodities and futures markets impacting the Fund's performance, each possessed unique insider knowledge about the adverse facts, events, trends and uncertainties detailed herein. The USO Defendants created the Fund, designed its investment objective, assessed its risks and likely performance, and were responsible for the daily management of the Fund. The USO Defendants also drafted and disseminated statements on behalf of the Fund to the investing public, including those detailed herein and issued during the Class Period, and held themselves out as the persons and entities most knowledgeable about the Fund and the factors impacting the Fund and its risk profile.

> 211. The USO Defendants had proprietary and privileged access to the complex and detailed market information described herein and sophisticated investment tools which gave them real-time and up-to-date data and analysis about, inter alia, crude spot prices,

oil storage constraints, oil futures markets, the value of the Fund's holdings, short interests in the Fund, events and uncertainties impacting the price of oil-related securities, market demand for USO shares, the Fund's performance, market distortions, liquidity, volatility, and the complex convergence of these myriad factors and how they were affecting the Fund and the risks and performance of the Fund during the Class Period. The USO Defendants were additionally responsible for trading tens of millions of dollars' worth of WTI futures on a daily basis during the Class Period and regularly updated, monitored and analyzed the key metrics and market information impacting the Fund. Indeed, the USO Defendants became a dominant force in the WTI futures market during the Class Period and were able to single-handedly influence WTI futures through their management of USO, providing them with unique insights about the performance and expected performance and risks impacting the Fund.

212. The USO Defendants also maintained regular communication and contact with various market players that provided information to them regarding the function of USO and the markets in which the Fund operated. These included the counterparties to the Fund's massive futures positions, the Fund's futures commission merchant, various regulatory authorities, custodial banks, the Fund's marketing agent, brokers, the Authorized Participant Defendants (who regularly redeemed and requested the creation of USO shares) and other market participants who provided the USO Defendants with vast amounts of information regarding the true performance of USO and the events, trends and uncertainties impacting the Fund as they were unfolding. As a result of the USO Defendants' central market role and access to and utilization of proprietary data feeds, vast amounts of relevant market data, daily analysis of the complex and interrelated markets impacting the Fund, sophisticated investment and trading tools, and communication with a diverse range of key market players, the USO Defendants knew or were reckless in not knowing the undisclosed facts detailed in [the Amended Complaint].

(Id. ¶¶ 209-212)

While the Amended Complaint alleges that the USO Defendants had access to material non-public information, the Amended Complaint does not "'specifically identify the reports or statements containing [the allegedly contrary, non-public information]'. . . ." Lau v. Opera Ltd., 527 F. Supp. 3d 537, 557 (S.D.N.Y. 2021) (quoting Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 196 (2d Cir. 2008)); see also Pope Invs. II LLC v. Deheng L. Firm, No. 10 CIV. 6608 LLS, 2011 WL 5837818, at *6 (S.D.N.Y. Nov. 21, 2011) ("Generalized assertions of access to 'books and records and other sources of knowledge' are thus insufficient to plead scienter, because they do not show that those 'books and records

and other sources of knowledge' would reveal [defendant's knowledge of the alleged fraud].")

Moreover, "[c]ourts in this Circuit have long held that accusations founded on nothing more than

a defendant's corporate position are entitled to no weight." Plumbers & Steamfitters Loc. 773

Pension Fund v. Canadian Imperial Bank of Com., 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010).

Similarly, although the Amended Complaint alleges that

> [t]he USO Defendants had proprietary and privileged access to the complex and detailed
> market information described [in the Amended Complaint] and sophisticated investment
> tools which gave them real-time and up-to-date data and analysis about, inter alia, crude
> spot prices, oil storage constraints, oil futures markets, the value of the Fund's holdings,
> short interests in the Fund, events and uncertainties impacting the price of oil-related
> securities, market demand for USO shares, the Fund's performance, market distortions,
> liquidity, volatility, and the complex convergence of these myriad factors and how they
> were affecting the Fund and the risks and performance of the Fund during the Class
> Period[,]

Plaintiff does not explain the specific content of the non-public data provided by the "proprietary

data feeds" and "sophisticated investment and trading tools" (Am. Cmplt. (Dkt. No. 68) ¶¶ 211-

12), or how that data bears on Plaintiff's claim that Defendants acted in "conscious misbehavior"

and with recklessness.

Nor does Plaintiff explain how the information allegedly available to the USO

Defendants "[a]s a result of [their] central market role and access to and utilization of proprietary

data feeds, vast amounts of relevant market data, daily analysis of the complex and interrelated

markets impacting the Fund, sophisticated investment and trading tools, and communication with

a diverse range of key market players" (id. ¶ 212) contradicts Defendants' public statements

during the Class Period.  Mere "access" to information does not "provide 'strong circumstantial

evidence' of recklessness" where "the complaint fails to specify exactly what information was

contained in [the data to which a defendant had access] or how said information 'contradicted

Defendants' public statements. . . .'" Maloney v. Ollie's Bargain Outlet Holdings, Inc., 518 F.

Supp. 3d 772, 781 (S.D.N.Y. 2021) (quoting ECA, 553 F.3d at 198, and then In re Adient PLC

Sec. Litig., No. 18-CV-9116, 2020 WL 1644018, at *28 (S.D.N.Y. Apr. 2, 2020)); see In re

DraftKings Inc. Sec. Litig., 650 F. Supp. 3d 120, 177 (S.D.N.Y. 2023) ("[W]here plaintiffs

contend defendants had access to contrary facts, they must specifically identify the reports or

statements containing this information. . . ." (internal quotation marks and citation omitted)); In

re Barrick Gold Corp. Sec. Litig., 341 F. Supp. 3d 358, 373 (S.D.N.Y. 2018) ("[B]road

allegations regarding expense and capital cost data are insufficient, as plaintiffs do not identify

what specific facts these data would have contained that contradict[] [defendant's] statement

. . . .").

      Plaintiff also contends that "Defendants' misleading statements and omissions

concerned critical aspects of USO's business," and thus Defendants' knowledge may be inferred

pursuant to the "core operations" doctrine. (Pltf. Opp. (Dkt. No. 151) at 60 (citing In re Rsrv.

Fund Sec., 732 F. Supp. 2d at 323)) "Under the core operations theory, a court may infer 'that a

company and its senior executives have knowledge of information concerning the core

operations of a business,' such as 'events affecting a significant source of income.'" In re

Supercom Inc. Sec. Litig., No. 15 CIV. 9650 (PGG), 2018 WL 4926442, at *31 (S.D.N.Y. Oct.

10, 2018) (quoting In re Express Scripts Holding Co. Sec. Litig., No. 16 CIV. 3338 (ER), 2017

WL 3278930, at *18 (S.D.N.Y. Aug. 1, 2017)). However, while "'the core operations inference

may be considered as part of a court's holistic assessment of the scienter allegations, . . . it is not

independently sufficient to raise a strong inference of scienter.'" Id. (quoting In re Rockwell

Med., Inc. Sec. Litig., No. 16 CIV. 1691 (RJS), 2018 WL 1725553, at *15 (S.D.N.Y. Mar. 30,

2018)). Here, the "core operations inference" is of no assistance to Plaintiff because, as

discussed above, the Amended Complaint does not explain what specific information Defendants

had access to that contradict their public statements during the Class Period.

In sum, none of the individual scienter allegations gives rise to a strong

inference of scienter.

### c.    Holistic Assessment

Having determined that none of Plaintiff's scienter arguments – when considered

individually – gives rise to a strong inference of scienter, the Court must go on to consider

whether these allegations "give rise to a strong inference of scienter" when "taken

collectively. . . ." Tellabs, 551 U.S. at 323.  As noted above, Plaintiff's Section 10(b) claim "will

survive [Defendants' motion to dismiss] . . . only if a reasonable person would deem the

inference of scienter cogent and at least as compelling as any opposing inference one could draw

from the facts alleged." Id. at 324.

As discussed above, Plaintiff has not pled facts demonstrating that Defendants

had a motive to commit fraud, and Plaintiff's allegations of conscious misbehavior and

recklessness are correspondingly meager.  Even when Plaintiff's allegations are considered

collectively, it has failed to demonstrate that the inference of scienter is more cogent and

compelling than the non-culpable inference – namely, "that in the face of an unprecedented

global pandemic, Defendants were making disclosures in uncharted waters and erred on the side

of making broad, general statements about actual and potential investment risks rather than

describing rapidly shifting events in detail." Optimum Strategies Fund I, LP v. United States Oil

Fund, LP, No. 3:22-CV-00511 (MPS), 2023 WL 2526394, at *13 (D. Conn. Mar. 15, 2023)

(addressing Section 10(b) claims that USO's disclosures contained misleading statements and

reflected material omissions; concluding that plaintiff had not adequately alleged scienter, and

finding that "[a]n attitude of uncertainty and caution about the unsettled and unprecedented

environment at the dawn of the COVID-19 pandemic is . . . a more compelling inference to draw than the inference of intentional or reckless wrongdoing urged by [p]laintiff.").

Because the inference that Defendants acted recklessly is less plausible than the non-culpable inference, Plaintiff has not sufficiently alleged scienter.  Tellabs, 551 U.S. at 324.

### D.    **Regulation S-K**

The Amended Complaint alleges that Defendants violated Items 303 and 105 of Regulation S-K by failing to disclose certain adverse events, trends, and uncertainties in the February and March 2020 Registration Statements.  (Am. Cmplt. (Dkt. No. 68) ¶¶ 170-77)

#### 1.    **Applicable Law**

Item 303 of Regulation S-K requires that certain SEC-mandated filings "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(b)(2)(ii).

The SEC's 1989 Interpretive Release concerning Item 303 sets forth a two-part inquiry:

> "(1) Is the known trend [or uncertainty] . . . likely to come to fruition?  If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend [or uncertainty] . . . on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur."

Stratte-McClure, 776 F.3d at 103 (quoting Management's Discussion and Analysis of Financial Condition and Results of Operations, Securities Act Release No. 6835, Exchange Act Release No. 26,831, Investment Company Act Release No. 16,961, 43 SEC Docket 1330 (May 18,

1989), 1989 WL 1092885, at *6), <u>abrogated on other grounds by Macquarie Infrastructure Corp.</u>
<u>v. Moab Partners, L. P.</u>, 601 U.S. 257 (2024).

 In sum, unless management "determine[s] that [the known trend or uncertainty] is
not reasonably likely to occur," disclosure is required.  And according to the SEC, the disclosure
threshold "is lower than 'more likely than not.'"  <u>Commission Statement about Management's</u>
<u>Discussion and Analysis of Financial Condition and Results of Operations</u>, Securities Act
Release No. 8056, Exchange Act Release No. 45321, FR-61, 2002 WL 77153 at *4 (Jan. 22,
2002).  Disclosure under Item 303 is "require[d][, however, only where] the registrant[] has
actual knowledge of the relevant trend or uncertainty."  <u>Ind. Pub. Ret. Sys. v. SAIC, Inc.</u>, 818
F.3d 85, 95 (2d Cir. 2016).

 Item 105 of SEC Regulation S-K requires issuers to "provide under the caption
'Risk Factors' a discussion of the material factors that make an investment in the registrant or
offering speculative or risky."  17 C.F.R. § 229.105(a).  "To state a claim under Item 105, an
issuer must know, at the time of the [issuance], about an undisclosed risk factor that could
seriously affect its present or future business."  <u>Wandel v. Gao</u>, 590 F. Supp. 3d 630, 646
(S.D.N.Y. 2022).

 Because "[p]ure omissions are not actionable" under Section 10(b) and Rule 10b-
5, "the failure to disclose information required by Item 303 can support a Rule 10b–5(b) claim
only if the omission renders affirmative statements made misleading."  <u>Macquarie Infrastructure</u>
<u>Corp. v. Moab Partners, L. P.</u>, 601 U.S. 257, 265-66 (2024).[10]

---

[10]  Although <u>Macquarie</u> does not address claims brought under Item 105, this Court concludes
"that <u>Macquarie</u> would presumably be applicable to analyzing whether such claims are
actionable."  <u>See</u> <u>In re Vroom, Inc. Sec. Litig.</u>, No. 21 CIV. 2477 (PGG), 2025 WL 862125, at
*39 n.9 (S.D.N.Y. Mar. 18, 2025) (internal quotation marks and citation omitted).

2.      **Analysis**

The Amended Complaint contends that "[t]he failure of the February [2020]

Registration Statement and the March [2020] Registration Statement to disclose the facts detailed

in [the Amended Complaint] violated Item 303 because these undisclosed adverse events, trends

and uncertainties were known and would and did have a material impact on the Fund's financial

condition, results and net income from continuing operations."  (Am. Cmplt. (Dkt. No. 68) ¶

174)

The Amended Complaint further contends that

> . . . . Defendants failed to include in the February Registration Statement and the March
> Registration Statement adequate explanations of the risks arising from the undisclosed
> facts alleged in [the Amended Complaint], despite the fact that these risks were already
> severely affecting USO and the shares being offered in the February Offering and the
> March Offering, and were likely to increase and continue to negatively impact the Fund,
> posing a high risk of catastrophic losses for investors and an existential threat to the
> Fund and its stated investment strategy and objective. . . . Because these omitted
> material facts were not disclosed, as well as the consequent material adverse effects on
> the Fund's results and prospects, Defendants violated Item 105.

(Id. ¶ 175)

The Court concludes – for the same reasons discussed in connection with

Plaintiff's failure to adequately plead (1) false or misleading statements as to the February and

March 2020 Registration Statements; and (2) scienter– that the Amended Complaint does not

adequately allege the omission of information required by Items 303 and 105.[11]

For all the reasons discussed above, the Amended Complaint's Section 10(b)

claims will be dismissed.

---

[11]  Moreover, because Defendants' alleged omissions under Items 303 and 105 do not "render[]
[their] affirmative statements . . . misleading," and instead constitute at most "[p]ure omissions,"
they are not independently actionable under Rule 10b-5.  Macquarie, 601 U.S. at 265-66.

### III.    SECTION 11 CLAIMS

The Amended Complaint alleges that Defendants violated Section 11 of the

Securities Act by issuing several false or misleading statements in the February and March 2020

Registration Statements.  (Am. Cmplt. (Dkt. No. 68) ¶¶ 191-201)

Section 11(a) of the Securities Act provides that "registration statement[s]" filed

with the SEC must not contain any "untrue statement of a material fact" or "omit[] to state a

material fact required to be stated therein or necessary to make the statements therein not

misleading. . . ."  15 U.S.C. § 77k(a).  "To state a claim under section 11, the plaintiff must

allege that:  (1) she purchased a registered security, either directly from the issuer or in the

aftermarket following the offering; (2) the defendant participated in the offering in a manner

sufficient to give rise to liability under section 11; and (3) the registration statement 'contained

an untrue statement of a material fact or omitted to state a material fact required to be stated

therein or necessary to make the statements therein not misleading.'"  In re Morgan Stanley Info.

Fund Sec. Litig., 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k(a)).

While "plaintiffs bringing claims under section[] 11 . . . need not allege scienter,

reliance, or loss causation," they must still allege an omission of "a material fact required to be

stated" in a registration statement.  Id. (internal quotation marks and citation omitted).

### A.    Standing

Defendants argue that Plaintiff lacks standing to assert its Section 11 claims,

"because Plaintiff does not plausibly allege that it purchased shares pursuant to either challenged

Registration Statement," and "[o]nly investors who purchased shares issued pursuant to the

challenged registration statement have standing under Section 11 to challenge its disclosures."

(USO Def. Br. (Dkt. No. 143) at 62 (citing DeMaria v. Andersen, 318 F.3d 170, 175 (2d Cir.

2003)))  And while "[a] plaintiff can establish traceability to the challenged registration

statement '[1] either through proof of a direct chain of title from the original offering to the [plaintiff] . . . or [2] through proof that [plaintiff] bought [its] shares in a market containing only shares issued pursuant to the allegedly defective registration statement,'" (id. at 63 (quoting In re IPO Sec. Litig., 471 F.3d 24, 31 n.1 (2d Cir. 2006) (citation omitted))), "Plaintiff does not allege any facts that could establish that it purchased USO shares pursuant to either challenged Registration Statement rather than one of the prior registration statements." Defendants also note that the Amended Complaint "does not even attempt to distinguish between the two challenged Registration Statements in alleging standing." (Id. at 64)

According to Defendants, "'experience and common sense tell us that when a company has offered shares under more than one registration statement, aftermarket purchasers usually will *not* be able to trace their shares back to a particular offering,' and so 'plaintiffs ha[ve] to allege facts from which we can reasonably infer that their situation is different.'" (Id. at 63 (quoting In re Century Aluminum Co. Sec. Litig., 729 F.3d 1104, 1107–08 (9th Cir. 2013)) (emphasis in In re Century Aluminum Co. Sec. Litig.); see also id. ("Bare allegations of traceability are insufficient if a plaintiff purchased its shares in a market that includes shares issued pursuant to other unchallenged registration statements." (citing In re Ariad Pharm., Inc. Sec. Litig., 842 F.3d 744, 756 (1st Cir. 2016)))) Moreover, "Plaintiff has not alleged that it even has any way of knowing if the USO shares that it purchased on the secondary market were issued pursuant to either challenged Registration Statement," as "investors can only buy and sell USO shares on the secondary market through Authorized Participants or other intermediaries." (Id. at 64) In sum, Defendants contend that the Amended Complaint "fails to allege that Plaintiff purchased USO shares traceable to either challenged Registration Statement." (Id.)

In response, Plaintiff argues that the Amended Complaint's allegation that "'Lead Plaintiff Nutit, A.S. purchased USO securities during the Class Period and shares of USO pursuant and/or traceable to the February Offering and the March Offering'" (Pltf. Opp. (Dkt. No. 151) at 65 (quoting Am. Cmplt. (Dkt. No. 68) ¶ 22)) "'is enough to confer standing at this stage to assert a §11 claim,'" (id. (quoting City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp., 450 F. Supp. 3d 379, 403 (S.D.N.Y. 2020)), and "'[n]othing more is required.'"  (Id. (quoting In re Marsh & Mclennan Cos., Sec. Litig., 501 F. Supp. 2d at 491 (S.D.N.Y. 2006)))  According to Plaintiff, "'[t]o establish standing under [Section] 11 at the motion-to-dismiss stage, . . . [a] [p]laintiff need only assert that [it] purchased shares "issued pursuant to, or traceable to the public offerings."'"  (Id. at 64 (quoting City of Omaha Police & Fire Ret. Sys, 450 F. Supp. 3d at 403))  And "[a]t the pleading stage, Section 11 'plaintiffs are not "required to explain *how* their shares can be traced.'"  (Id. (quoting In re Petrobras Sec. Litig., 116 F. Supp. 3d 368, 384 (S.D.N.Y. 2015)) (emphasis in In re Petrobras); citing In re Wachovia Equity Sec. Litig., 753 F. Supp. 2d 326, 373 (S.D.N.Y. 2011); Citiline Holdings, Inc. v. iStar Fin. Inc., 701 F. Supp. 2d 506, 511 (S.D.N.Y. 2010))

Plaintiff further argues that

> Defendants' reliance on In re Century Aluminum Co. Securities Litigation, 729 F.3d 1104, 1108 (9th Cir. 2013), and In re Ariad Pharmaceuticals, Inc. Securities Litigation, 842 F.3d 744, 756 (1st Cir. 2016), is misplaced because the Second Circuit has never endorsed the Ninth or First Circuit's strict pleading standards for Section 11 standing. Rather, district courts within the Second Circuit routinely hold that general allegations of standing are sufficient at this stage.

(Id. at 65 (citing In re Bioscrip, Inc. Sec. Litig., 95 F. Supp. 3d 711, 746 (S.D.N.Y. 2015); Wallace v. IntraLinks, 302 F.R.D. 310, 319 (S.D.N.Y. 2014)))

According to Plaintiff, a court in this District "rejected a similar challenge to the standing of one of the lead plaintiffs to assert a Section 11 claim where *two* public offerings were

at issue and the lead plaintiff alleged simply that 'it purchased . . . stock pursuant or traceable to the *offerings*.'" (Id. at 66 (quoting City of Omaha Police & Fire Ret. Sys., 450 F. Supp. 3d at 403) (emphasis in Pltf. Opp.))  Plaintiff contends that because the "general allegations" at issue in City of Omaha Police & Fire Ret. Sys. "were sufficient at the motion to dismiss stage to confer standing to assert a Section 11 claim," Plaintiff's "allegation that it purchased shares of USO pursuant and/or traceable to the February Offering and the March Offering [is also] sufficient at this stage."  (Id.)

The Amended Complaint alleges that "Lead Plaintiff Nutit, A.S. purchased USO securities during the Class Period and shares of USO pursuant and/or traceable to the February Offering and the March Offering. . . ."  (Am. Cmplt. (Dkt. No. 68) ¶ 22)

"'The pleading requirement for Section 11 standing is satisfied by general allegations that plaintiff purchased [shares] pursuant to or traceable to [a] false registration statement,'" In re Wachovia, 753 F. Supp. 2d at 373 (quoting Caiafa v. Sea Containers Ltd., 525 F.Supp.2d 398, 407 (S.D.N.Y. 2007)), and "[a]t this stage, plaintiffs are not 'required to explain how their shares can be traced.'"  In re Petrobras, 116 F. Supp. 3d at 384 (quoting In re Authentidate Holding Corp., No. 05–cv–5323, 2006 WL 2034644, at *7 (S.D.N.Y. July 14, 2006)) (emphasis omitted); see also In re Glob. Crossing, Ltd. Sec. Litig., 313 F. Supp. 2d 189, 208 (S.D.N.Y. 2003) ("[T]he pleading requirement" for a Section 11 claim "is not elaborate. Plaintiffs have not been required to explain how their shares can be traced; general allegations that plaintiff purchased [shares] 'pursuant to' or traceable to [a] false registration statement have been held sufficient to state a claim.").

While Defendants argue that "Plaintiff has not alleged that it even has any way of knowing if the USO shares that it purchased on the secondary market were issued pursuant to

either challenged Registration Statement," and "does not even attempt to distinguish between the two challenged Registration Statements in alleging standing," and that such "[b]are allegations of traceability are insufficient if a plaintiff purchased its shares in a market that includes shares issued pursuant to other unchallenged registration statements" (USO Def. Br. (Dkt. No. 151) at 63-64 (citing In re Ariad Pharm., Inc. Sec. Litig., 842 F.3d 744, 756 (1st Cir. 2016)), Defendants "supply no binding authority for the proposition that anything more" than what is pled in the Amended Complaint "is required to plead a Section 11 claim" in this Circuit.  In re Wachovia, 753 F. Supp. 2d at 373; see also Alta Partners, LLC v. Forge Glob. Holdings, Inc., No. 23-CV-2647 (JMF), 2024 WL 1116682, at *7 (S.D.N.Y. Mar. 13, 2024) ("'Although [defendants] assert that "there is no set of facts under which Plaintiffs could trace the notes purchased" to the Supplemental Offerings, they supply no binding authority for the proposition that anything more is required to plead a Section 11 claim.'" (quoting In re Wachovia Equity, 753 F. Supp. 2d at 373)).  And as Plaintiff points out, courts in this District considering motions to dismiss have found similar allegations sufficient to plead Section 11 standing, including general allegations that plaintiffs purchased shares pursuant to multiple offerings or registration statements.  See, e.g., City of Omaha Police & Fire Ret. Sys, 450 F. Supp. 3d at 403 (plaintiff's allegation "that it purchased . . . stock pursuant or traceable to the offerings. . . . is enough to confer standing at this stage to assert a § 11 claim."); In re Petrobras, 116 F. Supp. 3d at 384 ("[P]laintiffs' allegation that they purchased the notes 'pursuant to or traceable to the materially false and misleading' registration statements suffices, at this stage, to establish their standing under Section 11."); Alta Partners, 2024 WL 1116682, at *7 (plaintiff's allegation "that it 'purchased Public Warrants issued pursuant to or traceable to the Form S-4 registration statement'. . . . suffices at this stage."); In re Wachovia Equity, 753 F. Supp. 2d at 373 (allegation "that Plaintiffs purchased

securities 'pursuant or traceable to Offering Materials that contained material misstatements and omissions of fact'. . . . suffices for the Section 11 claims at this stage of the litigation.").

The Court concludes that Plaintiff has sufficiently pled standing for purposes of its Section 11 claim at this stage of the litigation.

**B.    Whether the Amended Complaint States a Claim Under Section 11**

The statements in the February and March 2020 Registration Statements challenged under Section 11 are the same statements challenged in connection with Plaintiff's Section 10(b) claim.  (See Am. Cmplt. (Dkt. No. 68) ¶¶ 224-25)  For all of the reasons discussed above in connection with Plaintiff's Section 10(b) claim, the Amended Complaint does not allege under Section 11 any actionably false statements or misleading omissions with respect to the February and March 2020 Registration Statements.  Moreover, the Amended Complaint does not allege an actionable omission of information required to be disclosed under Items 303 and 105 of Regulation S-K.[12]

As to the alleged violations of Item 303, as discussed above, the Amended Complaint alleges that the February 2020 Registration Statement "failed to disclose that the February Offering itself would increase volatility and illiquidity in the markets in which USO operated and thereby threaten the Fund's performance, investment strategy and investment objective" (Am. Cmplt. (Dkt. No. 68) ¶ 142), and that the March 2020 Registration Statement did not adequately disclose that

> the Fund was facing severe adverse trends, fundamental market disruptions and numerous existential threats at the time of the March Offering, including, inter alia:  (i) sharply rising positional concentration, volatility and market illiquidity as a result of the Fund's rapid growth in early March 2020, including as a result of the billions of dollars' worth of

---

[12]  While Macquarie does not address a Section 11 claim, the Supreme Court acknowledged in that case that – in contrast to Section 10(b) of the Exchange Act – "Congress imposed liability for pure omissions in § 11(a) of the Securities Act of 1933."  Macquarie, 601 U.S. at 264.

shares sold in the February Offering; (ii) unprecedented and sustained investor inflows into the Fund; (iii) a growing oil storage crisis in Cushing, Oklahoma, which had already resulted in the doubling of storage costs and the complete leasing of all tanks by mid-March 2020; (iv) the smashing of prior records in both USO shares traded and WTI front month futures contracts traded in a single day, by 72% and 26%, respectively; (v) the rapid tripling of the Fund's historical market share of WTI near months futures contacts to more than 15% by mid-March 2020; (vi) the widening divergence between the Fund's per share NAV and market price, including to more than double the Fund's pre-March 2020 peak historical price premium on March 18, 2020; (vii) the fact that the 15-day historical WTI front month futures volatility had risen seven fold in a matter of days by March 19, 2020; (viii) the collapse in WTI front months futures prices and the per share NAV of the Fund in the lead up to the offering; and (ix) accelerating super contango effects, which had risen to 6.7 times the historical average by March 23, 2020.

(Am. Cmplt. (Dkt. No. 68) ¶ 145)  The Amended Complaint also alleges that the March 2020 Registration Statement does not adequately disclose "the underlying causes of the contango environment, including that ***USO itself*** was contributing to the contango dynamic . . . and the fact that the continued growth of the Fund through the March Offering was certain to exacerbate these effects."  (Id. ¶ 162 (emphasis in Am. Cmplt.))

      All of the alleged omissions cited by Plaintiff concern events that took place over a period of less than two months, however.  And "'as a matter of law,' a pattern of two months does not a 'trend' make for purposes of Item 303. . . ."  In re Omega Healthcare Invs., Inc. Sec. Litig., 563 F. Supp. 3d 259, 276 (S.D.N.Y. 2021) (quoting Blackmoss Invs., Inc. v. ACA Capital Holdings, Inc., No. 07 Civ. 10528, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010)).

      While Plaintiff contends that "'"'whether a pattern or occurrence is sufficiently lengthy to constitute a trend is a question that should not be resolved at the motion to dismiss stage'"'" (Pltf. Opp. (Dkt. No. 151) at 45 (quoting Oklahoma Firefighters Pension & Ret. Sys. v. Lexmark Int'l, Inc., 367 F. Supp. 3d 16, 35 (S.D.N.Y. 2019) (quoting In re CPI Card Grp. Inc. Sec. Litig., 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017)))), courts in this District have

rejected such arguments where the alleged pattern of events took place over a period of time as short as that alleged here.

In In re Omega Healthcare Invs., Inc. Sec. Litig., 563 F. Supp. 3d 259, 276 n.15 (S.D.N.Y. 2021), for example, plaintiffs

> [c]it[ed] In re CPI Card Group Inc. Securities Litigation [in] urg[ing] us to not resolve at the pleading stage whether a pattern is sufficiently lengthy to constitute a trend. No. 16 Civ. 4531 (LAK), 2017 WL 4941597, at *3 (S.D.N.Y. Oct. 30, 2017). While plaintiffs [in In re Omega Healthcare Invs.] accurately summarize[d] the court's reluctance in CPI to pass judgment on this issue for a pattern that lasted at least a fiscal quarter or longer, Judge Kaplan factually distinguished that situation from cases in this District where courts determined as a matter of law that patterns lasting for only two months are not "trends" that required disclosure under Item 303. Id. at *3 n.38. Indeed, the clear weight of recent authority in this District holds that, as a matter of law, patterns lasting less than two months do not constitute "trends" that would trigger disclosure obligations under Item 303. See, e.g., Holbrook v. Trivago N.V., No. 17 Civ. 8348 (NRB), 2019 WL 948809, at *13 (S.D.N.Y. Feb. 26, 2019), aff'd sub nom. Shetty v. Trivago N.V., 796 F. App'x 31 (2d Cir. 2019); In re Pretium Res. Inc. Sec. Litig., 256 F. Supp. 3d 459, 482 n.11 (S.D.N.Y. 2017), aff'd sub nom. Martin v. Quartermain, 732 F. App'x 37 (2d Cir. 2018); Nguyen v. MaxPoint Interactive, Inc., 234 F. Supp. 3d 540, 546 (S.D.N.Y. 2017); In re Focus Media Holding Ltd. Litig., 701 F. Supp. 2d 534, 540 (S.D.N.Y. 2010).

Id. Accordingly, Plaintiff's Item 303 claim fails.

As to Plaintiff's claim that Defendants violated Item 105, the Court concludes – for the reasons explained above – that Defendants adequately disclosed risk factors facing the Fund.

For all these reasons, Plaintiff's claim under Section 11 of the Securities Action will be dismissed.

## IV.    **CONTROL PERSON LIABILITY**

The Amended Complaint also asserts control person liability under Section 20(a) of the Exchange Act and Section 15 of the Securities Act. Such claims are "necessarily predicated on a primary violation of [the] securities laws." Rombach, 355 F.3d at 177-78.

Because Plaintiff has not adequately pled any underlying violation of the securities laws, these claims will likewise be dismissed.

## CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the Amended Complaint (Dkt. No. 142) is granted.

While the Court grants leave to move to amend, in any such motion Plaintiff will explain in detail how each defect cited in this Opinion has been satisfied by factual allegations in the proposed second amended complaint. The proposed second amended complaint is to be attached as an exhibit to the motion. Any motion for leave to amend is to be filed by **October 29, 2025**.

The Clerk of Court is directed to terminate the motion (Dkt. No. 142).

Dated: New York, New York
      September 29, 2025          SO ORDERED.

Paul G. Gardephe
United States District Judge