# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| x | |
| In re UNITED STATES OIL FUND, LP SECURITIES LITIGATION | : Civil Action No. 1:20-cv-04740-PGG-~~GWG~~GS |
| | : |
| | : CLASS ACTION |
| This Document Relates To: | : |
| ALL ACTIONS. | : [PROPOSED] SECOND CONSOLIDATED AMENDED COMPLAINT FOR |
| x | VIOLATIONS OF THE FEDERAL SECURITIES LAWS |

**TABLE OF CONTENTS**

Page

I.      NATURE OF THE ACTION ...............................................................................................1

II.     JURISDICTION AND VENUE ...........................................................................................8

III.    PARTIES .............................................................................................................................9

        A.      Lead Plaintiff .........................................................................................................9

        B.      The USO Defendants .............................................................................................9

        C.      The Underwriter Defendants ...............................................................................11

IV.     CLASS ACTION ALLEGATIONS ..................................................................................13

V.      SUBSTANTIVE ALLEGATIONS ...................................................................................15

        A.      Background ...........................................................................................................15

                1.      Oil ETFs and Futures ...............................................................................15

                2.      USO ...........................................................................................................17

        B.      USO Suffers Adverse Trends and the Breakdown in Market
                Fundamentals as a Result of Defendants' Own Market-Distorting
                Activities ..............................................................................................................19

                1.      Defendants Rapidly Inflate USO Through the February and
                        March Offerings ........................................................................................24

                2.      USO Corners and Distorts the Market in WTI Near Months
                        Futures Contracts ......................................................................................29

                3.      USO Suffers Structural Defects and Exacerbates a
                        Breakdown in Market Fundamentals .........................................................35

                4.      USO Investors Suffer Catastrophic Losses ...............................................46

        C.      USO Is Forced to Abandon the Investment Strategy Which It Had
                Used to Raise Billions of Dollars in Investor Capital ..........................................50

        D.      The USO Defendants Belatedly Acknowledge Undisclosed Risks
                that Caused Investors to Lose Billions .................................................................55

        E.      The SEC and CFTC Determine the USO Defendants Made
                Material Misrepresentations to Investors in Violation of the Law ...........61

**Page**

VI.   MATERIALLY FALSE AND MISLEADING STATEMENTS AND
      OMISSIONS DURING THE CLASS PERIOD .................................................. 62

      A.    The February Registration Statement .................................................. 62

      B.    The March Registration Statement .................................................... 64

      C.    Violations of Items 303 and 105 of Regulation S-K ........................... 80

      D.    Statements Posted on USO's Website .................................................. 83

      E.    Defendants' Additional Materially False and Misleading
            Statements and Omissions .................................................................. 86

VII.  1933 Act Allegations ...................................................................................... 89

      A.    Materially False and Misleading Statements and Omissions in the
            February Registration Statement and the March Registration
            Statement ........................................................................................... 89

                  COUNT I .................................................................................. 90

For Violation of §11 of the 1933 Act Against All Defendants ...................................... 90

                  COUNT II ................................................................................. 92

For Violation of §15 of the 1933 Act Against the Sponsor and the Individual Defendants .................... 92

VIII. 1934 ACT ALLEGATIONS ........................................................................... 93

      A.    The USO Defendants' Scienter ........................................................... 93

      B.    Loss Causation and Economic Loss .................................................... 97

      C.    Applicability of Presumption of Reliance: Fraud-on-the-Market
            Doctrine ............................................................................................. 99

      D.    No Safe Harbor ................................................................................ 100

                  COUNT III ............................................................................. 101

For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against the USO Defendants ........................ 101

                  COUNT IV .............................................................................. 101

**Page**

For Violation of §20(a) of the 1934 Act Against the Sponsor and the Individual Defendants .............. 101

    IX.    PRAYER FOR RELIEF ............................................................................................. 103

**TABLE OF CONTENTS**

**Page**

I.     NATURE OF THE ACTION ........................................................................... 1

II.    JURISDICTION AND VENUE .................................................................... 11

III.   PARTIES ...................................................................................................... 11

       A.     Lead Plaintiff .................................................................................. 11

       B.     The USO Defendants ...................................................................... 11

       C.     The Underwriter Defendants ........................................................... 14

IV.    CLASS ACTION ALLEGATIONS ............................................................. 16

V.     SUBSTANTIVE ALLEGATIONS .............................................................. 17

       A.     Background ..................................................................................... 17

              1.     Oil ETFs and Futures ........................................................... 17

              2.     USO ..................................................................................... 19

              3.     USCF ................................................................................... 23

              4.     USO's History of Market-distorting Activity ...................... 24

       B.     USO Suffers Adverse Trends and the Breakdown in Market
              Fundamentals as a Result of Defendants' Own Market-Distorting
              Activities ........................................................................................ 25

              1.     Defendants Rapidly Inflate USO Through the February and
                     March Offerings, Attracting Droves of Retail Investors .............. 34

              2.     USO Corners and Distorts the Market in WTI Near Months
                     Futures Contracts ............................................................... 40

              3.     USO Suffers Structural Defects and Exacerbates a
                     Breakdown in Market Fundamentals ...................................... 51

              4.     USO Investors Suffer Catastrophic Losses ......................... 66

       C.     USO Continues to Mislead Investors as It Is Forced to Abandon
              the Investment Strategy Which It Had Used to Raise Billions of
              Dollars in Investor Capital ............................................................. 72

**Formatted:** Centered, Tab stops: Not at 3.25"

**Page**

D.    The USO Defendants Belatedly Acknowledge Undisclosed Risks that Caused Investors to Lose Billions ........................................78

E.    The SEC and CFTC Determine the USO Defendants Made Material Misrepresentations to Investors in Violation of the Law ...........86

VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD ...............................................91

A.    The February Registration Statement......................................91

B.    The March Registration Statement...........................................96

C.    Violations of Items 303 and 105 of Regulation S-K .............115

D.    April 2020 Statements Regarding Changes to USO's Investment Strategy.......................................................................120

E.    Statements and Omissions Regarding Subsequent Events Necessitating Disclosure.......................................................122

F.    Statements Posted on USCF's Website Throughout the Class Period ....................................................................................123

VII.    1933 Act Allegations.............................................................................130

A.    Materially False and Misleading Statements and Omissions in the February Registration Statement and the March Registration Statement ...............................................................................132

COUNT I.............................................................................................................133

For Violation of §11 of the 1933 Act Against All Defendants................................133

COUNT II............................................................................................................135

For Violation of §15 of the 1933 Act Against the Sponsor and the Individual Defendants..................135

VIII.    1934 ACT ALLEGATIONS .................................................................136

A.    The USO Defendants' Scienter...............................................136

B.    Loss Causation and Economic Loss........................................146

**Formatted:** Centered, Tab stops: Not at 3.25"

**Page**

C.      Applicability of Presumption of Reliance: Fraud-on-the-Market
        Doctrine ................................................................................................. 148

D.      No Safe Harbor ..................................................................................... 149

COUNT III ......................................................................................................................... 150

For Violation of §10(b) of the 1934 Act and Rule 10b-5 Against the USO Defendants ....................... 150

COUNT IV .......................................................................................................................... 151

For Violation of §20(a) of the 1934 Act Against the Sponsor and the Individual Defendants .............. 151

IX.      PRAYER FOR RELIEF ...................................................................................... 152

**Formatted:** Centered, Tab stops: Not at 3.25"

Court-appointed lead plaintiff Nutit, A.S. ("Lead Plaintiff"), individually and on behalf of all others similarly situated, by its undersigned attorneys, alleges the following based upon personal knowledge as to itself and its own acts and upon information and belief as to all other matters based on the investigation conducted by and through its counsel, which included, among other things, a review of U.S. Securities and Exchange Commission ("SEC") filings by, and other public filings and statements of, the United States Oil Fund, LP ("USO" or the "Fund"), as well as securities analysts' reports, media reports, press releases and other publicly disclosed reports and information about USO. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.  NATURE OF THE ACTION

1.  This is a federal securities class action on behalf of purchasers of: (i) USO securities during the period from February 25, 2020 to April 28, 2020, inclusive (the "Class Period"), seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act"); and (ii) shares of USO issued pursuant and/or traceable to the prospectus and registration statement (together, the "February Registration Statement"), issued in connection with the February 25, 2020 public offering of USO shares (the "February Offering"), and the prospectus and registration statement (together, the "March Registration Statement"), issued in connection with the March 23, 2020 public offering of USO shares (the "March Offering"), seeking to pursue remedies under Sections 11 and 15 of the Securities Act of 1933 (the "1933 Act").

2.  This case arises from the collapse of USO, an exchange traded fund ("ETF") that lured investors with the promise of a cost-effective way to invest indirectly in crude oil. During the Class Period, the Fund grew to become the largest oil-related ETF in the world and, unbeknownst to investors, faced a convergence of material, undisclosed risks and uncertainties stemming from

extraordinary market conditions and the Defendants'[1] own efforts to rapidly grow the Fund by billions of dollars.  In a span of a few short weeks, Defendants increased the size of USO by more than *930%*, creating a dangerous positional concentration in the oil futures markets in which the Fund operated and causing severe and catastrophic market-distorting effects.  Defendants' conduct led regulators and the Fund's sole futures commission merchant to impose limits on the Fund's ability to invest in oil futures contracts, undermining USO's investment objective and culminating in the SEC and CFTC imposing a $2.5 million penalty on USO and the Fund's operator, USCF, for *failing to disclose material information to investors*.

3.      The flood of investor capital, which USO poured into an increasingly illiquid oil futures market, ultimately caused USO to become the engine of its own demise as the Fund reached regulatory positional limits, suffered structural defects and engendered outsized impacts on oil futures prices because of the magnitude of its positional movements.  As a result, investors – including many retail investors seeking exposure to oil prices without the complexity of trading futures contracts – suffered massive losses not simply due to market volatility in the oil and oil futures markets, but due to USO's own extraordinary growth and the Fund's price-insensitive participation in – and catalyst for – an illiquid oil futures market.  By the end of the Class Period, USO was forced by regulators to abandon its investment strategy and objective, prohibited by the SEC from issuing any new shares, determined by multiple regulatory agencies to have ***violated the law*** in its representations to investors, and caused the destruction of billions of dollars in investor capital.  Although Defendants marketed USO as a cost-effective means to gain exposure to crude oil prices, the SEC would ultimately require the Fund to effectively disavow this purpose and include a

---

[1]      Capitalized terms not otherwise defined in this section are defined below.

new disclaimer in subsequent offering materials that USO "**IS NOT A PROXY FOR TRADING DIRECTLY IN THE OIL MARKETS**."

4.      USO's stated investment objective is for its per share net asset value ("NAV") to track the daily changes in percentage terms of the spot price of West Texas Intermediate ("WTI") light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of ~~short-term WTI futures contracts.  Because retail investors are generally not equipped to buy and sell barrels of oil, and~~the front or near month Benchmark Oil Futures Contract.  Because trading oil futures themselves is difficult and costly, ETFs such as USO provide one of the primary means ~~that~~for investors ~~can~~to gain exposure to fluctuations in oil prices.  As oil demand and prices fell precipitously throughout the Class Period, the Fund became an increasingly popular oil ETF accessible to investors who did not have access to non-public predictive models, sophisticated analytical tools, or the massive amounts of data (which included proprietary and non-public data available only to Defendants and certain other specialized market participants) necessary to comprehend the true risks of investing in USO.

5.      USO stated that it would achieve its investment objective by investing substantially its entire portfolio in front month ~~or next month WTI futures contracts.~~WTI futures contracts. Defendant Love, the President and CEO of the Fund's operator, USCF – which was a small, tightly-held company that vigilantly monitored market developments impacting the Fund, yet would go on to control billions of dollars' worth of oil futures contracts – distinguished USO from other products as an ETF that contained "purely just the front month future contract in crude."  Unbeknownst to investors, however, significant market volatility in early 2020 coupled with USO's public issuance

- 3 -

of over 1.4 billion shares[2] during the Class Period made the Fund's purported investment objective and strategy unfeasible and subject to severe risks of loss.  Oil demand had collapsed as governments imposed lockdowns and businesses halted operations in response to the novel coronavirus ("COVID-19").  Indeed, Love recognized as early as January 2020 that the outbreak was already a "***big factor*** in the market" that posed "***concern*** about demand" and that the "amount of demand" being impacted would be "***meaningful***."[3]  In addition, in early March 2020, ~~Saudi Arabia launched~~ an oil price war ~~against Russia, which~~ led to increased production and lowered export prices.  As excess oil supply increased and oil prices waned, the facilities available for storage in Cushing reached capacity and were completely leased by mid-March 2020.  These adverse dynamics synergistically converged with and were materially exacerbated by the Fund's increasingly enormous size~~, as detailed herein~~.

6.      During the Class Period, retail investors began pouring hundreds of millions of dollars into USO – facilitated by the February Offering and the March Offering – ~~in an attempt to "buy the dip,"~~ believing ~~(correctly)~~ that the price of oil would rebound as ~~economies exited lockdown periods~~ the economic turmoil triggered by COVID-19 eased and relying on Defendants' representations that USO's share price would continue to move almost perfectly in tandem with its per share NAV and the ~~Saudi/Russia oil~~ price ~~war ended~~ of the front month WTI futures contract. Indeed, by the end of the Class Period, user accounts holding USO in the popular online trading platform Robinhood ballooned to more than 220,000 accounts, an increase of more than ***2,600%*** from late February 2020.  As a result, by March 18, 2020, shortly before the March Offering, daily

---

[2]     All references to USO shares are to the unadjusted shares before USO effected a 1-or-8 reverse share split after the close of trading on April 28, 2020, unless otherwise noted.

[3]     All emphasis in this Complaint is added, except as otherwise noted.

- 4 -

trading volume in USO spiked to approximately *72%* above its historical peak and *582%* above the 5-year historical average.

7.     As a result of the surge of invested capital in USO, the Fund's positions in WTI futures grew exponentially, and it became the single largest holder of WTI near futures contracts in the world.  By mid-March 2020, USO held *over 15% of the entire market* for WTI near months futures contracts, an extremely concentrated and dangerous position for any single entity.  These risks were compounded by the fact that USO engaged in a monthly "roll" in which it sold all of its front month WTI futures contracts and purchased the next month WTI futures contract over four trading days.  This sale of billions of dollars' worth of WTI futures contracts in a short timeframe created intense selling pressure that further distorted market dynamics as WTI front month futures flooded the market, particularly because the Fund's positions were untethered to any intention to take physical delivery of the underlying referenced assets.

8.     Although the rapid growth in the size of USO accelerated investor losses and fundamentally altered the risk profile of the Fund, this growth allowed Defendants to reap millions of dollars in additional profits.  For example, the growth of USO during the Class Period sharply increased the management fees paid to USO's Sponsor[4] (USCF) and, ultimately, the USO Defendants as principals, officers and directors of the Sponsor, as USO was contractually obligated to pay management fees based on a percentage of its total NAV.  As a result, in the first half of 2020, USO was forced to pay almost as much in management fees as it had paid during the *entirety* of 2019, despite the fact that investors had suffered over *$2.5 billion in net losses* during this time period (compared to $473 million in net income earned by the Fund during 2019).

---

[4]     Capitalized terms in this section are defined below.

9.      Similarly, the Underwriter Defendants received millions of dollars in profits by capturing the increasingly divergent spread between the Fund's NAV per share and its price per share.  The Fund's offering materials falsely and misleadingly claimed that these two metrics "closely tracked" each other during the Class Period, the veracity of which was critical to ensure that investors did not pay more for Fund shares than those shares were worth.  In reality, the price premium paid by investors regularly diverged and increased far beyond historical precedent during the Class Period, ultimately reaching *more than 36%*.  This rate was akin to investors paying $13.60 for a $10 bill.  Although the divergence magnified investor losses, it allowed the Underwriter Defendants to capture exorbitant profits by buying USO shares at the lower NAV price and then selling those shares to investors at the much higher market price.

10.     In addition, the growing structural deficiencies in the Fund and its price-insensitive investment posture meant that USO investors could be preyed upon by sophisticated market participants with access to proprietary data feeds and complex investment tools that were not available to the general market.  From February 27 to April 21, 2020 alone, hedge funds tripled their short positions in USO, ultimately pocketing $286 million for a 110% return in less than two months as USO investors suffered hundreds of millions of dollars in losses.  The rapid growth in USO share issuances effectively facilitated a massive wealth transfer during the Class Period from investors fooled by the optical illusion of buying cheap oil futures through USO to hedge funds shorting USO or trading against the Fund, to market-makers such as the Underwriter Defendants collecting the spread between the per share NAV and USO per share market price, and to the USO Defendants collecting millions of dollars in fees for their management of the Fund.

11.     Defendants, as the creators, issuers, underwriters and operators of the largest oil-related ETF in existence and active market-making players in the complex commodities and futures

- 6 -

markets that determined the Fund's performance, possessed unique insider knowledge during the Class Period about the negative consequences to the Fund as a result of these converging adverse events, trends and uncertainties—, including through a combination of, *inter alia*: (1) access to confidential market data and other information, including from, *e.g.*, a licensing agreement with NYMEX (the exchange upon which USO's oil futures holdings trade); (2) maintaining regular communications with market participants, including "constant contact" with the CME Group, which operates NYMEX, about approaching accountability levels; (3) scrupulously monitoring the oil markets, including the economic turmoil from an "overabundance of supply, significantly curtailed demand and limited storage for excess crude oil" during the Class Period – and the unprecedented volatility, positional concentration, tracking failures, and extreme contango – impacting the Fund and its performance; and (4) the tightly-run management of USCF, a 15-person company, led by defendant Love, who previously managed the Fund's portfolio for years, including during its 2006 launch, and who served as a registered representative of USO's marketing agent, defendant ALPS, for which he performed marketing and sales activities, solicited investment in the offerings and interfaced with the Authorized Participant Defendants.

11. While Defendants represented that USO was a cost-effective means of gaining exposure to spot oil prices and related commodities, USO was inappropriate for this purpose as the Fund exposed investors to the risk of imminent catastrophic loss during the Class Period as the Fund was suffering an undisclosed breakdown in market fundamentals and the convergence of numerous adverse events, trends and uncertainties that would ultimately force the Fund to abandon its investment strategy and objective.

12. Rather than disclose these known impacts and risks to the Fund, Defendants chose to issue billions of dollars in new USO shares in the February Offering and the March Offering,

exacerbating the existential threats facing the Fund.  Incredibly, and despite the fact that the risk profile for the Fund had profoundly changed, solicitation materials for the offerings failed to apprise investors of these new risks or the known adverse events, trends and uncertainties impacting the Fund.  Instead, the February Registration Statement and the March Registration Statement contained boilerplate risk discussions that were almost *identical* to the Fund's prior offering materials, creating the false and misleading impression that investing in USO ~~was as risky as~~had the same risks that it ~~had~~ always ~~been~~had.  Moreover, the Fund's Class Period offerings *themselves* materially increased the risks to the Fund ~~because they heightened liquidity constraints in the WTI futures market~~ and pushed ~~the Fund~~USO up against established regulatory limits, facts that were not disclosed to investors.

13.    Soon after the launch of the March Offering, these undisclosed events, trends and uncertainties came to a catastrophic head.  On April 7, 2020, USO began its monthly WTI futures roll.  However, the sale of billions of dollars' worth of front month WTI futures contracts (estimated to account for over 10% of the entire market at the time) created intense, downward pricing pressure on prices for WTI futures.  Just three days after the roll period ended, on April 16, 2020, regulators took drastic action, intervening to order the Fund to limit its positions in the June WTI futures contract.  As a result, the Fund was forced to announce that same day the alteration of its investment strategy, an event likened to "***dropp[ing] a bomb on the energy markets***."[5]  This was the first in a series of rapid-fire investment overhauls announced by the Fund over the ensuing days that resulted in USO completely abandoning its stated investment strategy and undermining its investment objective.  But the regulatory action came too late to prevent the market-wide damage already

---

[5] ~~Herein, text that is both bold and italicized reflects emphasis that has been added, unless otherwise noted.~~

- 8 -

caused by the Fund's dangerous positional concentrations.  On April 20, 2020, the May 2020 WTI contracts closed at a *negative* price for the first time in history as the oil spot price fell to *($37.63)* per barrel, largely as a result of a selling panic and illiquidity induced by the Fund dumping billions of dollars' worth of the contract during its April roll.

14.    Then, on May 29, 2020, it was reported that the SEC and ~~Commodity Futures Trading Commission ("CFTC")~~CFTC had both launched investigations into USO regarding the Fund's disclosures to investors and the Fund's rapid-fire changes to its investment strategy.  On August 17, 2020, the SEC issued a Wells Notice to several of the USO Defendants stating that the SEC had made a preliminary determination that these Defendants violated the 1933 Act and the 1934 Act in connection with their disclosures to investors regarding USO's investment strategy.  Similarly, on August 19, 2020, the CFTC issued a Wells Notice stating that it had preliminary determined that these same Defendants had violated the Commodity Exchange Act in connection with their statements to investors and actions in managing the Fund.   Both Wells Notices recommended that the respective agencies pursue enforcement actions as a result of these violations of law.  Then, on November 8, 2021, the SEC and CFTC imposed a combined *$2.5 million civil penalty* on USO and USCF, and concluded that USO and USCF made material misrepresentations to investors during the Class Period, including for failing to disclose that the Fund's sole futures commission merchant told USO it would not execute any new oil futures positions for the Fund – a "critical" omitted fact – thereby introducing the risk of tracking error between USO's investment objective and its NAV.

15.    Ultimately, USO investors suffered billions of dollars in losses.  Between February and April 2020, the Fund lost *more than $4 billion* and experienced its worst monthly performances on record.  ~~Adding insult to injury~~Moreover, the dramatic ~~changes to~~overhaul of USO's investment

- 9 -

strategy necessitated by the undisclosed factors impacting the Fund meant that the droves of retail investors ~~could no longer enjoy the upside when oil markets eventually recovered, as USO investors successfully predicted.  For example, in May 2020,~~who poured money into the ~~price of WTI~~Fund during the Class Period as a "cost-effective way to invest directly in crude oil" through the Fund's passive investment of front month ~~futures~~contracts ~~rallied more than 88%, while the price of USO~~were left holding shares ~~rose only about 35%.~~of an actively managed ETF that would hold *no positions* in the front month contract and thus bore virtually no resemblance of the strategy pitched to investors.

16.     The price of USO shares plummeted as a result of Defendants' violations of law complained of herein, falling **over 80%** during the Class Period as reflected in the following chart:



17.     As a result of Defendants' material misrepresentations and omissions during the Class Period, Lead Plaintiff and members of the Class (defined below) suffered billions of dollars in losses.  This lawsuit seeks to recover for those losses.

## II.    JURISDICTION AND VENUE

18.    The claims alleged herein arise under Sections 10(b) and 20(a) of the 1934 Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder by the SEC, and Sections 11 and 15 of the 1933 Act, 15 U.S.C. §§77k and 77o.

19.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the 1934 Act and Section 22 of the 1933 Act.

20.    Venue is proper in this District pursuant Section 27 of the 1934 Act, Section 22 of the 1933 Act and 28 U.S.C. §1391(b).  USO shares trade and were distributed in this District and many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District.

21.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the NYSE Arca, Inc. ("NYSE"), a national securities exchange.

## III.    PARTIES

### A.    Lead Plaintiff

22.    Lead Plaintiff Nutit, A.S. purchased USO securities during the Class Period and shares of USO pursuant and/or traceable to the February Offering and the March Offering, as reflected in its earlier-filed certification, *see* ECF No. 45-2, which is incorporated herein by reference, and has been damaged thereby.

### B.    The USO Defendants

23.    Defendant United States Oil Fund, LP is a commodity pool operator and exchange-traded security that provides investment exposure to oil markets.  The Fund's shares trade on the NYSE under the symbol "USO."  The Fund is a Delaware limited partnership organized on May 12,

2005, and maintains its main business office at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596.

24.     Defendant United States Commodity Funds LLC (the "Sponsor" or "USCF") is the sponsor and general and managing partner for the Fund. USO pays USCF a management fee and grants USCF full management control of USO pursuant to the terms of the Seventh Amended and Restated Agreement of Limited Partnership dated December 15, 2017 (as amended from time to time, the "LP Agreement"). USCF is a single member limited liability company that was formed in the state of Delaware on May 10, 2005, and maintains its main business office at 1850 Mt. Diablo Boulevard, Suite 640, Walnut Creek, California 94596. USCF has been registered with the Commodity Futures Trading Commission ("CFTC") as a Commodity Pool Operator since 2005 and is a member of the National Futures Association. USO is the largest fund operated by USCF and was responsible for more than 50% of the Sponsor's entire management fees receivable in 2019.

25.     Defendant John P. Love is a Principal of USCF and has served as the President and Chief Executive Officer ("CEO") of USCF since May 15, 2015, Managing Director of USCF since October 2016 and Chairman of the Board of Directors of USCF since October 2019. Love was the Portfolio Manager of the Fund for four years, beginning with its launch in 2006. Defendant Love makes trading and investment decisions for USO and directs the execution of trades on behalf of USO, and was a registered representative for USO's marketing agent, defendant ALPS (defined below) during the Class Period.

26.     Defendant Stuart P. Crumbaugh is a Principal of USCF and has served as the Chief Financial Officer ("CFO"), Secretary and Treasurer of USCF since May 2015.

27.     Defendants Crumbaugh and Love are referred to herein as the "USO Officer Defendants."

- 12 -

28.    USO, the Sponsor and the USO Officer Defendants are collectively referred to herein as the "USO Defendants."

29.    Defendant Nicholas D. Gerber served as a Managing Director and Vice President of USCF at the time of the February Offering and the March Offering.

30.    Defendant Andrew F. Ngim co-founded USCF and served as its Managing Director and Chief Operating Officer at the time of the February Offering and the March Offering.

31.    Defendant Robert L. Nguyen co-founded USCF and served as its Management Director at the time of the February Offering and the March Offering.

32.    Defendant Peter M. Robinson served as a Director of USCF at the time of the February Offering and the March Offering.

33.    Defendant Gordon L. Ellis served as a Director of USCF at the time of the February Offering and the March Offering.

34.    Defendant Malcolm R. Fobes III served as a Director of USCF at the time of the February Offering and the March Offering.

35.    The Defendants identified in ¶¶29-34 and the USO Officer Defendants are referred to herein as the "Individual Defendants." The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of USO's SEC filings, published NAV, press releases, media statements and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. They were provided with copies of USO's SEC filings, press releases, NAV figures and other statements alleged herein to be misleading prior to or shortly after their issuance. The Individual Defendants are liable for the false and misleading statements pleaded herein.

- 13 -

### C.      The Underwriter Defendants

**Formatted:** Keep with next, Keep lines together

36.      Defendants ABN Amro, ~~BNP Paribas Securities Corporation, Citadel Securities LLC,~~ ~~Citigroup Global Markets, Inc., Credit Suisse Securities USA LLC, Deutsche Bank Securities Inc.,~~ Goldman Sachs & Company, J.P. Morgan Securities Inc., Merrill Lynch Professional Clearing Corporation, ~~Morgan Stanley & Company Inc., Nomura Securities International Inc., RBC Capital~~ ~~Markets LLC, SG Americas Securities LLC, UBS Securities LLC,~~ and Virtu Financial BD LLC (collectively, the "Authorized Participant Defendants") served as underwriters for the offer and sale of USO shares during the Class Period and for the shares sold in the February Offering and the March Offering.

37.      Each of the Authorized Participant Defendants executed an Authorized Participant Agreement with the Fund and the Sponsor for the sale of USO shares to the public.  These agreements provided the Authorized Participant Defendants with exclusive authorization to purchase and redeem shares of USO in blocks of 100,000 shares, dubbed "Baskets."  Throughout the Class Period, the Authorized Participant Defendants continuously purchased and redeemed Baskets. The Authorized Participant Defendants purchased Baskets from the Fund at USO's end-of-day NAV price – *i.e.*, the Fund's total assets minus its total liabilities, divided by the total number of outstanding shares.  For each order to create or redeem Baskets, the Authorized Participant Defendants were required to pay a $1,000 fee.  The Authorized Participant Defendants then sold the shares from these Baskets to the investing public at a per-share market price.

38.      The Authorized Participant Defendants received profits from the spread between the NAV at which they received USO shares from the Fund and the market price at which the shares were sold to the investing public.  For example, if USO shares were trading at a premium to NAV, the Authorized Participant Defendants would purchase Baskets from the Fund at the lower NAV and sell shares from these Baskets to investors at the higher market price.  Conversely, if USO shares

were trading at a discount to NAV, the Authorized Participant would purchase shares in the secondary market, at the lower market price, and redeem Baskets derived from those shares at the higher NAV. This mechanism was designed to ensure that the market price of USO shares tracked closely to the Fund's NAV per share.

39.    Defendant ALPS Distributors, Inc. ("ALPS") served as the marketing agent and an underwriter for USO in connection with the February Offering and the March Offering. ~~Defendant~~ ALPS solicited investment in these offerings and distributed and sold USO shares from the offerings on behalf of the Fund to the Authorized Participant Defendants. The Sponsor paid an annual fee to ~~Defendant~~defendant ALPS for the purpose of marketing and distributing the shares sold in USO share offerings, including the February Offering and the March Offering. Specifically, ~~Defendant~~ ALPS received $425,000 per annum plus an incentive fee of 0.0% on USO's assets from $0-500 million; 0.04% on USO's assets from $500 million-$4 billion; and 0.03% on USO's assets in excess of $4 billion, subject to a cap of 10% of the gross proceeds from share offerings conducted during the year. Defendant Love has served as a registered representative for ALPS since September 2011 and simultaneously held senior roles at USCF, including President and CEO, during the Class Period.

40.    The Authorized Participant Defendants and ~~Defendant~~defendant ALPS are referred to herein as the "Underwriter Defendants." By soliciting investors in the February Offering and the March Offering and purchasing Baskets from the Fund (*i.e.*, the issuer), breaking such Baskets down into constituent shares, and distributing and selling those shares to investors, the Underwriter Defendants acted as statutory underwriters within the meaning of the 1933 Act. *See* 15 U.S.C. §77b(a)(11). The Underwriter Defendants' failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

- 15 -

41.     The Individual Defendants, the Underwriter Defendants and the USO Defendants are collectively referred to herein as "Defendants."

IV.     **CLASS ACTION ALLEGATIONS**

42.     Lead Plaintiff brings this action as a class action on behalf of all persons or entities who: (i) purchased USO shares pursuant and/or traceable to the February Registration Statement or the March Registration Statement; and/or (ii) purchased USO securities during the Class Period (the "Class"). Excluded from the Class are Defendants and their families, the officers, directors and affiliates of the Defendants, at all relevant times, and members of their immediate families, and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

43.     The members of the Class are so numerous that joinder of all members is impracticable. The Fund's shares are actively traded on the NYSE under the ticker symbol "USO" and hundreds of millions of shares were sold throughout the Class Period. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds of members in the proposed Class. Beneficial owners and other members of the Class may be identified from records maintained by the Fund or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

44.     Lead Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law as complained of herein.

45.     Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

- 16 -

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the 1933 Act and/or the 1934 Act;

(b)     whether statements made by Defendants to the investing public during the Class Period about the business, operations and risks of investing in the Fund were false, misleading, or omitted material facts; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

47.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**V.     SUBSTANTIVE ALLEGATIONS**

**A.     Background**

**1.     Oil ETFs and Futures**

48.     An ETF is similar to a mutual fund in that it issues shares and then uses the proceeds from the sale of these shares to invest according to its stated investment strategy and objective. However, unlike mutual funds, ETFs issue their shares first to authorized participants through a marketing agent who then distribute and sell the shares to investors.  This allows the ETFs to trade on an exchange throughout the trading day without being directly created or redeemed by the commodity pool operator.

49.     Oil ETFs allow retail investors and speculators to gain access to investable products tied to oil prices and/or the energy market that can be easily traded directly in investors' brokerage accounts. ~~Owning oil ETFs that track futures contracts (as opposed to stocks of oil and gas companies) is one of the most convenient ways for investors to seek exposure to oil markets as trading futures through a broker can be a cumbersome process and require a significant initial investment. Moreover, most~~Most retail investors are not equipped to buy and sell barrels of oil or authorized to trade oil futures contracts directly, so they utilize ETFs such as USO to make investments based on the price of oil and to gain investment exposure to fluctuations in spot oil prices. Unlike equity ETFs, oil ETFs are not backed by the physical stock or asset, but rather trade futures contracts referencing barrels of oil in a particular oil market.

50.     A futures contract is a legal agreement to buy or sell a particular commodity at a predetermined price at a specified time in the future. The buyer of a futures contract takes on the obligation to buy and receive the underlying asset when the futures contract expires, while the seller of a futures contract takes on the obligation to deliver the underlying asset at expiration. Futures contracts can be used to hedge other investments, to protect against fluctuations in the price of a commodity, or as a speculative investment. As futures contracts approach expiration they tend to converge with prices in the physical spot market.

51.     Many traders and portfolio managers are not interested in delivering or receiving the barrels of oil referenced by oil futures contracts. Instead, such investors seek to capture trading profits based on the price moves of oil. Futures contracts can be utilized for this purpose without requiring receipt of the underlying physical asset, so long as the trade is closed before contract expiration. Oil ETFs utilize futures contracts in this way. When the futures contracts held by an oil

- 18 -

ETF approach expiry, the ETF must "roll" its position to a further dated futures contract in order to avoid having to take physical delivery of the oil.

52.    There are four basic components that determine returns for oil ETFs: (i) the change in the spot price and the price of the relevant futures contracts; (ii) the roll yield; (iii) the interest on cash held; and (iv) fees and expenses.  The spot price is the current market price for a barrel of oil, and the spot price return is the change in the spot price from one period to the next.  If the futures contract price increases during the holding period, then the futures contract holder earns a positive return.  But if the contract falls in price, then the futures holder has a negative return.  The roll yield refers to the difference between the futures price return and the spot price return over the same time period.  For example, suppose the spot price for oil is $35 a barrel, and an oil ETF exits a futures contract that is about to expire and enters into a new contract that expires a month from now at $37 a barrel.  The $37 price represents the market's expectation of what the oil spot price will be in 30 days.  But if the spot price of oil remains at $35 in 30 days, the spot price return is 0% because the spot price was $35 at the beginning of the period and $35 at the end of the period.  The ETF that held the futures contract lost $2 on the contract, entering at $37 and exiting at $35 as the futures contract converges on the spot price at expiration.  That equates to a 5.4% loss.  The roll yield is the difference between the 0% spot price return and the (5.4%) futures contract return.  Thus, the roll yield in this example would be (5.4%).

### ~~V.~~    2.            USO

Formatted: Heading 8,  No bullets or numbering, Widow/Orphan control

53.    USO was organized in 2005 and first began offering shares to the public in 2006.  USO is designed to allow investors to gain exposure to fluctuations in the price of oil.  The Fund's purported investment objective is for the daily changes in percentage terms of its per share NAV to reflect the daily changes in percentage terms of the spot price of WTI light, sweet crude oil delivered to Cushing, Oklahoma.  The Fund measures changes in the spot price of oil by reference to the daily

changes in the price of specified short-term WTI futures contracts traded on the New York Mercantile Exchange (the "NYMEX") – which USO dubs the "Benchmark Oil Futures Contract" – plus interest earned on USO's collateral holdings, less USO's expenses. Defendant Love emphasized that USO, unlike other ETFs that the Sponsor offered, was a single commodity fund which was known to invest in "***purely just the front-month future contract in crude***." While the Fund promoted USO as a "cost-effective way to invest directly in crude oil," USO acknowledged that "[c]rude oil prices depend on local, regional and global events or conditions that affect supply and demand for oil," which "correlates closely with general economic growth rates."

54.    The Fund was both the first crude oil-linked EFT in history, as well as the first single-commodity futures ETF. In an October 2015 *etf.com* article entitled, "The 15 Most Important ETFs," Defendant Love emphasized the Fund's status as a proxy for investing in the crude oil market, stating that "[p]rior to USO, if you wanted access to the global crude oil market, you would have to have a futures account or you would have to use an ***imperfect proxy*** like oil stocks." Reflecting on USO's growth and popularity, he explained that simplicity was central to the Fund's growth, explaining that "[w]e thought it'd be a great product. ***It's constructed very simply***, so you always know what's in there. That's one of the things that has helped popularize the ETF." As *The Wall Street Journal* reported on April 22, 2020, funds like USO "are one of the ***easiest ways ordinary investors can own commodities*** since trading futures through a broker is cumbersome." Indeed, a May 2020 article by *etf.com* noted that USO grew "to become the go-to strategy for anyone looking to play the oil market ***as closely to spot oil price performance as possible*** . . . [b]ecause [it] is the only ETF [] that offers access to front-month WTI crude oil futures ***only***."

~~54.~~55.  The Fund's Benchmark Oil Futures Contract refers to the WTI futures contract that is the nearest month contract to expire (*i.e.*, the "front" month), except when the nearest month contract

- 20 -

is within two weeks of expiration, in which case it refers to the futures contract that is the next month contract to expire. Prior to the Class Period, daily changes in the price of the Benchmark Oil Futures Contract historically tracked the daily changes in the spot price of oil. USO states that it seeks to achieve its investment objective by investing so that the average daily percentage change in its NAV over any 30-day period will be within plus or minus 10% of the daily percentage change in the price of the Benchmark Oil Futures Contract over the same period. Until recently, USO's stated investment strategy was to invest substantially all of its assets in front month WTI futures contracts, which were then rolled, in order to closely track the Benchmark Oil Futures Contract. In April 2020, a *Reuters* article explained the inherent danger of incorporating the Benchmark Oil Futures Contract into secondary products aimed at retail investors, such as USO:

> CME has warned *oil futures trading is not suitable for retail investors* and should only be done [by] professionals who understand and can manage the risks, including the challenges posed by physical settlement. "The *small retail investors are somebody that we do not target*. We go for professional participants in our marketplace," CME chief Terry Duffy said in a television interview with CNBC on April 22. The problem is that the WTI futures price has been incorporated as a benchmark into large numbers of secondary products, some *aimed at retail investors*, or at least not restricted to professionals. . . . *CME may not have encouraged retail investors to use WTI, but the contract's benchmark status depends on its popularity with them*, as well as with institutional investors and physical oil sellers.

55. 56. Since its founding and continuing through most of the Class Period, USO held itself out to the market as a passively-managed fund that simply invested all Fund assets into near months WTI futures contracts so as to most closely track the spot price of oil. If USO issued new shares, the Sponsor would invest the cash raised from those share sales in more near months WTI futures contracts, regardless of whether doing so would result in profits or losses for the Fund. No trader at USO attempted to adapt the Fund's investment strategy to market movements. In this way, the Fund was price-insensitive, meaning that the Sponsor would follow its stated investment strategy to buy

- 21 -

front month WTI futures contracts in an effort to track the spot price of crude oil whether or not the Sponsor thought the price for those contracts offered a favorable investment opportunity.

56.57.  The Fund's NAV per share is calculated as the current market value of its total assets, minus any liabilities, and dividing that total by the total number of outstanding shares.  USO publishes its NAV per share daily after 4:00 p.m. Eastern Time on its website, http://www.uscfinvestments.com/uso. As an ETF, the market price for USO shares can reflect either a premium or a discount to the Fund's NAV per share.  However, because the Underwriter Defendants, serving as market makers and authorized participants, can buy new shares or redeem outstanding shares from the Fund, arbitrage opportunities had historically caused daily changes in USO's share price on the NYSE to closely track daily changes in USO's NAV.  This was an important fact for investors, who risked overpaying for USO shares if the market price rose above the NAV per share, a dynamic known as a price "premium."

57.58.  As noted above, many investors, including oil ETFs such as USO, trade futures contracts without any expectation of ever taking or delivering the underlying asset.  Instead, these investors close out their positions prior to contract expiry.  In the case of USO, the Fund historically rolled over its futures contract positions every month by selling its front month WTI futures contracts holdings and then using the proceeds to buy the next month's WTI futures contracts. When the front month WTI futures contract was within two weeks of expiry, USO transitioned its positions to the next month futures contracts over a four trading day period, a sequence it repeated every month.

58.59.  The Fund's efforts to roll its portfolio over every month to the next month futures contract subjected the Fund to market forces known as "backwardation" and "contango."  Contango occurs where nearer month futures contracts trade at a lower price than later dated futures contracts.

- 22 -

In this situation, the value of the near month futures contracts tends to decline as they approach expiration.  Extraordinary market conditions in crude oil markets can also cause a phenomenon known as "super contango," which refers to an abnormally high level of contango.  Conversely, "backwardation" occurs when near month futures contracts trade at a higher price than the next month futures contracts, and as a result the value of the near month futures contracts would tend to rise as they approach expiration.

59.60.  Contango causes ETFs that invest primarily in futures contracts to suffer losses.  That is because automatically rolling cheaper near month futures contracts each month into more expensive next month futures contracts produces negative roll yields.  The value of the near month futures contracts degrades as the contracts approach expiration and converge on the spot price.  These contracts are then sold at this lower price during the roll process and the proceeds are used to purchase more expensive next month futures contracts.  As a result, the ETF will be able to purchase fewer contracts referencing a smaller amount of the underlying commodity, causing the ETF to suffer losses.

### 3.  USCF

61.  USO's sponsor and manager, USCF, was founded in 2005 as a "little upstart" that, according to *etf.com*, would defy odds to go on "to compete with the big ETF providers," following the launch of USO in 2006.  By 2015, USCF remained a small, 10-person company and continued to operate the Fund during the Class Period as a tightly-knit business with approximately 15 employees, mostly located in Walnut Creek, California.  Thus, the day-to-day management of USO – USCF's largest and most profitable fund – including decision-making, market analysis, and risk assessment, was concentrated under the leadership of CEO and President, defendant Love, and a handful of senior executives.  During the extreme market turmoil near the end of the Class Period, market observers recognized the danger of such a small company operating a fund with outsized

- 23 -

futures assets. For example, referencing USO, analyst and advisor Jim Collins cautioned in *Forbes* in April 2020 that "[a]n ETF managed by a tiny company now controls more than $3 billion worth of oil futures contracts." Collins similarly highlighted that "USO's sponsor, USCF—an operation with a $6 million asset base owned by a public company (Concierge Technologies) with a $17 million market capitalization—is managing (among others) a fund in USO with over $4 billion in assets."

62.    Before becoming CEO and President of USCF in 2015, Love had worked as a portfolio manager of USO beginning with its launch in 2006. During the Class Period, Love also served as a registered representative of defendant ALPS – USO's marketing agent and an underwriter for the February Offering and March Offering – which solicited investment and sold USO shares from the offerings on behalf of the Fund, and received incentive fees on USO's assets, including proceeds from the offerings. *Etf.com* reported that, as USCF's "flagship product," USO "was one of the most daring launches in exchange-traded fund history, and catapulted the firm into the dominant position when it came to commodity ETFs."

### 4.    USO's History of Market-distorting Activity

63.    In February 2009, the CFTC launched an investigation into USO for failing to properly report trades that occurred on February 6, 2009, when the Fund "rolled" its futures contracts position from the March to April contracts. According to *The Wall Street Journal*, "the fund's **large position and high trading volume** on its monthly roll day was seen by some market participants and regulators as **distorting oil prices**." As *The Wall Street Journal* separately reported in March 2009, USO had just expanded from a $7 million ETF three years before to $3.8 billion, "controlling nearly a fifth of the most-active oil-futures contracts" – a size that had "**prevented it from tracking the price of oil**." NYMEX, the exchange on which WTI futures trade, said at the time that it contacted the Fund about the size of its position before the roll. The CFTC ultimately concluded that USO's futures broker failed to properly disclose certain trades and that USCF could be liable. On February

- 24 -

13, 2009, USO filed a Form 8-K announcing that it was changing its roll period from one day to four days, which *The Wall Street Journal* reported on February 28, 2009 was "expected to lessen the impact of the roll on oil prices."  In 2011, the CFTC imposed position limits such that no single investor can hold more than 25% of the deliverable supply of a given futures contract.  As would later be revealed, neither the four-day roll period nor the CFTC position limits would prevent similar market-distorting activity that would negatively impact USO shareholders, as the Fund would exceed regulatory limits and was forced to expand the roll period yet again following USO's collapse in 2020.

64.    Similarly, in 2014, the Fund's large position in WTI futures contracts once again caused substantial losses for investors during a period of severe market turmoil.  According to the Bureau of Labor Statistics, between June 2014 and January 2015, oil prices dropped over 50% due to an oversupply of petroleum, weakening demand, and OPEC's decision in November 2014 to not cut production levels despite falling oil prices.  As oil prices fell, USO swelled dramatically in size.  According to a February 9, 2015 article in *VettaFi*, "[o]ver the [ ] trailing six months, USO has seen net inflows of nearly $2.3 billion, an incredible stat, especially considering the fund currently has just over $1 billion in assets under management."  Over the same period, however, "USO ha[d] sank nearly 50%" as the price of oil crashed, with accompanying contango effects during the rolling process exacerbating investor losses.

**B.    USO Suffers Adverse Trends and the Breakdown in Market Fundamentals as a Result of Defendants' Own Market-Distorting Activities**

60.65.  In early 2020, the convergence of the rapid spread of COVID-19 and disputes between major oil-producing countries created turmoil in oil markets.  In early January 2020, the World Health Organization ("WHO") announced the discovery of a new coronavirus strain in China, later dubbed COVID-19.  On January 23, 2020, Chinese authorities placed the 11 million person city

- 25 -

of Wuhan under quarantine in an effort to contain the rapid spread of the virus. A week later, the WHO declared COVID-19 a global public-health emergency, and the next day the United States banned foreign nationals from entering the U.S. if they had travelled to China within the prior two weeks. Shortly thereafter, the U.S. declared COVID-19 a public health emergency. During an Inside ETFs conference held on January 26-29, 2020, in Hollywood, Florida, defendant Love acknowledged in an interview, responding to a question about how much trade effects global demand (including in the oil markets), that COVID-19 became a "big factor in the market" that raised "concern about demand" *in January 2020*. He stated, in pertinent part, as follows:

> just a couple of days after the phase one trade deal is signed [on January 15, 2020] we have the *coronavirus erupt* and . . . and . . . become a *big factor* in the market. So there's some *concern about demand* on that side. I think if we really step back and look at it*, the amount of demand that's going to be impacted*, um, it's, *it's meaningful*, but it's not as big as people are afraid of so I think, right now, um, you know some things are moving today in a positive direction. You'll see some ups and downs. But, you know, the market's pulled back over the last week or so. If commodities markets continue doing that, I think it's going to be a short-lived thing and I think there's a lot of opportunity here that you know, we're potentially looking at a kind of recovery, you know a lot of commodities at low prices, and if they're going even lower right now, there may be some good opps.

66.    By February 2020, COVID-19 had begun to have a significant impact on commodity markets. On February 3, 2020, *Bloomberg* reported that "China Oil Demand Has Plunged 20% Because of the Virus Lockdown," explaining that "Chinese oil demand has dropped by about 3 million barrels a day, or 20% of total consumption, as the coronavirus squeezes the economy, according to people with inside knowledge of the country's energy industry." What was happening in China at the time had an outsized impact on the oil markets given that the country accounted for more than three-quarters of global oil demand growth in 2019. On February 4, 2020, the price of WTI crude fell below $50 per barrel, from more than $58 per barrel just two weeks previously. That same day, *BBC* published an article entitled, "Coronavirus and oil: Why crude has been *hit hard*," noting that the "outbreak is likely to have a particularly *large impact* on demand for jet fuel as

- 26 -

airlines around the world suspend flights to China, and travel restrictions within the country mean far fewer flights." The *BBC* article reported that "[t]he scale of the fall [of crude] has *shocked* the energy industry, according to Chicago-based oil analyst Phil Flynn: '*We have not seen a demand destruction event of this scale that moves this quickly*.'" That same week, *Bloomberg* reported "that China's daily crude consumption had slumped by 20%, the equivalent of the UK and Italy's oil needs combined."

67. By February 9, 2020, the death toll in China had surpassed that of the SARS epidemic in the early 2000s. Between February 12 and 21, 2020, the international expansion of COVID-19 accelerated, with South Korea, Iran and Italy suffering outbreaks. On February 13, 2020, China began turning away oil tankers as the country's lockdown intensified. ~~On February 24, 2020, Reuters~~ As *The Wall Street Journal* reported that same day, the International Energy Agency ("IEA") "slashed its oil demand growth forecast for 2020 by 365,000 barrels a day, *a cut of 30%* to its previous forecast made in January," "blam[ing] a *likely economic slowdown in China*" on "the novel coronavirus outbreak there," and forecasting a quarterly drop in oil of 435,000 barrels a day compared with a year ago, which would "represent the first quarterly drop in demand since the height of the financial crisis."

~~61.~~68. As reported in *The Wall Street Journal* on February 13, 2020, the IEA said that "[t]he consequences of [the virus] for global oil demand *will be significant*," as "there is already a *major slowdown in oil consumption* and the wider economy in China," and "[t]here is little doubt that the virus will have a larger impact on the economy and oil demand than did SARS." Also on February 13, 2020, *S&P Global* reported that "COVID-19 [was] potentially *hitting demand hard in H1 2020*." On February 18, 2020, the U.S. Energy Information Administration ("EIA") revised its global liquid fuels demand growth down by 378,000 barrels per day less than was forecasted just

- 27 -

weeks earlier in January 2020, "*because of the coronavirus*."  On February 24, 2020, *CNBC* reported that oil prices, including crude futures, slid 4% "as the *rapid spread of [the] coronavirus* in several countries outside China left investors concerned about a hit to demand."  ~~On~~Indeed, on February 25, 2020, San Francisco declared a local emergency, with several California counties following suit over the ensuing week.  The United States reported its first death from COVID-19 on February 29, 2020 (though later reports would confirm that an earlier death in fact occurred on February 6, 2020).

~~62.~~69.  Around this time, trading in WTI futures contracts accelerated as investors tried to take advantage of rapidly evolving events in oil markets.  By the end of February, more than one million WTI front month futures contracts were being exchanged daily, nearly double the 550,000 five-year average.  This heightened volume coincided with a period of increased price volatility.  Between February 26, 2020 and March 2, 2020, the 15-day historical price volatility for front month WTI futures contracts jumped from 30% to 44%.  Historical price volatility measures price fluctuations as a percentage deviation from the mean over a period of time.  High volatility indicates increased investment risk.  The jump to 44% 15-day historical price volatility for front month WTI futures contracts therefore represented that these assets were becoming increasingly risky.  Indeed, the price of WTI front month futures contracts fell 16% between February 21, 2020 and February 28, 2020, corresponding with a sharp decline in crude oil prices.

~~63.~~70.  To deal with slumping oil prices, on March 5, 2020, Saudi Arabia and other Organization of the Petroleum Exporting Countries ("OPEC") countries announced a proposal to cut oil output by 1.5 million barrels a day, or about 1.5% of global daily production.  However, for the proposal to work, Russia and other non-OPEC oil exporting countries would also need to agree to limit production.  On March 6, 2020, after a two day meeting in Vienna to attempt to reach a deal,

**Formatted:** Font: Bold, Italic

Russia walked away from negotiations.  Shortly thereafter, Saudi Arabia abruptly switched from a strategy of appeasement to instigating an all-out price war.

64.71.  On March 8, 2020, Saudi Arabia shocked global oil markets by announcing price discounts for its oil exports of $6 to $8 per barrel to its customers in Europe, Asia and the United States.  The move threatened to overwhelm global oil markets with supply even as demand plummeted due to the increasing coronavirus restrictions being pursued by government authorities around the world.  Russia responded in kind, and soon the two countries were flooding global markets with cheap oil as they sought to capitalize on a unique opportunity to potentially put smaller competitors out of business.

65.72.  These dramatic events created significant turmoil in oil markets.  On March 9, 2020, the price of WTI crude oil fell 33% before settling at $31.13 per barrel, a 25% decline and the biggest single-day drop since the 1991 Gulf War.  As would later be revealed, Defendants' own conduct in pursuit of the February Offering in the midst of this market turmoil was significantly to blame.  That same day, the front month to next month contango increased to $0.34, more than double the contango effect present just two trading days before.  Also on March 9, 2020, WTI front month futures contracts volume exploded to over 1.7 million contracts traded, more than 26% greater than the largest single-day trading volume in at least five years.  As would only later be revealed, this unprecedented spike in WTI futures contract trading was caused in large part by USO itself, and Defendants' decision to sell hundreds of millions of new shares in the February Offering.  Substantially all of the billions of dollars in proceeds from the February Offering had been invested in WTI front-month futures contracts, significantly exacerbating market volatility.

73.    Also on March 9, 2020, the IEA's Executive Director, Dr. Fatih Birol, stated that COVID-19's "'*impact on oil markets is particularly severe* because it is stopping people and goods

- 29 -

from moving around, dealing a heavy blow to demand for transport fuels," as reported by the IEA in an article entitled, "Global oil demand to decline in 2020 as *coronavirus weighs heavily on markets*.'"  Dr. Birol continued, "'[t]his is especially true in China, the largest energy consumer in the world, which accounted for more than 80% of global oil demand growth last year.  While the repercussions of the virus are spreading to other parts of the world, what happens in China will have major implications for global energy and oil markets.'"  Accordingly, the IEA revised its predicted global oil demand to 99.9 million barrels per day in 2020, down approximately 90,000 barrels per day from 2019, but cautioned that a "pessimistic low case" would see global demand fall by 730,000 barrels per day.  Dr. Birol clarified that "'[t]he coronavirus crisis is adding to the *uncertainties the global oil industry faces* as it contemplates new investments and business strategies.'"

66.74.  Compounding the threat to USO investors, the oil storage facilities which accepted WTI crude in Cushing, Oklahoma were quickly reaching capacity.  By March 13, 2020, storage rates skyrocketed to about 50 cents per barrel per month, an increase of about 100% over the prior month.  Inventories at Cushing rose by more than 640,000 barrels during the week, and terminal storage clearing houses booked six times their ordinary deal volume.  By mid-March, all tanks housed in Cushing had been leased for storage, and traders and producers scrambled to find alternatives for oil delivery.  This included the drastic step, in certain instances, of booking large crude tankers that provided floating storage.  Again, *USO itself was a primary contributor to the storage crisis* as the Fund ballooned in size, issuing more than 440 million new shares in the month of March alone – nearly five times the number of USO shares outstanding as of December 31, 2019.  Because USO plowed the proceeds from Defendants' share sales into WTI front month futures contracts without any intention to actually take delivery of the referenced oil barrels, the market experienced a USO-

- 30 -

induced surge in demand for WTI futures contracts without a commensurate increase in interest for oil delivery, further distorting market dynamics.

67.75.  Meanwhile, the pandemic continued unabated.  On March 8, 2020, Italy placed all 60 million of its residents on lockdown.  On March 11, 2020, the WHO declared the outbreak a pandemic, the United States banned all travel from 26 European countries, and President Trump declared a national emergency.  By March 18, 2020, WTI crude oil fell below $21 per barrel, an *8-year low* and less than half the price just two weeks previously.  On March 20, 2020, the Governor of New York announced a stay-at-home order just hours after the Governor of California ordered a similar shelter-in-place order.  The virus had infected more than 300,000 people and caused about 13,000 deaths as of March 22, 2020.  By March 23, 2020, New York City had confirmed 21,000 cases, making it the epicenter of the outbreak in the United States.  The price of oil fell in tandem with the continued drop in demand and increase in supply. By March 18, 2020, WTI crude oil fell below $21 per barrel, an 18-year low and less than half the price just two weeks previously.

76.    On March 19, 2020, Stephen Schork, president of the energy consultancy Schork Group Inc., described the crisis that was playing out at the time to *Bloomberg* as "'***Operation Desert Storm, Enron, 9/11, Hurricane Katrina/Rita, Lehman Bros, combined*** . . . And we are waking up to this combo every single day.'"  Noting that prices had already plunged 60% in 2020 to the lowest level since 2003 in what it described as "***one of the biggest oil crashes in history***," *Bloomberg* said that oil traders and analysts expected that the "***worst is yet to come***," with some "even speculating certain regional prices could go negative."  Such concerns were validated when, on April 3, 2020, the CME Group Inc. ("CME" or "CME GROUP"),[6] which runs the NYMEX exchange on which

---

[6]    While the CME Group Inc. operates certain derivative exchanges, including NYMEX and the Chicago Mercantile Exchange (also referred to as the CME), USO references "CME" generally in its

WTI futures trade, announced to its CME Globex and Market Data customers that futures and options, including crude oil, "'will be flagged as eligible to trade at negative prices.'"

77.    By March 22, 2020, the Chief Energy Officer Ramanan Krishnamoorti, reported in *Forbes* on behalf of the University of Houston Energy Fellows that "*[t]he price of crude has dropped to levels that we have not seen in a generation*" due to Russia and Saudi Arabia increasing production and the impact from COVID-19, which had been "vastly underestimated." By this time, IHS Markit (acquired by S&P Global, owner of the S&P Dow Jones Indices join ventures with CME Group, in 2022) predicted that gasoline consumption in the U.S. "will drop by *55%* for March and April due to COVID-19." That would mean that U.S. demand would drop from 20.5 million barrels of crude oil per day in 2019 to 12.5 million barrels per day – "a whopping 8 million barrels per day of crude oil, or *8% of global crude production!*" Anticipating that "world demand for crude oil is probably down . . . more than 10% from last year's average consumption and production," Krishnamoorti said that "[t]he additional amount of crude being added into the market by Saudi Arabia and Russia will exaggerate this oversupply." As described by *Bloomberg* on March 30, 2020, "the physical market is facing a *larger-scale breakdown* as the coronavirus outbreak hits demand and Saudi Arabia and Russia vie over market share," which coincided with "a measure of the volatility of [USO] skyrocket[ing] above 190% earlier this month" as the Fund's "value dropped almost 50% over the last three weeks."

68.78.   Defendants, as the creators, issuers, underwriters and operators of the largest oil-related ETF in existence and active market-making players in the commodities and futures markets that determined the Fund's performance, possessed insider knowledge about the negative

---

SEC filings, discussed *infra*, though likely referring to the parent company and not the exchange that it operates.

consequences and existential threats facing the Fund as a result of these converging adverse events as they unfolded.  The complex interplay of storage markets, spot markets, futures markets, and oil ETF activity impacted the Fund's performance, and Defendants – as direct players and outsized contributors to the market volatility impacting the relevant markets that existed during the Class Period – possessed a unique vantage point and understanding of the adverse trends and breakdown in market fundamentals that the Fund was then experiencing, as detailed herein.  In particular, Defendants possessed material inside information about how their *own* activities in managing the Fund and in conducting the February Offering and the March Offering were contributing to the risks faced by USO investors and the adverse events, trends and uncertainties impacting the Fund.

69.79.  These negative facts and their complex, compounding effects were only revealed later, *after* investors had suffered billions of dollars in losses.  The general investing public simply did not have access to the proprietary market data, non-public modelling capabilities, or the exacerbating effects of Defendants' own conduct in running USO sufficient to apprise them of the true risks facing the Fund and the tremendous destruction in investor capital that was then occurringtaking place behind the scenes.  USO reached a critical breaking point by March 9, 2020, as the flood of new USO shares from the February Offering converged with the launchan oversupply of the Saudi/Russia oil price war and the growing market turmoil caused by the COVID-19 pandemic.  Unaware of how Defendant's own actions in flooding the market with new USO shares had undermined the Fund's investment strategy and objective, investors poured into USO believing they were buying a temporary dip in oil prices.in the hopes of gaining exposure to low-priced oil. For example, on March 9, 2020, USO experienced daily trading volume of over *154 million* shares traded, more than five times greater than the five-year historical daily average and 40% greater than the prior single-day volume peak in USO trading over the preceding five years.

- 33 -

80.    As *etf.com* reported on April 2, 2020, there had already been an "[u]nprecedented [g]lut" of oil that had been roiling the market for weeks and contributing to a rapidly growing oil storage crisis:

> Falling demand and rising supply is never a good recipe for oil, but ***the current level of oversupply is unheard of***.  As economies around the world come to a standstill, demand in April may plummet by 15 to 22 million barrels per day, according to a survey of analysts by Bloomberg.

> Meanwhile, supply could increase by 2 to 3 million barrels per day—most of it from Saudi Arabia—as the Kingdom follows through on its threat to pump full throttle.

> For context, during the worst quarter of the financial crisis 11 years ago, demand fell by 2.5 million barrels per day; and that was while OPEC trimmed output by 4.2 million barrels per day to support the market.

> The current situation, where demand is falling by many multiples of what it did during the Great Recession, at the same time that supply is surging, ***simply has no parallels***.  In fact, the glut is so great that some analysts are suggesting that all available storage capacity could be filled up, leaving nowhere for excess crude oil to be stored.

> If that happens, prices could fall even more precipitously—into the teens, below $10, and even zero are values that have been thrown around.

70.81.  Despite the existential threats facing the Fund and Defendants' obligations to provide full and accurate disclosures to investors, Defendants conducted the February Offering and the March Offering as if nothing had changed from prior offerings, simply copying and pasting boilerplate risk warnings from past registration statements without any mention of the radically altered risk profile of the Fund, the inability of the Fund to pursue its stated investment objective, or the hundreds of millions of dollars in losses being suffered by USO investors.

> 1.    **Defendants Rapidly Inflate USO Through the February and March Offerings, Attracting Droves of Retail Investors**

71.82.  During the Class Period, Defendants took advantage of investor interest in gaining exposure to low-cost oil and ignorance of the true risks and market distortions impacting the Fund to conduct massive capital raises.  In the February Offering alone, launched on February 25, 2020,

- 34 -

Defendants offered and sold 400 million USO shares.  This represented more than *4.4 times* all USO shares outstanding as of December 31, 2019.  Less than one month later, on March 23, 2020, Defendants took their share sale activities to even greater heights, offering and ultimately selling *1 billion* USO shares to investors in the March Offering.  All told, through these two offerings, Defendants increased the number of USO shares issued and outstanding over year-end 2019 by *more than 1,500%*.  This rapid inflow of investor capital as a result of Defendants' offerings occurred at the absolute worst moment for USO investors, dramatically accelerating risks, losses and market distortions as a result of the already precarious environment that existed at the time for oil-related securities and fatally undermining the stated investment strategy and objective of the Fund.

72.83.  Almost immediately following the launch of the February Offering, Defendants' efforts to flood the market with new USO shares began exhibiting market-distorting effects.  Daily trading volume in front month WTI futures contracts spiked 16% on February 26, 2020, the day after Defendants launched the February Offering, while trading in USO increased by 19%.  By February 27, 2020, WTI front month daily trading volume increased to over 1 million contracts traded, almost double the five-year average.  Then, on March 9, 2020 – the first trading day following the launch of the Saudi/Russia oil price war – trading in WTI futures contracts exploded to record heights, reaching over 1.7 million contracts traded, more than 26% above the previous trading peak in the last five years, as reflected in the following chart:

- 35 -





73.84.  This spike was being driven in large part by USO.  For example, also on March 9, 2020, trading in USO reached unprecedented levels of more than 154 million shares traded, a staggering 40% above the prior five-year peak.  Trading in USO shares would soon eclipse this record on March 18, 2020 when volume reached over *190 million shares traded*, as reflected in the following chart:

- 36 -



74.85.  The February Offering precipitated an incredible growth in USO shares outstanding, a trend accelerated shortly thereafter by the March Offering.  Between February 25, 2020 – the launch of the February Offering – and March 12, 2020, the number of USO shares issued and outstanding increased from 141.3 million shares to more than 242.5 million shares, a 72% increase in just two weeks.  Within three trading days, Defendants issued and sold another 45 million USO shares.  A day later, 49 million more shares.  Nearly 60 million more shares the day after that.  In total, between the launch of the February Offering and the launch of the March Offering, Defendants issued and sold over 298 million shares.  In the month of March alone, Defendants sold a staggering *440 million* more USO shares to the investing public than they redeemed, worth more than *$2.2 billion*.  From the launch of the February Offering until the SEC blocked USO from issuing any additional shares in April 2020, Defendants issued and sold *1.4 billion* new USO shares, significantly increasing the number of USO shares outstanding as reflected in the following chart:



USO Shares Outstanding (Millions)

86.    Throughout March 2020, daily trading in USO averaged more than $250 million per day. ~~On several days during the Class Period, more than *half a billion dollars' worth* of USO shares exchanged hands.  Much of the investor inflow~~As *Bloomberg* reported on March 30, 2020, "[a]bout *$1.8 billion* flowed into USO over the last three weeks, marking the biggest consecutive weekly inflows on record."  On several days during the Class Period, more than *half a billion dollars' worth* of USO shares exchanged hands.  For example, on April 13, 2020, USO experienced its second-largest inflows in its history, and by the end of the week saw inflows of approximately *$1.5 billion*.  On April 16, 17, and 20, 2020, USO experienced single-day record inflows, with each day surpassing the prior day's newly-established record.  By April 16, 2020, USO held 148,264 June 2020 WTI crude oil NYMEX contracts – approximately *28%* of the total open interest for that contract.  *Etf.com* reported on April 17, 2020, that "[s]ince March 1, a whopping *$3.4 billion* of new net cash has entered the fund, with $725 million flowing in just this week alone."  Then, the outlet

reported on April 21, 2020, not counting inflows from the day before, that ***$4.3 billion*** in new net cash poured into the Fund since March 9, 2020, and that it "appeared likely to run out of shares very quickly" given "[t]he pace of inflows being what they were" (*e.g.*, $564 million on April 17 alone).

87.    Even as the Chairman and CEO of the CME Group (which operates NYMEX, upon which WTI futures trade), Terry Duffy, cautioned that "[t]he ***small retail investors are somebody that we do not target***," much of the investor inflow into USO came from retail investors with online brokerage accounts which provided easy access to buying and selling securities.  Indeed, despite Duffy's contention, *Bloomberg* reported on May 20, 2020, that USO – a secondary product which had historically "invest[ed] substantially the entire amount of its assets in Oil Futures Contracts" (according to USO) – was "arguably ***built for just such ordinary investors***: A low-fee, tax-efficient way to gain access to markets historically out of reach."  In fact, it was widely reported at the time that the record inflows the Fund attracted during the Class Period came from ***unsophisticated*** investors described as "mom and pop," "retail," "millennial," "young," and "less sophisticated" – who were unlikely to have understood the risks associated with an investment in USO during a period marked by extreme market turmoil.

~~75.~~88.  For example, by late February, *Robintrack.net*, which tracks the number of users holding assets on the Robinhood online trading platform, had only about 8,000 user accounts holding USO.  By the end of the Class Period, on April 28, 2020, those user accounts had ballooned to more than 220,000, an increase of over ***2,600%***.  On several days during the Class Period, USO was the most purchased security on Robinhood, and by April 2020, the Fund was among the top 30 most-held names on the platform.  Similarly, on April 21 and 22, 2020, USO was "'by far' the highest-volume security" traded on SoFI Invest – another trading platform used mostly by traders under 40.

- 39 -

76.89.  As a result of these record daily inflows made possible by the February Offering and the March Offering, USO exhausted its inventory of shares on April 21, 2020, forcing it to announce in a current report on Form 8-K that it had sold all of its shares and therefore was suspending new creations of shares.  The following chart illustrates the incredible flow of investor money into USO during the Class Period:

**U.S. Oil Fund daily flows**

V. 2.     **USO Corners and Distorts the Market in WTI Near Months Futures Contracts**

> Formatted: Heading 8,  No bullets or numbering
>
> Formatted: Heading 8 Char

77.90.  Class Period USO share issuances allowed Defendants to raise billions of dollars in offering proceeds from investors, a substantial portion of which they used to line their own pockets and profit from the widening spread between USO's NAV per share and market price.  For example, in the first half of 2020 alone, the USO Defendants garnered almost the same amount of management fees that they had generated during the *entirety* of 2019.  Virtually all of the remaining

offering proceeds were concentrated into a single asset: WTI near months futures contracts.  USO quickly came to dominate and distort the market for WTI near months futures contracts, ultimately causing acute illiquidity in these markets and a breakdown in market fundamentals.  For example, by mid-March 2020, USO is estimated to have controlled a staggering ***15% of the entire market*** for WTI near months futures contracts.  This unhealthy market dominance grew to more than ***one third*** of the market by mid-April, a position one market observer characterized as "***a ridiculous amount of holding for one fund***," as the growing proceeds from the February Offering and the March Offering were continuously plowed into buying up even more WTI near months futures contracts.  As summarized by *Bloomberg*, USO grew "to be a dominant player in the market for crude futures" as it "attracted legions of mom-and-pop investors who saw it as an easy and simple way to wager on oil." This massive position by a single entity in near months WTI futures catalyzed significant illiquidity, contributing to market distortions, structural deficiencies and increased costs to trade the Fund as detailed in ¶¶87-106102-121.

91.    USO's rapidly escalating dominance in the market for WTI near months futures is reflected in the following chart:

- 41 -



79.92. At the same time that USO was cornering the market in WTI near months futures contracts, available storage for incoming barrels of oil was quickly filling up in Cushing, Oklahoma. During the week of March 13, 2020 – around the time that USO's market position tripled to over 15% of the entire WTI near months futures market – storage costs reached 50 cents per barrel per month, an increase of about 100% over the prior month. Inventories at Cushing rose more than 640,000 barrels during the week, and terminal storage clearing houses booked six times their ordinary deal volume. By mid-March, all tanks housed in Cushing had been leased for storage, and traders and producers scrambled to find alternatives for oil delivery. USO played a direct role in

precipitating the storage crisis because the Fund was purchasing an ever-increasing proportion of outstanding WTI futures contracts without any intention of ever actually taking possession of the referenced barrels.

80.93.  USO's disproportionate impact on the markets for WTI futures also led to heightened price volatility and thus dramatically increased the risk of potential loss for investors.  For example, the historical 15-day price volatility of WTI front month contracts rose to historic highs during the Class Period.  On February 25, 2020 – the launch of the February Offering – 15-day WTI front month volatility stood at 31%, slightly above the historical average.  By March 19, 2020 – the date the Form S-3 registration statement was filed for the March Offering – historical volatility had risen to an incredible *210%*.  By comparison, the largest 15-day volatility peak in the prior two years topped out at only 74%, indicating a nearly three-fold increase over prior highs.  This unrivaled increase in volatility was attributable to wild swings in WTI futures prices as a result of USO's increasingly prominent role in the market.  For example, on a single day – March 9, 2020 – WTI front month prices crashed 25%.  As noted above, both the WTI and USO were also experiencing historically high single day trading volume on that date.  In addition, this one-day crash occurred during the precise period when USO was rolling over its April WTI contracts into May WTI contracts, thereby adding billions of dollars' worth of selling pressure to an already distressed WTI front month futures market environment.

81.94.  The following chart illustrates the unprecedented spike in WTI front month futures volatility, which occurred at the precise time that the Fund was growing in size because of the February Offering and the March Offering and *as a direct result of* those offerings:

- 43 -



95.    Moreover, on March 27, 2020, the U.S. Energy Information Administration ("EIA") reported that "*[o]il market volatility is at an all-time high*," explaining that with falling demand due to COVID-19 and a sudden increase in the crude oil supply, daily price changes of WTI crude oil "have been extremely volatile." Specifically, the EIA said that OVX, which measures the implied volatility of oil prices and is calculated using movements in the prices of financial options for WTI, reached 190 *on March 20, 2020*, "*the highest value since its inception in May 2007*." The EIA also said that a secondary and broader index of implied volatility, VIX, which measures the implied volatility of the S&P 500, similarly measured 82.7 on March 16, 2020, "a level *higher than any point during the financial crisis of 2008-09*." For example, according to the EIA report, WTI crude oil futures price volatility was so high in the run-up to the March Offering that price declines on March 9 and March 18 were the *largest single-day declines since at least 1999*, both of which were at least twice as large as the largest single-day decrease during the 2008-09 financial crisis, as follows:

- 44 -

Since 1999, daily WTI crude oil futures prices have settled within 2% of the previous trading day's price about 70% of the time. Nearly all (99.5%) of the daily WTI price changes since 1999 have settled within 10% of the previous day's price; larger price changes are relatively rare. ***March 2020 has had four days where WTI prices decreased by more than 10%*** and two days where WTI prices increased by more than 10%.

The 25% decline on March 9 and the 24% decline on March 18 were the ***two largest percentage declines in the WTI futures price since at least 1999***. On the days following those declines, WTI prices rose by 10% (March 10) and 24% (March 19), likely in response to announced plans from various countries' governments that emergency fiscal and monetary policy would be forthcoming.



**Frequency of West Texas Intermediate (WTI) futures daily price percentage changes (January 1999 - March 2020)**

**Source:** U.S. Energy Information Administration, based on data from Bloomberg, L.P.

Other highly volatile time periods, such as the 2008–09 financial crisis, also produced large price increases and decreases in quick succession. The largest single-day increase during the 2008–09 financial crisis—an 18% rise on September 22, 2008—was followed by the largest single-day decrease, a 12% fall on September 23.

82.96.  In addition to dramatically increasing market volatility, USO also played a significant role in driving down the price for WTI front month futures contracts. Specifically, as the Fund acquired larger and larger positions, its incessant and price-insensitive transactions in WTI futures contacts became a dominant force in setting market prices. This effect was particularly notable around the times that USO "rolled" into the next month futures contract, typically over a four trading day period which ended approximately one week before expiry. For example, USO rolled from the

- 45 -

April WTI contract into the May WTI contract over a four trading day period from March 6, 2020 to March 11, 2020. During this time, the price of the April WTI contract plummeted, from $45.90 the day before the roll began to $31.50 the day after the roll ended – a 31% price decline. Similarly, from April 7, 2020 to April 13, 2020 (four trading days), USO rolled from the May WTI contract into the June WTI contract. During this time, the price of the May WTI contract fell sharply, from $26.08 the day before the roll began to $20.11 the day after the roll ended – a 23% price decline. Thus, USO investors suffered massive losses as the Fund drove down the price of its only substantial asset. _These losses were further exacerbated by the super contango effects present at the time (described in detail in ¶¶88-95103-110), as USO rolled into more expensive next month contracts, selling billions of dollars' worth of front month WTI contracts low and buying the next month's WTI contracts high.

83.97.  The intense selling pressure caused by USO during the roll period, in which it sold billions of dollars' worth of front month futures contracts regardless of price, was also a catalyst for the extraordinary market events occurring in mid-April 2020. During its April roll, USO sold approximately *$3.8 billion* worth of front month futures contracts in just four trading days. Interest and liquidity in the May WTI futures contracts, previously buoyed by USO's rapacious demand, abruptly plummeted, causing bid and ask spreads to widen. Within days, regulators intervened to limit the Fund's market-distorting positions. Shortly thereafter, oil prices entered a period of unparalleled freefall. On April 20, 2020 (the day before the May WTI contract expiry), for the first time ever WTI front month futures contracts fell to a *negative* price. As the market was flush with billions of dollars' worth of expiring futures contracts but practically no available storage space and few willing to assume delivery, the contracts plunged to an astounding *($37.63)*. In effect, oil had become temporarily less than worthless because of the massive logistical complications and cost of

finding adequate storage precipitated in substantial part because of USO's rolling of its massive

positions.  As described by market observers at the time:

> U.S. crude oil futures plunged to -$37.63 a barrel on April 20, the first time in history the contract traded in negative territory.  ***Exchange-traded products like USO, along with other investors, were caught holding positions that would have required them to take delivery of crude barrels with few places to put it, leading to a panicked sell-off***.

~~84.~~98.  Similarly, on April 21, 2020, Michael O'Rourke, the Chief Market Strategist of

JonesTrading, summarized USO's causal involvement in driving oil prices into negative territory:

> ***The most remarkable aspect of this episode is that the speculators at the heart of this dislocation are the retail public as they sought to wager on oil prices through the USO ETF.***  Although retail is not directly responsible for yesterday's negative prices, they represent a remarkably outsized group of speculative longs who have no capability to take physical delivery.

> 99.    Additionally, as *etf.com* made abundantly clear, "[b]ecause of the fund size and

number of futures contracts it purchased, ***[USO] actually worsened the 2020 crash***."  Analyst Jim

Collins echoed this sentiment on April 20, 2020, rejecting the argument that USO's rolling out of the

May contract absolved it from any responsibility for the extreme market volatility underpinning

"'oil's plunge'" to negative territory and "the ***extreme distortions*** in the commodities futures curve

***caused by ETFs like USO***," writing in *Forbes* that:

> ***The culprit here is obvious.  The United States Oil ETF, USO.***  While USO's website notes that, as it does every month, the fund rolled out of its position in the front-month (May) contracts last week, ***USO's simultaneous creation of new positions in the June and July contracts added to the glut of "paper oil" that is causing this oil market spasm***.

> \*        \*        \*

> ***The solution here is for USO's fund administrators to dissolve it***, as happened with XIV. Those administrators made a minute change in the fund's composition last week—shifting holdings to the second- and third-month contracts instead of fully rolling over from the front-month contract to the second-month contract two weeks prior to expiration——but that was merely the proverbial shifting of the deck chairs on the Titanic.  ***USO has outlived its usefulness, if it ever had any***.

Formatted: Font: Not Bold, Not Italic

The sad thing about the trend toward ETFs is the human economic toll that can be caused by exaggerated price swings. The U.S. oil rig count fell by 11%—the largest weekly decrease in recent memory—in last week's Baker Hughes count. None of my oil patch contacts is telling me this morning that this is the bottom, either. Roughnecks and rig workers are losing their jobs so that USCF, Bank of New York, and the fund's distributor, *ALPS, can earn their fees on USO*.

*       *       *

There will be a day when arbitrageurs look at the act of renting a VLCC oil tanker solely to serve as an oversized storage closet as an act of folly. *Thanks to USO and the enormous amount of contango* (intermediate-term contracts are worth much more than near-term ones) in the oil futures curve *caused by the implosion of USO*, today is not that day.

100. The following chart illustrates the dramatic decline in the price of WTI front month futures contracts, which again correlates with the incredible growth and market dominance of USO and the Fund's efforts to roll billions of dollars' worth of WTI front month futures contracts in just four trading days:

- 48 -





86.101.Oil had never fallen so low in history, even in the face of past calamities and market shocks.  The following chart places the unprecedented collapse of WTI crude prices in mid-April 2020 in the context of historical prices and past significant events affecting those prices:



WTI crude, adjusted for inflation, plotted weekly · Source: Refinitiv · By The New York Times

### ~~V.~~ 3.        USO Suffers Structural Defects and Exacerbates a Breakdown in Market Fundamentals

Formatted: Heading 8, No bullets or numbering

~~87.~~102. As Defendants grew USO by billions of dollars and increasingly dominated the WTI near months futures markets, their actions resulted in other notable structural defects in the Fund and exacerbated the breakdown of important market fundamentals impacting the Fund's performance. In addition to precipitating the unprecedented collapse of WTI front month futures prices to below zero in mid-April 2020, during the Class Period USO also suffered from: (i) heightened detrimental contango effects and a rare super contango market dynamic; (ii) the extreme divergence of the price of USO shares from its per share NAV; and (iii) tracking failures that undermined the Fund's stated investment strategy and objective. None of these adverse events, their root causes or their ongoing negative impacts to the Fund were appropriately disclosed by Defendants to investors.

~~88.~~103. One consequence of USO's impact in driving down WTI front month futures contract prices during the Class Period was to increase the contango dynamic between front month and later

- 51 -

month WTI futures contracts. A contango dynamic exists when the expected spot price of a commodity and thus front month futures contracts referencing that commodity are priced lower than later dated futures contracts. As the front month contract approaches expiry, its price will tend to converge with the spot price, and thus decline. This results in a negative roll yield, and thus investment losses, when investors switch the front month contract to later dated contracts. When investors sell lower priced front month contracts and buy more expensive later dated contracts they will be able to buy fewer contracts, thereby incurring investment losses.

89.104. As USOUSO's offering materials acknowledged, "a prolonged period of contango could have a significant negative impact on USO's per share NAV and total return and investors could lose part or all of their investment." However, Defendants failed to timely disclose the extreme contango environment then impacting the Fund and, more importantly, ***Defendants' own role*** in exacerbating that contango dynamic during the Class Period, including by flooding the market with billions of dollars in front month WTI futures demand untethered to any interest or ability to take physical delivery. To the contrary, Defendants falsely reassured investors in connection with the February Offering and the March Offering that "[p]eriods of contango . . . do ***not*** materially impact USO's investment objective."

90.105. In mid-January 2020, the crude oil market flipped back into contango following a period of backwardation that began in August 2019. By the start of the February Offering, contango effects were relatively modest at just $0.16 per barrel between the front month and next month WTI futures contracts. However, by the time USO filed the Form S-3 registration statement for the March Offering on March 19, 2020, this contango dynamic had risen to $0.69, significantly above the preceding five-year historical average of $0.35. By the launch of the March Offering, on March 23, 2020, contango had jumped to $2.12, roughly 6.7 times the five-year historical average. Two

- 52 -

days later contango exceeded the prior five-year peak.  Three trading days after that it soared to $4.00.  When USO began its April roll period on April 7, 2020 – interjecting billions of dollars' worth of selling pressure into the market – contango jumped again to $5.06.  The day after the roll period ended, contango stood at a staggering *$7.29, more than two-and-a-half times the prior five-year peak*.

106. The following chart illustrates this dramatic increase in the contango spread between the front month and next month WTI futures contracts, which signaled unprecedented distortion in the WTI near months futures markets:





92.107.A week after USO's April roll ended, contango reached wholly unprecedented levels, growing to **$58.06**.  This represented more than *22 times* the size of the prior contango peak in the five-year period before March 2020, an aberration resulting from another breakdown in market fundamentals impacting the Fund during the Class Period and attributable to Defendants' own efforts to dramatically grow the size of the Fund.  The following chart illustrates the extreme contango spread between the front month and next month WTI futures contracts that occurred shortly after USO's April roll ended:





93.108.The contango between the front month WTI contracts and the twelfth month WTI contracts was even more extreme.  Notably, the USO Defendants often highlighted the relationship between these two contracts in their representations to investors.  As of the date of the February Offering, February 25, 2020, the two contracts were in a backwardation relationship, with the front month contract trading $0.11 above the twelfth month contract, as reflected below:





94.109.But in the lead up to the March Offering, the relationship between the front month WTI contract and the twelfth month contract significantly deteriorated. By the launch of the offering on March 23, 2020, the super contango dynamic had risen to *$9.97*, a startling level, as reflected in the following chart:





95.110.After the extraordinary events of April 21, 2020, *The Wall Street Journal* observed that the growth in trading by USO had directly contributed to the WTI volatility, super contango effects and negative roll yields "punishing investors."  The article stated in pertinent part as follows:

> ***The wagers are also contributing to oil's volatility because the U.S. Oil Fund normally holds futures contracts for oil to be delivered soon.***  After recent inflows, the ETF holds a large percentage of the total near-dated contracts.  When that contract is close to expiring each month, the fund must "roll" it to the next month's contract by selling the near-dated futures contract and buying the new one.  This process prevents holders from being stuck holding actual barrels of oil.  Typically, those contracts trade near each other, making the process relatively orderly.
>
> With consumers unable to take advantage of low fuel prices, large gaps are emerging between prices for oil delivered soon and oil arriving months in the future.  ***That forces the ETF to sell futures at the lower price and buy them for more, punishing investors.***

*     *     *

- 59 -

*The U.S. Oil Fund finished rolling its May crude contracts to June during the week ended April 13, a process that traders said resulted in heavy selling and helped set the table for this week's chaos.* Even if the rolling process doesn't immediately drive down crude prices, the large number of transactions involved can contribute to additional price swings.

96.111.In addition to the extreme super contango dynamic, USO also began to suffer from an increasing disconnect between its per share NAV and market price in the lead up to the March Offering. This created a costly price premium for investors purchasing USO shares. It also stood in direct contrast to Defendants' Class Period representations to investors that "arbitrage opportunities result in the price of the shares traded on the NYSE Arca *closely track[]* the NAV of USO." The veracity and completeness of these representations were materially important to investors because if the market price of USO shares exceeded the NAV price, USO investors would be effectively paying more for the shares than they were worth.

97.112.As early as March 2, 2020, USO shares were already trading at a 1.42% premium over NAV – significantly greater than the five-year historical average of (.0018%). As investors continued pouring into USO (as reflected in the abnormal trading volume and Defendants' share issuances as discussed above), this premium quickly exceeded all precedent. By March 13, 2020, USO closed at a 4.63% premium to NAV, 59 basis points above the highest premium recorded during the prior five years. By March 18, 2020 – the day before USO filed the Form S-3 registration statement for the March Offering – it had jumped to *9.14%*, representing an extreme divergence from historical norms that indicated severe structural deficiencies had arisen in the Fund. This was analogous to USO investors paying $10.91 for a $10 bill. The following chart illustrates the growing disconnect between the price of USO shares and per share NAV in the lead up to the March Offering:

- 60 -





98.113.In the week following USO's April roll period, this extreme divergence further deteriorated. On April 16, 2020, USO announced that it had been forced to change its investment strategy to deal with what it described as "market conditions and regulatory conditions." However, as detailed herein, Defendants' own behaviors and the Fund's market-distorting effects were themselves significant catalysts for the market environment and regulatory actions impacting the Fund at the time.

99.114.Two trading days later, on April 20, 2020, USO filed a Form S-3 registration statement seeking to register an additional four billion shares. However, this plan was thwarted by the SEC, who refused to declare the registration statement effective. As a result, USO was unable to issue any new shares. On April 21, 2020, the market price premium for USO shares skyrocketed to *36.46%* as investors traded more than one billion USO shares in a single day.

~~100.~~115.        The following chart illustrates this extraordinary divergence between the price

for USO shares and their underlying value:



~~101.~~116.        The widening price premium for USO shares caused investors to suffer

massive losses.  On April 21, 2020, Mike Venuto, the CEO of Toroso Asset Management, reflected

on the prior day's price premium for USO shares, observing that ***"[n]ot only is this one of the most***

***dangerous ETFs in the world, but you're paying 8% more to gain access to it."*** This comment was

notably made ***before*** the price premium more than quadrupled to over 36% later that same day.

Similarly, Bart Melek, head of commodity strategy at Toronto Dominion Bank, wrote in a research

note: "The more positive supply outlook, along with a spot price at lows not seen in decades, may

have lured many into the market. ~~...~~. . . Of course, the underlying ETF holdings consist of futures

contracts which are required to be rolled, and thereby to incur the steep cost associated with the

- 63 -

extreme contango." Hayman Capital Management Chief Information Officer Kyle Bass was more blunt, stating that "[r]etail investors" were getting "*fleeced*" by "plowing into these oil contracts thinking they're buying spot crude oil when they're buying the next front month. So they're paying $22 a barrel when the spot market's negative $38." By contrast, the USO Defendants continued to reap outsized rewards as a result of the rapid growth of the Fund, and the Underwriter Defendants profited handsomely from the existing price premium, as they purchased billions of dollars' worth of new USO shares from the USO Defendants at the lower NAV price, then sold those shares directly to Class members at the higher market price and pocketed the difference.

102.117.    Not only did USO suffer from unprecedented volatility in the WTI futures markets, wealth-destroying contango dynamics and a widening price premium, but even the most fundamental aspects of the Fund began to exhibit problematic distortions during the Class Period. As Defendants stated to investors, USO invested virtually all of its assets in WTI near months futures contracts that closely tracked crude oil prices, which determined USO's daily NAV per share. In turn, according to Defendants, the market price for USO "closely track[ed]" this NAV, meaning that percentage daily changes in the price of USO shares, USO's NAV per share, WTI near months futures contracts and spot prices should move almost perfectly in tandem.

103.118.    But on several days during the Class Period, these metrics diverged, sometimes shockingly so. For example, on March 13, 2020, the price of USO shares increased more than 6% even as the Fund's NAV per share and the May WTI futures contracts held by the Fund increased less than 1%. Similarly, on March 23, 2020, the Fund's NAV per share and the price of May WTI futures contracts grew 3%, but the price of USO shares *declined* over 1%.

104.119.    These divergences would grow even more significant after the Fund was forced by regulatory authorities to overhaul its investment strategy beginning on April 17, 2020.

- 64 -

Three trading days later, on April 22, 2020, the price of USO shares declined 11%, even as the June WTI futures contracts held by the Fund *increased* 19%. Notably, the Fund's NAV per share also underperformed that day, increasing only 12%. In subsequent days, the Fund's divergence from its stated investment objective continued to increase, as the USO Defendants implemented a rapid-fire array of investment overhauls in an attempt to keep the Fund from imploding and in a vain effort to stave off regulatory scrutiny. Indeed, on four days in April 2020, USO's NAV per share diverged *more than 10%* from its benchmark. Similarly, in May 2020, the price of WTI front month futures contracts rallied more than 88%, while the price of USO shares rose only about 35%.

105.120.    The following chart illustrates the sharp divergence in USO's total monthly return versus its benchmark that began during the Class Period and how this compared to prior periods:



**Formatted:** Normal, Justified, Level 2, Line spacing: Double, No widow/orphan control

106.121.    As market commentators, including *Barron's* senior investment reporter Daren Fonda, observed, the need for USO to implement these investment changes and the other extraordinary events detailed herein indicated "structural problems" with the Fund. Defendants, as the creators, issuers, underwriters and operators of the largest oil-related ETF in existence and active

market-making players in the commodities and futures markets that determined the Fund's performance, possessed unique insider knowledge about these structural deficiencies. As ~~NewsMax Finance~~Reuters wrote in an April 29, 2020 article, it would be **"several weeks" after "the end of March"** "before the market fully grasped the outsize role [USO] would play in this month's unprecedented collapse in the price of front-month oil contracts." By then, it was too late for USO investors who had suffered billions of dollars in losses.

### ~~V.~~ 4.        USO Investors Suffer Catastrophic Losses

~~107.~~122.        USO investors suffered massive losses as a result of the undisclosed defects and adverse events impacting the Fund during the Class Period. In February 2020 alone, the Fund suffered investment losses of more than $200 million~~,~~ ($205 million in investment losses, including a loss of $225 million on the value of the futures it held), largely as a result of the precipitous price declines in WTI futures at the end of the month around the time of the February Offering. For March 2020, USO's investment losses ballooned six-fold to $1.2 billion. During April 2020, USO's monthly losses jumped again to **more than $2.6 billion**. By comparison, during its fiscal year 2019, USO had generated $473 million in net income. Thus, USO lost roughly eight-and-a-half times the amount it had made during the entire previous year in just three months. The following chart illustrates the stunning decline in USO's per share NAV, which fell **81%** during the Class Period:

**Formatted:** Heading 8, No bullets or numbering



**Formatted:** Normal, Level 2, Line spacing: Double, No widow/orphan control

108.123.    The market price for USO shares similarly ***plummeted over 80%*** during the Class Period, even as investors poured billions into the Fund believing that they were investing in low-priced crude without awareness of the fatal defects that had fundamentally altered the Fund's performance and risk profile, as reflected in the following chart:



109.124.    Before regulators intervened to stop Defendants from issuing even more shares in late April 2020, the total NAV of USO actually grew in size despite the billions of dollars in losses being suffered by the Fund (which lowered the Fund's NAV), as investors continued to buy up the shares issued in the February Offering and the March Offering, as reflected in the following chart:



- 68 -



110.125.    As Robert Yawger, director of the futures division at Mizuho Securities USA, would later comment, these investors had "***no idea the slaughter they're getting into***."  Similarly, Elisabeth Kashner, director of ETF research at FactSet, ruefully observed the wreckage in late April: "***So much money has been chasing something that turns out to be so very wrong***."  Warren Pies, an energy strategist at Ned Davis Research, shared this sentiment, characterizing USO as a "***train wreck***."  Indeed, *Reuters* implied that secondary products incorporating WTI futures like USO were "***aimed at retail investors, or at least not restricted to professionals***," despite the CME Group's CEO Terry Duffy stating that "[t]he small retail investors are somebody that we do not target.  We go for professional participants in our marketplace."  This was particularly alarming given that, for example, "[r]etail investors buying [USO] likely ***aren't aware*** that it is no longer tracking oil prices

in lockstep," and that "[s]ome millennial investors have been **duped** by a complex oil ETF [USO] that is struggling to stay alive," according to *CNBC* on April 23, 2020.

111.126.    The catastrophic losses suffered by investors came largely as the direct result of USO's creation and exacerbation of the market-distorting effects detailed herein.  Despite the alarming increase in the Fund's share of the WTI near months futures market, growing illiquidity, a behind-the-scenes oil storage crisis, sharply widening contango effects and the growing disparity between the Fund's per share NAV and market price (all of which contributed to investor losses), the USO Defendants continued to sell billions of dollars' worth of new USO shares and invest substantially all of the proceeds into near months WTI futures contracts.  The Sponsor and the USO Defendants pocketed their management cut regardless of how the Fund performed, and USO investors unwittingly rewarded these Defendants for facilitating the monetary bonfire.  In the first half of 2020 – after the USO Defendants dramatically increased the size of the Fund – the Sponsor received about $6.3 million in management fees, roughly the same amount of management fees that it had generated during the **entirety** of 2019.

112.127.    Moreover, USO's passive investment nature and price-insensitive investment protocols compounded investor losses and left Class members at a severe disadvantage as compared to other, more sophisticated market participants with access to proprietary information and trading tools, such as hedge funds who could prey on the structural deficiencies of the Fund.  According to data analysis firm S3 Partners, "short sellers went into overdrive" from February 27 to April 21, 2020, tripling their positions in USO and ultimately pocketing approximately $286 million for a **110% return** in less than two months.  During this same time frame, the price of USO declined over 71%.  Hedge funds could also effectively front-run USO.  As later described by *The Wall Street Journal*, by "anticipating the roll process" these sophisticated market participants "can seek to profit

- 70 -

by taking the other side of the trade" or by attempting "to drive down the price of near-dated futures contracts or drive up the next month's price." This resulted in a massive value transfer during the Class Period from retail investors fooled by the "optical illusion" of buying cheap oil futures to hedge funds and similar market participants with access to proprietary data and non-public or restricted market information and sophisticated trading instruments. The Underwriter Defendants similarly profited off of USO investors and the breakdown in market fundamentals impacting the Fund during the Class Period, earning millions of dollars in profits by pocketing the growing spread between the per share NAV and market price of USO shares.

113.128. The scope of the staggering losses suffered by USO investors did not begin to be fully revealed until April 28, 2020, when USO filed on Form 8-K with the SEC its monthly account statement for March 2020. The statement disclosed that USO had suffered an incredible $466 million realized trading loss and $725 million unrealized trading loss on its futures positions during the month, resulting in a net $1.2 billion loss for the Fund. Shortly thereafter, these already startling figures were far exceeded by those provided in USO's April 2020 monthly account statement, filed with the SEC on May 27, 2020, wherein USO disclosed that it had suffered a *$3.7 billion* realized trading loss, which, after being offset by unrealized trading gains, caused the Fund to suffer a net $2.6 billion loss for the month.

114. Adding insult to injury, USO's dramatic investment overhaul in April and May 2020 prevented the Fund from capturing the upswing in oil futures prices. For example, in May 2020, WTI rallied more than 88%, while the price of USO shares rose only about 35%. Thus, even after USO investors suffered exceptional losses because of the hidden defects in the Fund and Defendants' own market-distorting actions, they were prevented from realizing the previously promised upside despite the fact that their wager that oil prices would recover ultimately proved

- 71 -

correct.

**C.    ~~USO~~USO Continues to Mislead Investors as It Is Forced to Abandon the Investment Strategy Which It Had Used to Raise Billions of Dollars in Investor Capital**

~~115.~~129.    As USO wreaked havoc because of its massive size during the Class Period, regulators intervened to prevent further damage to Fund investors and the market.  As previously detailed, USO amassed a dominant position in near months WTI contracts during the Class Period.  By mid-March 2020, it alone held 15% of all near months futures contracts outstanding.  By mid-April, that number had grown to more than 25% and eventually reached more than *one third* of all near months futures contracts outstanding.  This was an incredibly dangerous concentration in the hands of a single entity, which posed a grave (although undisclosed) risk to USO investors and indeed the entire market, a point painfully realized when USO's massive April roll helped precipitate the mid-April 2020 plunge in oil prices and caused the first ever negative price for front month WTI contracts.  As a result of its outsized market position and market-distorting effects, USO drew the scrutiny of regulators, who intervened to sharply restrict the ability of USO to concentrate its positions in near months futures contracts.

~~116.~~130.    On April 16, 2020, USO shocked the market when it revealed that it would be abandoning its stated investment strategy of purchasing entirely WTI front month futures contracts, and then rolling these contracts forward.  In a Form 8-K SEC filing, the Fund revealed that, beginning April 17, 2020, it would hold only 80% of its assets in front month WTI contracts and 20% split between the second and third month WTI contracts.  An analyst likened the change to "***dropp[ing] a bomb on the energy markets***."  Although the reason for this drastic change was not at first disclosed by the USO Defendants, USO would later admit in subsequent SEC filings that ~~regulators~~the regulator overseeing the NYMEX ~~and the Intercontinental Exchange ("ICE") Futures~~ ~~(~~the exchange on which WTI futures trade) – the CME – had imposed accountability level and

- 72 -

**Formatted:** Keep lines together

position limits on the Fund ~~that same day~~on April 16, 2020, in order to mitigate USO's market-distorting effects. ~~In addition, RBC Capital Markets, LLC, USO's only futures commissions merchant (through whom the Fund placed futures orders) sharply curtailed the Fund's ability to invest in front month futures contracts. These third parties, who could see~~Indeed, the ~~behind-the-scenes damage being wrought by~~Chairman and CEO of the CME Group, Terry Duffy, would reveal less than a week later that he was "in *constant contact* with people at USO" about accountability levels at the ~~Fund as a result of its exponential growth through~~time. Yet the ~~February Offering and~~*Financial Times* reported that defendant Love justified the ~~March Offering, effectively stepped in~~move on April 17, 2020, by stating that the Fund's WTI contract position "'*just got to the size where it makes sense* to ~~prevent further damage to~~*spread it out*,'" thereby misleading investors ~~and limit the market turmoil caused by Defendants' activities when Defendants themselves failed to do so~~about the true reason for the change.

Formatted: Font: Bold, Italic

~~117.~~131. Then, on April 21, 2020, USO filed another Form 8-K with the SEC announcing that the SEC had not declared effective a registration statement on Form S-3 (the "April Registration Statement") filed the previous day, through which Defendants had attempted to sell an additional *4 billion* USO shares to the market. The SEC apparently had refused to declare the registration statement effective out of concern for the impact to investors, preventing Defendants from flooding the market with even more USO shares. Like the regulatory bodies overseeing the exchanges, the SEC was forced to intervene to limit the harm caused by the rapid growth of USO, even as Defendants continued to attempt to inflate the size of the Fund in order to increase their own profits.

118.132.    Also on April 21, 2020, USO filed a Form 8-K with the SEC announcing that it was altering its investment strategy once again, further pushing out its investments along the WTI futures curve in an effort to reduce investment risk.

119.133.    On April 22, 2020, USO filed a Form 8-K with the SEC announcing that the Fund would undergo a 1-for-8 reverse split of shares after market close on April 28, 2020.  A reverse split reduces the number of shares outstanding in a company or fund into fewer and proportionally higher-priced shares.  Such an action typically signals that a stock or ETF is in distress.

120.    That same day, April 22, 2020, USO filed yet another Form 8-K with the SEC announcing that it had changed its investment strategy, once again pushing its positions further down the WTI futures curve.

134.    Two days laterAlso on April 22, 2020, USO filed yet another Form 8-K with the SEC announcing that it had changed its investment strategy, once again pushing its positions further down the WTI futures curve.  That same day, however, as would later be revealed, RBC Capital Markets, LLC ("RBC"), USO's only futures commissions merchant (through whom the Fund placed futures orders), informed USO that it was prohibiting the Fund from investing through RBC the proceeds from the sale of newly created shares in oil futures contracts.  Rather than reveal this information to investors, the USO Defendants *chose to conceal it*, even though the SEC later found that the restriction "was *critical* to USO," introduced the risk of tracking error between USO's investment objective and its NAV whenever the limit was lifted, and thereby constituted "*material information*" that the USO Defendants withheld from investors.  RBC, along with the CME and the Intercontinental Exchange ("ICE") Futures (on which WTI futures also trade), who could see the behind-the-scenes damage being wrought by the Fund as a result of its exponential growth through the February Offering and the March Offering, effectively stepped in to prevent further damage to

- 74 -

investors and limit the market turmoil caused by Defendants' activities when Defendants themselves failed to do so.

121.135.    USCF's chief marketing officer, Katie Rooney, continued to obscure the real reasons for the Fund's overhaul when she told CNBC on April 23, 2020, after being asked why the fund keeps changing its structure, that "'[d]ue to extraordinary market conditions in the crude oil markets, including super contango, USO has invested in other permitted investments, as described in the prospectus.'"  Rooney's comments proved particularly illusive when, on April 24, 2020, USO filed a Form 8-K with the SEC announcing that it was again altering its investment strategy.  This time, however, the USO Defendants finally disclosed part of the true reason for their rapid-fire investment overhaul by revealing that they had received letters from the Chicago Mercantile Exchange ("CME") on behalf of the NYMEX Market Regulation Department, the regulatory body overseeing the NYMEX, on April 16, 2020, ordering the Fund to limit its positions in the June WTI futures contract so as not to exceed accountability levels of 10,000 futures contracts – *eight days before the belated disclosure*, and the same day on which the USO Defendants had first announced changes to the Fund's investment strategy.  The Form 8-K also revealed that the USO Defendants had received another order from regulatory authorities on April 23, 2020 imposing limits on the Fund's positions further down the WTI futures curve, which had again corresponded with additional changes to the Fund's investment strategy.

122.136.    Three days later, on April 27, 2020, USO filed a Form 8-K with the SEC announcing that it was once again altering its investment strategy.  By now, the Fund's revised investment strategy bore virtually no resemblance to the strategy pitched to investors during the Class Period.  Instead of investing entirely in front month WTI futures contracts and then rolling those positions forward, USO stated it would hold *no positions* in the front month WTI futures

- 75 -

contract.  Instead, the Fund would invest approximately 30% in the second month WTI futures contract, 15% in the third month WTI futures contract, 15% in the fourth month WTI futures contract, 15% in the fifth month WTI futures contract, 15% in the sixth month WTI futures contract, and 10% in the June 2021 WTI futures contract.  USO also increased its roll period from 4 to 10 days in response to "regulatory requirements" and "risk mitigation measures imposed by USO's futures commission merchant," *i.e.*, to mitigate the disruptive effects of USO turning over its massive positions every month.

123.137.    Finally, on April 30, 2020, USO filed a notice with the SEC on Form 8-K disclosing that the Fund was once again changing its investment strategy and would likely continue to make such changes going forward.  Because of the frequent and dramatic changes to its investment strategy, the Fund stated that it would provide future updates on its investments on the Fund's website pursuant to a complex waterfall formula, effectively giving the Sponsor *carte blanche* to invest in any oil-related investments that it saw fit and destroying any pretense that the Fund was following the investment objective represented to investors during the Class Period.

124.138.    The following chart summarizes the progression of USO's investment strategy changes over time:

**Changes in futures allocation of USO contracts over two-week period.**



139.    As a result of these sudden and dramatic changes, the Fund's actual investments bore little resemblance to the strategy pitched to investors during the Class Period.  In a span of only a few weeks, USO had radically changed from a passive investment vehicle used to track the spot price of oil through "purely just the front- month WTI futures contractsfuture contract in crude" to what was effectively an actively managed fund frantically struggling to avoid a total implosion and satisfy concerned regulators through a hodgepodge of oil-related investments.  USO's radical transformation was not lost on market observers.  As analyst and advisor Jim Collins wrote in *Real Money*: "[t]he massive issuance of USO shares (from 156 million outstanding a year ago to 1.482 billion outstanding as of [April 30, 2020]) has created a ***bloated monster of a security that cannot possibly achieve its original goal*** of mirroring the moves in near-term oil futures contracts," and thus "has become an ***actively managed*** ETF."  Indeed, Collins concluded that "the list of what USO could own" following its rapid-fire overhaul "is ***so broad and vague as to be worthless***."  The notion that USO had transformed into an actively managed fund – despite primarily tracking front month

futures contracts for *14 years* – was a common assessment by market observers at the time, and stood in stark contrast to the previously common assessment that USO was a passive investment. As aptly put in an April 1, 2020 article in *The Motley Fool* before the Fund's overhaul, "[i]t is important to remember that *USO isn't an actively managed fund*."

125.140.    One consequence of these changes was the fact that USO could no longer pretend to track the spot price of oil. As USO itself acknowledged in an April 30, 2020 Form 8-K, the Fund now suffered "*significant deviations*" from its claimed investment objective as a result of its inability to invest entirely in the near months WTI futures market. USO had been forced by regulators to abandon its investment strategy and could not meet its investment objective *as a direct result* of its outsized position in the WTI futures market due to its hyperbolic growth from the February Offering and the March Offering. USO's stated investment strategy and investment objective were *never feasible* at the time of the offerings, and Defendants' representations highlighting these purportedly core aspects of the Fund in order to solicit investment in the offerings were materially false and misleading when made.

**D.    The USO Defendants Belatedly Acknowledge Undisclosed Risks that Caused Investors to Lose Billions**

126.141.    Beginning in April 2020, the USO Defendants began acknowledging that certain additional investment risks related to, *inter alia,* COVID-19, contango, markand market volatility, impacting the Saudi/Russia oil price war and regulatory requirementsmarkets and the Fund, were risks that had existed since *early* in the Class Period. For example, theThe April Registration Statement, filed on April 20, 2020, made numerous belated disclosures about how destructive market dynamics had adversely impacted the Fund by at least *March 2020*. InIndeed, the April Registration Statement acknowledged risks that predated both the February Registration Statement and the March Registration Statement – including in an entirely new section entitled,

- 78 -

"COVID-19 Risk," which had been wholly absent from ~~both the February Registration Statement and the March Registration Statement despite the fact that the risks detailed therein predated both offerings, Defendants disclosed some of the impacts of~~the registration statements – that, for example, discussed the "significant and continued market volatility" and "significant economic and financial market disruptions associated with the COVID-19 pandemic~~on~~" which could adversely impact "the ~~Fund's~~valuation and performance.  ~~The section stated in pertinent part~~ of the USO's investments," as follows:

> ***COVID-19 Risk.***
>
> An outbreak of infectious respiratory illness caused by a novel coronavirus known as COVID-19 was first detected in China in December 2019 and has now been detected globally. ***In March 2020***, the World Health Organization declared the COVID-19 outbreak a pandemic.  COVID-19 has resulted in numerous deaths, travel restrictions, closed international borders, enhanced health screenings at ports of entry and elsewhere, disruption of and delays in healthcare service preparation and delivery, prolonged quarantines and the imposition of both local and more widespread "work from home" measures, cancellations, supply chain disruptions, and lower consumer demand, as well as general concern and uncertainty.  The ongoing spread of COVID-19 has had, and is expected to continue to have, a material adverse impact on local economies in the affected jurisdictions and also on the global economy, as cross border commercial activity and market sentiment are increasingly impacted by the outbreak and government and other measures seeking to contain its spread.  The impact of COVID-19, and other infectious illness outbreaks that may arise in the future, could adversely affect individual issuers and capital markets in ways that cannot necessarily be foreseen.  In addition, actions taken by government and quasi-governmental authorities and regulators throughout the world in response to the COVID-19 outbreak, including significant fiscal and monetary policy changes, ***may affect the value, volatility, pricing and liquidity of some investments or other assets, including those held by or invested in by USO***.  Public health crises caused by the COVID-19 outbreak may exacerbate other pre-existing political, social and economic risks in certain countries or globally.  The duration of the COVID-19 outbreak and its ultimate impact on USO and, [sic] on the global economy, cannot be determined with certainty.  The COVID-19 pandemic and its effects may last for an extended period of time, and could result in ***significant and continued market volatility***, exchange trading suspensions and closures, declines in global financial markets, higher default rates, and a substantial economic downturn or recession.  The foregoing could impair ***the USO's ability to maintain operational standards (such as with respect to satisfying redemption requests), disrupt the operations of USO's service providers, adversely affect the value and liquidity of USO's investments, and negatively impact the USO's performance and your investment in USO***.  The

- 79 -

extent to which COVID-19 will affect USO and USO's service providers and portfolio investments will depend on future developments, which are highly uncertain and cannot be predicted, including new information that may emerge concerning the severity of COVID-19 and the actions taken to contain COVID-19. ***Given the significant economic and financial market disruptions associated with the COVID-19 pandemic, the valuation and performance of the USO's investments could be impacted adversely***.

127.142.    In additionAdditionally, the April Registration Statement stated that the Fund had suffered the "***[w]orst [m]onthly [d]rawdown***" in its history in March 2020, losing 54.7% in a single month.    The registration statementIt also acknowledged that the Fund would be unable to achieve any significant interest income for all of 2020 due to losses suffered since the start of the year.    It also stated that, stating: "[g]iven ***market volatility in 2020*** arising from the COVID-19 pandemic and other geopolitical issues, USO believes it is reasonable to assume that ***it will not earn any significant interest income in 2020***."

128.143.    Notably, the April Registration Statement failed to disclose the direct role that Defendants had played in exacerbating market volatility, illiquidity and the other ill effects detailed herein that the Fund had suffered during the Class Period by rapidly growing the size of the Fund through the February Offering and the March Offering.  Nor did the April Registration Statement reveal the extraordinary intervention of regulatory authorities to curtail the growth and dangerous market concentration posed by the Fund, including the Sponsor's receipt of an April 16, 2020 letter (***four days before the registration statement was filed***), ordering the Fund to limit its front month WTI contract exposure.

129.144.    On April 24, 2020, USO filed a current report on Form 8-K with the SEC which for the first time revealed that USO had run up against regulatory positional limits ***almost immediately after the Fund's April roll period ended***, stating that the CME, on behalf of the NYMEX – the exchange on which the WTI futures contracts trade – had ordered limits on the Fund's holdings of June, July, August and September contracts in April 16 and April 23, 2020

- 80 -

letters.  The timing of these regulatory orders made clear that they were the true impetus for USO's rapid-fire investment changes.

130.145.    On April 27, 2020, USO filed with the SEC an amendment to the April Registration Statement on Form S-3/A (the "April Amendment"), which included additional disclosures regarding the convergence of adverse factors impacting the Fund and its performance. For example, the April Amendment revealed additional information about the COVID-19-related negative impacts to extreme market turmoil negatively impacting the Fund that had been occurring throughout the Class Period, including that COVID-19 "has had, and is expected to continue to have, a material adverse impact on the crude oil markets and oil futures markets to the extent economic activity and the use of crude oil continues to be curtailed, which in turn has had a *significant adverse effect on the prices of Oil Futures Contracts, including the Benchmark Oil Futures Contract*, and Other Oil-Related Interests."

131.146.    The April Amendment also stated that the Fund was suffering from the impacts of "super contango" in the crude oil futures markets "due to over-supply of crude oil in the face of weak demand during the COVID-19 pandemic when disputes among oil-producing countries regarding limitations on the production of oil also were occurring."  The April Amendment acknowledged that these effects began earlier in the Class Period, noting that "*[i]n March 2020 contango dramatically increased and reached historic levels* in the wake of the COVID-19 crisis and oil price war causing an overabundance of supply, significantly curtailed demand and limited storage for excess crude oil."

132.147.    Although the April Amendment failed to acknowledge Defendants' own role in causing the Fund to suffer staggering losses, it further revealed that the Fund's performance and ability to execute its strategy had been impacted by the Saudi/Russia oil price war, the sale of an

- 81 -

Formatted: Font: Bold, Italic

Formatted: Font: Bold, Italic

enormous amount of USO shares in a short period of time (although it notably omitted that this was specifically caused by the February Offering and the March Offering), significant market volatility and the regulatory and marketplace limits placed on the Fund., including "risk mitigation measures imposed [] by USO's futures commission merchant that further limit USO['s]" ability to invest in certain crude oil futures contracts.  The April Amendment continued in pertinent part as follows:

> In 2020, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, *significant market volatility occurred and is continuing in the crude oil markets as well as the oil futures markets.  As a result of market and regulatory conditions, including significant market volatility, large numbers of USO shares purchased during a short period of time, regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO announced its intent to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract* and that it could, if it determined it appropriate in light of market conditions and regulatory requirements, invest in Other Oil-Related Interests.  Investments intended to meet USO's investment objective, other than investments in the Benchmark Futures Contract, may impact the performance of USO and *can make it difficult for USO to track the Benchmark Futures Contract or meet its investment objective*.
>
> Certain circumstances, including *the need to comply with regulatory requirements (including, but not limited to, exchange accountability and position limits) and market conditions (including but not limited to those allowing USO to obtain greater liquidity or to execute transactions with more favorable pricing), as well as risk mitigation measures imposed . . . by USO's futures commission merchant* that further limit USO and other market participants from investing in crude oil futures contracts in certain months, could and *have caused USO to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract. . . .  In addition, the exchange where the Benchmark Oil Futures Contract is traded became concerned about positions that USO had acquired in that contract and imposed limits on USO's holding of that contract, as well as subsequent months of that contract.*

133.148.    The April Amendment further acknowledged that the Fund risked substantially diverging from its benchmark and failing to meet its investment objective because of market conditions and its inability to sufficiently invest according to its previously claimed investment strategy and investment objective.  The April Amendment stated in pertinent part as follows:

- 82 -

In 2020, in the context of the COVID-19 pandemic and disputes among oil producing countries regarding potential limits on the production of crude oil, significant market volatility occurred and is continuing in the crude oil markets as well as the oil futures markets.  As a result of market and regulatory conditions, including significant market volatility, large numbers of USO shares purchased during a short period of time, and applicable regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO invested in Oil Futures Contracts in months other than the Benchmark Oil Futures Contracts.  ***The foregoing impacted the performance of USO and made it difficult for USO to track the Benchmark Futures Contract or meet its investment objective***, which is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses.

USO intends to attempt to continue tracking the Benchmark Futures Contract as closely as possible, however, ***in the current market and regulatory environment, significant tracking deviations can be anticipated to occur*** above and beyond the differences that historically occurred when the primary investment was the Benchmark Futures Contract and light sweet crude oil futures contracts of the same month traded on ICE Futures.  ***In addition, the types of permitted investments that USO invests in as a result of regulatory requirements and limits imposed by its futures commission merchants in trying to approximate its investment objective such as later months in the Oil Futures Contracts than the tenor of the Benchmark Futures Contract are likely, and will likely continue, to experience greater effects from contango.***  While it is USO's expectation that at some point in the future it will return to investing in the Benchmark Futures Contract and related ICE Futures contracts or other similar futures contracts of the same tenor based on light, sweet crude oil, there can be no guarantee of when, if ever, that will occur.  As a result, investors in USO should expect that there will be continued deviations between the performance of USO's investments and the Benchmark Futures Contract and that USO may not be able to track the Benchmark Futures Contract or meet its investment objective.

~~134.~~149.        On May 6, 2020, USO filed with the SEC another amendment on Form S-3/A to the April Registration Statement (the "May 6 Amendment").  The May 6 Amendment made clear that the extraordinary market conditions that had destroyed the ability of the Fund to follow its investment objective and caused investors to suffer billions of dollars in losses had materially impacted the Fund by "***the beginning of March 2020***" – *i.e.*, ***before*** the March Offering – despite the fact that these specific impacts and threats to the Fund's performance were omitted from the March Registration Statement.  ~~The May~~Specifically, the May 6 Amendment admitted, *inter alia*,

- 83 -

that the "unprecedented" and "significant" market volatility that rocked the oil markets, and "contango [that] dramatically increased and reached historic levels," took place *in March 2020*. Specifically, the May 6 Amendment stated in pertinent part as follows:

> As a result of previously discussed market conditions and the regulatory response that occurred in March and April of 2020, large numbers of USO shares that were purchased during a short period of time, and regulatory accountability levels and position limits on oil futures contracts that were imposed on USO, USO invested in Oil Futures Contracts in months other than the Benchmark Oil Futures Contracts. The foregoing impacted the performance of USO and made it difficult for USO to meet its investment objective, which is for the daily percentage changes in the NAV per share to reflect the daily percentage changes of the spot price of light, sweet crude oil, as measured by the daily percentage changes in the price of Benchmark Oil Futures Contract, plus interest earned on USO's collateral holdings, less USO's expenses.
>
> \*     \*     \*
>
> *In March 2020, contango dramatically increased and reached historic levels* during the economic crisis arising from the COVID-19 pandemic and disputes among oil producing nations regarding limits on oil production levels. *This contango was due to significant market volatility that has occurred* and is continuing in the crude oil markets as well as the oil futures markets. Crude oil prices have collapsed in the wake of the COVID-19 demand shock, which reduced global petroleum consumption, and the price war launched by Saudi Arabia at the *beginning of March 2020* in response to Russia's unwillingness to participate in extending previously agreed upon supply cuts. An estimated twenty million barrels a day of crude demand evaporated as a result of quarantines and massive drops in industrial and manufacturing activity. In addition, the United States, OPEC, Russia, and other oil producers around the world agreed to a historic 9.7 million barrel per day cut to crude supply. In the short term, this cut does not close the gap relative to the massive drop in demand. However, the duration of the agreement, lasting until 2022, should allow oil prices to slowly recover as demand re-materializes. *The supply cut should also reduce at least some of the unprecedented volatility oil markets experienced in March*. As the crisis continues into the second quarter of 2020, and potentially beyond, demand weakness and limited storage capacity will continue to put pressure on crude oil in the near term.

150. Additionally, the May 6 Amendment impliedly admitted that previous statements about the impact of periods of contango and backwardation were indeed false and misleading when made, now revealing that "*[p]rior to 2020*, periods of contango or backwardation have not materially impacted USO's investment objective." In other words, the May 6 Amendment suggested that in

2020 – including *during* the Class Period – contango *had* materially impacted USO's investment objective, and further elaborated that "[c]ontango may persist for the foreseeable future, potentially at *extreme* levels, as a result of the *unprecedented conditions* in the wake of the COVID-19 crisis described above (namely simultaneous oversupply and a collapse in demand for crude oil combined with a lack of on-land storage for crude oil)."

135.151.    Although the May 6 Amendment still failed to acknowledge Defendants' significant role in precipitating the extreme market events which had wiped out billions of dollars in investor capital, the more fulsome and specific risk disclosures it did provide stood in stark contrast to the complete absence of such disclosures in the February Registration Statement and the March Registration Statement, notwithstanding the fact that these disclosures were required to be made in order to make the statements provided therein not misleading and to comply with SEC regulations.

152.    On May 21, 2020, USO filed with the SEC yet another amendment on Form S-3/A to the April Registration Statement (the "May 21 Amendment"). The May 21 Amendment revealed for the first time that USO's sole future commission, RBC, "*expressly informed USO that, until further notice, USO may not hold positions in the Benchmark Futures Oil Futures Contract* and that it may not purchase any other Oil Futures Contracts for USO's portfolio through RBC whether or not such purchases would be within the limits permitted by the exchanges," and "indicated that such limitation on USO is a *result of RBC's own internal risk management requirements and directions it has received from other regulators in the United States, Canada and the United Kingdom*." And while the May 21 Amendment still did not reveal that RBC informed USO about the limitation at least as early as April 22, 2020 – *six days before the end of the Class Period* – as would later be revealed, it acknowledged that the regulatory restrictions and risk mitigation measures taken by third parties, along with the "large numbers of USO shares [that] have been purchased during a relatively

- 85 -

short period of time," were in fact "*events*" that "*severely limited, if not precluded*, USO's current ability to have a substantial portion of its assets invested in the Benchmark Oil Futures Contract and other Oil Futures Contracts."

153. Moreover, the May 21 Amendment clarified the catastrophic impact of RBC's limitation, stating that "[i]f USO were to again offer Creation Baskets for purchase, the limitations being imposed by the exchanges and USO's [futures commission merchant] *will significantly limit USO's ability to invest the proceeds of the purchases of Creation Baskets in Oil Futures Contracts*." Therefore, the amendment explained, "when USO determines it is able to sell Creation Baskets again, USO may be limited in its ability to invest in Oil Futures Contracts, including the Benchmark Oil Futures Contract, and may be required to invest in other permitted investments including Other Oil-Related Interests and may hold larger amounts of Treasuries, cash and cash equivalents, which will further impair USO's ability to meet its investment objective." USO's May 21, 2020 filing led *Bloomberg Law News* to report that same day on the limit that RBC imposed on the Fund. The article, entitled "Broker of Oil ETF Giant USO Blocks It From Buying Crude Futures," noted that "*record inflows from retail investors*" contributed to USO holding "30% of the total open interest" in the June WTI contract, prompting the "CME Group Inc., the exchange, to instruct it to limit its positions, forcing it to spread its holdings out among different contracts for delivery as far in the future as June 2021."

E. **The SEC and CFTC Determine the USO Defendants Made Material Misrepresentations to Investors in Violation of the Law**

154. On May 29, 2020, it was reported that the SEC and the CFTC had both launched investigations into USO regarding the propriety of the Fund's disclosures to investors and the Fund's rapid-fire changes to its investment strategy. *Bloomberg* reported that the issues the agencies were examining included "*whether shareholders were adequately informed* that the ETF's value

wouldn't necessarily move in tandem with the spot price of oil and the fund's recent decision to purchase crude contracts that expire further out in the future," given that "[t]he change in contracts USO was buying *deviated from its past investment strategy*."  As USO attracted "legions of mom-and-pop investors" as the Fund grew larger and "these less sophisticated shareholders are among those who've endured heavy losses amid the oil rout," *Bloomberg* also reported that the CFTC "issued a rare public warning last week to retail investors to highlight the 'unique risks' of commodity exchange traded products," including that the "'value of the shares in the commodity pool may not track the value of the underlying asset over time.'"

136.155.    Around this same time, the SEC required the Fund to revise many of its disclosures and representations to investors, including by requiring USO to prominently announce on the cover page of its prospectus that the Fund "**IS NOT A PROXY FOR TRADING DIRECTLY IN THE OIL MARKETS**."  This new disclosure stood in stark contrast with Defendants' prior representations during the Class Period that "USO's investment strategy is designed to provide investors with a cost-effective way to invest indirectly in crude oil."

137.156.    On August 17, 2020, the SEC issued a Wells Notice to Defendants USCF, USO and Love.  The Wells Notice stated that the SEC had made a preliminary determination to recommend that the SEC file an enforcement action against these Defendants for violating the 1933 Act and 1934 Act and Rule 10b-5 thereunder with respect to the Fund's disclosures to investors and actions during the Class Period, specifically regarding the changes made to USO's investment strategy and the limits placed upon the Fund by regulators.

138.157.    On August 19, 2020, the CFTC similarly issued a Wells Notice to Defendants USCF, USO and Love.  Like the proposed SEC enforcement action, the Wells Notice stated that the CFTC had made a preliminary determination to recommend that the CFTC file an enforcement

action against these Defendants for violating the Commodity Exchange Act and CFTC Regulations with respect to the Fund's disclosures to investors and recent activities.

158.    Then, on November 8, 2021, the SEC issued an Order Instituting Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Making Findings, and Imposing a Cease-and-Desist Order in *In the Matter of United States Commodity Funds LLC & United States Oil Fund, LP*, Release No. 11006 (the "SEC Order"), which determined that defendants ***USO and USCF violated the federal securities laws because USO failed to disclose material information to investors in public filings during the Class Period***.  Also on November 8, 2021, the CFTC issued a parallel Order Instituting Proceedings Pursuant to Section 6(C) and (D) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions in *In the Matter of United States Commodity Funds LLC*, CFTC Docket No. 22-06.  The agencies found violations of Securities Act Section 17(a)(3) (which prohibits, in the offer or sale of securities, any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser), CEA Section 4o(l)(B) (which makes it unlawful for a commodity pool operator to "employ any device, scheme, or artifice to defraud any client or participant or prospective client or participant"), and CFTC Rule 4.41(a)(2) (which prohibits advertising by a commodity trading advisor that operates as a fraud or deceit on clients or prospective clients.).

159.    Specifically, the agencies found that in the midst of significant oil market turmoil and following unprecedented investor inflow into USO, and just two days after the front month WTI futures contract closed at a negative price on April 20, 2020, USO's sole futures commission merchant ("FCM") (through whom the Fund placed futures orders) – RBC – told USO it would not execute any new oil futures positions for USO.  As a result of this explicit limitation, as explained in the orders, USO was restricted from investing the proceeds generated by the future sale of newly

created shares in oil future contracts, meaning that USO would have to invest those proceeds in U.S. Treasuries or cash equivalents – and not the front month WTI futures contract – creating the risk of tracking error between USO's investment objective and its NAV when the suspension of new creations was lifted, as well as limiting potential upside for investors. For example, after oil went negative on April 20, 2020, RBC imposed limitations on USO pursuant to their account agreement. In particular, on April 22, 2020, RBC conveyed on a telephone call with USO the newly-imposed limitation – *i.e.*, the restriction of USO's ability to invest through RBC the proceeds generated by the future creation of new USO shares in any investment that would increase USO's risk profile – which RBC confirmed in an April 23, 2020 e-mail.

160.    As a result of the limitation, USO would be restricted from investing the proceeds of any new creations, if it had shares available for sale, in oil futures contracts that would allow it to meet its investment objective and instead would be limited to investing such proceeds in U.S. Treasuries or cash equivalents or simply holding them as cash. This limitation presented the risk of tracking error between USO's investment objective and its NAV whenever new shares were registered and the corresponding suspension of new creations announced on April 21, 2020 was lifted.

161.    On April 23, 2020, RBC e-mailed formal notification of the New Creations Limit to USO, stating in relevant part: "[A]s discussed on our call, in light of current market conditions, [FCM] is not willing to expand the risk profile of the clearing relationship through new creations and additional increases in risk . . . ." RBC again communicated the New Creations Limit in an e-mail sent to USO the following morning, April 24, 2020: "[a]s a clarification to yesterday's note, [FCM] is not prohibiting the rebalance of the portfolio but [FCM] is not willing to expand the risk profile of the clearing relationship through new creations and additional increases in risk." That same evening,

- 89 -

USO responded, "[w]e will keep you posted on all developments and understand your comments below."

162.    Despite RBC's clear and repeated communications to USO about the limitation – which the SEC found was "*critical* to USO" given that it impaired USO's investment objective – the SEC determined that from April 24 through May 21, 2020, USO "*failed to fully disclose material information* regarding the [limitation] in numerous public filings, rendering those public filings *misleading*."  For example, USO referenced certain "risk mitigation measures" in April 24 and 27, 2020 Forms 8-K, and in an April 27, 2020 amendment to the April Registration Statement, including specifically that "risk mitigation measures imposed . . . by USO's futures commission merchant . . . further limit USO and other market participants from investing in crude oil futures contracts in certain months," thereby "caus[ing] USO to invest in Oil Futures Contracts other than the Benchmark Oil Futures Contract."  The SEC found that these filings failed to "specifically mention the FCM's limit on USO's ability, if it had shares available for sale, to invest the proceeds generated by new creations in *any* oil futures contracts."  Accordingly, USO's filings "were materially misleading" given the "fail[ure] to adequately inform the investing public . . . of the specific constraints put on the fund and, in turn, the impact that those constraints would have on the fund's ability to meet its investment objective."

163.    Not until after RBC informed the SEC about the limitation imposed on USO, and after the SEC directed USO to correct a May 11, 2020 amendment to the April Registration Statement (which again did not fully disclose the limitation), did USO finally disclose, in the May 21 Amendment, the FCM's limitation and the true investment risk it presented.  As a result of the foregoing conduct, the SEC and CFTC imposed a combined *$2.5 million civil penalty* on USO and USCF, and the SEC concluded that "USO and USCF *violated* Section 17(a)(3) of the Securities Act,

which prohibits in the offer or sale of securities, engaging in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser."

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

### A.    The February Registration Statement

139.164.        The Class Period begins on February 25, 2020.  On that date, USO filed with the SEC a prospectus on Form 424B3 to register more than 400 million shares, which incorporated and formed part of an earlier filed registration statement on Form S-3, which, after amendment, was declared effective that same day.  The Individual Defendants signed the February Registration Statement on behalf of themselves, USO and the Sponsor.  The Underwriter Defendants were also responsible for the statements contained in the February Registration Statement as the authorized participants, marketing agent and underwriters for the sale of the USO shares sold in the February Offering.

140.165.        The February Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with the rules and regulations governing its preparation.  For example, the February Registration Statement failed to make any disclosures about the economic turmoil impacting the markets in which the Fund operates, including the impact from COVID-19. Indeed, the February Registration Statement failed to mention COVID-19 *at all*, let alone provide any specifics about the associated risks to, or impacts on, USO associated with the pandemicthat had existed at the time of the February Registration Statement and which were known risks to Defendants.

166.    As detailed in ¶¶60-62,-65, 71--69, 72, 80-81, 10782-83, 92-93, 122, at the time of the February Offering, economic responses to COVID-19 and the then-existing impacts and expected

- 91 -

> **Formatted:** Keep with next, Keep lines together

impacts to global oil demand had *already* created material risks that threatened the Fund's performance. ~~Despite this fact, the February Registration Statement failed to disclose the known risks that COVID-19 posed, and was expected to continue to pose in the imminent future, including heightened volatility in the WTI futures markets as result of the sharp reduction in demand for oil.~~ Because USO's sole investment objective is for its per share NAV to reflect daily changes in the spot price of oil, ~~the pandemic's specific impacts on the Fund's performance were required to be disclosed.  Rather than timely provide this information~~COVID-19's specific impacts on the Fund's performance, and the risks associated therewith, were required to be disclosed.  By failing to disclose the known risks posed by COVID-19 and the resulting severe impact on global oil demand, including heightened volatility in the WTI futures markets as result of the sharp reduction in demand for oil, the February Registration Statement was materially false and misleading.  Indeed, defendant Love himself recognized as early as January 2020 that COVID-19 was a "big factor" in the market that caused "concern" and would impact a "meaningful" amount of demand.  ¶65.  Reports in February leading up to the registration statement validated Love's concern, with market analysts and observers widely sounding the alarm about COVID-19's significant impact, and expected continued impact, on crude oil demand.  Rather than timely disclose the risks and impacts associated with these events in the February Registration Statement as was required, these adverse trends, events and uncertainties were only belatedly revealed *after* the February Offering had been completed.

~~141.~~167.      Moreover, the February Registration Statement provided a list of all of the purportedly material "RISK FACTORS INVOLVED WITH AN INVESTMENT IN USO" yet failed to even mention COVID-19, creating the false and misleading impression ~~that the pandemic~~to investors that the outbreak that had been ravaging the oil markets since January was not a material risk impacting the Fund at the time and rendering the boilerplate discussion of risks provided therein

- 92 -

Formatted: Font: Bold, Italic

(copied almost verbatim from past SEC filings) materially false and misleading when made. For example, the February Registration Statement highlighted numerous risks associated specifically with crude oil – which relates *directly* to USO's investment objective of tracking the price of crude oil as measured by changes in the price of the Benchmark Oil Futures Contract (*i.e.*, the front month futures contract, which most closely reflects the price of crude oil) – including:

> *Economic conditions impacting crude oil*. The demand for crude oil correlates closely with general economic growth rates. The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices. Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and other events or conditions that impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil.

> *Other crude oil demand-related factors*. Other factors that may affect the demand for crude oil and therefore its price, include technological improvements in energy efficiency; seasonal weather patterns, which affect the demand for crude oil associated with heating and cooling; increased competitiveness of alternative energy sources that have so far generally not been competitive with oil without the benefit of government subsidies or mandates; and changes in technology or consumer preferences that alter fuel choices, such as toward alternative fueled vehicles.

168.    Yet these risks failed to disclose the existential threat to the Fund from the outbreak, which had already been recognized as causing a "major slowdown in oil consumption" that had "shocked the energy industry." ¶¶66, 68. In fact, the scale of the fall of global oil prices had, even *weeks* before the February Registration Statement, been described as a "demand destruction event" that had moved more quickly than anything seen before. ¶66. While the ultimate length and extent of the outbreak was unknown to investors at the time – and many investors undoubtedly sought to invest in USO at what they believed to be discounted prices as the outbreak increasingly stunted demand and as USO's share price plummeted – given the extent of the turmoil impacting the

- 93 -

markets and the Fund at the time of the offering, Defendants were required to disclose the then-existing risks of investing in USO, regardless of investors' understanding of the precise extent and length of that risk.  The resulting impact on the Fund by end-of-month – just *four days* following the February Offering – was significant, as USO would accumulate ***$205 million in investment losses*** in February alone, including a loss of ***$225 million*** on the value of the futures it held.  ¶¶122.

169.    Additionally, the February Registration Statement failed to disclose that the February Offering itself would increase volatility and illiquidity in the markets in which USO operated and thereby threaten the Fund's performance, investment strategy and investment objective.  Through the February Offering, USO issued 400 million shares to the investing public in just a few weeks, *4.4 times* the number of shares outstanding as of December 31, 2019.  Substantially all of the proceeds from this offering were in turn invested in WTI near months futures contracts, exacerbating volatility and creating market distortions at an already perilous moment for the Fund.  Almost immediately, the effects of the offering began to have an outsized effect on the markets, creating market distortions and ultimately leading to massive investor losses as detailed in ¶¶60-62, 65, 71 69, 72, 80-81, 10782-83, 92-93, 122.

170.    For example, on the ***very next day*** following the February Offering, trading in USO spiked ***19%***, while trading volume in front month WTI futures contracts spiked 16%. ¶83.  And the day after that, on February 27, 2020, WTI front month daily trading volume increased to almost ***double the five-year average*** (to 1 million contracts traded).  ¶83.  Indeed, between February 25, 2020 and March 12, 2020, the number of USO shares issued and outstanding increased ***72%***.  ¶85.  At the same time, by March 20, 2020, implied volatility of oil prices, as measured by OVX, reached "the highest value since its inception in May 2007." ¶95.  And WTI crude oil futures price volatility was so high in the run-up to the March Offering that price declines on March 9 and March 18 were

- 94 -

the *largest single-day declines since at least 1999*, both of which were at least *twice as large* as the largest single-day decrease during the 2008-09 financial crisis.  ¶95.

142.171.    Moreover, market experts and analysts noted that USO's massive growth in early 2020, including from the issuance of shares in the February Offering, contributed to the extreme market turmoil, volatility, and uncertainty adversely impacting the Fund.  As would later be revealed, the Fund accumulated *$205 million in investment losses* by the end of February (owing to a loss of *$225 million* on the value of the futures it held) – just *four days* after the February Offering.  ¶¶122.  Nevertheless, the February Registration Statement failed to disclose the known risks related to the size and timing of the offering and the rapidly increasing demand that the Fund was then experiencing.

143.172.    Furthermore, the February Registration Statement provided false and misleading assurances to investors.  ~~For example, the February Registration Statement stated that the WTI futures contracts in which USO invested were "*traded in sufficient volume to permit the ready taking and liquidation of positions*" and could "be *readily liquidated* with the original counterparty or through a third party assuming the position of USO."  Similarly~~For example, even though the USO Defendants would later admit that an "investment in USO is *not* a proxy for investing in the oil markets," the February Registration Statement stated otherwise, *i.e.*, that "[i]nvestors may choose to use USO as a means of investing indirectly in crude oil" and that "*USO's investment strategy is designed to provide investors with a cost-effective way to invest indirectly in crude oil*."  ~~The Registration Statement likewise reassured investors that "[p]eriods of contango . . . *do not materially impact USO's investment objective* of having the daily percentage changes in its per share NAV track the daily percentage changes in the price of the Benchmark Oil Futures Contract[.]"  The February Registration Statement also represented that "the daily changes in the price of USO's~~

- 95 -

~~shares on the NYSE Arca on a percentage basis *will closely track*, the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis, less USO's expenses."~~ These representations were materially false and misleading when made because the February Offering interjected considerable volatility and illiquidity into the markets, as the offering itself would cause USO to grow to dominate WTI near months futures markets and the Fund to experience insufficient liquidity, to run up against regulatory limits, significant per share NAV to price divergence, unprecedented market contango, and other breakdowns in market fundamentals, as described more fully in ¶¶~~65-138~~72-163.

### B.    The March Registration Statement

~~144.~~173.    On March 19, 2020, USO filed with the SEC a registration statement on Form S-3 to register over 1 billion shares of USO, which, after amendment, was declared effective March 23, 2020. Also, on March 23, 2020, USO filed with the SEC a prospectus on Form 424B3, which incorporated and formed part of the registration statement. These documents are collectively referred to herein as the "March Registration Statement." The Individual Defendants signed the Registration Statement on behalf of themselves, USO and the Sponsor. The Underwriter Defendants were also responsible for the statements contained in the March Registration Statement as the authorized participants, marketing agent and underwriters for the sale of the USO shares sold in the March Offering.

~~145.~~174.    The March Registration Statement contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading and was not prepared in accordance with the rules and regulations governing its preparation. As detailed in ¶¶~~65-138~~72-163, the Fund was facing severe adverse trends, fundamental market disruptions and numerous existential threats at the time of the March Offering, including, *inter alia*: (i) sharply rising positional concentration, volatility and market illiquidity as a result of the Fund's rapid growth in

early March 2020, including as a result of the billions of dollars' worth of shares sold in the February Offering; (ii) unprecedented and sustained investor inflows into the Fund; (iii) a growing oil storage crisis in Cushing, Oklahoma, which had already resulted in the doubling of storage costs and the complete leasing of all tanks by mid-March 2020; (iv) the smashing of prior records in both USO shares traded and WTI front month futures contracts traded in a single day, by 72% and 26%, respectively; (v) the rapid tripling of the Fund's historical market share of WTI near months futures contacts to more than 15% by mid-March 2020; (vi) the widening divergence between the Fund's per share NAV and market price, including to more than double the Fund's pre-March 2020 peak historical price premium on March 18, 2020; (vii) the fact that the 15-day historical WTI front month futures volatility had risen seven fold in a matter of days by March 19, 2020; (viii) the collapse in WTI front months futures prices and the per share NAV of the Fund in the lead up to the offering; and (ix) accelerating super contango effects, which had risen to 6.7 times the historical average by March 23, 2020.

146.175.    The convergence of these adverse factors, combined with the existing turmoil impacting global oil markets, made clear to Defendants that USO and the markets in which the Fund operated *were suffering material market distortions and presented unprecedented threats at the time of the March Offering*.  Indeed, by the time of the offering, the Fund had *already* suffered hundreds of millions of dollars in trading losses since the launch of the February Offering. Moreover, because of the magnitude of the March Offering, the offering itself was certain to dramatically exacerbate all of these ill effects almost as soon as it was completed, forcing the Fund to run up against regulatory limits and undermining the Fund's stated investment strategy and core investment objective.  Within days of the March Offering, the Fund had grown so large that it could

- 97 -

not even complete its ordinary monthly roll without inviting drastic regulatory action to limit the Fund's positions and precipitating the worst drop in WTI futures prices in history.

147.176.    Shockingly, Defendants failed to disclose *any* of these adverse facts in the March Registration Statement.  Indeed, the March Registration Statement in all material respects was almost identical to USO's past offering materials, effectively misrepresenting to investors that the Fund was as risky ashad the same risks that it had always beenhad.  As an example of how brazenly Defendants disregarded their obligations under the federal securities laws, the only mention of COVID-19 in the March Registration Statement came as an aside in a boilerplate risk disclosure regarding macro events that was otherwise identical to the Fund's past statements, which stated in pertinent part as follows:

> ***Economic conditions impacting crude oil***.  The demand for crude oil correlates closely with general economic growth rates.  The occurrence of recessions or other periods of low or negative economic growth will typically have a direct adverse impact on crude oil prices.  Other factors that affect general economic conditions in the world or in a major region, such as changes in population growth rates, periods of civil unrest, ***pandemics (e.g. COVID-19)*** government austerity programs, or currency exchange rate fluctuations, can also impact the demand for crude oil. Sovereign debt downgrades, defaults, inability to access debt markets due to credit or legal constraints, liquidity crises, the breakup or restructuring of fiscal, monetary, or political systems such as the European Union, and other events or conditions ***(e.g. pandemics such as COVID-19),*** that impair the functioning of financial markets and institutions also may adversely impact the demand for crude oil.

148.177.    Other than the phrase "e.g. pandemics such as COVID-19," the above paragraph is identical word-for-word to an excerpt from a Fund prospectus provided to investors in ***February 2019***.  The March Registration Statement simply appended COVID-19 to an existing laundry list of potentially disruptive market events without any substantive discussion whatsoever of how the pandemic was actually impacting the Fund at the time of the offering or could impact the Fund going forward.  This bare mention provided no more information than what was already apparent to any investor alive at the time: that COVID-19 was in fact a thing that existed that could

**Formatted:** Font: Bold, Italic

"affect general economic conditions in the world." This empty incantation was thus less than worthless, because it gave investors the false and misleading impression that COVID-19 did not present any specific risks to USO other than those impacting oil-related securities generally, when in fact it had converged with other material adverse events in the lead up to the March Offering that together threatened the Fund's very existence.

149.178.    Incredibly, the March Registration Statement said even less about the impact of the Saudi/Russia oil price war on the Fund.  This is because the registration statement said nothing *at all* about the Saudi/Russia oil price war, even though it had already been raging for two weeks at the time.  The March Registration Statement also failed to mention any of the myriad other events, trends and uncertainties adversely impacting the Fund as of the offering date, as detailed in ¶¶65-13872-163.  In fact, the March Registration Statement barely mentioned anything that had occurred to the Fund since the start of the year, instead referring investors to the Fund's historical performance and market data *as of December 31, 2019*.  This reference to pre-2020 USO operating performance and market data and failure to meaningfully update the Fund's risk disclosures created the false and misleading impression that these historical representations accurately reflected the Fund's performance and risk profile at the time of the offering, even though the Fund's actual performance and risk profile had, by that time, in fact radically deteriorated.

179.    Similarly, the Fund's related boilerplate risk disclosures about crude oil supply- and demand-related factors failed to mention that other significant supply-related factors, combined with the severe demand-oriented impacts of COVID-19 continued to materially impact the Fund and substantially exacerbate the risks that had since developed following the February Registration Statement.  Indeed, the impacts of this economic turmoil on the Fund, and the related heightened risks associated therewith, crystalized substantially in the weeks leading up to the March

- 99 -

Registration Statement.  The circumstances had at the time already caused "one of the biggest oil crashes in history," even prior to the subsequent extreme market turmoil in April 2020.  An industry professional described the situation four days before the March Registration Statement as "*Operation Desert Storm, Enron, 9/11, Hurricane Katrina/Rita, Lehman Bros, combined*."  ¶76. By failing to disclose the impacts and related risks associated with these events in the March Registration Statement, Defendants violated their duty to ensure that the true risks of investing in USO were adequately disclosed to investors.

150.180.    The March Registration Statement made numerous additional material misrepresentations and omissions regarding USO.  For example, the March Registration Statement highlighted USO's purported investment strategy and objectiveUSO's investment strategy and objective, including highlighting USO's purported strategy itself – *i.e.*, "[t]he investment objective of USO is for the daily changes in percentage terms of its shares' per share [NAV] to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the . . . 'Benchmark Oil Futures Contract,'" – but failed to disclose the existential threats facing the Fund that made this claimed investment strategy and objective unfeasible at the time, including the fact that the March Offering *itself* would cause USO to run up against regulatory limits that sharply constrained the Sponsor's investment discretion, compounding already severe market disruptions and accelerating investor losses, as detailed in ¶¶65-138.  The March Registration Statement stated in pertinent part as follows:72-163.

**USO's Investment Objective and Strategy**

The investment objective of USO is for the daily changes in percentage terms of its shares' per share net asset value ("NAV") to reflect the daily changes in percentage terms of the spot price of light, sweet crude oil delivered to Cushing, Oklahoma, as measured by the daily changes in the price of a specified short-term futures contract on light, sweet crude oil called the "Benchmark Oil Futures Contract," plus interest earned on USO's collateral holdings, less USO's expenses.

- 100 -

*    *    *

~~The Benchmark Oil Futures Contract is the futures contract on light, sweet crude oil as traded on the New York Mercantile Exchange (the "NYMEX") that is the near month contract to expire, except when the near month contract is within two weeks of expiration, in which case it will be measured by the futures contract that is the next month contract to expire.~~

~~151.~~181.    In addition, the March Registration Statement claimed that the "average daily difference was (0.001)% (or (0.01) basis points" between USO's per share NAV and the price of its benchmark contracts.  Thus, the registration statement represented that USO had almost perfectly matched its investment objective since inception.  The registration statement also included the following chart through December 31, 2019 showing the purportedly close correlation between USO's monthly returns and monthly benchmark futures contracts:



~~152.~~182.    The statements contained in ¶¶~~150-151~~180-181 were materially false and misleading when made.  As detailed in ¶¶~~65-138~~72-163, the rapid growth of USO, which would accelerate as a result of the March Offering, meant that USO's stated investment strategy was already impracticable at the time of the offering and that the Fund could not achieve its investment

- 101 -

objective. Indeed, after the ***very first*** monthly roll following the launch of the March Offering, CME on behalf of the NYMEX intervened to impose strict positional limits on the Fund, thereby precipitating a rapid-fire and complete overhaul of the Fund's investment strategy and sharp divergence from its stated investment objective. Notably, the Fund conducted no additional offerings prior to this drastic regulatory intervention, and thus the magnitude of USO's position that ran afoul of regulatory authorities was simply a function of the shares issued in the February Offering and the March Offering.

~~153.~~183. Similarly, the March Registration Statement claimed that "[i]nvestors may choose to use USO as a means of ***investing indirectly in crude oil***." The registration statement also stated that USO had been "***designed*** to permit investors generally to purchase and sell USO's shares ***for the purpose of investing indirectly in crude oil in a cost-effective manner***." The registration statement likewise represented that USO's market price would "closely track" the daily changes in the spot price of WTI oil, reinforcing the false and misleading notion that investors could use USO as a cost-effective means of gaining exposure to crude oil prices. The registration statement stated in pertinent part as follows:

> In addition, USCF believes that ***market arbitrage opportunities will cause daily changes in USO's share price on the NYSE Arca on a percentage basis to closely track daily changes in USO's per share NAV on a percentage basis***. USCF further believes that daily changes in prices of the Benchmark Oil Futures Contract have historically closely tracked the daily changes in spot prices of light, sweet crude oil. USCF believes that ***the net effect of these relationships will be that the daily changes in the price of USO's shares on the NYSE Arca on a percentage basis will closely track, the daily changes in the spot price of a barrel of light, sweet crude oil on a percentage basis***, less USO's expenses.

~~154. Similarly~~Additionally, the March Registration Statement claimed that "the changes in the price of USO's shares as traded on the NYSE Arca ***have closely tracked and will continue to closely track*** on a daily basis, the changes in the spot price of light, sweet crude oil on a percentage basis."

- 102 -

184.    ~~The~~ Similarly, the March Registration Statement ~~also~~ provided the Fund's *historical* price premium over per share NAV through December 31, 2019, but did not provide this information for 2020. The March Registration Statement stated, in pertinent part, that "[t]he table below shows the relationship between the trading prices of the shares and the daily NAV of USO, since inception through December 31, 2019":

| | USO |
|---|---|
| Average Difference | $ (.00)% |
| Max Premium % | 6.75% |
| Max Discount % | 4.51% |

~~155.~~185.    The registration statement used this constrained historical view to claim that the maximum price premium experienced by the Fund was 6.75%, *when in fact the Fund had suffered a 9.14% premium on March 18, 2020*. The registration statement also downplayed the possibility that any significant price premium would regularly occur, claiming that the rare instances when the per share NAV and market price did not closely converge were attributable to differences in timing between market hours for the NYSE (on which the shares trade) and the NYMEX (on which the WTI futures traded). These representations were materially false and misleading when made because the Fund was suffering drastic price premiums at the time of the March Offering that were far outside historical norms and not due to a difference in market hours, but rather the adverse events detailed in ¶¶65-138. Indeed, USO had suffered an extraordinarily high price premium of 4.63% or greater on *three of the six days* leading up to the March Offering, including the Fund's highest price premium ever, 9.14%, suffered on March 18, 2020. ~~The March Registration Statement stated in pertinent part as follows:~~

~~The table below shows the relationship between the trading prices of the shares and the daily NAV of USO, since inception through December 31, 2019. The first row shows the average amount of the variation between USO's closing market price and NAV, computed on a daily basis since inception, while the second and third rows depict the maximum daily amount of the end of day premiums and discounts to NAV since inception, on a percentage basis. USCF believes that maximum and minimum~~

- 103 -

*end of day premiums and discounts typically occur because trading in the shares continues on the NYSE Area until 4:00 p.m. New York time while regular trading in the benchmark futures contract on the NYMEX ceases at 2:30 p.m. New York time and the value of the relevant benchmark futures contract, for purposes of determining its end of day NAV, can be determined at that time.*

| | USO |
|---|---|
| Average Difference | $ (.00)% |
| Max Premium % | 6.75% |
| Max Discount % | 4.51% |

156.186.        The statements contained in ¶¶153-155183-185 were materially false and misleading when made, because, as detailed in ¶¶65-13872-163, USO and the markets in which it operated were suffering distortions and unprecedented volatility that had caused, and would continue to cause, the key metrics noted in the March Registration Statement to materially diverge.  As a result, the daily changes in the price of USO did *not* "closely track" and had materially diverged from the daily changes in the Fund's NAV per share, as well as the daily changes on WTI near month futures contracts and spot crude prices on multiple days leading up to the March Offering. These divergences were due in part to Defendants' own actions and were being significantly exacerbated by the February Offering and the March Offering.  Furthermore, USO was not a cost-effective means to invest, even indirectly, in crude oil, but in fact an incredibly expensive and highly risky means of investing in WTI futures contracts that guaranteed investors would suffer substantial losses due to the NAV premium, super contango dynamic, negative roll yield, Fund structural deficiencies, marketplace distortions and other issues impacting USO at the time, as detailed in ¶¶65-13872-163.  Indeed, in future offerings, the SEC would require Defendants to disclaim that the Fund could or should be used as a "proxy" for directly investing in the oil markets.

157.    In addition, the March Registration Statement represented that USO would roll its benchmark WTI futures contracts "from the near month contract to the next month contract over a four-day period."  The registration statement likewise represented that "USCF does not anticipate letting USO's Oil Futures Contracts expire and taking delivery of the underlying commodity."  The

registration statement claimed that, instead, "USCF will close existing positions, *e.g.*, when it changes the Benchmark Oil Futures Contracts or Other Oil-Related Investments or it otherwise determines it would be appropriate to do so and reinvests the proceeds in new Oil Futures Contracts or Other Oil-Related Investments."

158.    The statements contained in ¶157 were materially false and misleading when made. As detailed in ¶¶65-138, the massive size of the Fund, which was being accelerated by the March Offering, had caused USO to acquire a dominant and dangerous position in WTI near months futures contracts.  As a result, when the Fund attempted to roll its futures contracts forward, this caused market-distorting effects that not only caused USO investors to suffer tremendous losses, but also threatened market-wide stability.  For example, when USO rolled from the April WTI contract into the May WTI contract from March 6, 2020 to March 11, 2020, the price of the April WTI plummeted 31% and the price of USO shares fell 32%.  As USO sold billions of dollars of WTI futures contracts in a short period of time without any regard to price, this placed intense downward pressure on WTI futures prices.  Indeed, the roll period immediately following the March Offering led to the first negative oil prices in history and caused regulators to intervene to prevent the Fund from causing further severe market disruptions.  Furthermore, the fact that USO had become the biggest player in the WTI near futures markets, but never intended to take delivery and instead rolled over its positions, thereby creating intense futures demand untethered to physical delivery, helped spur an oil storage crisis in Cushing, Oklahoma by mid-March 2020.  As a result, USO was not exiting its positions as "appropriate," but rather in a manner that had caused and would continue to cause extreme, undisclosed adverse impacts to the Fund and which threatened the Fund's stated investment strategy and objective. Indeed, USO was forced to more than double its roll period to 10 days following the March Offering in response to regulatory and market pressures in order to

- 105 -

mitigate these dangers.

187.    Further, the March Registration Statement stated that the Sponsor employed a "'*neutral' investment strategy* in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down." The registration statement similarly highlighted that USO was "not actively managed," but instead simply "track[s] the Benchmark Oil Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising." It continued in pertinent part:

> *USO is not actively managed* by conventional methods. Accordingly, if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract. USCF will seek to cause the NAV of USO's shares to *track the Benchmark Oil Futures Contract* during periods in which its price is flat or declining as well as when the price is rising.

188.    The statements contained in ¶187 were materially false and misleading when made. As detailed in ¶¶72-163, the growth of USO and the precarious market conditions facing the Fund posed an existential threat to the Fund's investment objective and strategy and caused the Fund to run up against regulatory limits, forcing the Fund to radically overhaul its investment approach. Only a few weeks after the March Offering, USO was forced to change from a passive investment vehicle used to track the spot price of oil through current WTI futures contracts to what was effectively an actively managed fund frantically struggling to avoid a total implosion and satisfy concerned regulators through a hodgepodge of oil-related investments that caused the Fund to deviate significantly from its stated investment objective. Indeed, market observers at the time widely viewed the Fund's sudden and unprecedented changes as "becom[ing] an *actively managed* ETF," particularly given that "the list of what USO could own" as a result of the Fund's radical overhaul became "so broad and vague as to be *worthless*." ¶¶139.

- 106 -

**Formatted:** Font: Bold, Italic

**Formatted:** Font: Not Bold, Not Italic

**Formatted:** Font: Bold, Italic

189.    Furthermore, as detailed in ¶127, the passive and price-insensitive nature of the Fund heightened the risks faced by investors and caused USO to suffer predation by hedge funds and other sophisticated market participants with access to proprietary data and investment tools not available to the general market before, during and after the March Offering.  Market observers and reports at the time of the March Offering widely recognized that USO operated as a passive fund that was *not* actively managed by USCF.  Indeed, one noted that the fact that the Fund was not actively managed was an "*important* [point] to remember" about the Fund.  ¶¶139.  But given the existential threats to the Fund's investment objective and strategy that existed at the time of the March Offering, investors were left in the dark about the then-present risks threatening the Fund's ability to achieve its investment objective, as communicated to investors, without radical intervention.  Indeed, investors had universally understood that investing in USO was one of, if not *the* easiest way to gain exposure to crude oil by *simply* tracking the Benchmark Oil Futures Contract – which it had done by investing virtually all of its holdings in such contracts for *14 year*s.  ¶¶139.  The Fund's risk disclosures about USO's investment strategy failed to provide investors – and in particular unsophisticated retail investors who had significantly contributed to the Fund's growth leading up to the March Offering – with a complete picture of the then-existing threats to USO's investment strategy.

159.190.    Moreover, the March Registration Statement provided USO's historical investment returns through the end of 2019, but failed to inform investors regarding the hundreds of millions of dollars in losses that had been suffered by the Fund since the beginning of 2020.  For example, the registration statement stated, "for the year ended December 31, 2019, the actual total return of USO as measured by changes in its per share NAV was 33.26% … based on an initial per share NAV of $9.59 on December 31, 2018 and an ending per share NAV as of December 31, 2019 of $12.78."  The registration statement also claimed that the worst monthly draw down in the Fund's

- 107 -

history was in November 2018, during which the Fund had suffered a 22.11% loss. The registration statement included the following "Rates of Return," which notably omitted the Fund's horrendous rates of return since the start of 2020:

| Month | Rates of Return* | | | | |
|---|---|---|---|---|---|
| | 2015 | 2016 | 2017 | 2018 | 2019 |
| January | (10.47)% | (12.34)% | (3.33)% | 7.28% | 17.831% |
| February | 1.39% | (6.93)% | 1.24% | (4.32)% | 5.752% |
| March | (7.76)% | 8.34% | (7.33)% | 5.65% | 4.603% |
| April | 21.52% | 15.91% | (3.20)% | 5.65% | 6.400% |
| May | (0.63)% | 5.31% | (2.92)% | (2.02)% | (16.32)% |
| June | (2.16)% | (2.77)% | (5.11)% | 10.77% | 8.985% |
| July | (21.48)% | (15.31)% | 8.45% | (4.86)% | 0.17% |
| August | 3.00% | 5.61% | (6.13)% | 2.73% | (5.68)% |
| September | (9.62)% | 6.38% | 8.30% | 5.38% | (1.57)% |
| October | 2.13% | 3.81% | 4.60% | (10.54)% | 0.27% |
| November | (13.10)% | 3.96% | 5.13% | (22.11)% | 1.86% |
| December | (14.77)% | 6.45% | 5.23% | (11.04)% | 10.94% |
| Annual Rate of Return | (45.31)% | 6.26% | 3.16% | (20.61)% | 33.26%** |

160.191.    The statements contained in ¶159190 were materially false and misleading when made. USO was in fact suffering the worst monthly draw down in its history in March 2020, a *54.7% loss*, more than double the worst historical monthly performance provided in the March Registration Statement as detailed in ¶¶65-13872-163. In February 2020, USO had suffered a $225 million realized trading loss on its futures contracts, which would not be disclosed until March 27, 2020 – after the March Offering launched. Worse, by the time of the March Offering the Fund had suffered close to $1 billion in additional losses in March alone and was on track to lose $*1.2 billion* by the end of the month. This fact would not be disclosed until April 28, 2020 – more than a month after the launch of the March Offering. Thus, the statements in the March Registration Statement regarding USO's historical performance were materially false and misleading because the actual historical performance of the Fund had radically diverged from these trends by the time of the offering. In fact, the Fund was suffering losses that far exceeded any pre-2020 precedent by hundreds of millions of dollars.

161.192.    The March Registration Statement also discussed the potential effects of "contango," but failed to disclose the deleterious super contango dynamic that the Fund was

- 108 -

suffering at the time of the March Offering and the reasons for the extraordinary contango environment, as discussed in ¶¶65-13872-163. To the contrary, the registration statement falsely claimed that "[p]eriods of contango … ***do not materially impact*** USO's investment objective" as contango and backwardation tended "to ***equally*** impact the daily percentage changes in price of both USO's shares and the Benchmark Oil Futures Contract." The registration statement further provided the following charts of the purported market environment in which the Fund was operating, which ended in December 2019 at a time that the market was experiencing significant backwardation:



\*       \*       \*





*      *      *



162.193.    The statements contained in ¶161192 were materially false and misleading when made.  By the time of the March Offering, the WTI futures front month to next month contracts were already in a super contango dynamic of $2.12, roughly 6.7 times the five-year historical average.  The front month and the twelfth month WTI contracts were in an even more extreme contango dynamic of $9.97, compared to a backwardation between these two contracts of $0.11 at the time of the February Offering.  Thus, the statements in the March Registration Statement regarding the contango and backwardation dynamics impacting the Fund were materially false and misleading because the actual contango effects had radically diverged from these trends by the time of the offering.  The Fund was not only *not* enjoying a backwardation environment (as indicated by the historical charts provided), but in fact was suffering from extreme super contango effects that had caused and would continue to cause the Fund to suffer hundreds of millions of dollars in losses.  Furthermore, the March Registration Statement failed to disclose the underlying causes of the

- 111 -

contango environment, including that ***USO itself*** was contributing to the contango dynamic as detailed in ¶¶65-13872-163, and the fact that the continued growth of the Fund through the March Offering was certain to exacerbate these effects. Indeed, as the May 6 Amendment belatedly admitted, the USO share issuance contributed to market instability and "contango dramatically increased and reached ***historic levels***" "***[i]n March 2020***." ¶¶146, 149. And as later admitted in the May 6 Amendment, "***[p]rior to 2020***, periods of contango or backwardation have ***not*** materially impacted USO's investment objective." Thus, the May 6 Amendment suggested that, in 2020 – given the radical contango dynamic that existed during the Class Period – contango had in fact materially impacted USO's investment objective at the time of the March Offering.

163.194.        Furthermore, the March Registration Statement misleadingly stated that "a prolonged period of contango ***could*** have a significant negative impact on USO's per share NAV and total return." The characterization of contango as a potential, contingent future risk that "***could*** have a significant negative impact" on the Fund was materially misleading because the Fund was ***already*** suffering severe negative impacts from a super contango dynamic at the time. As the USO Defendants would only later admit, contango had already "dramatically increased and reached historic levels" by March 2020. The continued growth of USO was certain to accelerate these effects, including when the Fund dumped billions of dollars' worth of front month WTI futures contracts as part of its April roll process.

164.1.   The March Registration Statement stated that the Sponsor employed a "'neutral' investment strategy in order to track changes in the price of the Benchmark Oil Futures Contract regardless of whether the price goes up or goes down." The registration statement similarly highlighted that USO was "not actively managed," but instead simply "tracks the Benchmark Oil

**Formatted:** Font: Bold, Italic

Futures Contract during periods in which the price of the Benchmark Oil Futures Contract is flat or declining as well as when the price is rising." It continued in pertinent part:

*USO is not actively managed* by conventional methods. Accordingly, if USO's investments in Oil Interests are declining in value, USO will not close out such positions except in connection with paying the proceeds to an Authorized Participant upon the redemption of a basket or closing out futures positions in connection with the monthly change in the Benchmark Oil Futures Contract. USCF will seek to cause the NAV of USO's shares to *track the Benchmark Oil Futures Contract* during periods in which its price is flat or declining as well as when the price is rising.

165. The statements contained in ¶¶163-164 were materially false and misleading when made. As detailed in ¶¶65-138, the growth of USO and the precarious market conditions facing the Fund posed an existential threat to the Fund's investment objective and strategy and caused the Fund to run up against regulatory limits, forcing the Fund to radically overhaul its investment approach. Only a few weeks after the March Offering, USO was forced to change from a passive investment vehicle used to track the spot price of oil through current WTI futures contracts to what was effectively an actively managed fund frantically struggling to avoid a total implosion and satisfy concerned regulators through a hodgepodge of oil-related investments that caused the Fund to deviate significantly from its stated investment objective. Furthermore, as detailed in ¶112, the passive and price-insensitive nature of the Fund heightened the risks faced by investors and caused USO to suffer predation by hedge funds and other sophisticated market participants with access to proprietary data and investment tools not available to the general market before, during and after the March Offering.

166. The March Registration Statement claimed that the Fund's investments remained highly liquid at the time of the March Offering, stating in pertinent part as follows:

**Liquidity**

*USO invests only in Oil Futures Contracts and Other Oil-Related Investments that, in the opinion of USCF, are traded in sufficient volume to permit the ready taking*

- 113 -

*and liquidation of positions* in these financial interests and in Other Oil-Related Investments that, in the opinion of USCF, *may be readily liquidated with the original counterparty or through a third party assuming the position of USO.*

~~167.~~195.    Likewise, the March Registration Statement mentioned applicable regulatory position limits but failed to disclose that USO was approaching these limits or that the necessary positional growth caused by the March Offering itself would result in the Fund running afoul of regulators, thereby jeopardizing the Fund's entire investment strategy and undermining its investment objective.  The registration statement stated in pertinent part as follows:

> *The NYMEX current accountability level for investments for any one month in the Benchmark Oil Futures Contract is 10,000 contracts.*  In addition, the NYMEX imposes an accountability level for all months of 20,000 net futures contracts for light, sweet crude oil.  In addition, the ICE Futures Europe maintains the same accountability levels, position limits and monitoring authority for its light, sweet crude oil contract as the NYMEX.  If USO and the Related Public Funds exceed these accountability levels for investments in the futures contracts for light, sweet crude oil, the NYMEX and ICE Futures Europe will monitor such exposure and may ask for further information on their activities including the total size of all positions, investment and trading strategy, and the extent of liquidity resources of USO and the Related Public Funds.  If deemed necessary by the NYMEX and/or ICE Futures Europe, USO could be ordered to reduce its futures contracts traded on such exchanges to below the 10,000 single month and/or 20,000 all month accountability level.
>
> *       *       *
>
> *USO has not limited the size of its offering and is committed to utilizing substantially all of its proceeds to purchase Oil Futures Contracts and Other Oil-Related Investments.*  If USO encounters accountability levels, position limits, or price fluctuation limits for Oil Futures Contracts on the NYMEX or ICE Futures, it may then, if permitted under applicable regulatory requirements, purchase Oil Futures Contracts on other exchanges that trade listed crude oil futures or enter into swaps or other transactions to meet its investment objective.  In addition, if USO exceeds accountability levels on either the NYMEX or ICE Futures and is required by such exchanges to reduce its holdings, such reduction could potentially cause a tracking error between the price of USO's shares and the price of the Benchmark Oil Futures Contract.

~~168.    The March Registration Statement similarly represented that "[t]he large size of the positions that USO *may acquire* increases *the risk* of illiquidity," without disclosing the significant~~

- 114 -

~~illiquidity threats that USO was then experiencing as a result of the market- dominating positions that the Fund had *already* taken and was planning to take as a result of the March Offering.~~

~~169.~~196.    The statements contained in ~~¶¶166-168~~¶195 were materially false and misleading when made.  As detailed in ¶¶~~65-138~~72-163, the rapid growth of USO had caused it to corner a significant portion of the WTI near futures market.  By mid-March 2020, USO had more than tripled its share of WTI near term futures contracts to 15% of the entire market, a highly dangerous position for any single entity.  This extreme concentration had already caused distortions in the relevant markets impacting the Fund by the date of the March Offering, including, *inter alia*, significant illiquidity, heightened volatility, and divergent correlations in the key metrics that measured the Fund's performance.  In addition, USO was planning to invest substantially all of the proceeds from the March Offering into these same contracts, thereby guaranteeing to further increase illiquidity, volatility and other market-distorting effects.  Furthermore, USO was set to run up against regulatory limits as a result of the March Offering, and the CME intervened shortly thereafter to prohibit the Fund from investing all of the proceeds of the offering in front month futures contracts, contrary to the Fund investment strategy portrayed in the March Registration Statement.  Notably, the April 16 and April 23, 2020 CME letters ordered USO to reduce its near months futures contracts positions as a result of its massive size, despite the fact that the Fund had simply invested the proceeds of the February Offering and the March Offering, demonstrating that the positions necessitated by these offerings alone ran afoul of regulatory limits.

C.    **Violations of Items 303 and 105 of Regulation S-K**

~~170.~~197.    In addition to the materially false and misleading statements in the February Registration Statement and the March Registration Statement identified above, Defendants also violated their affirmative obligations to provide certain material information in these offering documents as required by applicable SEC rules and regulations.

171.198.    Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), requires issuersa company to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable and unfavorable impact on net sales or revenues or income from continuing operations."

172.199.    In May 1989, the SEC issued an interpretive release on Item 303 ("1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events, and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *    *    *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

173.200.    Further, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, ***event or uncertainty*** is known, management must make two assessments:
>
> (1)    Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.
>
> (2)    If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition.  Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

201.    TheItem 303 thus requires disclosure of known trends, events, *or* uncertainties that are *reasonably likely to have a material effect* on the company's financial condition or operational results.  Here, the failure of the February Registration Statement and the March Registration Statement to disclose the facts detailed in ¶¶65-13872-163 violated Item 303 because these

- 116 -

undisclosed adverse events, trends and uncertainties were known ~~and would~~ to Defendants and were reasonably likely to have, and did have, a ~~material impact~~materially adverse effect on the Fund's financial condition, ~~results~~revenue and income. For example, as detailed in ¶¶72-163, several known adverse trends, events and/or uncertainties were then-impacting and reasonably likely to impact USO's financial condition at the time of the February Offering and/or March Offering, including, *inter alia*:

- the increasingly severe risk to the Fund's sole investment objective (*i.e.*, for its per share NAV to reflect daily changes in the spot price of oil, as measured by the Benchmark Oil Futures Contract) from unprecedented economic conditions created by COVID-19 – which defendant Love acknowledged in January 2020 was considered a risk – the over-supply of crude oil in the face of sharply decreasing demand, the growing oil storage crisis, and the convergence of these events, contributing to severe negative economic growth impacting crude oil prices (which, for example, had fallen to an 18-year low by March 18, 2020 – less than half the price just two weeks previously) and thus the Fund's performance at the time of the Offerings given the admittedly close relationship between these factors and USO's NAV per share and public trading price;

- sharply rising positional concentration, volatility and market illiquidity as a result of the Fund's rapid growth during the Class Period – particularly given the unprecedented and sustained inflows into the Fund, including from unsophisticated retail investors seeking exposure to crude oil prices – as a result of the billions of dollars' worth of shares sold in the February Offering (that, combined with the additional 1 billion USO shares provided in the March Offering, all but ensured USO would run up against regulatory accountability levels and position limitations), as evidenced by, *inter alia*: (1) WTI front month futures contracts volume exploding to more than 26% greater than the largest single-day trading volume in at least five years by March 9, 2020; (2) trading volume in USO spiking to approximately 72% above its historical peak by March 18, 2020; and (3) the fact that the 15-day historical WTI front month futures volatility had risen seven fold in a matter of days by March 19, 2020;

- the widening divergence between the Fund's per share NAV and market price – creating an unprecedented and costly premium, or overpayment, for USO shares – including to more than double the Fund's pre-March 2020 peak historical price premium on March 18, 2020, an important fact for investors because Defendants represented that "shares traded on the NYSE Arca closely track[] the NAV of USO";

- accelerating super contango effects, which caused the Fund to suffer losses and which had risen to 6.7 times the historical average by March 23, 2020, particularly given the USO Defendants' later admissions that contango had "dramatically

- 117 -

increased" and reached "historic levels" "[i]n March 2020," including rising to the highest level in the Fund's 14-year history, and that contango had materially impacted USO's investment objective during the Class Period; and

- as a result of the foregoing then-existing developments, trends, events and/or uncertainties, the Fund was suffering massive investor losses – to the tune of over $205 million in net income ~~from continuing operations~~losses (and $225 million in realized trading losses on its futures contracts) in February 2020 and an additional nearly *$1 billion* in losses by the time of the March Offering – which deviated radically from USO's historical investment returns that had been represented to investors.

~~174.~~202.    These trends, events and/or uncertainties were known to Defendants, including because: (1) the USO Defendants scrupulously monitored the oil markets and other events, trends, and uncertainties impacting the Fund or likely to impact the Fund (and its performance), including global supply and demand factors, crude oil inventory data, storage capacity levels, oil production, geopolitical developments affecting oil prices, and macroeconomic trends; (2) the USO Defendants had access to and received confidential market data and other proprietary information during the Class Period, including by virtue of their licensing agreement with NYMEX; (3) the USO Defendants maintained regular communications with market participants, including, for example, "constant contact" with the CME Group about approaching regulatory and accountability levels; (4) USCF, the Fund's Sponsor, was a small, 15-person company responsible for billions of dollars of oil futures contracts during the Class Period and led by CEO and President defendant Love, who worked as the portfolio manager of USO during its launch in 2006, and who also solicited investment and sold USO shares as a registered representative of USO's marketing agent, defendant ALPS, during the Class Period; and (5) the Authorized Participant Defendants had a duty to conduct an adequate due diligence investigation during the Class Period in their role marketing and selling shares of USO in the offerings, including through their relationships with ALPS and USCF.

~~175.~~203.    In addition, Item 105 of SEC Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required, in the "Risk Factors" section of the February Registration Statement and the March

Registration Statement, a "discussion of the most significant factors that made the offering risky or speculative" and that each risk factor "adequately describe[] the risk," including by concisely explaining "how each risk affects the registrant or the securities being offered." Defendants failed to include in the February Registration Statement and the March Registration Statement adequate explanations of the risks arising from the undisclosed facts alleged in ¶¶65-13872-163, despite the fact that these risks were already severely affecting USO and the shares being offered in the February Offering and the March Offering, and were likely to increase and continue to negatively impact the Fund, posing a high risk of catastrophic losses for investors and an existential threat to the Fund and its stated investment strategy and objective. Indeed, the February Registration Statement and March Registration Statement largely copied the risk discussions from past USO offerings verbatim, without materially updating relevant risk disclosures despite the fact that the risk profile of the Fund had been radically altered as a result of changed events, trends and uncertainties. Because these omitted material facts were not disclosed, as well as the consequent material adverse effects on the Fund's results and prospects, Defendants violated Item 105.

176.204.    In fact, the purported risk factors included in the February Registration Statement and the March Registration Statement were themselves materially misleading. While the registration statements acknowledged the materiality to the Fund of certain categories of potentially adverse events, they failed to disclose the most significant adverse events and uncertainties that were then already occurring, threatening the Fund's very existence and undermining the Fund's ability to achieve its investment objective. Instead, the registration statements offered only generic, boilerplate discussions of future potential adverse impacts to the Fund that "*may*" or "*could*" occur if general categories of contingent circumstances later developed, while failing to disclose that extreme examples of these adverse events had *already* happened in the lead up to the offerings and providing

- 119 -

contra-indicators that undermined these purported contingencies.  For example, the March Registration Statement stated the "public trading price at which an investor buys or sells shares during the day from their broker *may* be different from the NAV of the shares," without disclosing that USO had suffered the highest price premium in its history on March 18, ~~2018~~2020 – just five days before the March Offering.  Moreover, the March Registration Statement also stated that "daily changes in USO's share price on the NYSE Arca on a percentage basis" had and apparently would continue to "*closely track* daily changes in USO's per share NAV," providing a false and misleading reassurance to investors that the possibility of significant and sustained price premium divergence was remote.

**Formatted:** Font: Bold, Italic

~~177.~~205.    The discussion of potential events that may occur in the future while failing to disclose related events that had already occurred and were then impacting USO rendered these statements of future, contingent so-called "risks" in the February Registration Statement and the March Registration Statement themselves materially misleading.  Further, by failing to provide any meaningful discussion of concrete harms and imminent threats then facing the Fund and instead simply copying generic, boilerplate risk disclosures from past offerings, the February Registration Statement and the March Registration Statement created the false and misleading impression that the risk profile of the Fund had not materially changed since the time of these prior offerings when in fact the Fund's risk profile had changed significantly as a result of the adverse events, trends and uncertainties detailed herein.

**D.    April 2020 Statements Regarding Changes to USO's Investment Strategy**

206.    On April 16, 2020, USO filed with the SEC on Form 8-K an announcement that the Fund would substantially revise its investment strategy beginning the next day, such that the Fund would only invest 80% of its portfolio in front month WTI futures contracts.  One analyst likened the

- 120 -

move to having "***dropped a bomb on the energy markets***," particularly given that USO had been known for well over a decade as a passively managed fund that invested almost exclusively in the front month futures contract.  However, this statement was materially misleading because it failed to disclose the specific reasons for the Fund's abrupt strategy change, including the fact that it had been necessitated by the adverse facts detailed in ¶¶72-163 and as a result of the Fund's rapid growth through the February Offering and the March Offering.  This statement was further misleading because it failed to disclose that on April 16, 2020, the CME, on behalf of the NYMEX, had sent a letter to the USO Defendants specifically ***ordering*** them to limit the Fund's exposure to June WTI futures contracts, a drastic regulatory move that undermined the stated investment strategy and objective of the Fund and that signaled the sharp curtailment of the Sponsor's investment discretion. The April 16, 2020 statement also failed to disclose that the CME Group was at the time in constant contact with USO about approaching accountability levels.

207.    Substantially similar material statements and omissions were again made by the USO Defendants in connection with a Form 8-K filed by USO on April 22, 2020, which announced that the Fund had changed its investment objective again but failed to provide the extraordinary regulatory intervention that had necessitated those changes.  Additionally, by this time, as would later be revealed following the issuance of the SEC and CFTC orders, USO's sole FCM, RBC, had informed the Fund that it would not execute any new oil futures positions for USO, a fact that the SEC determined was "critical to USO," and thus to investors.  Significantly, the SEC and CFTC imposed a $2.5 million penalty on USO and USCF for failing to disclose material information to investors regarding the limitation.

208.    Similarly, on April 21, 2020, USO filed with the SEC on Form 8-K an announcement that the SEC had yet to declare effective an S-3 registration statement for the sale of an additional 4

billion USO shares, which had been filed the previous day. This statement was materially misleading because it failed to disclose the specific reasons for the SEC's refusal to declare the registration statement effective, including due to the adverse facts detailed in ¶¶72-163. In fact, the SEC would not declare the registration statement effective until nearly *eight weeks* later, and only after the USO Defendants materially revised the disclosures to investors contained therein.

**E.    Statements and Omissions Regarding Subsequent Events Necessitating Disclosure**

209.    On March 20, 2020, USO filed with the SEC on Form 8-K the audited financial statements for the Sponsor for the year ended December 31, 2019. The Form 8-K stated that the "Company evaluated subsequent events for recognition and disclosure through March 20, 2020, the date the statements of financial condition were issued or filed" and that "*[N]othing has occurred* outside normal operations since that required recognition or disclosure in these statements of financial condition." These statements were materially false and misleading when made, because, as detailed in ¶¶72-163, the Sponsor's largest fund, USO, was suffering losses during the Class Period that far exceeded any pre-2020 precedent by hundreds of millions of dollars due to undisclosed adverse events, trends and uncertainties. In fact, USO was suffering the worst monthly draw down in the Fund's history in March 2020, a *54.7% loss*. By the time of the March Offering, the Fund suffered close to $1 billion in losses, and was on track to lose $*1.2 billion* by the end of the month. Thus, the statements regarding the Sponsor's historical performance were materially false and misleading because the actual historical performance of the Sponsor and its largest client, the Fund, had radically diverged from the presented trends, and numerous new material events, trends and uncertainties had subsequently arisen that were required to be disclosed (as detailed herein) at the time of the Form 8-K filing.

210.    Similarly, on March 24, 2020, USO filed with the SEC on Form 8-K the financial statements and performance for USO for the year ended December 31, 2019.  The Form 8-K highlighted the Fund's 33.26% return during the year.  Further, the Form 8-K stated that "USO has performed an evaluation of subsequent events through the date the financial statements were issued" and that this "evaluation did *not result in any subsequent events* that necessitated disclosures and/or adjustments."   These statements were materially false and misleading when made, because, as detailed in ¶¶72-163, USO was suffering losses during the Class Period that far exceeded any pre-2020 precedent by hundreds of millions of dollars due to undisclosed adverse events, trends and uncertainties.  In fact, USO was suffering the worst monthly draw down in the Fund's history in March 2020, a *54.7% loss*.  By the time of the March Offering, the Fund suffered close to $1 billion in losses, and was on track to lose $*1.2 billion* by the end of the month.  Thus, the statements regarding USO's historical performance (filed with only five trading days left in March 2020) were materially false and misleading because the actual historical performance of the Fund had radically diverged from the presented trends, and numerous new material events, trends and uncertainties had in fact subsequently arisen that were required to be disclosed as detailed herein at the time of the Form 8-K filing.

### D.F.    Statements Posted on ~~USO's~~USCF's Website Throughout the Class Period

~~178.~~211.    The USO Defendants provided purportedly daily updated statements regarding the Fund on ~~USO's~~USCF's website, http://www.uscfinvestments.com/uso.  Both the February Registration Statement and the March Registration Statement directed investors to the Fund's website to find "ADDITIONAL INFORMATION ABOUT USO, ITS INVESTMENT OBJECTIVE AND INVESTMENTS~~," including the Fund's stated investment objective and strategy, NAV per share, anticipated roll dates, and other information.~~."  The USO Defendants also

continuously published a copy of USO's most recent offering prospectus on the Fund's website, and the February Registration Statement and the March Registration Statement advised investors, "Before making an investment in this fund, you should read this entire prospectus, which can be found on USO's[USCF's] website at *www.uscfinvestments.com*." Thus, the USO Defendants had an obligation to ensure that these statements were complete and up to date (as represented) and not materially false and misleading.

179.212. However, in addition to the false, misleading and incomplete statements contained in the February Registration Statement and March Registration Statement as detailed in ¶¶139-177164-196, by at least March 9, 2020, certain additional categories of statements posted on the Fund's website contained additional materially false and misleading statements and omissions because ofthat failed to disclose the severe market distress, and adverse operatingevents, trends, and existential threatsuncertainties faced by the Fund that then existed, as detailed in ¶¶65-13872-163, which continued and progressively worsened throughout the Class Period. Specifically, the February Registration Statement and later the March Registration Statement posted on USO's website (to which Defendants directed investors for the latest information regarding the Fund), contained the materially false and misleading statements and omissions and categories of such misstatements and omissions as detailed in ¶¶65-17772-210.

180.  In addition, USO's NAV per share and roll information posted daily by the USO Defendants on the website also became materially misleading because it omitted the facts detailed in ¶¶65-138. As a result of these undisclosed adverse facts, trends and uncertainties, the Fund was suffering hundreds of millions of dollars in losses, a breakdown in market fundamentals (including the widening divergence of its NAV per share and share price), and was ultimately forced to abandon its purported investment strategy and objective, effectively preventing the Fund from

- 124 -

recovering in tandem with the eventual recovery in the price of WTI futures contracts.

213.   The USOUSCF website also contained a Fund "factsheetFact Sheet" compiled by the USO Defendants which purportedly summarized the most important information concerning USO. The factsheetFact Sheet stated that the "United States Oil Fund® LP (USO) is an exchange-traded security designed to track the movements of West Texas Intermediate ('WTI') light, sweet crude oil."  It also contained the purported investment strategy and objective of the Fund.  The factsheet further described ostensible "Fund Benefits," including that purportedly: (i) "USO has features including, intra-day pricing, and market, limit, and stop orders"; (ii) "USO offers commodity exposure without using a commodity futures account"; and (iii) "USO provides portfolio holdings, market price, NAV and TNA on its website each day."  These statements"USO offers *commodity exposure without using a commodity futures account*," thus emphasizing the Fund's easy access and exposure to the underlying oil futures contracts to which it sought to track, without adequate warnings about the dangers of investing in USO throughout the Class Period (including in April 2020).  Indeed, the CME Group cautioned that NYMEX, on which USO's oil futures contracts trade, targeted only professional, and *not* retail, investors, even though USO was "arguably built for such ordinary investors."  ¶87.  Tellingly, the USO Defendants later removed this false and misleading document completely from USO's website.  The Fund was the only USCF product featured on the website without this core document, as reflected in the following screenshot taken on November 23, 2020:

| Documents | | | | | | |
|---|---|---|---|---|---|---|
| Fund | Fact Sheet | Prospectus | Audit Committee Charter | Code of Ethics | Governance Policy | Privacy Policy |
| **Broad Commodities** | | | | | | |
| USCI | 📄 | 📄 | 📄 | 📄 | 📄 | 📄 |
| **Single Commodities** | | | | | | |
| USO | | 📄 | 📄 | 📄 | 📄 | 📄 |
| USL | 📄 | 📄 | 📄 | 📄 | 📄 | 📄 |
| BNO | 📄 | 📄 | 📄 | 📄 | 📄 | 📄 |
| UNG | 📄 | 📄 | 📄 | 📄 | 📄 | 📄 |
| UNL | 📄 | 📄 | 📄 | 📄 | 📄 | 📄 |
| UGA | 📄 | 📄 | 📄 | 📄 | 📄 | 📄 |
| CPER | 📄 | 📄 | 📄 | 📄 | 📄 | 📄 |

214.    Additionally, the USCF website contained a "**Disclosures**" webpage that provided a "Description of United States Oil Fund, and the General Risks of the Offering," and refers readers to "the Prospectus preceding or accompanying this Disclosure document" for a "more extensive discussion of the risks associated with investing directly or indirectly in USO."  These purported disclosures for USO were similar to those stated in the Class Period registration statements but they were continuously published and made on the USCF website throughout the Class Period, including in the days and weeks leading up to, and during, the Fund's overhaul in April 2020.  For example, the USO "Disclosures" webpage stated, in pertinent part:

> You may not be able to effectively use USO as a way to hedge against crude oil-related losses or *as a way to indirectly invest in crude oil if* the following were to occur:
>
> • Changes in USO's NAV *may* not correlate with changes in the price of the Benchmark Oil Futures Contracts;
>
> • The Benchmark Oil Futures Contract *may* not correlate with the spot price of light, sweet crude oil and this could cause changes in the price of the shares to substantially vary from the changes in the spot price of light, sweet crude oil;
>
> • Accountability levels, position limits, and daily price fluctuation limits set by the exchanges have the *potential* to cause a tracking error, which *could* cause the price

- 126 -

of shares to substantially vary from the price of the Benchmark Oil Futures Contracts.

The price relationship between the near month contract to expire and the next month contract to expire that compose the Benchmark Oil Futures Contract will vary and *may* impact both the total return over time of USO's NAV, as well as the degree to which its total return tracks other crude oil price indices' total returns.

\*        \*        \*

*[I]n the event of* a crude oil futures market where near month contracts trade at a lower price than next month contracts, a situation described as "contango" in the futures market, then absent the impact of the overall movement in crude oil prices the value of the benchmark contract would tend to decline as it approaches expiration. As a result, the total return of the Benchmark Oil Futures Contract would tend to track lower. When compared to total return of other price indices, such as the spot price of crude oil, the impact of backwardation and contango *may* lead the total return of USO's NAV to vary significantly. *In the event of a prolonged period of contango*, and absent the impact of rising or falling oil prices, this *could* have a significant negative impact on USO's NAV and total return.

181.215.    The statements contained in ¶¶213-214 above were materially false and misleading when made because they failed to disclose the facts listed in ¶¶65-13872-163. The Fund was not an appropriate tool to track the spot price of oil or means for investors to gain even indirect oil exposure.or oil futures contract exposure. The Fund had suffered and was continuing to suffer from (i) heightened detrimental contango effects and a rare super contango market dynamic; (ii) the extreme divergence of the price of USO shares from its per share NAV; and (iii) tracking failures that undermined the Fund's stated investment strategy and objective. Indeed, the SEC later required Defendants to warn investors that USO should *not* be used as a "proxy" for directly investing in oil. Moreover, the rapid growth of USO, which was accelerating as a result of the February Offering and the March Offering, meant that USO's stated investment strategy was impracticable and that the Fund could not achieve its investment objective. Tellingly, the USO Defendants have since removed this false and misleading document completely from USO's website. The Fund is the only USCF product featured on the website without this core document, as reflected in the following screenshot

- 127 -

taken on November 23, 2020:Additionally, Defendants later clarified that contango had "reached *historic levels*" in March 2020, and one analyst observed after the April 20, 2020, oil crash that USO's implosion had "*caused*" "enormous amounts of contango [] in the oil futures curve." In fact, the day after the roll period ended in mid-April, contango stood at $7.29, more than *two-and-a-half times* the prior five-year peak, and a week after the roll ended it had reached an unprecedented $58,06, *22 times* the five-year peak before March 2020.

216.     Moreover, following the Class Period, the USO Defendants have since added dire warnings about the risks of investing in the Fund to the USO website. However, they did so only *after* investors had suffered hundreds of millions of dollars in losses and USO was forced to abandon its stated investment strategy, further confirming that the information contained therein during the Class Period was materially false and misleading when made. These new warnings were captured in the following screenshot taken on November 23, 2020:



Formatted: Justified, No widow/orphan control

E.      Defendants' Additional Materially False and Misleading Statements and Omissions

183.    The USO Defendants made several additional materially false and misleading statements and omissions to investors during the Class Period.

217.    For example, on These additional warnings were so significant that prominent financial media outlets not only reported on them, but also published similar "big red box" warnings, as depicted in ¶216 above, on their own websites.  For example, *Forbes* included an image of a similar warning in a May 4, 2020 article entitled, "Buyer Beware: Retail Investors Buying USO's Oil ETF," and *etf.com* did the same in a May 8, 2020 article entitled, "When Passive Investing Goes Active," as follows:

> Disruptions in the markets for crude oil due to the COVID-19 Pandemic and the oversupply of crude oil, together with evolving regulatory limitations on USO's positions in the oil futures markets relating to such disruptions and increased demand for USO shares, are substantially impacting the ability of USO to make investments to best meet its business objective and could adversely affect the return on an investment in USO shares.  For more information click here to view most recently filed periodic reports and the prospectus.

184.    March 20, 2020, USO filed with the SEC on Form 8-K the audited financial statements for the Sponsor for the year ended December 31, 2019.  The Form 8-K stated that the

- 129 -

"Company evaluated subsequent events for recognition and disclosure through March 20, 2020, the date the statements of financial condition were issued or filed" and that "*[n]othing has occurred* outside normal operations since that required recognition or disclosure in these statements of financial condition." These statements were materially false and misleading when made, because, as detailed in ¶¶65-138, the Sponsor's largest fund, USO, was suffering losses during the Class Period that far exceeded any pre-2020 precedent by hundreds of millions of dollars due to undisclosed adverse events, trends and uncertainties. In fact, USO was suffering the worst monthly draw-down in the Fund's history in March 2020, a *54.7% loss*. By the time of the March Offering, the Fund suffered close to $1 billion in losses, and was on track to lose $*1.2 billion* by the end of the month. Thus, the statements regarding the Sponsor's historical performance were materially false and misleading because the actual historical performance of the Sponsor and its largest client, the Fund, had radically diverged from the presented trends, and numerous new material events, trends and uncertainties had in fact subsequently arisen that were required to be disclosed as detailed herein at the time of the Form 8-K filing. In addition, the USO Defendants were subject to an undisclosed risk of regulatory, legal and reputational fallout (including becoming the subject of regulatory enforcement actions for violating the law) as a result of their failure to adequately disclose these adverse facts.

185.    Similarly, on March 24, 2020, USO filed with the SEC on Form 8-K the financial statements and performance for USO for the year ended December 31, 2019. The Form 8-K highlighted the Fund's 33.26% return during the year. Further, the Form 8-K stated that "USO has performed an evaluation of subsequent events through the date the financial statements were issued" and that this "evaluation did *not result in any subsequent events* that necessitated disclosures and/or adjustments." These statements were materially false and misleading when made, because, as

- 130 -

detailed in ¶¶65-138, USO was suffering losses during the Class Period that far exceeded any pre-2020 precedent by hundreds of millions of dollars due to undisclosed adverse events, trends and uncertainties. In fact, USO was suffering the worst monthly draw-down in the Fund's history in March 2020, a *54.7% loss*. By the time of the March Offering, the Fund suffered close to $1 billion in losses, and was on track to lose $*1.2 billion* by the end of the month. Thus, the statements regarding USO's historical performance (filed with only five trading days left in March 2020) were materially false and misleading because the actual historical performance of the Fund had radically diverged from the presented trends, and numerous new material events, trends and uncertainties had in fact subsequently arisen that were required to be disclosed as detailed herein at the time of the Form 8-K filing. In addition, the USO Defendants were subject to an undisclosed risk of regulatory, legal and reputational fallout (including becoming the subject of regulatory enforcement actions for violating the law) as a result of their failure to adequately disclose these adverse facts.

186. On April 16, 2020, USO filed with the SEC on Form 8-K an announcement that the Fund would substantially revise its investment strategy beginning the next day, such that the Fund would only invest 80% of its portfolio in front-month WTI futures contracts. However, this statement was materially misleading because it failed to disclose the specific reasons for the Fund's abrupt strategy change, including the fact that it had been necessitated by the adverse facts detailed in ¶¶65-138 and as a result of the Fund's rapid growth through the February Offering and the March Offering. This statement was further misleading because it failed to disclose that on April 16, 2020, the CME, on behalf of the NYMEX, had sent a letter to the USO Defendants specifically *ordering* them to limit the Fund's exposure to June WTI futures contracts, a drastic regulatory move that undermined the stated investment strategy and objective of the Fund and that signaled the sharp curtailment of the Sponsor's investment discretion. Substantially the same material omissions were

- 131 -

again made by the USO Defendants in connection with a Form 8-K filed by USO on April 22, 2020, which also announced that the Fund had changed its investment objective but failed to provide the specific reasons and extraordinary regulatory intervention that had necessitated those changes.

187.    Similarly, on April 21, 2020, USO filed with the SEC on Form 8-K an announcement that the SEC had yet to declare effective an S-3 registration statement for the sale of an additional 4 billion USO shares, which had been filed the previous day.    This statement was materially misleading because it failed to disclose the specific reasons for the SEC's refusal to declare the registration statement effective, including due to the adverse facts detailed in ¶¶65-138.  In fact, the SEC would not declare the registration statement effective until nearly *eight weeks* later, and only after the USO Defendants materially revised the disclosures to investors contained therein. Furthermore, on August 17, 2020, the SEC issued a Wells Notice to Defendants USCF, USO and Love stating that the SEC had made a preliminary determination to recommend that the SEC file an enforcement action against these Defendants for violating the 1933 Act and 1934 Act and Rule 10b-5 with respect to the Fund's disclosures to investors and actions in managing the Fund.

**VII.    1933 Act Allegations**

    **A.    Materially False and Misleading Statements and Omissions in the February Registration Statement and the March Registration Statement**

218.    For the reasons set forth above in ¶¶139-177164-205, the statements contained in the February Registration Statement and the March Registration Statement were negligently prepared and, as a result, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made therein not misleading and were not prepared in accordance with the rules and regulations governing their preparation.  Section 11 requires that registration statements disclose all material facts necessary to make other statements in the registration statement not misleading.  The purpose of registration statements is to provide accurate and meaningful material

- 132 -

information so that investors can make informed decisions about whether or not to purchase stock pursuant to a particular offering, and to understand the risks inherent in the investment. Moreover, even publicly known information or risks can be materially misleading if its omission renders other information in the filing misleading to investors.

188.    Subsequent to the February Offering and the March Offering, the price of USO shares sold therein substantially declined in value. Specifically, between February 24, 2020 and April 28, 2020, the price of USO shares declined *more than 80%*.

189.219.    The following chart depicts the precipitous decline in the price of USO shares following the February Offering and the March Offering:



190.220.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of USO shares, Lead Plaintiff and other Class members have suffered significant losses and damages.

### COUNT ICOUNT I

**For Violation of §11 of the 1933 Act Against All Defendants**

- 133 -

**Formatted:** Heading 7

191.221.    Lead Plaintiff incorporates herein the foregoing paragraphs by reference.

192.222.    This Count is brought pursuant to Section 11 of the 1933 Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

193.223.    This Count does not sound in fraud.  Lead Plaintiff does not allege that the USO Defendants, the Individual Defendants or the Underwriter Defendants had scienter or fraudulent intent, which are not elements of a Section 11 claim.

194.224.    The February Registration Statement and the March Registration Statement were inaccurate and misleading, contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

195.225.    The Defendants named herein were responsible for the contents and dissemination of the February Registration Statement and the March Registration Statement.

196.226.    The Fund is the registrant for USO shares sold during the Class Period.  As the issuer of the shares, the Fund is strictly liable to Lead Plaintiff and the Class for the misstatements and omissions contained in the February Registration Statement and the March Registration Statement.  Similarly, as the relevant executive officers, principals, directors and investment managers of USO and USCF, the Individual Defendants and the Sponsor drafted the February Registration Statement and the March Registration Statement and were responsible for its contents.  The Individual Defendants also signed the February Registration Statement and the March Registration Statement on behalf of themselves, USO and the Sponsor.  Furthermore, as the authorized participants and marketing agent for the Fund, the Underwriter Defendants underwrote, marketed, sold and distributed the USO shares sold in the February Offering and the March Offering.

- 134 -

197.227.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the February Registration Statement and the March Registration Statement were true and without omissions of any material facts and were not misleading.

198.228.     By reason of the conduct herein alleged, each Defendant named herein violated, and/or controlled a person who violated, Section 11 of the 1933 Act.

199.229.     Lead Plaintiff and members of the Class purchased USO stock pursuant and/or traceable to the February Registration Statement and/or the March Registration Statement.

200.230.     Lead Plaintiff and the Class have sustained damages.  The value of USO shares has declined substantially subsequent to the February Offering and the March Offering and due to Defendants' violations of the 1933 Act detailed herein.

201.231.     At the time of their purchases of USO shares, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that Lead Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that this action was commenced. Less than three years have elapsed between the time that USO shares upon which this Cause of Action is brought was offered to the public and the time this action was commenced.  It is therefore timely.

### COUNT IICOUNT II

**For Violation of §15 of the 1933 Act**
**Against the Sponsor and the Individual Defendants**

202.232.     Lead Plaintiff incorporates herein the foregoing paragraphs by reference.

Formatted: Heading 7

203.233.        This Count is brought pursuant to Section 15 of the 1933 Act against the Sponsor and the Individual Defendants.

204.234.        The Individual Defendants were each control persons of the Fund and the Sponsor by virtue of their positions as directors, senior officers and/or principals of the Fund or the Sponsor.  USO had no executive officers, and its affairs were entirely managed and controlled by the Individual Defendants and the Sponsor.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or principals of the Fund and/or the Sponsor.  The Individual Defendants signed the February Registration Statement and the March Registration Statement and were responsible for its contents.

205.235.        The Sponsor controlled the Fund as its commodity pool operator and investment manager.  The Sponsor also controlled the Individual Defendants and all of its employees.

206.236.        The Defendants named herein each were culpable participants in the violations of Section 11 of the 1933 Act alleged in the Count above, based on their having signed or authorized the signing of the February Registration Statement and the March Registration Statement, selling USO shares and/or having otherwise participated in the process that allowed the offer and sale of USO shares to investors be successfully completed.

## VIII.   1934 ACT ALLEGATIONS

### A.    The USO Defendants' Scienter

207.237.        The prior paragraphs, ¶¶1-187217, are incorporated by reference herein.  In addition, under the 1934 Act, the USO Defendants are liable for: (i) making false and misleading statements during the Class Period as detailed herein; (ii) knowingly or recklessly failing to disclose adverse facts known to them about USO; and (iii) engaging in a fraudulent scheme to sell USO shares at artificially inflated prices, as detailed herein.  The USO Defendants' fraudulent scheme and

- 136 -

**Formatted:** Keep with next, Keep lines together

course of business that operated as a fraud or deceit on purchasers of USO securities was a success, as it: (i) deceived the investing public regarding USO's business, prospects and risks; (ii) artificially inflated the prices of USO securities; and (iii) caused Lead Plaintiff and other members of the Class to purchase USO securities at artificially inflated prices.

208.238.    The USO Defendants acted with scienter in that the USO Defendants: (i) knew, or at the very least were reckless in not knowing, that the public documents and statements they issued or disseminated in the name of the Fund during the Class Period were materially false and misleading when made; (ii) knew that such statements or documents would be issued or disseminated to the investing public; and (iii) knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  The USO Defendants, by virtue of their receipt of information reflecting the true facts regarding USO, their control over, and/or receipt and/or modification of the Fund's allegedly materially misleading misstatements and/or their associations with the Fund and/or the Sponsor which made them privy to confidential proprietary information concerning USO, were active and culpable participants in the fraudulent scheme alleged herein.

209.239.    Furthermore, the USO Officer Defendants and the Sponsor made, or caused to be made, the false and misleading statements that artificially inflated the price of USO shares, including by signing the February Registration Statement and March Registration Statement and other documents filed with the SEC and posted to the Fund's website during the Class Period.  The USO Officer Defendants, because of their positions with the Fund and/or the Sponsor, possessed the power and authority to control the contents of the Fund's public statements during the Class Period. The USO Officer Defendants, who were executive officers and principals of the Sponsor, were provided with copies of the Fund's statements alleged herein to be misleading prior to or shortly

- 137 -

after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions with the Fund and/or the Sponsor and their access to material non-public information, the USO Officer Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations being made were materially false and misleading.  As a result, each of the USO Officer Defendants and the Sponsor is responsible for the accuracy of the Fund's public statements and therefore liable for the misrepresentations contained therein.

210.240.    The USO Defendants, as the creators, issuers and operators of the largest oil-related ETF in existence and dominant players in the complex commodities and futures markets impacting the Fund's performance, each possessed unique insider knowledge about the adverse facts, events, trends and uncertainties detailed herein.  The USO Defendants created the Fund, designed its investment objective, assessed its risks and likely performance, and were responsible for the daily management of the Fund.  Indeed, defendant Love first worked as a portfolio manager of the Fund for four years beginning with USO's launch in 2006.  During the Class Period, USCF was a small, 15-person company, managed under the leadership of Love, as CEO and President.  The USO Defendants also drafted and disseminated statements on behalf of the Fund to the investing public, including those detailed herein and issued during the Class Period, and held themselves out as the persons and entities most knowledgeable about the Fund and the factors impacting the Fund and its risk profile.

241.    Before and throughout the Class Period, the USO Defendants scrupulously monitored the oil markets, including global supply and demand changes, crude oil inventory data, storage capacity levels, oil production, geopolitical developments affecting oil prices, and macroeconomic trends.  For example, at a panel discussion at the University of San Francisco on April 21, 2016,

- 138 -

defendant Love emphasized the importance of monitoring data affecting oil markets and stated that "***you can certainly make probabilistic judgments about what's going to happen*** and to do that you want as much information as you can have." During that discussion, Love stated that "this week the inventory numbers have been pretty good," implying he monitored oil inventory levels on at least a ***weekly*** basis. He also discussed global supply and demand trends, stating that "we just have multiple quarters in a row where global supply is exceeding demand and that is the whole reason that the price has done what it's done." Lastly, he acknowledged closely tracking recent oil market events by touching on the "OPEC meeting [ ] that occurred on Sunday" and the "Kuwaiti oil strike."

242.    Likewise, during an interview at the Inside ETFs conference in January 2017, Love described how USCF regularly analyzed data releases, OPEC policy, and macroeconomic signals to anticipate movements in oil prices and futures contracts. During that interview, Love discussed global oil storage levels in detail—explaining that "we've just come off of three years of banner headlines," with "about the all-time highs in storage in the U.S. and globally, 512 million barrels in the U.S., 3.1 billion barrels globally." He described tracking "announcements from OPEC over the last couple of weeks," and noted that producers were attempting to "knock that supply out of the market . . . and eventually start to knock that inventory down." Love also stated the Sponsor was monitoring "Saudi announcements that are propping up the market right now."

243.    In another interview in January 2020, Love further demonstrated that he and USCF management monitored the global supply-and-demand for market forces affecting oil futures. Love identified the coronavirus ***in January 2020*** – well before the February Offering – as "a ***big factor*** in the market" that had already created "some ***concern*** about demand," and that "the ***amount of demand*** that's going to be impacted, [ ] it's ***meaningful***." At the conference, Love also discussed the backwardation environment that USO was in at the time in advance of the extraordinary

- 139 -

contango environment that would develop during the Class Period. Additionally, Love discussed the impact of tariffs on commodities markets and noted that "commodities [in] the first half of 2018 were roaring back" before "the trade war interfere[d]." Indeed, given Love's scrupulous monitoring of the oil markets, he most certainly would have recognized in March 2020 that the Fund had entered a super contango environment, particularly given that USO itself would later admit that contango had "dramatically increased and reached *historic levels*" "*[i]n March 2020*," and due to USO's central role in *causing* the contango itself.

244. In conjunction with thoroughly monitoring the oil markets and their impact on the Fund, the USO Defendants were on notice that USO's huge positions in front month oil futures contracts would likely cause distortions in the markets that would negatively impact shareholders, particularly during roll periods and/or in times of severe economic turmoil. For example, in February 2009, the CFTC launched an investigation into USO for failing to properly report trades that occurred on February 6, 2009 when the Fund rolled its position from the March to the April contract. On March 3, 2010, *The Wall Street Journal* reported, "the fund's *large position* and high trading volume on its monthly roll day was seen by some market participants and regulators as *distorting oil prices*." Unsurprisingly, the CFTC concluded that USO's futures broker failed to properly disclose certain trades and that USCF could be liable.

245. Moreover, the oil price crash in 2014 similarly informed the USO Defendants that rapidly growing the Fund during a period of severe market turmoil could disproportionately influence the markets in which it operates, all but guaranteeing a heightened risk of substantial losses for USO investors. According to the Bureau of Labor Statistics, between June 2014 and January 2015, oil prices dropped over 50% due to an oversupply of petroleum, weakening demand, and OPEC's decision in November 2014 not to cut production levels despite falling oil prices. As oil

prices plummeted, USO swelled dramatically in size. According to a February 9, 2015 article by *VettaFi*, "[o]ver the [ ] trailing six months, USO has seen net *inflows of nearly $2.3 billion*, an incredible stat, especially considering the fund currently has just over $1 billion in assets under management." Over that same period, however, the price of "*USO ha[d] sank nearly 50%*" as the price of oil crashed.

246. The *Financial Times* explicitly connected the 2009 and 2014 episodes to the surge in USO's size during the Class Period, reporting on April 21, 2020, that, "[i]n *March 2020*, the USO fund once again began to mushroom in size as it did back in 2008/9 and again when oil collapsed in 2014," and explaining that dramatic fund growth inevitably results when there is a premium "over and above the indicative net asset value of the fund" that, along with "structural arbitrage mechanisms," "drive[s] creations (and thus fund growth)," as a result of "a desire to offload overpriced ETFs to potentially *unsophisticated investors who don't recognise the mis-valuation*." This, according to the *Financial Times*, was precisely what happened with USO's sudden growth during the Class Period, which "*influence[ed] its underlying markets disproportionately* (*á la* the USO's fund rolls) because the fund [became] the dominant and supporting presence in those markets." Following the 2020 oil collapse, analysts pointed to the 2009 and 2014 episodes as prior instances where the Fund's rapid growth distorted oil markets and harmed investors – paralleling what occurred in 2020.

247. The USO Defendants had proprietary and privileged access to the complex and detailed market information described herein and sophisticated investment tools, which gave them real-time and up-to-date data and analysis about, *inter alia*, crude spot prices, oil storage constraints, oil futures markets, the value of the Fund's holdings, short interests in the Fund, events and uncertainties impacting the price of oil-related securities, market demand for USO shares, the Fund's

- 141 -

performance, market distortions, liquidity, volatility, and the complex convergence of these myriad factors and how they were affecting the Fund and the risks and performance of the Fund during the Class Period.  For example, under a 2006 agreement with NYMEX, as amended in 2011 (and which automatically renews each year), USO and USCF received *confidential market data* during the Class Period, including "settlement prices (on a rolling basis) for the front (or spot) month, and the three months immediately thereafter for . . . NYMEX Light, Sweet Crude Oil (for delivery in Cushing, Oklahoma)."  All such market data and "*other information* that may exist from time to time which is provided to" the Fund by NYMEX, "or to which [USO is] given access by or on behalf of [NYMEX]," is considered "*Confidential Information*" "prior to such information being disclosed to the general public," under §§4.1-4.4 of the agreement, entitled, "CONFIDENTIALITY."  USO pays a licensing fee to NYMEX under the agreement in the amount of 0.015% on all net assets.

211.248.    The USO Defendants were additionally responsible for trading tens of millions of dollars' worth of WTI futures on a daily basis during the Class Period and regularly updated, monitored and analyzed the key metrics and market information impacting the Fund. Indeed, the USO Defendants became a dominant force in the WTI futures market during the Class Period and were able to single-handedly influence WTI futures through their management of USO, providing them with unique insights about the performance and expected performance and risks impacting the Fund.

212.249.    The USO Defendants also maintained regular communication and contact with various market players that provided information to them regarding the function of USO and the markets in which the Fund operated.  These included the counterparties to the Fund's massive futures positions, the Fund's futures commission merchant, various regulatory authorities, custodial

banks, the Fund's marketing agent, brokers, the Authorized Participant Defendants (who regularly redeemed and requested the creation of USO shares) and other market participants who provided the USO Defendants with vast amounts of information regarding the true performance of USO and the events, trends and uncertainties impacting the Fund as they were unfolding. As a result of the USO Defendants' central market role and access to and utilization of proprietary data feeds, vast amounts of relevant market data, daily analysis of the complex and interrelated markets impacting the Fund, sophisticated investment and trading tools, and communication with a diverse range of key market players, the USO Defendants knew or were reckless in not knowing the undisclosed facts detailed in ¶¶65–13872-163.

250.    For example, the USO Defendants maintained regular communications with CME Group (which operates the CME) during the Class Period. On April 22, 2020, Terry Duffy, CEO of the CME Group stated on CNBC, "*we are in constant contact with people at USO* and other large participants *on their accountability levels* of what they are going to do as it gets closer and closer into the delivery mechanism." Through their communications with the CME Group, the USO Defendants had access to nonpublic and specialized information regarding market conditions and participant activity that was unavailable to ordinary investors. These communications would have also alerted the USO Defendants to the CME Group's stated position that its exchanges, including NYMEX, *were not designed for retail investors*, but instead targeted professional investors, at the same time that USO had generated massive inflows during the Class Period from non-professional, individual retail investors seeking exposure to crude oil through easily accessible online and mobile brokerage accounts.

251.    The USO Defendants also had advance notice that NYMEX would facilitate negative pricing in WTI futures contracts through the Fund's relationship with CME Group. For example, on

- 143 -

April 3, 2020, CME Group announced to its CME "Market Data" customers, including USO and USCF, that effective April 5, 2020, futures and options, including crude oil "***will be flagged as eligible to trade at negative prices***." On April 8, 2020, CME Group published an advisory notice which stated that if major energy prices continued to fall towards zero in the following months, CME Clearing (CME Group's clearing house) had a "tested plan to support the possibility of a negative options underlying and enable markets to continue to function normally." The notice specifically mentioned WTI Crude Oil futures for possible negative pricing. Before these issuances, there was market uncertainty as to whether futures exchanges would support oil going negative, *i.e.*, whether oil futures contracts could settle at a price below zero.

252. On April 15, 2020, CME Group sent a memorandum to all clearing member firms – including USO's FCM, RBC – under the subject, "Testing opportunities in CME's 'News Release' Environment for Negative Prices and Strikes for Certain NYMEX Energy Contracts." The memorandum stated, "Support for zero or negative futures and/or strike prices is standard throughout CME systems." It also stated, "[e]ffective immediately, firms wishing to test such negative futures and/or strike prices in their systems may utilize CME's 'News Release' testing environments."

253. Defendant Love had further market insight through his role as a registered representative for defendant ALPS, the marketing agent for USO and other USCF-sponsored funds. According to his FINRA BrokerCheck report, Love has served as a registered representative for ALPS since September 2011 while simultaneously holding senior roles at USCF, including President and CEO. As a registered representative, Love was licensed to engage in the distribution and marketing of USO. In that capacity, he participated in activities including the solicitation of the Authorized Participant Defendants as well as the close monitoring and review of Fund sales and

asset-growth data. These functions provided him with ongoing access to non-public information regarding investor demand, market conditions, and USO trading activity.

213.254. In addition, the USO Defendants had the motive and opportunity to commit fraud and were highly incentivized to induce investors to commit assets to USO by concealing the true risks of such investments. Specifically, the Sponsor – and in turn the USO Officer Defendants – received fees for their management of Fund assets. These management fees were paid monthly at 0.45% per annum of the Fund's average daily net assets. Thus, the profits realized by the Sponsor and the USO Officer Defendants were directly related to the amount of assets invested in USO. As a result, as USO grew substantially in size, average monthly management fees paid by USO to the Sponsor grew in tandem. In March and April 2020 alone, the management fees paid by USO increased *74%* over the average monthly amount paid by the Fund in 2019. Indeed, during the first half of 2020, USO paid $6.3 million in management fees, roughly equal to the amount of management fees paid by the Fund during the *entirety* of 2019. This was despite the fact that investors had suffered over *$2.5 billion* in net losses during this time period, compared to $473 million in net income earned by the Fund in 2019.

255. ALPS also collected fees from USCF for its marketing services on behalf of USO, which meant Love, as a registered representative of ALPS, effectively stood on both sides of the arrangement—receiving compensation from USCF as its President and CEO and generating fee income for ALPS through the distribution of USCF's products as a representative of ALPS. During the extreme market turmoil in April 2020 caused in significant part by USO's own explosive growth and massive holdings in WTI futures contracts – market observers like analyst Jim Collins highlighted these perverse incentives of ALPS and USCF, writing on April 21, 2020, for example,

- 145 -

that USCF was "winning" while "*retail investors are losing . . . [b]ig time*" given the "*huge inflow in management fees*" to USO's sponsor.

214.256.    Furthermore, USO was by far the largest investment fund managed by the USO Defendants, responsible for more than 50% of all Sponsor management fees receivable in 2019. Notably, USO's proportional contribution to the USO Defendants' overall fee income grew in tandem with the Fund's rapid rise in 2020. Thus, USO, which was already the most important single revenue source to the USO Defendants, became even more critical to their overall profit-generating abilities and the central pillar of the record-setting profits enjoyed by the USO Defendants in 2020.

215.257.    The strategy of the USO Defendants to market and grow the Fund was a success. USO grew to become the largest oil-related ETF in existence, and ultimately sold billions of dollars' worth of USO shares to investors during the Class Period, growing the number of USO shares issued and outstanding by *more than 930%*. If the USO Defendants had disclosed the true events, trends and uncertainties impacting the Fund during the Class Period, the Sponsor and USO Officer Defendants would have received substantially less fees because Lead Plaintiff and the Class would have paid less to invest in the Fund or refused to invest in USO entirely.

**B.    Loss Causation and Economic Loss**

216.258.    As detailed herein, the USO Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the prices of USO securities and operated as a fraud or deceit on purchasers of USO securities. As detailed above, when the truth about the USO Defendants' misconduct was revealed, the value of USO securities declined precipitously as the prior artificial inflation no longer propped up the prices of such securities. The declines in the prices of USO securities were the direct result of the nature and extent of Defendants' fraud finally being revealed to investors and the market. The timing and magnitude of the share price declines negate any inference that the losses suffered by Lead Plaintiff and members of the Class were caused by

- 146 -

changed market conditions, macroeconomic or industry factors or Fund-specific facts unrelated to the Defendants' fraudulent conduct. The economic loss, *i.e.*, damages, suffered by Lead Plaintiff and members of the Class was a direct result of the USO Defendants' fraudulent scheme to artificially inflate the prices of USO securities and the subsequent significant decline in the value of the Fund's securities when the USO Defendants' prior misrepresentations and other fraudulent conduct were revealed.

217.259.    At all relevant times, the USO Defendants' materially false and misleading statements or omissions alleged herein directly or proximately caused the damages suffered by Lead Plaintiff and the members of the Class. Those statements were materially false and misleading through their failure to disclose a true and accurate picture of the Fund's performance, business, risks and operations, as alleged herein. Before and during the time of Lead Plaintiff's and Class members' purchases of USO securities, the USO Defendants issued materially false and misleading statements and omitted material facts necessary to make those statements not false or misleading, causing the prices of USO securities to be artificially inflated. Lead Plaintiff and members of the Class purchased USO securities at those artificially inflated prices, causing them to suffer damages as complained of herein. Specifically, from February 24, 2020 to April 28, 2020, the price of USO shares declined more than 80%.

218.260.    The following chart illustrates the precipitous decline in the price of USO shares as a direct result of the USO Defendants' violations of the federal securities laws as complained of herein:



### C.    Applicability of Presumption of Reliance: Fraud-on-the-Market Doctrine

~~219.~~261.    At all relevant times, USO securities traded in an efficient market for the following reasons, among others:

(a)    USO shares met the requirements for listing and were listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    as a regulated issuer, USO filed periodic public reports with the SEC;

(c)    the USO Defendants regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet and other wide-ranging public disclosures; and

(d)    unexpected material news about the Fund was rapidly reflected in and incorporated into the price of the Fund's securities.

~~220.~~262.    As a result of the foregoing, the market for USO securities promptly digested current information regarding the Fund from publicly available sources and reflected such

information in the prices of USO securities.  Under these circumstances, a presumption of reliance applies to Lead Plaintiff's and Class members' purchases of Fund securities.

221.263.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Lead Plaintiff's claims are based, in significant part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Fund's business, operations and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the USO Defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

### D.    No Safe Harbor

222.264.    The USO Defendants' false or misleading statements alleged to be actionable herein were not forward-looking statements ("FLS"), or were not identified as such by Defendants, but rather, were statements of historical and present fact, and thus did not fall within any "Safe Harbor."  Any purported "Safe Harbor" warnings accompanying any of the USO Defendants' FLS failed to provide meaningful cautionary statements regarding the specific facts and circumstances facing the Fund, and thus were ineffective to shield those statements from liability.

223.265.    The USO Defendants are also liable for any false or misleading FLS pleaded because, at the time each FLS was made, the speaker knew the FLS was false or misleading and the FLS was authorized and/or approved by an executive officer of USO or the Sponsor who knew that the FLS was false.  Further, none of the historic or present tense statements made by Defendants were assumptions underlying or relating to any plan, projection or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made.

## ~~COUNT III~~COUNT III

**For Violation of §10(b) of the 1934 Act and Rule 10b-5**
**Against the USO Defendants**

Formatted: Heading 7

~~224.~~266.    Lead Plaintiff incorporates herein ¶¶1-~~187~~217 and ¶¶~~207-223~~237-265 by reference.

~~225.~~267.    The USO Defendants disseminated or approved the false or misleading statements specified above, which they knew or recklessly disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

~~226.~~268.    These Defendants violated Section 10(b) of the 1934 Act and Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and Class members in connection with their purchases of USO securities.

~~227.~~269.    Lead Plaintiff and the other members of the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for USO securities.  Lead Plaintiff and the other members of the Class would not have purchased USO securities at the prices paid, or at all, had they been aware that the market prices were artificially and falsely inflated by the USO Defendants' misleading statements.

~~228.~~270.    As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the Class suffered damages in connection with their purchases of USO securities.

- 150 -

**COUNT IV<u>COUNT IV</u>**

**For Violation of §20(a) of the 1934 Act**
**Against the Sponsor and the Individual Defendants**

229.271.    Lead Plaintiff incorporates herein ¶¶1-187217 and ¶¶207-228237-270 by reference.

230.272.    The Sponsor and the Individual Defendants were control persons of USO within the meaning of Section 20(a) of the 1934 Act.

231.273.    By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of USO's operations and/or intimate knowledge of the false and misleading statements filed by USO with the SEC and disseminated to the investing public, the Sponsor and the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of USO, including the content and dissemination of the various statements Lead Plaintiff contends are false and misleading.  The Sponsor and the Individual Defendants were additionally provided with, or had unlimited access to, copies of USO's reports, press releases, public filings and other statements alleged by Lead Plaintiff to be misleading before and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

232.274.    In addition, the Individual Defendants were each control persons of the Fund and the Sponsor by virtue of their positions as directors, senior officers and/or principals of the Fund or the Sponsor.  USO had no executive officers, and its affairs were entirely managed and controlled by the Individual Defendants and the Sponsor.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or principals of the Fund and/or the Sponsor.

- 151 -

233.275.    The Sponsor meanwhile controlled the Fund as its commodity pool operator and investment manager.  The Sponsor also controlled the Individual Defendants and all of its employees.

234.276.    The Defendants named herein each were culpable participants in the violations of Section 10(b) of the 1934 Act alleged in the Count above, based on their making of the materially false and misleading statements described herein and otherwise taking actions which facilitated the USO Defendants' fraudulent scheme and allowed it to be successfully completed.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment, as follows:

A.    A.    Determining that this action is a proper class action, certifying Lead Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Lead Counsel;

B.    B.    Awarding Lead Plaintiff and the Class compensatory damages at an amount to be determined at trial and pre-judgment and post-judgment interest thereon;

C.    C.    Awarding Lead Plaintiff's reasonable costs and expenses, including attorneys' fees; and

D.    D.    Awarding such other relief as the Court may deem just and proper.

### JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED:  November 30, 2020 _____ , 2025        ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
VINCENT M. SERRADAVID A. ROSENFELD
VINCENT M. SERRA


/s/ Samuel H. Rudman
SAMUEL H. RUDMAN



58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
vserra@rgrdlaw.com

ROBBINS GELLER RUDMAN
    & DOWD LLP
BRIAN E. COCHRAN
200 South Wacker Drive, 31st Floor
Chicago, IL 60606
Telephone: 312/674-4674
312/674-4676 (fax)
bcochran@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

BRONSTEIN, GEWIRTZ & GROSSMAN, LLC
PERETZ BRONSTEIN
EITAN KIMELMAN
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: 212/697-6484
212/697-7296 (fax)
peretz@bgandg.com
eitan@bgandg.com

*Additional Counsel for Plaintiff*

- 153 -

CERTIFICATE OF
SERVICE

I, Samuel H. Rudman, hereby certify that on November 30, 2020, I authorized a true and correct copy of the foregoing document to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such public filing to all counsel registered to receive such notice.

/s/ Samuel H. Rudman
SAMUEL H. RUDMAN